**FILED**

**February 07, 2011**

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0003265465

1

Holly S. Burgess (State Bar No. 104575)
LAW OFFICES OF HOLLY S. BURGESS

2

680 Auburn-Folsom Road, Suite 109
Auburn, CA 95603

3

(530) 889-8900-Telephone
(530) 392-4641-Direct Dial

4

(530) 889-8988-Facsimile
hollyburgess@lohsb.com

5

6

Attorneys for Plaintiff/Debtor
JAMES L. MACKLIN

7

8

### UNITED STATES BANKRUPTCY COURT

9

### EASTERN DISTRICT OF CALIFORNIA

10

In re

11

JAMES L. MACKLIN,

12

Debtor,

13

_____

JAMES L. MACKLIN,

14

Plaintiff,

15

-vs.-

16

DEUTSCHE BANK NATIONAL TRUST

17

CO., AS INDENTURE TRUSTEE FOR
THE ACCREDITED MORTGAGE LOAN

18

TRUST 2006-2 ASSET-BACKED NOTES;
and all persons claiming by, through, or

19

under such person, all persons unknown,
claiming any legal or equitable right, title,

20

estate, lien, or interest in the property
described in the complaint adverse to

21

Debtor's title thereto; and
CORRESPONDENT DOES 1-10, Inclusive,

22

Defendants.

23

_____

**CASE NO. 2010-44610**

**CHAPTER 7**

**ADV. NO. 11-02024-E**

**DCN: HSB-01**

**EXHIBITS 1 -5 IN SUPPORT OF *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF JAMES L. MACKLIN IN SUPPORT THEREOF**

24

25

26

27

/ / / /

28

-1-

*EXHIBITS TO EX PARTE APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION*

1

2

**EXHIBIT INDEX:**

3    Exhibit 1:          Interest Only Note
4                              (Total pages 9)

5    Exhibit 2:          Deed of Trust
6                              (Total pages 18)

7    Exhibit 3:          Substitution of Trustee
8                              (Total pages 16)

9    Exhibit 4A-4D:   Accredited Mortgage Loan Trust 2006-2
10                            Asset-Backed Notes, Series 2006-3
                               (Total pages 237 – Bates Numbers 000001-000233)

11   Exhibit 5:          Master Sales and Servicing Agreement
12                            (Total pages 66 – Bates Numbers 000234-000298)

13       Attached hereto and incorporated herein by this reference are **Exhibits 1 through 5**

14   of Plaintiff's ***EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING**

15   **ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION;**

16   **MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATION OF**

17

18   **JAMES L. MACKLIN IN SUPPORT THEREOF.**

19    Dated:  February 7, 2011          LAW OFFICES OF HOLLY S. BURGESS
20

21                                              By     /s/ Holly S. Burgess                              .
22                                                     Holly S. Burgess
                                                       Attorney for Plaintiff/Debtor

23

24

25

26

27

28

*In re Debtor:  James L Macklin-  Chapter 7*

**USBC Eastern District of California Case No:  10-44610**
**Adversary No. 11-02024-E**
**NOTICE OF APPLICATION AND *EX PARTE* APPLICATION FOR TEMORARY RESTRAINING ORDER AND**
**ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

**EXHIBIT "1"**

# Interest Only NOTE

This is certified to be a true and correct copy of the original.

_____  CA
Financial Title Company

April 14, 2006  AUBURN  CA
[Date]  [City]  [State]

10040 WISE ROAD
AUBURN, CA 95603
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 532,000.00   (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **Accredited Home Lenders, Inc.**
**A California Corporation**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of   **6.125 %.**

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month. This payment will be for interest only for the first **60** months (unless I make a partial Prepayment, as described in Section 4 of this Note), and then will consist of principal and interest.

I will make my monthly payment on the **1st**   day of each month beginning on **June 01, 2006**   . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due-date, and if the payment includes both principal and interest it will be applied to interest before Principal. If, on **May 01, 2036**   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at   **P.O. Box 502480 San Diego, CA 92150-2480**
or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 2,715.42   for the first **60**   months of this Note, and thereafter will be in the amount of U.S. $ 3,468.45   . The Note Holder will notify me prior to the date of change in monthly payment.

## 4. BORROWER'S RIGHT TO PREPAY  - Prepayment Charge Rider attached hereto.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in

0603307230

MULTISTATE InterestFirst FIXED RATE NOTE-Single Family-Fannie Mae UNIFORM INSTRUMENT

-B36N (0210)   Form 3271 1/01
VMP MORTGAGE FORMS - (800)521-7291
Page 1 of 3   Initials

writing to those changes; however, the principal and the interest required under this Note will be paid prior to the Maturity Date.

If I make a partial Prepayment during the first **60** months of this Note, a portion of any subsequent monthly payment that I make may be applied to reduce the Principal amount of the Note.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **10** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **6.000 %** of my overdue payment of interest and/or principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

0603307230

Form 327/ 1/01

Initials:






## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
JAMES LEN MACKLIN                        -Borrower                                                        -Borrower


_____ (Seal)          _____ (Seal)
                                                 -Borrower                                                        -Borrower


_____ (Seal)          _____ (Seal)
                                                 -Borrower                                                        -Borrower


_____ (Seal)          _____ (Seal)
                                                 -Borrower                                                        -Borrower


*[Sign Original Only]*

0603307230

-836N (0210)                    Page 3 of 3                    Form 3271 1/01

# PREPAYMENT CHARGE RIDER TO NOTE

THIS PREPAYMENT CHARGE RIDER TO NOTE is made this 14th day of April, 2006, and is incorporated into and shall be deemed to amend and supplement the Note or Adjustable Rate Note, as applicable (the "Note"), of the same date given by the undersigned Borrower(s) to Accredited Home Lenders, Inc., A California Corporation.

## NOTICE TO THE BORROWER

**DO NOT SIGN THIS PREPAYMENT CHARGE RIDER TO NOTE BEFORE YOU READ IT.   THIS PREPAYMENT CHARGE RIDER TO NOTE PROVIDES FOR THE PAYMENT OF A PENALTY IF YOU WISH TO REPAY THE NOTE PRIOR TO THE DATE PROVIDED FOR REPAYMENT IN THE NOTE.**

**The provisions of this Prepayment Charge Rider to Note are authorized by applicable state law or the federal Alternative Mortgage Transaction Parity Act of 1982, 12 U.S.C. §§ 3801 et seq.**

## PREPAYMENT CHARGE

I/we may make a full prepayment or partial prepayments.  However, if the aggregate amount of the prepayment(s) made during any twelve (12) month period within Sixty(60) months of the date of the Note exceeds twenty percent (20%) of the original principal amount of the Note, then as consideration for the acceptance of such prepayment(s), I/we agree to pay the holder of the Note a sum equal to six (6) months' interest on the amount by which such prepayment(s) exceed twenty percent (20%) of the original principal amount of the Note.  Any prepayments made after said initial Sixty (60) month period shall not be subject to any prepayment charge.

I/we confirm that, prior to the closing of this mortgage loan, I/we were offered the option of obtaining a mortgage loan that did not require payment of a prepayment charge and that I/we are agreeing to this prepayment charge in exchange for a monetary benefit, including but not limited to a rate or fee reduction.

_____    4·19·06      _____
Borrower              Date          Borrower                    Date
JAMES LEN MACKLIN

_____            _____
Borrower              Date          Borrower                    Date

_____            _____
Borrower              Date          Borrower                    Date

_____            _____
Borrower              Date          Borrower                    Date

# Interest Only NOTE

*This is certified to be a true and correct copy of the original.*

April 14, 2006
[Date]

AUBURN
[City]

CA
[State]

~~Financial Title Company~~

10040 WISE ROAD
AUBURN, CA 95603
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 532,000.00       (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is  Accredited Home Lenders, Inc.
A California Corporation

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of        6.125 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will make a payment every month. This payment will be for interest only for the first 60 months (unless I make a partial Prepayment, as described in Section 4 of this Note), and then will consist of principal and interest.

I will make my monthly payment on the 1st       day of each month beginning on June 01, 2006        . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date, and if the payment includes both principal and interest it will be applied to interest before Principal. If, on May 01, 2036        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at        P.O. Box 502480 San Diego, CA  92150-2480
or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 2,715.42        for the first 60        months of this Note, and thereafter will be in the amount of U.S. $ 3,468.45        . The Note Holder will notify me prior to the date of change in monthly payment.

## 4. BORROWER'S RIGHT TO PREPAY  - Prepayment Charge Rider attached hereto.

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in

0603307230

MULTISTATE InterestFirst FIXED RATE NOTE-Single Family-Fannie Mae UNIFORM INSTRUMENT

VMP -836N (0210)
VMP MORTGAGE FORMS - (800)521-7291

Form 3271 1/01

Page 1 of 3

Initials

writing to those changes; however, the principal and the interest required under this Note will be paid prior to the Maturity Date.

If I make a partial Prepayment during the first 60 months of this Note, a portion of any subsequent monthly payment that I make may be applied to reduce the Principal amount of the Note.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 10 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 6.000% of my overdue payment of interest and/or principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE.

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
JAMES LEN MACKLIN   -Borrower                                     -Borrower

_____ (Seal)      _____ (Seal)
-Borrower                                                   -Borrower

_____ (Seal)      _____ (Seal)
-Borrower                                                   -Borrower

_____ (Seal)      _____ (Seal)
-Borrower                                                   -Borrower

*[Sign Original Only]*

0603307230

 -836N (0210)      Page 3 of 3      Form 3271 1/01

# PREPAYMENT CHARGE RIDER TO NOTE

THIS PREPAYMENT CHARGE RIDER TO NOTE is made this 14th day of April, 2006, and is incorporated into and shall be deemed to amend and supplement the Note or Adjustable Rate Note, as applicable (the "Note"), of the same date given by the undersigned Borrower(s) to Accredited Home Lenders, Inc., A California Corporation.

### NOTICE TO THE BORROWER

**DO NOT SIGN THIS PREPAYMENT CHARGE RIDER TO NOTE BEFORE YOU READ IT. THIS PREPAYMENT CHARGE RIDER TO NOTE PROVIDES FOR THE PAYMENT OF A PENALTY IF YOU WISH TO REPAY THE NOTE PRIOR TO THE DATE PROVIDED FOR REPAYMENT IN THE NOTE.**

**The provisions of this Prepayment Charge Rider to Note are authorized by applicable state law or the federal Alternative Mortgage Transaction Parity Act of 1982, 12 U.S.C. §§ 3801 et seq.**

## PREPAYMENT CHARGE

I/we may make a full prepayment or partial prepayments. However, if the aggregate amount of the prepayment(s) made during any twelve (12) month period within Sixty(60) months of the date of the Note exceeds twenty percent (20%) of the original principal amount of the Note, then as consideration for the acceptance of such prepayment(s), I/we agree to pay the holder of the Note a sum equal to six (6) months' interest on the amount by which such prepayment(s) exceed twenty percent (20%) of the original principal amount of the Note. Any prepayments made after said initial Sixty (60) month period shall not be subject to any prepayment charge.

I/we confirm that, prior to the closing of this mortgage loan, I/we were offered the option of obtaining a mortgage loan that did not require payment of a prepayment charge and that I/we are agreeing to this prepayment charge in exchange for a monetary benefit, including but not limited to a rate or fee reduction.

| | | | |
|---|---|---|---|
| _Borrower_   **4·19·06** | Date | Borrower | Date |
| JAMES LEN MACKLIN | | | |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |
| Borrower | Date | Borrower | Date |

**Standard - 5 yrs**
**CA 1st & 2nd - 5 yrs**
**KS 1st & 2nd - 5 yrs**

MIN # 100176106033072308      MACKLIN      Loan # 0603307230

AHL PPR-STD.UFF      Page 1 of 1

*In re Debtor:  James L Macklin-  Chapter 7*

**USBC Eastern District of California Case No:  10-44610**

**Adversary No. 11-02024-E**

**NOTICE OF APPLICATION AND *EX PARTE* APPLICATION FOR TEMORARY RESTRAINING ORDER AND**

**ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

**EXHIBIT "2"**

Recording Requested By:
**Accredited Home Lenders, Inc.**
**A California Corporation**
Return To:
Accredited Home Lenders, Inc.
.Attn: Post Closing Dept.
16550 West Bernardo Dr. Bldg 1
San Diego, CA 92127-1870

PLACER, County Recorder
JIM MCCAULEY
**DOC- 2006-0046431**
Acct 212-FINANCIAL TITLE COMPANY
Friday, APR 28, 2006 14:30:00
MIC   $3.00:AUT   $17.00:SBS   $16.00
REC   $19.00:
Ttl Pd   $55.00      Nbr-0001476398
               baj/BJ/1-17

Prepared By:
Accredited Home Lenders, Inc.
A California Corporation
15090 Avenue of Science
San Diego, CA 92128

RECORDING REQUESTED BY·
FINANCIAL TITLE COMPANY
∠651584265-823

————————[Space Above This Line For Recording Data]————————

# DEED OF TRUST

MIN 100176106033072308

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

(A) "**Security Instrument**" means this document, which is dated April 14, 2006
together with all Riders to this document.
(B) "**Borrower**" is JAMES LEN MACKLIN, A MARRIED MAN AS HIS SOLE AND SEPARATE
PROPERTY.

Borrower's address is 10040 WISE ROAD
AUBURN, CA 95603        . Borrower is the trustor under this Security Instrument.
(C) "**Lender**" is Accredited Home Lenders, Inc.
           A California Corporation
Lender is a Corporation
organized and existing under the laws of the State of California

0603307230

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS      Form 3005 1/01

VMP®-6A(CA) (0207)
Page 1 of 15      Initials:
     VMP MORTGAGE FORMS - (800)521-7291

4.

Lender's address is **15090 Avenue of Science**
San Diego, CA 92128
(D) "Trustee" is **FINANCIAL TITLE COMPANY**

(E) "**MERS**" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "**Note**" means the promissory note signed by Borrower and dated **April 14, 2006**
The Note states that Borrower owes Lender **five hundred thirty-two thousand and 00/100**
Dollars

(U.S. $ **532,000.00**         ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **May 1, 2036**

(G) "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(H) "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) "**Riders**" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(J) "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) "**Escrow Items**" means those items that are described in Section 3.

(N) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

0603307230

-6A(CA) (0207)                    Page 2 of 15            Initials:          Form 3005  1/01

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

County                                         of                          **PLACER**                           :
[Type of Recording Jurisdiction]                              [Name of Recording Jurisdiction]

**See Legal Description Addendum Page Attached**

Parcel ID Number: **040-040-046**                              which currently has the address of
**10040 WISE ROAD**                                                                                     [Street]
**AUBURN**                                              [City], California  **95603**          [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

                                                                                        0603307230

VMP -6A(CA) (0207)                          Page 3 of 15          Initials:                    Form 3005  1/01

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

-6A(CA) (0207)                    Page 4 of 15                    0603307230
                                                                 Form 3005  1/01

Initials:

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

0603307230

Initials:

-6A(CA) (0207)                    Page 5 of 15                    Form 3005  1/01

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

Initials

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

-6A(CA) (0207)                Page 8 of 15         Initials_____        0603307230

Form 3005  1/01



(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

0603307230

Initials

-6A(CA) (0207)          Page 9 of 15          Form 3005  1/01

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

0603307230

-6A(CA) (0207)    Page 10 of 15    Initials:    Form 3005  1/01

Branch :F09,User :3031                                    Comment:                                    Station Id :OXBZ

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

-6A(CA) (0207)                          Page 11 of 15                          Initials: ____

0603307230

Form 3005  1/01

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials

0603307230

-6A(CA) (0207)                     Page 12 of 15                              Form 3005   1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

0603307230

-6A(CA) (0207)                Page 13 of 15          Initials         Form 3005 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____        _____ (Seal)
                                 JAMES KEN MACKLIN                    -Borrower

_____        _____ (Seal)
                                                                     -Borrower

_____ (Seal)  _____ (Seal)
                 -Borrower                           -Borrower

_____ (Seal)  _____ (Seal)
                 -Borrower                           -Borrower

_____ (Seal)  _____ (Seal)
                 -Borrower                           -Borrower

0603307230

-6A(CA) (0207)                Page 14 of 15                Form 3005   1/01

State of California
County of   Placer

On   4/19/06                        before me, Desiree Vincent, Notary Public
                                                            personally appeared
JAMES LEN MACKLIN

} ss.

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

DESIREE VINCENT
Comm. # 1531564
NOTARY PUBLIC-CALIFORNIA
Sacramento County
My Comm. Expires Dec. 3, 2008

_____  (Seal)

Initials:

0603307230

-6A(CA) (0207)                    Page 15 of 15                    Form 3005  1/01

## LEGAL DESCRIPTION ADDENDUM

| Borrower Name(s): JAMES LEN MACKLIN | Lender: Accredited Home Lenders, Inc. A California Corporation 15090 Avenue of Science San Diego, CA 92128 |
|---|---|
| | Loan #: 0603307230 |

**Property Address:**
10040 WISE ROAD
AUBURN, CA 95603

**Legal Description:**
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.

Initials

MIN # 100176106033072308          MACKLIN          Loan #    0603307230
AHL 610101.UFF                    Page 1 of 1

42518842 -823 -MFP

## Legal Description

All that certain real property situated in the County of Placer, State of California, described as follows:

A portion of the East half of Section 18, Township 12 North, Range 8 East, M.D.M., being also a portion of the tract of land shown and designated as Parcel "A", as shown on the Map entitled, "Parcel Map No. 70586", filed for record December 14, 1973, in Book 5 of Parcel Maps, Page 16, described as:

Beginning at the North corner of the parcel of land described hereby, being a point identical with the North corner of the land shown and designated Parcel "A" on the above mentioned Parcel Map; thence along the boundary of said Parcel "A" on the following three consecutive courses: (1) South 43° 50' East 129.81 feet, (2) South 55° 26' East 170.19 feet to the East corner thereof, and (3) South 21° 41' 20" West for a distance of 390.00 feet; thence North 68° 18' 40" West 394.28 feet to a point on the Northwesterly boundary line of the land shown and designated as Parcel "A" on the above mentioned Parcel Map; thence along the Northwesterly boundary of said Parcel "A" on the following two courses: (1) North 27° 51' East for a distance of 261.39 feet and (2) North 42° 01' East 236.57 feet to the point of beginning.

040-040-046

*In re Debtor:  James L Macklin-  Chapter 7*
**USBC Eastern District of California Case No:  10-44610**
**Adversary No. 11-02024-E**
**NOTICE OF APPLICATION AND *EX PARTE* APPLICATION FOR TEMORARY RESTRAINING ORDER AND**
**ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

**EXHIBIT "3"**

Recording Requested B, Title Court Service

Recording requested by:

When recorded mail to:
Windsor Management, Co.
15253 Avenue of Science
San Diego, CA 92128

PLACER, County Recorder
JIM MCCAULEY
DOC- 2009-0018889-00
Acct 100-TITLE COURT SERVICE,INC
Tuesday, MAR 10, 2009 09:31:54
MIC   $3.00:AUT   $3.00:SBS   $2.00
ERD   $1.00:RED   $1.00:REC   $5.00
Ttl Pd   $15.00   Rcpt # 0001893924
                          J1f/JL/1-3

Space above this line for recorders use

TS # CA-08-01507-CS          Order # 080122247-CA-LGI          Loan # 060330723C

## Substitution of Trustee

WHEREAS, JAMES LEN MACKLIN, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY was the original Trustor, FINANCIAL TITLE COMPANY was the original Trustee, and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR ACCREDITED HOME LENDERS, INC., A CALIFORNIA CORPORATION was the original Beneficiary under that certain Deed of Trust dated 4/14/2006 and recorded on 4/28/2006 as Instrument No. 2006-0046431, in book xxx, page xxx of Official Records of PLACER County, CA; and

WHEREAS, the undersigned is the present Beneficiary under said Deed of Trust, and

WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in place and stead of said original Trustee, or Successor Trustee, thereunder, in the manner provided for in said Deed of Trust,

NOW, THEREFORE, the undersigned hereby substitutes Windsor Management Co.,as Trustee under said Deed of Trust.

Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

Page 1

Dated: 1/30/08

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS,
INC., AS NOMINEE FOR ACCREDITED HOME LENDERS,
INC., A CALIFORNIA CORPORATION

By:    Joseph Sanfilippo

State of CALIFORNIA             )
County of SAN DIEGO             )

On _MARCH 4_____, 20_09_ before me, _____Christiana Juarez_____, personally
appeared _JOSEPH SANFILIPPO_____, who proved to me on the basis of satisfactory
evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their
signature(s) in the instrument the person(s), or the entity upon behalf of which person(s) acted, executed
the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.



CHRISTIANA JUAREZ
Commission # 1725861
Notary Public - California
San Diego County
My Comm. Expires Feb 18, 2011

Signature _____

2

# Affidavit of Mailing
## for Substitution of Trustee By Code

TS No.: **CA-08-01507-CS**

Trustor: JAMES LEN MACKLIN, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY

I, Cindi Stewart, declare: That I am an officer, agent or employee of **Windsor Management Co.** whose business address is:

15253 Avenue of Science
San Diego, CA 92128

I am over the age of eighteen years; On 3/9/2009, by Certified and First Class mail, enclosed in a sealed envelope with postage fully prepaid, I deposited in the United States Mail, a copy of the attached Substitution of Trustee to the trustee of record under the Deed of Trust described in said Substitution, and;

A copy of the attached Substitution has been mailed prior to the recording thereof, in the manner provided in Section 2924(b) of the Civil Code of the State of California to all persons to whom a copy of the Notice of Default would be required to be mailed by the provisions of said section.

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 3/9/2009

Cindi Stewart

3

Recording Requested By:
Title Court Service

PLACER, County Recorder
JIM MCCAULEY
**DOC- 2009-0101490-00**
Acct 100-TITLE COURT SERVICE,INC
Wednesday, NOV 25, 2009 08:52:08
MIC    $3.00|AUT    $3.00|SBS    $2.00
ERD    $1.00|RED    $1.00|REC    $5.00
Ttl Pd    $15.00      Rcpt # 0001995323
                              ocg/CG/1-3

Recording requested by:

When recorded mail to:

Quality Loan Service Corp.
2141 5th Avenue
San Diego, CA 92101
619-645-7711

---

Space above this line for recorders use

TS # CA-09-304774-RT        Order # 090576095-CA-DCI
MERS MIN No.:
100176106033072308

## Substitution of Trustee

WHEREAS, JAMES LEN MACKLIN , A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY was the original Trustor, FINANCIAL TITLE COMPANY was the original Trustee, and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR ACCREDITED HOME LENDERS, INC. A CALIFORNIA CORPORATION A CORPORATION was the original Beneficiary under that certain Deed of Trust dated 4/14/2006 and recorded on 4/28/2006 as Instrument No. 2006-0046431, in book xxx, page xxx of Official Records of PLACER County, CA; and

WHEREAS, the undersigned is the present Beneficiary under said Deed of Trust, and

WHEREAS, the undersigned desires to substitute a new Trustee under said Deed of Trust in place and stead of said original Trustee, or Successor Trustee, thereunder, in the manner provided for in said Deed of Trust,

NOW, THEREFORE, the undersigned hereby substitutes QUALITY LOAN SERVICE CORPORATION ,as Trustee under said Deed of Trust.

Whenever the context hereof so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural.

"This instrument is being recorded as an ACCOMMODATION ONLY, with no Representation as to its effect upon title"

Page 1

4

Substitution of Trustee - CA
TS # CA-09-304774-RT
Page 2

Dated:

8-21-09

Deutsche Bank National Trust Company, as Indenture
Trustee, on behalf of the holders of the Accredited
Mortgage Loan Trust 2006-2 Asset Backed Notes by
Select Portfolio Servicing, Inc as Attorney in Fact

By: _____

Wayne Hessler
**Duly Appointed Officer**

State of Minnesota
County of Dakota )

On _____8-21-09_____ Date before me, ____**Mark Bischof**____ a notary public,  personally
appeared _____Wayne Hessler_____ who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s),
or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of ____MN____
that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

MARK BISCHOF
NOTARY PUBLIC · MINNESOTA
MY COMMISSION
EXPIRES JAN. 31, 2013

See Attached "Exhibit A"

5

## Affidavit of Mailing
## for Substitution of Trustee By Code

TS No.: **CA-09-304774-RT**

Trustor: JAMES LEN   MACKLIN , A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY

I, Ryan McKenzie, declare: That I am an employee of **Quality Loan Service Corp.**, an agent for beneficiary, whose business address is:

> 2141 5th Avenue
> San Diego, CA 92101

I am over the age of eighteen years and in accordance with California Civil Code Section 2934, I caused a copy of the attached Substitution of Trustee to be mailed, in the manner provided in Section 2924(b) of the Civil Code of the State of California, to the trustee of record under the Deed of Trust described in said Substitution and to all persons to whom a copy of the Notice of Default would be required to be mailed by the provisions of said section.

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed at San Diego, CA on 11/23/2009.

/s/ _____

Ryan McKenzie

Recording Requested By:
Title Court Service

Recording Requested By:
SELECT PORTFOLIO SERVICING, INC.

When Recorded Return To:

BILL KOCH
SELECT PORTFOLIO SERVICING, INC
3815 SW TEMPLE
SALT LAKE CITY, UT 84115

090576095

PLACER, County Recorder
JIM MCCAULEY
DOC- 2009-0101918-00
Acct 100-TITLE COURT SERVICE,INC
Monday, NOV 30, 2009 08:00:00
MIC   $3.00:AUT   $2.00:SBS   $1.00
ERD   $1.00:RED   $1.00:REC   $4.00
Ttl Pd   $12.00   Rcpt # 0001995884
                                    jlc/JC/1-2

## CORPORATE ASSIGNMENT OF DEED OF TRUST

Placer, California   SELLER'S SERVICING #: 0011896883   "MACKLIN"
INVESTOR #: U20
MERS #: 100176106033072308

For Value Received, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR
ACCREDITED HOME LENDERS, INC., A CALIFORNIA CORPORATION, A CORPORATION hereby grants, assigns
and tranfers to DEUTSCHE BANK NATIONAL TRUST COMPANY, AS INDENTURE TRUSTEE, ON BEHALF OF
THE HOLDERS OF THE ACCREDITED MORTGAGE LOAN TRUST 2006-2 ASSET BACKED NOTES  at 3815 SW
TEMPLE, SALT LAKE CITY, UT 84115 all beneficial interest under that certain Deed of Trust dated 04/14/2006 , in
the amount of $532,000.00, executed by JAMES LEN MACKLIN, A MARRIED MAN AS HIS SOLE AND SEPARATE
PROPERTY. to MERS AS NOMINEE FOR ACCREDITED HOME LENDERS, INC. A CALIFORNIA CORPORATION
and Recorded: 04/28/2006 as Instrument No.: 2006-0046431 in Placer County , State of California

 Together with the note or notes therein described or referred to, in said Deed of Trust, the money due and to
become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust.

In witness whereof this instrument is executed.

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR ACCREDITED HOME
LENDERS, INC., A CALIFORNIA CORPORATION, A CORPORATION
On 28 NOV 17 2009         ⊗ Nov 17 2009

_____
Bill Koch, Assistant Secretary

[SEAL: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. CORPORATE SEAL 1999 DELAWARE]

*This instrument is being recorded as an
ACCOMMODATION ONLY, with no
Reoresentation as to its effect upon title*

STATE OF Utah
COUNTY OF Salt Lake

On _____, before me, SHIRLEY TUITUPOU, a Notary Public in and for Salt Lake in the State of Utah,
personally appeared Bill Koch, Assistant Secretary, MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
AS NOMINEE FOR ACCREDITED HOME LENDERS, INC., A CALIFORNIA CORPORATION, A CORPORATION,
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,     ⊗ Public in and
                                         for Salt Lake
_____
SHIRLEY TUITUPOU
Notary Expires: 11/12/2012 #576792

[SEAL: SHIRLEY TUITUPOU
Notary Public State of Utah
My Commission Expires on:
November 12, 2012
Comm. Number: 576792]

(This area for notarial seal)

*SOM*SOMAMRC*11/13/2009 03:55:27 PM* AMRC83AMRC00000000000000000381430* CAPLACE* 0011896883 CASTATE_TRUST_ASSIGN_ASSN *ACK*ACKAMRC*

# CERTIFICATE OF ILLEGIBILITY
Government Code 27361.7

I certify under penalty of perjury under the laws of the State of California that the Notary Seal on the document to which this statement is attached reads as follows:

Name of Notary: _Shirley Tuitupou_

Date Commission Expires: _11/12/12_

Commission Number: _576792_

County of Commission: _Salt Lake_

State of Commission: _Utah_

Manufacturer Number: _____
(In California this number is on the left and right side of the seal.)

Place of Execution: _Auburn, Ca_

Signature: _____ Date: _11/30/09_

Recording Requested by
Title Court Service

PLACER, County Recorder
JIM MCCAULEY
**DOC- 2009-0108075-00**
Acct  100-TITLE COURT SERVICE,INC
**Monday, DEC 21, 2009 09:13:15**
MIC   $3.00:AUT    $2.00:SBS    $1.00
ERD   $1.00:RED    $1.00:REC    $4.00
Ttl Pd    $12.00        Rcpt # 0002003286
                                    smm/SM/1-2

Trustee's Deed Upon Sale

1 | Page

Recording requested by:

When recorded mail to:

Select Portfolio Servicing, Inc.
3815 S.W. Temple
Salt Lake City, UT 84115-4412

Forward tax statements to the address given above

Space above this line for recorders use

TS # CA-09-304774-RT          Order # 090576095-CA-DCI

# Trustee's Deed Upon Sale

A.P.N.: **040-040-046**                     Transfer Tax: **$0.00**

The undersigned grantor declares:
The grantee herein **IS** the foreclosing beneficiary.
The amount of the unpaid debt together with costs was:     **$623,986.20**
The amount paid by the grantee at the trustee sale was:    **$342,550.24**
The documentary transfer tax is:                           None
Said property is in the City of:  AUBURN, County of PLACER

**QUALITY LOAN SERVICE CORPORATION** , as Trustee, (whereas so designated in the Deed of Trust hereunder more particularly described or as duly appointed Trustee) does hereby **GRANT** and **CONVEY** to

**Deutsche Bank National Trust Company, as Indenture Trustee, on behalf of the holders of the Accredited Mortgage Loan Trust 2006-2 Asset Backed Notes**

(herein called Grantee) but without covenant or warranty, expressed or implied, all right title and interest conveyed to and now held by it as Trustee under the Deed of Trust in and to the property situated in the county of  PLACER, State of California, described as follows:

A PORTION OF THE EAST HALF OF SECTION 18, TOWNSHIP 12 NORTH, RANGE 8 EAST, M.D.M., BEING ALSO A PORTION OF THE TRACT OF LAND SHOWN AND DESIGNATED AS PARCEL "A", AS SHOWN ON THE MAP ENTITLED, "PARCEL MAP NO. 70586", FILED FOR RECORD DECEMBER 14, 1973, IN BOOK 5 OF PARCEL MAPS, PAGE 16, DESCRIBED AS: BEGINNING AT THE NORTH CORNER OF THE PARCEL OF LAND DESCRIBED HEREBY, BEING A POINT IDENTICAL WITH THE NORTH CORNER OF THE LAND SHOWN AND DESIGNATED PARCEL "A" ON THE ABOVE MENTIONED PARCEL MAP; THENCE ALONG THE BOUNDARY OF SAID PARCEL "A" ON THE FOLLOWING THREE CONSECUTIVE COURSE: (1) SOUTH 43° 50' EAST 129.81 FEET, (2) SOUTH 55° 26' EAST 170.19 FEET TO THE EAST CORNER THEREOF, AND (3) SOUTH 21° 41' 20" WEST FOR A DISTANCE OF 390.00 FEET; THENCE NORTH 68° 18' 40" WEST 394.28 FEET TO A POINT ON THE NORTHWESTERLY BOUNDARY LINE OF THE LAND SHOWN AND DESIGNED AS PARCEL "A" ON THE ABOVE MENTIONED PARCEL MAP; THENCE ALONG THE NORTHWESTERLY BOUNDARY OF SAID PARCEL "A" ON THE FOLLOWING TWO COURSES: (1) NORTH 27° 51' EAST FOR A DISTANCE OF 261.39 FEET AND (2) NORTH 42° 01' EAST 236.57 FEET TO THE POINT OF BEGINNING.

"This instrument is being recorded as an
ACCOMMODATION ONLY, with no
Representation as to its effect upon title"

4

9

Trustee's Deed Upon Sale

**2** | P a g e

This conveyance is made in compliance with the terms and provisions of the Deed of Trust executed by **JAMES LEN MACKLIN , A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY**, as trustor, dated **4/14/2006**,  and recorded on  **4/28/2006** as instrument number **2006-0046431**, in Book **xxx**, Page **xxx** of Official Records in the office of the Recorder of **PLACER**, California, under the authority and powers vested in the Trustee designated in the Deed of Trust or as the duly appointed trustee, default having occurred under the Deed of Trust pursuant to the Notice of Breach and Election to Sell under the Deed of Trust recorded on **12/8/2008**, instrument no **2008-0094154-00**, Book , Page , of Official records. Trustee having complied with all applicable statutory requirements of the State of California and performed all duties required by the Deed of Trust including sending a Notice of Default and Election to Sell within ten days after its recording and a Notice of Sale at least twenty days prior to the Sale Date by certified mail, postage pre-paid to each person entitled to notice in compliance with California Civil Code 2924b

Default occurred as set forth in a Notice of Breach and Election to Sell which was recorded in the office of the Recorder of said County.

All requirements of law regarding the mailing of copies of notices or the publication of a copy of the Notice of Breach and Election to Sell or the personal delivery of the copy of the Notice of Breach and Election to Sell and the posting and publication of copies of the Notice of Sale have been complied with.

Said property was sold by said Trustee at public auction on **12/14/2009** at the place named in the Notice of Sale, in the County of **PLACER,** California, in which the property is situated.  Grantee, being the highest bidder at such sale, became the purchaser of said property and paid therefore to said trustee the amount being **$342,550.24** in lawful money of the United States, or by the satisfaction, pro tanto, of the obligations then secured by said Deed of Trust.

Date: **12/15/2009**                          **QUALITY LOAN SERVICE CORPORATION**

By:

Karla Sanchez, Assistant Secretary

State of California    )
County of San Diego)

On **12·17·09** before me, **Michelle Nguyen** a notary public, personally appeared **Karla Sanchez**, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)
             **Michelle Nguyen**

MICHELLE NGUYEN
COMM. #1665032
NOTARY PUBLIC • CALIFORNIA
SAN DIEGO COUNTY
Comm. Exp. MAY 8, 2010

THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Recording Requested By:
Title Court Service

PLACER, County Recorder
JIM MCCAULEY
**DOC- 2008-0094154-00**
Acct 100-TITLE COURT SERVICE,INC
Monday, DEC 08, 2008 08:55:20
MIC      $3.00:AUT      $2.00:SBS      $1.00
ERD      $1.00:RED      $1.00:REC      $4.00
Ttl Pd    $12.00      Rcpt # 0001862149
                                    baj/BJ/1-2

Recording requested by:

When recorded mail to:

Windsor Management Co.
15253 Avenue of Science
Building #3
San Diego, CA 92128

08012247

TS No.: **CA-08-01507-CS**                  Loan No.: 0603307230

Space above this line for Recorder's use

# IMPORTANT NOTICE
## NOTICE OF DEFAULT AND ELECTION TO SELL UNDER DEED OF TRUST

**IF YOUR PROPERTY IS IN FORECLOSURE BECAUSE YOU ARE BEHIND IN YOUR PAYMENTS, IT MAY BE SOLD WITHOUT ANY COURT ACTION.** You may have the legal right to bring your account in good standing by paying all of your past due payments plus permitted costs and expenses within the time permitted by law for reinstatement of your account (normally five business days prior to the date set for the sale of your property). No sale may be set until three months from the date this notice of default is recorded (which date of recordation appears on this notice). This amount is **$21,168.60** as of **12/4/2008** and will increase until your account becomes current.

While your property is in foreclosure, you still must pay other obligations (such as insurance and taxes) required by your note and deed of trust or mortgage. If you fail to make future payments on the loan, pay taxes on the property, provide insurance on the property, or pay other obligations as required in the note and deed of trust or mortgage, the beneficiary or mortgagee may insist that you do so in order to reinstate your account in good standing. In addition, the beneficiary or mortgagee may require as a condition of reinstatement that you provide reliable written evidence that you paid all senior liens, property taxes, and hazard insurance premiums.

Upon your written request, the beneficiary or mortgagee will give you a written itemization of the entire amount you must pay. You may not have the pay the entire unpaid portion of your account, even though full payment was demanded, but you must pay all amounts in default at the time payment is made. However, you and your beneficiary or mortgagee may mutually agree in writing prior to the time the notice of sale is posted (which may not be earlier than the three-month period stated above) to, among other things, (1) provide additional time in which to cure the default by transfer of the property or otherwise; or (2) establish a schedule of payments in order to cure your default; or both (1) and (2).

Following the expiration of the time period referred to in the first paragraph of this notice, unless the obligation being foreclosed upon or a separate written agreement between you and your creditor permits a longer period, you have only the legal right to stop the sale of your property by paying the entire amount demanded by your creditor.

To find out the amount you must pay, or arrange for payment to stop the foreclosure, or if your property is in foreclosure for any other reason, contact:

**Accredited Home Lenders, Inc.**
**C/O Windsor Management Co.**
**15253 Avenue of Science**
**San Diego, CA 92128**
**1-858-451-7322**

7

11

If you have any questions, you should contact a lawyer or the governmental agency which may have insured your loan. Notwithstanding the fact that your property is in foreclosure, you may offer your property for sale provided the sale is concluded prior to the conclusion of the foreclosure.

Remember, **YOU MAY LOSE LEGAL RIGHTS IF YOU DO NOT TAKE PROMPT ACTION.**

NOTICE IS HEREBY GIVEN: That the undersigned is either the original trustee, the duly appointed substituted trustee, or acting as agent for the trustee or beneficiary under a Deed of Trust dated 4/14/2006, executed by JAMES LEN MACKLIN, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY, as Trustor, to secure certain obligations in favor of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR ACCREDITED HOME LENDERS, INC., A CALIFORNIA CORPORATION, as beneficiary, recorded 4/28/2006, as Instrument No. 2006-0046431, in Book xxx, Page xxx of Official Records in the Office of the Recorder of PLACER County, California describing land therein: **as more fully described in said Deed of Trust.**

Said obligations including 1 NOTE(S) FOR THE ORIGINAL sum of $532,000.00, that the beneficial interest under such Deed of Trust and the obligations secured thereby are presently held by the undersigned; that a breach of, and default in, the obligations for which such Deed of Trust is security has occurred in that payment has not been made of:

Installment of principal and interest plus impounds and / or advances which became due on 9/1/2008 plus amounts that are due or may become due for the following: late charges, delinquent property taxes, insurance premiums, advances made on senior liens, taxes and/or insurance, trustees fees, and any attorney fees and court costs arising from or associated with beneficiaries effort to protect and preserve its security must be cured as a condition of reinstatement.

That by reason thereof, the present beneficiary under such deed of trust, has executed and delivered to said duly appointed Trustee, a written Declaration of Default and Demand for same, and has deposited with said duly appointed Trustee, such deed of trust and all documents evidencing obligations secured thereby, and has declared and does hereby declare all sums secured thereby immediately due and payable and has elected and does hereby elect to cause the trust property to be sold to satisfy the obligations secured thereby.

The Beneficiary or its designated agent declares that it has contacted the borrower, tried with due diligence to contact the borrower as required by California Civil code § 2923.5, or the borrower has surrendered the property to the beneficiary or authorized agent, or is otherwise exempt from the requirements of § 2935.5

Dated: 12/4/2008          **Windsor Management Co., AS AGENT FOR BENEFICIARY**
                          BY: LSI Title Company

                          _CATHY GARCIA_

**THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

As required by law, you are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit report agency if you fail to fulfill the terms of your credit obligations.

12

Recording requested by:

When recorded mail to:

Windsor Management Co.
15253 Avenue of Science
San Diego, CA 92128

---

Space above this line is for recorder' s use.

TS#CA-08-01507-CS              Order#080122247-CA-LGI              Loan#0603307230

## Notice of Trustee's Sale

**YOU ARE IN DEFAULT UNDER A DEED OF TRUST DATED 4/14/2006.  UNLESS YOU TAKE ACTION TO PROTECT YOUR PROPERTY, IT MAY BE SOLD AT A PUBLIC SALE.  IF YOU NEED AN EXPLANATION OF THE NATURE OF THE PROCEEDING AGAINST YOU, YOU SHOULD CONTACT A LAWYER.**

A public auction sale to the highest bidder for cash, cashier's check drawn on a state or national bank, check drawn by state or federal credit union, or a check drawn by a state or federal savings and loan association, or savings association, or savings bank specified in Section 5102 to the Financial code and authorized to do business in this state, will be held by duly appointed trustee. The sale will be made, but without covenant or warranty, expressed or implied, regarding title, possession, or encumbrances, to pay the remaining principal sum of the note(s) secured by the Deed of Trust, with interest and late charges thereon, as provided in the note(s), advances, under the terms of the Deed of Trust, interest thereon, fees, charges and expenses of the Trustee for the total amount (at the time of the initial publication of the Notice of Sale) reasonably estimated to be set forth below.  The amount may be greater on the day of sale.

Trustor(s):       **JAMES LEN MACKLIN, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY**

Recorded:       **4/28/2006** as Instrument No. **2006-0046431** in book **xxx**, page **xxx** of Official Records in the office of the Recorder of **PLACER** County, California;

Date of Sale:    **3/30/2009** at **10:00 AM**

Place of Sale:   **At the main entrance to the Municipal Courthouse, 11546 "B" Avenue, Auburn, CA.**

Amount of unpaid balance and other charges: **$561,894.06**

The purported property address is:       **1004 WISE ROAD**
                                          **AUBURN , CA 95603**

Assessors Parcel No.                     **040-040-046-000**

TS # CA-08-01507-CS
Loan # 0603307230
Notice of Trustee's Sale

The undersigned Trustee disclaims any liability for any incorrectness of the property address or other common designation, if any, shown herein.  If no street address or other common designation is shown, directions to the location of

13

the property may be obtained by sending a written request to the beneficiary within 10 days of the date of first publication of this Notice of Sale.

If the Trustee is unable to convey title for any reason, the successful bidder's sole and exclusive remedy shall be the return of monies paid to the Trustee, and the successful bidder shall have no further recourse.


Date: _____          **Windsor Management Co.**


**Cindi Stewart,**
**15253 Avenue of Science**
**San Diego, CA 92128**
**1-858-451-7322**


**In compliance with California Civil Code 2923.5(c) the mortgagee, trustee, beneficiary, or authorized agent declares: that it has contacted the borrower(s) to assess their financial situation and to explore options to avoid foreclosure; or that it has made efforts to contact the borrower(s) to assess their financial situation and to explore options to avoid foreclosure by one of the following methods: by telephone; by United States mail; either 1st class or certified; by overnight delivery; by personal delivery; by e-mail; by face to face meeting.**


**THIS OFFICE IS ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

14

PLACER, County Recorder
JIM MCCAULEY
**DOC- 2006-0061203**

Check Number  67181dh
**Wednesday, JUN 07, 2006 10:48:12**
MIC    $3.00:AUT    $1.00:SBS    $0.00
REC    $3.00:           :

Ttl Pd    $7.00        Nbr-0001494445
                        odh/DH/1-1

Recording Requested By:
Wilshire Credit Corp

When Recorded Return To:
Current Trustor:
James Macklin
10040 Wise Rd
Auburn, CA  95603

---

## FULL RECONVEYANCE

Wilshire Credit Corp #:958181 "MACKLIN" ID:/15344393   Placer, CA

**Wilshire Credit Corporation, P.O. BOX 8517, Portland, OR 97207-8517**

WILSHIRE CREDIT CORPORATION, as present Trustee for the Deed of Trust executed by JAMES MACKLIN AND ELIZABETH A TAMBLE, HUSBAND AND WIFE AS JOINT TENANTS as Trustor(s), dated 02/01/2005 and recorded on 02/15/2005 as: Instrument/File No. 2005-0018132   of Official Records in the office of the County Recorder of PLACER County, CALIFORNIA, having been requested in writing, by the holder of the obligations secured by said Deed of Trust, to reconvey the estate granted to trustee under said Deed of Trust, does hereby reconvey to the person or persons legally entitled thereto, without warranty, all the estate, title and interest acquired by Trustee under said Deed of Trust.

IN WITNESS WHEREOF, WILSHIRE CREDIT CORPORATION, as Trustee, has caused its corporate name to be affixed by a duly authorized officer on the date shown in the acknowledgment certificate below:

By WILSHIRE CREDIT CORPORATION as Trustee
On   May 24, 2006

By
KATHY ANDERSON,  TITLE SERVICES
MANAGER

STATE OF Oregon
COUNTY OF Washington

On May 24, 2006, before me, PAUL SPANO, Notary Public, personally appeared Kathy Anderson, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

PAUL SPANO
Notary Expires: 02/17/2008  #377490

OFFICIAL SEAL
**PAUL SPANO**
NOTARY PUBLIC-OREGON
COMMISSION NO. 377490
MY COMMISSION EXPIRES FEBRUARY 17, 2008

(This area for notarial seal)

JMC-20060524-0010 CAPLACE PLACER CA BAT: 7523/958181 KXCATDR1

11.15

*In re Debtor:  James L Macklin-  Chapter 7*

**USBC Eastern District of California Case No:  10-44610**

**Adversary No. 11-02024-E**

**NOTICE OF APPLICATION AND *EX PARTE* APPLICATION FOR TEMORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

**EXHIBIT "4A"**



# UNITED STATES OF AMERICA

## SECURITIES AND EXCHANGE COMMISSION

# ATTESTATION

I HEREBY ATTEST

that:

*Attached is a copy of, prospectus supplement dated April 18, 2006, received in this Commission June 19, 2006, under the name Accredited Mortgage Loan Trust 2006-2, File No. 333-129972-02, pursuant to the provisions of the Securities Act of 1933.*

on file in this Commission

*January 10, 2011*

(Date)

Larry Mills
*Records Officer*

It is hereby certified that the Secretary of the U.S. Securities and Exchange Commission, Washington, D.C., which Commission was created by the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) is official custodian of the records and files of said Commission, and all records and files created or established by the Federal Trade Commission pursuant to the provisions of the Securities Act of 1933 and transferred to this Commission in accordance with Section 210 of the Securities Exchange Act of 1934, and was such official custodian at the time of executing the above attestation, and that he/she, and persons holding the positions of Deputy Secretary, Assistant Director, Records Officer, Branch Chief of Records Management, and the Program Analyst for the Records Officer, or any one of them, are authorized to execute the above attestation.

For the Commission

Secretary

SEC 334 (10/07)

Table of Contents

Filed pursuant to Rule 424(b)(5)
Registration No. 333-129972

*PROSPECTUS SUPPLEMENT*
*(For Use with Base Prospectus dated April 18, 2006)*

# $1,397,200,000
## Accredited Mortgage Loan Trust 2006-2
### (Issuing Entity)
### Asset-Backed Notes, Series 2006-2



### ACCREDITED
#### HOME LENDERS
**Accredited Home Lenders, Inc.**
(Sponsor and Servicer)
**Accredited Mortgage Loan REIT Trust**
(Depositor)

You should read the section entitled "Risk Factors" starting on page S-16 of this prospectus supplement and on page 1 of the accompanying prospectus and consider these factors before making a decision to invest in the notes.

The notes represent non-recourse obligations of the issuing entity only and are not interests in or obligations of the sponsor, the depositor, any of their affiliates, or any other person.

*Neither the notes nor the mortgage loans will be insured or guaranteed by any governmental agency or instrumentality.*

**The trust -estate —**

- *The trust estate consists of residential mortgage loans, first and second lien fixed- and adjustable-rate conforming and non-conforming mortgage loans.*

**The notes —**

- *The issuing entity will issue and offer four classes of senior notes and nine classes of subordinate notes.*
- *Payments on the notes will be made monthly. The first expected payment date for the notes is July 25, 2006.*

**Credit enhancement and other support —**

- *The class A notes will be supported by the class M notes. Each class of class M notes will be supported by the classes of class M notes having a lower payment priority, with the most subordinate class being supported by overcollateralization.*
- *Excess interest will be used to increase and maintain a required level of overcollateralization.*
- *Prepayment penalties will be used to absorb losses and to achieve overcollateralization and then to maintain a required level of overcollateralization.*
- *The issuing entity will enter into an interest rate swap agreement with Barclays Bank PLC.*

**Pre-Funding —**

- *The trust estate has a pre-funding feature.*

| Class | Original Note Principal Balance | Interest Rate | Expected Final Payment Date | Final Stated Maturity Date | Price to Public | Underwriting Discount | Proceeds to the Depositor(3) |
|---|---|---|---|---|---|---|---|
| A-1 | $ 559,514,000 | 1 Month LIBOR + 0.04%(1)(2) | April 2008 | September 2036 | 100.00000% | 0.21000% | 99.79000% |
| A-2 | $ 158,862,000 | 1 Month LIBOR + 0.09%(1)(2) | September 2008 | September 2036 | 100.00000% | 0.21000% | 99.79000% |
| A-3 | $ 289,467,000 | 1 Month LIBOR + 0.15%(1)(2) | June 2011 | September 2036 | 100.00000% | 0.21000% | 99.79000% |
| A-4 | $ 181,457,000 | 1 Month LIBOR + 0.26%(1)(2) | May 2013 | September 2036 | 100.00000% | 0.21000% | 99.79000% |
| M-1 | $ 41,300,000 | 1 Month LIBOR + 0.27%(1)(2) | May 2013 | September 2036 | 100.00000% | 0.21000% | 99.79000% |
| M-2 | $ 37,100,000 | 1 Month LIBOR + 0.29%(1)(2) | May 2013 | September 2036 | 100.00000% | 0.21000% | 99.79000% |
| M-3 | $ 23,800,000 | 1 Month LIBOR + 0.33%(1)(2) | May 2013 | September 2036 | 100.00000% | 0.21000% | 99.79000% |
| M-4 | $ 20,300,000 | 1 Month LIBOR + 0.35%(1)(2) | May 2013 | September 2036 | 100.00000% | 0.21000% | 99.79000% |
| M-5 | $ 20,300,000 | 1 Month LIBOR + 0.38%(1)(2) | May 2013 | September 2036 | 100.00000% | 0.21000% | 99.79000% |
| M-6 | $ 17,500,000 | 1 Month LIBOR + 0.45%(1)(2) | May 2013 | September 2036 | 100.00000% | 0.21000% | 99.79000% |
| M-7 | $ 15,400,000 | 1 Month LIBOR + 0.85%(1)(2) | May 2013 | September 2036 | 100.00000% | 0.21000% | 99.79000% |
| M-8 | $ 10,500,000 | 1 Month LIBOR + 1.05%(1)(2) | May 2013 | September 2036 | 100.00000% | 0.21000% | 99.79000% |
| M-9 | $ 21,700,000 | 1 Month LIBOR + 1.90%(1)(2) | May 2013 | September 2036 | 100.00000% | 0.21000% | 99.79000% |
| Total | $ 1,397,200,000 | | | | | | |

(1) Subject to increase as described herein and subject to an available funds cap rate described herein.
(2) This rate is variable based on LIBOR. Further disclosure of how LIBOR is determined is included in the summary.
(3) Before deducting expenses payable by the sponsor estimated to be approximately $800,000.

Each of the underwriters will purchase a portion of the notes listed in the table above from the depositor and will offer the notes purchased by it only after such notes have been issued, delivered to and accepted by the underwriters. See "Plan of Distribution" in this prospectus supplement.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus supplement. Any representation to the contrary is a criminal offense.**

*GOLDMAN, SACHS & CO.*

*BEAR, STEARNS & CO. INC.*        *CREDIT SUISSE*        *MERRILL LYNCH & CO.*        *UBS INVESTMENT BANK*

*The date of this Prospectus Supplement is June 16, 2006.*

Table of Contents

**Important notice about the information presented in this
prospectus supplement and the accompanying prospectus**

We provide information to you about the notes in two separate documents that provide progressively more detail:



- the accompanying prospectus, which provides general information, some of which may not apply to your series or class of notes, and

- this prospectus supplement, which describes the specific terms of your series or class of notes.

If the accompanying prospectus contemplates multiple options, you should rely on the information in this prospectus supplement as to the applicable option.

We cannot sell the notes to you unless you have received both this prospectus supplement and the accompanying prospectus.

Dealers will deliver a prospectus supplement and prospectus when acting as underwriters of the notes and with respect to their unsold allotments or subscriptions. In addition, all dealers selling the notes will be required to deliver a prospectus supplement and prospectus for ninety days following the date of the prospectus supplement.

Annex I and Schedule 1 are incorporated into and are a part of this prospectus supplement as if fully set forth herein.

We include cross-references in this prospectus supplement and the accompanying prospectus to captions in these materials where you can find further information concerning a particular topic. The following table of contents provides the pages on which these captions are located.

i





Table of Contents

European Economic Area

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), the underwriter has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of notes to the public in that Relevant Member State prior to the publication of a prospectus in relation to the notes which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of notes to the public in that Relevant Member State at any time:

(a) to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b) to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts; or

(c) in any other circumstances which do not require the publication by the issuing entity of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of notes to the public" in relation to any notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the notes to be offered so as to enable an investor to decide to purchase or subscribe the notes, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

United Kingdom

Each underwriter has represented and agreed that:

(a) it has only communicated or caused to be communicates and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act (the "FSMA")) received by it in connection with the issue or sale of the notes in circumstances in which Section 21(1) of the FSMA does not apply to the issuing entity; and

(b) it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the notes in, from or otherwise involving the United Kingdom.

ii

000004

Table of Contents

# Table of Contents

**Summary**

**Risk Factors** ........................................................................................ S-2

**Transaction Overview** ......................................................................... S-16

   Formation of the Issuing Entity and Issuance of the Trust Certificates ... S-27
   Sale and Servicing of the Mortgage Loans ... S-27
   Issuance of the Notes ... S-27
      ... S-27

**The Mortgage Loans** ........................................................................... S-28

   General ... S-28
   Conveyance of Subsequent Mortgage Loans and the Pre-Funding Account ... S-30
   The Mortgage Loans ... S-31

**The Sponsor** ........................................................................................ S-51

   Underwriting ... S-53

**Delinquency and Loss Information for the Initial Mortgage Loans** .... S-56

**Static Pool Information** ...................................................................... S-57

**The Depositor** ..................................................................................... S-57

**The Issuing Entity** .............................................................................. S-58

**The Servicer** ....................................................................................... S-60

   Mortgage Loan Servicing ... S-61
   Delinquency and Loan Loss Experience ... S-65

**The Owner Trustee** ............................................................................. S-66

**The Indenture Trustee** ........................................................................ S-67

**The Swap Provider** ............................................................................. S-70

**Description of the Notes and the Trust Certificates** .......................... S-71

   Book-Entry Notes ... S-71
   Assignment and Pledge of Mortgage Loans ... S-72
   Delivery of Mortgage Loan Documents ... S-72
   Representations and Warranties of the Sponsor ... S-74
   Payments on the Mortgage Loans ... S-75
   Payments of Interest ... S-77
   Payments of Principal ... S-78
   Allocation of Net Monthly Excess Cashflow ... S-80
   Fees and Expenses ... S-80
   Interest Rate Swap Agreement ... S-81
   Calculation of LIBOR ... S-84
   Overcollateralization Provisions ... S-84
   Events of Default ... S-85
   Notice of Default ... S-87
   Reports to Noteholders ... S-87
   Optional Clean-up Call ... S-88
   Step-Up Rates ... S-88
   Optional Purchase of Delinquent Mortgage Loans ... S-88
   Amendment ... S-89
   Termination ... S-89

**Servicing of the Mortgage Loans** ....................................................... S-89

   Collection and Other Servicing Procedures ... S-89
   Delinquency and Loss Procedures ... S-90
   Servicing Fees and Other Compensation and Payment of Expenses ... S-91
   Delinquency Advances, Servicing Advances and Compensating Interest ... S-91
   Relief Act Interest Shortfalls and Prepayment Interest Shortfalls ... S-92
   Evidence as to Compliance ... S-92
   Removal and Resignation of the Servicer ... S-93

**Prepayment and Yield Consequences** ................................................ S-95

   Expected Final Scheduled Payment Date ... S-96
   Final Payment Dates ... S-97
   Modeling Assumptions ... S-97

**Material Federal Income Tax Consequences** ..................................... S-117

   Treatment of the Notes ... S-117

**ERISA Consequences** ......................................................................... S-120

**Legal Investment** ............................................................................... S-121

**Plan of Distribution** ........................................................................... S-121

**Incorporation of Information by Reference** ....................................... S-124

**Additional Information** ....................................................................... S-125

000005

**Legal Matters**   S-125

**Ratings**   S-125

**Glossary**   S-127

iii

Table of Contents

## Flow of Funds Diagram



Available Funds

Limited indemnification expenses of the issuing entity, indenture trustee fee, payment to Swap Provider and certain swap termination payments

Interest Payments to Class A Notes, concurrently

Current Interest Payments to Class M Notes, sequentially, in ascending numerical order

Principal Payments to Class A Notes, sequentially, in ascending numerical order

Principal Payments to Class M Notes, sequentially, in ascending numerical order

Principal Deficiency Amounts to Class M Notes, sequentially, in ascending numerical order

Unpaid interest amounts to the Class M Notes, sequentially, in ascending numerical order

Basis Risk Carry Forward Amounts to the Class A Notes, pro rata

Basis Risk Carry Forward Amounts to the Class M Notes, sequentially, in ascending order

Deferred Interest to the Class M Notes, sequentially in ascending numerical order

Remaining unpaid amounts due to the trustees

Subordinated swap termination payments to the Swap Provider

Remaining amounts to the trust certificate

S-1

Table of Contents

## Summary

*This section gives a brief summary of the information contained herein. The summary does not include all of the important information about the notes. We encourage you to review carefully the more detailed information in this prospectus supplement and in the attached prospectus.*

*Capitalized terms used in this prospectus supplement are defined under the caption "Glossary."*

| | |
|---|---|
| **Sponsor and Servicer** | Accredited Home Lenders, Inc. |
| **Depositor** | Accredited Mortgage Loan REIT Trust. |
| **Issuing Entity** | Accredited Mortgage Loan Trust 2006-2. |
| **Indenture Trustee** | Deutsche Bank National Trust Company. |
| **Owner Trustee** | U.S. Bank Trust National Association. |
| **Swap Provider** | Barclays Bank PLC. |
| **The Trust Estate** | The notes represent obligations of the issuing entity and will be secured by conventional, first and second lien, fixed and adjustable rate, fully amortizing, interest only and balloon, residential mortgage loans having a total principal balance as of the closing date, of approximately $1,050,000,000. The initial mortgage loans have an aggregate principal balance as of their initial cut-off date of approximately $835,719,121, or approximately 79.59% of the closing date mortgage loan pool. The depositor expects the additional mortgage loans to be added to the issuing entity on the closing date to have an aggregate principal balance as of their cut-off date of approximately $214,280,879, or approximately 20.41% of the closing date mortgage loan pool. On the closing date, the depositor will deposit approximately $350,000,000 into a pre-funding account which will be used from time to time before the end of the pre-funding period to acquire subsequent mortgage loans to include in the mortgage pool. |
| **The Mortgage Loans** | The mortgage loans will be secured by first and second mortgages or deeds of trust on residential properties. The mortgage loans will be fixed and adjustable rate, level pay, fully amortizing, interest-only and balloon loans that may or may not conform to certain agency investment guidelines. |
| | The mortgage loans consist of loans used to purchase a new home, to refinance an existing mortgage loan, to consolidate debt and/or to obtain cash proceeds by borrowing against the mortgagor's equity in the property. The issuing entity will purchase the closing date mortgage loans on the closing date. |

S-2

000008

**Table of Contents**

The initial mortgage loans have the following characteristics, each as of the cut-off date:

| Number of Loans | Initial Pool Balance |
|---|---|
| 4,766 | $835,719,121 |

The initial mortgage loans have the following approximate characteristics as of the cut-off date:

Adjustable-rate mortgage loans (1): 49.00%

Fixed-rate mortgage loans (1): 51.00%

Interest only mortgage loans (1): 9.49%

Second lien mortgage loans (1): 1.61%

Balloon mortgage loans (1): 31.10%

Range of mortgage rates: 5.125% - 15.990%

Weighted average mortgage rate: 7.829%

Range of gross margins of the adjustable-rate mortgage loans: 2.000% - 10.000%

Weighted average gross margin of the adjustable-rate mortgage loans: 5.373%

Range of minimum mortgage rates of the adjustable-rate mortgage loans: 5.950% - 13.125%

Weighted average minimum mortgage rate of the adjustable-rate mortgage loans: 8.230%

Range of maximum mortgage rates of the adjustable-rate mortgage loans: 12.199% - 20.125%

Weighted average maximum mortgage rate of the adjustable-rate mortgage loans: 15.229%

Weighted average next adjustment date of the adjustable-rate mortgage loans: September 2008

Weighted average remaining term to stated maturity: 351 Range of principal balances: $12,375 - $749,253

Average principal balance: $175,350 Range of loan- to-value ratios (2): 7.26% - 100.00%

Weighted average loan-to-value ratio (2): 76.78% Geographic concentrations in excess of 5%:

| | |
|---|---|
| California (1) | 15.36% |
| Florida (1) | 15.23% |
| Illinois (1) | 5.90% |
| Texas (1) | 5.12% |

---

(1) Percentages determined by reference to the total principal balance of the initial mortgage loans as of the cut-off date.

(2) As used in this prospectus supplement, the loan-to-value ratio for any second lien mortgage loan will mean the combined original loan-to-value ratio.

S-3

Table of Contents

| | |
|---|---|
| **Cut-off Date** | With respect to the initial mortgage loans, the close of business on June 1, 2006, with respect to the additional mortgage loans, the later of the close of business on June 1, 2006 or the date of origination of such additional mortgage loans and with respect to the subsequent mortgage loans, the later of the first day of the month of the transfer to the issuing entity and the date of origination of such subsequent mortgage loan. |
| **Closing Date** | On or about June 29, 2006. |
| **Record Date** | For any payment date, the last business day immediately preceding the related payment date so long as the notes are in book-entry form and for notes in definitive form, the last business day of the month immediately preceding the month in which the payment date occurs. |
| **Classes of Notes** | The issuing entity will issue the following classes of notes (also listed in the table on the front cover of this prospectus supplement), under an indenture, dated as of June 1, 2006, between the issuing entity and the indenture trustee. |

| | |
|---|---|
| Offered Notes: | Class A and Class M Notes |
| Class A Notes: | Class A-1, Class A-2, Class A-3 and Class A-4 Notes. |
| Class M Notes: | Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8 and Class M-9 Notes. |

As used in this prospectus supplement, the preceding terms refer to the respective classes of notes.

| | |
|---|---|
| **Trust Certificates** | The issuing entity will also issue a class of trust certificates representing the entire beneficial ownership interest in the issuing entity. The trust certificates are not offered by this prospectus supplement. |
| **Pre-Funding Feature** | On the closing date, the depositor will deposit approximately $350,000,000 into a pre-funding account which will be used from time to time before the end of the pre-funding period to acquire subsequent mortgage loans to include in the mortgage pool. |

S-4

000010



Table of Contents

The pre-funding period commences on the closing date and ends on the earlier of (i) the date on which the amount on deposit in the pre-funding account is less than $185,000 and (ii) August 28, 2006.

Purchases of subsequent mortgage loans are subject to the same criteria as the initial mortgage loans and additional restrictions related to the composition of the aggregate loan pool following the acquisition of the subsequent mortgage loans, as described in this prospectus supplement.

To the extent that the issuing entity does not fully use amounts on deposit in the pre-funding account to purchase subsequent mortgage loans by the end of the pre-funding period, the issuing entity will apply the remaining amounts as a prepayment of principal to the related classes of notes on the payment date immediately following the end of the pre-funding period. Although no assurance is possible, we do not anticipate that a material amount of principal will be prepaid on the notes from amounts in the pre-funding account.

**Capitalized Interest Account**

If required by the rating agencies, a capitalized interest account will be established and funded on the closing date. Funds so deposited will be used to cover shortfalls in collections of interest due to the pre-funding feature. Any amounts remaining in the capitalized interest account (including investment earnings) and not needed for such purpose will be paid to the depositor and will not thereafter be available for payment to the noteholders.

**Expected Final Payment Date**

The expected final scheduled payment date for each class of offered notes is the last date on which the initial Class Note Balance set forth on the cover page hereof for that class is expected to be reduced to zero. This expectation is based on the assumptions that the mortgage loans prepay at 100% of the Prepayment Assumption, that a 10% optional termination occurs, that no defaults in the payment by the mortgagors of the principal of and interest on the mortgage loans are experienced and that the levels of one-month LIBOR and six-month LIBOR remain constant at 5.199% and 5.420%, respectively. The expected final scheduled payment date for each class of offered notes is as follows:

| Class A-1 | April 2008 |
| Class A-2 | September 2008 |
| Class A-3 | June 2011 |
| Class A-4 | May 2013 |
| Class M | May 2013 |

*See "Prepayment and Yield Consequences –Expected Final Scheduled Payment Date" in this prospectus supplement.*

S-5

000011

Table of Contents



| | |
|---|---|
| **Final Scheduled Payment Date** | The last possible date on which the principal of the notes is payable in full is the payment date occurring in September 2036 and is referred to as the final scheduled payment date. The notes could be retired before the final scheduled payment date. |
| **Registration of Notes** | The notes will be issued only in book-entry form, in denominations of $25,000 initial principal balance and integral multiples of $1,000 in excess thereof, except that one note of each class may be issued in a different amount; provided, however, that the underwriters will only sell offered notes to initial investors in minimum total investment amounts of $100,000. |
| **Denominations** | The issuing entity will initially issue the notes in book-entry form. You may elect to hold your interest in the notes through The Depository Trust Company in the United States, or Clearstream Banking, société anonyme or the Euroclear Bank, S.A./N.V. in Europe, or indirectly through participants in these systems. You will not be entitled to receive a definitive note representing your interest except under limited circumstances. |
| | *See "Description of the Notes and the Trust Certificates" for a discussion of the minimum denominations and the incremental denominations of each class of notes and "Description of the Notes and the Trust Certificates — Book-Entry Notes" in this prospectus supplement.* |
| **Payment Date** | The 25th day of each month, or if such day is not a business day, on the next business day, beginning in July 2006. |
| | The right of the holders of each class of the Class M Notes to receive payments is subordinate to the right of the holders of each class of the Class A Notes to receive payments, as well as to the rights of the holders of more senior classes of Class M Notes to receive payments. |
| **Payments of Interest** | On each payment date, the indenture trustee will distribute Available Funds representing interest collections on the mortgage loans in the following order of priority: |

- to payment of certain limited indemnification liabilities to certain of the transaction parties and net swap payments and swap termination payments under the circumstances described in this prospectus supplement;

- from the Distributable Interest Amount, interest payments to each class of Class A Notes; and

S-6

000012

Table of Contents



- from the remaining Distributable Interest Amount, to make current interest payments to the Class M Notes, to each such class in ascending numerical order.

See *"Description of the Notes and Trust Certificates   Payments of Interest"* in this prospectus supplement.

*Interest Accrual Periods.* The interest accrual period for the Offered Notes for each payment date is the period from and including the prior payment date (or, in the case of the first payment date, from and including the closing date) to but excluding the current payment date. Interest will accrue on the Offered Notes on the basis of a 360-day year and the actual number of days elapsed in the interest accrual period.



**Payments of Principal**

The amount of principal payable to the notes will be determined by (1) funds received on the mortgage loans and under the interest rate swap agreement (including excess interest as described herein) that are available to make principal payments on the notes, as well as in the case of the first payment date after the pre-funding period has ended, the funds on deposit in the pre-funding account at the end of the pre-funding period and (2) formulas that allocate portions of principal payments received or advanced on the mortgage loans and under the interest rate swap agreement that are available to make principal payments to specified classes of notes. Funds received on the mortgage loans may consist of monthly scheduled payments, unscheduled payments resulting from prepayments by borrowers, liquidation of defaulted mortgage loans and repurchases of mortgage loans under the circumstances described in this prospectus supplement or prepayment penalties.

The manner of distributing principal among the classes of notes will differ, as described in this prospectus supplement, depending upon whether a payment date occurs before the step-down date, or on or after that date, and depending on whether a trigger event is in effect. The step-down date for each class of notes will be the earlier of the date on which the aggregate class note balances of the Class A Notes have been reduced to zero and the later to occur of the payment date occurring in July 2009, and the first payment date on which the credit enhancement percentage for the Class A Notes would be greater than or equal to approximately 34.60%.

On each payment date (A) prior to the step-down date or (B) on which a trigger event is in effect, the indenture trustee will distribute Available Funds representing principal collections on the mortgage loans in the following order of priority:

- to make principal payments to the Class A Notes, to each such class in ascending numerical order; and

S-7

000013

Table of Contents

- to make principal payments to the Class M Notes, to each such class in ascending numerical order.

On each payment date (A) on or after the step-down date and (B) on which a trigger event is not in effect, the indenture trustee will distribute Available Funds representing principal collections on the mortgage loans in the following order of priority:

- to make principal payments to the Class A Notes, to each such class in ascending numerical order, in the amount required to achieve the level of credit enhancement described in this prospectus supplement; and

- to make principal payments to the Class M Notes, to each such class in ascending numerical order, in the amount required to achieve the level of credit enhancement for each class described in this prospectus supplement.

However, on any payment date on which the overcollateralization amount has been reduced to zero, and the aggregate outstanding principal balance of the Class M Notes has been reduced to zero, then any payments of principal to be made on the Class A Notes shall be made to such holders on a pro rata basis, rather than sequentially as described above.

*See "Description of the Notes and the Trust Certificates   Payments of Principal" in this prospectus supplement.*

*See "Prepayment and Yield Consequences" in this prospectus supplement for a discussion of the factors that could affect when the principal of each class of notes will be paid in full.*

For any payment date, any Available Funds for such payment date remaining after making all payments of interest and principal described above shall be paid as described in "*Description of the Notes and the Trust Certificates   Allocation of Net Monthly Excess Cashflow*" in this prospectus supplement.

**Limited Recourse**

The only source of funds available to make interest and principal payments on the notes will be the assets of the issuing entity. The issuing entity will have no source of funds other than collections and recoveries on the mortgage

S-8

**Table of Contents**



loans through insurance or otherwise and payments received under the interest rate swap agreement. No other entity will be required or expected to make any payments on the notes.

See "*Risk Factors – The issuing entity assets are the only source of payments on the notes*" in this prospectus supplement.

**Optional Clean-up Call by the Depositor**

The depositor may, at its option, terminate the issuing entity on any payment date when the outstanding principal balance of the notes is equal to or less than 10% of the original principal balance of the notes, after giving effect to distributions on that payment date.

**Events of Default**

The following events are events of default under the indenture:

- default for a specified period of time in the payment of any principal or interest on any note; or

- the issuing entity is in breach or default of any one or more of the covenants under the indenture, and the breach or default continues beyond any applicable grace period; or

- the issuing entity consents to the appointment of a custodian, receiver, trustee or liquidator, or other similar official, of itself, or of a substantial part of its property, or shall admit in writing its inability to pay its debts generally as they come due, or a court of competent jurisdiction shall determine that the issuing entity is generally not paying its debts as they come due, or the issuing entity shall make a general assignment for the benefit of creditors; or

- certain events of bankruptcy relating to the issuing entity or the issuing entity's property.

See "*Description of the Notes and Trust Certificates – Events of Default*" in this prospectus supplement.

**Acceleration after Event of Default**

Upon the occurrence of an event of default, the indenture trustee may, or shall at the direction of noteholders representing at least 51% of the aggregate principal balance of the notes, declare the aggregate outstanding principal balance of all the notes to be due and payable together with all accrued and unpaid interest thereon without presentment, demand, protest or other notice of any kind, all of which are waived by the issuing entity. Such declaration may be rescinded by noteholders representing at least 51% of the aggregate principal balance of the notes.

000015

Table of Contents

Amounts collected following the acceleration of the notes will not be distributed in accordance with the priorities set forth above under "Payments of Interest" and "Payments of Principal" but will instead be distributed in accordance with the priorities set forth under "Description of the Notes and the Trust Certificates—Events of Default" in this prospectus supplement.

*See "Description of the Notes and Trust Certificates– Events of Default" in this prospectus supplement.*

**Credit Enhancement**

Credit enhancement includes subordination, excess interest, overcollateralization and prepayment penalties.

*See "Risk Factors    Credit enhancement is limited and may be inadequate to cover shortfalls and losses," and "Description of the Notes and the Trust Certificates" in this prospectus supplement for a more detailed description of the excess interest, overcollateralization, subordination and prepayment penalties.*

*Subordination of Payments.* The right of the holders of the more junior classes of notes to receive payments is subordinated to the right of the holders of the more senior classes of notes to receive payments. Therefore, each subordinate class of notes is more likely to experience losses than any class that is senior to such subordinate class.

In general, the protection afforded the holders of more senior classes of notes by means of this subordination will be affected by the preferential right of the holders of the more senior classes to receive, prior to any payment being made on any payment date to the holders of the more junior classes of notes, the amount of interest and principal due on such more senior classes of notes and, if necessary, by the right of such more senior holders to receive future payments on the mortgage loans that would otherwise have been allocated to the holders of the more junior classes of notes.

*See "Risk Factors—Credit Enhancement is limited and may be inadequate to cover shortfalls and losses" in this prospectus supplement.*

*Excess Interest.* The mortgage loans bear interest each month that, in the aggregate, is expected to exceed the amount needed to pay monthly interest on the related notes and certain fees and expenses of the issuing entity. The "excess interest" received from the mortgage loans each month will be available, after taking into account certain payments received by or paid out from the issuing entity under the

S-10

000016

Table of Contents

interest rate swap agreement as described in this prospectus supplement, to absorb realized losses on the mortgage loans and to achieve and maintain overcollateralization at required levels.

*See "Risk Factors - Credit enhancement is limited and may be inadequate to cover shortfalls and losses" in this prospectus supplement.*

*Overcollateralization.* The overcollateralization amount is the excess of the sum of the aggregate scheduled principal balance of the mortgage loans plus the amount on deposit in the pre-funding account over the aggregate principal balance of the notes. On the closing date, overcollateralization will be equal to approximately $2,800,000, and excess interest will be used to achieve and maintain the target overcollateralization amount.

Generally, because more interest is required to be paid by the mortgagors than is necessary to pay the interest accrued on the notes and the expenses of the issuing entity, there is expected to be excess interest. The issuing entity will apply some or all of this excess interest as principal payments on those classes of notes then entitled to receive payments of principal, until the overcollateralization target is initially met, resulting in an acceleration of amortization of such notes relative to the mortgage loans. This acceleration feature is intended to achieve the overcollateralization target. Once the required level of overcollateralization is met, the acceleration feature will cease, unless it becomes necessary again to restore the required level of overcollateralization. In addition, once the overcollateralization target is initially met, if the overcollateralization amount is reduced below the target overcollateralization amount as a result of losses on the mortgage loans, the issuing entity will apply some or all of this excess interest as principal payments on those classes of notes then entitled to receive payments of principal, until the overcollateralization target is restored, resulting in an acceleration of amortization of such notes relative to the mortgage loans. This acceleration feature is intended to restore overcollateralization. Once the required level of overcollateralization is restored, the acceleration feature will cease, unless it becomes necessary again to restore the required level of overcollateralization. The actual level of overcollateralization may increase or decrease over time. This could result in a temporarily faster or slower amortization of the notes.

*See "Risk Factors— Credit enhancement is limited and may be inadequate to cover shortfalls and losses" and "Description of the Notes and the Trust Certificates—Overcollateralization Provisions" in this prospectus supplement.*

S-11

Table of Contents

*Prepayment Penalties.* Some of the mortgage loans contain prepayment penalty fee clauses pursuant to which prepayment penalty fees are chargeable on prepayments occurring during the first six months to five years after origination. Any prepayment penalties will be used, if necessary on any payment date, to absorb losses on the mortgage loans and to achieve or maintain overcollateralization.

*See "Risk Factors –Credit enhancement is limited and may be inadequate to cover shortfalls and losses" in this prospectus supplement.*

**Interest Rate Swap Agreement**

As of the closing date, the issuing entity will have entered into an interest rate swap agreement with Barclays Bank PLC. The purpose of the interest rate swap agreement is to minimize the risk to noteholders of adverse changes in interest rates. Under the interest rate swap agreement, on each payment date the issuing entity will pay to the swap provider a fixed payment at a rate of 5.250% per annum (on the basis of an actual/360 day count fraction), and the swap provider will pay to the issuing entity a floating payment at LIBOR (as determined pursuant to the interest rate swap agreement) (on the basis of an actual/360 day count fraction), in each case calculated on a scheduled notional amount and, in each case adjusted on a monthly basis. To the extent that the fixed payment exceeds the floating payment on any payment date, amounts otherwise available to noteholders will be applied to make a net payment to the swap provider, and to the extent that the floating payment exceeds the fixed payment on any payment date, the swap provider will owe a net payment to the issuing entity. Any net amounts received by or paid out from the issuing entity under the interest rate swap agreement will either increase or reduce the amount available to make payments on the notes, as described in this prospectus supplement. The interest rate swap agreement terminates after the payment date in June 2011.

*See "Description of the Notes and the Trust Certificates -- Interest Rate Swap Agreement" in this prospectus supplement.*

**Allocation of Losses**

All realized losses on the mortgage loans will be allocated on each payment date, sequentially as follows: first to the excess cash flow, second to prepayment penalties and third in reduction of the overcollateralization amount. Realized losses on the mortgage loans will not be allocated to reduce the note principal balance of any class of notes. However, investors in the notes should realize that under certain loss

S-12

000018

Table of Contents

scenarios, there may not be enough principal and interest on the mortgage loans to distribute to the notes all principal and interest amounts to which such notes are then entitled. If realized losses are incurred with respect to the mortgage loans, to the extent that the aggregate principal balance of the notes exceeds the aggregate principal balance of the mortgage loans, the Class M Notes may never receive principal or interest in respect of such excess. The amount of interest accrued on the portion of the balance of the notes in excess of the balance of the mortgage loans will be deferred and such deferral will be allocated to the Class M Notes, sequentially in ascending numerical order. The amount of interest so deferred will be paid only after certain other payments are made from excess interest to restore overcollateralization and to pay basis risk shortfalls.

*See "Risk Factors - Credit enhancement is limited and may be inadequate to cover shortfalls and losses - Subordination" and "Description of the Notes and the Trust Certificates" in this prospectus supplement.*

**Removal and Substitution of Mortgage Loans**

Upon the earlier of discovery or receipt of notice by the depositor of a breach of any of the representations and warranties contained in the sale and servicing agreement which materially and adversely affects the value of the related mortgage loan or the interests of the noteholders in the related mortgage loan, the depositor will have a period of sixty days to effect a cure. If the breach is not cured within the sixty-day period, the depositor will, and if the depositor fails to, then the sponsor will either (a) substitute for such mortgage loan a Qualified Substitute Mortgage Loan or (b) purchase such mortgage loan from the issuing entity. *See "Description of the Notes and Trust Certificates—Representations and Warranties of the Sponsor" in this prospectus supplement.*

The indenture trustee shall review each mortgage loan file and if during the process of reviewing the mortgage files, finds any document constituting a part of a mortgage file which is not executed, has not been received, is unrelated to the mortgage loan, or does not conform to the requirements in the sale and servicing agreement, the indenture trustee will promptly so notify the servicer and the sponsor in writing with details thereof. If, within sixty days after the indenture trustee's notice of such defect, the depositor or the sponsor has not caused the defect to be remedied and the defect materially and adversely affects the value of the related mortgage loan or the interest of the noteholders in the related mortgage loan, the depositor or the sponsor will either (a) substitute such mortgage loan with a Qualified Substitute Mortgage Loan or (b) purchase such mortgage loan. *See "Description of the Notes and Trust Certificates - Delivery of Mortgage Loan Documents" in this prospectus supplement.*

S-13

Table of Contents

| | |
|---|---|
| **Servicing Fee** | The servicer will receive a servicing fee on each payment date in an amount equal to interest at the servicing fee rate for a mortgage loan on the outstanding principal balance of that mortgage loan. The servicing fee rate with respect to each mortgage loan will be 0.500% per annum. The servicing fee will be paid out of Available Funds on each payment date prior to any payments on the notes. |
| **Advancing** | The servicer will be required to advance amounts representing delinquent payments of scheduled principal and interest, other than balloon payments, as well as expenses to preserve and to protect the value of collateral, in each case to the extent considered recoverable. Reimbursement of these advances is senior to payments to noteholders. |
| **Step-Up Rates** | If the depositor does not elect to exercise the clean-up call, the margins with respect to each class of Class A Notes will increase to twice their initial margins, and the margins with respect to each class of Class M Notes will increase to 1.5 times their initial margins, in each case on the next payment date. |
| **Calculation of LIBOR** | The London interbank offered rate ("LIBOR") with respect to any payment date will be determined by the indenture trustee (provided that, in the case of the interest rate swap agreement, it will be determined by the swap provider) and will equal the posted rate for United States dollar deposits for one month that appears on Telerate Page 3750 as of 11:00 a.m., London time, on the second LIBOR Business Day prior to the immediately preceding payment date (or, in the case of the first payment date, the second LIBOR business day preceding the closing date). If no such posted rate appears, LIBOR will be determined on the basis of the offered quotation of the reference banks (which shall be four major banks that are engaged in transactions in the London interbank market) identified in the indenture for United States dollar deposits for one month to prime banks in the London interbank market as of 11:00 a.m., London time, on such date. See *"Description of the Notes and the Trust Certificates-Calculation of LIBOR" in this prospectus supplement.* |
| **ERISA Consequences** | Subject to the conditions and considerations described in this prospectus supplement and in the accompanying prospectus, the notes may be purchased by pension, profit-sharing and other employee benefit plans, as well as individual retirement accounts and Keogh plans, and by persons investing on behalf of or with plan assets of such plans. |

S-14

000020

Table of Contents



**Federal Income Tax Status**

It is the opinion of Dewey Ballantine LLP, federal tax counsel to the issuing entity, that for federal income tax purposes:

- the notes, other than notes held by the owner of the trust certificates, will be characterized as indebtedness, and

- as long as the issuing entity is wholly-owned either directly by a REIT, or by another qualified REIT subsidiary, that maintains its REIT status, the issuing entity will be treated as a qualified REIT subsidiary and will not be characterized as an association (or publicly traded partnership) taxable as a corporation.

Each noteholder, by the acceptance of a note, will agree to treat the notes as indebtedness.

**Legal Investment**

The notes will not be "mortgage related securities" under the Secondary Mortgage Market Enhancement Act of 1984.

**Ratings**



In order to be issued, the notes must receive at least the following ratings from Standard & Poor's Rating Services, a division of the McGraw-Hill Companies, Inc. and Moody's Investors Service, Inc.:

| Class | Ratings (S&P/Moody's) |
|---|---|
| A | AAA/Aaa |
| M-1 | AA+/Aa1 |
| M-2 | AA+/Aa2 |
| M-3 | AA/Aa3 |
| M-4 | AA/A1 |
| M-5 | AA-/A2 |
| M-6 | A+/A3 |
| M-7 | BBB+/Baa1 |
| M-8 | BBB/Baa2 |
| M-9 | BBB-/Baa3 |

These ratings subsequently may be lowered, qualified or withdrawn by the rating agencies. These ratings do not cover any payment of Basis Risk Carry-Forward Amounts.

**Use of Proceeds**

The net proceeds to be received from the sale of the notes will be applied primarily to repay financing for the mortgage loans and to purchase the interest rate swap agreement. The underwriters or affiliates of the underwriters have provided financing for certain of the mortgage loans.

S-15

Table of Contents

## Risk Factors

*An investment in the notes involves significant risks. Before you decide to invest in the notes, we recommend that you carefully consider the following risk factors and the risk factors discussed under the heading "Risk Factors" beginning on page 1 of the prospectus.*

The statistical information presented in this prospectus supplement is computed based on the Initial Pool Balance. All percentages are measured by the aggregate Initial Cut-off Date Principal Balance of the applicable initial mortgage loans in relation to the Initial Pool Balance.



**Certain features of the mortgage loans may result in losses or cash flow shortfalls**

There are a number of features of the mortgage loans that create additional risk of loss, including the following:

- *The borrowers have less than perfect credit and may be more likely to default.* The sponsor's underwriting standards are less restrictive than those of Fannie Mae or Freddie Mac with respect to a borrower's credit history and other factors. A derogatory credit history or a lack of credit history will not necessarily prevent the sponsor from making a loan but may reduce the size and the loan-to-value ratio of the loan the sponsor will make. As a result of these less restrictive standards, the issuing entity may experience higher rates of delinquencies and defaults than if the mortgage loans were underwritten in a more traditional manner.

- *Newly originated mortgage loans may be more likely to default which may cause losses.* Defaults on mortgage loans tend to occur at higher rates during the early years of the mortgage loans. Substantially all of the mortgage loans will have been originated within 12 months prior to the sale to the issuing entity. As a result, the issuing entity may experience higher rates of default than if the mortgage loans had been outstanding for a longer period of time.

- *Balloon loans may have higher rates of default which may cause losses.* Based on the Initial Pool Balance of the initial mortgage loans, approximately 31.10% of all of the initial mortgage loans are "balloon loans," which are loans originated with a stated maturity scheduled to occur prior to the expiration of the corresponding amortization schedule. Upon the maturity of a balloon loan, the borrower will be required to make a "balloon" payment that will be significantly larger than the borrower's previous scheduled payments. The ability of such a borrower to repay a balloon loan at maturity frequently will depend on such borrower's ability to refinance the loan. The ability of a borrower to refinance such a loan will be affected by a number of factors, including the level of available mortgage rates at the time, the value of the related mortgaged property, the borrower's equity in the mortgaged property, the financial condition of the borrower, the tax laws and general economic conditions at the time. A high interest rate environment may make it more difficult for the borrower to accomplish a refinancing and may result in an increased rate of delinquencies, foreclosures and/or losses. If the borrower is unable to repay the unpaid principal amount of a balloon loan on its maturity date, the servicer will not be obligated to advance that amount. Instead, the servicer will be obligated to advance an amount equal to the assumed monthly payment that would have been due on the balloon loan based upon the original amortization schedule for that loan. If the borrower is unable to repay the loan balance by its maturity date or refinance the balloon loan, you will suffer a loss if the collateral for such loan is insufficient, or if other forms of credit enhancement are insufficient to cover such loss. Neither the servicer nor the sponsor will be obligated to refinance a balloon loan.

S-16 

000022

Table of Contents

- *The rate of default of mortgage loans secured by second-liens may be greater than that of mortgage loans secured by first-liens on comparable properties*. The initial mortgage pool includes mortgage loans secured by second-liens on the related mortgaged property. Approximately 1.61% of the initial mortgage loans were secured by a second lien on the related mortgaged property. The proceeds from any liquidation, insurance or condemnation proceedings will be available to satisfy the outstanding balance of such mortgage loans only to the extent that the claims of the related senior mortgages have been satisfied in full, including any related foreclosure costs. In circumstances when it has been determined to be uneconomical to foreclose on the mortgaged property, the servicer may write off the entire balance of such mortgage loan as a bad debt. The foregoing considerations will be particularly applicable to mortgage loans secured by second-liens that have high combined loan-to-value ratios because it is comparatively more likely that the servicer would determine foreclosure to be uneconomical in the case of such mortgage loans.

- *The concentration of mortgage loans in specific geographic areas may increase the risk of loss.* Economic conditions in the states where borrowers reside may affect the delinquency, loss and foreclosure experience of the issuing entity with respect to the mortgage loans. Based on the Initial Pool Balance of the initial mortgage loans, approximately 15.36%, 15.23%, 5.90% and 5.12% of the initial mortgage loans are secured by properties in California, Florida, Illinois and Texas, respectively. These states may suffer economic problems or reductions in market values for residential properties that are not experienced in other states. Because of the concentration of mortgage loans in these states, those types of problems may have a greater effect on the notes than if borrowers and properties were more spread out in different geographic areas. For example, some of the mortgaged properties may be more susceptible to certain types of special hazards, such as earthquakes, hurricanes, floods, mudslides, wildfires and other natural disasters and major civil disturbances, than residential properties located in other parts of the country.

- *The concentration of mortgage loans in California and Florida may increase the risk of loss.* Approximately 15.36% of the aggregate principal balance of the initial mortgage loans are secured by mortgaged properties located in California. Property in California may be more susceptible than homes located in other parts of the country to some types of uninsurable hazards, such as earthquakes, mudslides, floods, wildfires and eruptions, and civil disturbances such as riots. Since 2001, California has experienced intermittent energy shortages that have resulted in unpredictable rolling blackouts and higher energy costs. Such obligors could potentially become delinquent in making monthly payments or default if they were unable to make payments due to increased energy or fuel bills or unemployment. The issuing entity's ability to make payments on the notes could be adversely affected if the related obligors were unable to make timely payments. The depositor cannot predict whether, or to what extent or for how long, such events may occur.

Approximately 15.23% of the aggregate principal balance of the initial mortgage loans are secured by mortgaged properties located in Florida. Property in Florida may be more susceptible than homes located in other parts of the country to some types of uninsurable hazards, such as hurricanes and floods. In 2005, hurricanes Katrina and Wilma caused substantial devastation to parts of Florida. Additional hurricanes may strike the region. Such hazards may increase the rate of delinquencies and losses on the mortgage loans secured by mortgaged properties that are or may be affected by the hurricanes because they may have

000023

Table of Contents

an impact on the ability of borrowers to make payments on their mortgage loans, the ability of the servicer to make collections on mortgage loans and the level of forbearance afforded by the servicer to borrowers. Other economic effects include localized areas of nearly complete destruction of the economic infrastructure and cessation of economic activity, regional interruptions in travel and transportation, tourism and economic activity generally. Any adverse impact as a result of such events may be borne by the holders of the notes.

In addition, there are also concentrations of mortgage loans in other states as described under *"The Mortgage Loans"* in this prospectus supplement. Consequently, losses and prepayments on the mortgage loans and the resultant payments on the notes may be affected significantly by changes in the housing markets and the regional economies in any of these areas and by the occurrence of natural disasters, such as earthquakes, hurricanes, tornadoes, tidal waves, mudslides, fires and floods in these areas.

- *Interest-only mortgage loans may have an increased risk of loss.* Approximately 9.49% of all of the initial mortgage loans do not provide for any payments of principal during the first five years of their term. These mortgage loans may involve a greater degree of risk because, if the related mortgagor defaults, the outstanding principal balance of that mortgage loan will be higher than for a mortgage loan that does not have an interest-only period.

**Simultaneous second lien risk**

With respect to approximately 24.92% of all of the first lien initial mortgage loans (by aggregate principal balance as of the cut-off date), at the time of origination of the first lien initial mortgage loan, the originator also originated a second lien mortgage loan which may or may not be included in the initial mortgage pool. The weighted average loan-to-value ratio of such initial mortgage loans is approximately 79.52%, and the weighted average combined loan-to-value ratio of such initial mortgage loans (including the second lien) is approximately 98.47%. With respect to a first lien mortgage loan where the mortgaged property is also encumbered by a second lien mortgage loan, foreclosure frequency may be increased since mortgagors have less equity in the mortgaged property. In addition, the servicer may declare a default on the second lien loan, even though the first lien is current which would constitute a default on the first lien loan. Investors should also note that any mortgagor may obtain secondary financing at any time subsequent to the date of origination of their mortgage loan from the originator or from any other lender.

**The assignment of certain of the mortgages in the name of MERS may result in delays and additional costs in commencing, prosecuting and completing foreclosure proceedings**

The assignment of certain of the mortgages in the name of Mortgage Electronic Registration Systems, Inc. ("MERS") is a relatively new practice in the mortgage lending industry. The sponsor expects that the servicer or successor servicer will be able to commence foreclosure proceedings on the mortgaged properties, when necessary and appropriate; however, public recording officers and others may have limited, if any, experience with lenders seeking to foreclose mortgages, assignments of which are registered with MERS. Accordingly, delays and additional costs in commencing, prosecuting and completing foreclosure proceedings, defending litigation commenced by third parties and conducting foreclosure sales of the mortgaged properties could result. Those delays and additional costs could in turn delay the distribution of liquidation proceeds to the noteholders and increase the amount of realized losses on the mortgage loans.

S-18

Table of Contents

**Your yield to maturity may be reduced by prepayments and defaults**

The pre-tax yield to maturity on your investment is uncertain and will depend on a number of factors, including the following:

- ***Prepayments on fixed-rate mortgage loans.*** The mortgage loans allow the borrowers to prepay the loans in full or in part at any time. Approximately 51.00% of all of the initial mortgage loans are fixed-rate mortgage loans. Based on the Initial Pool Balance of the initial mortgage loans, approximately 84.85% of the fixed-rate initial mortgage loans have prepayment penalty fee clauses pursuant to which prepayment penalty fees are chargeable on prepayments occurring during the first six months to five years after origination. These fees may discourage borrowers from prepaying their mortgage loans during the prepayment penalty fee period and, accordingly, affect the rate of prepayment of such mortgage loans even in a declining interest rate environment. The servicer may waive a prepayment charge if a mortgage loan is in default or if a default is reasonably foreseeable.

  The rate of prepayments on the mortgage loans is sensitive to prevailing interest rates. If prevailing interest rates fall significantly below the mortgage interest rates on the mortgage loans, the mortgage loans are likely to be subject to higher prepayment rates than if prevailing interest rates remain at or above the mortgage interest rates on the mortgage loans. Conversely, if prevailing interest rates rise significantly above the mortgage interest rates on the mortgage loans, the rate of prepayments is likely to decrease. The weighted average lives of the notes and, if purchased at other than par, the yields realized by owners of the notes, will be sensitive to rates of payment of principal on the mortgage loans. The yield on a note that is purchased at a premium from its outstanding principal balance may be adversely affected by higher than anticipated levels of prepayments on the mortgage loans. Conversely, the yield on a note that is purchased at a discount from its outstanding principal balance may be adversely affected by lower than anticipated levels of prepayments on the mortgage loans.

- ***Prepayments on adjustable-rate mortgage loans.*** Approximately 49.00% of the initial mortgage loans are adjustable-rate mortgage loans which have fixed rates of interest for the first six months, two years ("2/28 loans"), three years ("3/27 loans") or five years ("5/25 loans") after origination and then convert to adjustable rates. This type of adjustable-rate mortgage loan is commonly referred to as a hybrid mortgage loan. Based on the Initial Pool Balance of the initial mortgage loans, approximately 67.76% of the adjustable-rate initial mortgage loans have prepayment penalty fee clauses pursuant to which prepayment penalty fees are chargeable on prepayments occurring during the first six months to five years after origination. The prepayment experience on the adjustable-rate loans may differ from the prepayment experience on fixed-rate mortgage loans due to provisions which provide for conversion to an adjustable mortgage interest rate, periodic coupon reset caps and a maximum mortgage interest rate. In particular, hybrid mortgage loans may be subject to higher prepayment rates as they approach the date they are scheduled to convert to an adjustable-rate mortgage loan. As a hybrid mortgage loan approaches its initial adjustment date, the borrower may become more likely to refinance that loan to avoid an increase in the loan rate, even if fixed-rate mortgage loans are only available at rates that are slightly lower or higher than the mortgage interest rate before adjustment. All adjustable-rate initial mortgage loans currently originated by the Sponsor have an initial period of time in which the interest rate on the note is fixed (six months, two years, three years or five years). For the first month after the expiration of the fixed interest rate period (month 25, for a 2/28 loan, for example), the borrower's interest rate is calculated using the "Six Month LIBOR Index" plus the margin specified in the borrower's note. With regard to substantially all of the adjustable-

S-19

Table of Contents

rate initial mortgage loans, for the initial six-month period after the change date, the borrower's interest rate cannot be more than 1.500% greater than the fixed rate (2/28, 3/27 and 5/25 loans) or 1.000% for the "Six month fixed rate period" product. With regard to substantially all of the adjustable-rate initial mortgage loans, for each subsequent rate change, the borrower's interest rate cannot be more than 1.500% greater than the previous interest rate (2/28, 3/27 and 5/25) and 1.000% for the "six month fixed rate period" product. At any time, the borrower's interest rate cannot be more than 7.000% greater than the fixed rate which the borrower initially paid (2/28, 3/27 and 5/25) and 6.000% for the "six month fixed rate period" product.

- **Prepayments on interest-only mortgage loans.** Approximately 9.49% of the initial mortgage loans provide for payment of interest at the related mortgage interest rate, but no payment of principal for approximately the first five years following the origination of the mortgage loan. Following such interest-only period, the monthly payment with respect to each of these mortgage loans will be increased to, and include a portion allocable to principal in, an amount sufficient to amortize the principal balance of the mortgage loan over the remaining term and to pay interest at the mortgage interest rate. If a recalculated monthly payment as described above is substantially higher than a borrower's previous interest-only monthly payment, that loan may be subject to an increased risk of delinquency, loss and/or prepayment.

- **Defaults and delinquencies may cause shortfalls in cash available to make payments.** There can be no assurance that the applicable credit enhancement will adequately cover any shortfalls in cash available to make payments on your notes as a result of delinquencies or defaults on the mortgage loans. If delinquencies or defaults occur on the mortgage loans, neither the servicer nor any other entity will advance scheduled monthly payments of interest on delinquent or defaulted mortgage loans if such advances are not likely to be recovered.

- **You may be unable to reinvest distributions in comparable investments.** Asset-backed securities, like the notes, usually produce more returns of principal to investors when market interest rates fall below the mortgage interest rates on the mortgage loans and produce less returns of principal when market interest rates rise above the mortgage interest rates on the mortgage loans. If borrowers refinance their mortgage loans as a result of lower interest rates, you will receive an unanticipated payment of principal. As a result, you are likely to receive more money to reinvest at a time when other investments generally are producing a lower yield than that on the notes, and are likely to receive less money to reinvest when other investments generally are producing a higher yield than that on the notes. You will bear the risk that the timing and amount of distributions on your notes will prevent you from attaining your desired yield.

- **Limitations on interest rates will affect your yield to maturity.** The notes may be subject to an "available funds cap rate" on some payment dates, if the interest rate otherwise applicable to such notes exceeds the Available Funds Cap. The application of these caps would reduce the amount of interest you will receive. Any shortfall in interest on the notes due to these caps will be paid out of excess interest and amounts, if any, received, from the swap provider to the extent available in accordance with the priority of payments described herein. However, if the full amount of such shortfall is not paid, such unpaid amounts will be carried forward to subsequent payment dates. Further, increases and decreases in interest rates may be limited for any interest rate adjustment date (i.e., an initial or a periodic adjustment cap). In addition, the mortgage interest rates may be subject to an overall maximum and minimum interest rate.

S-20

Table of Contents

- *Mortgage loans with higher mortgage rates may affect the Available Funds Cap.* If prepayments, defaults and liquidations occur more rapidly on the applicable mortgage loans with relatively higher mortgage rates than on the mortgage loans with relatively lower mortgage rates, it will have the effect of lowering the Available Funds Cap.

**Additional mortgage loans may have characteristics that differ from those of the initial mortgage loans which may reduce your yield to maturity**

Following the transfer of the additional mortgage loans (approximately $214,280,879 in aggregate principal balance) to the issuing entity on the closing date, the characteristics of the mortgage loans may differ from the information presented in this prospectus supplement, though we do not expect them to vary materially. The characteristics that may differ include, among others, the composition of the mortgage loans, the credit quality of the mortgage loans, the distribution by interest rate, the distribution by principal balance, the distribution by loan-to-value ratio and the distribution by remaining term to stated maturity. We recommend that you consider potential variances when making your investment decision concerning the offered notes.

**The final pool of mortgage loans will include mortgage loans which will differ from the pool of initial mortgage loans described in this prospectus supplement**

Subsequent mortgage loans may have characteristics different from those of the initial mortgage loans. However, each subsequent mortgage loan must satisfy the eligibility criteria referred to under the "*The Mortgage Pool—Conveyance of Subsequent Mortgage Loans and the Pre-Funding Account*" at the time of its conveyance to the issuing entity and must be underwritten in accordance with the criteria described under "*The Sponsor*" herein. The statistical information presented in this prospectus supplement under "*The Mortgage Pool*" describes a pool of mortgage loans consisting in the aggregate of the initial mortgage loans to be transferred to the issuing entity on the closing date.

**The pre-funding feature could result in a significant prepayment on the Notes at the end of the pre-funding period.**

If the amount in the pre-funding account with respect to a group of mortgage loans is not fully applied to the purchase of subsequent mortgage loans by the end of the pre-funding period, the remaining funds will be used to make a principal prepayment on the Notes. No assurances can be given that there will not be such a payment.

**The use of an interest rate swap agreement creates risk to your yield if there are rapid prepayments on the mortgage loans or an early termination of the interest rate swap agreement occurs; there can be no assurance that any amounts will be received under the interest rate swap agreement**

Any net payment payable to the swap provider under the terms of the interest rate swap agreement will reduce amounts available for distribution to noteholders, and may reduce the interest rates of the notes. If the rate of prepayments on the mortgage loans is faster than anticipated, the scheduled notional amount on which payments due under the interest rate swap agreement are calculated may exceed the Pool Balance, thereby increasing the relative proportion of interest collections on the loans that must be applied to make net payments to the swap provider. The combination of a rapid rate of prepayment and low prevailing interest rates could adversely affect the yields on the notes.

In addition, swap termination payments (other than Defaulted Swap Termination Payments) arising under the interest rate swap agreement are payable to the swap provider on a senior basis and such payments may reduce amounts available for distribution to noteholders.

S-21

Table of Contents

Any amounts received under the interest rate swap agreement will be applied as described in this prospectus supplement to pay interest shortfalls, achieve, restore and maintain overcollateralization and cover losses. However, no amounts will be payable to the issuing entity by the swap provider unless the floating payment owed by the swap provider on a payment date exceeds the fixed payment owed to the swap provider on such payment date. This generally will not occur except in a period where one-month LIBOR (as determined pursuant to the interest rate swap agreement) exceeds 5.250% per annum. We cannot assure you that any amounts will be received under the interest rate swap agreement, or that any such amounts that are received will be sufficient to restore or maintain required overcollateralization or to cover interest shortfalls and losses on the mortgage loans.

*See "Description of the Notes and the Trust Certificates Distributions of Interest Priority of Payment" " Distributions of Principal" and " Interest Rate Swap Agreement."*

**The credit rating of the swap provider and its guarantor could affect rating of notes**

The short term unsecured obligations of the swap provider are rated A-1+ by Standard & Poor's, P-1 by Moody's and F1+ by Fitch Ratings Limited. The long-term obligations of the swap provider are rated AA by Standard & Poors, Aa1 by Moody's and AA+ by Fitch Ratings Limited.

The ratings on the notes are dependent in part upon the credit ratings of the swap provider. If a credit rating of the swap provider is qualified, reduced or withdrawn and a substitute swap provider is not obtained or collateral is not posted in accordance with the terms of the interest rate swap agreement, the ratings of the notes may be qualified, reduced or withdrawn. In such event, the value and marketability of the notes may be adversely affected.

*See "Description of the Notes and the Trust Certificates Interest Rate Swap Agreement."*

**The issuing entity assets are the only source of payments on the notes**

All distributions on each class of notes will be made from payments by borrowers under the mortgage loans, net of payments made under the interest rate swap agreement and amounts received, if any, from the swap provider. The issuing entity has no other assets to make distributions on the notes and any shortfalls in collections on the mortgage loans may result in your receiving less than what is owed to you. The mortgage loans are not insured or guaranteed by any person. The issuing entity is the only person that is obligated to make distributions on the notes. The notes are not insured by any governmental agency.

**Credit enhancement is limited and may be inadequate to cover shortfalls and losses**

The excess interest, overcollateralization, subordination and prepayment penalties described in this prospectus supplement are intended to enhance the likelihood that holders of more senior classes will receive regular payments of interest and principal, but are limited in nature and may be insufficient to cover all shortfalls and all losses on the mortgage loans.

***Excess Interest and Overcollateralization.*** In order to achieve or maintain overcollateralization, it will be necessary that the mortgage loans generate more interest than is needed to pay interest on the notes as well as the fees and expenses of the issuing entity. We expect that the mortgage loans will generate more interest than is needed to pay those amounts, at least during certain periods, because the weighted average of the interest rates on the mortgage loans is expected to be higher than the weighted average of the Interest Rates on the related notes. Any remaining interest generated by the mortgage loans will be used, if necessary on any payment date, to absorb losses on the mortgage loans, to achieve or maintain overcollateralization.

000028

Table of Contents

On the closing date, the aggregate scheduled principal balance of the mortgage loans plus the pre-funding amount will exceed the aggregate principal balance of the notes. Such excess is referred to herein as "overcollateralization" and will be available to absorb losses. We cannot assure you, however, that the mortgage loans will generate enough excess interest in all periods to achieve and maintain the overcollateralization level required by the rating agencies. The following factors will affect the amount of excess interest that the mortgage loans will generate:

*Prepayments.* Every time a mortgage loan is prepaid in whole or in part, total excess interest after the date of prepayment will be reduced because that mortgage loan will no longer be outstanding and generating interest or, in the case of a partial prepayment, will be generating less interest. The effect on your notes of this reduction will be influenced by the amount of prepaid loans and the characteristics of the prepaid loans. Prepayment of a disproportionately high number of high interest rate mortgage loans would have a greater negative effect on future excess interest.

*Delinquencies, Defaults and Liquidations.* If the rates of delinquencies (to the extent not covered by advances made by the servicer), defaults or losses on the mortgage loans turn out to be higher than expected, excess interest will be reduced by the amount necessary to compensate for any shortfalls in cash available to pay noteholders. Every time a mortgage loan is liquidated or charged off, excess interest is reduced because such mortgage loan will no longer be outstanding and generating interest.

*Increases in LIBOR with respect to mortgage loans.* Based on the Initial Pool Balance of the initial mortgage loans, approximately 49.00% have interest rates that adjust based on a six-month LIBOR index (generally subject to an initial fixed rate period of six months, or two, three or five years after origination) and not the one-month LIBOR index used to determine the interest rates on the Offered Notes. The remainder of the mortgage loans have fixed rates of interest. As a result of an increase in one-month LIBOR, the Interest Rate on such notes may increase relative to interest rates on the mortgage loans, requiring that more of the interest generated by the mortgage loans be applied to cover interest on such notes which will accordingly reduce the amount of excess interest available.

See *"Description of the Notes and the Trust Certificates  Overcollateralization Provisions" in this prospectus supplement.*

**Subordination.** The rights of the holders of each class of the Class M Notes to receive payments will be subordinate to the rights of the holders of the Class A Notes to receive payments, as well as to the rights of the holders of more senior classes of Class M Notes to receive payments. This subordination is intended to enhance the likelihood of regular receipt by higher-ranking classes of notes of the full amount of the monthly payments allocable to them, and to afford protection against losses.

If realized losses are incurred with respect to the mortgage loans, to the extent that the aggregate principal balance of the notes exceeds the aggregate principal balance of the mortgage loans plus the remaining pre-funding amount, the Class M Notes may never receive principal or interest in respect of such excess. The amount of interest accrued on the portion of the balance of the notes in excess of the balance of the mortgage loans plus the remaining pre-funding amount will be deferred and such deferral will be allocated to the Class M Notes in reverse order of seniority. The amount of interest so deferred will be paid only after certain other payments are made from excess interest to restore overcollateralization and to pay basis risk shortfalls. Investors should fully consider the risks associated with an investment in the Class M Notes, including the possibility that investors may not fully recover their initial investment as a result of realized losses.

The Class M Notes have the following levels of priority with respect to payments and effects of realized losses:



| | |
|---|---|
| Class M-1 | more senior |
| Class M-2 | |
| Class M-3 | |
| Class M-4 | |
| Class M-5 | |
| Class M-6 | |
| Class M-7 | |
| Class M-8 | |
| Class M-9 | less senior |

S-23

000029

Table of Contents



*Prepayment Penalties.* Some of the mortgage loans contain prepayment penalty fee clauses pursuant to which prepayment penalty fees are chargeable on prepayments occurring during the first six months to five years after origination. Any prepayment penalties will be used, if necessary on any payment date, to absorb losses on the mortgage loans and to achieve or maintain overcollateralization. The servicer may waive a prepayment charge if a mortgage loan is in default or if a default is reasonably foreseeable.

**Bankruptcy of the servicer may adversely affect payments on the notes and servicing of the mortgage loans**

In the event of a bankruptcy or insolvency of Accredited Home Lenders, Inc., as servicer, the bankruptcy trustee or receiver may have the power to prevent Deutsche Bank National Trust Company, as indenture trustee, or the noteholders (in the limited circumstances outlined in the sale and servicing agreement) from appointing a successor servicer. Regardless of whether a successor servicer is appointed, any termination of Accredited Home Lenders, Inc., as servicer (whether due to bankruptcy or insolvency or otherwise), could adversely affect the servicing of the mortgage loans, including the delinquency experience of the mortgage loans.

**The notes are not suitable investments for all investors**

The notes are not suitable investments for any investor that requires a regular or predictable schedule of payments or payment on any specific date. The notes are complex investments that should be considered only by investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment, and the interaction of these factors.

**Terrorist attacks and military action could adversely affect the yield on the notes**

The terrorist attacks in the United States on September 11, 2001 suggest that there is an increased likelihood of future terrorist activity in the United States. In addition, current political and military tensions in the Middle East have resulted in a significant deployment of United States military personnel in the region. Investors should consider the possible effect of past and possible future terrorist attacks and any resulting military response by the United States on the delinquency, default and prepayment



S-24

Table of Contents

experience of the mortgage loans. In accordance with the servicing standard set forth in the sale and servicing agreement, the servicer may defer, reduce or forgive payments and delay foreclosure proceedings in respect of mortgage loans to borrowers affected in some way by past and possible future events.

In addition, the current deployment of United States military personnel in the Middle East and the activation of a substantial number of United States military reservists and members of the National Guard may significantly increase the proportion of mortgage loans whose mortgage rates are reduced by the application of the Servicemembers Civil Relief Act, as amended (the "Relief Act") or a state law providing for similar relief. See "*Legal Aspects of Loans — Relief Act*" in the prospectus. Certain shortfalls in interest collection arising from the application of the Relief Act of any state law providing for similar relief will not be covered by the servicer or any subservicer.

**Taxation of the issuing entity**

It is anticipated that the issuing entity will be characterized as one or more taxable mortgage pools, or TMPs, for federal income tax purposes. In general, a TMP is treated as a separate corporation not includible with any other corporation in a consolidated income tax return, and is subject to corporate income taxation. However, it is anticipated that the issuing entity will be entirely owned by the depositor, that at all times that it owns the sole class of equity in the issuing entity, intends to qualify as a "real estate investment trust," or REIT. So long as the issuing entity is owned by the depositor (or another REIT or "qualified REIT subsidiary"), and the depositor continues to qualify as a REIT, classification of the issuing entity as a TMP will not cause it to be subject to corporate income tax.

In the event that the issuing entity is not wholly owned by a REIT or a "qualified REIT subsidiary," (for instance, as a consequence of the depositor losing its REIT status), the issuing entity would become subject to federal income taxation as a corporation and would not be permitted to be included in a consolidated income tax return of another corporate entity. No transfer of the owner trust certificates will be permitted to an entity that is not a REIT or a qualified REIT subsidiary.

In the event that federal income taxes are imposed on the issuing entity, the cash flow available to make payments on the offered notes would be reduced. In addition, the need for cash to pay such taxes could result in a liquidation of the issuing entity, with a consequential redemption of the offered notes at a time earlier than anticipated.

**The sponsor may be adversely affected by litigation to which it is, or may become, a party**

As more fully described under "*The Sponsor—Legal Proceedings*," the sponsor currently is and may in the future become a defendant in class action or other lawsuits, which seek to recover substantial amounts from the sponsor. No assurances can be given that the sponsor will be able to successfully defend all or any of such lawsuits, and adverse results in one or more of such lawsuits could have a material adverse effect on the sponsor's ability to perform as the servicer and to repurchase defective mortgage loans. In addition to the class actions disclosed in Accredited's public filings, Accredited is subject to the lawsuit described below.

In March 2006, Accredited was served with a class action complaint, *Cabrejas v. Accredited Home Lenders, Inc.*, brought in the Circuit Court for Prince George's County, Maryland. The complaint alleges that fees charged and disclosed on second lien loans originated by Accredited in Maryland (i) violated the Maryland Secondary Mortgage Loan Law in that such fees exceeded 10% of the respective loan amounts and (ii) constituted unfair and deceptive trade practices in violation of the Maryland Consumer Protection Act. The plaintiffs seek to recover, on behalf of themselves and similarly situated individuals, damages, disgorgement of fees, pre-judgment interest, declaratory and injunctive relief.

S-25

Table of Contents

attorneys' fees, and any other relief the court may grant. On April 13, 2006, Accredited removed the action to the United States District Court, District of Maryland. On May 15, 2006, Accredited filed a motion to dismiss plaintiffs' second cause of action alleging a violation of the Maryland Consumer Protection Act on the basis that full disclosure of the fees cannot be an unfair or deceptive trade practice. A hearing date for the motion to dismiss has not been set. A motion to certify a class has not yet been filed, and there has been no ruling on the merits of either the plaintiff's individual claims or the claims of the putative class, and the ultimate outcome of this matter and the amount of liability, if any, which may result is not presently determinable. Accredited intends to vigorously defend this matter and does not believe it will have a material adverse effect on its business.

**High loan-to-value ratios increase risk of loss**

Mortgage loans with higher loan-to-value ratios may present a greater risk of loss than mortgage loans with lower loan-to-value ratios. Based on the Initial Pool Balance of the initial mortgage loans, approximately 28.61% of the initial mortgage loans had loan-to-value ratios in excess of 80% (references to loan-to-value ratios in this prospectus supplement are references to combined loan-to-value ratios with respect to second-lien mortgage loans). Additionally, the determination of the value of a mortgaged property used to calculate the loan-to-value ratio of a mortgage loan may differ from the appraised value of such mortgaged properties if current appraisals were to be obtained.

**Violation of lending laws could result in losses on the notes**

In addition to federal law, some states have enacted laws or regulations that prohibit inclusion of some provisions in mortgage loans that have interest rates or origination costs in excess of prescribed levels, and require that mortgagors be given certain disclosures prior to the consummation of the mortgage loans and restrict the ability of the servicer to foreclose in response to the mortgagor's default. The failure of the originator to comply with these laws could subject the issuing entity to significant monetary penalties, could result in the mortgagors rescinding the mortgage loans against the issuing entity and/or limit the servicer's ability to foreclose upon the related mortgaged property in the event of a mortgagor's default.

Under the anti-predatory lending laws of some states, the borrower is required to meet a net tangible benefits test in connection with the origination of the related mortgage loan. This test may be highly subjective and open to interpretation. As a result, a court may determine that a mortgage loan does not meet the test even if the originator reasonably believed that the test was satisfied. Any determination by a court that a mortgage loan does not meet the test will result in a violation of the state anti-predatory lending law, in which case the depositor or the sponsor will be required to purchase that mortgage loan from the trust estate in the manner described in this prospectus supplement.

The sponsor will represent that each mortgage loan at the time it was made was in compliance with applicable federal and state laws and regulations. In the event of a breach of such representation, the depositor or the sponsor will be obligated to cure such breach or repurchase or replace the affected mortgage loan in the manner described in this prospectus supplement. If the depositor and the sponsor are unable or otherwise fail to satisfy such obligations, the yield on the offered notes may be materially and adversely affected.

S-26

Table of Contents

## Transaction Overview

### Formation of the Issuing Entity and Issuance of the Trust Certificates

The issuing entity will be formed pursuant to the terms of a trust agreement between the owner trustee and the sponsor and upon the filing of a certificate of trust with the Secretary of State of the State of Delaware. Under the trust agreement, the issuing entity will also issue a class of trust certificates evidencing the entire beneficial ownership interest in the issuing entity.

The trust estate will consist of:

- the initial mortgage loans and subsequent mortgage loans, together with the mortgage files relating thereto,
- all scheduled collections on the mortgage loans and proceeds thereof due after the Cut-off Date and all unscheduled collections on the mortgage loans and proceeds thereof received on or after the Cut-off Date,
- REO property acquired through the foreclosure or other realization upon defaulted mortgage loans, and collections on and proceeds of such REO property,
- assets that are deposited in the accounts, including the pre-funding account and the capitalized interest account, if any,
- rights under all insurance policies required to be maintained pursuant to the sale and servicing agreement and any insurance proceeds thereof,
- proceeds upon the liquidation of any mortgage loans,
- the interest rate swap agreement, and
- released mortgaged property proceeds.

### Sale and Servicing of the Mortgage Loans

The mortgage loans have been originated or purchased by the sponsor pursuant to its underwriting guidelines, including the sponsor's exception policy, as described under *"The Sponsor and the Servicer."* The sponsor contributed the mortgage loans to its wholly-owned subsidiary, the depositor. The sponsor will direct the depositor to sell the mortgage loans to the issuing entity pursuant to a sale and servicing agreement, dated as of June 1, 2006, among the depositor, the issuing entity, the indenture trustee, the sponsor, and the servicer. The servicer will service the mortgage loans pursuant to the terms of the sale and servicing agreement.

### Issuance of the Notes

Pursuant to the terms of an indenture, dated as of June 1, 2006, between the issuing entity and the indenture trustee, the issuing entity will pledge the trust estate to the indenture trustee, for the benefit of the noteholders, and issue the notes.

S-27

Table of Contents

## The Mortgage Loans

**General**

Each of the mortgage loans will bear interest at a fixed or adjustable mortgage interest rate and be secured by a first or second lien on the related mortgaged property.

The mortgage loans were made for the purpose of purchasing a new home, obtaining construction-to-permanent financing, refinancing an existing mortgage loan, consolidating debt and/or obtaining cash proceeds by borrowing against the borrower's equity in the mortgaged property. The mortgage loans are secured by first and second liens on single family residences, which may be detached, part of a one- to four-family dwelling, a condominium unit or a unit in a planned unit development. The mortgaged properties may be owner occupied or non-owner occupied investment properties. A substantial number of the mortgage loans were originated pursuant to the sponsor's exception policy. See "The Sponsor and the Servicer  Underwriting" herein.

The sponsor currently sells a majority of the loans it originates to third parties through whole loan sales, with the remainder of the loans the sponsor originates being securitized from its own shelf registration. From time to time, the sponsor will designate certain loans for specific whole loan sales (loans having LTVs greater than 90% and second-lien loans, for example), as the sponsor believes that a higher value is received for these loans through whole loan sales. For loans not specifically designated for sale to third parties as described above, the sponsor uses a proprietary software program to determine best execution and allocates the remaining loans between whole loan bid packages and securitization.

The statistical information presented in this prospectus supplement is computed based on the Initial Pool Balance for the initial mortgage loans. The statistical information presented in this prospectus supplement describes only the initial mortgage loans included in the issuing entity on the closing date, and does not include the additional mortgage loans that will be included in the trust estate on the closing date and the subsequent mortgage loans which may be acquired through the pre-funding feature. All percentages are measured with respect to the aggregate Initial Pool Balance of all the initial mortgage loans.

This prospectus supplement contains information regarding the initial mortgage loans to be included in the issuing entity as of the closing date. The depositor will also transfer additional mortgage loans (collectively, the "additional mortgage loans") to the issuing entity as of the closing date. Although these additional mortgage loans will have characteristics that differ somewhat from the initial mortgage loans. In addition, all additional mortgage loans must conform to the representations and warranties in the sale and servicing agreement. The materially from the initial mortgage loans we describe in this prospectus supplement, the depositor does not expect that their characteristics will vary initial mortgage loans and the additional mortgage loans are collectively referred to as the "closing date mortgage loans".

The depositor expects that the closing date mortgage loans will have an aggregate principal balance as of the date of their transfer to the issuing entity of approximately $1,050,000,000. The initial mortgage loans have an aggregate principal balance as of their initial cut-off date as of the date of their transfer to the issuing entity of approximately closing date mortgage loan pool. The depositor expects the additional mortgage loans to be added to the issuing entity on the closing date to have an aggregate principal balance as of their cut-off date of approximately $214,280,879, or approximately 20.41% of the closing date mortgage loan pool.

The Initial Pool Balances for the initial mortgage loans was approximately $835,719,121.

000034

Table of Contents

As of the Initial Cut-off Date, no initial mortgage loan had a remaining term to maturity greater than 30 years. None of the initial mortgage loans were more than one payment past due. Each of the initial mortgage loans was an "actuarial" loan. See "*Delinquency and Loss Information for the Mortgage Loans*" herein.

Approximately 98.39% of the initial mortgage loans were secured by a first lien on the related mortgaged property and approximately 1.61% of the initial mortgage loans were secured by a second lien on the related mortgaged property.

As of the Initial Cut-off Date, approximately 9.49% of the initial mortgage loans were "interest only" loans. These loans provide for an initial payment period, which is typically five years, during which the mortgagor's monthly payment consists only of interest. When this initial period ends, the loan will begin to amortize and will amortize fully over its remaining term.

As of the Initial Cut-off Date, the weighted average loan-to-value ratio was approximately 76.78% (references to loan-to-value ratios in this prospectus supplement are references to combined loan-to-value ratios with respect to second-lien mortgage loans), the weighted average interest rate of the initial mortgage loans was approximately 7.829% per annum and the weighted average remaining term to maturity was approximately 351 months, with a weighted average seasoning of approximately 2 months.

Approximately 76.48% of the initial mortgage loans impose a prepayment penalty for early full or partial prepayments during a period ranging from six months to five years from the date of origination. These prepayment penalties are generally calculated as a specified percentage of the original principal balance of the initial mortgage loans or of the outstanding principal balance of the initial mortgage loans, or a specified number of months of interest accrued at the related mortgage interest rate, or a specified percentage of the amount prepaid.

Approximately 4.85% of the initial mortgage loans were originated using an automated valuation model to provide an estimate of value for a specific property in lieu of a standard appraisal in accordance with Accredited's underwriting guidelines in effect at the time of origination. See "*The Sponsor-Underwriting*" in this prospectus supplement.

Each initial mortgage loan, at the time it was made, complied in all material respects with applicable local, state and federal laws, including, but not limited to, all applicable predatory and abusive lending laws. None of the initial mortgage loans are "high cost" loans under the Home Ownership Equity Protection Act of 1994 (or other applicable predatory and abusive lending laws), none of the initial mortgage loans financed a single-premium credit insurance policy and none of the initial mortgage loans were originated on or after October 1, 2002 and before March 7, 2003 and encumber property located in Georgia.

The loan-to-value ratios (references to loan-to-value ratios in this prospectus supplement are references to combined loan-to-value ratios with respect to second-lien mortgage loans) ("LTVs") described in this prospectus supplement were calculated based upon the lesser of (1) the appraised values of the related mortgaged properties at the time of origination and (2) the purchase prices of related mortgaged properties in the case of any mortgaged property purchased with a mortgage loan (or purchased within the twelve months preceding origination of the mortgage loan.) No assurance can be given that such values have remained or will remain at the levels that existed on the dates of origination of the related mortgage loans. If property values decline such that the outstanding principal balances of the mortgage loans become equal to or greater than the value of the mortgaged properties, investors may experience a loss.

S-29

000035

Table of Contents

**Conveyance of Subsequent Mortgage Loans and the Pre-Funding Account**

On the closing date if required by the rating agencies, the depositor will deposit cash into the capitalized interest account for application to cover shortfalls in interest attributable to the pre-funding feature. This shortfall will exist during the pre-funding period because the aggregate class note balance of the notes, and interest accrued thereon, during the pre-funding period will be greater than the aggregate principal balance of the closing date mortgage loans, and interest accrued thereon, during such period. Funds on deposit in the capitalized interest account will be withdrawn monthly during the pre-funding period to fund shortfalls resulting from the pre-funding feature. Any amounts remaining in the capitalized interest account (including investment earnings) and not needed for such purpose will be paid to the depositor and will not thereafter be available for payment to the noteholders.

On the closing date, the depositor will deposit approximately $350,000,000, the original pre-funded amount, in a pre-funding account which will be in the name of the indenture trustee and which amount will be used to acquire subsequent mortgage loans. During the pre-funding period, the related original pre-funded amount will be reduced by the amount used to purchase subsequent mortgage loans. The "pre-funding period" is the period commencing on the closing date and ending on the earlier to occur of (i) the date on which the amount on deposit in the pre-funding account is less than $185,000 and (ii) August 28, 2006.

The indenture trustee will invest funds deposited in the pre-funding account and the capitalized interest account, if any, as directed by the servicer in writing in eligible investments with a maturity date (i) no later than the business day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to the sale and servicing agreement, if a person other than the indenture trustee or an affiliate manages or advises such investment, and (ii) no later than the date on which such funds are required to be withdrawn from such account pursuant to the sale and servicing agreement, if the indenture trustee or an affiliate manages or advises such investment. If the indenture trustee does not receive such written investment instructions it will retain such funds uninvested. All income and gain realized from investment of funds deposited in the pre-funding account will be withdrawn and deposited in the collection account.

The purchase price for each subsequent mortgage loan will be 100% of the then outstanding principal balance.

With respect to the subsequent mortgage loans, none of the subsequent mortgage loans may be between 30 and 59 days delinquent as of the applicable cut-off date.

Each subsequent mortgage loan will be acquired from the sponsor, and will have been underwritten in accordance with the criteria applicable to the sponsor, as described under "*The Sponsor*."

Confirmation from the rating agencies that the acquisition of any subsequent mortgage loans will not result in a downgrade, withdrawal or qualification of the ratings then in effect for the outstanding notes will be required in connection with the subsequent transfer of mortgage loans. The consent of the rating agencies will be required for all subsequent transfers and an officer's certificate from the sponsor will be required confirming that each subsequent mortgage loan satisfies the following criteria (among other criteria described in the sale and servicing agreement):

- the remaining stated term to maturity of the any subsequent mortgage loan will not exceed 360 months;

- the subsequent mortgage loan must have an outstanding principal balance of at least $10,000;

S-30

000036

Table of Contents

- the subsequent mortgage loan must have a loan-to-value ratio equal to or less than 100%;

- the stated maturity of the subsequent mortgage loan will be no later than October 2036;

- the acquisition of any subsequent mortgage loans will not result in a weighted average current Mortgage Rate of at least 7.780% per annum;

- the acquisition of any subsequent mortgage loans will not result in a weighted average Original Loan-to-Value Ratio of not more than 79.00%;

- the acquisition of any subsequent mortgage loans will not result in a weighted average Credit Score of less than 625; and

- each Subsequent Mortgage Loan will be secured by a first lien or second lien on a mortgaged property.

Following the purchase of the subsequent mortgage loans by the issuing entity, all mortgage loans must have a weighted average mortgage rate and a weighted average loan-to-value ratio which will not vary materially from those statistics with respect to the pool of initial mortgage loans.

Changes to the mortgage loan pool as a result of the purchase of the subsequent mortgage loans by the issuing entity will be disclosed on a Form 10-D report filed with the Securities and Exchange Commission.

To the extent that the issuing entity does not fully use amounts on deposit in the pre-funding account to purchase subsequent mortgage loans by the end of the pre-funding period, the issuing entity will apply the remaining amounts as a prepayment of principal to the related classes of notes on the payment date immediately following the end of the pre-funding period. Although no assurance is possible, we do not anticipate that a material amount of principal will be prepaid on the notes from amounts in the pre-funding account.

**The Mortgage Loans**

The following section describes the statistical characteristics of the mortgage loans (the "initial mortgage loans"). The statistical information does not describe the additional mortgage loans that will be included in the trust estate on the closing date and the subsequent mortgage loans which may be acquired through the pre-funding feature using the remainder of the funds on deposit in the pre-funding account. Unless otherwise noted, all statistical percentages in this section are approximate and are measured by the aggregate Initial Cut-off Date Principal Balance of the applicable initial mortgage loans in relation to the Initial Pool Balance of the initial mortgage loans.

As of the Initial Cut-off Date, the initial mortgage loans had the following characteristics:

- the aggregate Initial Pool Balance was approximately $835,719,121.

- there were 4,766 initial mortgage loans under which the related mortgaged properties are located in 49 states,

- the minimum Initial Cut-off Date Principal Balance was approximately $12,375, the maximum Initial Cut-off Date Principal Balance was approximately $749,253 and the average Initial Cut-off Date Principal Balance was approximately $175,350,

S-31

000037

Table of Contents

- the mortgage interest rate ranged from 5.125% to 15.990% per annum, and the weighted average mortgage interest rate was approximately 7.829% per annum,

- approximately 51.00% of the initial mortgage loans are fixed-rate mortgage loans, and approximately 49.00% of the initial mortgage loans are adjustable-rate mortgage loans,

- the gross margin for the adjustable-rate initial mortgage loans in ranged from 2.000% to 10.000% per annum and the weighted average gross margin was approximately 5.373% per annum,

- the maximum rate for the adjustable-rate initial mortgage loans ranged from 12.199% to 20.125% per annum and the weighted average maximum rate was approximately 15.229% per annum,

- the minimum rate for the adjustable-rate initial mortgage loans ranged from 5.950% to 13.125% per annum and the weighted average minimum rate was approximately 8.230% per annum,

- approximately 0.65% of the adjustable-rate initial mortgage loans had an initial periodic cap of 1.000% per annum, approximately 99.35% of the adjustable-rate mortgage loans had an initial periodic cap of 1.500% per annum,

- approximately 0.65% of the adjustable-rate initial mortgage loans had a subsequent periodic cap of 1.000% per annum, approximately 99.35% of the adjustable-rate mortgage loans had a subsequent periodic cap of 1.500% per annum,

- the original term to stated maturity ranged from 120 months to 360 months and the weighted average original term to stated maturity was approximately 353 months,

- the remaining term to stated maturity ranged from 115 months to 360 months and the weighted average remaining term to stated maturity was approximately 351 months,

- the age of the initial mortgage loans ranged from 0 months to 14 months and the weighted average age was approximately 2 months,

- approximately 51.00% of the initial mortgage loans were fixed-rate loans, approximately 26.92% of the initial mortgage loans were 2 Year adjustable rate loans, approximately 21.27% of the initial mortgage loans were 3 Year adjustable rate loans, approximately 0.80% of the initial mortgage loans were 5 Year adjustable rate loans and approximately 0.02% of the initial mortgage loans were six-month LIBOR loans,

- approximately 59.41% of the initial mortgage loans require monthly payments of principal that will fully amortize these mortgage loans by their respective maturity dates, approximately 9.49% of the initial mortgage loans have a five year interest only period, after which such loans will fully amortize over their remaining terms and approximately 31.10% of the initial mortgage loans are balloon loans,

- the LTVs (which includes the senior balance for second liens) ranged from approximately 7.26% to approximately 100.00% and the weighted average LTV was approximately 76.78%,

S-32

000038

Table of Contents



- approximately 98.39% of the initial mortgage loans are secured by first liens on the related mortgaged properties and approximately 1.61% of the initial mortgage loans are secured by second liens on the related mortgaged properties,

- approximately 15.36%, 15.23%, 5.90% and 5.12% of the initial mortgage loans are secured by mortgaged properties located in the states of California, Florida, Illinois and Texas, respectively, and

- approximately 4.85% of the initial mortgage loans were originated using an insured automated valuation model. 

The following tables set forth certain information with respect to the initial mortgage loans based on the aggregate Initial Cut-off Date Principal Balance of the initial mortgage loans in relation to the Initial Pool Balance of the initial mortgage loans. Due to rounding, the percentages shown may not precisely total 100.00%.

000039

Table of Contents

### Geographical Distribution of Mortgaged Properties
### Aggregate Initial Mortgage Loans

| State | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| California | 476 | $128,341,624 | 15.36% | 7.262% | 350 | 71.54% | 654 |
| Florida | 757 | 127,311,948 | 15.23 | 7.705 | 354 | 75.41 | 624 |
| Illinois | 269 | 49,291,636 | 5.90 | 8.244 | 352 | 80.21 | 636 |
| Texas | 380 | 42,799,781 | 5.12 | 7.950 | 335 | 77.51 | 614 |
| Arizona | 225 | 41,042,902 | 4.91 | 7.610 | 351 | 75.81 | 619 |
| Maryland | 191 | 40,710,362 | 4.87 | 8.010 | 353 | 77.43 | 605 |
| Washington | 183 | 36,520,222 | 4.37 | 7.610 | 354 | 79.05 | 636 |
| Maine | 139 | 36,289,794 | 4.34 | 7.978 | 356 | 77.35 | 642 |
| New Jersey | 121 | 33,449,051 | 4.00 | 7.852 | 355 | 75.38 | 638 |
| Georgia | 193 | 27,521,341 | 3.29 | 8.492 | 348 | 80.27 | 620 |
| Other | 1,832 | 272,440,460 | 32.60 | 8.007 | 350 | 78.64 | 629 |
| Total: | 4,766 | $835,719,121 | 100.00% | 7.829% | 351 | 76.78% | 631 |

S-34

Table of Contents

### Range of Initial Cut-off Date Principal Balances ($)
### Aggregate Initial Mortgage Loans

| Range of Initial Cut-off Date Principal Balances ($) | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| $ 25,000 & Below | 34 | $ 721,039 | 0.09% | 11.306% | 179 | 97.08% | 635 |
| $ 25,001 - $ 50,000 | 137 | 5,667,515 | 0.68 | 10.034 | 238 | 76.24 | 628 |
| $ 50,001 - $ 75,000 | 510 | 33,613,197 | 4.02 | 8.749 | 320 | 71.39 | 610 |
| $ 75,001 - $100,000 | 733 | 64,680,518 | 7.74 | 8.503 | 339 | 75.66 | 611 |
| $100,001 - $125,000 | 520 | 58,543,128 | 7.01 | 8.290 | 344 | 76.68 | 613 |
| $125,001 - $150,000 | 542 | 74,679,707 | 8.94 | 7.966 | 347 | 76.88 | 614 |
| $150,001 - $175,000 | 461 | 74,923,232 | 8.97 | 7.752 | 352 | 76.31 | 617 |
| $175,001 - $200,000 | 395 | 74,253,742 | 8.89 | 7.739 | 355 | 76.85 | 625 |
| $200,001 - $225,000 | 307 | 65,201,202 | 7.80 | 7.651 | 356 | 76.29 | 627 |
| $225,001 - $250,000 | 231 | 55,080,376 | 6.59 | 7.634 | 358 | 77.66 | 631 |
| $250,001 - $275,000 | 153 | 40,141,710 | 4.80 | 7.517 | 355 | 79.27 | 637 |
| $275,001 - $300,000 | 149 | 43,017,389 | 5.15 | 7.539 | 358 | 75.86 | 639 |
| $300,001 - $325,000 | 111 | 34,854,252 | 4.17 | 7.771 | 355 | 78.05 | 634 |
| $325,001 - $350,000 | 101 | 34,263,832 | 4.10 | 7.790 | 358 | 77.04 | 636 |
| $350,001 - $375,000 | 56 | 20,233,717 | 2.42 | 7.655 | 358 | 77.38 | 657 |
| $375,001 - $400,000 | 58 | 22,554,524 | 2.70 | 7.622 | 356 | 79.90 | 650 |
| $400,001 - $425,000 | 46 | 19,040,206 | 2.28 | 7.415 | 358 | 76.42 | 636 |
| $425,001 - $450,000 | 57 | 25,011,035 | 2.99 | 7.474 | 358 | 76.46 | 646 |
| $450,001 - $475,000 | 34 | 15,810,289 | 1.89 | 7.304 | 358 | 78.50 | 659 |
| $475,001 - $500,000 | 42 | 20,522,822 | 2.46 | 7.503 | 354 | 77.72 | 651 |
| $500,001 - $750,000 | 89 | 52,905,690 | 6.33 | 7.388 | 358 | 77.29 | 684 |
| **Total:** | **4,766** | **$835,719,121** | **100.00%** | **7.829%** | **351** | **76.78%** | **631** |

S-35

Table of Contents

**Range of LTV Ratios (%)\***
**Aggregate Initial Mortgage Loans**

| Range of LTV Ratios (%) | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 15.00 & Below | 4 | $ 260,256 | 0.03% | 7.946% | 319 | 11.58% | 659 |
| 15.01 - 20.00 | 12 | 844,260 | 0.10 | 7.321 | 287 | 16.79 | 640 |
| 20.01 - 25.00 | 19 | 1,877,661 | 0.22 | 7.530 | 291 | 23.14 | 626 |
| 25.01 - 30.00 | 17 | 1,517,523 | 0.18 | 7.235 | 341 | 27.97 | 609 |
| 30.01 - 35.00 | 50 | 6,608,422 | 0.79 | 6.856 | 349 | 32.96 | 659 |
| 35.01 - 40.00 | 40 | 4,357,441 | 0.52 | 7.055 | 317 | 37.20 | 658 |
| 40.01 - 45.00 | 82 | 11,771,180 | 1.41 | 7.168 | 346 | 42.93 | 622 |
| 45.01 - 50.00 | 85 | 12,692,486 | 1.52 | 7.206 | 345 | 48.06 | 638 |
| 50.01 - 55.00 | 128 | 19,911,424 | 2.38 | 7.080 | 345 | 52.80 | 625 |
| 55.01 - 60.00 | 166 | 26,173,190 | 3.13 | 7.429 | 347 | 57.64 | 617 |
| 60.01 - 65.00 | 214 | 35,064,804 | 4.20 | 7.423 | 350 | 63.05 | 624 |
| 65.01 - 70.00 | 300 | 47,559,356 | 5.69 | 7.611 | 350 | 68.23 | 609 |
| 70.01 - 75.00 | 446 | 80,096,667 | 9.58 | 7.666 | 353 | 73.53 | 624 |
| 75.01 - 80.00 | 1,691 | 347,915,786 | 41.63 | 7.879 | 356 | 79.59 | 646 |
| 80.01 - 85.00 | 501 | 88,284,530 | 10.56 | 7.811 | 354 | 83.82 | 612 |
| 85.01 - 90.00 | 796 | 138,043,372 | 16.52 | 8.048 | 354 | 89.13 | 618 |
| 90.01 - 95.00 | 18 | 864,088 | 0.10 | 11.615 | 177 | 94.98 | 645 |
| 95.01 - 100.00 | 197 | 11,876,676 | 1.42 | 11.310 | 181 | 99.96 | 646 |
| Total: | 4,766 | $835,719,121 | 100.00% | 7.829% | 351 | 76.78% | 631 |

* The loan-to-value ratio for any second lien mortgage loan will mean the combined original loan-to-value ratio.

S-36

000042

Table of Contents

**Range of Gross Interest Rates (%)**
**Aggregate Initial Mortgage Loans**

| Range of Gross Interest Rates (%) | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 5.000 - 5.999 | 146 | $ 33,462,426 | 4.00% | 5.876% | 349 | 64.45% | 711 |
| 6.000 - 6.999 | 970 | 212,617,179 | 25.44 | 6.672 | 351 | 73.53 | 666 |
| 7.000 - 7.999 | 1,462 | 270,434,921 | 32.36 | 7.625 | 354 | 77.43 | 628 |
| 8.000 - 8.999 | 1,340 | 222,621,717 | 26.64 | 8.570 | 354 | 78.62 | 607 |
| 9.000 - 9.999 | 563 | 73,445,259 | 8.79 | 9.526 | 351 | 80.17 | 585 |
| 10.000 - 10.999 | 147 | 14,294,737 | 1.71 | 10.531 | 311 | 83.84 | 594 |
| 11.000 - 11.999 | 68 | 4,692,208 | 0.56 | 11.709 | 234 | 93.85 | 618 |
| 12.000 - 12.999 | 54 | 3,390,592 | 0.41 | 12.565 | 182 | 99.16 | 632 |
| 13.000 - 13.999 | 13 | 652,620 | 0.08 | 13.626 | 206 | 95.78 | 633 |
| 14.000 - 14.999 | 2 | 61,485 | 0.01 | 14.555 | 179 | 97.19 | 627 |
| 15.000 - 15.999 | 1 | 45,978 | 0.01 | 15.990 | 176 | 100.00 | 634 |
| Total: | 4,766 | $835,719,121 | 100.00% | 7.829% | 351 | 76.78% | 631 |

S-37

Table of Contents

**Range of Gross Margins (%)**
**Aggregate Initial Mortgage Loans**

| Range of Gross Margins (%) | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Fixed Rate Loans | 2,715 | $426,186,401 | 51.00% | 7.445% | 344 | 74.50% | 638 |
| 3.499 & Below | 119 | 27,265,090 | 3.26 | 7.175 | 358 | 77.17 | 657 |
| 3.500 - 3.999 | 125 | 32,470,895 | 3.89 | 7.057 | 358 | 78.04 | 657 |
| 4.000 - 4.499 | 217 | 50,965,388 | 6.10 | 7.650 | 358 | 78.57 | 643 |
| 4.500 - 4.999 | 269 | 58,964,034 | 7.06 | 7.930 | 358 | 79.17 | 635 |
| 5.000 - 5.499 | 283 | 56,493,921 | 6.76 | 8.362 | 358 | 79.46 | 623 |
| 5.500 - 5.999 | 337 | 63,092,912 | 7.55 | 8.636 | 358 | 79.91 | 608 |
| 6.000 - 6.499 | 234 | 40,629,013 | 4.86 | 8.508 | 357 | 78.98 | 613 |
| 6.500 - 6.999 | 212 | 37,077,557 | 4.44 | 8.951 | 358 | 79.98 | 604 |
| 7.000 - 7.499 | 149 | 26,629,808 | 3.19 | 9.008 | 357 | 78.90 | 596 |
| 7.500 - 7.999 | 59 | 8,717,842 | 1.04 | 9.423 | 357 | 82.25 | 580 |
| 8.000 - 8.499 | 31 | 5,557,149 | 0.66 | 9.611 | 357 | 80.42 | 591 |
| 8.500 - 8.999 | 9 | 957,634 | 0.11 | 10.039 | 357 | 81.61 | 558 |
| 9.000 - 9.499 | 2 | 142,986 | 0.02 | 10.649 | 355 | 77.01 | 536 |
| 9.500 - 9.999 | 4 | 480,577 | 0.06 | 11.686 | 357 | 83.95 | 573 |
| 10.000 & Above | 1 | 87,915 | 0.01 | 11.500 | 357 | 80.00 | 524 |
| **Total:** | **4,766** | **$835,719,121** | **100.00%** | **7.829%** | **351** | **76.78%** | **631** |

S-38

000044

Table of Contents

**Range of Maximum Mortgage Interest Rates (%)**
**Aggregate Initial Mortgage Loans**

| Range of Maximum Mortgage Interest Rates (%) | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Fixed Rate Loans | 2,715 | $426,186,401 | 51.00% | 7.445% | 344 | 74.50% | 638 |
| 12.000 - 12.499 | 1 | 160,186 | 0.02 | 6.199 | 357 | 90.00 | 678 |
| 12.500 - 12.999 | 4 | 974,550 | 0.12 | 5.983 | 359 | 65.20 | 717 |
| 13.000 - 13.499 | 17 | 4,502,987 | 0.54 | 6.311 | 359 | 76.57 | 709 |
| 13.500 - 13.999 | 142 | 37,068,651 | 4.44 | 6.871 | 358 | 77.34 | 668 |
| 14.000 - 14.499 | 178 | 42,227,484 | 5.05 | 7.301 | 358 | 78.98 | 644 |
| 14.500 - 14.999 | 464 | 103,032,851 | 12.33 | 7.813 | 358 | 78.99 | 636 |
| 15.000 - 15.499 | 306 | 64,069,334 | 7.67 | 8.272 | 358 | 79.41 | 623 |
| 15.500 - 15.999 | 518 | 96,310,954 | 11.52 | 8.769 | 358 | 79.44 | 605 |
| 16.000 - 16.499 | 167 | 25,786,848 | 3.09 | 9.281 | 358 | 80.54 | 593 |
| 16.500 - 16.999 | 176 | 26,295,957 | 3.15 | 9.751 | 358 | 80.24 | 582 |
| 17.000 - 17.499 | 40 | 5,212,749 | 0.62 | 10.321 | 358 | 78.69 | 581 |
| 17.500 - 17.999 | 28 | 2,807,629 | 0.34 | 10.733 | 358 | 82.09 | 566 |
| 18.000 - 18.499 | 3 | 366,368 | 0.04 | 11.288 | 355 | 77.67 | 546 |
| 18.500 - 18.999 | 5 | 552,661 | 0.07 | 11.878 | 359 | 81.51 | 581 |
| 19.500 - 19.999 | 1 | 64,600 | 0.01 | 12.990 | 360 | 85.00 | 605 |
| 20.000 - 20.499 | 1 | 98,910 | 0.01 | 13.125 | 360 | 90.00 | 594 |
| Total: | 4,766 | $835,719,121 | 100.00% | 7.829% | 351 | 76.78% | 631 |

S-39

000045

Table of Contents

## Range of Minimum Mortgage Interest Rates (%)
### Aggregate Initial Mortgage Loans

| Range of Minimum Mortgage Interest Rates (%) | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Fixed Rate Loans | 2,715 | $426,186,401 | 51.00% | 7.445% | 344 | 74.50% | 638 |
| 5.501 - 6.000 | 4 | 974,550 | 0.12 | 5.983 | 359 | 65.20 | 717 |
| 6.001 - 6.500 | 23 | 5,328,111 | 0.64 | 6.331 | 359 | 76.52 | 714 |
| 6.501 - 7.000 | 144 | 38,226,093 | 4.57 | 6.884 | 358 | 77.59 | 667 |
| 7.001 - 7.500 | 208 | 50,685,213 | 6.06 | 7.352 | 358 | 78.21 | 644 |
| 7.501 - 8.000 | 444 | 96,166,897 | 11.51 | 7.853 | 358 | 79.39 | 634 |
| 8.001 - 8.500 | 356 | 73,621,462 | 8.81 | 8.325 | 358 | 79.28 | 622 |
| 8.501 - 9.000 | 456 | 84,354,997 | 10.09 | 8.813 | 358 | 79.49 | 604 |
| 9.001 - 9.500 | 198 | 31,474,945 | 3.77 | 9.336 | 358 | 80.73 | 592 |
| 9.501 - 10.000 | 141 | 19,726,004 | 2.36 | 9.838 | 358 | 80.14 | 579 |
| 10.001 - 10.500 | 50 | 5,978,649 | 0.72 | 10.355 | 358 | 79.26 | 578 |
| 10.501 - 11.000 | 17 | 1,913,260 | 0.23 | 10.842 | 358 | 81.12 | 568 |
| 11.001 - 11.500 | 4 | 454,283 | 0.05 | 11.329 | 356 | 78.12 | 541 |
| 11.501 - 12.000 | 4 | 464,747 | 0.06 | 11.949 | 359 | 81.79 | 592 |
| 12.501 - 13.000 | 1 | 64,600 | 0.01 | 12.990 | 360 | 85.00 | 605 |
| 13.001 - 13.500 | 1 | 98,910 | 0.01 | 13.125 | 360 | 90.00 | 594 |
| **Total:** | **4,766** | **$835,719,121** | **100.00%** | **7.829%** | **351** | **76.78%** | **631** |

S-40

000046

Table of Contents

**Month and Year of Next Rate Change Date**
**Aggregate Initial Mortgage Loans**

| Month and Year of Next Rate Change Date | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Fixed Rate Loans | 2,715 | $426,186,401 | 51.00% | 7.445% | 344 | 74.50% | 638 |
| April 2007 | 1 | 126,037 | 0.02 | 7.200 | 346 | 99.61 | 601 |
| April 2008 | 160 | 33,004,551 | 3.95 | 8.248 | 358 | 78.82 | 622 |
| April 2009 | 279 | 50,715,523 | 6.07 | 8.229 | 358 | 79.38 | 622 |
| April 2011 | 6 | 1,354,521 | 0.16 | 7.214 | 358 | 82.05 | 664 |
| August 2008 | 1 | 44,093 | 0.01 | 8.679 | 350 | 85.00 | 634 |
| December 2007 | 19 | 3,832,503 | 0.46 | 8.264 | 354 | 81.15 | 632 |
| December 2008 | 2 | 252,015 | 0.03 | 8.804 | 354 | 77.83 | 527 |
| December 2010 | 2 | 199,539 | 0.02 | 8.276 | 354 | 81.38 | 604 |
| February 2008 | 50 | 9,718,882 | 1.16 | 8.413 | 356 | 78.98 | 609 |
| February 2009 | 11 | 2,576,081 | 0.31 | 8.617 | 356 | 83.45 | 618 |
| February 2011 | 3 | 852,633 | 0.10 | 8.300 | 356 | 82.48 | 630 |
| January 2008 | 29 | 7,963,864 | 0.95 | 8.542 | 355 | 80.77 | 637 |
| January 2009 | 1 | 63,576 | 0.01 | 9.500 | 355 | 75.00 | 582 |
| June 2007 | 1 | 137,167 | 0.02 | 7.500 | 348 | 65.00 | 521 |
| June 2008 | 168 | 37,564,354 | 4.49 | 8.249 | 360 | 79.13 | 629 |
| June 2009 | 176 | 38,198,191 | 4.57 | 8.180 | 360 | 79.71 | 630 |
| June 2011 | 5 | 848,800 | 0.10 | 8.439 | 360 | 75.73 | 573 |
| March 2008 | 480 | 98,426,974 | 11.78 | 8.196 | 357 | 78.47 | 620 |
| March 2009 | 271 | 52,271,638 | 6.25 | 8.351 | 357 | 79.49 | 620 |
| March 2011 | 13 | 2,715,934 | 0.32 | 8.591 | 357 | 78.29 | 583 |
| May 2008 | 162 | 33,433,456 | 4.00 | 8.105 | 359 | 78.87 | 628 |
| May 2009 | 201 | 33,597,562 | 4.02 | 8.148 | 359 | 79.12 | 632 |
| May 2011 | 4 | 699,848 | 0.08 | 7.824 | 359 | 83.73 | 629 |
| November 2007 | 4 | 700,382 | 0.08 | 7.714 | 353 | 84.17 | 627 |
| November 2008 | 1 | 74,407 | 0.01 | 10.150 | 353 | 84.89 | 533 |
| September 2006 | 1 | 160,186 | 0.02 | 6.199 | 357 | 90.00 | 678 |
| Total: | 4,766 | $835,719,121 | 100.00% | 7.829% | 351 | 76.78% | 631 |

S-41

Table of Contents

**Range of Original Terms to Maturity (in months)**
**Aggregate Initial Mortgage Loans**

| Original Term to Maturity (in months) | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 120 | 25 | $ 2,026,652 | 0.24% | 7.184% | 118 | 70.36% | 657 |
| 180 | 330 | 25,115,722 | 3.01 | 9.416 | 177 | 81.28 | 643 |
| 240 | 85 | 8,803,899 | 1.05 | 7.645 | 238 | 70.54 | 633 |
| 300 | 17 | 1,948,039 | 0.23 | 7.311 | 299 | 70.34 | 631 |
| 360 | 4,309 | 797,824,810 | 95.47 | 7.784 | 358 | 76.74 | 630 |
| Total: | 4,766 | $835,719,121 | 100.00% | 7.829% | 351 | 76.78% | 631 |

S-42

Table of Contents

## Range of Remaining Terms to Maturity (in months)
### Aggregate Initial Mortgage Loans

| Range of Remaining Terms to Maturity (in months) | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 1 - 140 | 25 | $ 2,026,652 | 0.24% | 7.184% | 118 | 70.36% | 657 |
| 161 - 180 | 330 | 25,115,722 | 3.01 | 9.416 | 177 | 81.28 | 643 |
| 221 - 240 | 85 | 8,803,899 | 1.05 | 7.645 | 238 | 70.54 | 633 |
| 281 - 300 | 17 | 1,948,039 | 0.23 | 7.311 | 299 | 70.34 | 631 |
| 341 - 360 | 4,309 | 797,824,810 | 95.47 | 7.784 | 358 | 76.74 | 630 |
| Total: | 4,766 | $835,719,121 | 100.00% | 7.829% | 351 | 76.78% | 631 |

S-43

Table of Contents

### Distribution by Lien Position
### Aggregate Initial Mortgage Loans

| Lien Position | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| First Lien | 4,541 | $822,273,942 | 98.39% | 7.772% | 354 | 76.43% | 631 |
| Second Lien | 225 | 13,445,180 | 1.61 | 11.338 | 179 | 98.11 | 647 |
| Total: | 4,766 | $835,719,121 | 100.00% | 7.829% | 351 | 76.78% | 631 |

### Distribution by Occupancy Status
### Aggregate Initial Mortgage Loans

| Occupancy Status | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Owner Occupied | 4,498 | $798,841,645 | 95.59% | 7.809% | 351 | 76.97% | 630 |
| Investor Property | 231 | 30,163,611 | 3.61 | 8.368 | 353 | 74.87 | 653 |
| Second Home | 37 | 6,713,865 | 0.80 | 7.797 | 343 | 62.87 | 650 |
| Total: | 4,766 | $835,719,121 | 100.00% | 7.829% | 351 | 76.78% | 631 |

S-44

000050

Table of Contents

### Distribution by Property Types
### Aggregate Initial Mortgage Loans

| Property Types | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Single Family Residence | 3,749 | $619,700,770 | 74.15% | 7.840% | 350 | 76.51% | 627 |
| Planned Unit Development | 469 | 103,692,329 | 12.41 | 7.697 | 353 | 77.47 | 636 |
| Condominium | 286 | 47,057,597 | 5.63 | 7.890 | 351 | 77.51 | 645 |
| Two-to-Four Unit Residence | 212 | 57,149,773 | 6.84 | 7.921 | 353 | 77.47 | 653 |
| Townhouse | 43 | 7,274,168 | 0.87 | 7.538 | 354 | 78.41 | 634 |
| Modular Home | 7 | 844,484 | 0.10 | 9.084 | 315 | 89.10 | 620 |
| **Total:** | **4,766** | **$835,719,121** | **100.00%** | **7.829%** | **351** | **76.78%** | **631** |

### Distribution of Seasoning (in months)
### Aggregate Initial Mortgage Loans

| Months Elapsed Since Origination (in months) | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 0 | 777 | $148,071,402 | 17.72% | 7.859% | 355 | 76.70% | 637 |
| 1 | 1,167 | 198,613,052 | 23.77 | 7.640 | 349 | 75.69 | 635 |
| 2 | 1,092 | 186,197,297 | 22.28 | 7.690 | 352 | 77.20 | 632 |
| 3 | 1,359 | 251,376,560 | 30.08 | 7.945 | 353 | 76.78 | 625 |
| 4 | 140 | 22,754,373 | 2.72 | 8.336 | 345 | 77.98 | 617 |
| 5 | 92 | 14,634,941 | 1.75 | 8.440 | 333 | 78.25 | 630 |
| 6 | 78 | 8,023,582 | 0.96 | 8.780 | 311 | 83.27 | 626 |
| 7 | 28 | 2,430,458 | 0.29 | 9.471 | 253 | 91.90 | 641 |
| 8 | 15 | 1,864,280 | 0.22 | 7.060 | 275 | 78.71 | 689 |
| 9 | 12 | 1,088,771 | 0.13 | 7.268 | 287 | 82.47 | 663 |
| 10 | 4 | 401,200 | 0.05 | 8.519 | 330 | 86.68 | 602 |
| 12 | 1 | 137,167 | 0.02 | 7.500 | 348 | 65.00 | 521 |
| 14 | 1 | 126,037 | 0.02 | 7.200 | 346 | 99.61 | 601 |
| **Total:** | **4,766** | **$835,719,121** | **100.00%** | **7.829%** | **351** | **76.78%** | **631** |

000051

Table of Contents

## Initial Mortgage Loan Types
## Aggregate Initial Mortgage Loans

| Initial Mortgage Loan Types | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| 2 Year ARM | 596 | $106,208,405 | 12.71% | 8.432% | 358 | 78.04% | 614 |
| 2 Year ARM Balloon 40/30 | 401 | 93,734,207 | 11.22 | 8.153 | 358 | 79.77 | 619 |
| 2 Year ARM IO | 78 | 25,009,653 | 2.99 | 7.562 | 358 | 78.95 | 678 |
| 3 Year ARM | 533 | 83,282,390 | 9.97 | 8.533 | 358 | 79.37 | 616 |
| 3 Year ARM Balloon 40/30 | 322 | 68,097,209 | 8.15 | 8.208 | 358 | 80.19 | 612 |
| 3 Year ARM IO | 87 | 26,369,396 | 3.16 | 7.443 | 358 | 78.06 | 684 |
| 5 Year ARM | 21 | 4,125,253 | 0.49 | 8.074 | 358 | 80.48 | 624 |
| 5 Year ARM Balloon 40/30 | 11 | 2,404,022 | 0.29 | 8.368 | 358 | 78.85 | 584 |
| 5 Year ARM IO | 1 | 142,000 | 0.02 | 7.375 | 354 | 81.94 | 618 |
| 6 Month ARM | 1 | 160,186 | 0.02 | 6.199 | 357 | 90.00 | 678 |
| Fixed | 1,998 | 302,763,752 | 36.23 | 7.386 | 346 | 72.89 | 636 |
| Fixed Balloon 30/15 | 211 | 12,929,041 | 1.55 | 11.320 | 177 | 98.36 | 648 |
| Fixed Balloon 40/30 | 402 | 82,745,791 | 9.90 | 7.298 | 358 | 76.40 | 628 |
| Fixed IO | 104 | 27,747,817 | 3.32 | 6.723 | 358 | 75.20 | 675 |
| **Total:** | **4,766** | **$835,719,121** | **100.00%** | **7.829%** | **351** | **76.78%** | **631** |

S-46

Table of Contents

**Prepayment Penalty Terms (in months)**
**Aggregate Initial Mortgage Loans**

| Prepayment Penalty Terms (in months) | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| No Prepayment Penalty | 1,145 | $196,569,468 | 23.52% | 8.256% | 349 | 77.66% | 626 |
| 6 | 63 | 13,374,260 | 1.60 | 7.841 | 358 | 79.87 | 631 |
| 12 | 165 | 35,516,228 | 4.25 | 8.013 | 346 | 77.79 | 643 |
| 18 | 24 | 6,329,015 | 0.76 | 7.102 | 358 | 78.76 | 671 |
| 24 | 374 | 67,715,542 | 8.10 | 8.214 | 350 | 78.41 | 623 |
| 30 | 18 | 3,500,391 | 0.42 | 7.572 | 358 | 80.59 | 636 |
| 36 | 1,449 | 264,261,083 | 31.62 | 7.821 | 354 | 76.76 | 633 |
| 42 | 10 | 1,764,739 | 0.21 | 7.454 | 358 | 76.08 | 641 |
| 48 | 15 | 2,835,135 | 0.34 | 8.033 | 358 | 78.25 | 631 |
| 54 | 2 | 429,115 | 0.05 | 7.947 | 360 | 87.61 | 633 |
| 60 | 1,501 | 243,424,144 | 29.13 | 7.383 | 349 | 75.19 | 632 |
| **Total:** | **4,766** | **$835,719,121** | **100.00%** | **7.829%** | **351** | **76.78%** | **631** |

S-47

000053

Table of Contents

**Loan Purpose**
**Aggregate Initial Mortgage Loans**

| Loan Purpose | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Cashout Refinance | 3,480 | $600,518,828 | 71.86% | 7.732% | 351 | 75.59% | 620 |
| Purchase | 1,123 | 206,620,824 | 24.72 | 8.162 | 350 | 80.41 | 662 |
| Rate/Term Refinance | 163 | 28,579,469 | 3.42 | 7.483 | 347 | 75.55 | 640 |
| Total: | 4,766 | $835,719,121 | 100.00% | 7.829% | 351 | 76.78% | 631 |

**Loan Documentation Types**
**Aggregate Initial Mortgage Loans**

| Loan Documentation Types | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| Full Documentation | 3,564 | $569,583,879 | 68.15% | 7.762% | 351 | 77.00% | 619 |
| Stated Documentation | 888 | 192,454,988 | 23.03 | 8.080 | 349 | 75.16 | 662 |
| Alternative Documentation | 314 | 73,680,254 | 8.82 | 7.699 | 350 | 79.32 | 642 |
| Total: | 4,766 | $835,719,121 | 100.00% | 7.829% | 351 | 76.78% | 631 |

000054

Table of Contents

## Range of FICO Scores
## Aggregate Initial Mortgage Loans

| Range of FICO Scores | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| No Score | 1 | $ 124,616 | 0.01% | 8.500% | 355 | 22.32% | 0 |
| 500 - 524 | 206 | 31,182,236 | 3.73 | 8.783 | 356 | 70.82 | 517 |
| 525 - 549 | 293 | 43,207,591 | 5.17 | 8.532 | 352 | 71.17 | 536 |
| 550 - 574 | 654 | 97,831,418 | 11.71 | 8.443 | 353 | 77.90 | 562 |
| 575 - 599 | 642 | 103,897,893 | 12.43 | 8.191 | 353 | 78.08 | 587 |
| 600 - 624 | 674 | 106,194,680 | 12.71 | 7.980 | 349 | 76.99 | 613 |
| 625 - 649 | 801 | 138,000,560 | 16.51 | 7.900 | 347 | 78.82 | 637 |
| 650 - 674 | 589 | 116,943,784 | 13.99 | 7.532 | 350 | 77.74 | 661 |
| 675 - 699 | 373 | 82,637,420 | 9.89 | 7.248 | 351 | 77.79 | 686 |
| 700 - 724 | 254 | 53,798,984 | 6.44 | 7.021 | 352 | 76.03 | 712 |
| 725 - 749 | 135 | 30,379,306 | 3.64 | 7.043 | 350 | 74.96 | 736 |
| 750 - 774 | 77 | 17,599,153 | 2.11 | 6.756 | 354 | 72.89 | 761 |
| 775 - 799 | 53 | 11,276,297 | 1.35 | 6.834 | 342 | 67.13 | 786 |
| 800 & Above | 14 | 2,645,183 | 0.32 | 6.636 | 348 | 63.31 | 805 |
| Total: | 4,766 | $835,719,121 | 100.00% | 7.829% | 351 | 76.78% | 631 |

000055

Table of Contents

**Prepayment Penalty Description**
**Aggregate Initial Mortgage Loans**

| Prepayment Penalty Description | Number of Mortgage Loans | Aggregate Initial Cut-off Date Principal Balance ($) | Percentage of Mortgage Pool Aggregate Initial Cut-off Date Principal Balance (%) | Weighted Average Coupon Interest Rate (%) | Weighted Average Remaining Term (in months) | Weighted Average LTV (%) | Weighted Average Credit Score |
|---|---|---|---|---|---|---|---|
| No prepayment penalty | 1,145 | $196,569,468 | 23.52% | 8.256% | 349 | 77.66% | 626 |
| 1% of amount prepaid | 94 | 11,886,267 | 1.42 | 8.344 | 352 | 80.03 | 619 |
| 1% of original balance | 196 | 26,863,231 | 3.21 | 8.382 | 355 | 81.80 | 619 |
| 2 months interest/original balance/20% allowed | 8 | 661,265 | 0.08 | 9.426 | 311 | 71.25 | 593 |
| 2 months interest/original balance/33.3% allowed | 92 | 19,363,041 | 2.32 | 7.301 | 351 | 75.40 | 625 |
| 2% of amount prepaid | 269 | 42,262,973 | 5.06 | 7.962 | 348 | 78.31 | 627 |
| 3 months or balance of 1st year's interest (whichever is less). If refinanced, addit | 2 | 362,672 | 0.04 | 8.030 | 358 | 63.76 | 626 |
| 5% of amount prepaid | 93 | 13,438,072 | 1.61 | 8.448 | 329 | 78.67 | 612 |
| 6 months interest/amount prepaid/20% allowed | 2,795 | 514,528,518 | 61.57 | 7.606 | 352 | 75.90 | 635 |
| First year 5%/second year 4%/third year 3%/fourth year 2%/fifth year 1%/unpaid | 46 | 4,987,973 | 0.60 | 8.518 | 348 | 81.69 | 609 |
| Lessor of 2% or 2 months interest/amount prepaid | 26 | 4,795,641 | 0.57 | 8.267 | 358 | 82.61 | 621 |
| **Total:** | **4,766** | **$835,719,121** | **100.00%** | **7.829%** | **351** | **76.78%** | **631** |

S-50

000056

Table of Contents

## The Sponsor

Accredited Home Lenders, Inc. ("Accredited"), a California corporation, is a nationwide mortgage banking company that originates, finances, sells, securitizes and services first and subordinate lien mortgage loans secured by single family residences, two-to-four-family residential properties, condominium units, units in planned unit developments, townhomes and modular housing units. Accredited focuses on originating mortgage loans which do not conform to credit and other criteria established by Fannie Mae and Freddie Mac, commonly referred to as "nonconforming" and "subprime" mortgage loans. Accredited is wholly owned by Accredited Home Lenders Holding Co., a publicly traded company traded under the ticker symbol LEND.

Accredited's mortgage loan originations are primarily wholesale, i.e., conducted through mortgage brokers. On a smaller scale, Accredited makes retail originations directly to borrowers.

Accredited's total annual mortgage loan production has increased steadily from approximately $2.3 billion in 2001, $4.3 billion in 2002, $8.0 billion in 2003, $12.4 billion in 2004 and $16.3 billion in 2005. In 2001, Accredited originated approximately 16,100 mortgage loans secured by first liens and approximately 4,500 mortgage loans secured by second liens. In 2002, Accredited originated approximately 26,600 mortgage loans secured by first liens and approximately 8,600 mortgage loans secured by second liens. In 2003, Accredited originated approximately 48,100 mortgage loans secured by first liens and approximately 14,400 mortgage loans secured by second liens. In 2004, Accredited originated approximately 67,200 mortgage loans secured by first liens and approximately 23,400 mortgage loans secured by second liens. In 2005, Accredited originated approximately 79,000 mortgage loans secured by first liens and approximately 28,200 mortgage loans secured by second liens. As of March 31, 2006, Accredited had 2,626 employees.

Accredited performs the servicing functions for its loan originations prior to sale or securitization, during an interim servicing period for mortgage loans sold on a whole loan basis, and for a portion of its loan originations sold or securitized on a servicing-retained basis. As of March 31, 2006, Accredited performed the servicing functions for residential mortgage loans with an aggregate unpaid principal balance of approximately $9.6 billion.

Accredited disposes of its loans primarily by selling them to third parties and through securitizations. The decision by Accredited to sell or to securitize loans depends upon a number of factors, including, but not limited to, premiums earned for whole loan sales and Accredited's leverage targets.

Accredited completed its first securitization in 1996 and has closed additional securitizations in 2000, 2002, 2003, 2004, 2005 and 2006. The securitizations completed in 1996 and 2000 have both been terminated as a result of Accredited exercising a clean-up call. For the years 2002, 2003, 2004, 2005 and 2006, Accredited closed two, three, four, four and one securitizations, respectively, selling loans totaling approximately $749.3 million, $1,236.5 million, $3,271.6 million, $4,240.2 million and $1,003.8 million, respectively, from its own shelf registration statement. Accredited currently plans to close one securitization in each calendar quarter. Accredited retains the servicing for loans securitized from its own shelf registration statement. None of the pools that Accredited has securitized have defaulted or experienced an early amortization target.

These securitizations are structured legally as sales, but for accounting purposes are treated as financings under SFAS No. 140. These securitizations do not meet the qualifying special purpose entity criteria under SFAS No. 140 and related interpretations because after the loans are securitized, the securitization trusts may acquire derivatives relating to beneficial interests retained by Accredited and, Accredited, as servicer, subject to applicable contractual provisions, has discretion, consistent with prudent mortgage servicing practices, to determine whether or not to sell or work out any loans securitized through the securitization trusts that become troubled. Accordingly, the loans remain on the balance sheet as "loans held for investment", retained interests are not recorded, and securitization bond

000057

Table of Contents

financing replaces the short-term debt originally associated with the loans held for investment. Accredited records interest income on loans held for investment and interest expense on the bonds issued in the securitizations over the life of the securitizations. Deferred debt issuance costs and discounts related to the bonds are amortized on a level yield basis over the estimated life of the bonds.

Accredited serves in essentially three roles in connection with its securitization program. As the sponsor, Accredited works with the underwriters and the rating agencies to select the pool of mortgage loans and structure the transaction. Generally in structuring each transaction, the sponsor looks to achieve the most efficient execution, that is to achieve the lowest cost of funds. As the servicer, Accredited is responsible for servicing each pool of mortgage loans. As the administrator of the issuing entity, Accredited is responsible for causing the issuing entity to perform its duties under the transaction documents, which duties include the provision of notices of material events, reporting and monitoring and maintaining the security interest of the noteholders in the mortgage loans.

The notes issued in each securitization do not represent an interest in or obligation of, nor are the mortgage loans guaranteed by Accredited, nor are the securitized mortgage loans insured or guaranteed by the Federal Deposit Insurance Corporation or any other governmental agency or instrumentality.

*Limitations on Liability*

Accredited and its directors, officers, employees or agents are not under any liability to the issuing entity or the noteholders for any action taken, or for refraining from the taking of any action, in good faith pursuant to the sale and servicing agreement, or for errors in judgment. However, Accredited is not protected from liability for any breach of warranties or representations made by Accredited in the sale and servicing agreement, or against any specific liability imposed on Accredited pursuant to the sale and servicing agreement or against any liability which would otherwise be imposed upon Accredited by reason of willful misfeasance, bad faith or negligence in the performance of its duties or by reason of failure to perform its obligations or duties under the sale and servicing agreement.

*Contemplated Transactions*

On May 24, 2006, Accredited Home Lenders Holding Co., a Delaware corporation ("LEND"), Aames Investment Corp., a Maryland corporation, ("Aames") and AHL Acquisition, LLC, a Maryland limited liability company and wholly owned subsidiary of LEND ("Merger Sub"), entered into an Agreement and Plan of Merger (the "Merger Agreement"), under which Aames will be merged with and into Merger Sub, with Merger Sub continuing after the merger as the surviving company and a wholly owned subsidiary of LEND (the "Merger").

Based on the closing price of LEND common stock on May 24, 2006, the aggregate consideration to be paid to holders of Aames common stock at the closing of the Merger is approximately $340 million, or $5.35 per share of Aames common stock. Approximately $109 million, or 32% of the consideration, will be paid in cash to Aames stockholders. The remainder will be paid in shares of LEND's common stock on the basis of an exchange ratio equal to 0.070 shares of LEND's common stock for each share of Aames common stock. The cash consideration paid to Aames will be reduced by the REIT dividends, if any, paid to Aames shareholders prior to the closing. Since Aames shareholders will have the ability to make a cash or stock election with respect to the consideration they receive after the closing of the Merger, the exchange ratio will be adjusted based on the cumulative elections received and the pro-ration provisions of the Merger Agreement.

The Merger Agreement has been unanimously approved by the Board of Directors of LEND. The Merger is subject to customary conditions, including compliance with the pre-merger notification requirements of the Hart-Scott-Rodino Act and approval by the stockholders of LEND and the shareholders of Aames. The Merger Agreement contains certain covenants regarding the operation of Aames prior to closing as well as the cooperation of both parties in meeting the conditions to closing. The Merger Agreement also contains termination rights in favor of both LEND and Aames upon the

S-52

Table of Contents

occurrence of certain events, including the right of either party to terminate the Merger Agreement after December 15, 2006 if the Merger has not been consummated by such date and such failure is not caused by a breach of the Merger Agreement by the terminating party.

### Legal Proceedings

Because the nature of Accredited's business involves the collection of numerous accounts and compliance with federal, state and local lending laws, the originator is subject to claims and legal actions in the ordinary course of its business. Like a number of other consumer finance companies, Accredited is subject to certain class-action lawsuits alleging violations of various federal and state consumer protection laws and other laws. Accredited intends to defend or seek other resolution of these lawsuits and, except as described below, Accredited either does not believe that their resolution will have a material adverse effect on its financial position or results of operations or has not been able to make a determination regarding the ultimate outcome of the matter or the amount of potential liability. In addition to the class actions disclosed in Accredited's public filings, Accredited is subject to the lawsuit described below.

In March 2006, Accredited was served with a class action complaint, *Cabrejas v. Accredited Home Lenders, Inc.*, brought in the Circuit Court for Prince George's County, Maryland. The complaint alleges that fees charged and disclosed on second lien loans originated by Accredited in Maryland (i) violated the Maryland Secondary Mortgage Loan Law in that such fees exceeded 10% of the respective loan amounts and (ii) constituted unfair and deceptive trade practices in violation of the Maryland Consumer Protection Act. The plaintiffs seek to recover, on behalf of themselves and similarly situated individuals, damages, disgorgement of fees, pre-judgment interest, declaratory and injunctive relief, attorneys' fees, and any other relief the court may grant. On April 13, 2006, Accredited removed the action to the United States District Court, District of Maryland. On May 15, 2006, Accredited filed a motion to dismiss plaintiffs' second cause of action alleging a violation of the Maryland Consumer Protection Act on the basis that full disclosure of the fees cannot be an unfair or deceptive trade practice. A hearing date for the motion to dismiss has not been set. A motion to certify a class has not yet been filed, and there has been no ruling on the merits of either the plaintiff's individual claims or the claims of the putative class, and the ultimate outcome of this matter and the amount of liability, if any, which may result is not presently determinable. Accredited intends to vigorously defend this matter and does not believe it will have a material adverse effect on its business.

### Underwriting

*General.* Each mortgage loan originated or acquired by Accredited is underwritten prior to loan closing, or re-underwritten after loan closing but prior to purchase by Accredited, in accordance with Accredited's underwriting guidelines. Accredited's underwriting process is intended to assess a loan applicant's credit standing and repayment ability and the value and adequacy of the real property security as collateral for the proposed loan. All underwriting and re-underwriting is performed by Accredited's underwriting personnel, and Accredited does not delegate underwriting authority to any broker, correspondent or other mortgage loan provider. Accredited's underwriting standards are applied in a standardized manner which complies with applicable federal and state laws and regulations.

*Brokers and Correspondents.* All of Accredited's prospective mortgage brokers and correspondents are subjected to a pre-approval process, including verification that all required licenses are current, and are required to sign agreements pursuant to which they represent and warrant compliance with Accredited's underwriting guidelines and all applicable laws and regulations. Accredited periodically reviews each of its mortgage broker's and correspondent's performance relative to issues disclosed by Accredited's quality control review, and discontinues relationships with unacceptable performers.

*Loan Applications and Credit Reports.* Each prospective mortgagor completes a mortgage loan application that includes information with respect to the applicant's liabilities, income, credit history, employment history and personal information. At least one credit report on each applicant from an

S-53

000059

Table of Contents

independent, nationally recognized credit reporting company is required. The credit report typically contains information relating to such matters as credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions, or judgments. All derogatory credit items occurring within the preceding two years and all credit inquiries within the preceding 90 days must be addressed by the applicant to the satisfaction of Accredited.

*Property Appraisals.* A full appraisal of the property proposed to be pledged as collateral is required in connection with the origination of each first priority loan and each second priority loan greater than $50,000. Appraisals are performed by licensed, third-party, fee-based appraisers and include, among other things, an inspection of the exterior and interior of the subject property. Appraisals are also required to address neighborhood conditions, site and zoning status and the condition and value of improvements. Following each appraisal, the appraiser prepares a report which includes a reproduction costs analysis (when appropriate) based on the current cost of constructing a similar home and market value analysis based on recent sales of comparable homes in the area. Appraisals generally conform to the Uniform Standards of Professional Appraisal Practice and must be on forms acceptable to Freddie Mac and Fannie Mae. Every appraisal is reviewed by a non-affiliated appraisal review firm or by Accredited's Appraisal Review Department or a qualified underwriter before the mortgage loan is closed. The appraisal may not be more than 180 days old on the day the loan is funded. A second full appraisal is required for combined loan amounts and/or property values greater than $1,000,000. For second priority loans of $50,000 or less, "drive-by" appraisals alone are acceptable. The standard appraisal may be waived in favor of an Insured Automated Value Model (AVM) with a physical inspection, provided the loan meets certain criteria. The Insured AVM is effective for the life of the loan, is transferable, and provides an unbiased opinion of the property value. The Insured AVM process includes a Property Condition Report which is a drive-by inspection that verifies the collateral is conforming. The insurance certificate provides protection that may minimize loss severity in the event of foreclosure.

*Income and Assets Verification.* Accredited's underwriting guidelines require verification or evaluation of the income of each applicant pursuant to Accredited's "Full Documentation," "Lite Documentation" or "Stated Income" programs. Under each of these programs, Accredited reviews the loan applicant's source of income, calculates the amount of income from sources indicated on the loan application or similar documentation, and calculates debt service-to-income ratios to determine the applicant's ability to repay the loan. Under the Full Documentation program, applicants are generally required to submit the most current year to date pay stub and written verification of income signed by the employer, Forms W-2 or 1040 and, in the case of self-employed applicants, most recent two years' complete tax returns, signed year to date profit and loss statement, or bank statements. Personal bank statements are acceptable as Full Documentation, with bank statements for the preceding 24 months acceptable for "Alt2" documentation type or bank statements for the preceding 12 months acceptable for "Alt1." Under the Lite Documentation program, applicants must be self-employed and are required to submit personal bank statements covering at least the preceding six months. Under the Stated Income program, applicants are evaluated based upon income as stated in the mortgage loan application. Under all programs, Accredited may verify by telephone employment, business and income, and self-employed applicants may be required to submit a business license.

Verification of the source of funds (if any) required to be paid by the applicant at closing is generally required under all documentation programs in the form of a standard verification of deposit, two months' consecutive bank statements or other acceptable documentation. On Accredited's core mortgage loan products and on some of its specialty products, twelve months' mortgage payment or rental history must be verified by the related lender or landlord.

*Credit Classifications.* A critical function of Accredited's underwriting process is to identify the level of credit risk associated with each applicant for a mortgage loan. Accredited has established five principal classifications, "A+" to "C," with respect to the credit profile of potential borrowers, and a rating is assigned to each loan based upon these classifications. Accredited has a sixth, generally inactive credit classification, called "C-" which may be assigned to a borrower with a current or recent foreclosure or bankruptcy and can still be used on an exception basis with approval from executive management. Accredited assigns credit grades by analyzing mortgage payment history, consumer credit history, credit score, bankruptcy history, and debt-to-income ratio.

S-54

Table of Contents

*Quality Control.* Each month, Accredited's internal audit and quality control department generally reviews and re-underwrites a sample of the loans originated by Accredited. The statistical sample of loans is chosen by random selection and based on the prior defect rates. In addition, targeted reviews are conducted, including but not limited to the following areas: regulatory compliance, non-performing assets, targeted and discretionary reviews, or where fraud is suspected. The quality control department re-underwrites these loans through an in-depth analysis of the following areas: application, income/employment, appraisals, credit decision, program criteria, net tangible benefits, re-verifications, and compliance. Specifically, these tests focus on verifying proper completion of borrower disclosures and other loan documentation, correct processing of all legally required documentation, and compliance with time frames imposed by applicable law. When fraud is suspected, the quality control department undertakes a comprehensive re-underwriting of not only the loan in question, but any related loans connected by broker, appraiser, or other parties to the transaction. All findings of the internal audit and quality control department are reported on a regular basis to members of senior management and the audit committee of the board of directors. The Chief Executive Officer and the Chief Operating Officer, along with the Director of Operations and others analyze the results of the monthly internal audit and quality control department audits as well as performance trends and servicing issues. Based upon this analysis, corrective actions are taken.

*Loan Programs.* Accredited's mortgage loans are made for the purpose of enabling borrowers to purchase new homes, refinance existing mortgage loans, consolidate debt and/or obtain cash for whatever purposes the borrowers desire. Accredited's single-family residence loans are secured by one- to four-unit primary residences, one-unit second homes, or one- to four-unit investment properties, and eligible property types are deemed to include single-family detached homes, semi-detached homes, row or townhomes, individual condominiums, individual units in planned-unit developments, and leasehold estates. These collateral types are consistent with the Freddie Mac Seller-Servicer Guide for describing mortgage eligibility requirements. The mortgaged properties may be owner-occupied, second or vacation homes, or non-owner occupied investment properties.

Accredited's loans have payment schedules based primarily upon (1) an interest rate that is constant over the life of the loan, commonly referred to as "fixed-rate loans" or (2) generally, an interest rate that is fixed for the initial two, three or five years and adjusts after an initial fixed period of two, three or five years and every six months thereafter, sometimes referred to as "adjustable-rate loans". Generally, the payments on Accredited's fixed-rate loans are calculated to fully repay the loans in 15 or 30 years, or, in the case of so-called "balloon" loans, the payments are based on a 30-year repayment schedule, but all unpaid principal is due in a larger "balloon" payment at the end of 15 years. The payments on Accredited's adjustable-rate loans are calculated to fully repay the loans in 30 years, and the payment amounts are adjusted whenever the interest rates are adjusted. Accredited's adjustable-rate loans with a two-year initial fixed-rate period are commonly referred to as "2/28's," Accredited's adjustable-rate loans with a three-year initial fixed-rate period are commonly referred to as "3/27's" and Accredited's adjustable-rate loans with a five-year initial fixed-rate period are commonly referred to as "5/25's". Accredited's fixed-rate or adjustable-rate loans may have initial interest-only periods, typically five years, during which the monthly payments are limited to the amounts required to pay accrued interest due on the loans. After the interest-only periods, the monthly payments are adjusted to fully repay the loans over their remaining terms.

The interest rate adjustments on Accredited's adjustable-rate loans are determined by adding a "margin" to an "index" rate, subject to certain adjustment limitations. The "margin" is a percentage established at origination of a loan, and the "index" for Accredited's adjustable-rate loans is six-month LIBOR, and is determined as of a specified time prior to the interest adjustment date. It is common during the initial fixed-rate period of an adjustable-rate loan to allow the borrower to pay a rate lower than the margin plus the index at loan origination. Over time, the rate may adjust upward such that, eventually, the interest rate will equal the index plus the entire margin. Such adjustments are generally

S-55

Table of Contents

limited to no more than 1.5% at each adjustment date, and the interest rates may not be adjusted above or below a maximum and minimum amount specified in the loan documents. The goal is to acclimate the borrower to the repayment obligation, yet be able to achieve the fully indexed interest rate over time.

Accredited offers a full range of subprime mortgage loan programs, and the key distinguishing features of each program are the documentation required, the LTV, the mortgage and consumer credit payment history, the property type and the credit score necessary to qualify under a particular program. Nevertheless, each program relies upon Accredited's analysis of each borrower's ability to repay, the risk that the borrower will not repay the loan, the fees and rates Accredited charges, the value of the collateral, the benefit Accredited believes it is providing to the borrower, and the loan amounts relative to the risk Accredited believes it is taking.

In general, Accredited's LTV maximums decrease with credit quality, and, within each credit classification, the LTV maximums vary depending on the property type. LTV maximums for loans secured by owner-occupied properties are higher than for loans secured by properties that are not owner-occupied. LTV maximums for Lite Documentation and Stated Income programs are generally lower than the LTV maximums for corresponding Full Documentation programs. Our maximum debt-to-income ratios range from 50% to 55% for Full Documentation programs, and maximum 45% for Lite Documentation and Stated Income Programs.

Accredited offers a variety of specialty programs that provide higher LTV's and CLTV's to borrowers in higher credit grades. Credit grades may be determined by the same criteria as in the core programs, but may also be determined only on the basis of mortgage credit or credit score. Specialty programs may be restricted as to property and occupancy types and documentation requirements.

Accredited also offers Alt-A mortgage loan programs with additional income documentation types, higher qualifying minimum credit scores and higher loan amounts than the non-prime programs. The same underwriting standards as described above for non-prime programs also apply to Alt-A mortgage loans. Alt-A documentation types requiring less documentation, such as "SISA," defined as Stated Income Stated Assets, "No Ratio," and "No Doc," also receive close review and evaluation to determine whether the borrower's ability to repay the mortgage debt is reasonable. Documentation and qualifying requirements vary depending on the product selected.

*Exceptions.* Accredited may allow exceptions to its underwriting guidelines in accordance with Accredited's established exception policy. Exceptions may be allowed based upon the presence of compensating factors such as a low LTV, demonstrated pride of ownership and stability of employment. A substantial number of the mortgage loans were originated pursuant to Accredited's exception policy.

### Delinquency and Loss Information for the Initial Mortgage Loans

During the previous twelve months from the Initial Cut-off Date, eighty-nine initial mortgage loans with an aggregate principal balance of approximately $15,825,630 were 30 or more days contractually delinquent one time. Five initial mortgage loans with an aggregate principal balance of approximately $832,375 were 30 or more days contractually delinquent three times in the twelve months prior to the Initial Cut-off Date. One initial mortgage loan with an aggregate principal balance of approximately $49,733 was 30 or more days contractually delinquent six times in the twelve months prior to the Initial Cut-off Date.

The following table sets forth certain information regarding the delinquency performance as of the Initial Cut-off Date for sixty-one initial mortgage loans with an aggregate principal balance of approximately $10,193,468 representing approximately 1.22% of the Initial Pool Balance.

In the following table, a mortgage loan is defined as 30 days contractually delinquent on the last day of the calendar month in which the payment is due and losses are recognized when collateral relating to a mortgage loan has been foreclosed and the mortgaged property has been liquidated, except in those instances in which management determines that the loss amount would be less by "walking away" from

S-56

Table of Contents

the property. The loss amount is equal to the principal amount on the loan, plus accrued and unpaid interest on the loan, plus any foreclosure expenses less proceeds received from the buyer of the foreclosed property. None of the initial mortgage loans had any losses as of the Initial Cut-Off Date.

| | As of June 1, 2006 | | | |
|---|---|---|---|---|
| | Number of Initial Mortgage Loans | Percentage of Total Number of Mortgage Loans(1) | Initial Mortgage Loan Principal Balance | Percentage of Principal Balance(2) |
| Total mortgage loan pool | 4,766 | | $835,719,121 | |
| Delinquency 30 - 59 days | 61 | 1.22% | $ 10,193,468 | 1.22% |
| Foreclosures | — | — | — | — |
| Total delinquencies and foreclosures | 61 | 1.22% | $ 10,193,468 | 1.22% |

(1) Percentage of initial mortgage loan pool as of the Initial Cut-Off Date.
(2) Percentage of the Initial Pool Balance as of the Initial Cut-Off Date.

**Static Pool Information**

Static pool information for Accredited's amortizing asset pools is available at http://www.accredhome.com/regs/AHL_RegAB1105_2006-03.pdf. This website has unrestricted access, is free of charge and does not require user registration for immediate access. The static pool information will remain available on the website for a period of not less than five years from the date of this prospectus supplement and any subsequent modification or update to such information will be clearly indicated on the website as of the date of such modification or update.

The static pool information posted on this website that relates to securitizations sponsored by Accredited prior to January 1, 2006 and that relates to the pool of mortgage loans being securitized in the current transaction for periods prior to January 1, 2006 is not deemed to be part of this prospectus supplement or the accompanying prospectus or the registration statement related to the securities being offered pursuant to this prospectus supplement and the accompanying prospectus.

**The Depositor**

The depositor, a Maryland real estate investment trust, was formed in the State of Maryland on May 4, 2004. The depositor's principal business objective is to acquire, hold and manage mortgage assets that will generate net income for distribution to its shareholders. All of the depositor's outstanding common shares are owned by the sponsor. The depositor completed a public offering of preferred shares and they are publicly-traded on the New York Stock Exchange. The sponsor has contributed the closing date mortgage loans to the depositor, and on the closing date, the sponsor will direct the depositor to sell the closing date mortgage loans to the issuing entity.

***Continuing Options***

The depositor has the option, but is not obligated, to purchase from the issuing entity any mortgage loan that is ninety days or more delinquent at a purchase price equal to the outstanding principal balance thereof as of the date of purchase, plus all accrued and unpaid interest on such principal balance,

Table of Contents

computed at the related mortgage interest rate — plus the amount of any unreimbursed Delinquency Advances and Servicing Advances with respect to such mortgage loan in accordance with the provisions specified in the sale and servicing agreement. Pursuant to this option, the depositor may not purchase more than 10% of the mortgage loans in the pool, measured by the outstanding principal balance of the mortgage loans repurchased as a percentage of the Initial Pool Balance.

In addition, the depositor has the ongoing option to terminate the issuing entity on any payment date when the outstanding principal balance of the notes is less than or equal to 10% of the original principal balance of the notes, after giving effect to distributions on that payment date. In addition, pursuant to the sale and servicing agreement, if a breach related to a mortgage loan is not cured within the specified time period, the depositor will, and if the depositor fails to, then the sponsor will either (a) substitute for such mortgage loan a Qualified Substitute Mortgage Loan or (b) purchase such mortgage loan from the issuing entity, such repurchase amount to include any costs and damages incurred by the issuing entity in connection with a violation of a predatory or abusive lending law. See *"Description of the Notes and Trust Certificates - Optional Clean-Up Call and -Representations and Warranties of the Sponsor"* for more information regarding the depositor's termination option and the removal or substitution of mortgage loans by the depositor.

## The Issuing Entity

Accredited Mortgage Loan Trust 2006-2, a Delaware statutory trust, is the issuing entity of the Notes. The issuing entity's fiscal year end will be December 31.

*Permissible Activities*

The purpose of the issuing entity is to engage in the following activities:

(a) to issue the Notes and to sell such Notes;

(b) with the proceeds of the sale of the Notes and the trust certificates and to purchase the mortgage loans to be included in the trust estate from the depositor with the balance of such funds pursuant to the sale and servicing agreement;

(c) to assign, grant, transfer, pledge, mortgage and convey the trust estate pursuant to the indenture and to hold, manage and distribute to the certificateholders any portion of the trust estate released from the lien of, and remitted to the issuing entity pursuant to, the indenture;

(d) to enter into and perform its obligations under the trust agreement, the sale and servicing agreement, the indenture and the interest rate swap agreement, to which it is or is to be a party;

(e) to engage in those activities, including entering into agreements, that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith;

(f) subject to compliance with the trust agreement, the sale and servicing agreement, the indenture and the interest rate swap agreement, to engage in such other activities as may be required in connection with conservation of the trust estate and the making of distributions and payments to the noteholders and the certificateholders; and

(g) to issue the trust certificates pursuant to the trust agreement.

*Restrictions on Issuing Entity's Activities*

The issuing entity shall not engage in any activity other than in connection with the foregoing or other than as required or authorized by the terms of the trust agreement, the sale and servicing agreement, the indenture and the interest rate swap agreement.

S-58

000064

*In re Debtor:  James L Macklin-  Chapter 7*
**USBC Eastern District of California Case No:  10-44610**
**Adversary No. 11-02024-E**
**NOTICE OF APPLICATION AND *EX PARTE* APPLICATION FOR TEMORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

**EXHIBIT "4B"**

*In re Debtor:  James L Macklin-  Chapter 7*
**USBC Eastern District of California Case No:  10-44610**
**Adversary No. 11-02024-E**
**NOTICE OF APPLICATION AND *EX PARTE* APPLICATION FOR TEMORARY RESTRAINING ORDER AND**
**ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

**EXHIBIT "4C"**

Table of Contents

# $1,397,200,000

### Accredited Mortgage Loan Trust 2006-2
**Issuing Entity**

### Accredited Home Lenders, Inc.
**Sponsor and Servicer**

### Accredited Mortgage Loan REIT Trust
**Depositor**

**Asset-Backed Notes**
**Series 2006-2**

---

### PROSPECTUS SUPPLEMENT
**June 9, 2006**

---

*GOLDMAN, SACHS & CO.*

*BEAR, STEARNS & CO. INC.*      *CREDIT SUISSE*      *MERRILL LYNCH & CO.*

*UBS INVESTMENT BANK*

You should rely only on the information contained or incorporated by reference in this prospectus supplement and the accompanying prospectus. We have not authorized anyone to provide you with different information.

We are not offering the notes offered in this prospectus supplement in any state where the offer is not permitted.

Dealers will be required to deliver a prospectus supplement and prospectus when acting as underwriters of the notes offered hereby and with respect to their unsold allotments or subscriptions. In addition, all dealers selling the notes, whether or not participating in this offering, may be required to deliver a prospectus supplement and prospectus until 90 days after the date of the prospectus supplement.

Table of Contents

**PROSPECTUS**

**ACCREDITED HOME LENDERS, INC.**
(The Sponsor and a Depositor)
**ACCREDITED MORTGAGE LOAN REIT TRUST**
(a Depositor)
**ASSET-BACKED SECURITIES**
**(ISSUABLE IN SERIES BY SEPARATE TRUSTS)**

**You should read the section entitled "Risk Factors" starting on page 1 of this prospectus before making a decision to invest in the securities.**

Retain this prospectus for future reference. This prospectus may not be used to consummate sales of securities unless accompanied by the prospectus supplement relating to the offering of the securities.

**The Securities:**

- will be issued in one or more classes,
- will consist of either asset-based notes or asset-backed certificates,
- will be issued by a trust or other special purpose entity,
- will be backed by one or more pools of residential mortgage loans held by the issuing entity, and
- may have one or more forms of credit enhancement, such as insurance policies or reserve funds.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

The date of this prospectus is April 18, 2006

Table of Contents

**IMPORTANT NOTICE ABOUT INFORMATION IN THIS PROSPECTUS
AND EACH ACCOMPANYING PROSPECTUS SUPPLEMENT**

Information about each series of securities is contained in two separate documents:

- this prospectus, which provides general information, some of which may not apply to a particular series; and

- the accompanying prospectus supplement for a particular series, which describes the specific terms of the securities of that series.

The prospectus supplement will contain information about a particular series that supplements the information contained in this prospectus, and you should rely on that supplementary information in the prospectus supplement.

You should rely only on the information in this prospectus and the accompanying prospectus supplement. We have not authorized anyone to provide you with information that is different from that contained in this prospectus and the accompanying prospectus supplement.

If you require additional information, the mailing address of our principal executive offices is Accredited Home Lenders, Inc., 15090 Avenue of Science, San Diego, California 92128 and the telephone number is (858) 676-2100. For other means of acquiring additional information about us or a series of securities, see "Incorporation of Certain Documents by Reference" beginning on page 76.

i

Table of Contents

# TABLE OF CONTENTS

RISK FACTORS ............................................................................... 1
DESCRIPTION OF THE SECURITIES ................................................. 8
Payments of Interest ...................................................................... 8
Payments of Principal ..................................................................... 8
Final Scheduled Payment Date ......................................................... 8
Optional Redemption ...................................................................... 9
Mandatory Redemption .................................................................... 9
Weighted Average Life of the Securities ............................................. 9
Use of Notional Amounts ................................................................. 10
Form of Securities .......................................................................... 10
THE TRUST ESTATES ..................................................................... 10
The Loans .................................................................................... 14
CREDIT ENHANCEMENT ................................................................ 15
Overcollateralization ...................................................................... 17
Subordinated Securities ................................................................... 17
Insurance ..................................................................................... 17
Reserve Funds ............................................................................... 18
Letter of Credit ............................................................................. 19
Other Insurance, Guarantee and Similar Instruments or Agreements .......... 19
Cross Collateralization .................................................................... 19
SWAPS AND YIELD SUPPLEMENT AGREEMENTS .............................. 19
SERVICING OF LOANS ................................................................... 20
Advances and Limitations Thereon .................................................... 21
Maintenance of Insurance Policies and Other Servicing Procedures ........... 21
Realization upon Defaulted Loans ..................................................... 21
Enforcement of Due-On-Sale Clauses ................................................. 23
Servicing Compensation and Payment of Expenses ................................ 23
Evidence as to Compliance ............................................................... 23
Certain Matters Regarding the Servicer ............................................... 24
THE AGREEMENTS ........................................................................ 24
Assignment of Loans ...................................................................... 25
Reports to Security Holders .............................................................. 25
Servicer Defaults ........................................................................... 28
Events of Default ........................................................................... 28
The Trustee .................................................................................. 29
Duties of the Trustee ...................................................................... 30
Resignation of Trustee .................................................................... 30
Amendment of Agreements .............................................................. 31
Voting Rights ............................................................................... 31
Meetings of Holders ....................................................................... 31
REMIC Administrator ..................................................................... 31
Termination .................................................................................. 32
YIELD AND MATURITY CONSIDERATIONS ...................................... 32
LEGAL ASPECTS OF LOANS ........................................................... 33
Mortgage Loans ............................................................................ 36
The Home Improvement Contracts ..................................................... 36
Installment Contracts ...................................................................... 47
                                                                              49

ii

**Table of Contents**

Servicemembers Civil Relief Act ......................................................................................... 49
Environmental Legislation ................................................................................................... 50
Consumer Protection Laws .................................................................................................. 51
THE SPONSOR AND THE SERVICER .............................................................................. 52
THE DEPOSITOR .............................................................................................................. 52
USE OF PROCEEDS ........................................................................................................... 52
MATERIAL FEDERAL INCOME TAX CONSEQUENCES .............................................. 53
Grantor Trust Securities ...................................................................................................... 53
REMIC Securities ............................................................................................................... 55
Debt Securities .................................................................................................................... 62
Partnership Interests ........................................................................................................... 63
Discount and Premium ........................................................................................................ 66
REIT/TMP ........................................................................................................................... 70
Backup Withholding ............................................................................................................ 70
Foreign Investors ................................................................................................................ 70
STATE TAX CONSIDERATIONS ...................................................................................... 72
ERISA CONSIDERATIONS ............................................................................................... 72
LEGAL INVESTMENT ...................................................................................................... 75
AVAILABLE INFORMATION ........................................................................................... 76
INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE ................................ 76
PLAN OF DISTRIBUTION ................................................................................................ 76
LEGAL MATTERS ............................................................................................................. 77

iii

Table of Contents

## RISK FACTORS

You should carefully consider the following factors prior to any purchase of any class of securities. You should also consider the information under the caption "Risk Factors" in the accompanying prospectus supplement.

**Limited liquidity may result in delays in your ability to sell securities or lower returns; you should be prepared to hold your investment to maturity.**

There will be no market for the securities prior to their issuance, and there can be no assurance that a secondary market will develop or, if it does develop, that it will provide you holders with liquidity of investment or that the market will continue for the life of the securities. The underwriters specified in the related prospectus supplement may make a secondary market in the securities, but have no obligation to do so. The securities will not be listed on any securities exchange. Absent a secondary market for the securities, you may not be able to find a buyer for your securities at the time you choose to sell your securities and the price that you receive may be less than the price that you would receive for a comparable liquid security. You should be prepared to hold your investment to maturity.

**The assets of each trust estate, as well as any applicable credit enhancement, will be limited and, if such assets and credit enhancement become insufficient to service the related securities, losses may result.**

The securities will be payable solely from the assets of the related trust estate and any applicable credit enhancement. You will not have recourse to the depositors nor to any other entity if you do not receive a required distribution on the securities. Consequently, you must rely solely upon payments derived from the trust estate, including, if applicable, any amounts available from any credit enhancement, for the payment of principal of and interest on the securities.

Although any credit enhancement for the securities will be intended to reduce the risk of delinquent payments or losses to you, the amount of such credit enhancement will be limited, and will decline and could be depleted under circumstances prior to the payment in full of the securities. In addition, the available credit enhancement may not cover all potential sources of loss. For example, the credit enhancement may not cover fraud or negligence by a loan originator or other parties. Also, the trustee may be permitted to reduce, substitute for, or even eliminate all or a portion of a credit enhancement so long as the rating agencies that have rated the securities the indicate that they would not reduce their rating of the securities. As a result, you may suffer losses.

**The securities do not have specified payment or debt service schedules, and payments on the securities are subject to the rate of payment on the underlying loans.**

The yield to maturity of the securities will depend on the rate of payment of principal (including prepayments, liquidations due to defaults, and repurchases due to breaches of representations and warranties) on the loans and the price paid by you. The yield to maturity on principal-only or interest-only securities purchased at premiums or discounted to par will be extremely sensitive to the rate of prepayments on the related loans.

1

Table of Contents

The loans may be prepayable in full or in part at any time, although a prepayment charge or premium may be imposed. These charges may or may not be property of the issuing entity. We cannot predict the rate of prepayments of the loans, which is influenced by a wide variety of economic, social, and other factors, including prevailing mortgage market interest rates, the availability of alternative financing, local and regional economic conditions and homeowner mobility. Therefore, we can give no assurance as to the level of prepayment that a trust estate will experience.

The rate of prepayments of conventional housing loans has fluctuated significantly in recent years. In general, however, if prevailing interest rates fall significantly below the interest rates on the loans for a series, such loans are likely to prepay at rates higher than if prevailing interest rates remain at or above the interest rates borne by such loans. In this regard, it should be noted that the loans for a series may have different interest rates. In addition, the weighted average life of the securities may be affected by the varying maturities of the loans. If any loans for a series have actual terms-to-stated maturity of less than those assumed in calculating the final scheduled payment date of the related securities, one or more classes of the series may be fully paid prior to their respective final scheduled payment dates, even in the absence of prepayments. See "Yield and Maturity Considerations" in this prospectus. In addition to prepayments, your securities may be repaid more quickly than expected as a result of mandatory prepayments relating to unused moneys held in pre-funding accounts, voluntary early payments by borrowers (including payments in connection with refinancings of related senior liens), sales of mortgaged properties subject to "due-on-sale" provisions and liquidations due to default, as well as the receipt of proceeds from physical damage, credit life and disability insurance policies. In addition, repurchases or purchases of loans or substitution adjustments will have the same effect on the securities as a prepayment of the loans.

### Nonconforming credit mortgage loans may experience higher rates of delinquencies and losses.

In general, the sponsor originates and acquires mortgage loans which do not meet the credit criteria required by the Federal National Mortgage Association, or Fannie Mae and the Federal Home Loan Mortgage Corporation, or Freddie Mac. These mortgage loans are commonly referred to as "nonconforming credit" mortgage loans. These mortgage loans tend to exhibit higher levels of delinquency, foreclosure and loss than mortgage loans which conform to the requirements of Fannie Mae and Freddie Mac. The interest rates and the loan-to-value ratios for such mortgage loans are established at levels designed to compensate for and offset the increased delinquency, foreclosure and loss risks presented by such loans, and rating agencies take such increased risks into account in assigning ratings to classes of securities which represent interests in such loans. No assurances can be given, however, that the loans in any trust estate will not experience delinquency, foreclosure and loss levels that are greater than expected, which will and adversely affect the value of the related securities.

### Junior liens may experience higher rates of delinquencies and losses.

To the extent that mortgages are junior liens that are subordinate to the rights of the mortgagee under the related senior mortgage or mortgages, the proceeds from any liquidation, insurance or condemnation proceedings will be available to satisfy the outstanding balance of such junior mortgage only to the extent that the claims of such senior mortgagees have been satisfied in full, including any related foreclosure costs. In addition, a junior mortgagee may not foreclose on the mortgaged property securing a junior mortgage unless it forecloses subject to the senior mortgages, in which case it must either pay the entire amount due on the senior mortgages

2

000153

Table of Contents

to the mortgagees at or prior to the foreclosure sale or undertake the obligation to make payments on the senior mortgages in the event the mortgagor is in default thereunder. The trust estate will not have any source of funds to satisfy the senior mortgages or make payments due to the senior mortgagees.

Some states have imposed legal limits on the remedies of a mortgagee in the event that the proceeds of any sale under a deed of trust or other foreclosure proceedings are insufficient to pay amounts owed to that secured lender. In some states, including California, if a lender simultaneously originates a loan secured by a senior lien on a particular property and a loan secured by a junior lien on the same property, that lender as the holder of the junior lien may be precluded from obtaining a deficiency judgment with respect to the excess of:

- the aggregate amount owed under both the senior and junior loans over
- the proceeds of any sale under a deed of trust or other foreclosure proceedings.

**Property values may decline, leading to higher losses.**

An investment in the securities, which are backed by residential mortgage loans, may be affected by a decline in real estate values. A decline could be caused by a general decline in the real estate market, the borrower's failure to maintain the property, a deterioration in economic conditions or a natural disaster, among other things. If such a decline occurs, the actual rates of delinquencies, foreclosure and losses on the loans could be higher than those currently experienced in the mortgage lending industry in general. These losses, to the extent not otherwise covered by credit enhancement, will be borne by the holder of one or more classes of securities.

**Adjustable-rate loans may experience higher rates of delinquencies and losses.**

In general, the sponsor's underwriting guidelines provide for a prospective borrower's repayment ability to be evaluated based on the initial level of monthly payment required by the mortgage loan for which the borrower is applying. However, with respect to certain types of loans, including loans as to which the loan rate may adjust in accordance with movements in an index, the scheduled payment may increase beyond the initial level of the scheduled payment. To the extent the income level of the related borrower may not be sufficient to enable the borrower to meet higher scheduled payments, the risk of delinquency, foreclosure and loss may be increased with respect to such loans. In addition, certain types of these loans may provide for "negative amortization"—deferral of the payment of a portion of currently accrued interest and the addition of such deferred amount to the principal balance of the loan. To the extent such "negative amortization" results in total liens against a mortgaged property in excess of the value of the mortgaged property, the risk of delinquency, foreclosure and loss with respect to the related loan may be further increased.

**Non-owner-occupied loans may experience higher rates of delinquencies and losses.**

A loan included in a trust estate may be secured by a mortgaged property which is not the primary residence of the related borrower. Because the borrower on such a "nonowner-occupied" loan may have less incentive to avoid foreclosure than borrowers under loans secured by primary residences, nonowner-occupied loans may experience higher rates of delinquencies and losses than owner-occupied loans.

3

Table of Contents

### Bankruptcy of mortgagors may lead to higher levels of losses.

General economic conditions may have an impact on the ability of borrowers to repay loans. Loss of earnings, illness and other similar factors also may lead to an increase in delinquencies and bankruptcy filings by borrowers. In the event of personal bankruptcy of a borrower, it is possible that a trust estate could experience a loss with respect to the related loan. In conjunction with a borrower's bankruptcy, a bankruptcy court may suspend or reduce the payments of principal and interest to be paid with respect to such loan or permanently reduce the principal balance of such loan thereby either delaying or permanently limiting the amount received by the trust estate with respect to such loan. Moreover, in the event that a bankruptcy court prevents the transfer of the related mortgaged property to the trust estate, any remaining balance on the loan may not be recoverable.

### Foreclosure of properties may be subject to substantial delay, resulting in longer maturity of the securities, as well as higher losses.

Even if the mortgaged properties provide adequate security for the loans, substantial delays could be encountered in connection with the foreclosure of defaulted loans, and corresponding delays in the receipt of the foreclosure proceeds could occur. Foreclosures are regulated by state statutes, rules and judicial decisions and are subject to many of the delays and expenses of other lawsuits, sometimes requiring several years to complete. The servicer will be entitled to reimburse itself for any expenses it has paid in attempting to recover amounts due on the liquidated loans, including payments to prior lienholders, accrued fees and costs of legal action, real estate taxes, and maintenance and preservation expenses, all of which will reduce the amount of the net recovery by the trust.

### Environmental conditions on the mortgaged property may give rise to liabilities.

Real property pledged as security to a lender may be subject to certain environmental risks which could cause losses on your securities. Under the laws of certain states, contamination of a mortgaged property may give rise to a lien on the property to assure the costs of clean-up. In several states, such a lien has priority over the lien of an existing mortgage or owner's interest against such property. In addition, under the laws of some states and under the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980, or CERCLA, a lender may be liable, as an "owner" or "operator", for costs of addressing releases or threatened releases of hazardous substances that require remedy at a property, if agents or employees of the lender have become sufficiently involved in the operations of the borrower, regardless of whether or not the environmental damage or threat was caused by a prior owner. A lender also increases its risk of environmental liability upon the foreclosure of the mortgaged property, since the lender may then become the legal owner of the property. If the trust is considered the owner or operator of a property, it will suffer losses as a result of any liability imposed for environmental hazards on the property.

### Violation of lending laws could result in losses on the securities.

Applicable state laws generally regulate interest rates and other charges and require certain disclosures with respect to mortgage loans. In addition, other state laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the loans. Depending on the provisions of the applicable law and the specific facts and circumstances involved, violations of these laws, policies and principles may limit the ability of the servicer to collect all or part of the principal of or interest on the loans, may entitle the borrower to a refund of amounts previously paid and, in addition, could subject the owner of the loan to damages and administrative enforcement.

4

Table of Contents

Additional requirements may be imposed under federal, state or local laws on so-called "high cost mortgage loans," which typically are defined as loans secured by a consumer's dwelling that have interest rates or origination costs in excess of prescribed levels. These laws may limit certain loan terms, such as prepayment charges, or the ability of a creditor to refinance a loan unless it is in the borrower's interest. In addition, certain of these laws may allow claims against loan brokers or originators, including claims based on fraud or misrepresentations, to be asserted against persons acquiring the loans, such as the trust estate.

The federal laws that may apply to loans held in the trust estate include the following:

- the Truth in Lending Act and its regulations, which (among other things) require disclosures to borrowers regarding the terms of loans and provide consumers who pledged their principal dwelling as collateral in a non-purchase money transaction with a right of rescission that generally extends for three days after proper disclosures are given;

- the Home Ownership and Equity Protection Act and its regulations, which (among other things) imposes additional disclosure requirements and limitations on loan terms with respect to non-purchase money, installment loans secured by the consumer's principal dwelling that have interest rates or origination costs in excess of prescribed levels;

- the Home Equity Loan Consumer Protection Act and its regulations, which (among other things) limits changes that may be made to open-end loans secured by the consumer's dwelling, and restricts the ability to accelerate balances or suspend credit privileges on such loans; and

- the Real Estate Settlement Procedures Act and its regulations, which (among other things) prohibit the payment of referral fees for real estate settlement services (including mortgage lending and brokerage services) and regulate escrow accounts for taxes and insurance and billing inquiries made by borrowers.

The loans are also subject to federal laws, including laws that require particular disclosures to borrowers, that prohibit discrimination and that regulate the use and reporting of information relating to the borrower's credit experience. Violations of provisions of these federal laws may limit the ability of the servicer to collect all or part of the principal of or interest on the loans and in addition could subject the related trust estate as the owner of the loan to damages and administrative enforcement.

The home improvement contracts are also subject to the regulations of the Federal Trade Commission and other similar federal and state statutes and Holder in Due Course Rules, which protect the homeowner from defective craftsmanship or incomplete work by a contractor. These laws permit the obligor to withhold payment if the work does not meet the quality and durability standards agreed to by the homeowner and the contractor. The Holder in Due Course Rules have the effect of subjecting any assignee of the seller in a consumer credit transaction, such as the related trust estate with respect to the loans, to all claims and defenses which the obligor in the credit sale transaction could assert against the seller of the goods.

5

Table of Contents

Losses on loans from violation of these lending laws that are not otherwise covered by the enhancement for a series will be borne by the holders of one or more classes of securities for the related series.

### Geographic concentration of mortgaged properties may result in higher losses, if particular regions experience downturns.

Certain geographic regions from time to time will experience weaker regional economic conditions and housing markets than will other regions, and, consequently, will experience higher rates of delinquency, foreclosure and loss on mortgage loans generally. The loans underlying certain series of securities may be concentrated in such regions, and such concentrations may present risk considerations in addition to those generally present for similar mortgage loan asset-backed securities without such concentrations. Statistical information with respect to the geographic concentration of properties relating to a particular series will be specified in the related prospectus supplement.

### Bankruptcy of the related depositor may adversely affect the interests of holders.

In the event of the bankruptcy of the related depositor at a time when it or any affiliate holds a security, a trustee in bankruptcy of the related depositor or such affiliate, or its creditors could attempt to recharacterize the sale of the loans to the related trust estate as a borrowing by the related depositor or such affiliate, with the result, if such recharacterization is upheld, that the related security holders would be deemed creditors of the related depositor or such affiliate, secured by a pledge of the loans. If such an attempt were successful, it could prevent timely payments of amounts due to the trust estate.

### Certain limitations on interest payments and foreclosures may reduce the amounts payable on the loans and limit the enforcement of the loans against certain mortgagors.

Generally, under the terms of the Servicemembers Civil Relief Act, as amended, or similar state legislation, a mortgagor who enters military service after the origination of his or her loan, including a borrower who is a member of the National Guard or is in reserve status at the time of the origination of the loan and is later called to active duty, may not be charged interest (including fees and charges) above an annual rate of 6% during the period of such mortgagor's active duty status, unless a court orders otherwise upon application of the lender. It is possible that such action could limit, for an indeterminate period of time, the ability of the servicer to collect full amounts of interest on these loans.

In addition, the Servicemembers Civil Relief Act imposes limitations that would impair the ability of the servicer to foreclose on loans during the mortgagor's period of active duty status. Thus, in the event that such a loan goes into default, there may be delays and losses occasioned by the inability to realize upon the mortgaged property in a timely fashion.

### Uncertainty regarding original issue discount.

Some or all classes of the securities may be issued with original issue discount, which generally will result in recognition of some taxable income in advance of the receipt of the cash attributable to such income. A security will be considered to be issued with original issue discount equal to the excess, if any, of its "stated redemption price at maturity" over its "issue price." The issue price of a security is the initial offering price to the public (excluding bond houses and brokers) at which a substantial number of the securities was sold.

6

Table of Contents

**Ratings of the securities may be dependent on the related credit enhancer, and further, may be reduced or withdrawn at any time; there is no obligation to maintain any specific ratings.**

It will be a condition to the issuance of a series of offered securities that they be rated in one of the four highest rating categories by each rating agency. Any such rating would be based on, among other things, the adequacy of the value of the loans and any credit enhancement with respect to such series. Such rating should not be deemed a recommendation to purchase, hold or sell securities, inasmuch as it does not address market price or suitability for a particular investor. There is also no assurance that any such rating will remain in effect for any given period of time or may not be lowered or withdrawn entirely by the related rating agency if in its judgment circumstances in the future so warrant. In addition to being lowered or withdrawn due to any erosion in the adequacy of the value of the loans, such rating might also be lowered or withdrawn, among other reasons, because of an adverse change in the financial or other condition of an credit enhancer or a change in the rating of such credit enhancer's financial strength.

**Losses may be greater in the event of an acceleration.**

Upon an event of default under the related indenture for a series of securities that are structured as notes and a sale of the assets in the related trust estate, the trustee, the servicer, any credit enhancer and any other service provider specified in the related prospectus supplement will be entitled to receive their unpaid fees and other amounts owing to them prior to distributions to you in respect of your securities. Upon any such sale, the proceeds thereof may be insufficient to pay in full the principal of and interest on the securities.

**Certain risks relating to differing underwriting criteria.**

The loans included in a particular trust estate may have been purchased by the sponsor from one or more originators, and may, to the extent described in the related prospectus supplement, have been originated using underwriting criteria different from that of the sponsor. Nevertheless, the loans included in a particular trust estate will satisfy the underwriting criteria set forth in the related prospectus supplement.

7

000158

Table of Contents

## DESCRIPTION OF THE SECURITIES

The securities will be issued in series. Each series of securities will consist of one or more classes of securities, one or more of which may be compound interest securities, variable interest securities, "planned amortization class", or PAC securities, zero coupon securities, principal only securities, interest only securities or participating securities. A series may also include one or more classes of subordinate securities, which subordinate securities may be subdivided into senior subordinate, mezzanine subordinate and junior subordinate securities. Payments of principal of and interest on the securities will be made by the trustee, or a paying agent on behalf of the trustee, as specified in the related prospectus supplement.

The securities will be issued either in the form of equity securities, denominated as certificates, or debt securities, denominated as notes. Each series of certificates will evidence ownership interests in the related trust estate. Each series of notes will evidence indebtedness of the related trust estate. The issuing entity of notes will be the depositor or a trust for the purpose of issuing a series of notes.

**Payments of Interest**

The securities of each class will bear interest from the date and at the rate per annum specified, or calculated in the method described, in the related prospectus supplement. The rate of interest on securities of a series may be variable or may change with changes in the annual percentage rates of the loans included in the related trust estate and/or as prepayments occur with respect to such loans. Principal only securities may not be entitled to receive any interest distributions or may be entitled to receive only nominal interest distributions.

Interest payable on the securities on a payment date will include all interest accrued during the period specified in the related prospectus supplement. In the event that interest accrues during the calendar month preceding a payment date, the effective yield to security holders will be reduced from the yield that would otherwise be obtainable if interest payable on the securities were to accrue through the day immediately preceding the payment date.

**Payments of Principal**

On each payment date for a series, principal payments will be made to the security holders of such series on which principal is then payable, to the extent set forth in the related prospectus supplement. Such payments will be made in an aggregate amount determined as specified in the related prospectus supplement and will be allocated among the respective classes of a series in the manner, at the times and in the priority (which may, in certain cases, include allocation by random lot) set forth in the related prospectus supplement.

**Final Scheduled Payment Date**

The final scheduled payment date with respect to each class of securities is the date no later than which principal balance is expected to be reduced to zero, calculated on the basis of assumptions described in the related prospectus supplement. The final scheduled payment date will be specified in the related prospectus supplement. Since payments on the loans will be used to make distributions in reduction of the outstanding principal amount of the securities, it is likely that the actual final payment date of any such class will occur earlier, and may occur substantially earlier, than its final scheduled payment date.

8

Table of Contents

Alternatively, as a result of delinquencies, defaults and liquidations of the loans in the trust estate, the actual final payment date of any such class may occur later than its final scheduled payment date. See "Yield and Maturity Considerations" in this prospectus.

**Optional Redemption**

The entity that is identified in the related prospectus supplement, may, at its option, cause an early termination of the related trust estate by repurchasing all of the loans and/or properties remaining in the trust estate on or after:

- the termination date specified in the related prospectus supplement, or

- on or after such time as the aggregate principal balance of the securities of the series or the securities relating to such series, is less than the amount or percentage specified in the related prospectus supplement.

The purchase price for this optional purchase will be in an amount not less than an amount, when added to the amount of any available credit enhancement, necessary to pay all principal and interest on the securities.

**Mandatory Redemption**

The trustee, or such other party specified in the prospectus supplement may be required to effect early retirement of a series of securities by auction sale. Within a period following the failure of the holder of the optional redemption right to exercise its right, the required party shall solicit bids for the purchase of all primary assets remaining in the trust estate. In the event that satisfactory bids are received, the net sale proceeds will be distributed to holders in the same order of priority as collections on the loans. A satisfactory bid will not be less than an amount, when added to the amount of any available credit enhancement, necessary to pay all principal and interest on the securities. If satisfactory bids are not received, the required party shall decline to sell the loans and shall not be under any obligation to solicit any further bids or otherwise negotiate any further sale of the loans. The sale and consequent termination of the trust must constitute a "qualified liquidation" of each REMIC, if the related trust estate has elected to be treated as a REMIC.

The prospectus supplement will disclose whether a credit enhancement provider has the right to consent to the exercise of a clean-up call or an auction sale.

**Weighted Average Life of the Securities**

"Weighted average life" refers to the average amount of time that will elapse from the date of issue of a security until each dollar of principal of such security will be repaid to the investor. The weighted average life of the securities of a class will be influenced by the rate at which the amount financed under the loans included in the trust estate for a series is paid. The source of Repayment may be receipts representing the scheduled amortization or prepayments or may be derived from the credit enhancement.

Prepayments on loans can be measured relative to a prepayment standard or model. The prospectus supplement for a series of securities will describe the prepayment standard or model, if any, used and may contain tables setting forth the projected weighted average life of each class of securities and the percentage of the original principal amount of each class of securities of such

9

Table of Contents

series that would be outstanding on specified payment dates for such series based on the assumptions stated in such prospectus supplement, including assumptions that prepayments on the loans included in the related trust estate are made at rates corresponding to various percentages of the prepayment standard or model specified in the prospectus supplement.

**Use of Notional Amounts**

If so provided in the related prospectus supplement, interest on certain classes of securities may be payable based on a notional amount rather than a principal balance or the actual aggregate outstanding principal balances of the related loans. These notional amounts would not necessarily be affected by prepayments on the related loans, potentially reducing the disproportionate impact which prepayments have on the yield of interest only securities relative to the yields of other types of securities which are entitled to payments of principal. See "Yield and Maturity Considerations" in this prospectus.

The related prospectus supplement will set forth the notional amount schedule, if any, and will describe fee prepayment spreads to the extent used in constructing such schedule.

**Form of Securities**

The offered securities will be book-entry securities. Persons acquiring beneficial ownership interests in the securities may elect to hold their securities through the Depository Trust Company, or DTC, in the United States, or Clearstream Banking Société Anonyme or Euroclear System (in Europe) if they are participants of such systems, or indirectly through organizations which are participants in such systems. Each class of book-entry securities will be issued in one or more securities which equal the aggregate principal amount of the securities of each class and will initially be registered in the name of Cede & Co., the nominee of DTC. Clearstream and Euroclear will hold omnibus positions on behalf of their participants through customers' securities accounts in Clearstream's and Euroclear's names on the books of their respective depositaries which in turn will hold such positions in customers' securities accounts in the depositaries' names on the books of DTC. Citibank, N.A., will act as depositary for Clearstream and JPMorgan Chase Bank will act as depositary for Euroclear. Except as described below, no beneficial owner acquiring a book-entry security will be entitled to receive a physical security representing such security. Unless and until definitive securities are issued, it is anticipated that the only "securityholders" of the securities will be Cede & Co., as nominee of DTC. Security owners will not be securityholders as that term is used in the related servicing agreements. Security owners are only permitted to exercise their rights indirectly through the participating organizations that utilize the services of DTC, including securities brokers and dealers, banks and trust companies and clearing corporations and certain other organizations and DTC.

A security owner's ownership of a book-entry security will be recorded on the records of the brokerage firm, bank, thrift institution or other financial intermediary that maintains the beneficial owner's account for such purpose. In turn, the financial intermediary's ownership of such book-entry security will be recorded on the records of DTC (or of a participating firm that acts as agent for the financial intermediary, whose interests will in turn be recorded on the records of DTC, if the beneficial owner's financial intermediary is not a DTC participant, and on the records of Clearstream or Euroclear, as appropriate). Security owners will receive all payments of principal of, and interest on, the securities from the trustee through DTC and DTC participants. While the securities are outstanding (except under the circumstances described below), under the rules, regulations and procedures creating and affecting DTC and its operations, DTC is required

10

000161

Table of Contents

to make book-entry transfers among participants on whose behalf it acts with respect to the securities and is required to receive and transmit payments of principal of, and interest on, the securities. Participants and indirect participants which have indirect access to the DTC system, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly, with whom security owners have accounts with respect to securities are similarly required to make book-entry transfers and receive and transmit such payments on behalf of their respective security owners. Accordingly, although security owners will not possess securities, the rules provide a mechanism by which security owners will receive payments and will be able to transfer their interest.

Security owners will not receive or be entitled to receive securities representing their respective interests in the securities, except under the limited circumstances described below. Unless and until definitive securities are issued, security owners who are not participants may transfer ownership of securities only through participants and indirect participants by instructing such participants and indirect participants to transfer securities, by book-entry transfer, through DTC for the account of the purchasers of such securities, which account is maintained with their respective participants. Under the rules and in accordance with DTC's normal procedures, transfers of ownership of securities will be executed through DTC and the accounts of the respective participants at DTC will be debited and credited. Similarly, the participants and indirect participants will make debits or credits, as the case may be, on their records on behalf of the selling and purchasing security owners.

Because of time zone differences, credits of securities received in Clearstream or Euroclear as a result of a transaction with a participant will be made during subsequent securities settlement processing and dated the business day following the DTC settlement date. Such credits or any transactions in such securities settled during such processing will be reported to the relevant Euroclear or Clearstream participants on such business day. Cash received in Clearstream or Euroclear as a result of sales of securities by or through a Clearstream participant or Euroclear participant to a DTC participant will be received with value on the DTC settlement date but will be available in the relevant Clearstream or Euroclear cash account only as of the business day following settlement in DTC. For information relating to tax documentation procedures relating to the securities, see "*Material Federal Income Tax Consequences—Foreign Investors*" herein and "*Global Clearance, Settlement and Tax Documentation Procedures   Certain U.S. Federal Income Tax Documentation Requirements*" in Annex I hereto.

Transfers between participants will occur in accordance with DTC rules. Transfers between Clearstream participants and Euroclear participants will occur in accordance with their respective rules and operating procedures.

Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Clearstream participants or Euroclear participants, on the other, will be effected in DTC in accordance with DTC rules on behalf of the relevant European international clearing system by the relevant depository; however, such cross-market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in such system in accordance with its rules and procedures and within its established deadlines (European time). The relevant European international clearing system will, if the transaction meets its settlement requirements, deliver instructions to the relevant depository to take action to effect final settlement on its behalf by delivering or receiving securities in DTC, and making or receiving payment in accordance with normal procedures for same day fund settlement applicable to DTC. Clearstream participants and Euroclear participants may not deliver instructions directly to the European depositaries.

11

Table of Contents

DTC, which is a New York-chartered limited purpose trust company, performs services for its participants, some of which (and/or their representatives) own DTC. In accordance with its normal procedures, DTC is expected to record the positions held by each DTC participant in the book-entry securities, whether held for its own account or as nominee for another person. In general, beneficial ownership of book-entry securities will be subject to the rules, regulation and procedures governing DTC and DTC participants as in effect from time to time.

Clearstream is incorporated under the laws of Luxembourg as a professional depository. Clearstream holds securities for its participating organizations and facilitates the clearance and settlement of securities transactions between Clearstream participants through electronic book-entry changes in accounts of Clearstream participants, thereby eliminating the need for physical movement of securities. Transactions may be settled in Clearstream in any of 31 currencies, including United States dollars. Clearstream provides to its Clearstream participants, among other things, services for safekeeping, administration, clearance and settlement of internationally traded securities and securities lending and borrowing. Clearstream interfaces with domestic markets in several countries. As a professional depository, Clearstream is subject to regulation by the Luxembourg Monetary Institute. Clearstream participants are recognized financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. Indirect access to Clearstream is also available to others, such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Clearstream participant, either directly or indirectly.

Euroclear was created in 1968 to hold securities for its participants and to clear and settle transactions between its participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of securities and any risk from lack of simultaneous transfers of securities and cash. The Euroclear System is owned by Euroclear Clearance System Public Limited Company (ECSplc) and operated through a license agreement by Euroclear Bank S.A./N.V., a bank incorporated under the laws of the Kingdom of Belgium.

The Euroclear operator holds securities and book-entry interests in securities for participating organizations and facilitates the clearance and settlement of securities transactions between Euroclear participants, and between Euroclear participants and participants of certain other securities intermediaries through electronic book-entry changes in accounts of such participants or other securities intermediaries. The Euroclear operator provides Euroclear participants, among other things, with safekeeping, administration, clearance and settlement, securities lending and borrowing, and related services.

Non-participants of Euroclear may hold and transfer book-entry interests in the securities through accounts with a direct participant of Euroclear or any other securities intermediary that holds a book-entry interest in the securities through one or more securities intermediaries standing between such other securities intermediary and the Euroclear operator.

The Euroclear operator is regulated and examined by the Belgian Banking and Finance Commission and the National Bank of Belgium.

Securities clearance accounts and cash accounts with Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System and applicable Belgian law. The terms and conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific securities to specific securities clearance

12

Table of Contents

accounts. The Euroclear operator acts under the terms and conditions only on behalf of Euroclear participants and has no record of or relationship with persons holding through Euroclear participants.

Payments on the book-entry securities will be made on each payment date by the trustee to DTC. DTC will be responsible for crediting the amount of such payments to the accounts of the applicable DTC participants in accordance with DTC's normal procedures. Each DTC participant will be responsible for disbursing such payments to the beneficial owners of the book-entry securities that it represents and to each financial intermediary for which it acts as agent. Each such financial intermediary will be responsible for disbursing funds to the beneficial owners of the book-entry securities that it represents.

Under a book-entry format, beneficiary owners of the book-entry securities may experience some delay in their receipt of payments, since such payments will be forwarded by the trustee to Cede & Co., as nominee of DTC. Payments with respect to securities held through Clearstream or Euroclear will be credited to the cash accounts of Clearstream participants or Euroclear participants in accordance with the relevant system's rules and procedures, to the extent received by the relevant depository. Such payments will be subject to tax reporting in accordance with relevant United States tax laws and regulations. See "*Material Federal Income Tax Consequences—Foreign Investors*" and "*Backup Withholding*" herein. Because DTC can only act on behalf of financial intermediaries, the ability of a beneficial owner to pledge book-entry securities to persons or entities that do not participate in the depository system, or otherwise take actions in respect of such book-entry security, may be limited due to the lack of physical securities for such book-entry securities. In addition, issuance of the book-entry securities in book-entry form may reduce the liquidity of such securities in the secondary market since certain potential investors may be unwilling to purchase securities for which they cannot obtain physical securities.

Monthly and annual reports on the issuing entity will be provided to Cede & Co., as nominee of DTC, and may be made available by Cede & Co., to beneficial owners upon request, in accordance with the rules, regulations and procedures creating and affecting DTC or the relevant depository, and to the financial intermediaries to whose DTC accounts the book-entry securities of such beneficial owners are credited.

DTC has advised the trustee that, unless and until definitive securities are issued, DTC will take any action permitted to be taken by the holders of the book-entry securities under the related servicing agreement only at the direction of one or more financial intermediaries to whose DTC accounts the book-entry securities are credited, to the extent that such actions are taken on behalf of financial intermediaries whose holdings include such book-entry securities. Clearstream or the Euroclear operator, as the case may be, will take any other action permitted to be taken by a certificateholder under the related servicing agreement on behalf of a Clearstream participant or Euroclear participant only in accordance with its relevant rules and procedures and subject to the ability of the relevant depository to effect such actions on its behalf through DTC. DTC may take actions, at the direction of the related participants, with respect to some securities which conflict with actions taken with respect to other securities.

Definitive securities will be issued to beneficial owners of the book-entry securities, or their nominees rather than to DTC, only if (a) DTC or the issuing entity advises the trustee in writing that DTC is no longer willing, qualified or able to discharge properly its responsibilities as nominee and depositary with respect to the book-entry securities and the issuing entity or the trustee is unable to locate a qualified successor, (b) if after the occurrence of an event of default

13

Table of Contents

under the related indenture or an event of default under the related transaction documents, owners of beneficial interests in a global security representing in the aggregate more than 50% of the aggregate outstanding principal amount of the securities of that series advise the trustee through DTC participants in writing that the continuation of a book-entry system with respect to the securities through DTC is no longer in the best interest of those owners or (c) under any other circumstances set forth in the related prospectus supplement.

Upon the occurrence of any of the events described in the immediately preceding paragraph, the trustee will be required to notify all beneficial owners of the occurrence of such event and the availability through DTC of the definitive securities. Upon surrender by DTC of the global note or notes representing the book-entry securities and instructions for re-registration, the trustee, as registrar, will issue definitive securities, and thereafter the trustee will recognize the holders of such definitive securities as certificateholders under the related servicing agreement.

Although DTC, Clearstream and Euroclear have agreed to the foregoing procedures in order to facilitate transfers of securities among participants of DTC, Clearstream and Euroclear, they are under no obligation to perform or continue to perform such procedures and such procedures may be discontinued at any time.

Neither the sponsor, the servicer nor the related trustee will have any responsibility for any aspect of the records relating to or payments made on account of beneficial ownership interests of the book-entry securities held by Cede & Co., as nominee of DTC, or for maintaining, supervising or reviewing any records relating to such beneficial ownership interests.

For additional information regarding DTC and the book-entry securities, see Annex I hereto.

## THE TRUST ESTATES

The trust estate of each series will include assets originated by the sponsor or acquired from affiliated or unaffiliated institutions composed of:

- loans,
- amounts available from the reinvestment of payments on such loans,
- any credit enhancement, and
- any property that secured a loan but which is acquired by foreclosure or deed in lieu of foreclosure or repossession.

The securities will be nonrecourse obligations of the related issuing entity. The assets of the issuing entity for a series of securities will serve as collateral only for that series of securities. In the case of an event of default with respect to a series of debt securities, the trustee generally may only proceed against the collateral securing such series and may not proceed against any assets of the related issuing entity not pledged to secure such notes.

The loans for a series will be originated or acquired by the sponsor or its affiliate in the open market or in privately negotiated transactions, which may include transactions with affiliates and will be transferred by the depositor to the issuing entity. Loans relating to a series will be serviced by the servicer pursuant to the related servicing agreement.

14

000165

Table of Contents

Prior to the initial offering of the related series of securities, the issuing entity will have no assets or liabilities. We do not expect any issuing entity to engage in any activities other than acquiring, managing and holding the related loans and other assets and the proceeds thereof, issuing securities and making payments and distributions thereon. No issuing entity is expected to have any source of capital other than its assets and any related credit enhancement.

**The Loans**

Loans included in the trust estate for a series may consist of any combination of mortgage loans and contracts.

*Mortgage Loans.* The loans for a series may consist, in whole or in part, of closed-end mortgage loans, including closed-end home equity loans secured by mortgages on single family properties and small mixed-use properties, which mortgages may be subordinated to other mortgages on the same mortgaged property. The mortgage loans may have fixed interest rates or adjustable interest rates and may provide for other payment characteristics as described below and in the related prospectus supplement.

The full principal amount of a closed-end loan is advanced at origination of the loan and generally is repayable in equal (or substantially equal) installments of an amount sufficient to fully amortize such loan at its stated maturity, although some loans may be balloon loans or interest only loans, as described below. Interest on each closed-end loan will accrue on the outstanding principal balance of such loan at the related loan rate and further multiplied by a fraction, the numerator of which is the number of days in the period elapsed since the preceding payment of interest was made and the denominator is the number of days in the annual period for which interest accrues on such loan. Certain loans may be balloon loans, which have monthly payments that will not fully pay off the loan balance by the maturity date. Certain loans may provide that the borrower's monthly payment will consist of interest only for a specified period of time. After the interest only period has ended, the borrower must begin making monthly payments of principal and interest on the loan. Balloon loans and interest only loans, if included in a trust, will be further described in the related prospectus supplement.

The mortgaged properties will include primarily single family property (i.e., one- to four-family residential housing, including condominium units and cooperative dwellings). The mortgaged properties may consist of detached individual dwellings, individual condominiums, townhouses, duplexes, row houses, individual units in planned unit developments and other attached dwelling units. Each single family property will be located on land owned in fee simple by the borrower or on land leased by the borrower for a term at least five years greater than the term of the related loan. Attached dwellings may include owner-occupied structures where each borrower owns the land upon which the unit is built, with the remaining adjacent land owned in common or dwelling units subject to a proprietary lease or occupancy agreement in a cooperatively owned apartment building.

Mortgages on cooperative dwellings consist of a lien on the shares issued by such cooperative dwelling and the proprietary lease or occupancy agreement relating to such cooperative dwelling.

15

000166

Table of Contents

The aggregate principal balance of loans secured by mortgaged properties that are owner-occupied will be disclosed in the related prospectus supplement. To the extent specified in the related prospectus supplement, the mortgaged properties may include nonowner-occupied investment properties and vacation and second homes.

*Home Improvement Contracts.* The loans for a series may consist, in whole or part, of home improvement installment sales contracts and installment loan agreements originated by a home improvement contractor in the ordinary course of business. A home improvement contract will be secured by a mortgage, primarily on single family properties, which will generally be subordinate to other mortgages on the same mortgaged property or by a purchase money security interest in the home improvements financed thereby.

The home improvements securing the home improvement contracts include, but are not limited to, replacement windows, house siding, new roofs, swimming pools, satellite dishes, kitchen and bathroom remodeling goods and solar heating panels.

*Additional Information.* The selection criteria which shall apply with respect to the loans relating to a particular series, including, but not limited to, the combined loan-to-value ratios or loan-to-value ratios, as applicable, original terms-to-maturity (which may exceed 30 years) and delinquency information, will be specified in the related prospectus supplement.

The related prospectus supplement for each series will provide information with respect to the related loans as of the cut-off date, including, among other things, and to the extent relevant:

- the aggregate unpaid principal balance of the loans (or the aggregate unpaid principal balance included in the trust estate for the related series);

- the range and weighted average loan rate on the loans, and, in the case of adjustable-rate loans, the range and weighted average of the current loan rates and the lifetime rate caps, if any;

- the range and average outstanding principal balance of the loans;

- the weighted average original and remaining term-to-stated maturity of the loans and the range of original and remaining terms-to-stated maturity, if applicable;

- the range and weighted average of combined loan-to-value ratios or loan-to-value ratios for the loans, as applicable;

- the percentage (by outstanding principal balance as of the cut-off date) of loans that accrue interest at adjustable or fixed interest rates;

- the percentage (by principal balance as of the cut-off date) of loans that are secured by mortgaged properties or home improvements;

- the geographic distribution of any mortgaged properties securing the loans;

- the percentage of loans (by principal balance as of the cut-off date) that are secured by single family properties, shares relating to cooperative dwellings, condominium units, investment property and vacation or second homes;

16

Table of Contents

- the lien priority of the loans; and

- the delinquency status and year of origination of the loans.

The related prospectus supplement will also specify any other limitations on the types or characteristics of loans for a series.

Substitution of loans will be permitted in the event of breaches of representations and warranties with respect to any original loans or in the event the documentation with respect to any loan is determined by the trustee to be incomplete. The period during which such substitution will be permitted generally will be indicated in the related prospectus supplement.

## CREDIT ENHANCEMENT

Credit enhancement may be provided, which may include subordinated securities, surety bond, insurance policy or an irrevocable letter of credit, a spread account or combination thereof in favor of the trustee on behalf of the security holders of the related series. The credit enhancement will support the payment of principal and interest on the securities, or certain classes of securities, and may be applied for certain other purposes to the extent and under the conditions set forth in such prospectus supplement. Any of such credit enhancement may be structured so as to protect against losses relating to more than one trust estate.

### Overcollateralization

Credit enhancement for a series may include overcollateralization—an excess of the aggregate principal balance of the related loans, or a group thereof, over the aggregate principal balance of the related securities. Overcollateralization is achieved by the application of interest payments on loans in excess of the amount required to pay principal and interest on the securities, and the expenses of the issuing entity to the payment of principal of one or more classes of securities. Some or all of the target overcollateralization in a transaction may be funded on the closing date to the extent described in the related prospectus supplement. This feature may continue for the life of the related securities or may be limited as set forth in the related prospectus supplement. In the case of limited overcollateralization, once the required level of overcollateralization is reached, such limited acceleration feature may cease, unless necessary to maintain the required level of overcollateralization. In addition, the specified level of overcollateralization may be increased or reduced under the circumstances described in the prospectus supplement.

### Subordinated Securities

Credit enhancement for a series may consist of one or more classes of subordinate securities. The rights of security holders of such subordinate securities to receive distributions will be subordinate in right and priority to the rights of security holders of senior securities of the series, but only to the extent described in the related prospectus supplement. In addition, the holders of subordinated securities may have limited or no voting rights, to the extent described in the related prospectus supplement.

17

Table of Contents

**Insurance**

Credit enhancement for a series may consist of surety bonds, pool insurance policies, special hazard insurance policies or bankruptcy bonds relating to the loans, as described below and in the related prospectus supplement.

*Surety Bond and Pool Insurance Policy.* The sponsor may obtain an insurance policy for certain of the securities issued with respect to the related trust estate. A surety bond will insure certain payments, typically current interest and principal at maturity, on one or more classes of securities. A pool insurance policy will cover certain payments required to be made by the mortgagors under the related mortgage loans. The amount and terms of any such coverage will be set forth in the related prospectus supplement.

*Special Hazard Insurance Policy.* Although the terms of such policies vary to some degree, a special hazard insurance policy typically provides that, where there has been damage to property securing a defaulted or foreclosed loan (title to which has been acquired by the insured) and to the extent such damage is not covered by the standard hazard insurance policy or any flood insurance policy, if applicable, required to be maintained with respect to such property, or in connection with partial loss resulting from the application of the coinsurance clause in a standard hazard insurance policy, the special hazard insurer will pay the lesser of (i) the cost of repair or replacement of such property or (ii) upon transfer of such property to the special hazard insurer, the unpaid principal balance of such loan at the time of acquisition of such property by foreclosure or deed in lieu of foreclosure, plus accrued interest to the date of claim settlement and certain expenses incurred by the servicer with respect to such property. If the unpaid principal balance plus accrued interest and certain expenses is paid by the special hazard insurer, the amount of further coverage under the special hazard insurance policy will be reduced by such amount less any net proceeds from the sale of such property. Any amount paid as the cost of repair of such property will reduce coverage by such amount. Special hazard insurance policies typically do not cover losses occasioned by war, civil insurrection, certain governmental actions, errors in design, faulty workmanship or materials (except under certain circumstances), nuclear reaction, flood (if the mortgaged property is in a federally designated flood area), chemical contamination and certain other risks.

Restoration of the property with the proceeds described under (i) above is expected to satisfy the condition under any pool insurance policy that such property be restored before a claim under such pool insurance policy may be validly presented with respect to the defaulted loan secured by such property. The payment described under (ii) above will render unnecessary presentation of a claim in respect of such loan under any pool insurance policy. Therefore, so long as such pool insurance policy remains in effect, the payment by the special hazard insurer of the cost of repair or of the unpaid principal balance of the related loan plus accrued interest and certain expenses will not affect the total insurance proceeds paid to security holders, but will affect the relative amounts of coverage remaining under the special hazard insurance policy and pool insurance policy.

*Bankruptcy Bond.* In the event of a bankruptcy of a borrower, the bankruptcy court may establish the value of the property securing the related loan at an amount less than the then outstanding principal balance of such loan. The amount of the secured debt could be reduced to such value, and the holder of such loan thus would become an unsecured creditor to the extent the outstanding principal balance of such loan exceeds the value so assigned to the property by the bankruptcy court. In addition, certain other modifications of the terms of a loan can result from a bankruptcy proceeding. See "Certain Legal Aspects of Loans". The trust estate may include a

18

Table of Contents

bankruptcy bond or similar insurance contract covering losses resulting from proceedings with respect to borrowers under the Bankruptcy Code. The bankruptcy bond will cover certain losses resulting from a reduction by a bankruptcy court of scheduled payments of principal of and interest on a loan or a reduction by such court of the principal amount of a loan and will cover certain unpaid interest on the amount of such a principal reduction from the date of the filing of a bankruptcy petition.

### Reserve Funds

The sponsor may deposit into one or more funds to be established with the trustee as part of the trust estate for such series or for the benefit of any credit enhancer with respect to such series cash, a letter or letters of credit, cash collateral accounts or eligible investments meeting the criteria of each rating agency in the amount specified in such prospectus supplement. In the alternative or in addition to such deposit, a reserve fund for a series may be funded over time through application of all or a portion of the excess cash flow from the mortgage assets for such series, to the extent described in the related prospectus supplement.

Amounts withdrawn from any reserve fund will be applied by the trustee to make payments on the securities of a series, to pay expenses, to reimburse any credit enhancer or for any other purpose, in the manner and to the extent specified in the related prospectus supplement.

### Letter of Credit

The letter of credit, if any, with respect to a series of securities will be issued by the bank or financial institution specified in the related prospectus supplement. Under the letter of credit, the bank will be obligated to honor drawings thereunder in an aggregate fixed dollar amount, net of unreimbursed payments thereunder, equal to the percentage specified in the related prospectus supplement of the aggregate principal balance of the loans on the related cut-off date or of one or more classes of securities. If so specified in the related prospectus supplement, the letter of credit may permit drawings in the event of losses not covered by insurance policies or other credit support, such as losses arising from damage not covered by standard hazard insurance policies, losses resulting from the bankruptcy of a borrower and the application of certain provisions of the federal Bankruptcy Code, or losses resulting from denial of insurance coverage due to misrepresentations in connection with the origination of a loan. The amount available under the letter of credit will, in all cases, be reduced to the extent of the unreimbursed payments thereunder. The obligations of the bank under the letter of credit for each series of securities will expire at the earlier of the date specified in the related prospectus supplement or the termination of the issuing entity.

### Other Insurance, Guarantee and Similar Instruments or Agreements

A trust estate may include a guaranteed investment contract or reinvestment agreement pursuant to which funds held in one or more accounts will be invested at a specified rate.

### Cross Collateralization

The source of payment for securities of each series will be the assets of the related trust estate only. No collections on any loans held by any trust estate may be applied to the payment of securities issued by any other trust estate (except to the limited extent that certain collections in excess of amounts needed to pay the related securities may be deposited in a common, master reserve account that provides credit enhancement for more than one series of securities).

19

Table of Contents

However, a trust estate may include the right to receive moneys from a common pool of credit enhancement which may be available for more than one series of securities, such as a master reserve account or a master insurance policy. In addition, a series of securities may provide for excess cash flow with respect to one class of the series to be applied to shortfalls with respect to another class of the same series.

## SWAPS AND YIELD SUPPLEMENT AGREEMENTS

The trustee on behalf of a trust estate may enter into interest rate swaps and related caps, floors or collars, or currency swaps to minimize the risk to securityholders from adverse changes in interest rates or currency fluctuations, which are collectively referred to as swaps, and other yield supplement agreements or similar yield maintenance arrangements that do not involve swap agreements or other notional principal contracts, which are collectively referred to as yield supplement agreements.

An interest rate swap is an agreement between two parties to exchange a stream of interest payments based on an agreed-upon hypothetical or "notional" principal amount. No principal amount is exchanged between the counterparties to an interest rate swap. In the typical swap, one party agrees to pay a fixed rate on a notional principal amount, while the counterparty pays a floating rate based on one or more reference interest rates including the London Interbank Offered Rate, or LIBOR, a specified bank's prime rate or U.S. Treasury Bill rates.

Interest rate swaps also permit counterparties to exchange a floating rate obligation based upon one reference interest rate, such as LIBOR, for a floating rate obligation based upon another referenced interest rate, such as U.S. Treasury Bill rates.

Yield supplement agreements may be entered into to supplement the interest rate or other rates on one or more classes of the securities of any series. The terms of any derivative product agreement and any counterparties will be described in the accompanying prospectus supplement.

There can be no assurance that the trustee will be able to enter into or offset swaps or enter into yield supplement agreements or derivative product agreements at any specific time or at prices or on other terms that are advantageous. In addition, although the terms of the swaps and yield supplement agreements may provide for termination under various circumstances, there can be no assurance that the trustee will be able to terminate a swap or yield supplement agreement when it would be economically advantageous to the trust estate to do so.

To the extent that a derivative provider is downgraded below the rating specified in the accompanying prospectus supplement or the applicable rating agencies withdraw their rating of the derivative provider, the issuing entity has the right to terminate the derivative agreement or transfer the derivative provider's rights and obligations under the derivative agreement to a counterparty that satisfies certain rating conditions described in the accompanying prospectus supplement, each within the time period specified in the derivative agreement.

If the issuing entity is unable to or, if applicable, chooses not to obtain a substitute derivative agreement in the event that the derivative agreement is terminated, interest due on the notes will be paid from amounts received on the mortgage loans without the benefits of a derivative agreement or a substitute derivative agreement. There can be no assurance that such amounts will be sufficient to provide for the full payment of interest on the notes at the applicable note interest rate.

20

000171

Table of Contents

### SERVICING OF LOANS

Customary servicing functions with respect to the loans in the trust estate will be provided by the servicer. The servicer is authorized to enter into one or more subservicing agreements with one or more subservicers pursuant to which the subservicer will agree to perform all or a portion of the servicer's servicing responsibilities with respect to the loans in a trust estate.

Notwithstanding the servicer's engagement of any subservicer, the servicer shall not be relieved of its obligations and the servicer shall be obligated to the same extent and under the same terms and conditions as if it alone were servicing and administering the loans. The servicer shall be entitled to include in any subservicing agreement provisions for indemnification of the servicer by the related subservicer.

### Advances and Limitations Thereon

To the extent specified in the related prospectus supplement, the servicer will be obligated to make advances, and such obligations may be limited in amount, or may not be activated until a certain portion of a specified reserve fund is depleted. Advances are intended to provide liquidity and, not to guarantee or insure against losses. Accordingly, any funds advanced will be recoverable by the servicer primarily out of amounts received on particular loans which represent late recoveries of principal or interest, insurance proceeds or liquidation proceeds respecting which any such advance was made. If an advance is made and subsequently determined to be nonrecoverable from late collections, insurance proceeds or liquidation proceeds from the related loan, the servicer may be entitled to reimbursement from other funds in the collection account or from a specified reserve fund as applicable, to the extent specified in the related prospectus supplement. This reimbursement to the servicer will reduce amounts available for distribution to the security holders, but since such reimbursement will only relate to amounts previously advanced by the servicer, such reimbursement will not result in a net reduction of funds available for distribution to security holders.

### Maintenance of Insurance Policies and Other Servicing Procedures

*Standard Hazard Insurance; Flood Insurance.* The servicer generally will be required to maintain or to cause the obligor on each loan to maintain a standard hazard insurance policy providing coverage of the standard form of fire insurance with extended coverage for certain other hazards as is customary in the state in which the related mortgaged property is located. The standard hazard insurance policies provide for coverage at least equal to the applicable state standard form of fire insurance policy with extended coverage for property of the type securing the related loans. In general, the standard form of fire and extended coverage policy covers physical damage to or destruction of, the related mortgaged property caused by fire, lightning, explosion, smoke, windstorm, hail, riot, strike and civil commotion, subject to the conditions and exclusions particularized in each policy. Because the standard hazard insurance policies relating to the loans will be underwritten by different hazard insurers and will cover mortgaged properties located in various states, such policies will not contain identical terms and conditions. The basic terms, however, generally will be determined by state law and generally will be similar. Most such policies typically will not cover any physical damage resulting from war, revolution, governmental actions, floods and other water-related causes, earth movement (including earthquakes, landslides, and mudflows), nuclear reaction, wet or dry rot, vermin, rodents, insects or domestic animals, theft and, in certain cases, vandalism. The foregoing list is merely indicative of certain kinds of uninsured risks and is not intended to be all inclusive. Uninsured

21

Table of Contents

risks not covered by a special hazard insurance policy or other form of credit enhancement will adversely affect distributions to security holders. When a mortgaged property securing a loan is located in a flood area identified by HUD pursuant to the Flood Disaster Protection Act of 1973, as amended, the servicer will generally be required to cause flood insurance to be maintained with respect to such mortgaged property, to the extent available.

The hazard insurance policies will not cover physical damage resulting from earthquakes. The servicer is not obligated to require that any mortgagor maintain earthquake or other additional insurance and is under no obligation itself to maintain any such additional insurance itself.

The standard hazard insurance policies covering mortgaged properties securing loans typically will contain a "coinsurance" clause which, in effect, will require the insured at all times to carry hazard insurance of a specified percentage (generally 80% to 90%) of the full replacement value of the mortgaged property, including the improvements on any mortgaged property, in order to recover the full amount of any partial loss. If the insured's coverage falls below this specified percentage, such clause will provide that the hazard insurer's liability in the event of partial loss will not exceed the greater of (i) the actual cash value (the replacement cost less physical depreciation) of the mortgaged property, including the improvements, if any, damaged or destroyed or (ii) such proportion of the loss, without deduction for depreciation, as the amount of insurance carried bears to the specified percentage of the full replacement cost of such mortgaged property and improvements. Since the amount of hazard insurance to be maintained on the improvements securing the loans declines as the principal balances owing thereon decrease, and since the value of the mortgaged properties will fluctuate in value over time, the effect of this requirement in the event of partial loss may be that hazard insurance proceeds will be insufficient to restore fully the damage to the affected mortgaged property.

Coverage will be in an amount at least equal to the least of (i) the outstanding principal balance of the loan plus the outstanding principal balance of any mortgage loan senior to such mortgage loan, but in no event shall such amount be less than is necessary to prevent the mortgagor from becoming a coinsurer thereunder, (ii) the minimum amount required to compensate for loss or damage on a replacement cost basis and (iii) the full insurable value of the related mortgaged property. The servicer will also be required to maintain, on REO property that secured a defaulted loan and that has been acquired upon foreclosure, deed in lieu of foreclosure, or repossession, a standard hazard insurance policy in an amount that is at least equal to the lesser of (i) the maximum insurable value from time to time of the improvements which are a part of such property or (ii) the sum of the principal balance of such loan and the principal balance of any loan senior to such loan at the time of such foreclosure plus accrued interest and the good-faith estimate of the servicer of related liquidation expenses to be incurred. No earthquake or other additional insurance will be required of any obligor or will be maintained on REO property acquired in respect of a defaulted loan, other than pursuant to such applicable laws and regulations as shall at any time be in force and shall require such additional insurance.

Any amounts collected by the servicer under any such policies of insurance (other than amounts to be applied to the restoration or repair of the property, released to the obligor in accordance with normal servicing procedures or used to reimburse the servicer for amounts to which it is entitled to reimbursement) will be deposited in the collection account.

In the event that the servicer obtains and maintains a blanket policy insuring against hazard losses on all of the loans, written by an insurer that satisfies the requirements of Fannie Mae or Freddie Mac, it will conclusively be deemed to have satisfied its obligations to cause to be

22

000173

Table of Contents

maintained a standard hazard insurance policy for each loan or related REO property. This blanket policy may contain a deductible clause, in which case the servicer will, in the event that there has been a loss that would have been covered by such policy absent such deductible clause, deposit in the collection account the amount not otherwise payable under the blanket policy because of the application of such deductible clause.

### Realization upon Defaulted Loans

The servicer will use its reasonable efforts to foreclose upon, repossess or otherwise comparably convert the ownership of the mortgaged properties securing the related loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments. In connection with such foreclosure or other conversion, the servicer will follow such practices and procedures as it deems necessary or advisable and as are normal and usual in its servicing activities with respect to comparable loans serviced by it. However, the servicer will not be required to expend its own funds in connection with any foreclosure or towards the restoration of the property unless it determines that: (i) such restoration or foreclosure will increase the liquidation proceeds in respect of the related loan available to the security holders after reimbursement to itself for such expenses and (ii) such expenses will be recoverable by it either through liquidation proceeds or insurance proceeds. In the case of a issuing entity for which a REMIC election has been made, the servicer shall liquidate any mortgaged property acquired through foreclosure within two years after the acquisition of the beneficial ownership of such mortgaged property (or such other period as may be required under the REMIC regulations. While the holder of a mortgaged property acquired through foreclosure can often maximize its recovery by providing financing to a new purchaser, the issuing entity, if applicable, will have no ability to do so and neither the servicer nor the sponsor will be required to do so.

### Enforcement of Due-On-Sale Clauses

When any property is about to be conveyed by the obligor, the servicer will, to the extent it has knowledge of such prospective conveyance and prior to the time of the consummation of such conveyance, exercise its rights to accelerate the maturity of the related loan under the applicable "due-on-sale" clause, if any, unless it reasonably believes that such clause is not enforceable under applicable law or if the servicer reasonably believes that to permit an assumption of the mortgage loan would not materially and adversely affect the interests of the security holders. In such event, the servicer will enter into an assumption and modification agreement with the person to whom the property is to be conveyed, pursuant to which such person becomes liable under the mortgage note and, unless prohibited by applicable law or the mortgage documents, the original mortgagor remains liable thereon. If the foregoing is not permitted under applicable law, the servicer will enter into a substitution of liability agreement with such person, pursuant to which the original mortgagor will be released from liability and such person is substituted as mortgagor and becomes liable under the mortgage note. Any fee collected in connection with an assumption will be retained by the servicer as additional servicing compensation. The terms of a loan may not be changed in connection with an assumption.

### Servicing Compensation and Payment of Expenses

The servicer will be entitled to a periodic fee as servicing compensation in an amount to be determined as specified in the related prospectus supplement. To the extent specified in the related prospectus supplement, the servicer will be entitled to reimbursement for certain expenses incurred by it in connection with the liquidation of defaulted loans. The related security holders

23

Table of Contents

will suffer no loss by reason of such expenses to the extent expenses are covered under related insurance policies or from excess liquidation proceeds. If claims are either not made or paid under the applicable insurance policies or if coverage thereunder has been exhausted, the related security holders will suffer a loss to the extent that liquidation proceeds, after reimbursement of the servicer's expenses, are less than the outstanding principal balance of and unpaid interest on the related loan which would be distributable to security holders. In addition, the servicer will be entitled to reimbursement of expenditures incurred by it in connection with the restoration of property securing a defaulted loan, such right of reimbursement being prior to the rights of the security holders to receive any related insurance proceeds, liquidation proceeds or amounts derived from other credit enhancement.

### Evidence as to Compliance

The related servicing agreement for each series will provide that each year, a firm of independent public accountants will furnish a statement to the trustee to the effect that such firm has examined certain documents and records relating to the servicing of the loans by the servicer will be and that such examination has disclosed no items of noncompliance with the provisions of the servicing agreement which in the opinion of such form are material, except for such items of noncompliance as are set forth in such statement.

The servicing agreement will also provide for delivery to the trustee for such series of an annual statement signed by an officer of the servicer to the effect that the servicer has fulfilled its material obligations under the servicing agreement, throughout the preceding calendar year.

### Certain Matters Regarding the Servicer

In the event of a servicer default under a servicing agreement, the servicer may be replaced by the trustee or another specified party. Such servicer defaults and the rights of the trustee upon such a default under the servicing agreement for the related series will be described in the prospectus supplement.

The servicer will not have the right to assign the servicing agreement nor resign from the obligations and duties imposed on it under the servicing agreement except upon the determination that the servicer's duties are no longer permissible under applicable law and that such incapacity cannot be cured by the servicer, without incurring unreasonable expense. No such resignation of the servicer shall become effective until a successor servicer has assumed the servicer's responsibilities and obligations under the servicing agreement. A successor servicer (other than the trustee) must:

- be a housing and home finance institution, bank or mortgage servicing institution which has been designated as an approved seller-servicer by Fannie Mae or Freddie Mac, and

- have equity of not less than $5,000,000 as determined in accordance with generally accepted accounting principles.

To the extent that the servicer transfers its obligations to a wholly owned subsidiary or affiliate, such subsidiary or affiliate need not satisfy the criteria set forth above; to the extent that the assigning servicer remains liable for the servicing obligations under the related servicing agreement. Any entity into which the servicer is merged or consolidated or any successor corporation resulting from any merger, conversion or consolidation will succeed to the servicer's obligations under the related servicing agreement, provided that such successor or surviving entity meets the requirements for a successor servicer set forth above.

24

Table of Contents

Each servicing agreement will provide that neither the servicer, nor any director, officer, employee or agent of the servicer, will be under any liability to the related issuing entity, the sponsor or the security holders for any action taken or for failing to take any action in good faith pursuant to the servicing agreement, or for errors in judgment. However, neither the servicer nor any such person will be protected against any breach of warranty or representation made under such servicing agreement, or the failure to perform its obligations in compliance with any standard of care set forth in such servicing agreement, or liability which would otherwise be imposed by reason of willful misfeasance, bad faith or negligence in the performance of their duties or by reason of reckless disregard of their obligations and duties thereunder.

## THE AGREEMENTS

The following summaries describe certain provisions of the related agreements. The summaries do not purport to be complete and are subject to, and qualified in their entirety by reference to, the provisions of the agreements. Where particular provisions or terms used in the agreements are referred to, such provisions or terms are as specified in the related agreements.

Each issuing entity will be established pursuant to a trust agreement by and between the sponsor and a trustee named in the related trust agreement. Each trust agreement will describe the assets of the related issuing entity, which will include the related loans and, if so specified in the related prospectus supplement, may include any combination of a mortgage pool insurance policy, letter of credit, financial guaranty insurance policy, special hazard policy or reserve fund.

The loans held by each issuing entity will be serviced by the servicer pursuant to a servicing agreement by and between the servicer and the related trustee.

With respect to securities that represent debt secured by the related issuing entity, the sponsor will enter into an indenture with the trustee named on such indenture, as set forth in the related prospectus supplement. Securities that represent beneficial ownership interests in the related issuing entity will be issued pursuant to the related trust agreement.

In the case of any individual issuing entity, the contractual arrangements relating to the establishment of the issuing entity, the servicing of the related loans and the issuance of the related securities may be contained in a single agreement, or in several agreements which combine certain aspects of the trust agreement, the servicing agreement and the indenture described above (for example, a pooling and servicing agreement, or a servicing and collateral management agreement).

### Assignment of Loans

At the time of issuance of the securities of a series, the depositor will transfer, convey and assign to the issuing entity all of its right, title and interest in the loans and other property to be transferred to the issuing entity for a series. Such assignment will include all principal and interest due on or with respect to the loans after the cut-off date specified in the related prospectus supplement. The trustee will, concurrently with such assignment, execute and deliver the securities.

*Assignment of Loans.* The depositor as to each loan, will deliver or cause to be delivered to the trustee or a custodian on behalf of the trustee the mortgage note endorsed without recourse

25

Table of Contents

to the order of the trustee or in blank, the original mortgage with evidence of recording indicated thereon (except for any mortgage not returned from the public recording office, in which case a copy of such mortgage will be delivered, together with a certificate that the original of such mortgage was delivered to such recording office) and, unless the mortgage is recorded on the MERS system, an assignment of the mortgage in recordable form. The trustee or the custodian will hold such documents in trust for the benefit of the security holders.

The mortgages for certain mortgage loans may be recorded in the name of the Mortgage Electronic Registration System, Inc. ("MERS"), solely as nominee for the sponsor, and its successors and assigns. Subsequent assignments of such mortgages were or may be, at the sole discretion, in the opinion of counsel acceptable to the trustee, such recording system. Alternatively, for certain other mortgage loans, (i) the mortgage may have been originally recorded in the name of the sponsor, (ii) record ownership was later assigned to MERS, solely as nominee for the sponsor, and (iii) subsequent assignments of the mortgage were registered electronically through the MERS system. For each of such mortgage loans registered with MERS, MERS serves as mortgagee of record on the mortgage solely as a nominee in an administrative capacity on behalf of the indenture trustee, and does not have any beneficial interest in the mortgage loan.

The depositor will, as to each home improvement contract, either deliver or cause to be delivered to the trustee (or the custodian) the original home improvement contract and copies of documents and instruments related to each home improvement contract and the security interest in the property securing such home improvement contract, or maintain possession (or cause the servicer to maintain possession) of such home improvement contracts and other documents, as custodian on behalf of the related issuing entity. In order to give notice of the right, title and interest of security holders to the home improvement contracts, the depositor will cause a UCC-1 financing statement to be executed by the depositor, identifying the trustee as the secured party and identifying all home improvement contracts as collateral. See *"Legal Aspects of the Loans—The Home Improvement Contracts"* in this prospectus.

With respect to loans secured by mortgages, the depositor, will, at the time of issuance of the securities, cause assignments to the trustee of the mortgages relating to the loans for a series to be recorded in the appropriate public office for real property records, except in states where, in the opinion of counsel acceptable to the trustee, such recording is not required to protect the trustee's interest in the related loans. The depositor will cause such assignments to be so recorded within a specified time period after issuance of the securities. If the recorded mortgages are not received within the specified time period, the related servicing agreement may require the depositor to repurchase from the trustee any loan the related mortgage of which is not recorded within such time period, at the price described below with respect to repurchases by reason of defective documentation. Such repurchase obligation would constitute the sole remedy available to the security holders or the trustee for the failure of a mortgage to be recorded.

Each loan will be identified in a schedule appearing as an exhibit to the related servicing agreement. Such loan schedule will specify with respect to each loan: the original principal balance; the unpaid principal balance as of the cut-off date; the current loan rate; the current scheduled payment; the maturity date, if the loan is an adjustable-rate loan, the periodic and lifetime rate caps, if any, and the current index.

*Pre-Funding Account.* A trust estate may include a "pre-funding account." The issuing entity will use the amounts on deposit in the pre-funding amount to acquire additional loans from time to time during the time period specified in the related prospectus supplement.

26

000177

Table of Contents

During any pre-funding period, the depositor will be obligated (subject only to the availability thereof) to transfer to the related trust estate, additional loans from time to time. These additional loans will be required to satisfy certain eligibility criteria more fully set forth in the related prospectus supplement, which eligibility criteria will generally be consistent with the eligibility criteria of the loans included in the trust estate as of the closing date subject to such exceptions as are expressly stated in such prospectus supplement and will be established in consultation with the rating agencies.

Although the specific parameters of the pre-funding account with respect to any issuance of securities will be specified in the related prospectus supplement, it is anticipated that: (a) the pre-funding period will not exceed one year from the related closing date, (b) that the additional loans to be acquired during the pre-funding period will be subject to the same representations and warranties as the loans included in the related trust estate on the closing date (although additional or substitute criteria may be required to be satisfied, as described in the related prospectus supplement) and (c) that the pre-funded amount will not exceed 50% of the principal amount of the securities issued pursuant to a particular offering.

The amounts set aside in the pre-funding account that are not applied within the required period of time will be deemed to be principal prepayments and applied in the manner set forth in the related prospectus supplement.

**Revolving Period and Amortization Period**

If the applicable prospectus supplement so provides, there may be a period commencing on the date of issuance of securities of a series and ending on the date set forth on the applicable prospectus supplement during which no principal payments will be made to one or more classes of securities of the related series as are identified in such applicable prospectus supplement (the **"revolving period"**). The revolving period may not be longer than one year from the date of issuance of a class of securities of a series, and the portion of the asset pool which may revolve may not exceed 50% of the aggregate proceeds of the related offering. During the revolving period, all collections of principal otherwise allocated to such classes of securities may be:

- utilized by the issuing entity during the revolving period to acquire additional receivables which satisfy the criteria in this prospectus and the criteria set forth in the applicable prospectus supplement;

- held in an account and invested in eligible investments for later distribution to security holders;

- applied to those securities of the related series as then are in amortization, if any; or

- otherwise applied as specified in the applicable prospectus supplement.

The material features and aspects of the revolving period, including the mechanics of the revolving period, underwriting criteria for assets acquired during the revolving period, a description of the party with authority to add, remove or substitute assets during the revolving period and the procedures for temporary re-investment of funds, will be described in the applicable prospectus supplement.

An **"amortization period"** is the period during which an amount of principal is payable to holders of a series of securities which, during the revolving period, were not entitled to such

27

Table of Contents

payments. If so specified in the applicable prospectus supplement, during an amortization period all or a portion of principal collections on the receivables may be applied as specified above for a revolving period and, to the extent not so applied, will be distributed to the classes of notes or certificates. In addition, the applicable prospectus supplement will set forth the circumstances which will result in the commencement of an amortization period.

Each issuing entity which has a revolving period may also issue to the depositor a certificate evidencing a retained interest in the issuing entity not represented by the other securities issued by such issuing entity. As further described in the applicable prospectus supplement, the value of such retained interest will fluctuate as the amount of issuing entity property fluctuates and the amount of notes and certificates of the related series of securities outstanding is reduced. The terms of each class of securities will be fully disclosed in the applicable prospectus supplement for each series.

*Repurchase and Substitution of Defective Loans.* If any document in the file relating to a loan delivered by the depositor to the trustee (or custodian) is found by the trustee within a specified time period following the execution of the related agreements (or promptly after the trustee's receipt of any document permitted to be delivered after the closing date) to be defective in any material respect and the depositor does not cure such defect, the depositor (or such other entity specified in the prospectus supplement) will be required to repurchase the related loan or any property acquired in respect thereof from the trustee at a price equal to (a) the outstanding principal balance of such loan and (b) accrued and unpaid interest to the date of the next scheduled payment on such loan at the rate set forth in the related agreements (less any unreimbursed advances respecting such loan).

The depositor (or such other entity specified in the prospectus supplement), may, rather than repurchase the loan as described above, remove such loan from the trust estate and substitute in its place one or more other qualifying substitute loans. These substitutions may only occur during a specified period if the trust estate has elected to be treated as a REMIC for federal income tax purposes.

The depositor will make representations and warranties with respect to the loans for a series. If the depositor (or such other entity specified in the prospectus supplement) cannot cure a breach of any such representations and warranties in all material respects within a specified time period after notification by the trustee of such breach, and if such breach is of a nature that materially and adversely affects the value of such loan, the depositor or such entity is obligated to repurchase the affected loan or, provide a qualifying substitute loan therefor, subject to the same conditions and limitations on purchases and substitutions as described above.

**Reports to Security Holders**

The trustee or other entity specified in the related prospectus supplement will prepare and forward to each holder the report described in the related prospectus supplement.

**Servicer Defaults**

Servicer defaults under each servicing agreement are specified in the related prospectus supplement.

28

Table of Contents

**Events of Default**

Events of default for each series of notes are specified in the related prospectus supplement. If, following an event of default with respect to any series of notes, the notes have been declared to be due and payable, the related trustee or another specified party may elect to maintain possession of the collateral securing the notes and to continue to apply distributions on such collateral as if there had been no declaration of acceleration if such collateral continues to provide sufficient funds for the payment of principal of and interest on the notes as they would have become due if there had not been such a declaration.

*Private sales.* To the extent permitted by law, the trustee shall not in any private sale sell or otherwise dispose of the trust estate, or any portion thereof, unless:

- the holders of notes representing more than 50% of the voting rights consents to or directs the trustee in writing to make such sale; or

- the proceeds of such sale would be not less than the entire amount that would be payable to the holders of the notes on the payment date next succeeding the date of such sale.

*Public sales.* Unless the holders of all outstanding notes of the related series have otherwise consented or directed the trustee, at any public sale of all or any portion of the trust estate at which a minimum bid equal to or greater than the amount necessary to pay the entire amount payable on the notes has not been established by the trustee, the trustee on behalf of the noteholders, shall prevent such sale and bid an amount at least $1.00 more than the highest other bid in order to preserve the trust estate on behalf of the noteholders.

In connection with a sale of all or any portion of the trust estate:

- any holder or holders of notes may bid for and purchase the property offered for sale, and upon compliance with the terms of sale may hold, retain and possess and dispose of such property, without further accountability; and

- the trustee may bid for and acquire the property offered for sale, and, in lieu of paying cash therefor, may make settlement for the purchase price by crediting the gross sale price against the sum of (a) the amount that would be payable to the holders of the notes as a result of such sale on the payment date next succeeding the date of such sale and (b) the expenses of the sale and of any proceedings in connection therewith which are reimbursable to it, without being required to produce the notes in order to complete any such sale or in order for the net sale price to be credited against such notes, and any property so acquired by the trustee shall be held and dealt with by it in accordance with the provisions of the indenture.

In the event that the trustee liquidates the collateral in connection with an event of default involving a default in the payment of principal of or interest on the notes, the trustee will have a prior lien on the proceeds of any such liquidation for unpaid fees and expenses. As a result, upon the occurrence of such an event of default, the amount available for distribution to the noteholders would be less than would otherwise be the case. However, the trustee may not institute a proceeding for the enforcement of its lien except in connection with a proceeding for the enforcement of the lien of the related agreements for the benefit of the noteholders after the occurrence of such an event of default.

29

Table of Contents

In the event the principal of the notes of a series is declared due and payable, as described above, the holders of any such notes issued at a discount from par may be entitled to receive no more than an amount equal to the unpaid principal amount thereof less the amount of such discount which is unamortized.

Subject to the provisions of the related agreements relating to the duties of the trustee, in case an event of default occurs with respect to a series of notes, the trustee shall be under no obligation to exercise any of the rights or powers under the related agreements at the request or direction of any of the noteholders, unless such noteholders offer to the trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which might be incurred by it in complying with such request or direction. Subject to such provisions for indemnification and certain limitations contained in the related agreements, the related credit enhancer or the holders of a majority of the then aggregate outstanding amount of the notes (with the consent of the related credit enhancer, if any) shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the trustee or exercising any trust or power conferred on the trustee with respect to the notes, and the related credit enhancer or the majority noteholders (with the consent of the related credit enhancer, if any) may, in certain cases, waive any default with respect thereto, except a default in the payment of principal or interest or a default in respect of a covenant or provision of the indenture that cannot be modified without the waiver or consent of all the outstanding noteholders affected thereby.

**The Trustee**

The prospectus supplement will identify the trustee for the series. The trustee may have normal banking relationships with the depositor and its affiliates. In addition, for the purpose of meeting the legal requirements of local jurisdictions, the trustee will have the power to appoint co-trustees or separate trustees of all or any part of the trust estate relating to a series of securities. In the event of an appointment, all rights, powers, duties and obligations conferred or imposed upon the trustee will be conferred or imposed upon the trustee and each separate trustee or co-trustee jointly, or, in any jurisdiction in which the trustee shall be incompetent or unqualified to perform as trustee, singly upon the separate trustee or co-trustee who will exercise and perform solely at the direction of the trustee. The trustee may also appoint agents to perform any of the responsibilities of the trustee, which agents will have any or all of the rights, powers, duties and obligations of the trustee conferred on them by appointment; although the trustee will continue to be responsible for its duties and obligations under the agreement.

**Duties of the Trustee**

The trustee will not make any representations as to the validity or sufficiency of the agreements, the securities or of any loan or related documents. If no event of default as defined in the related agreements has occurred, the trustee is required to perform only those duties specifically required of it under the related agreements.

The trustee may be held liable for its own negligent action or failure to act, or for its own misconduct. The trustee will not be liable, however, with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the security holders in an event of default. The trustee is not required to expend or risk its own funds or incur any financial liability in the performance of any of its duties, or in the exercise of any of its rights or powers, if repayment of those funds or adequate indemnity against risk is not reasonably assured to it.

30

000181

Table of Contents

**Resignation of Trustee**

The trustee may, upon written notice to the sponsor, resign at any time, in which event the issuing entity will be obligated to use reasonable efforts to appoint a successor trustee. If no successor trustee has been appointed and has accepted the appointment within 30 days after giving such notice of resignation, the resigning trustee may petition any court of competent jurisdiction for appointment of a successor trustee. The trustee may also be removed at any time (i) if the trustee ceases to be eligible to continue as such under the related agreement, (ii) if the trustee becomes insolvent (iii) the trustee has a conflict of interests prohibited by the agreements and fails to resign; or (iv) related credit enhancer or by a majority of security holders (with the consent of the related credit enhancer, if any). Any resignation or removal of the trustee and appointment of a successor trustee will not become effective until acceptance of the appointment by the successor trustee.

**Amendment of Agreements**

The related prospectus supplement will set forth the method for amending the related agreements.

**Voting Rights**

The related prospectus supplement will set forth the method of determining allocation of voting rights with respect to a series. The voting rights for a series of securities may be controlled by a credit enhancer with respect to such series, or the exercise of voting control by the security holders may be subject to the consent of the credit enhancer, as specified in the related prospectus supplement. In addition, the holders of subordinate securities may have limited or no voting rights, to the extent described in the related prospectus supplement.

No security holder, solely by virtue of such holder's status as a holder, will have any right under the agreements for such series to institute any proceeding with respect to such agreements, unless such security holder previously has given to the trustee for such series written notice of default and unless the security holders of securities evidencing not less than 25% (or other percentage disclosed in the prospectus supplement) of the aggregate voting rights of the securities for such series have made written request upon the trustee to institute such proceeding in its own name as trustee thereunder and have offered to the trustee reasonable indemnity, and the trustee for 60 days has neglected or refused to institute any such proceeding and no direction inconsistent with such written request has been given to the trustee during such sixty day period by the holders of securities representing more than 50% of the aggregate voting rights of such series. In the event that the trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of holders, each representing less than 50% of the voting rights, the trustee shall take the action prescribed by the group representing a greater percentage of the voting rights.

**Meetings of Holders**

No agreement will provide for the holding of any annual or other meeting of security holders.

31

Table of Contents

**REMIC Administrator**

For any series with respect to which a REMIC election is made, preparation of reports and other administrative duties with respect to the trust fund may be performed by a REMIC administrator, who may be the servicer.

**Termination**

*Certificates.* The obligations created by the pooling and servicing agreement for a series of certificates will terminate upon the distribution to holders of all amounts distributable to them pursuant to such pooling and servicing agreement after the earlier of (i) the later of (a) the final payment or other liquidation of the last loan remaining in the trust estate for such series and (b) the disposition of all property acquired upon foreclosure or deed in lieu of foreclosure or repossession in respect of any loan or (ii) the repurchase, as described below, by the servicer or other entity specified in the related prospectus supplement from the trustee for such series of all loans and other property at that time subject to such pooling and servicing agreement. The pooling and servicing agreement for each series may permit, but generally does not require, the servicer or another entity to purchase from the trust estate for such series all remaining loans at a price equal to, 100% of the aggregate principal balance of such loans plus, with respect to any property acquired in respect of a loan, if any, the outstanding principal balance of the related loan at the time of foreclosure, less, in either case, related unreimbursed advances (in the case of the loans, only to the extent not already reflected in the computation of the aggregate principal balance of such loans) and unreimbursed expenses (that are reimbursable pursuant to the terms of the pooling and servicing agreement) plus, in either case, accrued interest thereon at the weighted average interest rate on the related loans through the last day of the month in which such repurchase occurs. If an election is made for treatment as a REMIC under the Internal Revenue Code, the repurchase price may equal the greater of (a) 100% of the aggregate principal balance of such loans, plus accrued interest thereon at the applicable interest rates on the loans through the last day of the month of such repurchase and (b) the aggregate fair market value of such loans plus the fair market value of any property acquired in respect of a loan and remaining in the trust estate. The exercise of such right will effect early retirement of the securities, but such entity's right to so purchase is subject to the aggregate principal balance of the loans at the time of repurchase being less than a fixed percentage, to be set forth in the related prospectus supplement, of the aggregate principal balance of the loans as of the cut-off date. In no event, however, will the trust created by pooling and servicing agreement continue beyond the expiration of 21 years from the death of the last survivor of certain persons identified therein. For each series, the servicer or the trustee, as applicable, will give written notice of termination of the pooling and servicing agreement to each holder, and the final distribution will be made only upon surrender and cancellation of the securities at an office or agency specified in the notice of termination. If so provided in the related prospectus supplement for a series, the sponsor or another entity may effect an optional termination of the trust estate under the circumstances described in such prospectus supplement. See "Description of the Securities—Optional Redemption; Mandatory Redemption".

*Notes.* The indenture will be discharged with respect to a series of notes (except with respect to certain continuing rights specified in the indenture) upon the delivery to the trustee for cancellation of all the notes or, with certain limitations, upon deposit with the trustee of funds sufficient for the payment in full of all of the notes.

In addition to such discharge with certain limitations, the related indenture will provide that, if so specified with respect to the notes of any series, the related trust estate will be

32

Table of Contents

discharged from any and all obligations in respect of the notes of such series (except for certain obligations relating to temporary notes and exchange of notes, to register the transfer of or exchange notes of such series, to replace stolen, lost or mutilated notes of such series, to maintain paying agencies and to hold monies for payment in trust) upon the deposit with the trustee, in trust, of money and/or direct obligations of or obligations guaranteed by the United States of America which through the payment of interest and principal in respect thereof in accordance with their terms will provide money in an amount sufficient to pay the principal of and each installment of interest on the notes of such series on the final scheduled payment date for such notes and any installment of interest on such notes in accordance with the terms of the pooling and servicing agreement and the notes of such series. In the event of any such defeasance and discharge of notes of such series, holders of notes of such series would be able to look only to such money and/or direct obligations for payment of principal and interest, if any, on their notes until maturity.

## YIELD AND MATURITY CONSIDERATIONS

The yield to maturity of a security will depend on the price paid by the holder for such security, the interest rate on such security (which interest rate may vary if so specified in the related prospectus supplement), the rate of payment of principal on such security (or the rate at which the notional amount thereof is reduced if such security is not entitled to payments of principal) and other factors.

In general, if a class of securities is purchased at initial issuance at a premium and payments of principal on the related loans occur at a rate faster than anticipated at the time of purchase, the purchaser's actual yield to maturity will be lower than that assumed at the time of purchase. In addition, if a class of securities is purchased at initial issuance at a discount and payments of principal on the related loans occur at a rate slower than that assumed at the time of purchase, the purchaser's actual yield to maturity will be lower than that originally anticipated. The effect of principal prepayments, liquidations and purchases on yield will be particularly significant in the case of a series of securities having a class entitled to payments of interest only or to payments of interest that are disproportionately high relative to the principal payments to which such class is entitled. Such a class will likely be sold at a substantial premium to its principal balance, if any, and any faster than anticipated rate of prepayments will adversely affect the yield to holders thereof. In certain circumstances, rapid prepayments may result in the failure of such holders to recoup their original investment. In addition, the yield to maturity on certain other types of classes of securities, may be relatively more sensitive to the rate of prepayment on the related loans than other classes of securities.

The timing of changes in the rate of principal payments on or repurchases of the loans may significantly affect an investor's actual yield to maturity, even if the average rate of principal payments experienced over time is consistent with an investor's expectation. In general, the earlier a prepayment of principal on the underlying loans or a repurchase thereof, the greater will be the effect on an investor's yield to maturity. As a result, the effect on an investor's yield of principal payments and repurchases occurring at a rate higher (or lower) than the rate anticipated by the investor during the period immediately following the issuance of a series of securities would not be fully offset by a subsequent like reduction (or increase) in the rate of principal payments.

When a full prepayment is made on a loan, the mortgagor is charged interest on the principal amount of the loan so prepaid for the number of days in the month actually elapsed up to the date of the prepayment. A series of securities may provide that the servicer is obligated to

33

Table of Contents

deposit into the distribution account, for distribution to holders of the series, an amount, not to exceed the servicer's aggregate servicing fee for such series for the related month, equal to the difference between (a) a full months' interest (net of the servicing fee) on a loan which has prepaid in full and (b) the amount of interest actually paid with such prepayment in full. See "*Servicing of Loans - Servicing Compensation and Payment of Expenses*". To the extent the servicer is not obligated to deposit for distribution to the related holders the full amount of such difference, the effect of prepayments in full will be to reduce the amount of interest paid in the next succeeding month to security holders entitled to payments of interest because interest on the principal amount of any loan so prepaid will be paid only to the date of prepayment rather than for a full month. A partial prepayment of principal is applied so as to reduce the outstanding principal balance of the related loan as of the first day of the month in which such partial prepayment is received. As a result, the effect of a partial prepayment on a loan will be to reduce the amount of interest passed through to security holders on the payment date following the receipt of such partial prepayment by an amount equal to one month's interest at the applicable pass- through rate, as the case may be, on the prepaid amount. Neither full nor partial principal prepayments are passed through until the month following receipt.

A number of factors affect principal prepayment rates, including homeowner mobility, economic conditions, mortgage market interest rates, the availability of mortgage funds and the enforceability of due-on-sale clauses. Many loans will contain due-on-sale provisions permitting the mortgagee to accelerate the maturity of the loan upon sale or certain transfers by the mortgagor of the underlying property. The servicer will generally enforce any due-on-sale clause to the extent it has knowledge of the conveyance or proposed conveyance of the underlying property and it is entitled to do so under applicable law; provided, however, that the servicer will not take any action in relation to the enforcement of any due-on-sale provision which would adversely affect the interests of the holders or adversely affect or jeopardize coverage under any applicable insurance policy. The extent to which the loans are assumed by purchasers of the properties rather than prepaid by the related mortgagors in connection with the sales of the properties will affect the yield of the related series of securities.

The yield on the securities also will be effected by liquidations of loans following mortgagor defaults and by purchases of loans required by the agreements in the event of breaches of representations made in respect of such mortgage loans by the sponsor or other entity, or repurchases due to conversions of ARM loans to a fixed interest rate. See "*Descriptions of the Securities*" above. Under certain circumstances, the servicer, the sponsor or, if specified in the related prospectus supplement, the holders of the REMIC residual interest or the credit enhancer may have the option to purchase the loans in a trust estate. See "*Description of the Securities--Optional Redemption; Mandatory Redemption.*"

The rate of prepayments with respect to fixed-rate mortgage loans has fluctuated significantly in recent years. In general, if prevailing interest rates fall significantly below the interest rates on fixed-rate mortgage loans, such mortgage loans are likely to be subject to higher prepayment rates than if prevailing rates remain at or above the interest rate on such mortgage loans. Conversely, if prevailing interest rates rise appreciably above the interest rates on fixed-rate mortgage loans, such mortgage loans are likely to experience a lower prepayment rate than if prevailing rates remain at or below the interest rates on such mortgage loans.

Although the loan rates on ARM loans will be subject to periodic adjustments, such adjustments will, generally, (i) not increase or decrease such loan rates by more than a fixed percentage amount on each adjustment date, (ii) not increase such loan rates over a fixed percentage amount during the life of any ARM loan and (iii) be based on an index (which may

34

**Table of Contents**

not rise and fall consistently with mortgage interest rates) plus the related margin (which may be different from margins being used at the time for newly originated adjustable rate mortgage loans). As a result, the loan rates on the ARM loans in a trust estate at any time may not equal the prevailing rates for similar, newly originated adjustable-rate mortgage loans. In certain rate environments, the prevailing rates on fixed-rate mortgage loans may be sufficiently low in relation to the then-current loan rates on ARM loans that the rate of prepayment may increase as a result of refinancings.

In addition, and as may be described in the related prospectus supplement, the related agreements may provide that all or a portion of such collected principal may be retained by the trustee (and held in certain temporary investments, including loans) for a specified period prior to being used to fund payments of principal to holders. The result of such retention and temporary investment by the trustee of such principal would be to slow the amortization rate of the related securities relative to the amortization rate of the related loans, or to attempt to match the amortization rate of the related securities to an amortization schedule established at the time such securities are issued. Any such feature applicable to any securities may terminate upon the occurrence of events to be described in the related prospectus supplement, resulting in the current funding of principal payments to the related holders and an acceleration of the amortization of such securities.

In addition to its impact on a security's yield to maturity the rate of principal prepayments on the loans related to the security will affect the weighted average life of the security. "Weighted average life" refers to the average amount of time from the date of issuance of a security until each dollar of principal of the security is repaid to the investor.

There can be no assurance as to the rate of prepayment of the loans. The depositors are not aware of any reliable, publicly available statistics relating to the principal prepayment experience of diverse portfolios of mortgage loans such as the loans over an extended period of time. All statistics known to the sponsor that have been compiled with respect to prepayment experience on mortgage loans indicate that while some mortgage loans may remain outstanding until their stated maturities, a substantial number will be paid prior to their respective stated maturities.

The effective yield to maturity to each holder of fixed-rate securities entitled to payments of interest will be below that otherwise produced by the applicable interest rate and purchase price of such security because, while interest will accrue on each loan from the first day of each month, the payment of such interest to the holders will be made on a specified day (for example, the twenty-fifth day) of the month (or, in the case of quarterly pay securities, the twenty-fifth day of every third month, or, in the case of semiannually pay securities, the twenty-fifth day of every sixth month) following the month of accrual.

The loan rates on certain ARM loans subject to negative amortization adjust monthly and their amortization schedules adjust less frequently. During a period of rising interest rates as well as immediately after origination (initial loan rates are generally lower than the sum of the indices applicable at origination and the related loan margins) the amount of interest accruing on the principal balance of such loans may exceed the amount of the minimum scheduled monthly payment thereon. As a result, a portion of the accrued interest on negatively amortizing loans may become deferred interest that will be added to the principal balance thereof and will bear interest at the applicable loan rate. The addition of any such deferred interest to the principal balance will lengthen the weighted average life of the securities evidencing interests in such loans and may adversely affect yield to holders thereof depending upon the price at which such

35

Table of Contents

securities were purchased. In addition, with respect to certain ARM loans subject to negative amortization, during a period of declining interest rates, it might be expected that each minimum scheduled monthly payment on such a loan would exceed the amount of scheduled principal and accrued interest on the principal balance. To the extent such excess will be applied to reduce such principal balance, the weighted average life of such securities will be reduced and may adversely affect yield to holders thereof depending upon the price at which such securities were purchased.

## LEGAL ASPECTS OF LOANS

The following discussion contains summaries of legal aspects of mortgage loans, home improvement installment sales contracts and home improvement installment loan agreements which are general in nature. Because these legal aspects are governed by state law, the summaries do not purport to be complete, nor reflect the laws of any particular state, nor encompass the laws of all states in which the properties securing the loans are situated.

### Mortgage Loans

The mortgage loans for a series will and certain home improvement contracts may be secured by either mortgages or deeds of trust or deeds to secure debt (such mortgage loans and home improvement contracts are hereinafter referred to in this section as "mortgage loans"), depending upon the prevailing practice in the state in which the property subject to a mortgage loan is located. The filing of a mortgage, deed of trust or deed to secure debt creates a lien or title interest upon the real property covered by such instrument and represents the security for the repayment of an obligation that is customarily evidenced by a promissory note. It is not prior to the lien for real estate taxes and assessments or other charges imposed under governmental police powers and may also be subject to other liens pursuant to the laws of the jurisdiction in which the mortgaged property is located. Priority with respect to such instruments depends on their terms, the knowledge of the parties to the mortgage and generally on the order of recording with the applicable state, county or municipal office. There are two parties to a mortgage, the mortgagor, who is the borrower/property owner or the land trustee (as described below), and the mortgagee, who is the lender. Under the mortgage instrument, the mortgagor delivers to the mortgagee a note or bond and the mortgage. In the case of a land trust, there are three parties because title to the property is held by a land trustee under a land trust agreement of which the borrower/property owner is the beneficiary; at origination of a mortgage loan, the borrower executes a separate undertaking to make payments on the mortgage note. A deed of trust transaction normally has three parties, the trustor, who is the borrower/property owner; the beneficiary, who is the lender, and the trustee, a third-party grantee. Under a deed of trust, the trustor grants the property, irrevocably until the debt is paid, in trust, generally with a power of sale, to the trustee to secure payment of the obligation. The mortgagee's authority under a mortgage and the trustee's authority under a deed of trust are governed by the law of the state in which the real property is located, the express provisions of the mortgage or deed of trust, and, in some cases, in deed of trust transactions, the directions of the beneficiary.

### Cooperative Loans

The cooperative owns or has a leasehold interest in all the real property and owns in fee or leases the building and all separate dwelling units therein. The cooperative is directly responsible for project management and, in most cases, payment of real estate taxes, other governmental impositions and hazard and liability insurance. If there is a blanket mortgage on the cooperative apartment building and underlying land, or one or the other, the cooperative, as

36

000187

Table of Contents

project mortgagor, is also responsible for meeting these blanket mortgage obligations. A blanket mortgage is ordinarily incurred by the cooperative in connection with either the construction or purchase of the cooperative's apartment building or the obtaining of capital by the cooperative. The interests of the occupants under proprietary leases or occupancy agreements as to which the cooperative is the lessee, is also responsible for meeting the rental obligation. The interests of the occupants under proprietary leases or occupancy agreements as to which the cooperative is the landlord are generally subordinate to the interests of the holder of the blanket mortgage and to the interest of the holder of a land lease. If the cooperative is unable to meet the payment obligations (a) arising under its blanket mortgage, the mortgagee holding the blanket mortgage could foreclose on that mortgage and terminate all subordinate proprietary leases and occupancy agreements or (b) arising under its land lease, the holder of the landlord's interest under the land lease could terminate it and all subordinate proprietary leases and occupancy agreements. Also, the blanket mortgage on a cooperative may provide financing in the form of a mortgage that does not fully amortize, with a significant portion of principal being due in one final payment at final maturity. The inability of the cooperative to refinance this mortgage and its consequent inability to make the final payment could lead to foreclosure by the mortgagee. Similarly, a land lease has an expiration date and the inability of the cooperative to extend its term or, in the alternative, to purchase the land could lead to termination of the cooperative's interest in the property and termination of all proprietary leases and occupancy agreements. In either event, foreclosure by the holder of the blanket mortgage or the termination of the underlying lease could eliminate or significantly diminish the value of any collateral securing the cooperative loans. that financed the purchase by an individual tenant-stockholder of cooperative shares or, in the case of the trust estate, the collateral securing the cooperative loans.

The cooperative is owned by tenant-stockholders who, through ownership of stock, shares or membership certificates in the corporation, receive proprietary leases or occupancy agreements which confer exclusive rights to occupy specific units. Generally, a tenant-stockholder of a cooperative must make a monthly payment to the cooperative representing the tenant-stockholder's pro rata share of the cooperative's payments for its blanket mortgage, real property taxes, maintenance expenses and other capital or ordinary expenses. An ownership interest in a cooperative and accompanying occupancy rights is financed through a cooperative share loan evidenced by a promissory note and secured by an assignment of and a security interest in the occupancy agreement or proprietary lease and a security interest in the related cooperative shares. The lender generally takes possession of the share certificate and a counterpart of the proprietary lease or occupancy agreement and a financing statement covering the proprietary lease or occupancy agreement and the cooperative shares is filed in the appropriate state and local offices to perfect the lender's interest in its collateral. Upon default of the tenant-stockholder, the lender may sue for judgment on the promissory note, dispose of the collateral at a public or private sale or otherwise proceed against the collateral or tenant-stockholder as an individual as provided in the security agreement covering the assignment of the proprietary lease or occupancy agreement and the pledge of cooperative shares as described under "Foreclosure on Cooperative Shares" below.

## Manufactured Housing Contracts

Under the laws of most states, manufactured housing that is not permanently affixed to its site constitutes personal property and is subject to the motor vehicle registration laws of the state or other jurisdiction in which the unit is located. In a few states, where certificates of title are not required for manufactured homes, security interests are perfected by the filing of a financing statement under Article 9 of the UCC which has been adopted by all states. Financing statements are effective for five years and must be renewed at the end of each five years. The certificate of title laws adopted by the majority of states provide that ownership of

37

Table of Contents

motor vehicles and manufactured housing shall be evidenced by a certificate of title issued by the motor vehicles department, or a similar entity, of the state. In the states that have enacted certificate of title laws, a security interest in a unit of manufactured housing, so long as it is not attached to land in so permanent a fashion as to become a fixture, is generally perfected by the recording of the interest on the certificate of title to the unit in the appropriate motor vehicle registration office or by delivery of the required documents and payment of a fee to such office, depending on state law.

The servicer will be required under the related servicing agreement to effect the notation or delivery of the required documents and fees, and to obtain possession of the certificate of title, as appropriate under the laws of the state in which any manufactured home is registered. If the servicer fails, due to clerical errors or otherwise, to effect the notation or delivery, or files the security interest under the wrong law, for example, under a motor vehicle title statute rather than under the UCC, in a few states, the trustee may not have a first priority security interest in the manufactured home securing a manufactured housing contract. As manufactured homes have become larger and often have been attached to their sites without any apparent intention by the borrowers to move them, courts in many states have held that manufactured homes may become subject to real estate title and recording laws. As a result, a security interest in a manufactured home could be rendered subordinate to the interests of other parties claiming an interest in the home under applicable state real estate law. In order to perfect a security interest in a manufactured home under real estate laws, the holder of the security interest must file either a fixture filing under the provisions of the UCC or a real estate mortgage under the real estate laws of the state where the home is located. These filings must be made in the real estate records office of the county where the home is located. Generally, manufactured housing contracts will contain provisions prohibiting the obligor from permanently attaching the manufactured home to its site. So long as the obligor does not violate this agreement, a security interest in the manufactured home will be governed by the certificate of title laws or the UCC, and the notation of the security interest on the certificate of title or the filing of a UCC financing statement will be effective to maintain the priority of the security interest in the manufactured home. If, however, a manufactured home is permanently attached to its site, other parties could obtain an interest in the manufactured home that is prior to the security interest originally retained by the seller and transferred to the depositor.

The depositor will assign or cause to be assigned a security interest in the manufactured homes to the trustee, on behalf of the securityholders. Neither the depositor, the servicer nor the trustee will amend the certificates of title to identify the trustee, on behalf of the securityholders, as the new secured party and, accordingly, the depositor or the mortgage loan seller will continue to be named as the secured party on the certificates of title relating to the manufactured homes. In most states, an assignment is an effective conveyance of a security interest in a manufactured home without amendment of any lien noted on the related certificate of title and the new secured party succeeds to the depositor's rights as the secured party. However, in several states there exists a risk that, in the absence of an amendment to the certificate of title, the assignment of the security interest might not be held effective against creditors of the depositor or mortgage loan seller.

In the absence of fraud, forgery or permanent affixation of the manufactured home to its site by the manufactured home owner, or administrative error by state recording officials, the notation of the lien of the depositor on the certificate of title or delivery of the required documents and fees will be sufficient to protect the trustee against the rights of subsequent purchasers of a manufactured home or subsequent lenders who take a security interest in the manufactured home. If there are any manufactured homes as to which the depositor has

38

*In re Debtor:  James L Macklin-  Chapter 7*
**USBC Eastern District of California Case No:  10-44610**
**Adversary No. 11-02024-E**
**NOTICE OF APPLICATION AND *EX PARTE* APPLICATION FOR TEMORARY RESTRAINING ORDER AND**
**ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

# EXHIBIT "4D"

Table of Contents

failed to perfect or cause to be perfected the security interest assigned to the trust estate, the security interest would be subordinate to subsequent purchasers for value of manufactured homes and holders of perfected security interests. There also exists a risk in not identifying the trustee, on behalf of the securityholders, as the new secured party on the certificate of title that, through fraud or negligence, the security interest of the trustee could be released.

If the owner of a manufactured home moves it to a state other than the state in which the manufactured home initially is registered, under the laws of most states, the perfected security interest in the manufactured home would continue for four months after the relocation and thereafter until the owner re-registers the manufactured home in that state. If the owner were to relocate a manufactured home to another state and re-register the manufactured home in the new state, and if the depositor did not take steps to re-perfect its security interest in the new state, the security interest in the manufactured home would cease to be perfected. A majority of states generally require surrender of a certificate of title to re-register a manufactured home. Accordingly, the depositor must surrender possession if it holds the certificate of title to the manufactured home or, in the case of manufactured homes registered in states that provide for notation of lien, the depositor would receive notice of surrender if the security interest in the manufactured home is noted on the certificate of title. Accordingly, the depositor would have the opportunity to re-perfect its security interest in the manufactured home in the state of relocation. In states that do not require a certificate of title for registration of a manufactured home, re-registration could defeat perfection. Similarly, when an obligor under a manufactured housing conditional sales contract sells a manufactured home, the obligee must surrender possession of the certificate of title or it will receive notice as a result of its lien noted thereon and accordingly will have an opportunity to require satisfaction of the related manufactured housing conditional sales contract before release of the lien. Under each related servicing agreement, the servicer will be obligated to take those steps, at the servicer's expense, as are necessary to maintain perfection of security interests in the manufactured homes.

Under the laws of most states, liens for repairs performed on a manufactured home take priority even over a perfected security interest. The depositor will obtain the representation of the mortgage loan seller that it has no knowledge of any liens of that type with respect to any manufactured home securing a manufactured home loan. However, liens could arise at any time during the term of a manufactured home loan. No notice will be given to the trustee or securityholders in the event a lien for repairs arises.

*Foreclosure on Mortgages.* Foreclosure of a mortgage is generally accomplished by judicial action. Generally, the action is initiated by the service of legal pleadings upon all parties having an interest of record in the real property. Delays in completion of the foreclosure occasionally may result from difficulties in locating necessary parties defendant. When the mortgagee's right to foreclosure is contested, the legal proceedings necessary to resolve the issue can be time-consuming and expensive. After the completion of a judicial foreclosure proceeding, the court may issue a judgment of foreclosure and appoint a receiver or other officer to conduct the sale of the property. In some states, mortgages may also be foreclosed by advertisement, pursuant to a power of sale provided in the mortgage. Foreclosure of a mortgage by advertisement is essentially similar to foreclosure of a deed of trust by nonjudicial power of sale.

Foreclosure of a deed of trust is generally accomplished by a nonjudicial trustee's sale under a specific provision in the deed of trust which authorizes the trustee to sell the property upon any default by the borrower under the terms of the note or deed of trust. In certain states, such foreclosure also may be accomplished by judicial action in the manner provided for foreclosure of mortgages. In some states, the trustee must record a notice of default and send a

39

Table of Contents

copy to the borrower/trustor and to any person who has recorded a request for a copy of a notice of default and notice of sale. In addition, the trustee in some states must provide notice to any other individual having an interest in the real property, including any junior lienholders. If the deed of trust is not reinstated within any applicable cure period, a notice of sale must be posted in a public place and, in most states, published for a specified period of time in one or more newspapers. In addition, some state laws require that a copy of the notice of sale be posted on the property and sent to all parties having an interest of record in the property. The trustor, borrower, or any person having a junior encumbrance on the real estate, may, during a reinstatement period, cure the default by paying the entire amount in arrears plus the costs and expenses incurred in enforcing the obligation. Generally, state law controls the amount of foreclosure expenses and costs, including attorney's fees, which may be recovered by a lender. If the deed of trust is not reinstated, a notice of sale must be posted in a public place and, in most states, published for a specified period of time in one or more newspapers. In addition, some state laws require that a copy of the notice of sale be posted on the property, recorded and sent to all parties having an interest in the real property.

An action to foreclose a mortgage is an action to recover the mortgage debt by enforcing the mortgagee's rights under the mortgage. It is regulated by statutes and rules and subject throughout to the court's equitable powers. Generally, a mortgagor is bound by the terms of the related mortgage note and the mortgage as made and cannot be relieved from his default if the mortgagee has exercised his rights in a commercially reasonable manner. However, since a foreclosure action historically was equitable in nature, the court may exercise equitable powers to relieve a mortgagor of a default and deny the mortgagee foreclosure on proof that either the mortgagor's default was neither willful nor in bad faith or the mortgagee's action established a waiver, fraud, bad faith, or oppressive or unconscionable conduct such as to warrant a court of equity to refuse affirmative relief to the mortgagee. Under certain circumstances a court of equity may relieve the mortgagor from an entirely technical default where such default was not willful.

A foreclosure action is subject to most of the delays and expenses of other lawsuits if defenses or counter claims are interposed, sometimes requiring up to several years to complete. Moreover, a non-collusive, regularly conducted foreclosure sale may be challenged as a fraudulent conveyance, regardless of the parties' intent, if a court determines that the sale was for less than fair consideration and such sale occurred while the mortgagor was insolvent and within one year (or within the state statute of limitations if the trustee in bankruptcy elects to proceed under state fraudulent conveyance law) of the filing of bankruptcy. Similarly, a suit against the debtor on the related mortgage note may take several years and, generally, is a remedy alternative to foreclosure, the mortgagee being precluded from pursuing both at the same time.

In the case of foreclosure under either a mortgage or a deed of trust, the sale by the referee or other designated officer or by the trustee is a public sale. However, because of the difficulty potential third-party purchasers at the sale have in determining the exact status of title and because the physical condition of the property may have deteriorated during the foreclosure proceedings, it is uncommon for a third party to purchase the property at a foreclosure sale. Rather, it is common for the lender to purchase the property from the trustee or referee for an amount which may be equal to the unpaid principal amount of the mortgage note secured by the mortgage or deed of trust plus accrued and unpaid interest and the expenses of foreclosure, in which event the mortgagor's debt will be extinguished or the lender may purchase for a lesser amount in order to preserve its right against a borrower to seek a deficiency judgment in states where such a judgment is available. Thereafter, subject to the right of the borrower in some states to remain in possession during the redemption period, the lender will assume the burdens of ownership, including obtaining hazard insurance, paying taxes and making such repairs at its own

40

Table of Contents

expense as are necessary to render the property suitable for sale. The lender will commonly obtain the services of a real estate broker and pay the broker's commission in connection with the sale of the property. Depending upon market conditions, the ultimate proceeds of the sale of the property may not equal the lender's investment in the property. Any loss may be reduced by the receipt of any mortgage guaranty insurance proceeds.

*Junior Mortgages; Rights of Senior Mortgages.* The mortgage loans included in the trust estate for a series will be secured by mortgages or deeds of trust which may be second or more junior mortgages to other mortgages held by other lenders or institutional investors. The rights of the trust estate (and therefore the holders), as mortgagee under a junior mortgage, are subordinate to those of the mortgagee under the senior mortgage, including the prior rights of the senior mortgagee to receive hazard insurance and condemnation proceeds and to cause the property securing the mortgage loan to be sold upon default of the mortgagor, thereby extinguishing the junior mortgagee's lien unless the junior mortgagee asserts its subordinate interest in the property in foreclosure litigation and, possibly, satisfies the defaulted senior mortgage. A junior mortgagee may satisfy a defaulted senior loan in full and, in some states, may cure such default and bring the senior loan current, in either event adding the amounts expended to the balance due on the junior loan. In most states, absent a provision in the mortgage or deed of trust, no notice of default is required to be given to a junior mortgagee.

The standard form of the mortgage used by most institutional lenders confers on the mortgagee the right both to receive all proceeds collected under any hazard insurance policy and all awards made in connection with condemnation proceedings, and to apply such proceeds and awards to any indebtedness secured by the mortgage, in such order as the mortgagee may determine. Thus, in the event improvements on the property are damaged or destroyed by fire or other casualty, or in the event the property is taken by condemnation, the mortgagee or beneficiary under underlying senior mortgages will have the prior right to collect any insurance proceeds payable under a hazard insurance policy and any award of damages in connection with the condemnation and to apply the same to the indebtedness secured by the senior mortgages. Proceeds in excess of the amount of senior mortgage indebtedness, in most cases, may be applied to the indebtedness of a junior mortgage.

Another provision sometimes found in the form of the mortgage or deed of trust used by institutional lenders obligates the mortgagor to pay before delinquency all taxes and assessments on the property and, when due, all encumbrances, charges and liens on the property which appear prior to the mortgage or deed of trust, to provide and maintain fire insurance on the property, to maintain and repair the property and not to commit or permit any waste thereof, and to appear in and defend any action or proceeding purporting to affect the property or the rights of the mortgagee under the mortgage. Upon a failure of the mortgagor to perform any of these obligations, the mortgagee is given the right under certain mortgages to perform the obligation itself, at its election, with the mortgagor agreeing to reimburse the mortgagee for any sums expended by the mortgagee on behalf of the mortgagor. All sums so expended by the mortgagee become part of the indebtedness secured by the mortgage.

**Foreclosure On Cooperative Shares**

The cooperative shares and proprietary lease or occupancy agreement owned by the tenant- stockholder and pledged to the lender are, in almost all cases, subject to restrictions on transfer as set forth in the cooperative's certificate of incorporation and by-laws, as well as in the proprietary lease or occupancy agreement, and may be canceled by the cooperative for failure by the tenant- stockholder to pay rent or other obligations or charges owed by the tenant-stockholder.

41

Table of Contents

including mechanics' liens against the cooperative apartment building incurred by the tenant-stockholder. Typically, rent and other obligations and charges arising under a proprietary lease or occupancy agreement that are owed to the cooperative are made liens upon the shares to which the proprietary lease or occupancy agreement relates. In addition, the proprietary lease or occupancy agreement generally permits the cooperative to terminate the lease or agreement in the event the tenant-stockholder fails to make payments or defaults in the performance of covenants required thereunder. Typically, the lender and the cooperative enter into a recognition agreement that, together with any lender protection provisions contained in the proprietary lease, establishes the rights and obligations of both parties in the event of a default by the tenant-stockholder on its obligations under the proprietary lease or occupancy agreement. A default by the tenant-stockholder under the proprietary lease or occupancy agreement will usually constitute a default under the security agreement between the lender and the tenant-stockholder.

The recognition agreement generally provides that, in the event that the tenant-stockholder has defaulted under the proprietary lease or occupancy agreement, the cooperative will take no action to terminate the lease or agreement until the lender has been provided with notice of and an opportunity to cure the default. The recognition agreement typically provides that if the proprietary lease or occupancy agreement is terminated, the cooperative will recognize the lender's lien against proceeds from a sale of the cooperative apartment, subject, however, to the cooperative's right to sums due under the proprietary lease or occupancy agreement or that have become liens on the shares relating to the proprietary lease or occupancy agreement. The total amount owed to the cooperative by the tenant-stockholder, which the lender generally cannot restrict and does not monitor, could reduce the value of the collateral below the outstanding principal balance of the cooperative loan and accrued and unpaid interest thereon.

Recognition agreements also provide that in the event of a foreclosure on a cooperative loan, the lender must obtain the approval or consent of the cooperative as required by the proprietary lease before transferring the cooperative shares or assigning the proprietary lease. Generally, the lender is not limited in any rights it may have to dispossess the tenant-stockholders.

Under the laws applicable in most states, foreclosure on the cooperative shares is accomplished by a sale in accordance with the provisions of Article 9 of the UCC and the security agreement relating to those shares. Article 9 of the UCC requires that a sale be conducted in a "commercially reasonable" manner. Whether a foreclosure sale has been conducted in a commercially reasonable manner will depend on the facts in each case. In determining commercial reasonableness, a court will look to the notice given the debtor and the method, manner, time, place and terms of the foreclosure. Generally, a sale conducted according to the usual practice of banks selling similar collateral will be considered reasonably conducted.

Article 9 of the UCC provides that the proceeds of the sale will be applied first to pay the costs and expenses of the sale and then to satisfy the indebtedness secured by the lender's security interest. The recognition agreement, however, generally provides that the lender's right to reimbursement is subject to the right of the cooperative corporation to receive sums due under the proprietary lease or occupancy agreement. If there are proceeds remaining, the lender must account to the tenant-stockholder for the surplus. Conversely, if a portion of the indebtedness remains unpaid, the tenant-stockholder is generally responsible for the deficiency. See "—Anti-Deficiency Legislation and Other Limitations on Lenders" below.

42

Table of Contents

## Repossession With Respect To Manufactured Housing Contracts

Repossession of manufactured housing is governed by state law. A few states have enacted legislation that requires that the debtor be given an opportunity to cure its default (typically 30 days to bring the account current) before repossession can commence. Unless as a manufactured home has not become so attached to real estate that it would be treated as a part of the real estate under the law of the state where it is located, repossession of the manufactured home in the event of a default by the obligor will generally be governed by the UCC. Article 9 of the UCC provides the statutory framework for the repossession of manufactured housing. While the UCC as adopted by the various states may vary in minimal ways, the general repossession procedure established by the UCC is as follows:



- Except in those states where the debtor must receive notice of the right to cure a default, repossession can commence immediately upon default without prior notice. Repossession maybe effected either through self- help pursuant to a peaceable retaking without court order, voluntary repossession or through judicial process by means of repossession under a court-issued writ of replevin. The self-help or voluntary repossession methods are more commonly employed, and are accomplished simply by retaking possession of the manufactured home. In cases in which the debtor objects or raises a defense to repossession, a court order must be obtained from the appropriate state court, and the manufactured home must then be repossessed in accordance with that order. Whether the method employed is self-help, voluntary repossession or judicial repossession, the repossession can be accomplished either by an actual physical removal of the manufactured home to a secure location for refurbishment and resale or by removing the occupants and their belongings from the manufactured home and maintaining possession of the manufactured home on the location where the occupants were residing. Various factors may affect whether the manufactured home is physically removed or left on location, such as the nature and term of the lease of the site on which it is located and the condition of the unit. In many cases, leaving the manufactured home on location is preferable if the home is already set up because the expenses of retaking and redelivery will be saved. However, in those cases where the home is left on location, expenses for site rentals will usually be incurred.

- Once repossession has been achieved, preparation for the subsequent disposition of the manufactured home can commence. The disposition may be by public or private sale provided the method, manner, time, place and terms of the sale are commercially reasonable.

Sale proceeds are to be applied first to repossession expenses like those expenses incurred in retaking, storage, preparing for sale including refurbishing costs and selling, and then to satisfaction of the indebtedness. While several states impose prohibitions or limitations on deficiency judgments if the net proceeds from resale do not cover the full amount of the indebtedness, the remainder may be sought from the debtor in the form of a deficiency judgment in those states that do not prohibit or limit deficiency judgments. The deficiency judgment is a personal judgment against the debtor for the shortfall. Occasionally, after resale of a manufactured home and payment of all expenses and indebtedness, there is a surplus of funds. In that case, the UCC requires the party suing for the deficiency judgment to remit the surplus to the debtor. Because the defaulting owner of a manufactured home generally has very little capital or income available following repossession, a deficiency judgment may not be sought in many cases or, if obtained, will be settled at a significant discount in light of the defaulting owner's strained financial condition.

43

000194

Table of Contents

*Rights of Redemption.* In some states, after sale pursuant to a deed of trust or foreclosure of a mortgage, the trustor or mortgagor and foreclosed junior lienors are given a statutory period in which to redeem the property from the foreclosure sale. The right of redemption should be distinguished from the equity of redemption, which is a non-statutory right that must be exercised prior to the foreclosure sale. In some states, redemption may occur only upon payment of the entire principal balance of the loan, accrued interest and expenses of foreclosure. In other states, redemption may be authorized if the former borrower pays only a portion of the sums due. The effect of a statutory right of redemption is to diminish the ability of the lender to sell the foreclosed property. The exercise of a right of redemption would defeat the title of any purchaser at a foreclosure sale, or of any purchaser from the lender subsequent to foreclosure or sale under a deed of trust. Consequently the practical effect of a right of redemption is to force the lender to retain the property and pay the expenses of ownership until the redemption period has run. In some states, there is no right to redeem property after a trustee's sale under a deed of trust.

*Anti-Deficiency Legislation and Other Limitations on Lenders.* Certain states have imposed statutory prohibitions which limit the remedies of a beneficiary under a deed of trust or a mortgage under a mortgage. In some states, statutes limit the right of the beneficiary or mortgagee to obtain a deficiency judgment against the borrower following foreclosure or sale under a deed of trust. A deficiency judgment is a personal judgment against the former borrower equal in most cases to the difference between the net amount realized upon the public sale of the real property and the amount due to the lender. Other statutes require the beneficiary or mortgagee to exhaust the security afforded under a deed of trust or mortgage by foreclosure in an attempt to satisfy the full debt before bringing a personal action against the borrower. In certain other states, the lender has the option of bringing a personal action against the borrower on the debt without first exhausting such security; however, in some of these states, the lender, following judgment on such personal action, may be deemed to have elected a remedy and may be precluded from exercising remedies with respect to the security. Consequently, the practical effect of the election requirement, when applicable, is that lenders will usually proceed first against the security rather than bringing a personal action against the borrower. Finally, other statutory provisions limit any deficiency judgment against the former borrower following a foreclosure sale to the excess of the outstanding debt over the fair market value of the property at the time of the public sale. The purpose of these statutes is generally to prevent a beneficiary or a mortgagee from obtaining a large deficiency judgment against the former borrower as a result of low or no bids at the foreclosure sale.

In addition to laws limiting or prohibiting deficiency judgments, numerous other statutory provisions, including the federal bankruptcy laws, the federal Servicemembers Relief Act, and state laws affording relief to debtors, may interfere with or affect the ability of the secured lender to realize upon collateral and/or enforce a deficiency judgment. For example, with respect to federal bankruptcy law, the filing of a petition acts as a stay against the enforcement of remedies for collection of a debt. Moreover, a court with federal bankruptcy jurisdiction may permit a debtor through a Chapter 13 Bankruptcy Code rehabilitative plan to cure a monetary default with respect to a loan on a debtor's residence by paying arrearages within a reasonable time period and reinstating the original loan payment schedule even though the lender accelerated the loan and the lender has taken all steps to realize upon his security (provided no sale of the property has yet occurred) prior to the filing of the debtor's Chapter 13 petition. Some courts with federal bankruptcy jurisdiction have approved plans, based on the particular facts of the reorganization case, that effected the curing of a loan default by permitting the obligor to pay arrearages over a number of years.

44

Table of Contents

Courts with federal bankruptcy jurisdiction have also indicated that the terms of a mortgage loan may be modified if the borrower has filed a petition under Chapter 13. These courts have suggested that such modifications may include reducing the amount of each monthly payment, changing the rate of interest, altering the repayment schedule and reducing the lender's security interest to the value of the residence, thus leaving the lender a general unsecured creditor for the difference between the value of the residence and the outstanding balance of the loan. Federal bankruptcy law and limited case law indicate that the foregoing modifications could not be applied to the terms of a loan secured by property that is the principal residence of the debtor. In all cases, the secured creditor is entitled to the value of its security plus post-petition interest, attorney's fees and costs to the extent the value of the security exceeds the debt.

In a Chapter 11 case under the Bankruptcy Code, the lender is precluded from foreclosing without authorization from the bankruptcy court. The lender's lien may be transferred to other collateral and/or be limited in amount to the value of the lender's interest in the collateral as of the date of the bankruptcy. The loan term may be extended, the interest rate may be adjusted to market rates and the priority of the loan may be subordinated to bankruptcy court-approved financing. The bankruptcy court can, in effect, invalidate due-on-sale clauses through confirmed Chapter 11 plans of reorganization.

The Bankruptcy Code provides priority to certain tax liens over the lender's security. This may delay or interfere with the enforcement of rights in respect of a defaulted loan. In addition, substantive requirements are imposed upon lenders in connection with the organization and the servicing of mortgage loans by numerous federal and some state consumer protection laws. The laws include the federal Truth in Lending Act, Regulation Z, Real Estate Settlement Procedures Act, Regulation X, Equal Credit Opportunity Act, Regulation B, Fair Credit Billing Act, Fair Hosing Act, Fair Credit Reporting Act and related statutes and regulations. These federal laws impose specific statutory liabilities upon lenders who originate loans and who fail to comply with the provisions of the law. In some cases, this liability may affect assignees of the loans.

In addition, some of the mortgage loans may be subject to special rules, disclosure requirements and other provisions that were added to the federal Truth-in-Lending Act by the Home Ownership and Equity Protection Act of 1994 (the "Homeownership Act"), if such mortgage loans were originated on or after October 1, 1995, are not loans made to finance the purchase of the mortgaged property and have mortgage rates or origination costs in excess of certain prescribed levels (the "High Cost Loans"). The Homeownership Act requires certain additional disclosures, specifies the timing of those disclosures and limits or prohibits inclusion of certain provisions in mortgages subject to the Homeownership Act. Purchasers or assignees of any High Cost Loan, including the trust, could be liable under federal law for all claims and subject to all defenses that the borrower could not with reasonable diligence have determined that the loan was subject to the provisions of the Homeownership Act. Remedies available to the borrower include monetary penalties, as well as rescission rights if appropriate disclosures were not given as required or if the particular mortgage includes provisions prohibited by the law. The maximum damages that may be recovered under these provisions from an assignee, including the trust, is the remaining amount of indebtedness plus the total amount paid by the borrower in connection with the mortgage loan.

45



Table of Contents

For Cooperative Loans

Generally, Article 9 of the UCC governs foreclosure on cooperative shares and the related proprietary lease or occupancy agreement. Several courts have interpreted Section 9-504 of the UCC to prohibit a deficiency award unless the creditor establishes that the sale of the collateral, which, in the case of a cooperative loan, would be the shares of the cooperative and the related proprietary lease or occupancy agreement, was conducted in a commercially reasonable manner.

*Due-On-Sale Clauses In Mortgage Loans.* Due-on-sale clauses permit the lender to accelerate the maturity of the loan if the borrower sells or transfers, whether voluntarily or involuntarily, all or part of the real property securing the loan without the lender's prior written consent. The enforceability of these clauses has been the subject of legislation or litigation in many states, and in some cases, typically involving single-family residential mortgage transactions, their enforceability has been limited or denied. The Garn-St. Germain Depository Institutions Act of 1982 preempts state constitutional, statutory and case law that prohibits the enforcement of due-on-sale clauses and permits lenders to enforce these clauses in accordance with their terms, subject to certain exceptions. Also, the Garn-St. Germain Act does "encourage" lenders to permit assumption of loans at the original rate of interest or at some other rate less than the average of the original rate and the market rate.

The Garn-St Germain Act also sets forth nine specific instances in which a mortgage lender covered by the Garn-St Germain Act, including federal savings and loan associations and federal savings banks, may not exercise a due-on-sale clause, even though a transfer of the property may have occurred. These include intra-family transfers, some transfers by operation of law, leases of fewer than three years and the creation of a junior encumbrance. Regulations promulgated under the Garn-St Germain Act also prohibit the imposition of a prepayment penalty upon the acceleration of a loan in accordance with a due-on-sale clause.

In addition, under federal bankruptcy law, due-on-sale clauses may not be enforceable in bankruptcy proceedings and may, under certain circumstances, be eliminated in any modified mortgage resulting from such bankruptcy proceeding.

*Enforceability of Prepayment and Late Payment Fees.* Some state laws restrict the imposition of prepayment charges and late fees even when the loans expressly provide for the collection of those charges. Although the Alternative Mortgage Transaction Parity Act of 1982 (the "Parity Act"), permits the collection of prepayment charges and late fees in connection with some types of eligible loans preempting any contrary state law prohibitions, some states may not recognize the preemptive authority of the Parity Act or have formally opted out of the Parity Act. As a result, it is possible that prepayment charges and late fees may not be collected even on loans that provide for the payment of those charges. The servicer or another entity identified in the accompanying prospectus supplement will be entitled to all prepayment charges and late payment charges received on the loans and those amounts will not be available for payment on the certificates. The Office of Thrift Supervision ("OTS"), the agency that administers the Parity Act for unregulated housing creditors, withdrew its favorable Parity Act regulations and Chief Counsel Opinions that previously authorized lenders to charge prepayment charges and late fees in certain circumstances notwithstanding contrary state law, effective with respect to loans originated on or after July 1, 2003. However, the OTS's ruling does not retroactively affect loans originated before July 1, 2003.

*Equitable Limitations on Remedies.* In connection with lenders' attempts to realize upon their security, courts have invoked general equitable principles. The equitable principles are generally designed to relieve the borrower from the legal effect of the borrower's default under

000197



Table of Contents

the loan documents. Such equitable relief has included court-imposed requirements that the lender undertake affirmative and sometimes costly actions to determine the causes of the borrower's default and the likelihood that the borrower will be able to reinstate the loan. In some cases, courts have required that lenders reinstate loans or recast payment schedules in order to accommodate borrowers who are suffering from temporary financial disability. In other cases, courts have limited the right of a lender to realize upon its security if the default under the security agreement is not monetary, such as the borrower's failure to adequately maintain the property or the borrower's execution of secondary financing affecting the property. Finally, some courts have considered whether federal or state constitutional requirements of "due process" require that borrowers under security agreements receive notices in addition to the statutorily prescribed minimums. For the most part, these cases have upheld the notice provisions as being reasonable or have found that, in cases involving the sale by a trustee under a deed of trust or by a mortgagee under a mortgage having a power of sale, there is insufficient state action to afford constitutional protections to the borrower.

Most conventional single-family mortgage loans may be prepaid in full or in part without penalty. The regulations of the Federal Home Loan Bank Board prohibit the imposition of a prepayment penalty or equivalent fee for or in connection with the acceleration of a loan by exercise of a due-on-sale clause. A mortgagee to whom a prepayment in full has been tendered may be compelled to give either a release of the mortgage or an instrument assigning the existing mortgage. The absence of a restraint on prepayment, particularly with respect to mortgage loans having higher mortgage rates, may increase the likelihood of refinancing or other early retirements of such mortgage loans.

*Applicability of Usury Laws.* Title V of the Depository Institutions Deregulation and Monetary Control Act of 1980, enacted in March 1980 ("Title V"), provides that state usury limitations shall not apply to certain types of residential first mortgage loans originated by certain lenders after March 31, 1980. Similar federal statutes were in effect with respect to mortgage loans made during the first three months of 1980. The Federal Home Loan Bank Board is authorized to issue rules and regulations and to publish interpretations governing implementation of Title V. Title V authorizes any state to reimpose interest rate limits by adopting, before April 1, 1983, a state law, or by certifying that the voters of such state have voted in favor of any provision, constitutional or otherwise, which expressly rejects an application of the federal law. Fifteen states adopted such a law prior to the April 1, 1983 deadline. In addition, even where Title V is not so rejected, any state is authorized by the law to adopt a provision limiting discount points or other charges on mortgage loans covered by Title V.

**The Home Improvement Contracts**

Home improvement contracts that are secured by the home improvements financed grant to the originator of such contracts a purchase money security interest in the home improvements to secure all or part of the purchase price or a release of the home improvements and related services. A financing statement generally is not required to be filed to perfect a purchase money security interest in consumer goods. Such purchase money security interests are assignable.

In general, a purchase money security interest grants to the holder a security interest that has priority over a conflicting security interest in the same collateral and the proceeds of such collateral. However, to the extent that the collateral subject to a purchase money security interest becomes a fixture, in order for the related purchase money security interest to take priority over a conflicting interest in the fixture, the holder's interest in such collateral must generally be perfected by a timely fixture filing. In general, under the Uniform Commercial Code (the

47

Table of Contents

"UCC"), a security interest does not exist under the UCC in ordinary building material incorporated into an improvement on land. Home improvement contracts that finance lumber, bricks, other types of ordinary building material or other goods that are deemed to lose such characterization, upon incorporation of such materials into the related property, will not be secured by a purchase money security interest in the home improvement being financed.

*Enforcement of Security Interest In Home Improvements.* So long as home improvements have not become fixtures subject to real property laws, a creditor can repossess home improvements securing a home improvement contract by voluntary surrender, by "self-help" repossession that is peaceful (i.e., without breach of the peace) or, in the absence of voluntary surrender and the ability to repossess without breach of the peace, by judicial process. The holder of such a home improvement contract must give the debtor a number of days' notice, which varies from 10 to 30 days depending on the state, prior to commencement of any repossession. The UCC and consumer protection laws in most states place restrictions on repossession sales, including requiring prior notice to the debtor and commercial reasonableness in effecting such a sale. The laws in most states also require that the debtor be given notice of any sale prior to resale of the unit so that the debtor may redeem it at or before such resale.

Under the laws applicable in most states, a creditor is entitled to obtain a deficiency judgement from a debtor for any deficiency following repossession and resale of the property securing the debtor's loan. However, some states impose prohibitions or limitations on deficiency judgements, and in many cases the defaulting borrower would have no assets with which to pay a judgement.

Certain other statutory provisions, including federal and state bankruptcy and insolvency laws and general equitable principles may limit or delay the ability of a lender to repossess and resell collateral or enforce a deficiency judgment.

*Consumer Protection Laws.* The so-called "Holder-in-Due-Course" rule of the Federal Trade Commission is intended to defeat the ability of the transferor of a consumer credit contract, if such transferor is the seller of the goods which gave rise to the transaction (and certain related lenders and assignees), to transfer such contract free of notice of claims by the debtor thereunder. The effect of the rule is to subject the assignee of such a contract to all claims and defenses which the debtor could assert against the seller of goods. Liability under this rule is limited to amounts paid under a contract; however, the obligor also may be able to assert the rule to offset remaining amounts due as a defense against a claim brought by the assignee against such obligor. Numerous other federal and state consumer protection laws impose requirements applicable to the home improvement contracts, including the Truth in Lending Act, the Federal Trade Commission Act, the Fair Credit Billing Act, the Fair Credit Reporting Act, the Equal Credit Opportunity Act, the Fair Debt Collection Practices Act and the Uniform Consumer Credit Code. In the case of some of these laws, the failure to comply with their provisions may affect the enforceability of the related contract.

*Applicability of Usury Laws.* Title V provides that, subject to certain conditions, state usury limitations shall not apply to any contract which is secured by a first lien on certain kinds of consumer goods. In the case of home improvement contracts secured by home improvements which have not become fixtures, such conditions include, among other things, restrictions on prepayment fees, late charges and deferral fees and a 30-day notice period prior to instituting any action leading to repossession of the related unit.

48

Title V authorized any state to reimpose limitations on interest rates and finance charges by adopting, before April 1, 1983, a law or constitutional provision which expressly rejects application of the federal law. Fifteen states adopted such a law prior to the April 1, 1983 deadline. In addition, even where Title V was not so rejected, any state is authorized by the law to adopt a provision limiting discount points or other charges on loans covered by Title V.

**Installment Contracts**

The loans may also consist of installment contracts. Under an installment contract, the seller retains legal title to the property and enters into an agreement with the purchaser for the payment of the purchase price, plus interest, over the term of such contract. Only after full performance by the purchaser of the contract is the seller obligated to convey title to the property to the purchaser. As with mortgage or deed of trust financing, during the term of the installment contract, the purchaser is generally responsible for maintaining the property in good condition and for paying real estate taxes, assessments and hazard insurance premiums associated with the property.

The method of enforcing the rights of the seller under an installment contract varies on a state-by-state basis depending upon the extent to which state courts are willing, or able pursuant to state statute, to enforce the contract strictly according to the terms. The terms of installment contracts generally provide that upon a default by the purchaser, the purchaser loses his or her right to occupy the property, the entire indebtedness is accelerated, and the purchaser's equitable interest in the property is forfeited.

The seller in such a situation does not have to foreclose in order to obtain title to the property, although in some cases, a quiet title action is in order if the purchaser has filed the installment contract in local land records, and an ejectment action may be necessary to recover possession. In a few states, particularly in cases of a purchaser default during the early years of an installment contract, the courts will permit ejectment of the purchaser and a forfeiture of his or her interest in the property. However, most state legislatures have enacted provisions by analogy to mortgage law protecting purchasers under installment contracts from the harsh consequences of forfeiture. Under such statutes, a judicial or nonjudicial foreclosure may be required, the seller may be required to give notice of default, the purchaser may be granted some grace period during which the installment contract may be reinstated upon full payment of the default amount, and the purchaser may have a post-foreclosure statutory redemption right. In other states, courts in equity may permit a purchaser with significant investment in the property under an installment contract for the sale of real estate to share in the proceeds of sale of the property after the indebtedness is repaid or may otherwise refuse to enforce the forfeiture clause. Nevertheless, generally speaking, the seller's procedures for obtaining possession and clear title under an installment contract in a given state are simpler and less time-consuming and costly than are the procedures for foreclosing and obtaining clear title to a property subject to one or more liens.

**Servicemembers Civil Relief Act**

Under the Servicemembers Civil Relief Act, members of all branches of the military on active duty, including draftees and reservists in military service, (1) are entitled to have interest rates reduced and capped at 6% per annum, on obligations (including mortgage loans) incurred prior to the commencement of military service for the duration of military service, (2) may be entitled to a stay of proceedings on any kind of foreclosure or repossession action in the case of defaults on those obligations entered into prior to military service for the duration of military service and (3) may have the maturity of the obligations incurred prior to military service

49



Table of Contents

extended, the payments lowered and the payment schedule readjusted for a period of time after the completion of military service. However, the benefits of (1), (2), or (3) above are subject to challenge by creditors and if, in the opinion of the court, the ability of a person to comply with the obligations is not materially impaired by military service, the court may apply equitable principles accordingly. If a borrower's obligation to repay amounts otherwise due on a mortgage loan included in a trust estate for a series is relieved under the Servicemembers Civil Relief Act, none of the trust estate, the servicer, the sponsor nor the trustee will be required to advance the amounts, and any loss in respect thereof may reduce the amounts available to be paid to the holders of the securities of that series.

### Environmental Legislation



Under the federal Comprehensive Environmental Response, Compensation and Liability Act, as amended, and under several state laws, a secured party which takes a deed-in-lieu of foreclosure, purchases a mortgaged property at a foreclosure sale, or operates a mortgaged property may become liable for the costs of cleaning up hazardous substances regardless of whether they have contaminated the property. CERCLA imposes strict as well as joint and several liability on several classes of potentially responsible parties, including current owners and operators of the property who did not cause or contribute to the contamination. Furthermore, liability under CERCLA is not limited to the original or unamortized principal balance of a loan or to the value of the property securing a loan. Lenders may be held liable under CERCLA as owners or operators unless they qualify for the secured creditor exemption to CERCLA. This exemption exempts from the definition of owners and operators those who, without participating in the management of a facility, hold indicia of ownership primarily to protect a security interest in the facility. What constitutes sufficient participation in the management of a property securing a loan or the business of a borrower to render the exemption unavailable to a lender has been a matter of interpretation by the courts. CERCLA has been interpreted to impose liability on a secured party even absent foreclosure where the party participated in the financial management of the borrower's business to a degree indicating a capacity to influence waste disposal decisions. However, court interpretations of the secured creditor exemption have been inconsistent. In addition, when lenders foreclose and become owners of collateral property, courts are inconsistent as to whether that ownership renders the secured creditor exemption unavailable. Other federal and state laws may impose liability on a secured party which takes a deed-in-lieu of foreclosure, purchases a mortgaged property at a foreclosure sale, or operates a mortgaged property on which contaminants other than CERCLA hazardous substances are present, including petroleum, agricultural chemicals, hazardous wastes, asbestos, radon, and lead- based paint. Environmental cleanup costs may be substantial. It is possible that the cleanup costs could become a liability of a trust estate and reduce the amounts otherwise distributable to the holders of the related series of securities. Moreover, there are federal statutes and state statutes that impose an environmental lien for any cleanup costs incurred by the state on the property that is the subject of the cleanup costs. All subsequent liens on a property generally are subordinated to an environmental lien and in some states even prior recorded liens are subordinated to environmental liens. In the latter states, the security interest of the trust estate in a related parcel of real property that is subject to an environmental lien could be adversely affected.

Traditionally, many residential mortgage lenders have not taken steps to evaluate whether contaminants are present with respect to any mortgaged property prior to the origination of the mortgage loan or prior to foreclosure or accepting a deed-in-lieu of foreclosure. Accordingly, the servicer has not made and will not make these kinds of evaluations prior to the origination of the mortgage loans. Neither the servicer nor any replacement servicer will be required by any servicing agreement to undertake any environmental evaluations prior to foreclosure or accepting



50

000201



Table of Contents

a deed-in-lieu of foreclosure. The servicer will not make any representations or warranties or assume any liability with respect to the absence or effect of contaminants on any related real property or any casualty resulting from the presence or effect of contaminants. The servicer will not be obligated to foreclose on related real property or accept a deed-in-lieu of foreclosure if it knows or reasonably believes that there are material contaminated conditions on a property. A failure so to foreclose may reduce the amounts otherwise available to security holders of the related series.

**Consumer Protection Laws**

Federal, state and local laws extensively regulate various aspects of brokering, originating, servicing and collecting loans secured by consumers' dwellings. Among other things, these laws may regulate interest rates and other charges, require disclosures, impose financial privacy requirements, mandate specific business practices, and prohibit unfair and deceptive trade practices. In addition, licensing requirements may be imposed on persons that broker, originate, service or collect such loans.

Additional requirements may be imposed under federal, state or local laws on so-called "high cost mortgage loans," which typically are defined as loans secured by a consumer's dwelling that have interest rates or origination costs in excess of prescribed levels. These laws may limit certain loan terms, such as prepayment penalties, or the ability of a creditor to refinance a loan unless it is in the borrower's interest. In addition, certain of these laws may allow claims against loan brokers or originators, including claims based on fraud or misrepresentations, to be asserted against persons acquiring the loans, such as the trust estate.

The federal laws that may apply to loans held in the trust estate include the following:

- the Truth in Lending Act and its regulations, which (among other things) require disclosures to borrowers regarding the terms of loans and provide consumers who pledged their principal dwelling as collateral in a non-purchase money transaction with a right of rescission that generally extends for three days after proper disclosures are given;

- the Home Ownership and Equity Protection Act and its regulations, which (among other things) imposes additional disclosure requirements and limitations on loan terms with respect to non-purchase money, installment loans secured by the consumer's principal dwelling that have interest rates or origination costs in excess of prescribed levels;

- the Home Equity Loan Consumer Protection Act and its regulations, which (among other things) limits changes that may be made to open-end loans secured by the consumer's dwelling, and restricts the ability to accelerate balances or suspend credit privileges on such loans;

- the Real Estate Settlement Procedures Act and its regulations, which (among other things) prohibit the payment of referral fees for real estate settlement services (including mortgage lending and brokerage services) and regulate escrow accounts for taxes and insurance and billing inquiries made by borrowers;

- the Equal Credit Opportunity Act and its regulations, which (among other things) generally prohibits discrimination in any aspect of a credit transaction on certain enumerated basis, such as age, race, color, sex, religion, marital status, national origin or receipt of public assistance;

51



000202



Table of Contents

- the Fair Credit Reporting Act, which (among other things) regulates the use of consumer reports obtained from consumer reporting agencies and the reporting of payment histories to consumer reporting agencies; and
- the Federal Trade Commission's Rule on Preservation of Consumer Claims and Defenses, which generally provides that the rights of an assignee of a conditional sales contract (or of certain lenders making purchase money loans) to enforce a consumer credit obligation are subject to the claims and defenses that the consumer could assert against the seller of goods or services financed in the credit transaction.

The penalties for violating these federal, state, or local laws vary depending on the applicable law and the particular facts of the situation. However, private plaintiffs typically may assert claims for actual damages and, in some cases, also may recover civil money penalties or exercise a right to rescind the loan. Violations of certain laws may limit the ability to collect all or part of the principal or interest on a loan and, in some cases, borrowers even may be entitled to a refund of amounts previously paid. Federal, state and local administrative or law enforcement agencies also may be entitled to bring legal actions, including actions for civil money penalties or restitution, for violations of certain of these laws.

Depending on the particular alleged misconduct, it is possible that claims may be asserted against various participants in secondary market transactions, including assignees that hold the loans, such as the trust estate. Losses on loans from the application of these federal, state and local laws that are not otherwise covered by a credit enhancement will be borne by the holders of one or more classes of securities.

## THE SPONSOR AND THE SERVICER

Accredited Home Lenders, Inc. is a nationwide mortgage banking institution engaged in the business of originating, acquiring, servicing and selling mortgage loans secured by one- to four-family residential properties. Accredited's principal business strategy is to originate mortgage loans which do not conform to credit or other criteria established by Fannie Mae or Freddie Mac, commonly referred to as "nonconforming" and "subprime" mortgage loans.

## THE DEPOSITOR

Either Accredited Home Lenders, Inc. or Accredited Mortgage Loan REIT Trust, a Maryland real estate investment trust, will act as the depositor. The depositor will transfer the loans to the related issuing entity.

## USE OF PROCEEDS

The depositor will apply all or substantially all of the net proceeds from the sale of each series of securities for one or more of the following purposes: (i) to purchase the related mortgage assets, (ii) to repay indebtedness which has been incurred to obtain funds to acquire such mortgage assets, (iii) to establish any reserve funds described in the related prospectus supplement and (iv) to pay costs of structuring and issuing such securities, including the costs of obtaining credit enhancement, if any.

52

Table of Contents

## MATERIAL FEDERAL INCOME TAX CONSEQUENCES

The following is a general discussion of the material anticipated federal income tax consequences to investors of the purchase, ownership and disposition of the securities offered hereby. The discussion is based upon laws, regulations, rulings and decisions now in effect, all of which are subject to change. The discussion below does not purport to deal with all federal tax consequences applicable to all categories of investors, some of which may be subject to special rules. Investors are urged to consult their own tax advisors in determining the particular federal, state, local and other tax consequences to them of the purchase, ownership and disposition of the securities. References in this section to "sections" and the "code" refer to the Internal Revenue Code of 1986, as amended.

The following discussion addresses securities of four general types:

- securities representing interests in a grantor trust which the sponsor will covenant not to elect to have treated as a REMIC;

- securities representing interests in a trust, or a portion thereof, which the sponsor will covenant to elect to have treated as a REMIC under sections 860A through 860G;

- securities that are intended to be treated for federal income tax purposes as indebtedness secured by the underlying loans; and

- securities representing interests in a trust that is intended to be treated as a partnership under the code.

The prospectus supplement for each series of securities will indicate whether a REMIC election (or elections) will be made for the related trust and, if a REMIC election is to be made, will identify all "regular interests" and "residual interests" in the REMIC.

The Taxpayer Relief Act of 1997 adds provisions to the code that require the recognition of gain upon the "constructive sale of an appreciated financial position." A constructive sale of an appreciated financial position occurs if a taxpayer enters into transactions with respect to a financial instrument that have the effect of substantially eliminating the taxpayer's risk of loss and opportunity for gain with respect to the financial instrument. These provisions apply only to classes of securities that do not have a principal balance.

### Grantor Trust Securities

With respect to each series of grantor trust securities, Dewey Ballantine LLP, special tax counsel to the sponsor, will deliver its opinion to the sponsor that the related grantor trust will be classified as a grantor trust and not as a partnership or an association taxable as a corporation. The opinion shall be attached on Form 8-K to be filed with the Securities and Exchange Commission within fifteen days after the initial issuance of the securities or filed with the Securities and Exchange Commission as a post-effective amendment to the prospectus. Accordingly, each beneficial owner of a grantor trust security will generally be treated as the owner of an interest in the loans included in the grantor trust.

For purposes of the following discussion, a grantor trust security representing an undivided equitable ownership interest in the principal of the loans constituting the related grantor trust, together with interest thereon at a pass-through rate, will be referred to as a "grantor trust fractional interest security." A grantor trust security representing ownership of all or a

53

Table of Contents

portion of the difference between interest paid on the loans constituting the related grantor trust and interest paid to the beneficial owners of grantor trust fractional interest securities issued with respect to the grantor trust will be referred to as a "grantor trust strip security."

*Taxation of Beneficial Owners of Grantor Trust Securities*

Beneficial owners of grantor trust fractional interest securities generally will be required to report on their federal income tax returns their respective shares of the income from the loans (including amounts used to pay reasonable servicing fees and other expenses but excluding amounts payable to beneficial owners of any corresponding grantor trust strip securities) and, subject to the limitations described below, will be entitled to deduct their shares of any reasonable servicing fees and other expenses. If a beneficial owner acquires a grantor trust fractional interest security for an amount that differs from its outstanding principal amount, the amount includible in income on a grantor trust fractional interest security may differ from the amount of interest distributable thereon. See "Discount and Premium," below. Individuals holding a grantor trust fractional interest security directly or through pass-through entities will be allowed a deduction for reasonable servicing fees and expenses only to the extent that the aggregate of the beneficial owner's miscellaneous itemized deductions exceeds 2% of the beneficial owner's adjusted gross income. Further, beneficial owners (other than corporations) subject to the alternative minimum tax may not deduct miscellaneous itemized deductions in determining alternative minimum taxable income.

Beneficial owners of grantor trust strip securities generally will be required to treat the securities as "stripped coupons" under section 1286. Accordingly, that beneficial owner will be required to treat the excess of the total amount of payments on the security over the amount paid for the security as original issue discount and to include the discount in income as it accrues over the life of the security. See "—Discount and Premium," below.

Grantor trust fractional interest securities may also be subject to the coupon stripping rules if a class of grantor trust strip securities is issued as part of the same series of securities. The consequences of the application of the coupon stripping rules would appear to be that any discount arising upon the purchase of that security (and perhaps all stated interest thereon) would be classified as original issue discount and includible in the beneficial owner's income as it accrues (regardless of the beneficial owner's method of accounting), as described below under "—Discount and Premium." The coupon stripping rules will not apply, however, if (i) the pass-through rate is no more than 100 basis points lower than the gross rate of interest payable on the underlying loans and (ii) the difference between the outstanding principal balance on the security and the amount paid for the security is less than 0.25% of the principal balance times the weighted average remaining maturity of the security.

*Sales of Grantor Trust Securities*

Any gain or loss recognized on the sale of a grantor trust security (equal to the difference between the amount realized on the sale and the adjusted basis of the grantor trust security) will be capital gain or loss, except to the extent of accrued and unrecognized market discount, which will be treated as ordinary income, and in the case of banks and other financial institutions except as provided under section 582(c). The adjusted basis of a grantor trust security will generally equal its cost, increased by any income reported by the seller (including original issue discount and market discount income) and reduced (but not below zero) by any previously reported losses, any amortized premium and by any distributions of principal.



54

000205

Table of Contents

*Grantor Trust Reporting*

The trustee will furnish to each beneficial owner of a grantor trust fractional interest security with each distribution a statement setting forth the amount of the distribution allocable to principal on the underlying loans and to interest thereon at the related interest rate. In addition, within a reasonable time after the end of each calendar year, based on information provided by the servicer, the trustee will furnish to each beneficial owner during the year any customary factual information that the servicer deems necessary or desirable to enable beneficial owners of grantor trust securities to prepare their tax returns and will furnish comparable information to the Internal Revenue Service (the "IRS") as and when required to do so by law.

## REMIC Securities

If provided in a prospectus supplement, an election will be made to treat a trust as one or more REMICS. With respect to each series of securities for which that election is made, Dewey Ballantine LLP, special tax counsel to the sponsor, will deliver its opinion to the sponsor that, assuming compliance with the related pooling and servicing agreement, the trust will be treated as one or more REMICS for federal income tax purposes. A trust for which a REMIC election is made will be referred to in this prospectus as a "REMIC trust." The securities of each class will be designated as "regular interests" in the REMIC trust except that a separate class will be designated as the "residual interest" in the REMIC trust. The prospectus supplement for each series of securities will state whether securities of each class will constitute a REMIC regular security or a REMIC residual security. The opinion shall be attached on Form 8-K to be filed with the Securities and Exchange Commission within fifteen days after the initial issuance of the securities or filed with the Securities and Exchange Commission as a post-effective amendment to the prospectus.

A REMIC trust will not be subject to federal income tax except with respect to income from prohibited transactions and in other instances described below. See "—Taxes on a REMIC Trust." Generally, the total income from the mortgage loans in a REMIC trust will be taxable to the beneficial owners of the securities of that series, as described below.

Starting in 2005, the American Jobs Creation Act of 2004 (the "Jobs Act") allows REMICs to hold home equity loans and the assets needed to fund additional draws on these loans. If home equity loans are contributed to a REMIC, the accompanying tax consequences will be discussed separately in the prospectus supplement offering interests in that REMIC.

Regulations issued by the Treasury Department on December 23, 1992 (the "REMIC regulations") provide some guidance regarding the federal income tax consequences associated with the purchase, ownership and disposition of REMIC securities. While material provisions of the REMIC regulations are discussed below, investors should consult their own tax advisors regarding the possible application of the REMIC regulations in their specific circumstances.

*Special Tax Attributes*

REMIC regular securities and REMIC residual securities will be "regular or residual interests in a REMIC" within the meaning of section 7701(a)(19)(C)(xi) and "real estate assets" within the meaning of section 856(c)(5)(B). If at any time during a calendar year less than 95% of the assets of a REMIC trust consist of "qualified mortgages" (within the meaning of section 860G(a)(3)) then the portion of the REMIC regular securities and REMIC residual securities that are qualifying assets under those sections during the calendar year may be limited to the portion

55

Table of Contents

of the assets of the REMIC trust that are qualified mortgages. Similarly, income on the REMIC regular securities and REMIC residual securities will be treated as "interest on obligations secured by mortgages on real property" within the meaning of section 856(c)(3)(B) , subject to the same limitation as described in the preceding sentence. For purposes of applying this limitation, a REMIC trust should be treated as owning the assets represented by the qualified mortgages. The assets of the trust estate will include, in addition to the mortgage loans, payments on the mortgage loans held pending distribution on the REMIC regular securities and REMIC residual securities and any reinvestment income thereon. REMIC regular securities and REMIC residual securities held by a financial institution to which section 585, 586 or 593 applies will be treated as evidences of indebtedness for purposes of section 582(c)(1). REMIC regular securities will also be qualified mortgages with respect to other REMICs.

*Taxation of Beneficial Owners of REMIC Regular Securities*

Except as indicated below in this federal income tax discussion, the REMIC regular securities will be treated for federal income tax purposes as debt instruments issued by the REMIC trust on the settlement date and not as ownership interests in the REMIC trust or its assets. Beneficial owners of REMIC regular securities that otherwise report income under a cash method of accounting will be required to report income with respect to those securities under an accrual method. For additional tax consequences relating to REMIC regular securities purchased at a discount or with premium, see "—*Discount and Premium*," below.

*Taxation of Beneficial Owners of REMIC Residual Securities*

*Daily Portions.* Except as indicated below, a beneficial owner of a REMIC residual security for a REMIC trust generally will be required to report its daily portion of the taxable income or net loss of the REMIC trust for each day during a calendar quarter that the beneficial owner owned the REMIC residual security. For this purpose, the daily portion shall be determined by allocating to each day in the calendar quarter its ratable portion of the taxable income or net loss of the REMIC trust for the quarter and by allocating the amount so allocated among the beneficial owners of residual securities (on that day) in accordance with their percentage interests on that day. Any amount included in the gross income or allowed as a loss of any beneficial owner of a residual security by virtue of this paragraph will be treated as ordinary income or loss.

The requirement that each beneficial owner of a REMIC residual security report its daily portion of the taxable income or net loss of the REMIC trust will continue until there are no securities of any class outstanding, even though the beneficial owner of the REMIC residual security may have received full payment of the stated interest and principal on its REMIC residual security.

The trustee will provide to beneficial owners of REMIC residual securities of each series of securities (i) any information as is necessary to enable them to prepare their federal income tax returns and (ii) any reports regarding the securities of the series that may be required under the code.

*Taxable Income or Net Loss of a REMIC Trust.* The taxable income or net loss of a REMIC trust will be the income from the qualified mortgages it holds and any reinvestment earnings less deductions allowed to the REMIC trust. The taxable income or net loss for a given calendar quarter will be determined in the same manner as for an individual having the calendar year as the taxable year and using the accrual method of accounting, with modifications. The first

56

Table of Contents

modification is that a deduction will be allowed for accruals of interest (including any original issue discount, but without regard to the investment interest limitation in section 163(d)) on the REMIC regular securities (but not the REMIC residual securities), even though REMIC regular securities are for non-tax purposes evidences of beneficial ownership rather than indebtedness of a REMIC trust. Second, market discount or premium equal to the difference between the total stated principal balances of the qualified mortgages and the basis to the REMIC trust generally will be included in income (in the case of discount) or deductible (in the case of premium) by the REMIC trust as it accrues under a constant yield method, taking into account the "prepayment assumption" (as defined in the prospectus supplement, see "—*Discount and Premium   Original Issue Discount*," below). The basis to a REMIC trust in the qualified mortgages is the aggregate of the issue prices of all the REMIC regular securities and REMIC residual securities in the REMIC trust on the settlement date. If, however, a substantial amount of a class of REMIC regular securities or REMIC residual securities has not been sold to the public, then the fair market value of all the REMIC regular securities or REMIC residual securities in that class as of the date of the prospectus supplement should be substituted for the issue price.

Third, no item of income, gain, loss or deduction allocable to a prohibited transaction (see "—*Taxes on a REMIC Trust   Prohibited Transactions*" below) will be taken into account. Fourth, a REMIC trust generally may not deduct any item that would not be allowed in calculating the taxable income of a partnership by virtue of section 703(a)(2). Finally, the limitation on miscellaneous itemized deductions imposed on individuals by section 67 will not be applied at the REMIC trust level to any servicing and guaranty fees. (See, however, "—*Pass-Through of Servicing and Guaranty Fees to Individuals*" below.) In addition, under the REMIC regulations, any expenses that are incurred in connection with the formation of a REMIC trust and the issuance of the REMIC regular securities and REMIC residual securities are not treated as expenses of the REMIC trust for which a deduction is allowed. If the deductions allowed to a REMIC trust exceed its gross income for a calendar quarter, the excess will be a net loss for the REMIC trust for that calendar quarter. The REMIC regulations also provide that any gain or loss to a REMIC trust from the disposition of any asset, including a qualified mortgage or "permitted investment" (as defined in section 860G(a)(5)) will be treated as ordinary gain or loss.

A beneficial owner of a REMIC residual security may be required to recognize taxable income without being entitled to receive a corresponding amount of cash. This could occur, for example, if the qualified mortgages are considered to be purchased by the REMIC trust at a discount, some or all of the REMIC regular securities are issued at a discount, and the discount included as a result of a prepayment on a mortgage loan that is used to pay principal on the REMIC regular securities exceeds the REMIC trust's deduction for unaccrued original issue discount relating to the REMIC regular securities. Taxable income may also be greater in earlier years because interest expense deductions, expressed as a percentage of the outstanding principal amount of the REMIC regular securities, may increase over time as the earlier classes of REMIC regular securities are paid, whereas interest income with respect to any given mortgage loan expressed as a percentage of the outstanding principal amount of that mortgage loan, will remain constant over time.

*Basis Rules and Distributions.* A beneficial owner of a REMIC residual security has an initial basis in its security equal to the amount paid for that REMIC residual security. That basis is increased by amounts included in the income of the beneficial owner and decreased by distributions and by any net loss taken into account with respect to the REMIC residual security. A distribution on a REMIC residual security to a beneficial owner is not included in gross income to the extent it does not exceed the beneficial owner's basis in the REMIC residual security (adjusted as described above) and, to the extent it exceeds the adjusted basis of the REMIC residual security, shall be treated as gain from the sale of the REMIC residual security.

57

000208

Table of Contents

A beneficial owner of a REMIC residual security is not allowed to take into account any net loss for any calendar quarter to the extent that the net loss exceeds the beneficial owner's adjusted basis in its REMIC residual security as of the close of the calendar quarter (determined without regard to the net loss). Any loss disallowed by reason of this limitation may be carried forward indefinitely to future calendar quarters and, subject to the same limitation, may be used only to offset income from the REMIC residual security.

*Excess Inclusions.* Any excess inclusions with respect to a REMIC residual security are subject to special tax rules. With respect to a beneficial owner of a REMIC residual security, the excess inclusion for any calendar quarter is defined as the excess (if any) of the daily portions of taxable income over the sum of the "daily accruals" for each day during a quarter that the REMIC residual security was held by the beneficial owner. The daily accruals are determined by allocating to each day during a calendar quarter its ratable portion of the product of the "adjusted issue price" of the REMIC residual security at the beginning of the calendar quarter and 120% of the "federal long-term rate" in effect on the settlement date, based on quarterly compounding, and properly adjusted for the length of the quarter. For this purpose, the adjusted issue price of a REMIC residual security as of the beginning of any calendar quarter is equal to the issue price of the REMIC residual security, increased by the amount of daily accruals for all prior quarters and decreased by any distributions made with respect to the REMIC residual security before the beginning of that quarter. The issue price of a REMIC residual security is the initial offering price to the public (excluding bond houses and brokers) at which a substantial number of the REMIC residual securities was sold. The federal long-term rate is a blend of current yields on treasury securities having a maturity of more than nine years, computed and published monthly by the IRS.

In general, beneficial owners of REMIC residual securities with excess inclusion income cannot offset that income by losses from other activities. For beneficial owners that are subject to tax only on unrelated business taxable income (as defined in section 511), an excess inclusion of a beneficial owner is treated as unrelated business taxable income. With respect to variable contracts (within the meaning of section 817), a life insurance company cannot adjust its reserve to the extent of any excess inclusion, except as provided in regulations. The REMIC regulations indicate that if a beneficial owner of a REMIC residual security is a member of an affiliated group filing a consolidated income tax return, the taxable income of the affiliated group cannot be less than the sum of the excess inclusions attributable to all residual interests in REMICs held by members of the affiliated group. For a discussion of the effect of excess inclusions on foreign investors that own REMIC residual securities, see "—*Foreign Investors*" below.

The Treasury Department also has the authority to issue regulations that would treat all taxable income of a REMIC trust as excess inclusions if the REMIC residual security does not have "significant value." Although the Treasury Department did not exercise this authority in the REMIC regulations, future regulations may contain this rule. If that rule were adopted, it is unclear how significant value would be determined for these purposes. If no similar rule is applicable, excess inclusions should be calculated as discussed above.

In the case of any REMIC residual securities that are held by a real estate investment trust (a "REIT"), the aggregate excess inclusions with respect to REMIC residual securities reduced (but not below zero) by the REIT taxable income (within the meaning of section 857(b)(2) , excluding any net capital gain) will be allocated among the shareholders of that trust in

58



Table of Contents

proportion to the dividends received by the shareholders from the trust, and any amount so allocated will be treated as an excess inclusion with respect to a REMIC residual security as if held directly by the shareholder. Similar rules will apply in the case of regulated investment companies, common trust funds and cooperatives that hold a REMIC residual security.

*Pass-Through of Servicing and Guaranty Fees to Individuals.* A beneficial owner of a REMIC residual security who is an individual will be required to include in income a share of any servicing and guaranty fees. A deduction for these fees will be allowed to a beneficial owner only to the extent that those fees, along with some of the beneficial owner's other miscellaneous itemized deductions exceed 2% of the beneficial owner's adjusted gross income. In addition, a beneficial owner of a REMIC residual security may not be able to deduct any portion of the fees in computing a beneficial owner's alternative minimum tax liability. A beneficial owner's share of the fees will generally be determined by (i) allocating the amount of the expenses for each calendar quarter on a pro rata basis to each day in the calendar quarter, and (ii) allocating the daily amount among the beneficial owners in proportion to their respective holdings on that day.

*Taxes on a REMIC Trust*

*Prohibited Transactions.* The code imposes a tax on a REMIC equal to 100% of the net income derived from "prohibited transactions." In general, a prohibited transaction means the disposition of a qualified mortgage other than under specified exceptions, the receipt of investment income from a source other than a mortgage loan or other permitted investments, the receipt of compensation for services, or the disposition of an asset purchased with the payments on the qualified mortgages for temporary investment pending distribution on the regular and residual interests.

*Contributions to a REMIC after the Startup Day.* The code imposes a tax on a REMIC equal to 100% of the value of any property contributed to the REMIC after the "startup day" (generally the same as the settlement date). Exceptions are provided for cash contributions to a REMIC (i) during the three month period beginning on the startup day, (ii) made to a qualified reserve fund by a beneficial owner of a residual interest, (iii) in the nature of a guarantee, (iv) made to facilitate a qualified liquidation or clean-up call, and (v) as otherwise permitted by Treasury Regulations.

*Net Income from Foreclosure Property.* The code imposes a tax on a REMIC equal to the highest corporate rate on "net income from foreclosure property." The terms "foreclosure property" (which includes property acquired by deed in lieu of foreclosure) and "net income from foreclosure property" are defined by reference to the rules applicable to REITs. Generally, foreclosure property would be treated as such for a period of three years, with a possible extension. Net income from foreclosure property generally means gain from the sale of foreclosure property that is inventory property and gross income from foreclosure property other than qualifying rents and other qualifying income for a REIT.

*Sales of REMIC Securities*

Except as provided below, if a REMIC regular or residual security is sold, the seller will recognize gain or loss equal to the difference between the amount realized in the sale and its adjusted basis in the security. The adjusted basis of a REMIC regular security generally will equal the cost of that security to the seller, increased by any original issue discount or market discount included in the seller's gross income with respect to the security and reduced by distributions on that security previously received by the seller of amounts included in the stated redemption price

59



Table of Contents

at maturity and by any premium that has reduced the seller's interest income with respect to the security. See "—*Discount and Premium*." The adjusted basis of a REMIC residual security is determined as described above under "—*Taxation of Beneficial Owners of REMIC Residual Securities—Basis Rules and Distributions*." Except as provided in the following paragraph or under section 582(c) , any gain or loss will be capital gain or loss, provided the security is held as a "capital asset" (generally, property held for investment) within the meaning of section 1221.

Gain from the sale of a REMIC regular security that might otherwise be capital gain will be treated as ordinary income to the extent that the gain does not exceed the excess, if any, of (i) the amount that would have been includible in the income of the beneficial owner of a REMIC regular security had income accrued at a rate equal to 110% of the "applicable federal rate" (generally, an average of current yields on treasury securities) as of the date of purchase over (ii) the amount actually includible in the beneficial owner's income. In addition, gain recognized on a sale by a beneficial owner of a REMIC regular security who purchased the security at a market discount would also be taxable as ordinary income in an amount not exceeding the portion of the discount that accrued during the period a security was held by the beneficial owner, reduced by any market discount includible in income under the rules described below under "—Discount and Premium."

If a beneficial owner of a REMIC residual security sells its REMIC residual security at a loss, the loss will not be recognized if, within six months before or after the sale of the REMIC residual security, the beneficial owner purchases another residual interest in any REMIC or any interest in a taxable mortgage pool (a "TMP") (as defined in section 7701(i) ) comparable to a residual interest in a REMIC. That disallowed loss would be allowed upon the sale of the other residual interest (or comparable interest) if the rule referred to in the preceding sentence does not apply to that sale. While this rule may be modified by Treasury Regulations, no such regulations have yet been published.

*Transfers of REMIC Residual Securities.* Section 860E(e) imposes a substantial tax, payable by the transferor (or, if a transfer is through a broker, nominee, or other middleman as the transferee's agent, payable by that agent) upon any transfer of a REMIC residual security to a disqualified organization and upon a pass-through entity (including regulated investment companies, REITs, common trust funds, partnerships, trusts, estates, cooperatives, and nominees) that owns a REMIC residual security if the pass-through entity has a disqualified organization as a record-holder. For purposes of the preceding sentence, a transfer includes any transfer of record or beneficial ownership, whether by purchase, by default under a secured lending agreement or otherwise.

The term "disqualified organization" includes the United States, any state or political subdivision thereof, any foreign government, any international organization, or any agency or instrumentality of the foregoing (other than taxable instrumentalities), any cooperative organization furnishing electric energy or providing telephone service to persons in rural areas, or any organization (other than a farmers' cooperative) that is exempt from federal income tax, unless the organization is subject to the tax on unrelated business income. Moreover, an entity will not qualify as a REMIC unless there are reasonable arrangements designed to ensure that (i) residual interests in the entity are not held by disqualified organizations and (ii) information necessary for the application of the REMIC tax will be made available. Restrictions on the transfer of a REMIC residual security and other provisions that are intended to meet this requirement are described in the related servicing agreement, and will be discussed more fully in the prospectus supplement relating to the offering of any REMIC residual security. In addition, a pass-through entity (including a nominee) that holds a REMIC residual security may be subject to

60



Table of Contents

additional taxes if a disqualified organization is a record-holder of an interest in that entity. A transferor of a REMIC residual security (or an agent of a transferee of a REMIC residual security, as the case may be) will be relieved of that tax liability if (i) the transferee furnishes to the transferor (or the transferee's agent) an affidavit that the transferee, among other things, (a) is not a disqualified organization, (b) is not acquiring the REMIC residual security for the account of a disqualified organization and (c) will not cause income from the REMIC residual security to be attributable to a foreign permanent establishment or fixed base (within the meaning of an applicable income tax treaty) of the transferee or another U.S. taxpayer, and (ii) the transferor (or the transferee's agent) does not have actual knowledge that the affidavit is false at the time of the transfer. Similarly, no tax will be imposed on a pass-through entity for a period with respect to an interest in that entity owned by a disqualified organization if (i) the record-holder of the interest furnishes to the pass-through entity an affidavit that it is not a disqualified organization, and (ii) during that period, the pass-through entity has no actual knowledge that the affidavit is false.

The Taxpayer Relief Act of 1997 adds provisions to the code that will apply to an "electing large partnership." If an electing large partnership holds a residual certificate, all interests in the electing large partnership are treated as held by disqualified organizations for purposes of the tax imposed upon a pass-through entity by section 860E(e). An exception to this tax, otherwise available to a pass-through entity that is furnished with affidavits by record holders of interests in the entity and that does not know the affidavits are false, is not available to an electing large partnership.

Under the REMIC regulations, a transfer of a "noneconomic residual interest" to a U.S. Person (as defined below in "—*Foreign Investors—Grantor Trust Securities and REMIC Regular Securities*") will be disregarded for all federal tax purposes unless no significant purpose of the transfer is to impede the assessment or collection of tax. A REMIC residual security would be treated as constituting a noneconomic residual interest unless, at the time of the transfer, (i) the present value of the expected future distributions on the REMIC residual security is no less than the product of the present value of the "anticipated excess inclusions" with respect to that security and the highest corporate rate of tax for the year in which the transfer occurs, and (ii) the transferor reasonably expects that the transferee will receive distributions from the applicable REMIC trust in an amount sufficient to satisfy the liability for income tax on any "excess inclusions" at or after the time when the liability accrues. Anticipated excess inclusions are the excess inclusions that are anticipated to be allocated to each calendar quarter (or portion thereof) following the transfer of a REMIC residual security, determined as of the date the security is transferred and based on events that have occurred as of that date and on the prepayment assumption. See "—*Discount and Premium*" and "—*Taxation of Beneficial Owners of REMIC Residual Securities—Excess Inclusions*."

The REMIC regulations provide that a significant purpose to impede the assessment or collection of tax exists if, at the time of the transfer, a transferor of a REMIC residual security has "improper knowledge" (i.e., either knew, or should have known, that the transferee would be unwilling or unable to pay taxes due on its share of the taxable income of the REMIC trust). A transferor is presumed not to have improper knowledge if (i) the transferor conducts, at the time of a transfer, a reasonable investigation of the financial condition of the transferee and, as a result of the investigation, the transferor finds that the transferee has historically paid its debts as they come due and finds no significant evidence to indicate that the transferee will not continue to pay its debts as they come due in the future; and (ii) the transferee makes representations to the transferor in the affidavit relating to disqualified organizations discussed above. Transferors of a REMIC residual security should consult with their own tax advisors for further information regarding the transfers.

61

On July 18, 2003 the Treasury Department issued proposed regulations providing that, to clearly reflect income, an inducement fee paid to a transferee of a noneconomic residual interest in a REMIC must be included in income over a period that is reasonably related to the period during which the applicable REMIC is expected to generate taxable income or net loss allocable to the transferee. The proposed regulations set forth two safe harbor methods under which a taxpayer's accounting for the inducement fee will be considered to clearly reflect income for these purposes. The proposed regulations also provide that an inducement fee shall be treated as income from sources within the United States. If finalized as proposed, the regulations would be effective for taxable years ending on or after the publication of the final regulations in the Federal Register. The proposed regulations contain additional details regarding their application and you should consult your own tax advisor regarding the application of the proposed regulations.

*Reporting and Other Administrative Matters.* For purposes of the administrative provisions, each REMIC trust will be treated as a partnership and the beneficial owners of REMIC residual securities will be treated as partners. The trustee will prepare, sign and file federal income tax returns for each REMIC trust, which returns are subject to audit by the IRS. Moreover, within a reasonable time after the end of each calendar year, the trustee will furnish to each beneficial owner that received a distribution during that year a statement setting forth the portions of any distributions that constitute interest distributions, original issue discount, and any other information required by Treasury Regulations and, with respect to beneficial owners of REMIC residual securities in a REMIC trust, information necessary to compute the daily portions of the taxable income (or net loss) of the REMIC trust for each day during the year. The trustee will also act as the tax matters partner for each REMIC trust, either in its capacity as a beneficial owner of a REMIC residual security or in a fiduciary capacity. Each beneficial owner of a REMIC residual security, by the acceptance of its REMIC residual security, agrees that the trustee will act as its fiduciary in the performance of any duties required of it in the event that it is the tax matters partner.

Each beneficial owner of a REMIC residual security is required to treat items on its return consistently with the treatment on the return of the REMIC trust, unless the beneficial owner either files a statement identifying the inconsistency or establishes that the inconsistency resulted from incorrect information received from the REMIC trust. The IRS may assert a deficiency resulting from a failure to comply with the consistency requirement without instituting an administrative proceeding at the REMIC trust level.

*Termination*

In general, no special tax consequences will apply to a beneficial owner of a REMIC regular security upon the termination of a REMIC trust by virtue of the final payment or liquidation of the last mortgage loan remaining in the trust estate. If a beneficial owner of a REMIC residual security's adjusted basis in its REMIC residual security at the time the termination occurs exceeds the amount of cash distributed to the beneficial owner in liquidation of its interest, although the matter is not entirely free from doubt, it would appear that the beneficial owner of the REMIC residual security is entitled to a loss equal to the amount of that excess.

**Debt Securities**

With respect to each series of debt securities, Dewey Ballantine LLP, special tax counsel to the sponsor, will deliver its opinion to the sponsor that the securities will be classified as debt secured by the related loans. Consequently, the debt securities will not be treated as ownership

<div align="center">62</div>



Table of Contents

interests in the loans or the trust. for additional tax consequences relating to debt securities issued by a REIT or a qualified REIT subsidiary, see "—*REIT TMP*," below. Beneficial owners will be required to report income received with respect to the debt securities in accordance with their normal method of accounting. For additional tax consequences relating to debt securities purchased at a discount or with premium, see "—*Discount and Premium*," below.

*Special Tax Attributes*

As described above, REMIC securities will possess special tax attributes by virtue of the REMIC provisions. In general, debt securities will not possess these special tax attributes. Investors to whom these attributes are important should consult their own tax advisors regarding investment in debt securities.

*Sale or Exchange*

If a beneficial owner of a debt security sells or exchanges the security, the beneficial owner will recognize gain or loss equal to the difference, if any, between the amount received and the beneficial owner's adjusted basis in the security. The adjusted basis in the security generally will equal its initial cost, increased by any original issue discount or market discount previously included in the seller's gross income with respect to the security and reduced by the payments previously received on the security, other than payments of qualified stated interest, and by any amortized premium.

In general (except as described in "—*Discount and Premium · Market Discount*," below), except for financial institutions subject to section 582(c) , any gain or loss on the sale or exchange of a debt security recognized by an investor who holds the security as a capital asset (within the meaning of section 1221), will be capital gain or loss and will be long-term or short-term depending on whether the security has been held for more than one year.

**Partnership Interests**

With respect to each series of partnership interests, Dewey Ballantine LLP, special tax counsel to the sponsor, will deliver its opinion to the sponsor that the trust will be treated as a partnership and not an association taxable as a corporation for federal income tax purposes. The opinion shall be attached on Form 8-K to be filed with the Securities and Exchange Commission within fifteen days after the initial issuance of the securities or filed with the Securities and Exchange Commission as a post-effective amendment to the prospectus. Accordingly, each beneficial owner of a partnership interest will generally be treated as the owner of an interest in the loans.

*Special Tax Attributes*

As described above, REMIC securities will possess special tax attributes by virtue of the REMIC provisions. In general, partnership interests will not possess these special tax attributes. Investors to whom these attributes are important should consult their own tax advisors regarding investment in partnership interests.

*Taxation of Beneficial Owners of Partnership Interests*

If the trust is treated as a partnership for federal income tax purposes, the trust will not be subject to federal income tax. Instead, each beneficial owner of a partnership interest will be

63

Table of Contents

required to separately take into account an allocable share of income, gains, losses, deductions, credits and other tax items of the trust. These partnership allocations are made in accordance with the code, Treasury Regulations and the partnership agreement (here, the trust agreement and related documents).

The trust's assets will be the assets of the partnership. The trust's income will consist primarily of interest and finance charges earned on the underlying mortgage loans. The trust's deductions will consist primarily of interest accruing with respect to any indebtedness issued by the trust, servicing and other fees, and losses or deductions upon collection or disposition of the trust's assets.

The trust could have an obligation to make payments of withholding tax on behalf of a beneficial owner of a partnership interest. (See "*Backup Withholding*" and "*Foreign Investors*" below).

Substantially all of the taxable income allocated to a beneficial owner of a partnership interest that is a pension, profit sharing or employee benefit plan or other tax-exempt entity (including an individual retirement account) will constitute "unrelated business taxable income" generally taxable to the holder under the code.

Under section 708 , the trust will be deemed to terminate for federal income tax purposes if 50% or more of the capital and profits interests in the trust are sold or exchanged within a 12-month period. Under the final regulations issued on May 9, 1997 if such a termination occurs, the trust is deemed to contribute all of its assets and liabilities to a newly formed partnership in exchange for a partnership interest. Immediately thereafter, the terminated partnership distributes interests in the new partnership to the purchasing partner and remaining partners in proportion to their interests in liquidation of the terminated partnership.

*Sale or Exchange of Partnership Interests*

Generally, capital gain or loss will be recognized on a sale or exchange of partnership interests in an amount equal to the difference between the amount realized and the seller's tax basis in the partnership interests sold. A beneficial owner of a partnership interest's tax basis in a partnership interest will generally equal the beneficial owner's cost increased by the beneficial owner's share of trust income (includible in income) and decreased by any distributions received with respect to the partnership interest. In addition, both the tax basis in the partnership interest and the amount realized on a sale of a partnership interest would take into account the beneficial owner's share of any indebtedness of the trust. A beneficial owner acquiring partnership interests at different prices may be required to maintain a single aggregate adjusted tax basis in the partnership interest, and upon sale or other disposition of some of the partnership interests, allocate a portion of the aggregate tax basis to the partnership interests sold (rather than maintaining a separate tax basis in each partnership interest for purposes of computing gain or loss on a sale of that partnership interest).

Any gain on the sale of a partnership interest attributable to the beneficial owner's share of unrecognized accrued market discount on the assets of the trust would generally be treated as ordinary income to the holder and would give rise to special tax reporting requirements. If a beneficial owner of a partnership interest is required to recognize an aggregate amount of income over the life of the partnership interest that exceeds the aggregate cash distributions with respect thereto, that excess will generally give rise to a capital loss upon the retirement of the partnership interest. If a beneficial owner sells its partnership interest at a profit or loss, the transferee will have a higher or lower basis in the partnership interests than the transferor had.

<div align="center">64</div>

000215

Table of Contents

Based on an exception to the new mandatory basis adjustment rule added to the code by the American Jobs Creation Act of 2004, a partnership, the sole business activity of which is to issue securities which provide for a fixed principal or similar amount and are primarily serviced by the cash flow of a discrete pool of receivables or other financial assets, generally will not be required to adjust the basis of partnership property following a sale or exchange of a partnership interest, unless the partnership files an election under section 754 of the code.

*Partnership Reporting Matters*

The owner trustee is required to (i) keep complete and accurate books of the trust, (ii) file a partnership information return (IRS Form 1065) with the IRS for each taxable year of the trust and (iii) report each beneficial owner of a partnership interest's allocable share of items of trust income and expense to beneficial owners and the IRS on Schedule K-1. The trust will provide the Schedule K-1 information to nominees that fail to provide the trust with the information statement described below and those nominees will be required to forward the information to the beneficial owners of the partnership interests. Generally, beneficial owners of a partnership interests must file tax returns that are consistent with the information return filed by the trust or be subject to penalties unless the beneficial owner of a partnership interest notifies the IRS of all the inconsistencies.

Under section 6031 , any person that holds partnership interests as a nominee at any time during a calendar year is required to furnish the trust with a statement containing information on the nominee, the beneficial owners and the partnership interests so held. Required information includes (i) the name, address and taxpayer identification number of the nominee and (ii) as to each beneficial owner (x) the name, address and identification number of the person, (y) whether the person is a United States person, a tax-exempt entity or a foreign government, and international organization, or any wholly owned agency or instrumentality of either of the foregoing, and (z) information on partnership interests that were held, bought or sold on behalf of the person throughout the year. In addition, brokers and financial institutions that hold partnership interests through a nominee are required to furnish directly to the trust information as to themselves and their ownership of partnership interests. A clearing agency registered under section 17A of the Securities Exchange Act of 1934 is not required to furnish any such information statement to the trust. Nominees, brokers and financial institutions that fail to provide the trust with the information described above may be subject to penalties.

The code provides for administrative examination of a partnership as if the partnership were a separate and distinct taxpayer. Generally, the statute of limitations for partnership items does not expire before three years after the date on which the partnership information return is filed. Any adverse determination following an audit of the return of the trust by the appropriate taxing authorities could result in an adjustment of the returns of the beneficial owner of a partnership interests, and a beneficial owner of a partnership interest may be precluded from separately litigating a proposed adjustment to the items of the trust. An adjustment could also result in an audit of the beneficial owner of a partnership interest's returns and adjustments of items note related to the income and losses of the trust.

65

Table of Contents

**Discount and Premium**

A security purchased for an amount other than its outstanding principal amount will be subject to the rules governing original issue discount, market discount or premium. In addition, all grantor trust strip securities and some grantor trust fractional interest securities will be treated as having original issue discount by virtue of the coupon stripping rules in section 1286. In very general terms, (1) original issue discount is treated as a form of interest and must be included in a beneficial owner's income as it accrues (regardless of the beneficial owner's regular method of accounting) using a constant yield method; (2) market discount is treated as ordinary income and must be included in a beneficial owner's income as principal payments are made on the security (or upon a sale of a security); and (3) if a beneficial owner so elects, premium may be amortized over the life of the security and offset against inclusions of interest income. These tax consequences are discussed in greater detail below.

*Original Issue Discount*

In general, a security will be considered to be issued with original issue discount equal to the excess, if any, of its "stated redemption price at maturity" over its "issue price." The issue price of a security is the initial offering price to the public, excluding bond houses and brokers, at which a substantial number of the securities was sold. The issue price also includes any accrued interest attributable to the period between the beginning of the first remittance period and the settlement date. The stated redemption price at maturity of a security that has a notional principal amount or receives principal only or that is or may be an accrual security is equal to the sum of all distributions to be made under the security. The stated redemption price at maturity of any other security is its stated principal amount, plus an amount equal to the excess, if any, of the interest payable on the first payment date over the interest that accrues for the period from the settlement date to the first payment date.

Notwithstanding the general definition, original issue discount will be treated as zero if the discount is less than 0.25% of the stated redemption price at maturity multiplied by its weighted average life. The weighted average life of a security is apparently computed for this purpose as the sum, for all distributions included in the stated redemption price at maturity of the amounts determined by multiplying (1) the number of complete years (rounding down for partial years) from the settlement date until the date on which each distribution is expected to be made under the assumption that the mortgage loans prepay at the rate specified in the prospectus supplement by (2) a fraction, the numerator of which is the amount of the distribution and the denominator of which is the security's stated redemption price at maturity. If original issue discount is treated as zero under this rule, the actual amount of original issue discount must be allocated to the principal distributions on the security and, when each distribution is received, gain equal to the discount allocated to the distribution will be recognized.

Section 1272(a)(6) contains special original issue discount rules directly applicable to REMIC securities and debt securities. The Taxpayer Relief Act of 1997 extends application of section 1272(a)(6) to the grantor trust securities for tax years beginning after August 5, 1997. Under these rules, (1) the amount and rate of accrual of original issue discount on each series of securities will be based on (x) the prepayment assumption, and (y) in the case of a security calling for a variable rate of interest, an assumption that the value of the index upon which the variable rate is based remains equal to the value of that rate on the settlement date, and (2) adjustments will be made in the amount of discount accruing in each taxable year in which the actual prepayment rate differs from the prepayment assumption.

66

Table of Contents

Section 1272(a)(6)(B)(iii) requires that the prepayment assumption used to calculate original issue discount be determined in the manner prescribed in Treasury Regulations. To date, no such regulations have been promulgated. The legislative history of this code provision indicates that the assumed prepayment rate must be the rate used by the parties in pricing the particular transaction. The sponsor anticipates that the prepayment assumption for each series of securities will be consistent with this standard. The sponsor makes no representation, however, that the mortgage loans for a given series will prepay at the rate reflected in the prepayment assumption for that series or at any other rate. Each investor must make its own decision as to the appropriate prepayment assumption to be used in deciding whether or not to purchase any of the securities.

Each beneficial owner must include in gross income the sum of the "daily portions" of original issue discount on its security for each day during its taxable year on which it held the security. For this purpose, in the case of an original beneficial owner, the daily portions of original issue discount will be determined as follows. A calculation will first be made of the portion of the original issue discount that accrued during each "accrual period." The trustee will supply, at the time and in the manner required by the IRS, to beneficial owners, brokers and middlemen information with respect to the original issue discount accruing on the securities. The trustee will report original issue discount based on accrual periods of no longer than one year either (1) beginning on a payment date or, in the case of the first accrual period, the settlement date, and ending on the day before the next payment date or (2) beginning on the next day following a payment date and ending on the next payment date.

Under section 1272(a)(6), the portion of original issue discount treated as accruing for any accrual period will equal the excess, if any, of (1) the sum of (A) the present values of all the distributions remaining to be made on the security, if any, as of the end of the accrual period and (B) the distribution made on the security during the accrual period of amounts included in the stated redemption price at maturity, over (2) the adjusted issue price of the security at the beginning of the accrual period. The present value of the remaining distributions referred to in the preceding sentence will be calculated based on (1) the yield to maturity of the security, calculated as of the settlement date, giving effect to the prepayment assumption, (2) events (including actual prepayments) that have occurred prior to the end of the accrual period, (3) the prepayment assumption, and (4) in the case of a security calling for a variable rate of interest, an assumption that the value of the index upon which the variable rate is based remains the same as its value on the settlement date over the entire life of the security. The adjusted issue price of a security at any time will equal the issue price of the security, increased by the aggregate amount of previously accrued original issue discount with respect to that security, and reduced by the amount of any distributions made on the security as of that time of amounts included in the stated redemption price at maturity. The original issue discount accruing during any accrual period will then be allocated ratably to each day during the period to determine the daily portion of original issue discount.

In the case of grantor trust strip securities and some REMIC securities, the calculation described in the preceding paragraph may produce a negative amount of original issue discount for one or more accrual periods. No definitive guidance has been issued regarding the treatment of the negative amounts. The legislative history to section 1272(a)(6) indicates that the negative amounts may be used to offset subsequent positive accruals but may not offset prior accruals and may not be allowed as a deduction item in a taxable year in which negative accruals exceed positive accruals. In an advanced notice of proposed rulemaking issued in August 24, 2004, the IRS and Treasury requested comments on whether to adopt special rules for certain types of REMIC regular interests, specifically, REMIC regular interests that are entitled only to a

67



Table of Contents

specified portion of the interest in respect of one or more mortgage loans held by the REMIC ("REMIC IOs"), high-yield REMIC regular interests, and "negative-yield" instruments. The same notice requested comments on different methods for taxing these instruments, including, for example, allowing a holder to recognize negative accruals or applying the "bad debt" rules of section 166. It is uncertain whether the IRS will propose any new regulations as a consequence of the notice, whether the regulations would address the treatment of REMIC IOs or when any new regulations would be effective. Beneficial owners of the securities should consult their own tax advisors concerning the treatment of negative accruals.

Certain of the REMIC regular securities ("Payment Lag Certificates") may provide for payments of interest based on accrual periods that have the same number of days as the accrual periods between payment dates (the "Ordinary Accrual Period") but that end and begin on other dates. In addition, in some cases, even though the period between the settlement date for a Payment Lag Certificate and its first payment date is shorter than an Ordinary Accrual Period, the Payment Lag Certificate will pay on the first payment date an amount of interest for a full Ordinary Accrual Period (the extra interest being "pre-issuance interest"). In the case of such a Payment Lag Certificate, the trust fund intends to (i) treat the pre-issuance interest as part of the issue price of the Payment Lag Certificate and (ii) the remaining amount of such interest as interest. Investors should consult their tax advisors concerning the treatment for federal income tax purposes of Payment Lag Certificates.

A subsequent purchaser of a security that purchases the security at a cost less than its remaining stated redemption price at maturity also will be required to include in gross income for each day on which it holds the security, the daily portion of original issue discount with respect to that security, but reduced, if the cost of the security to the purchaser exceeds its adjusted issue price, by an amount equal to the product of (1) the daily portion and (2) a constant fraction, the numerator of which is the excess and the denominator of which is the sum of the daily portions of original issue discount on the security for all days on or after the day of purchase.

*Market Discount*

A beneficial owner that purchases a security at a market discount, that is, at a purchase price less than the remaining stated redemption price at maturity of the security, or, in the case of a security with original issue discount, its adjusted issue price, will be required to allocate each principal distribution first to accrued market discount on the security, and recognize ordinary income to the extent that the distribution does not exceed the aggregate amount of accrued market discount on the security not previously included in income. With respect to securities that have unaccrued original issue discount, the market discount must be included in income in addition to any original issue discount. A beneficial owner that incurs or continues indebtedness to acquire a security at a market discount may also be required to defer the deduction of all or a portion of the interest on the indebtedness until the corresponding amount of market discount is included in income. In general terms, market discount on a security may be treated as accruing either (1) under a constant yield method or (2) in proportion to remaining accruals of original issue discount, if any, or if none, in proportion to remaining distributions of interest on the security. In any case taking into account the prepayment assumption. The trustee will make available, as required by the IRS, to beneficial owners of securities information necessary to compute the accrual of market discount.

Notwithstanding the above rules, market discount on a security will be considered to be zero if that discount is less than 0.25% of the remaining stated redemption price at maturity of the security multiplied by its weighted average remaining life. Weighted average remaining life

68

000219

Table of Contents

presumably would be calculated in a manner similar to weighted average life, taking into account payments, including prepayments, prior to the date of acquisition of the security by the subsequent purchaser. If market discount on a security is treated as zero under this rule, the actual amount of market discount must be allocated to the remaining principal distributions on the security and, when each distribution is received, gain equal to the discount allocated to that distribution will be recognized.

*Securities Purchased at a Premium*

A purchaser of a security that purchases the security at a cost greater than its remaining stated redemption price at maturity will be considered to have purchased that "premium security" at a premium. The purchaser need not include in income any remaining original issue discount and may elect, under section 171(c)(2) , to treat the premium as an "amortizable bond premium." If a beneficial owner makes that election, the amount of any interest payment that must be included in the beneficial owner's income for each period ending on a payment date will be reduced by the portion of the premium allocable to each period based on the plan's yield to maturity. The premium amortization should be made using constant yield principles. If the election is made by the beneficial owner, the election will also apply to all bonds the interest on which is not excludible from gross income held by the beneficial owner at the beginning of the first taxable year to which the election applies and to all the fully taxable bonds thereafter acquired by it, and is irrevocable without the consent of the IRS. If the election is not made, (1) the beneficial owner must include the full amount of each interest payment in income as it accrues, and (2) the premium must be allocated to the principal distrioutions on the plan and, when each principal distribution is received, a loss equal to the premium allocated to that distribution will be recognized. Any tax benefit from the premium not previously recognized will be taken into account in computing gain or loss upon the sale or disposition of the plan.

Some securities may provide for only nominal distributions of principal in comparison to the distributions of interest thereon. It is possible that the IRS or the Treasury Department may issue guidance excluding some securities from the rules generally applicable to debt instruments issued at a premium. In particular, it is possible that a security will be treated as having original issue discount equal to the excess of the total payments to be received thereon over its issue price. In that event, section 1272(a)(6) would govern the accrual of the original issue discount, but a beneficial owner would recognize substantially the same income in any given period as would be recognized if an election were made under section 171(c)(2). Unless and until the Treasury Department or the IRS publishes specific guidance relating to the tax treatment of these securities, the trustee intends to furnish tax information to beneficial owners of the securities in accordance with the rules described in the preceding paragraph.

*Special Election*

For any security acquired on or after April 4, 1994, a beneficial owner may elect to include in gross income all "interest" that accrues on the security by using a constant yield method. For purposes of the election, the term "interest" includes stated interest, acquisition discount, original issue discount, de minimis original issue discount, market discount, de minimis market discount and unstated interest as adjusted by any amortizable bond premium or acquisition premium. A beneficial owner should consult its own tax advisor regarding the time and manner of making and the scope of the election and the implementation of the constant yield method.

69

Table of Contents

**REIT/TMP**

If the issuing entity is issuing classes of debt instruments with multiple maturity dates that are backed by real estate mortgages, it is anticipated that the issuing entity will be treated as a TMP for federal income tax purposes. In general, a TMP is treated as a separate corporation not includible with any other corporation in a consolidated income tax return, and is subject to corporate income taxation. A TMP, however, that is treated as a "qualified REIT subsidiary" of a REIT will not be subject to corporate income taxation. Generally, the issuing entity will be treated as a qualified REIT subsidiary so long as the issuing entity is wholly owned by either another qualified REIT subsidiary (whose ultimate parent company is a REIT) or directly by a REIT (each, a "Parent REIT") that maintains continuing qualification as a REIT.

In the event that the Parent REIT loses its REIT status or the issuing entity is otherwise no longer wholly owned by a REIT or a qualified REIT subsidiary, the issuing entity would become subject to federal income taxation as a corporation and would not be permitted to be included in a consolidated income tax return of another corporate entity. Unless entitled to relief under certain code provisions, if the Parent REIT loses its REIT status, it would also be disqualified from treatment as a REIT for the four taxable years following the year is which qualification was lost. In the event that federal income taxes are imposed on the issuing entity, the cash flow available to make payments on the offered notes would be reduced. In addition, a failure to pay such taxes could result in the bankruptcy or insolvency of the issuing entity, which could result in a temporary stay of payments on the notes or a consequential redemption of the notes at a time earlier than anticipated. The prospectus supplement for each series of securities will indicate whether the issuing entity will be a TMP and if so whether the issuing entity is owned by a Parent REIT. In such a case, the Prospectus Supplement may also establish that no transfer of the ownership interest in the issuing entity will be permitted (i) to an entity that is not a REIT or a qualified REIT subsidiary or (2) that would result in the issuing entity not being treated as a qualified REIT subsidiary.

**Backup Withholding**

Distributions of interest and principal, as well as distributions of proceeds from the sale of securities, may be subject to the "backup withholding tax" under section 3406 if recipients of the distributions fail to furnish to the payor information, including their taxpayer identification numbers, or otherwise fail to establish an exemption from the tax. Holders that are not exempt recipients must provide Form W-9 or the equivalent to avoid having such amounts withheld. Any amounts deducted and withheld from a distribution to a recipient would be allowed as a credit against that recipient's federal income tax. Furthermore, penalties may be imposed by the IRS on a recipient of distributions that is required to supply information but that does not do so in the proper manner.

**Foreign Investors**

*General*

U.S. withholding regulations require, in the case of securities held by a foreign partnership, that (x) certification of exemption from U.S. tax be provided by the partners rather than by the foreign partnership and (y) the partnership provide information, including a United States taxpayer identification number. A look-through rule would apply in the case of tiered partnerships. Non-U.S. Persons should consult their own tax advisors regarding the application to them of U.S. withholding regulations.

70

Table of Contents

*Grantor Trust Securities, Debt Securities and REMIC Regular Securities*

Distributions made on a grantor trust security, debt security or a REMIC regular security to, or on behalf of, a beneficial owner that is not a U.S. Person generally will be exempt from U.S. federal income and withholding taxes. The term "U.S. Person" means a citizen or resident of the United States, a corporation, partnership or other entity created or organized in or under the laws of the United States or any political subdivision thereof, an estate that is subject to U.S. federal income tax regardless of the source of its income, or a trust if a court within the United States can exercise primary supervision over its administration and at least one United States fiduciary has the authority to control all substantial decisions of the trust. This exemption is applicable provided (a) the beneficial owner is not subject to U.S. tax as a result of a connection to the United States other than ownership of the security, (b) the beneficial owner signs a statement under penalties of perjury that certifies that the beneficial owner is not a U.S. Person, and provides the name and address of that beneficial owner, and (c) the last U.S. Person in the chain of payment to the beneficial owner receives a statement from the beneficial owner or a financial institution holding on its behalf and does not have actual knowledge that the statement is false. Beneficial owners should be aware that the IRS might take the position that this exemption does not apply to a beneficial owner that also owns 10% or more of the REMIC residual securities of any REMIC trust, or to a beneficial owner that is a "controlled foreign corporation" described in section 881(c)(3)(C).

*REMIC Residual Securities*

Amounts distributed to a beneficial owner of a REMIC residual security that is a not a U.S. Person generally will be treated as interest for purposes of applying the 30%, or lower treaty rate, withholding tax on income that is not effectively connected with a U.S. trade or business. Temporary Treasury Regulations clarify that amounts not constituting excess inclusions that are distributed on a REMIC residual security to a beneficial owner that is not a U.S. Person generally will be exempt from U.S. federal income and withholding tax, subject to the same conditions applicable to distributions on grantor trust securities, debt securities and REMIC regular securities, as described above, but only to the extent that the obligations directly underlying the REMIC that issued the REMIC residual security, e.g., mortgage loans or regular interests in another REMIC, were issued after July 18, 1984. In no case will any portion of REMIC income that constitutes an excess inclusion be entitled to any exemption from the withholding tax or a reduced treaty rate for withholding. See "—*REMIC Securities—Taxation of Beneficial Owners of REMIC Residual Securities– Excess Inclusions*."

*Partnership Interests*

Depending upon the particular terms of the trust agreement and servicing agreement, a trust may be considered to be engaged in a trade or business in the United States for purposes of federal withholding taxes with respect to non-U.S. persons. If the trust is considered to be engaged in a trade or business in the United States for those purposes and the trust is treated as a partnership, the income of the trust distributable to a non-U.S. person would be subject to federal withholding tax. Also, in those cases, a non-U.S. beneficial owner of a partnership interest that is a corporation may be subject to the branch profits tax. If the trust is notified that a beneficial owner of a partnership interest is a foreign person, the trust may withhold as if it were engaged in a trade or business in the United States in order to protect the trust from possible adverse consequences of a failure to withhold. A foreign holder generally would be entitled to file with the IRS a claim for refund with respect to withheld taxes, taking the position that no taxes were due because the trust was not in a U.S. trade or business.

71

Table of Contents

## STATE TAX CONSIDERATIONS

In addition to the federal income tax consequences described in "Material Federal Income Tax Consequences," potential investors should consider the state and local income tax consequences of the acquisition, ownership, and disposition of the securities. State and local income tax law may differ substantially from the corresponding federal law, and this discussion does not purport to describe any aspect of the income tax laws of any state or locality. Therefore, potential investors should consult their own tax advisors with respect to the various state and local tax consequences of an investment in the securities.

## ERISA CONSIDERATIONS

Section 406 of ERISA and section 4975 of the Internal Revenue Code prohibit a "plan," which includes a pension, profit sharing or other employee benefit plan as well as an individual retirement account, from engaging in transactions involving "plan assets" with persons that are "parties in interest" under ERISA or "disqualified persons" under the Internal Revenue Code with respect to the plan, unless a statutory or administrative exemption applies to the transaction. ERISA and the Internal Revenue Code also prohibit generally actions involving conflicts of interest by persons who are fiduciaries of a plan. A violation of these "prohibited transaction" rules may generate excise tax and other liabilities under ERISA and the Internal Revenue Code for those persons. In addition, investments by plans subject to Title I of ERISA must comply with certain fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that a plan's investments be made in accordance with the documents governing the plan. Employee benefit plans that are governmental plans, as defined in Section 3(32) of ERISA, and certain church plans, as defined in section 3(33) of ERISA, are not subject to the requirements of ERISA and section 4975 of the Internal Revenue Code. Accordingly, assets of these plans may be invested in securities without regard to the ERISA considerations discussed below, subject to the provisions of other applicable federal, state and local law. Any plan which is qualified and exempt from taxation under section 401(a) and 501(a) of the Internal Revenue Code, however, is subject to the prohibited transaction rules of section 503 of the Internal Revenue Code.

Transactions involving the trust might be deemed to constitute prohibited transactions under ERISA and the Internal Revenue Code with respect to a plan that purchased securities. Therefore, in the absence of an exemption, the purchase, sale or holding of a security by a plan might result in prohibited transactions and the imposition of excise taxes and civil penalties.

The Department of Labor has issued to various underwriters individual prohibited transaction exemptions, which generally exempt from the application of the prohibited transaction provisions of section 406(a), 406(b)(1), 406(b)(2) and 407(a) of ERISA and the excise taxes imposed by sections 4975(a) and (b) of the Internal Revenue Code, transactions with respect to the initial purchase, the holding and the subsequent resale by plans of securities issued by investment pools whose assets consist of secured receivables, secured loans and other secured obligations that meet the conditions and requirements of the underwriter exemption.

Among the conditions that must be satisfied in order for the underwriter exemption to apply to offered securities are the following:

- the acquisition of the securities by a plan is on terms, including the price for the securities, that are at least as favorable to the plan as they would be in an arm's-length transaction with an unrelated party;

72



Table of Contents

- the obligations held by the trust must be fully secured (other than residential mortgage loans and home equity loans or receivables backing certain types of securities, as described below);

- unless the securities are issued in "designated transactions" (as described below) and are backed by fully-secured obligations, the rights and interests evidenced by the securities acquired by the plan are not subordinated to the rights and interests evidenced by other securities of the trust;

- the securities acquired by the plan have received a rating at the time of the acquisition that is one of the three (or, in the case of designated transactions, four) highest generic rating categories from Standard & Poor's Ratings Services, Moody's Investors Service, Inc. or Fitch, Inc.;

- the trustee is not an affiliate of any other member of the restricted group (as defined below) other than the underwriter;

- the sum of all payments made to and retained by the underwriters in connection with the distribution of the securities represents not more than reasonable compensation for underwriting the securities; the sum of all payments made to and retained by the originators and the sponsor in exchange for the assignment of the obligations to the trust estate represents not more than the fair market value of the obligations; the sum of all payments made to and retained by any servicer represents not more than reasonable compensation for that person's services under the related servicing agreement and reimbursement of that person's reasonable expenses;

- the plan investing in the securities is an "accredited investor" as defined in Rule 501(a)(1) of Regulation D of the Securities and Exchange Commission under the Securities Act of 1933; and

- in the event that all of the obligations used to fund the trust have not been transferred to the trust on the closing date, additional obligations of the types specified in the prospectus supplement and/or the related servicing agreement having an aggregate value equal to no more than 25% of the total principal amount of the securities being offered by the trust may be transferred to the trust, in exchange for amounts credited to the account funding the additional obligations, within a funding period of no longer than 90 days or 3 months following the closing date.

The trust estate must also meet the following requirements:

- the corpus of the trust estate must consist solely of assets of the type that have been included in other investment pools;

- securities in the other investment pools must have been rated in one of the three (or, in the case of designated transactions, four) highest rating categories of Standard & Poor's, Moody's Investors Service or Fitch, Inc. for at least one year prior to the plan's acquisition of securities; and

- securities evidencing interests in other investment pools must have been purchased by investors other than plans for at least one year prior to the plan's acquisition of securities.

73

Table of Contents

In the case of securitization transactions in which the securities are backed by trust assets that consist of single-family residential, multi-family residential, home equity or manufactured housing mortgage obligations, which transactions are defined in the underwriter exemption as "designated transactions", securities issued by the trust in such transactions may be rated in one of the highest four generic rating categories by the specified rating agencies and/or may be subordinated. In addition, residential and home equity loans or receivables that back securities issued in such designated transactions may be less than fully secured, provided that (a) the rights and interests evidenced by securities issued in such designated transactions are not subordinated to the rights and interests evidenced by securities of the same trust; (b) such securities acquired by the plan have received a rating from the specified rating agencies at the time of such acquisition that is in one of the two highest generic rating categories; and (c) any obligation included in the corpus or assets of the trust is secured by collateral whose fair market value on the closing date of the designated transactions is at least equal to 80% of the sum of: (i) the outstanding principal balance due under the obligation which is held by the trust and (ii) the outstanding principal balance(s) of any other obligation(s) of higher priority (whether or not held by the trust) which are secured by the same collateral.

Moreover, the underwriter exemption provides relief from self-dealing/conflict of interest prohibited transactions that may occur when the plan fiduciary causes a plan to acquire securities in a trust in which the fiduciary, or its affiliate, is an obligor on the receivables held in the trust; although, among other requirements, (1) in the case of an acquisition in connection with the initial issuance of securities, at least fifty percent of each class of securities in which plans have invested is acquired by persons independent of the restricted group and at least fifty percent of the aggregate interest in the trust is acquired by persons independent of the restricted group; (2) the fiduciary, or its affiliate, is an obligor with respect to five percent or less of the fair market value of the obligations contained in the trust; (3) the plan's investment in securities of any class does not exceed twenty-five percent of all of the securities of that class outstanding at the time of the acquisition; and (4) immediately after the acquisition, no more than twenty-five percent of the assets of the plan with respect to which the person is a fiduciary are invested in securities representing an interest in one or more trusts containing assets sold or serviced by the same entity. The underwriter exemption does not apply to plans sponsored by the "restricted group," which is the sponsor, any underwriter, the trustee, any servicer, any obligor with respect to obligations included in the trust estate constituting more than five percent of the aggregate unamortized principal balance of the assets in the trust estate, the insurer, the counterparty of any interest rate swap or any affiliate of the foregoing persons.

The underwriter exemption permits interest-rate swaps and/or a yield supplement agreements to be assets of a trust provided that certain requirements are satisfied. The prospectus supplement for a series of securities will provide further information if the trust holds such a contract.

In addition to the underwriter exemption, the Department of Labor has issued Prohibited Transaction Class Exemption ("PTCE") 83-1, which provides an exemption for transactions involving the sale or exchange of residential mortgage pool pass-through certificates by plans and for transactions in connection with the servicing and operation of the mortgage pool.

Under the "plan assets regulation" issued by the United States Department of Labor, the assets of the trust would be treated as plan assets of a plan for the purposes of ERISA and the Internal Revenue Code only if the plan acquired an equity interest in the trust and none of the exceptions contained in the plan assets regulation were applicable. An "equity interest" is defined under the plan assets regulation as an interest other than an instrument which is treated as

74

Case 11-02024    Doc 8    Page 193 of 266

Table of Contents

indebtedness under applicable local law and which has no substantial equity features. Accordingly, if the securities being offered are notes which are treated as having substantial equity features, the purchase, holding and resale of the notes could, in the absence of an exemption, result in a transaction that is prohibited under ERISA or the Internal Revenue Code. If the notes are treated as indebtedness without substantial equity features, the trust's assets would not be deemed assets of a plan. However, in that case, the acquisition or holding of the notes by or on behalf of a plan could nevertheless give rise to a prohibited transaction if the acquisition and holding of notes by or on behalf of a plan was deemed to be a prohibited loan to a party in interest or disqualified person with respect to the plan. Exemptions from the prohibited transaction rules could be applicable to the purchase and holding of notes by a plan, depending on the type and circumstances of the plan fiduciary making the decision to acquire the notes. Included among these exemptions are: PTCE 84-14, regarding transactions effected by "qualified professional asset managers"; PTCE 90-1, regarding transactions entered into by insurance company pooled separate accounts; PTCE 91-38, regarding transactions entered into by bank collective investment funds; PTCE 95-60, regarding transactions entered into by insurance company general accounts; and PTCE 96-23, regarding transactions effected by "in-house asset managers". Each purchaser and each transferee of a note that is treated as debt for purposes of the plan assets regulation may be required to represent and warrant that its purchase and holding of the note will be covered by one of the exemptions listed above or by another Department of Labor class exemption.

The prospectus supplement for each series of securities will provide further information which plans should consider before purchasing the offered securities. A plan fiduciary considering the purchase of securities should consult its tax and/or legal advisors regarding whether the assets of the trust would be considered plan assets, the possibility of exemptive relief from the prohibited transaction rules and other ERISA issues and their potential consequences. Moreover, each fiduciary of a plan subject to Title I of ERISA should determine whether, under the general fiduciary standards of investment prudence and diversification, an investment in the securities is appropriate for the plan, taking into account the overall investment policy of the plan and the composition of the plan's investment portfolio. The sale of securities to a plan is in no respect a representation by the sponsor or the underwriters that this investment meets all relevant requirements with respect to investments by plans generally or any particular plan or that this investment is appropriate for plans generally or any particular plan.

In John Hancock Mutual Life Insurance Co. v. Harris Trust and Savings Bank, 510 U.S. 86 (1993), the United States Supreme Court ruled that assets held in an insurance company's general account may be deemed to be "plan assets" for ERISA purposes. In addition, the Department of Labor has issued final regulations under Section 401(c) of ERISA that describe a safe harbor for insurers that issued certain nonguaranteed policies supported by their general accounts to plans. Special caution should be exercised before purchasing a series of securities from an insurance company's general account where assets in such account may be deemed plan assets for purposes of ERISA.

### LEGAL INVESTMENT

The related prospectus supplement will describe whether or not the securities will constitute "mortgage-related securities" within the meaning of SMMEA. Accordingly, investors whose investment authority is subject to legal restrictions should consult their own legal advisors to determine whether and to what extent the securities constitute legal investments for them.

75

000226

Table of Contents

## AVAILABLE INFORMATION

The depositor has filed with the Securities and Exchange Commission a Registration Statement under the Securities Act of 1933, as amended, covering the securities. This prospectus, which forms a part of the Registration Statement, and the prospectus supplement relating to each series of certificates contain summaries of the material terms of the documents referred to in this prospectus and in the prospectus supplement, but do not contain all of the information in the Registration Statement pursuant to the rules and regulations of the Commission. For further information, reference is made to the Registration Statement and its exhibits. The Registration Statement and exhibits can be inspected and copied at prescribed rates at the public reference facilities maintained by the Commission at its Public Reference Room at 100 F. Street, NE, Washington, D.C. 20549, and at its Regional Offices located as follows: Chicago Regional Office, 500 West Madison Street, Chicago, Illinois 60661; and New York Regional Office, 233 Broadway, New York, New York 10279. You may obtain information on the operation of the Public Reference Room by calling the Commission at 1-800-SEC-0330. The Commission maintains an Internet Web site that contains reports, information statements and other information regarding the registrants that file electronically with the Commission, including the depositor. The address of that Internet Web site is http://www.sec.gov.

This prospectus does not contain all of the information set forth in the registration statement (of which this prospectus forms a part) and exhibits thereto which the sponsor has filed with the Commission under the Securities Act and to which reference is hereby made.

## INCORPORATION OF CERTAIN DOCUMENTS BY REFERENCE

All documents that we subsequently file with the Securities and Exchange Commission under section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, after the date of this prospectus shall be incorporated by reference in this prospectus and be a part of this prospectus. Any statement contained in a document incorporated by reference shall be modified or superseded if a statement contained in this prospectus, the prospectus supplement or in any other document subsequently incorporated by reference modifies or replaces that statement.

Neither the depositor nor the servicer intends to file with the Securities and Exchange Commission periodic reports with respect to the issuing entity following completion of the reporting period required by Rule 15d-1 or Regulation 15D under the Securities Exchange Act of 1934.

The sponsor will provide without charge, on request of each person to whom this prospectus is delivered, a copy of any of the documents that are incorporated by reference in this prospectus. Requests should be directed to the sponsor at Accredited Home Lenders, Inc., 15090 Avenue of Science, Suite 100, San Diego, California 92128 (telephone number (858) 451-7044).

## PLAN OF DISTRIBUTION

The related underwriter may offer each series of securities through the following methods from time to time:

1.   by negotiated firm commitment or best efforts underwriting and public re-offering by underwriters;

76

Table of Contents



2.  by placements by the sponsor with institutional investors through dealers;

3.  by direct placements by the sponsor with institutional investors; and

4.  by competitive bid.

If underwriters are used in a sale of any securities (other than in connection with an underwriting on a best efforts basis), such securities will be acquired by the underwriters for their own account and may be resold from time to time in one or more transactions, including negotiated transactions, at fixed public offering prices or at varying prices to be determined at the time of sale or at the time of commitment therefor. The securities will be set forth on the cover of the prospectus supplement relating to such series and the members of the underwriting syndicate, if any, will be named in such prospectus supplement.

In connection with the sale of the securities, underwriters may receive compensation from the sponsor or from purchasers of the securities in the form of discounts, concessions or commissions. Underwriters and dealers participating in the distribution of the securities may be deemed to be underwriters in connection with such securities, and any discounts or commissions received by them from the sponsor and any profit on the resale of securities by them may be deemed to be underwriting discounts and commissions under the Securities Act. The prospectus supplement will describe any such compensation paid by the sponsor.

It is anticipated that the underwriting agreement pertaining to the sale of any series of securities will provide that the obligations of the underwriters will be subject to certain conditions precedent, that the underwriters will be obligated to purchase all such securities if any are purchased (other than in connection with an underwriting on a best efforts basis) and that, in limited circumstances, the sponsor will indemnify the several underwriters and the underwriters will indemnify the sponsor against certain civil liabilities, including liabilities under the Securities Act or will contribute to payments required to be made in respect thereof.

The prospectus supplement with respect to any series offered by placements through dealers will contain information regarding the nature of such offering and any agreements to be entered into between the sponsor and purchasers of securities of such series.

Purchasers of securities, including dealers, may, depending on the facts and circumstances of such purchases, be deemed to be "underwriters" within the meaning of the Securities Act in connection with reoffers and sales by them of securities. Security holders should consult with their legal advisors in this regard prior to any such reoffer or sale.

## LEGAL MATTERS

Dewey Ballantine LLP, New York, New York, or any other counsel identified in the prospectus supplement, will pass upon legal matters for the sponsor and the depositors.

77

000228

Table of Contents

Annex I
### Global Clearance, Settlement and Tax Documentation Procedures

Except in certain limited circumstances, the globally offered securities will be available only in book-entry form. Investors in the global securities may hold such global securities through any of The Depository Trust Company, Clearstream or Euroclear. The global securities will be tradable as home market instruments in both the European and U.S. domestic markets. Initial settlement and all secondary trades will settle in same-day funds.

Secondary market trading between investors global securities through Clearstream and Euroclear will be conducted in the ordinary way in accordance with their normal rules and operating procedures and in accordance with conventional Eurocertificate practice (i.e., seven calendar day settlement).

Secondary market trading between investors holding global securities through DTC will be conducted according to the rules and procedures applicable to U.S. corporate debt obligations and prior collateralized mortgage security issues.

Secondary cross-market trading between Clearstream or Euroclear and DTC participants holding global securities will be effected on a delivery-against-payment basis through the respective depositories of Clearstream and Euroclear (in such capacity) and as DTC participants.

Non-U.S. holders (as described below) of global securities will be subject to U.S. withholding taxes unless such holders meet certain requirements and deliver appropriate U.S. tax documents to the securities clearing organizations or their participants.

### Initial Settlement

All global securities will be held in book-entry form by DTC in the name of Cede & Co. as nominee of DTC. Investors' interests in the global securities will be represented through financial institutions acting on their behalf as direct and indirect participants in DTC. As a result, Clearstream and Euroclear will hold positions on behalf of their participants through their respective Depositaries, which in turn will hold such positions in accounts as DTC participants.

Investors electing to hold their global securities through DTC will follow the settlement practices applicable to other collateralized mortgage security issues. Investor securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold their global securities through Clearstream or Euroclear accounts will follow the settlement procedures applicable to conventional Eurocertificates, except that there will be no temporary global security and no "lock-up" or restricted period. global securities will be credited to the securities custody accounts on the settlement date against payment in same-day funds.

### Secondary Market Trading

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

78

Table of Contents

*Trading between DTC participants.* Secondary market trading between DTC participants will be settled using the procedures applicable to prior collateralized mortgage security issues in same-day funds.

*Trading between Clearstream and/or Euroclear participants.* Secondary market trading between Clearstream participants or Euroclear participants will be settled using the procedures applicable to conventional Eurocertificates in same-day funds.

*Trading between DTC seller and Clearstream or Euroclear purchaser.* When global securities are to be transferred from the account of a DTC participant to the account of a Clearstream participant or a Euroclear participant, the purchaser will send instructions to Clearstream or Euroclear through a Clearstream participant or Euroclear participant at least one business day prior to settlement. Clearstream or Euroclear will instruct the respective Depositary, as the case may be, to receive the global securities against payment. Payment will include interest accrued on the global securities from and including the last coupon payment date to and excluding the settlement date, on the basis of the actual number of days in such accrual period and a year is assumed to consist of 360 days. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. Payment will then be made by the respective Depositary of the DTC participant's account against delivery of the global securities. After settlement has been completed, the global securities will be credited to the respective clearing system and by the clearing system, in accordance with its usual procedures, to the Clearstream participant's or Euroclear participant's account. The securities credit will appear the next day (European time) and the cash debit will be back-valued to, and the interest on the global securities will accrue from, the value date (which would be the preceding day when settlement occurred in New York). If settlement is not completed on the intended value date (i.e., the trade fails), the Clearstream or Euroclear cash debt will be valued instead as of the actual settlement date.

Clearstream participants and Euroclear participants will need to make available to the respective clearing systems the funds necessary to process same-day funds settlement. The most direct means of doing so is to preposition funds for settlement, either from cash on hand or existing lines of credit, as they would for any settlement occurring within Clearstream or Euroclear. Under this approach, they may take on credit exposure to Clearstream or Euroclear until the global securities are credited to their accounts one day later.

As an alternative, if Clearstream or Euroclear has extended a line of credit to them, Clearstream participants or Euroclear participants can elect not to preposition funds and allow that credit line to be drawn upon the finance settlement. Under this procedure, Clearstream participants or Euroclear participants purchasing global securities would incur overdraft charges for one day, assuming they cleared the overdraft when the global securities were credited to their accounts. However, interest on the global securities would accrue from the value date. Therefore, in many cases the investment income on the global securities earned during that one-day period may substantially reduce or offset the amount of such overdraft charges, although this result will depend on each Clearstream participant's or Euroclear participant's particular cost of funds. Since the settlement is taking place during New York business hours, DTC participants can employ their usual procedures for sending global securities to the respective European depository for the benefit of Clearstream participants or Euroclear participants. The sale proceeds will be available to the DTC seller on the settlement date. Thus, to the DTC participants a cross-market transaction will settle no differently than a trade between two DTC participants.

79

Table of Contents

*Trading between Clearstream or Euroclear seller and DTC purchaser.* Due to time zone differences in their favor, Clearstream participants and Euroclear participants may employ their customary procedures for transactions in which global securities are to be transferred by the respective clearing system, through the respective Depositary, to a DTC participant. The seller will send instructions to Clearstream or Euroclear through a Clearstream participant or Euroclear participant at least one business day prior to settlement. In these cases Clearstream or Euroclear will instruct the respective Depositary, as appropriate, to deliver the global securities to the DTC participant's account against payment. Payment will include interest accrued on the global securities from and including the last coupon payment to and excluding the settlement date on the basis of the actual number of days in such accrual period and a year is assumed to consist of 360 days. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. The payment will then be reflected in the account of the Clearstream participant or Euroclear participant the following day, and receipt of the cash proceeds in the Clearstream participant's or Euroclear participant's account would be back-valued to the value date (which would be the preceding day, when settlement occurred in New York). Should the Clearstream participant or Euroclear participant have a line of credit with its respective clearing system and elect to be in debt in anticipation of receipt of the sale proceeds in its account, the back-valuation will extinguish any overdraft incurred over that one-day period. If settlement is not completed on the intended value date (i.e., the trade fails), receipt of the cash proceeds in the Clearstream participant's or Euroclear participant's account would instead be valued as of the actual settlement date.

Finally, day traders that use Clearstream or Euroclear and that purchase global securities from DTC participants for delivery to Clearstream participants or Euroclear participants should note that these trades would automatically fail on the sale side unless affirmative action were taken. At least three techniques should be readily available to eliminate this potential problem:

    (a) borrowing through Clearstream or Euroclear for one day (until the purchase side of the day trade is reflected in their Clearstream or Euroclear accounts) in accordance with the clearing system's customary procedures;

    (b) borrowing the global securities in the U.S. from a DTC participant no later than one day prior to settlement, which would give the global securities sufficient time to be reflected in their Clearstream or Euroclear account in order to settle the sale side of the trade; or

    (c) staggering the value dates for the buy and sell sides of the trade so that the value date for the purchase from the DTC participant is at least one day prior to the value date for the sale to the Clearstream participant or Euroclear participant.

**Certain U.S. Federal Income Tax Documentation Requirements**

    A beneficial owner of the certificates holding securities through Clearstream or Euroclear (or through DTC if the holder has an address outside the U.S.) will be subject to the 30% U.S. withholding tax that generally applies to payments of interest (including original issue discount) on registered debt issued by U.S. Persons, unless:

    (i)    each clearing system, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business in the chain of intermediaries between such beneficial owner and the U.S. entity required to withhold tax complies with applicable certification requirements; and

80

Table of Contents

(ii)    such beneficial owner takes one of the following steps to obtain an exemption or reduced tax rate.

This summary does not deal with all aspects of U.S. federal income tax withholding that may be relevant to foreign holders of the securities as well as the application of the withholding regulations. You should consult your own tax advisors for specific advice regarding the holding and disposing of the securities.

Exemption for Non- U.S. Persons - Form W-8BEN.

Beneficial owners of global securities that are Non-U.S. Persons, as defined below, generally can obtain a complete exemption from the withholding tax by filing a signed Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding). Generally, a Form W-8BEN provided without a U.S. taxpayer identification number (TIN) is valid for a period of three years beginning on the date that the form is signed. If the information shown on Form W-8BEN changes, a new Form W-8BEN must be filed within 30 days of the change. A Form W-8BEN provided with a U.S. TIN is valid until a change in circumstances renders any information on the form incorrect, provided that the withholding agent reports on Form 1042-S at least one payment annually to such beneficial owner.

Exemption for Non-U.S. Persons with effectively connected income - Form W-8ECI

A Non-U.S. Person may claim an exemption from U.S. withholding on income effectively connected with the conduct of a trade or business in the United States by filing Form W-8ECI (Certificate of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with the Conduct of a Trade or Business in the United States). The Form W-8ECI is valid for a period of three years beginning on the date that the form is signed. If the information shown on Form W-8ECI changes, a new Form W-8ECI must be filed within 30 days of the change.

Exemption or reduced rate for Non-U.S. Persons resident in treaty countries - Form W-8BEN.

A Non-U.S. Person may claim treaty benefits by filing Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding). Generally, a Form W-8BEN provided without a U.S. taxpayer identification number (TIN) is valid for a period of three years beginning on the date that the form is signed. If the information shown on Form W-8BEN changes, a new Form W-8BEN must be filed within 30 days of the change. A Form W-8BEN provided with a U.S. TIN is valid until a change in circumstances renders any information on the form incorrect, provided that the withholding agent reports on Form 1042-S at least one payment annually to such beneficial owner.

Exemption for U.S. Persons (Form W-9).

U.S. Persons can obtain a complete exemption from the withholding tax by filing Form W-9 (Payer's Request for Taxpayer Identification Number and Certification).

A "U.S. Person" is:

(i)    a citizen or resident of the United States;

81



**Table of Contents**

(ii)    a corporation, partnership or other entity organized in or under the laws of the United States or any political subdivision thereof;

(iii)    an estate that is subject to U.S. federal income tax regardless of the source of its income; or

(iv)    a trust if a court within the United States can exercise primary supervision over its administration and at least one United States person has the authority to control all substantial decisions of the trust.

A "Non-U.S. Person" is any person who is not a U.S. Person.

82



000233

*In re Debtor:  James L Macklin-  Chapter 7*
**USBC Eastern District of California Case No:  10-44610**
**Adversary No. 11-02024-E**
**NOTICE OF APPLICATION AND *EX PARTE* APPLICATION FOR TEMORARY RESTRAINING ORDER AND**
**ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**

**EXHIBIT "5"**

Exhibit 10.1

**EXECUTION VERSION**

SALE AND SERVICING AGREEMENT

dated as of June 1, 2006

by and among

ACCREDITED MORTGAGE LOAN REIT TRUST,
as Depositor,

ACCREDITED HOME LENDERS, INC.,
as Sponsor and Servicer,

ACCREDITED MORTGAGE LOAN TRUST 2006-2,
as Issuing Entity,

and

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Indenture Trustee

**TABLE OF CONTENTS**

**Page**

ARTICLE I
DEFINITIONS

| | | |
|---|---|---|
| Section 1.01. | Certain Defined Terms | 1 |
| Section 1.02. | Provisions of General Application | 2 |

ARTICLE II
SALE AND CONVEYANCE OF THE MORTGAGE LOANS

| | | |
|---|---|---|
| Section 2.01. | Purchase and Sale of the Closing Date Mortgage Loans; Deposit of Derivatives | 2 |
| Section 2.02. | Reserved | 3 |
| Section 2.03. | Purchase Price | 3 |
| Section 2.04. | Possession of Mortgage Files; Access to Mortgage Files | 3 |
| Section 2.05. | Delivery of Mortgage Loan Documents | 4 |
| Section 2.06. | Acceptance of the Trust Estate; Certain Substitutions; Certification by the Indenture Trustee | 7 |
| Section 2.07. | Grant of Security Interest | 8 |
| Section 2.08. | Further Action Evidencing Assignments | 9 |
| Section 2.09. | Assignment of Agreement | 10 |
| Section 2.10. | Conveyance of the Subsequent Mortgage Loans | 10 |

ARTICLE III
REPRESENTATIONS, WARRANTIES AND COVENANTS

| | | |
|---|---|---|
| Section 3.01. | Representations, Warranties and Covenants of the Servicer | 13 |
| Section 3.02. | Representations, Warranties and Covenants of the Sponsor | 15 |
| Section 3.03. | [Reserved] | 16 |
| Section 3.04. | Representations, Warranties and Covenants of the Indenture Trustee | 16 |
| Section 3.05. | Covenants and Representations of the Sponsor and Servicer Regarding Prepayment Charges | 17 |
| Section 3.06. | Representations, Warranties and Covenants of the Depositor | 18 |

ARTICLE IV
THE MORTGAGE LOANS

| | | |
|---|---|---|
| Section 4.01. | Representations and Warranties Concerning the Mortgage Loans | 19 |

Exhibit 5 - 000234

Sale and Servicing Agreement                    file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 203 of 266

Section 4.02.   Purchase and Substitution                                    28

ARTICLE V
ADMINISTRATION AND SERVICING OF THE MORTGAGE LOANS

Section 5.01.   The Servicer                                                 30
Section 5.02.   Collection of Certain Mortgage Loan Payments; Collection Account   33

i

Section 5.03.   Permitted Withdrawals from the Collection Account            34
Section 5.04.   Hazard Insurance Policies; Property Protection Expenses      35
Section 5.05.   Assumption and Modification Agreements                       36
Section 5.06.   Realization Upon Defaulted Mortgage Loans                    37
Section 5.07.   Indenture Trustee to Cooperate                               38
Section 5.08.   Servicing Compensation; Payment of Certain Expenses by Servicer   39
Section 5.09.   Annual Statement as to Compliance                           39
Section 5.10.   Assessments of Compliance and Attestation Reports           40
Section 5.11.   Reports Filed with Securities and Exchange Commission       41
Section 5.12.   Access to Certain Documentation                             46
Section 5.13.   Maintenance of Fidelity Bond                                46
Section 5.14.   Subservicing Agreements Between the Servicer and Subservicer and Subservicers   46
Section 5.15.   Reports to the Indenture Trustee; Collection Account Statements   47
Section 5.16.   Optional Purchase of Defaulted Mortgage Loans               48
Section 5.17.   Reports to be Provided by the Servicer                      48
Section 5.18.   [Reserved]                                                  50
Section 5.19.   Delinquency Advances                                        50
Section 5.20.   Indemnification; Third Party Claims                         50
Section 5.21.   Maintenance of Corporate Existence and Licenses; Merger or Consolidation of the Servicer   51
Section 5.22.   Assignment of Agreement by Servicer; Servicer Not to Resign   51
Section 5.23.   [Reserved]                                                  51
Section 5.24.   Administrative Duties                                       51
Section 5.25.   Advance Facility                                            52

ARTICLE VI
APPLICATION OF FUNDS

Section 6.01.   Deposits to the Payment Account                             55
Section 6.02.   Collection of Money                                         55
Section 6.03.   Application of Principal and Interest                       55
Section 6.04.   [Reserved                                                   55
Section 6.05.   Compensating Interest                                       55

ARTICLE VII
SERVICER DEFAULT

Section 7.01.   Servicer Events of Default                                  55
Section 7.02.   Indenture Trustee to Act: Appointment of Successor          58
Section 7.03.   Waiver of Defaults                                          61

ARTICLE VIII
TERMINATION

Section 8.01.   Termination                                                 61
Section 8.02.   Additional Termination Requirements                        62
Section 8.03.   Accounting Upon Termination of Servicer                     62

ii

Exhibit 5 - 000235

Sale and Servicing Agreement  file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024  Doc 8  Page 204 of 266

ARTICLE IX
[RESERVED]

ARTICLE X
MISCELLANEOUS PROVISIONS

| Section 10.01. | Limitation on Liability | 63 |
|---|---|---|
| Section 10.02. | Acts of Noteholders | 63 |
| Section 10.03. | Amendment | 64 |
| Section 10.04. | Recordation of Agreement | 65 |
| Section 10.05. | Duration of Agreement | 65 |
| Section 10.06. | Notices | 65 |
| Section 10.07. | Severability of Provisions | 66 |
| Section 10.08. | No Partnership | 66 |
| Section 10.09. | Counterparts | 66 |
| Section 10.10. | Successors and Assigns | 66 |
| Section 10.11. | Headings | 66 |
| Section 10.12. | No Petition | 66 |
| Section 10.13. | Third Party Beneficiary | 66 |
| Section 10.14. | Intent of the Parties | 66 |
| Section 10.15. | Compliance With Regulation AB | 67 |
| Section 10.16. | GOVERNING LAW; CONSENT TO JURISDICTION; WAIVER OF JURY TRIAL | 67 |

| Schedule I | Mortgage Loan Schedule |
|---|---|
| Appendix I | Defined Terms |

EXHIBITS

| Exhibit A | Contents of the Mortgage File |
|---|---|
| Exhibit B | Reserved |
| Exhibit C | Indenture Trustee's Acknowledgement of Receipt |
| Exhibit D | Initial Certification of Indenture Trustee |
| Exhibit E | Final Certification of Indenture Trustee |
| Exhibit F | Request for Release of Documents |
| Exhibit G | AHL Officer's Certificate |
| Exhibit H | Servicing Criteria to be Addressed in Assessment of Compliance |
| Exhibit I | Form 10-D, Form 8-K and Form 10-K Reporting Responsibility |
| Exhibit J-1 | Form of Certification to Be Provided by the Depositor with Form 10-K |
| Exhibit J-2 | Form of Certification to Be Provided to the Depositor by the Indenture Trustee |
| Exhibit K | Form of Officer's Certificate Regarding Annual Statement of Compliance |
| Exhibit L | Form of Addition Notice |
| Exhibit M | Depositor's Subsequent Transfer Instrument |
| Exhibit N | Form of Additional Disclosure Notification |

iii

---

SALE AND SERVICING AGREEMENT, dated as of June 1, 2006 (this "Agreement"), by and among ACCREDITED MORTGAGE LOAN REIT TRUST, a Maryland real estate investment trust, as depositor (the "Depositor"), ACCREDITED HOME LENDERS, INC., a California corporation, as sponsor (the "Sponsor"), ACCREDITED MORTGAGE LOAN TRUST 2006-2, a Delaware statutory trust, as issuing entity (the "Issuing Entity"), ACCREDITED HOME LENDERS, INC., a California corporation, as servicer (the "Servicer"), and DEUTSCHE BANK NATIONAL TRUST COMPANY, a national banking association, as indenture trustee (the "Indenture Trustee").

W I T N E S S E T H

WHEREAS, the Sponsor has contributed the mortgage loans (the "Closing Date Mortgage Loans") listed on Schedule I to this Agreement to the Depositor, pursuant to the Contribution Agreements and Assignments, dated June 7, 2006, June 15, 2006, June 27, 2006 and June 28, 2006, between the Sponsor and the Depositor, (the "Contribution Agreements");

Exhibit 5 - 000236

Sale and Servicing Agreement file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024 Doc 8 Page 205 of 266

WHEREAS, the Depositor desires to sell to the Issuing Entity, and the Issuing Entity desires to purchase from the Depositor, the Closing Date Mortgage Loans;

WHEREAS, immediately after such purchase, the Issuing Entity will pledge such Closing Date Mortgage Loans to the Indenture Trustee pursuant to the terms of an Indenture, dated as of June 1, 2006 (the "Indenture"), between the Issuing Entity and the Indenture Trustee, and issue the Accredited Mortgage Loan Trust 2006-2, Asset-Backed Notes (the "Notes");

WHEREAS, the Servicer has agreed to service the Mortgage Loans, which constitute the principal assets of the Trust;

WHEREAS, the Indenture Trustee will hold the Mortgage Loans and certain other assets pledged to the Indenture Trustee pursuant to the Indenture;

WHEREAS, the Issuing Entity will enter into an interest rate swap agreement with the Swap Provider where the Issuing Entity agrees to pay certain fixed-rate amounts to the Swap Provider and the Swap Provider agrees to pay certain floating-rate amounts to the Trust; and

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein contained, the Depositor, the Sponsor, the Issuing Entity, the Servicer and the Indenture Trustee hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01. Certain Defined Terms. Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in Appendix I attached hereto.

1

Section 1.02. Provisions of General Application.

(a) The terms defined herein and in Appendix I to the Indenture include the plural as well as the singular.

(b) The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole. Unless otherwise noted, all references to Articles and Sections shall be deemed to refer to Articles and Sections of this Agreement.

(c) Any reference to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute to which reference is made and all regulations promulgated pursuant to such statutes.

(d) All calculations of interest with respect to the LIBOR Notes provided for herein shall be on the basis of a 360-day year and the actual number of days elapsed in the related Interest Accrual Period. All calculations of interest with respect to any Mortgage Loan provided for herein shall be made in accordance with the terms of the related Mortgage Note and Mortgage or, if such documents do not specify the basis upon which interest accrues thereon, on the basis of a 360 day year consisting of twelve 30-day months, to the extent permitted by applicable law.

(e) Any Mortgage Loan payment is deemed to be received on the date such payment is actually received by the Servicer; provided, however, that, for purposes of calculating payments on the Notes, prepayments with respect to any Mortgage Loan are deemed to be received on the date they are applied in accordance with Accepted Servicing Practices consistent with the terms of the related Mortgage Note and Mortgage to reduce the outstanding Principal Balance of such Mortgage Loan on which interest accrues.

## ARTICLE II

## SALE AND CONVEYANCE OF THE MORTGAGE LOANS

Section 2.01. Purchase and Sale of the Closing Date Mortgage Loans; Deposit of Derivatives.

(a) The Sponsor hereby directs the Depositor to sell, transfer, assign, set over and convey, and the Depositor does hereby sell, transfer, assign, set over and convey to the Issuing Entity, in each case without recourse, but subject to the terms and provisions of this Agreement, all of the right, title and interest of the Depositor in and to the Closing Date Mortgage Loans, including the Cut-Off Date Principal Balance of, and interest due on, such Closing Date Mortgage Loans listed on Schedule I attached hereto, and all other assets included or to be included in the Trust Estate (other than the Swap Agreement, which is being entered into directly by the Issuing Entity). The sale of the Closing Date Mortgage Loans will take place on the Closing Date, subject to and simultaneously with the deposit of the Closing Date Mortgage Loans and the Original Pre-Funded Amount and the Capitalized Interest Account into the Trust Estate, the authentication of the Notes by the Indenture Trustee and the sale of the Notes pursuant to the Underwriting Agreement.

2

Exhibit 5 - 000237

Sale and Servicing Agreement         file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

**Case 11-02024    Doc 8    Page 206 of 266**

(b) The Depositor may cause the deposit of derivatives at any time into the Accredited Mortgage Loan Trust 2006-2 and any such deposited derivatives shall become part of the Trust Estate.

(c) The parties hereto understand and agree that it is not intended that any Mortgage Loan be included in the Issuing Entity that is a "High-Cost Home Loan" as defined by HOEPA or any other applicable predatory or abusive lending laws.

Section 2.02. Reserved.

Section 2.03. <u>Purchase Price</u>. On the Closing Date, as full consideration for the Depositor's sale of the Closing Date Mortgage Loans to the Issuing Entity, the Underwriters, on behalf of the Issuing Entity, will deliver to, or at the direction of, the Depositor an amount in cash equal to $1,394,265,880.00. Additionally, the Depositor will receive the Certificates issued by the Issuing Entity pursuant to the Trust Agreement.

Section 2.04. <u>Possession of Mortgage Files; Access to Mortgage Files</u>.

(a) Upon the receipt by the Depositor, or its designee, of the purchase price for the Closing Date Mortgage Loans set forth in Section 2.03 hereof, the ownership of each Mortgage Note, each Mortgage and the contents of the Mortgage File related to each Closing Date Mortgage Loan will be vested in the Issuing Entity, and will be pledged to the Indenture Trustee, for the benefit of the Noteholders.

(b) Pursuant to Section 2.05 hereof, the Depositor has delivered, or caused to be delivered the Indenture Trustee's Mortgage File related to each Closing Date Mortgage Loan to the Indenture Trustee.

(c) The Indenture Trustee will hold the Indenture Trustee's Mortgage Files in trust pursuant to the terms of the Indenture for the benefit of all present and future Noteholders and the Swap Provider.

(d) Consistent with the terms of the Indenture, the Indenture Trustee shall afford the Depositor, the Sponsor, the Issuing Entity and the Servicer reasonable access to all records and documentation regarding the Mortgage Loans relating to this Agreement, such access being afforded at customary charges, upon reasonable prior written request and during normal business hours at the offices of the Indenture Trustee.

(e) No later than the fifth Business Day of each fourth month, commencing in October 2006, the Indenture Trustee shall deliver to the Servicer a report dated as of the first day of such month, identifying those Mortgage Loans for which it has not yet received (i) an original recorded Mortgage or a copy thereof certified to be true and correct by the public recording office in possession of such Mortgage or (ii) in the event that Assignments of Mortgage are required to be recorded in accordance with the provisions of Section 2.05, an original recorded Assignment of Mortgage to the Indenture Trustee and any required intervening Assignments of Mortgage or a copy thereof certified to be a true and correct copy by the public recording office in possession of such Assignment of Mortgage.

3

Section 2.05. <u>Delivery of Mortgage Loan Documents</u>. (a) In connection with the transfer and assignment of the Mortgage Loans, the Depositor shall, on or before the Closing Date, in the case of a Closing Date Mortgage Loan and two business days prior to the related Subsequent Transfer Date in the case of a Subsequent Mortgage Loan, deliver, or cause to be delivered, to the Indenture Trustee (as pledgee of the Issuing Entity pursuant to the Indenture), the following documents or instruments constituting the Indenture Trustee's Mortgage File with respect to each Mortgage Loan so transferred or assigned:

(i) the original Mortgage Note, endorsed without recourse in blank or to "Deutsche Bank National Trust Company, as Indenture Trustee under the Indenture dated as of June 1, 2006, Accredited Mortgage Loan Trust 2006-2" by the Sponsor, including all intervening endorsements showing a complete chain of endorsement;

(ii) the related original Mortgage with evidence of recording indicated thereon or a copy thereof certified by the applicable recording office and if the Mortgage Loan is registered on the MERS System, such Mortgage or an assignment of the mortgage shall reflect MERS as the mortgagee of record and shall include the MIN for such Mortgage Loan;

(iii) each intervening mortgage assignment, with evidence of recording indicated thereon or if the original is not available, a copy thereof certified by the applicable recording office, if any, showing a complete chain of assignment from the originator of the related Mortgage Loan to the Sponsor (or to MERS, if the Mortgage Loan is registered on the MERS System), and noting the presence of a MIN (if the Mortgage Loan is registered on the MERS System), which assignment may, at the Sponsor's option, be combined with the assignment referred to in subpart (iv) hereof, in which case it must be in recordable form, but need not have been previously recorded);

(iv) unless the Mortgage Loan is registered on the MERS System, a mortgage assignment in recordable form (which, if acceptable for recording in the relevant jurisdiction as evidenced by an Opinion of Counsel addressed to the Indenture Trustee, may be included in a blanket assignment or assignments) of each Mortgage from the Sponsor to the Indenture Trustee;

(v) originals of all assumption, modification and substitution agreements in those instances where the terms or provisions

Exhibit 5 - 000238

Sale and Servicing Agreement      file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 207 of 266

of a Mortgage or Mortgage Note have been modified or such Mortgage or Mortgage Note has been assumed (if any); and

(vi) an original title insurance policy or title opinion (or (A) a copy of the title insurance policy or title opinion, or (B) the related binder, commitment or preliminary report, or copy thereof in which case the Sponsor hereby certifies that the original Mortgage has been delivered to the title insurance company that issued such binder, commitment or preliminary report).

<div align="center">4</div>

In instances where the original recorded Mortgage or any intervening mortgage assignment or a completed assignment of the Mortgage in recordable form cannot be delivered by the Sponsor to the Indenture Trustee prior to or concurrently with the execution and delivery of this Agreement due to a delay in connection with recording, the Sponsor may:

(x) in lieu of delivering such original recorded Mortgage or intervening mortgage assignment, deliver to the Indenture Trustee, a copy thereof and the Sponsor hereby certifies that the original Mortgage has been delivered to a title insurance company for recordation after receipt of its policy of title insurance or the related binder, commitment or preliminary report thereof; and

(y) with respect to clause (iv) above, in lieu of delivering the completed assignment in recordable form, deliver to the Indenture Trustee, the assignment in recordable form, otherwise complete except for recording information.

The Indenture Trustee is hereby authorized and directed, upon an Event of Default and subject to subsection (b) below, with respect to each assignment described in Section 2.05(a)(iv) hereof, to endorse such assignment as follows: "Deutsche Bank National Trust Company, as Indenture Trustee under the Indenture dated as of June 1, 2006, Accredited Mortgage Loan Trust 2006-2."

(b) As promptly as practicable, but in any event within thirty (30) days from the Closing Date or the relevant Subsequent Transfer Date, as applicable, the Sponsor shall promptly submit, or cause to be submitted for recording in the appropriate public office for real property records, each assignment referred to in Section 2.05(a)(iv); provided, that the Sponsor need not cause to be recorded any assignment which (i) is registered on the MERS System, or (ii) relates to a Mortgage Loan in any jurisdiction under the laws of which, as evidenced by an Opinion of Counsel delivered by the Sponsor (at the Sponsor's expense) to the Indenture Trustee, acceptable to the Rating Agencies, the recordation of such assignment is not necessary to protect the Indenture Trustee's, the Noteholders', the Swap Provider's and the Certificates' interest in the related Mortgage Loan. The Indenture Trustee, shall retain a copy of each assignment submitted for recording. In the event that any such assignment is lost or returned unrecorded because of a defect therein, the Sponsor shall promptly prepare a substitute assignment or cure such defect, as the case may be, and thereafter the Sponsor shall submit each such assignment for recording. The costs relating to the delivery and recordation of the documents in connection with the Mortgage Loans as specified in this Article II shall be borne by the Sponsor. With respect to Mortgage Loans (i) not registered on the MERS System, or (ii) not covered by an Opinion of Counsel described in this section 2.05(b) to the extent that assignments of mortgage have not been recorded within one year after the Closing Date or the relevant Subsequent Transfer Date, as applicable, the Depositor shall, and if the Depositor fails to, then the Sponsor shall be obligated to repurchase such Mortgage Loans in accordance with the provisions of Section 4.02.

In connection with the assignment of any Mortgage Loan registered on the MERS System, promptly after the Closing Date or the relevant Subsequent Transfer Date, as applicable, the Sponsor will cause, at its own expense, the MERS System to indicate that such Mortgage Loan has been assigned to the Indenture Trustee for the benefit of the Noteholders by entering (a) the Indenture Trustee's Org ID in the "Investor" field which identifies the Indenture Trustee and (b) in the "Pool" field a code which identifies the securitization serial number of the Notes issued in connection with such Mortgage Loans. The Sponsor and the Servicer will not alter the

<div align="center">5</div>

entries referenced in this paragraph with respect to any such Mortgage Loan during the term of this Agreement unless and until such Mortgage Loan is repurchased or otherwise in accordance with the terms of this Agreement.

(c) The Sponsor shall, within five (5) Business Days after the receipt thereof, deliver, or cause to be delivered, to the Indenture Trustee: (i) the original recorded Mortgage and related power of attorney, if any, in those instances where a copy thereof certified by the Sponsor was delivered to the Indenture Trustee; (ii) the original recorded assignment of Mortgage from the last endorsee to the Indenture Trustee, which, together with any intervening assignments of Mortgage, evidences a complete chain of assignment from the originator of the Mortgage Loan to the Indenture Trustee, in those instances where copies of such assignments certified by the Sponsor were delivered to the Indenture Trustee; and (iii) the title insurance policy or title opinion required in Section 2.05(a)(vi).

Notwithstanding anything to the contrary contained in this Section 2.05, in those instances where the public recording office retains the original Mortgage, power of attorney, if any, assignment or assignment of Mortgage after it has been recorded or such original has been lost, the Sponsor shall be deemed to have satisfied its obligations hereunder upon delivery to the Indenture Trustee, of a copy of such Mortgage, power of attorney, if any, assignment or assignment of Mortgage certified by the public recording office

Exhibit 5 - 000239

Sale and Servicing Agreement                    file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 208 of 266

to be a true copy of the recorded original thereof.

From time to time the Sponsor may forward, or cause to be forwarded, to the Indenture Trustee, additional original documents evidencing any assumption or modification of a Mortgage Loan.

(d) All original documents relating to the Mortgage Loans that are not required to be delivered to the Indenture Trustee, pursuant to Section 2.05(a) hereof are, and shall be, held by the Servicer, the Sponsor or the Depositor, as the case may be, in trust for the benefit of the Indenture Trustee, on behalf of the Noteholders and the Swap Provider. In the event that any such original document is required pursuant to the terms of this Section 2.05 to be a part of an Indenture Trustee's Mortgage File, such document shall be delivered promptly to the Indenture Trustee. From and after the sale of the Mortgage Loans to the Issuing Entity pursuant hereto, to the extent that the last assignee thereof retains title of record to any Mortgage Loans prior to the vesting of legal title in the Issuing Entity, such title shall be retained in trust for the Issuing Entity as the owner of the Mortgage Loans, and the Indenture Trustee, as the pledgee of the Issuing Entity under the Indenture. In acting as custodian of any original document which is part of the Indenture Trustee's Mortgage Files, the Servicer agrees further that it does not and will not have or assert any beneficial ownership interest in the related Mortgage Loans or the Mortgage Files. Promptly upon the Servicer's receipt of any such original document, the Servicer, on behalf of the Issuing Entity, shall mark conspicuously each such original document, and its master data processing records with a legend evidencing that the Issuing Entity has purchased the related Mortgage Loan and all right and title thereto and interest therein, and pledged such Mortgage Loan and all right and title thereto and interest therein to the Indenture Trustee, on behalf of the Noteholders and the Swap Provider.

<div align="center">6</div>

Section 2.06. Acceptance of the Trust Estate; Certain Substitutions; Certification by the Indenture Trustee. (a) The Indenture Trustee is authorized and directed to, and agrees to, do the following:

(i) execute and deliver to the Depositor, the Sponsor and the Servicer, on or prior to the Closing Date with respect to each Closing Date Mortgage Loan transferred on such date, an acknowledgement of receipt, in the form attached as Exhibit C hereto, of the original Mortgage Note as required to be included in the Indenture Trustee's Mortgage File (with any exceptions noted) and declares that it will hold such documents and any amendments, replacements or supplements thereto, as well as any other assets included in the definition of Trust Estate and delivered to the Indenture Trustee, subject to the conditions set forth in the Indenture, for the benefit of the Noteholders.

(ii) to review (or cause to be reviewed) each Indenture Trustee's Mortgage File within sixty (60) days after the Closing Date (or, with respect to any Qualified Substitute Mortgage Loans, within sixty (60) days after receipt thereof), and to deliver to the Servicer, the Depositor and the Sponsor a certification, in the form attached hereto as Exhibit D, to the effect that, except as otherwise noted, as to each Mortgage Loan listed in the related Mortgage Loan Schedule (other than any Mortgage Loan paid in full or any Mortgage Loan specifically identified in such certification as not covered by such certification), (i) all documents specified in Section 2.05(a)(i)-(iv) and (vi) are in its possession, (ii) each such document has been reviewed by it and appears, on its face, not to have been mutilated, damaged, torn or otherwise physically altered (handwritten additions, changes or corrections shall not constitute physical alteration if they reasonably appear to have been initialed), appears regular on its face and relates to such Mortgage Loan, and (iii) based on its examination and only as to the foregoing documents, the information set forth on the Mortgage Loan Schedule with respect to items (i), (ii) (with respect to property address only, excluding zip code), (iii) and (vi) of the definition of "Mortgage Loan Schedule" accurately reflects the information set forth in the Indenture Trustee's Mortgage File delivered on such date; provided however, no certification of the Indenture Trustee shall constitute a determination by the Indenture Trustee of the proper form, adequacy or enforceability of any document included in the Indenture Trustee's Mortgage File.

(iii) to review (or cause to be reviewed) each Indenture Trustee's Mortgage File within one hundred eighty (180) days after the Closing Date (or, with respect to any Qualified Substitute Mortgage Loans, within one hundred eighty (180) days after receipt thereof), and to deliver to the Servicer and the Sponsor a certification in the form attached hereto as Exhibit E to the effect that, except as otherwise noted, as to each Mortgage Loan listed in the related Mortgage Loan Schedule (other than any Mortgage Loan paid in full or any Mortgage Loan specifically identified in such certification as not covered by such certification), (i) all documents specified in Section 2.05(a)(i)-(iv) and (vi) are in its possession, (ii) each such document has been reviewed by it and has not been mutilated, damaged, torn or otherwise physically altered (handwritten additions, changes or corrections shall not constitute physical alteration if they reasonably appear to be initialed by the Mortgagor), appears regular on its face and

<div align="center">7</div>

relates to such Mortgage Loan, and (iii) based on its examination and only as to the foregoing documents, the information set forth in items (i), (ii) (with respect to property address only, excluding zip code), (iii) and (vi) of the definition of "Mortgage Loan Schedule" accurately reflects the information set forth in the Indenture Trustee's Mortgage File delivered on such date.

In performing any such review, the Indenture Trustee may conclusively rely on the Sponsor as to the purported genuineness of any such document and any signature thereon. It is understood that the scope of the Indenture Trustee's review of the Indenture

Exhibit 5 - 000240

Sale and Servicing Agreement    file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024  Doc 8  Page 209 of 266

Trustee's Mortgage Files is limited solely to confirming that the documents listed in Section 2.05 have been executed and received and relate to the Indenture Trustee's Mortgage Files identified in the related Mortgage Loan Schedule. The Indenture Trustee shall be under no duty or obligation to inspect, review or examine any such documents, instruments, certificates or other papers to determine that they are genuine, enforceable, or appropriate for the represented purpose or that they are other than what they purport to be on their face.

(b) If the Indenture Trustee during the process of reviewing the Indenture Trustee's Mortgage Files finds any document constituting a part of a Indenture Trustee's Mortgage File which is not executed, has not been received, is unrelated to the Mortgage Loan identified in the related Mortgage Loan Schedule, or does not conform to the requirements of Section 2.05 or the description thereof as set forth in the related Mortgage Loan Schedule, the Indenture Trustee shall promptly so notify the Servicer and the Sponsor. Upon receipt of such notice respecting such defect, the Depositor and the Sponsor shall have a sixty (60) day period after such notice within which to correct or cure any such defect, or if the Servicer determines that the defect materially and adversely affects the value of the related Mortgage Loan or the interest of the Noteholders in the related Mortgage Loan, to either (i) substitute in lieu of such Mortgage Loan a Qualified Substitute Mortgage Loan in the manner and subject to the conditions set forth in this Section 2.06 or (ii) purchase such Mortgage Loan at a purchase price equal to the Loan Repurchase Price. Upon receipt by the Indenture Trustee of two copies of a certification, in the form attached hereto as Exhibit F, of a Servicing Officer of such substitution or purchase and, in the case of a substitution, upon receipt by the Indenture Trustee, of the related Indenture Trustee's Mortgage File, and the deposit of the Loan Repurchase Price, in the case of a purchase, or the Substitution Adjustment, if any, in connection with a substitution, in the Collection Account, the Indenture Trustee shall release to the Servicer for release to the Depositor or the Sponsor, as applicable, the related Indenture Trustee's Mortgage File and the Indenture Trustee shall execute, without recourse, and deliver such instruments of transfer furnished by the Depositor or the Sponsor as may be necessary to transfer such Mortgage Loan to the Depositor or the Sponsor, as applicable.

Section 2.07. Grant of Security Interest. (a) It is intended that the conveyance of the Mortgage Loans and other property by the Depositor to the Issuing Entity as provided in this Article II be, and be construed for all purposes other than tax and accounting purposes as, a sale of the Mortgage Loans and such other property by the Depositor to the Issuing Entity. It is, for all purposes other than tax and accounting purposes further, not intended that such conveyance be deemed a pledge of the Mortgage Loans or such other property by the Depositor to the Issuing Entity to secure a debt or other obligation of the Depositor. However, in the event that the Mortgage Loans or any of such other property are held to be property of the Depositor, or if for

<div align="center">8</div>

any reason this Agreement is held or deemed to create a security interest in the Mortgage Loans or any of such other property, then it is intended that: (i) this Agreement shall also be deemed to be a security agreement within the meaning of the Uniform Commercial Code; (ii) the conveyance provided for in this Article II shall be deemed to be a grant by the Depositor to the Issuing Entity of a security interest in all of the Depositor's right, title and interest in and to the Mortgage Loans and such other property and all amounts payable to the holders of the Mortgage Loans in accordance with the terms thereof and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including, without limitation, all amounts from time to time held or invested in the Accounts whether in the form of cash, instruments, securities or other property; (iii) the possession by the Indenture Trustee, of the Mortgage Notes and such other items of property as constitute instruments, money, negotiable documents or chattel paper shall be deemed to be "possession by the secured party" for purposes of perfecting the security interest pursuant to the Uniform Commercial Code; and (iv) notifications to persons holding such property, and acknowledgments, receipts or confirmations from persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from financial intermediaries, bailees or agents, as applicable, of the Indenture Trustee for the purpose of perfecting such security interest under applicable law. The Depositor, the Sponsor, the Servicer, on behalf of the Issuing Entity and the Indenture Trustee, shall, to the extent consistent with this Agreement, take such actions as may be reasonably necessary to ensure that, if this Agreement were deemed to create a security interest in the Mortgage Loans or any of such other property, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of this Agreement.

(b) The Depositor, the Sponsor and the Servicer shall take no action inconsistent with the Issuing Entity's ownership of the Trust Estate and each shall indicate or shall cause to be indicated in its records and records held on its behalf that ownership of each Mortgage Loan and the other assets in the Trust Estate is vested in the Issuing Entity, as owner, and is pledged to the Indenture Trustee, for the benefit of the Noteholders and the Swap Provider pursuant to the terms of the Indenture. The Indenture Trustee is authorized to act, pursuant to the terms of this Agreement for the benefit of the Noteholders and shall be authorized to act at the direction of such parties. In addition, the Depositor, the Sponsor and the Servicer shall respond to any inquiries from third parties with respect to ownership of a Mortgage Loan or any other asset in the Trust Estate by stating that it is not the owner of such asset and that the Issuing Entity is the owner of such Mortgage Loan or other asset in the Trust Estate, which is pledged to the Indenture Trustee, for the benefit of the Noteholders and the Swap Provider.

Section 2.08. Further Action Evidencing Assignments. (a) The Servicer agrees that, from time to time, at its expense, it shall cause the Sponsor or Depositor, as the case may be, to, and each of the Sponsor and Depositor agree that it shall, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or appropriate, or that the Servicer or the Indenture Trustee may reasonably request, in order to perfect, protect or more fully evidence the transfer of ownership

Exhibit 5 - 000241

Sale and Servicing Agreement     file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

**Case 11-02024     Doc 8     Page 210 of 266**

of the Mortgage Loans and other assets in the Trust Estate or to enable the Indenture Trustee, to exercise or enforce any of its rights hereunder. Without limiting the generality of the foregoing, the Servicer, the Sponsor and the Depositor shall, upon the request of the Servicer or the Indenture Trustee execute and file (or cause to be executed and filed) such real estate filings, financing or continuation statements, or amendments thereto or assignments thereof, and such other instruments or notices, as may be necessary or appropriate.

9

(b) Each of the Sponsor and the Depositor hereby grants to the Servicer and the Indenture Trustee powers of attorney to execute all documents on its behalf under this Agreement as may be necessary or desirable to effectuate the foregoing.

Section 2.09. Assignment of Agreement. The Sponsor, the Depositor and the Servicer hereby acknowledge and agree that the Issuing Entity may assign its interest under this Agreement to the Indenture Trustee, for the benefit of the Noteholders and the Swap Provider, as may be required to effect the purposes of the Indenture, without further notice to, or consent of, the Sponsor or the Servicer, and the Indenture Trustee shall succeed to such of the rights of the Issuing Entity hereunder as shall be so assigned. The Issuing Entity shall, pursuant to the Indenture, assign all of its right, title and interest in and to the Mortgage Loans and its right to exercise the remedies created by Section 4.02 of this Agreement for breaches of the representations, warranties, agreements and covenants of the Sponsor contained in Sections 3.02 and 4.01 of this Agreement, assign such right, title and interest to the Indenture Trustee, for the benefit of the Noteholders and the Swap Provider. The Sponsor agrees that, upon such assignment to the Indenture Trustee, such representations, warranties, agreements and covenants will run to and be for the benefit of the Indenture Trustee and the Indenture Trustee may enforce, without joinder of the Sponsor or the Issuing Entity, the repurchase obligations of the Sponsor set forth herein with respect to breaches of such representations, warranties, agreements and covenants.

Section 2.10. Conveyance of the Subsequent Mortgage Loans.

(a) Subject to the conditions set forth in paragraph (b) below in consideration of the Issuing Entity's delivery on the related Subsequent Transfer Dates of all or a portion of the balance of funds in the Pre-Funding Account, the Depositor, shall then sell, transfer, assign, set over and convey, without recourse, to the Issuing Entity, but subject to the other terms and provisions of this Sale and Servicing Agreement, all of the right, title and interest of the Depositor in and to (i) the Subsequent Mortgage Loans identified on the related Mortgage Loan Schedule attached to the related Subsequent Transfer Instrument delivered by the Depositor on such Subsequent Transfer Date, (ii) principal due and interest accruing on the Subsequent Mortgage Loans after the related Subsequent Cut-off Date and (i) with respect to such Subsequent Mortgage Loans all items to be delivered pursuant to Section 2.05 above and the other items in the related Mortgage Files; provided, however, that the Depositor reserves and retains all right, title and interest in and to principal received and interest accruing on the Subsequent Mortgage Loans prior to the related Subsequent Cut-off Date. The transfer by the Depositor to the Issuing Entity, of the Subsequent Mortgage Loans identified on each Mortgage Loan Schedule attached to the related Subsequent Transfer Instrument shall be absolute and is intended by the Issuing Entity, the Depositor and the Sponsor to constitute and to be treated as a sale of the Subsequent Mortgage Loans by the Depositor to the Issuing Entity.

In the event such transactions shall be deemed not to be a sale, the Depositor hereby grants to the Issuing Entity as of each Subsequent Transfer Date a security interest in all of the Depositor's right, title and interest in, to and under the related Subsequent Mortgage Loans and

10

such other property, to secure all of the Depositor's obligations hereunder, and this Sale and Servicing Agreement shall constitute a security agreement under applicable law, and in such event, the parties hereto acknowledge that the Indenture Trustee holds the Subsequent Mortgage Loans as designee of the Issuing Entity. The Depositor agrees to take or cause to be taken such actions and to execute such documents, including without limitation, the filing of all necessary UCC-1 financing statements filed in the State of Maryland (which shall be submitted for filing as of the related Subsequent Transfer Date), any continuation statements with respect thereto and any amendments thereto required to reflect a change in the name or corporate structure of the Depositor or the filing of any additional UCC-1 financing statements due to a change in the state of incorporation of the Depositor as are necessary to perfect and protect the interests of the Issuing Entity and its assignees in Subsequent Mortgage Loans.

The related Mortgage File for each Subsequent Mortgage Loan shall be delivered to the Indenture Trustee, prior to the related Subsequent Transfer Date.

The Indenture Trustee on each Subsequent Transfer Date shall acknowledge by signing receipt thereof its acceptance of all right, title and interest to the related Subsequent Mortgage Loans and other property, existing on the Subsequent Transfer Date and thereafter created, conveyed to it pursuant to this Section 2.10.

The Indenture Trustee, as indenture trustee of the Trust Estate, shall be entitled to all scheduled principal payments due after each Subsequent Cut-off Date, all other payments of principal due and collected after each related Subsequent Cut-off Date, and all payments of interest on the Subsequent Mortgage Loans, minus that portion of any such payment which is allocable to the period prior to the related Subsequent Cut-off Date. No scheduled payments of principal due on or before the related Subsequent Cut-off Date and collected after the related Subsequent Cut-off Date shall belong to the Trust Estate pursuant to the terms of this Sale and Servicing

Exhibit 5 - 000242

Sale and Servicing Agreement        file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 211 of 266

Agreement.

The purchase price paid by the Indenture Trustee, at the direction of the Servicer and on behalf of the Indenture Trustee, from amounts released from the Pre-Funding Account shall be one-hundred percent (100%) of the aggregate Principal Balances of the Subsequent Mortgage Loans so transferred (as identified on the Mortgage Loan Schedule attached to the related Subsequent Transfer Instrument provided by the Depositor).

(b) The Depositor shall transfer to the Issuing Entity, the Subsequent Mortgage Loans and the other property and rights related thereto described in Section 2.10(a) above, and the Indenture Trustee shall cause to be released funds from the related Pre-Funding Account, only upon the satisfaction of each of the following conditions on or prior to the related Subsequent Transfer Date:

(i) the Depositor shall have provided the Indenture Trustee, with a timely Addition Notice, which notice shall be given no fewer than four Business Days prior to the related Subsequent Transfer Date and shall designate the Subsequent Mortgage Loans to be sold to the Issuing Entity and the aggregate Principal Balances of such Subsequent Mortgage Loans as of the related Subsequent Cut-off Date and any other information reasonably requested by the Indenture Trustee with respect to the Subsequent Mortgage Loans;

11

(ii) the Depositor shall have delivered to the Indenture Trustee, a duly executed Subsequent Transfer Instrument substantially in the form of Exhibit M, as applicable, (A) confirming the satisfaction of each condition precedent and representations specified in this Section 2.10(b), Section 2.10(c) and in the related Subsequent Transfer Instrument and (B) including a Mortgage Loan Schedule attached thereto listing the Subsequent Mortgage Loans;

(iii) as of each Subsequent Transfer Date, as evidenced by delivery of the Depositor's Subsequent Transfer Instrument is the form of Exhibit M, neither the Sponsor nor the Depositor shall be insolvent or have been made insolvent by such transfers, nor shall they be aware of any pending insolvency;

(iv) the Pre-Funding Period shall not have terminated; and

(v) the Depositor shall have delivered to the Indenture Trustee, the Issuing Entity, the Sponsor and the Rating Agencies Opinions of Counsel addressed to the Rating Agencies, the Indenture Trustee, the Issuing Entity and the Sponsor with respect to the transfers of the Subsequent Mortgage Loans substantially in the form of the Opinion of Counsel delivered to the Indenture Trustee, the Issuing Entity, the Sponsor and the Rating Agencies on the Closing Date (1) regarding certain corporate matters and (2) confirming the existence of a true sale which may be contained in such opinion delivered on the Closing Date.

(c) The obligation of the Issuing Entity to purchase a Subsequent Mortgage Loan on any Subsequent Transfer Date is subject to the following conditions: (1) each such Subsequent Mortgage Loan shall satisfy the representations and warranties specified in the related Subsequent Transfer Instrument and this Sale and Servicing Agreement; (2) the Depositor shall not select such Subsequent Mortgage Loans in a manner that it reasonably believes is adverse to the interests of the Majority Noteholders; (3) the Depositor shall have delivered certain Opinions of Counsel required pursuant to Section 2.10(v) hereof; (4) as of the related Subsequent Cut-off Date, the Subsequent Mortgage Loans shall satisfy the following criteria: (i) none of the Subsequent Mortgage Loans shall be contractually delinquent as of the related Subsequent Cut-off Date; (ii) the remaining stated term to maturity of each Subsequent Mortgage Loan shall not exceed 360 months; (iii) all of the Subsequent Mortgage Loans are secured by either a first lien or second lien on the related Mortgaged Property; (iv) each Subsequent Mortgage Loan shall have an outstanding Principal Balance of at least $10,000; (v) each Subsequent Mortgage Loan shall be underwritten in accordance with the Underwriting Guidelines; (vi) each Subsequent Mortgage Loan shall have a Loan-to-Value Ratio or a combined Loan-to-Value Ratio of no more than 100%; (vii) each Subsequent Mortgage Loan shall have a stated maturity of no later than October 2036; (viii) the remaining stated term to maturity of the any subsequent mortgage loan will not exceed 360 months; (ix) the acquisition of any Subsequent Mortgage Loans will not result in a weighted average current Mortgage Rate of at least 7.780% per annum; (x) the acquisition of any Subsequent Mortgage Loans will not result in a weighted average Original Loan-to-Value Ratio of not more than 79.00%; and (xi) the acquisition of any Subsequent Mortgage Loans will not result in a weighted average Credit Score of less than 625.

12

The acceptance of the Subsequent Mortgage Loans by the Issuing Entity is subject to the Depositor receiving a written or verbal consent from each of the Rating Agencies that states that the addition of such Subsequent Mortgage Loans will not cause the Rating Agencies to downgrade any of their ratings on the Offered Notes.

Notwithstanding the foregoing, Subsequent Mortgage Loans with characteristics varying from those set forth above may be purchased by the Issuing Entity and included in the Trust Estate, if (i) the Issuing Entity is provided with written confirmation that the aggregate credit risk of such Subsequent Mortgage Loans is similar to that of the Closing Date Mortgage Loans and (ii) the Depositor receives and provides to the Issuing Entity a written consent from each of the Rating Agencies that states that the addition of such Subsequent Mortgage Loans will not cause the Rating Agencies to downgrade any of their ratings of the Offered Notes.

Exhibit 5 - 000243

Sale and Servicing Agreement        file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 212 of 266

(d) Within five Business Days after the end of the Pre-Funding Period, the Depositor shall deliver to the Rating Agencies, the Indenture Trustee, the Issuing Entity and the Sponsor a copy of the updated Mortgage Loan Schedule including the Subsequent Mortgage Loans in electronic format.

# ARTICLE III

## REPRESENTATIONS, WARRANTIES AND COVENANTS

Section 3.01. <u>Representations, Warranties and Covenants of the Servicer</u>. The Servicer hereby represents, warrants and covenants to the Indenture Trustee, the Depositor, the Sponsor, the Issuing Entity, the Swap Provider and the Noteholders as of the Closing Date, as of each Subsequent Transfer Date and during the term of this Agreement that:

(a) The Servicer is duly organized, validly existing and in good standing under the laws of its state of incorporation and has the power to own its assets and to transact the business in which it is currently engaged. The Servicer is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which the character of the business transacted by it or properties owned or leased by it or the performance of its obligations hereunder requires such qualification and in which the failure so to qualify could reasonably be expected to have a material adverse effect on the business, properties, assets, or condition (financial or other) of the Servicer or the performance of its obligations hereunder.

(b) The Servicer has the power and authority to make, execute, deliver and perform this Agreement and all of the transactions contemplated under this Agreement, and has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement, and assuming the due authorization, execution and delivery hereof by the other parties hereto constitutes, or will constitute, the legal, valid and binding obligation of the Servicer, enforceable in accordance with its terms, except as enforcement of such terms may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights of creditors generally, and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

<div align="center">13</div>

(c) The Servicer is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency which consent already has not been obtained in connection with the execution, delivery, performance, validity or enforceability of this Agreement, except such as have been obtained prior to the Closing Date.

(d) The execution, delivery and performance of this Agreement by the Servicer will not violate any provision of any existing law or regulation or any order or decree of any court or the charter or bylaws of the Servicer, or constitute a breach of any mortgage, indenture, contract or other Agreement to which the Servicer is a party or by which it may be bound.

(e) Except as set forth in the Prospectus Supplement under the heading "*Risk Factors*," there is no action, suit, proceeding or investigation pending or to Servicer's knowledge threatened against the Servicer which, either in any one instance or in the aggregate, is, in the Servicer's judgment, likely to result in any material adverse change in the business, operations, financial condition, properties, or assets of the Servicer, or in any material impairment of the right or ability of the Servicer to carry on its business substantially as now conducted, or in any material liability on the part of the Servicer, or which would draw into question the validity of this Agreement, the Notes, or the Closing Date Mortgage Loans or of any action taken or to be taken in connection with the obligations of the Servicer contemplated herein or therein, or which would be likely to impair materially the ability of the Servicer to perform its obligations hereunder.

(f) Neither this Agreement nor any statement, report, or other document furnished by the Servicer pursuant to this Agreement or in connection with the transactions contemplated hereby, including, without limitation, the sale or placement of the Notes, contains any untrue material statement of fact provided by or on behalf of the Servicer or omits to state a material fact necessary to make the statements provided by or on behalf of the Servicer contained herein or therein not misleading.

(g) The Servicer does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement.

(h) The Servicer is not an "investment company" or a company "controlled by an investment company," within the meaning of the Investment Company Act of 1940, as amended.

(i) The Servicer shall take all necessary steps to maintain the Indenture Trustee's perfection and priority in the Mortgage Loans.

(j) The Servicer will fully furnish, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (i.e., favorable and unfavorable) on its borrower credit files to Equifax, Experian, and Trans Union Credit Information Company (three of the credit repositories), on a monthly basis.

Exhibit 5 - 000244

Sale and Servicing Agreement        file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 213 of 266

14

(k) The Servicer is a member of MERS in good standing, and will comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS.

It is understood and agreed that the representations, warranties and covenants set forth in this Section 3.01 shall survive the delivery of the respective Indenture Trustee's Mortgage Files to the Indenture Trustee and inure to the benefit of the Indenture Trustee.

Section 3.02. <u>Representations, Warranties and Covenants of the Sponsor</u>. The Sponsor hereby represents, warrants and covenants to the Indenture Trustee, the Depositor, the Issuing Entity, the Swap Provider and the Servicer that as of the date of this Agreement or as of such date specifically provided herein, and as of each subsequent Transfer Date:

(a) The Sponsor is a corporation duly organized, validly existing and in good standing under the laws of the State of California.

(b) The Sponsor has the corporate power and authority to execute, deliver and perform, and to enter into and consummate the transactions contemplated by this Agreement and each Sponsor's Subsequent Transfer Instrument.

(c) This Agreement has been duly and validly authorized, executed and delivered by the Sponsor, all requisite corporate action having been taken, and, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes or will constitute the legal, valid and binding agreement of the Sponsor, enforceable against the Sponsor in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights of creditors generally, and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

(d) No consent, approval, authorization or order of or registration or filing with, or notice to, any governmental authority or court is required for the execution, delivery and performance of or compliance by the Sponsor with this Agreement or the consummation by the Sponsor of any of the transactions contemplated hereby, except as have been made on or prior to the Closing Date.

(e) None of the execution and delivery of this Agreement or of each Sponsor's subsequent Transfer Instrument, the consummation of the transactions contemplated hereby or thereby, or the fulfillment of or compliance with the terms and conditions of this Agreement, or of each Sponsor's subsequent Transfer Instrument by the Sponsor (i) conflicts or will conflict with or results or will result in a breach of, or constitutes or will constitute a default or results or will result in an acceleration under (A) the articles of incorporation or bylaws of the Sponsor, or (B) of any term, condition or provision of any material indenture, deed of trust, contract or other agreement or instrument to which the Sponsor or any of its subsidiaries is a party or by which it or any of its subsidiaries is bound; (ii) results or will result in a violation of any law, rule, regulation, order, judgment or decree applicable to the Sponsor of any court or governmental authority having jurisdiction over the Sponsor or its subsidiaries; or (iii) results in the creation or imposition of any lien, charge or encumbrance which would have a material adverse effect upon the Mortgage Loans or any documents or instruments evidencing or securing the Mortgage Loans.

15

(f) Except as set forth in the Prospectus Supplement under the heading "*Risk Factors*," there are no actions, suits or proceedings before or against or investigations of, the Sponsor pending, or to the knowledge of the Sponsor, threatened, before any court, administrative agency or other tribunal, and no notice of any such action, which, in the Sponsor's reasonable judgment, might materially and adversely affect the performance by the Sponsor of its obligations under this Agreement, or the validity or enforceability of this Agreement.

(g) The Sponsor is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency that may materially and adversely affect its performance hereunder.

It is understood and agreed that the representations, warranties and covenants set forth in this Section 3.02 may not be waived and shall survive delivery of the respective Indenture Trustee's Mortgage Files to the Indenture Trustee and shall inure to the benefit of the Indenture Trustee.

Section 3.03. [Reserved.]

Section 3.04. <u>Representations, Warranties and Covenants of the Indenture Trustee</u>. The Indenture Trustee hereby represents, warrants and covenants to the Issuing Entity, the Swap Provider, the Servicer, the Depositor and the Sponsor that as of the date of this Agreement and the subsequent Transfer Instruments or as of such date specifically provided herein:

(a) The Indenture Trustee is a national banking association duly organized, validly existing and in good standing under the laws of the United States of America;

Exhibit 5 - 000245

Sale and Servicing Agreement        file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 214 of 266

(b) The Indenture Trustee has the requisite power and authority to execute, deliver and perform, and to enter into and consummate transactions contemplated by this Agreement;

(c) This Agreement has been duly and validly authorized, executed and delivered by the Indenture Trustee, all requisite action having been taken, and, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes or will constitute the legal, valid and binding agreement of the Indenture Trustee, enforceable against the Indenture Trustee in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights of creditors generally, and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law);

(d) No consent, approval, authorization or order of or registration or filing with, or notice to, any governmental authority or court is required for the execution, delivery and performance of or compliance by the Indenture Trustee with this Agreement or the consummation by the Indenture Trustee of any of the transactions contemplated hereby, except as have been made on or prior to the Closing Date;

16

(e) None of the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby or thereby, or the fulfillment of or compliance with the terms and conditions of this Agreement, (i) conflicts or will conflict with or results or will result in a breach of, or constitutes or will constitute a default or results or will result in an acceleration under (A) the articles of association or bylaws of the Indenture Trustee, or (B) to the best of its knowledge, of any term, condition or provision of any material indenture, deed of trust, contract or other agreement or instrument to which the Indenture Trustee is a party or by which it is bound; or (ii) results or will result in a violation of any statute, rule, regulation, order, judgment or decree applicable to the Indenture Trustee of any court or governmental authority having jurisdiction over the Indenture Trustee or its subsidiaries which violation would materially and adversely affect the Indenture Trustee's performance of its duties hereunder; and

(f) There are no actions, suits or proceedings before or against or investigations of, the Indenture Trustee, pending or to the knowledge of the Indenture Trustee threatened, before any court, administrative agency or other tribunal, and no notice of any such action, which, in the Indenture Trustee's reasonable judgment, would materially and adversely affect the performance by the Indenture Trustee of its obligations under this Agreement, or the validity or enforceability of this Agreement.

It is understood and agreed that the representations, warranties and covenants set forth in this Section 3.04 shall survive delivery of the respective Indenture Trustee's Mortgage Files to the Indenture Trustee.

Section 3.05. Covenants and Representations of the Sponsor and Servicer Regarding Prepayment Charges.

(a) The Servicer covenants that it will not waive any Prepayment Charge or part of a Prepayment Charge unless in connection with a Mortgage Loan that is in default or for which a default is reasonably foreseeable.

(b) The Sponsor hereby represents and warrants that the information set forth in the Prepayment Charge Schedule is complete, true and correct in all material respects at the date or dates respecting which such information is furnished and each Prepayment Charge is permissible and enforceable in accordance with its terms (except to the extent that the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally) under applicable law.

(c) Upon discovery by the Sponsor or the Indenture Trustee of a breach of the foregoing, the party discovering such breach shall give prompt written notice to the other parties. Within 60 days of the earlier of discovery by the Servicer or receipt of notice by the Servicer of breach, the Servicer shall cure such breach in all material respects. If the covenant made by the Servicer in clause (a) above is breached the Servicer must pay into the Collection Account the amount of the waived Prepayment Charge. If the representation made by the Sponsor in clause (b) above is breached, the Sponsor must pay into the Collection Account the amount of the scheduled Prepayment Charge, less any amount previously collected and paid by the Servicer into the Collection Account. The foregoing obligations of the Servicer and the Sponsor shall be the sole and exclusive remedies for a breach of this Section 3.05(a) or (b).

17

Section 3.06. Representations, Warranties and Covenants of the Depositor. The Depositor hereby represents, warrants and covenants to the Indenture Trustee, the Issuing Entity, the Swap Provider, the Sponsor and the Servicer that as of the date of this Agreement or as of such date specifically provided herein, and as of each subsequent Transfer Date:

(a) The Depositor is a Maryland real estate investment trust duly organized, validly existing and in good standing under the laws of the State of Maryland.

(b) The Depositor has the trust power and authority to convey the Mortgage Loans and to execute, deliver and perform, and to enter into and consummate the transactions contemplated by this Agreement, and each Depositor's Subsequent Transfer

Exhibit 5 - 000246

Sale and Servicing Agreement        file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 215 of 266

Instrument.

(c) This Agreement has been duly and validly authorized, executed and delivered by the Depositor, all requisite corporate action having been taken, and, assuming the due authorization, execution and delivery hereof by the other parties hereto, constitutes or will constitute the legal, valid and binding agreement of the Depositor, enforceable against the Depositor in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights of creditors generally, and by general equity principles (regardless of whether such enforcement is considered in a proceeding in equity or at law).

(d) No consent, approval, authorization or order of or registration or filing with, or notice to, any governmental authority or court is required for the execution, delivery and performance of or compliance by the Depositor with this Agreement or the consummation by the Depositor of any of the transactions contemplated hereby, except as have been made on or prior to the Closing Date.

(e) None of the execution and delivery of this Agreement or of each Depositor's Subsequent Transfer Instrument, the consummation of the transactions contemplated hereby or thereby, or the fulfillment of or compliance with the terms and conditions of this Agreement, or of each Depositor's Subsequent Transfer Instrument by the Depositor (i) conflicts or will conflict with or results or will result in a breach of, or constitutes or will constitute a default or results or will result in an acceleration under (A) the certificate of trust or bylaws of the Depositor, or (B) of any term, condition or provision of any material indenture, deed of trust, contract or other agreement or instrument to which the Depositor or any of its subsidiaries is a party or by which it or any of its subsidiaries is bound; (ii) results or will result in a violation of any law, rule, regulation, order, judgment or decree applicable to the Depositor of any court or governmental authority having jurisdiction over the Depositor or its subsidiaries; or (iii) results in the creation or imposition of any lien, charge or encumbrance which would have a material adverse effect upon the Mortgage Loans or any documents or instruments evidencing or securing the Mortgage Loans.

(f) Except as set forth in the Prospectus Supplement under the heading "*Risk Factors,*" there are no actions, suits or proceedings before or against or investigations of, the Depositor pending, or to the knowledge of the Depositor, threatened, before any court, administrative agency or other tribunal, and no notice of any such action, which, in the Depositor's reasonable judgment, might materially and adversely affect the performance by the Depositor of its obligations under this Agreement, or the validity or enforceability of this Agreement.

18

(g) The Depositor is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency that may materially and adversely affect its performance hereunder.

(h) The Depositor hereby covenants that it has filed a federal income tax return for its taxable year ending December 31, 2004 on Internal Revenue Service Form 1120 REIT on which the Depositor elected to be taxed as a REIT. The Depositor hereby represents that it has been organized in conformity with the requirements for qualification for taxation as a REIT and hereby covenants that it at all times the Depositor owns Trust Certificates, either directly, or indirectly through one or more Qualified REIT Subsidiaries, will conduct its operations so as to qualify as a REIT. If, at any time the Depositor owns Trust Certificates, either directly, or indirectly through one or more Qualified REIT Subsidiaries, the Depositor determines that is has failed to qualify as a REIT, the Depositor shall, within 30 days of such discovery, notify the Indenture Trustee of such failure.

It is understood and agreed that the representations, warranties and covenants set forth in this Section 3.06 shall survive delivery of the respective Indenture Trustee's Mortgage Files to the Indenture Trustee and shall inure to the benefit of the Indenture Trustee.

<div align="center">

**ARTICLE IV**

**THE MORTGAGE LOANS**

</div>

Section 4.01. <u>Representations and Warranties Concerning the Mortgage Loans</u>. The Sponsor makes the following representations and warranties to the Depositor, the Servicer, the Indenture Trustee, the Swap Provider and the Issuing Entity as to the Mortgage Loans on which the Issuing Entity relies in accepting the Mortgage Loans in trust and executing the Notes. All uses and variations of the word "enforceable" in this Section 4.01, shall be deemed to be qualified as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (whether considered in a proceeding or action in equity or at law). With respect to the representations and warranties stated in Sections 4.01(i), (r), (ddd), (eee) and (fff), the Sponsor makes such representations and warranties on behalf of itself and the Depositor. Such representations, warranties and covenants are made or deemed to be made as to each Closing Date Mortgage Loan as of the Closing Date, and as to each Subsequent Mortgage Loan as of the Subsequent Transfer Date.

(a) The information with respect to each Closing Date Mortgage Loan set forth in the Mortgage Loan Schedule is true and correct as of the Cut-Off Date, based on Cut-Off Date Principal Balances, and with respect to each Subsequent Mortgage Loan is true

Exhibit 5 - 000247

Sale and Servicing Agreement                         file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 216 of 266

and correct as of the related Subsequent Transfer Date.

19

(b) Each Mortgage Loan is being serviced either (i) through the Servicer or (ii) a Person controlling, controlled by or under common control with the Servicer and qualified to service mortgage loans.

(c) Each Mortgage Loan was underwritten or reunderwritten pursuant to the Underwriting Guidelines which conform in all material respects to the description thereof set forth in the Prospectus Supplement.

(d) All of the original or certified documentation required to be delivered to the Indenture Trustee pursuant to this Agreement (including all material documents related thereto) with respect to each Mortgage Loan has been or will be delivered to the Indenture Trustee in accordance with the terms of this Agreement. Each of the documents and instruments specified to be included therein has been duly executed and in due and proper form, and each such document or instrument is in a form generally acceptable to prudent mortgage lenders that regularly originate or purchase mortgage loans comparable to the Mortgage Loans for sale to prudent investors in the secondary market that invest in mortgage loans such as the Mortgage Loans.

(e) [Reserved.]

(f) Each Mortgaged Property is improved by a single (one to four) family residential dwelling, which may include condominiums, individual units in a planned unit development and townhouses but shall not include cooperatives.

(g) No Mortgage Loan had an LTV at origination in excess of 100%.

(h) Each Mortgage Loan is a valid, subsisting enforceable and perfected first lien as identified on the Mortgage Loan Schedule on the Mortgaged Property and subject in all cases to the exceptions to title set forth in the title insurance policy, with respect to the related Mortgage Loan, which exceptions are generally acceptable to banking institutions in connection with their regular mortgage lending activities, and such other exceptions to which similar properties are commonly subject and which do not individually, or in the aggregate, materially and adversely affect the benefits of the security intended to be provided by such Mortgage. At the time each Mortgage Loan was originated, the originator was a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Sections 203 and 211 of the National Housing Act or a savings and loan association, a savings bank, a commercial bank or similar banking institution which was supervised and examined by a federal or state authority or a mortgage banker or broker licensed or authorized to do business in the jurisdiction in which the related Mortgaged Property is located, applying the same standards and procedures used by the Sponsor in originating Mortgage Loans directly.

(i) Immediately prior to the transfer and assignment of the Mortgage Loans to the Depositor pursuant to the Contribution Agreements, the Sponsor held good and marketable title to, and was the sole owner of each Mortgage Loan, subject to no liens, charges, mortgages or encumbrances or rights of others, except liens of third party warehouse lenders that will be released simultaneously with the transfer and assignment contemplated herein; and immediately prior to the transfer and assignment herein contemplated, the Depositor held good and

20

marketable title to, and was the sole owner of, each Mortgage Loan subject to no liens, charges, mortgages, encumbrances or rights of others except liens which will be released simultaneously with such transfer and assignment; and immediately upon the transfer and assignment herein contemplated, the Indenture Trustee will hold good and marketable title to, and be the sole owner of, each Mortgage Loan subject to no liens, charges, mortgages, encumbrances or rights of others except liens which will be released simultaneously with such transfer and assignment.

(j) There is no delinquent tax or assessment lien on any Mortgaged Property, and each Mortgaged Property is free of substantial damage and is in good repair.

(k) There is no valid and enforceable right of rescission, set-off, defense or counterclaim to any Mortgage Note or Mortgage, including the obligation of the related Mortgagor to pay the unpaid principal of or interest on such Mortgage Note or the defense of usury, nor will the operation of any of the terms of the Mortgage Note or the Mortgage, or the exercise of any right thereunder, render either the Mortgage Note or the Mortgage unenforceable in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto.

(l) There is no mechanics' lien or claim for work, labor or material affecting any Mortgaged Property which is or may be a lien prior to, or equal with and no rights are outstanding that under the law gives rise to such liens, the lien of the related Mortgage except those which are insured against by any title insurance policy referred to in paragraph (n) below.

(m) Each Mortgage Loan at the time it was made complied with, and each Mortgage Loan at all times was serviced in compliance with, in each case, in all material respects, applicable local, state and federal laws and regulations, including, without

Exhibit 5 - 000248

Sale and Servicing Agreement file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

**Case 11-02024 Doc 8 Page 217 of 266**

limitation, the federal Truth-in-Lending Act and other consumer protection laws, the Home Ownership and Equity Protection Act of 1994, real estate settlement procedure, usury, equal credit opportunity, disclosure and recording laws and all applicable predatory and abusive lending laws.

(n) With respect to each Mortgage Loan, a lender's title insurance policy, issued in standard California Land Title Association form or American Land Title Association form, or other form acceptable in a particular jurisdiction by a title insurance company authorized to transact business in the state in which the related Mortgaged Property is situated, in an amount at least equal to the original Principal Balance of such Mortgage Loan insuring the mortgagee's interest under the related Mortgage Loan as the holder of a valid first mortgage lien of record on the real property described in the related Mortgage, as the case may be, subject only to exceptions of the character referred to in paragraph (h) above, was effective on the date of the origination of such Mortgage Loan, and, as of the Closing Date or relevant Subsequent Transfer Date such policy will be valid and inure to the benefit of the Indenture Trustee on behalf of the Noteholders.

(o) The improvements upon each Mortgaged Property are covered by a valid and existing hazard insurance policy (which may be a blanket policy of the type described in this Agreement) with a generally acceptable carrier that provides for fire and extended coverage representing coverage not less than the least of (i) the outstanding Principal Balance of the related Mortgage Loan, (ii) the minimum amount required to compensate for damage or loss on a replacement cost basis or (iii) the full insurable value of the Mortgaged Property.

<div align="center">21</div>

(p) If any Mortgaged Property is in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy (which may be a blanket policy of the type described in this Agreement) in a form meeting the requirements of the current guidelines of the Federal Insurance Administration is in effect with respect to such Mortgaged Property with a generally acceptable carrier in an amount representing coverage not less than the least of (i) the outstanding Principal Balance of the related Mortgage Loan (together, in the case of a second mortgage loan, with the outstanding principal balance of the first mortgage loan), (ii) the minimum amount required to compensate for damage or loss on a replacement cost basis or (iii) the maximum amount of insurance that is available under the Flood Disaster Protection Act of 1973.

(q) Each Mortgage and Mortgage Note is the legal, valid and binding obligation of the maker thereof and is enforceable in accordance with its terms, except only as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (whether considered in a proceeding or action in equity or at law), and all parties to each Mortgage Loan had full legal capacity to execute all documents relating to such Mortgage Loan and convey the estate therein purported to be conveyed.

(r) The Sponsor has directed and the Depositor has caused to be performed any and all acts required to be performed to preserve the rights and remedies of the Indenture Trustee in any Insurance Policies applicable to any Mortgage Loan delivered by the Sponsor or the Depositor including, to the extent such Mortgage Loan is not covered by a blanket policy described in this Agreement, any necessary notifications of insurers, assignments of policies or interests therein, and establishments of coinsured, joint loss payee and mortgagee rights in favor of the Indenture Trustee.

(s) The Sponsor has caused or will have caused, within ten days, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the original Mortgage Note and all subsequent assignments of the original Mortgage, granted to the Indenture Trustee hereunder, subject to the provisions of Section 2.05(b) of this Agreement.

(t) The terms of each Mortgage Note and each Mortgage have not been impaired, altered, waived or modified in any respect, except by a written instrument which has been recorded, if necessary, to protect the interest of the Noteholders and which has been delivered to the Indenture Trustee.

(u) The proceeds of each Mortgage Loan have been fully disbursed, and there is no obligation on the part of the mortgagee to make future advances thereunder. All costs, fees and expenses incurred in making or closing or recording such Mortgage Loans were paid.

(v) Except as otherwise required by law or pursuant to the statute under which the related Mortgage Loan was made, the related Mortgage Note is not and has not been secured by any collateral, pledged account or other security except the lien of the corresponding Mortgage.

<div align="center">22</div>

(w) No Mortgage Loan was originated under a buydown plan.

(x) No Mortgage Loan provides for negative amortization, has a shared appreciation feature, or other contingent interest feature.

Exhibit 5 - 000249

Sale and Servicing Agreement      file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 218 of 266

(y) Each Mortgaged Property is located in the state identified in the Mortgage Loan Schedule and consists of one or more parcels of real property with a residential dwelling erected thereon and that no residence or dwelling is a mobile home.

(z) Each Mortgage securing a Mortgage Note contains a provision for the acceleration of the payment of the unpaid Principal Balance of the related Mortgage Loan in the event the related Mortgaged Property is sold without the prior consent of the mortgagee thereunder.

(aa) Any advances made after the date of origination of a Mortgage Loan but prior to the Cut-Off Date, have been consolidated with the outstanding principal amount secured by the related Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term reflected on the Mortgage Loan Schedule. The consolidated principal amount does not exceed the original principal amount of the related Mortgage Loan. No Mortgage Note permits or obligates the Depositor, the Servicer, the Sponsor or any other Person to make future advances to the related Mortgagor at the option of the Mortgagor.

(bb) There is no proceeding pending or threatened for the total or partial condemnation of any Mortgaged Property, nor is such a proceeding currently occurring, and each Mortgaged Property is undamaged by waste, fire, earthquake or earth movement, flood, tornado or other casualty, so as to affect adversely the value of the Mortgaged Property as security for the Mortgage Loan or the use for which the premises were intended.

(cc) All of the improvements which were included for the purposes of determining the Appraised Value of any Mortgaged Property lie wholly within the boundaries and building restriction lines of such Mortgaged Property, and no improvements on adjoining properties encroach upon such Mortgaged Property, except as stated in the related title insurance policy and affirmatively insured.

(dd) No improvement located on or being part of any Mortgaged Property is in violation of any applicable zoning law or regulation. As of the related date of origination, all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of each Mortgaged Property and, with respect to the use and occupancy of the same, including, but not limited to, certificates of occupancy and fire underwriting certificates, have been made or obtained from the appropriate authorities and such Mortgaged Property is lawfully occupied under the applicable law.

(ee) With respect to each Mortgage constituting a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so

<center>23</center>

serves and is named in such Mortgage, and no fees or expenses are or will become payable by the Sponsor, the Depositor, or the Issuing Entity to the trustee under the deed of trust, except in connection with a trustee's sale after default by the related Mortgagor.

(ff) [Reserved.]

(gg) [Reserved.]

(hh) Each Mortgage contains customary and enforceable provisions which render the rights and remedies of the holder thereof adequate for the realization against the related Mortgaged Property of the benefits of the security, including (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale and (ii) otherwise by judicial foreclosure. There is no homestead or other exemption available which materially interferes with the right to sell the related Mortgaged Property at a trustee's sale or the right to foreclose the related Mortgage.

(ii) There is no default, breach, violation or event of acceleration existing under any Mortgage or the related Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration; and the Depositor has not waived any default, breach, violation or event of acceleration.

(jj) No instrument of release or waiver has been executed in connection with any Mortgage Loan, and no Mortgagor has been released, in whole or in part.

(kk) [Reserved.]

(ll) The Sponsor has no actual knowledge that there exists on any Mortgaged Property any hazardous substances, hazardous wastes or solid wastes, as such terms are defined in the CERCLA, the Resource Conservation and Recovery Act of 1976, or other federal, state or local environmental legislation.

(mm) No action, error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to the origination of a Mortgage Loan has taken place on the part of any person, including, without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application of any insurance in

<div align="right">Exhibit 5 - 000250</div>

Sale and Servicing Agreement                                    file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 219 of 266

relation to such Mortgage Loan.

(nn) The Sponsor has not solicited the Mortgagor in connection with any refinancing.

(oo) If the Mortgage Loan is an adjustable rate Mortgage Loan, all of the adjustments to the Mortgage Interest Rate, to the amount of the monthly payment, and to the principal balance have been made in accordance with the terms of the related Mortgage Note.

(pp) The origination and collection practices used with respect to the Mortgage Loan have been in all respects legal, proper, prudent and customary in the mortgage origination and servicing business.

<center>24</center>

(qq) Except with respect to AVM Mortgage Loans, an appraisal of the related Mortgaged Property was made and signed, prior to the approval of the Mortgage Loan application, by a qualified appraiser who met the requirements of the Sponsor's appraisal policy and procedures and who had no interest, direct or indirect in the Mortgaged Property or in any loan made on the security thereof, whose compensation was not affected by the approval or disapproval of the Mortgage Loan, with respect to each AVM Mortgage Loan, the Mortgage File contains an insured automated valuation meeting the requirements of the Sponsor's Underwriting Guidelines.

(rr) The Mortgagor has received all disclosure materials required by applicable law with respect to the making of adjustable rate mortgage loans; and if the Mortgage Loan is a refinanced Mortgage Loan, the Mortgagor has received all disclosure and rescission materials required by applicable law with respect to the making of a refinanced Mortgage Loan, and evidence of such receipt is and will remain in the Servicer's file.

(ss) If the residential dwelling on the Mortgaged Property is a condominium unit or a unit in a planned unit development (other than a de minimis planned unit development), such condominium or planned unit development project meets the Sponsor's eligibility requirements.

(tt) None of the Closing Date Mortgage Loans was more than one payment past due or had been dishonored. Except for eighty-nine Closing Date Mortgage Loans that were 30 or more days contractually delinquent one time, five Closing Date Mortgage Loans that were 30 or more days contractually delinquent three times in the twelve months prior to the Initial Cut-off Date, one Closing Date Mortgage Loan that was 30 or more days contractually delinquent six times in the twelve months prior to the Initial Cut-off Date, none of the Closing Date Mortgage Loans have been thirty or more days delinquent more than one time in the twelve months preceding the Cut-Off Date. The number of Closing Date Mortgage Loans which are more than 30 days delinquent do not exceed 20% of the Initial Pool Balance of the Closing Date Mortgage Loans.

(uu) The Sponsor has not advanced funds, or induced, solicited or knowingly received any advance of funds by a person other than the Mortgagor, directly or indirectly, for the payment of any amount required under the Mortgage Loan, except for interest prepaid upon the closing of the Mortgage Loan. No Mortgage Loan contains any provision pursuant to which Monthly Payments are: (i) paid or partially paid with funds deposited in any separate account established by the Sponsor, the Mortgagor, or anyone on behalf of the Mortgagor or (ii) paid by any source other than the Mortgagor. The Mortgage Loan is not deemed a graduated payment mortgage loan and the Mortgage Loan does not have a shared appreciation or other contingent interest feature.

(vv) No foreclosure proceedings are pending against the Mortgaged Property and the Mortgage Loan is not subject to any pending bankruptcy or insolvency proceeding, and to the Sponsor's best knowledge, no material litigation or material lawsuit relating to the Mortgage Loan is pending.

<center>25</center>

(ww) Principal payments on the Mortgage Loan commenced or will commence within sixty days after the proceeds of the Mortgage Loan were disbursed.

(xx) With respect to escrow deposits, if any, all such payments are in the possession of, or under the control of, the Servicer and there exists no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made or could be made. No escrow deposits or escrow advances or other charges or payments due the Servicer have been capitalized under any Mortgage or the related Mortgage Note.

(yy) With respect to the conveyance of the Mortgage Loans by the Sponsor to the Depositor, the Sponsor used no selection procedures that identified the Mortgage Loans as being less desirable or valuable than other comparable mortgage loans originated or acquired by the Sponsor. The Mortgage Loans are representative of the Sponsor's portfolio of fixed-rate or adjustable-rate mortgage loans, as applicable. With respect to the conveyance of the Mortgage Loans pursuant to this Agreement, the Depositor used no selection procedures that identified the Mortgage Loans as being less desirable or valuable than other comparable mortgage loans originated or acquired by the Depositor. The Mortgage Loans are representative of the Depositor's portfolio of

Exhibit 5 - 000251

Sale and Servicing Agreement         file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024   Doc 8   Page 220 of 266

fixed-rate or adjustable-rate mortgage loans, as applicable.

(zz) Each Mortgage Loan conforms, and all such Mortgage Loans in the aggregate conform in all material respects to the description thereof set forth in the Prospectus Supplement.

(aaa) All requirements for the valid transfer of each Insurance Policy, including any assignments or notices required in each Insurance Policy, have been satisfied.

(bbb) This Agreement creates a valid and continuing security interest (as defined in the applicable UCC) in the Mortgage Loans in favor of the Indenture Trustee, which security interest is prior to all other liens, and is enforceable as such as against creditors of and purchasers from the Depositor.

(ccc) The Mortgage Loans constitute "instruments" within the meaning of the applicable UCC.

(ddd) The Sponsor received all consents and approvals required by the terms of the Mortgage Loans to the contribution of the Mortgage Loans pursuant to the Contribution Agreements to the Depositor and the Depositor has received all consents and approvals required by the terms of the Mortgage Loans to the sale of the Mortgage Loans hereunder to the Owner Trustee and the subsequent pledge to the Indenture Trustee.

(eee) Other than the security interest granted to the Indenture Trustee pursuant to the Indenture, neither the Sponsor nor the Depositor has pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Mortgage Loans. Neither the Sponsor nor the Depositor has authorized the filing of nor is aware of any financing statements against the Sponsor or the Depositor that include a description of collateral covering the Mortgage Loans other than any financing statement relating to the security interest granted to the Indenture Trustee hereunder or that has been terminated. Neither the Sponsor nor the Depositor is aware of any judgment or tax lien filings affecting the Mortgage Loans against either the Depositor or the Sponsor.

26

(fff) All financing statements filed or to be filed against the Sponsor or the Depositor in favor of the Indenture Trustee in connection herewith describing the Mortgage Loans contain a statement to the following effect: "A purchase of or security interest in any collateral described in this financing statement will violate the rights of the Indenture Trustee."

(ggg) None of the Mortgage Loans are classified as (a) "high cost" loans under the Home Ownership and Equity Protection Act of 1994 or (b) "high cost," "threshold," "covered", "predatory" or "abusive" loans under any other applicable state, federal or local law (including without limitation any regulation or ordinance) (or a similarly classified loan using different terminology under a law imposing heightened regulatory scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees).

(hhh) No proceeds from any Mortgage Loan were used to finance single-premium credit insurance policies. With respect to each Mortgage Loan, no borrower obtained a prepaid single-premium credit-life, credit-disability, credit unemployment or credit property insurance policy in connection with the origination of the mortgage loan.

(iii) No Mortgage Loan is a "High Cost Home Loan" or "Covered Loan," as applicable, (as such terms are defined in the then current Standard & Poor's LEVELS Glossary which is now Version 5.6c Revised, Appendix E) and no Mortgage Loan originated on or after October 1, 2002 through March 6, 2003 is governed by the Georgia Fair Lending Act. No Mortgage Loan that was originated on or after October 1, 2002 and before March 7, 2003 is secured by property located in the State of Georgia. There is no Mortgage Loan that was originated on or after March 7, 2003 which is a "high cost home loan" as defined under the Georgia Fair Lending Act.

(jjj) No Mortgage Loan is secured by a leasehold interest, unless such leasehold interest extends 60 months beyond the stated maturity of the Mortgage Note.

(kkk) There is no pending action or proceeding directly involving the Mortgaged Property in which compliance with any environmental law, rule or regulation is an issue. Based upon customary and prudent residential mortgage industry underwriting standards, there is no violation of any environmental law, rule or regulation with respect to the Mortgaged Property, and nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation constituting a prerequisite to use and enjoyment of said property.

(lll) The Mortgagor has not notified Accredited, and Accredited has no knowledge of any relief requested or allowed to the Mortgagor under the Servicemembers Civil Relief Act or any similar state statute.

(mmm) No Mortgage Loan was made in connection with the construction (other than a "construct to perm" loan) or rehabilitation of a Mortgaged Property or facilitating the trade in or exchange of a Mortgaged Property.

27

Exhibit 5 - 000252

Sale and Servicing Agreement      file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 221 of 266

(nnn) Accredited has complied with all applicable anti money laundering laws and regulations, including without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws").

(ooo) No Mortgage Loan imposes a Prepayment Charge for a term in excess of five years.

(ppp) No Mortgage Loan is a "High-Cost Home Loan" as defined in the New Jersey Home Ownership Act, effective as of November 27, 2003, or the Home Loan Protection Act of New Mexico, effective as of January 1, 2004.

(qqq) No Mortgage Loan is a "High-Cost Home Loan" as defined in the Massachusetts Predatory Home Loan Practice Act effective November 7, 2004 (MA House Bill 4880).

(rrr) [Reserved.]

(sss) A breach of any one of the representations set forth in paragraphs (ggg), (hhh), (iii) and (qqq) above, will be deemed to materially and adversely affect the interests of the Noteholders and shall require a repurchase of the affected Mortgage Loan pursuant to Section 4.02.

It is understood and agreed that the representations, warranties and covenants set forth in this Section 4.01 shall survive delivery of the respective Indenture Trustee's Mortgage Files to the Indenture Trustee and shall inure to the benefit of the Indenture Trustee on behalf of the Noteholders.

Section 4.02. Purchase and Substitution. (a) It is understood and agreed that the representations and warranties set forth in Section 4.01 shall survive the transfer of the Mortgage Loans by the Depositor to the Issuing Entity, the subsequent pledge thereof by the Issuing Entity to the Indenture Trustee, for the benefit of the Noteholders, and the delivery of the Notes to the Noteholders, and shall continue in full force and effect, notwithstanding any restrictive or qualified endorsement on the Mortgage Notes and notwithstanding subsequent termination of this Agreement.

(b) Upon discovery by the Depositor, the Sponsor, the Servicer, the Indenture Trustee or a Noteholder of a breach of any of the representations and warranties in Section 4.01 which materially and adversely affects the value of any Mortgage Loan, or which materially and adversely affects the interests of the Noteholders in the related Mortgage Loan, the party discovering such breach or failure shall promptly (and in any event within five (5) days of the discovery) give written notice thereof to the others. Within sixty (60) days of the earlier of its discovery or its receipt of notice of any breach of a representation or warranty, the Depositor shall, and if the Depositor fails to, then the Sponsor shall (a) promptly cure such breach in all material respects, (b) purchase such Mortgage Loan on a Servicer Remittance Date, in the manner and at the price specified in Section 2.06(b) and this Section 4.02, or (c) remove such Mortgage Loan from the Trust Estate (in which case it shall become a Deleted Mortgage Loan) and substitute one or more Qualified Substitute Mortgage Loans in the manner specified in Section 2.06 and this Section 4.02. The Indenture Trustee shall deliver prompt written notice to the Rating Agencies of any repurchase or substitution made pursuant to this Section 4.02 or Section 2.06(b).

28

(c) As to any Deleted Mortgage Loan for which the Depositor or the Sponsor substitutes a Qualified Substitute Mortgage Loan or Loans, the Servicer shall cause the Depositor or Sponsor to effect such substitution by delivering to the Indenture Trustee a certification, in the form attached hereto as Exhibit F, executed by a Servicing Officer, and the documents described in Sections 2.05(a)(i)-(vi) for such Qualified Substitute Mortgage Loan or Loans.

(d) The Servicer shall deposit in the Collection Account all payments received in connection with such Qualified Substitute Mortgage Loan or Loans after the date of such substitution. Monthly Payments due with respect to Qualified Substitute Mortgage Loans in or before the Due Period in which the substitution occurs shall not be part of the Trust Estate and will be retained by the Sponsor on the next succeeding Payment Date. For the Due Period in which the substitution occurs, distributions to Noteholders will include the Monthly Payment due on any Deleted Mortgage Loan for such Due Period and thereafter the Sponsor shall be entitled to retain all amounts received in respect of such Deleted Mortgage Loan. The Servicer shall give written notice to the Indenture Trustee that such substitution has taken place and shall amend the Mortgage Loan Schedule to reflect the removal of such Deleted Mortgage Loan from the terms of this Agreement and the substitution of the Qualified Substitute Mortgage Loan or Loans. Upon such substitution, such Qualified Substitute Mortgage Loan or Loans shall be subject to the terms of this Agreement in all respects.

(e) With respect to any Mortgage Loan that has been converted to an REO Mortgage Loan, all references in this Section 4.02 or Section 2.06 to "Mortgage Loan" shall be deemed to also refer to the REO Mortgage Loan. With respect to any Mortgage Loan that the Depositor and Sponsor are required to repurchase that is or becomes a Liquidated Mortgage Loan, in lieu of repurchasing such Mortgage Loan, the Servicer shall deposit into the Payment Account, pursuant to Section 8.01 of the Indenture, an amount equal to the amount of the Liquidated Loan Loss, if any, incurred in connection with the liquidation of such Mortgage Loan within the same time period in which the Servicer, Depositor or Sponsor would have otherwise been required to repurchase such Mortgage Loan.

Exhibit 5 - 000253

Sale and Servicing Agreement       file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 222 of 266

(f) It is understood and agreed that the obligations of the Depositor and the Sponsor set forth in Sections 2.06 and 4.02 to cure, purchase or substitute for a defective Mortgage Loan, or to indemnify as described in Section 4.02(g) constitute the sole remedies of the Indenture Trustee and the Noteholders respecting a breach of the representations and warranties of the Sponsor set forth in Section 4.01 of this Agreement.

(g) The Sponsor shall be obligated to indemnify the Depositor, the Indenture Trustee, the Issuing Entity, the Owner Trustee and the Noteholders for any third party claims arising out of a breach by the Sponsor of representations or warranties regarding the Mortgage Loans.

29

---

## ARTICLE V

### ADMINISTRATION AND SERVICING OF THE MORTGAGE LOANS

Section 5.01. The Servicer. (a) The Servicer shall service and administer the Mortgage Loans in accordance with this Agreement and in accordance with Accepted Servicing Practices and all applicable requirements of the Servicing Criteria, and shall have full power and authority, acting alone, to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable.

(b) The Servicer shall exercise its discretion consistent with Accepted Servicing Practices and the terms of this Agreement, with respect to the enforcement of defaulted Mortgage Loans in such manner as will maximize the receipt of principal and interest with respect thereto, including but not limited to the sale of such Mortgage Loan to a third party, the modification of such Mortgage Loan, or foreclosure upon the related property with a Mortgage and disposition thereof.

(c) The duties of the Servicer shall include collecting and posting of all payments, responding to inquiries of Mortgagors or by federal, state or local government authorities with respect to the Mortgage Loans, investigating delinquencies, reporting tax information to Mortgagors in accordance with its customary practices and accounting for collections and furnishing monthly and annual statements to the Indenture Trustee with respect to distributions, paying Compensating Interest and making Delinquency Advances and Servicing Advances pursuant hereto. The Servicer shall follow its customary standards, policies and procedures in performing its duties as Servicer. The Servicer shall cooperate with the Indenture Trustee and furnish to the Indenture Trustee with reasonable promptness information in its possession as may be necessary or appropriate to enable the Indenture Trustee to perform its tax reporting duties hereunder. The Indenture Trustee shall furnish the Servicer with any powers of attorney and other documents as the Indenture Trustee shall deem necessary or appropriate to enable the Servicer to carry out its servicing and administrative duties hereunder; provided, however, that the Indenture Trustee shall not be responsible for any misuse of any such power of attorney; provided, further, that the Indenture Trustee shall prepare for and deliver to the Indenture Trustee for its execution any such powers of attorney; provided, further, that the Indenture Trustee shall not be responsible for any misuse of any such power of attorney. Notwithstanding anything contained herein to the contrary, the Servicer shall not, without the Indenture Trustee's written consent, other than routine foreclosure actions: (i) initiate any action, suit or proceeding directly relating to the servicing of the Mortgage Loan solely under the Indenture Trustee's name without indicating the Servicer's representative capacity, (ii) initiate any other action, suit or proceeding not directly relating to the servicing of any Mortgage Loan (including but not limited to actions, suits or proceedings against Noteholders or Certificateholders, or against the Depositor for breaches of representations and warranties) solely under the Indenture Trustee's name, (iii) engage counsel to represent the Indenture Trustee in any action, suit or proceeding not directly related to the servicing of any Mortgage Loan (including but not limited to actions, suits or proceedings against Noteholders or Certificateholders, or against the Depositor for breaches of representations and warranties, or (iv) prepare, execute or deliver any government filings, forms, permits, registrations or other documents or take any action with the intent to cause, and that actually causes, the Indenture Trustee to be registered to do business in any state.

30

---

(d) [Reserved.]

(e) The Servicer shall, in accordance with Accepted Servicing Practices, have the right to approve requests of Mortgagors for consent to (i) partial releases of Mortgage Loans and (ii) alterations, removal, demolition or division of Mortgaged Properties subject to Mortgage Loans. No such request shall be approved by the Servicer unless: (x) the provisions of the related Mortgage Note have been complied with; (y) the LTV (which may, for this purpose, be determined at the time of any such action) after any release does not exceed the LTV set forth for such Mortgage Loan in the Mortgage Loan Schedule; and (z) the lien priority, monthly payment, Mortgage Interest Rate or maturity date of the related Mortgage is not affected except in accordance with Section 5.01(f); provided, however, that the foregoing requirements (x), (y) and (z) shall not apply to any such situation described in this paragraph if such situation results from any condemnation or easement activity by a governmental entity.

(f) Notwithstanding anything else contained herein, the Servicer may not agree to a modification or extension of any Mortgage Loan unless both (i) such Mortgage Loan is in default or a default thereon is reasonably foreseeable and (ii) such modification or extension would not result in the Servicer agreeing to modifications or extensions on Mortgage Loans with Initial Pool Balances of more than 5.0% of the Maximum Collateral Amount. In addition, the Servicer may not agree to more than (i) one

Exhibit 5 - 000254

Sale and Servicing Agreement        file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 223 of 266

modification or extension with respect to any individual Mortgage Loan in a calendar year or (ii) three modifications or extensions of an individual Mortgage Loan during the life of such Mortgage Loan.

(g) [Reserved.]

(h) Without limiting the generality of the foregoing, but subject to Sections 5.05 and 5.06, the Servicer in its own name may be authorized and empowered pursuant to a power of attorney executed and delivered by the Indenture Trustee to execute and deliver, and may be authorized and empowered by the Indenture Trustee, to execute and deliver, on behalf of itself, the Noteholders and the Indenture Trustee or any of them, (i) any and all instruments of satisfaction or cancellation or of partial or full release or discharge and all other comparable instruments with respect to the Mortgage Loans and with respect to the Mortgaged Properties, (ii) and to institute foreclosure proceedings or obtain a deed in lieu of foreclosure so as to effect ownership of any Mortgaged Property on behalf of the Indenture Trustee, and (iii) to hold title to any Mortgaged Property upon such foreclosure or deed in lieu of foreclosure on behalf of the Indenture Trustee; provided, however, that Section 5.07(a) shall constitute a power of attorney from the Indenture Trustee to the Servicer to execute an instrument of satisfaction (or assignment of mortgage without recourse) with respect to any Mortgage Loan paid in full (or with respect to which payment in full has been escrowed). Subject to Sections 5.05 and 5.06, the Indenture Trustee shall furnish the Servicer with any powers of attorney and other documents as the Servicer shall reasonably request to enable the Servicer to carry out its servicing and administrative duties hereunder; provided, however, the Servicer shall prepare for and deliver to the Indenture Trustee for its execution any such powers of attorney; provided, further, that the Indenture Trustee shall not be responsible for any misuse of any such power of attorney. Notwithstanding anything contained herein to the contrary, the Servicer shall not, without the Indenture Trustee's written consent, other than routine foreclosure actions: (i) initiate any action, suit or proceeding directly relating to the servicing of the Mortgage Loan solely under the

31

Indenture Trustee's name without indicating the Servicer's representative capacity, (ii) initiate any other action, suit or proceeding not directly relating to the servicing of any Mortgage Loan (including but not limited to actions, suits or proceedings against Noteholders or Certificateholders, or against the Depositor for breaches of representations and warranties) solely under the Indenture Trustee's name, (iii) engage counsel to represent the Indenture Trustee in any action, suit or proceeding not directly related to the servicing of any Mortgage Loan (including but not limited to actions, suits or proceedings against Noteholders or Certificateholders, or against the Depositor for breaches of representations and warranties, or (iv) prepare, execute or deliver any government filings, forms, permits, registrations or other documents or take any action with the intent to cause, and that actually causes, the Indenture Trustee to be registered to do business in any state.

(i) The Servicer shall give prompt notice to the Indenture Trustee of any action, of which the Servicer has actual knowledge, to (i) assert a claim against the Issuing Entity or (ii) assert jurisdiction over the Trust.

(j) Servicing Advances incurred by the Servicer in connection with the servicing of the Mortgage Loans (including any penalties in connection with the payment of any taxes and assessments or other charges) on any Mortgaged Property shall be recoverable by the Servicer to the extent described herein.

(k) The Servicer shall be entitled to rely, and shall be fully protected in relying, upon any promissory note, writing, resolution, notice, consent, certificate, affidavit, letter, e-mail, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Mortgagor(s)), independent accountants and other experts selected by the Servicer.

(l) The Servicer shall have no liability to the Depositor, the Sponsor, the Indenture Trustee, the Owner Trustee, any Noteholder or any other Person for any action taken, or for refraining from the taking of any action, in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that the foregoing shall not apply to any breach of representations and warranties made by the Servicer herein, or to any specific liability imposed upon the Servicer pursuant to this Agreement or any liability that would otherwise be imposed upon the Servicer by reason of its willful misconduct, bad faith or negligence in the performance of its duties hereunder or by reason of its failure to perform its obligations or duties hereunder.

(m) The Servicer further is authorized and empowered by the Indenture Trustee, on behalf of the Noteholders and the Indenture Trustee, when the Servicer believes it is appropriate in its best judgment to register any Mortgage Loan on the MERS System, or cause the removal from the registration of any Mortgage Loan on the MERS System, to execute and deliver, on behalf of the Indenture Trustee and the Noteholders or any of them, any and all instruments of assignment and other comparable instruments with respect to such assignment or re-recording of a Mortgage in the name of MERS, solely as nominee for the Indenture Trustee and its successors and assigns. Any expenses incurred in connection with the actions described in the preceding sentence shall be reimbursable to the Servicer as Servicing Advances.

32

(n) The Servicer shall not permit a subservicer, subcontractor or Servicing Function Participant to perform any Servicing

Exhibit 5 - 000255

Sale and Servicing Agreement          file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024   Doc 8   Page 224 of 266

Function hereunder with respect to the Mortgage Loans unless such Servicing Function Participant first agrees in writing with the Servicer to deliver an Assessment of Compliance and an Attestation Report in such manner and at such time that permits the Servicer to comply with Section 5.10 hereof.

Section 5.02. <u>Collection of Certain Mortgage Loan Payments; Collection Account</u>. (a) The Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Mortgage Loans, and shall, to the extent such procedures shall be consistent with this Agreement, follow Accepted Servicing Practices. Consistent with the foregoing, the Servicer may in its discretion waive any assumption fees or other fees which may be collected in the ordinary course of servicing such Mortgage Loans.

(b) The Servicer shall establish and maintain, in the name of the Indenture Trustee, a segregated account (the "Collection Account"), in trust for the benefit of the Noteholders. The Collection Account shall be established and maintained as an Eligible Account.

(c) The Servicer shall deposit in the Collection Account any amounts representing Monthly Payments on the Mortgage Loans due or to be applied as of a date after the Cut-Off Date on each Business Day, not more than two Business Days after the date of collection, the following payments and collections received or made by it (other than in respect of monthly payments of principal on and interest of the Mortgage Loans that were due on or before the related Cut-Off Date and Monthly Payments due on June 1, 2006):

(i) payments of interest on the Mortgage Loans including Prepayment Charges;

(ii) payments of principal of the Mortgage Loans, including Principal Prepayments;

(iii) the Loan Repurchase Price of Mortgage Loans repurchased pursuant to Sections 2.06(b) or 4.02;

(iv) the Substitution Adjustment received in connection with Mortgage Loans for which Qualified Substitute Mortgage Loans are received pursuant to Sections 2.06 and 4.02;

(v) all Net REO Proceeds;

(vi) all Net Liquidation Proceeds; and

(vii) all Insurance Proceeds (including, for this purpose, any amounts required to be deposited by the Servicer pursuant to Section 5.04 hereof).

It is understood that the Servicer need not deposit amounts representing fees, late payment charges or extension or other administrative charges (other than Prepayment Charges) payable by Mortgagors, or amounts received by the Servicer for the account of Mortgagors for application towards the payment of taxes, insurance premiums, assessments and similar items or foreclosure proceeds to the extent payable to the related Mortgagor.

33

(d) The Servicer shall invest any funds in the Collection Account in Permitted Investments, which shall mature not later than the Business Day next preceding the Servicer Remittance Date next following the date of such investment (except that any investment held by the Indenture Trustee may mature on such Servicer Remittance Date) and shall not be sold or disposed of prior to its maturity. All net income and gain realized from any such investment shall be for the benefit of the Servicer and shall be subject to its withdrawal or order on a Servicer Remittance Date. The Servicer shall deposit from its own funds the amount of any loss, to the extent not offset by investment income or earnings, in the Collection Account upon the realization of such loss.

Section 5.03. <u>Permitted Withdrawals from the Collection Account</u>. The Servicer may make withdrawals from the Collection Account, on or prior to any Servicer Remittance Date, for the following purposes:

(a) to pay to the Sponsor amounts received in respect of any Defective Mortgage Loan purchased or substituted for by the Sponsor to the extent that the payment of any such amounts on the Servicer Remittance Date upon which the proceeds of such purchase are paid would make the total amount distributed in respect of any such Mortgage Loan on such Servicer Remittance Date greater than the Loan Repurchase Price or the Substitution Adjustment therefor;

(b) to reimburse the Servicer for unreimbursed Delinquency Advances and unreimbursed Servicing Advances with respect to the Mortgage Loans for which it has made a Delinquency Advance or Servicing Advance, from late or deferred payments collected, collections other than timely Monthly Payments, Liquidation Proceeds and/or the Loan Repurchase Price or Substitution Adjustment of or relating to such Mortgage Loans;

(c) to reimburse the Servicer for any Delinquency Advances and Servicing Advances determined in good faith to have become Nonrecoverable Advances, such reimbursement to be made from any funds in the Collection Account;

(d) to withdraw any amount received from a Mortgagor that is recoverable and sought to be recovered as a voidable preference by a trustee in bankruptcy pursuant to the Bankruptcy Code in accordance with a final, nonappealable order of a court having competent jurisdiction;

Exhibit 5 - 000256

Sale and Servicing Agreement       file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024   Doc 8   Page 225 of 266

(e) to withdraw any funds deposited in the Collection Account that were not required to be deposited therein;

(f) to pay the Servicer the Servicing Compensation pursuant to Section 5.08 hereof to the extent not retained or paid;

(g) [Reserved];

34

(h) without duplication, and solely out of amounts which are payable to a former servicer pursuant to Section 7.02(g), to pay to the Indenture Trustee or any successor servicer amounts paid by them in connection with the transfer of the Servicer's servicing obligations pursuant to Article VII hereof and required under such Article VII to be borne by the Servicer;

(i) to withdraw income on the Collection Account as provided in Section 5.02(d); and

(j) amounts deposited into the Collection Account in respect of late fees, assumption fees and similar fees (other than Prepayment Charges).

The Servicer shall keep and maintain a separate accounting for each Mortgage Loan for the purpose of accounting for withdrawals from the Collection Account pursuant to this Section 5.03.

Section 5.04. Hazard Insurance Policies; Property Protection Expenses. (a) The Servicer shall cause to be maintained with respect to each Mortgage Loan a hazard insurance policy with a carrier licensed in the state in which the Mortgaged Property is located that provides for fire and extended coverage, and which provides for a recovery by the named insured of insurance proceeds relating to such Mortgage Loan in an amount not less than the least of (i) the outstanding Principal Balance of the Mortgage Loan plus the outstanding principal balance of any mortgage loan senior to such Mortgage Loan, but in no event shall such amount be less than is necessary to prevent the Mortgagor from becoming a coinsurer thereunder, (ii) the minimum amount required to compensate for loss or damage on a replacement cost basis and (iii) the full insurable value of the related Mortgage Property. The Servicer shall also maintain on property acquired upon foreclosure, or by deed in lieu of foreclosure, hazard insurance with extended coverage in an amount which is at least equal to the lesser of (i) the maximum insurable value from time to time of the improvements which are a part of such property or (ii) the sum of the Principal Balance of such Mortgage Loan and the principal balance of any mortgage loan senior to such Mortgage Loan at the time of such foreclosure plus accrued interest and the good-faith estimate of the Servicer of related Liquidation Expenses to be incurred in connection therewith. Amounts collected by the Servicer under any such policies shall be deposited in the Collection Account to the extent that they constitute Liquidation Proceeds or Insurance Proceeds. Each hazard insurance policy shall contain a standard mortgage clause naming the Servicer, its successors and assigns, as mortgagee. The Servicer shall be under no obligation to require that any Mortgagor maintain earthquake (except as provided herein) or other additional insurance and shall be under no obligation itself to maintain any such additional insurance on property acquired in respect of a Mortgage Loan, other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance.

(b) In the event that the Servicer shall obtain and maintain a blanket policy with an insurer which satisfies the corresponding requirements of Fannie Mae or Freddie Mac, insuring against fire, flood and hazards of extended coverage on all of the Mortgage Loans, then, to the extent such policy names the Servicer as loss payee and provides coverage in an amount equal to the aggregate unpaid Principal Balance on the Mortgage Loans without co-insurance, and otherwise complies with the requirements of this Section 5.04, the Servicer shall be deemed

35

conclusively to have satisfied its obligations with respect to fire and hazard insurance coverage under this Section 5.04, it being understood and agreed that such blanket policy may contain a deductible clause (payable by the Servicer), in which case the Servicer shall, in the event that there shall not have been maintained on the related Mortgaged Property a policy complying with the preceding paragraph of this Section 5.04, and there shall have been a loss which would have been covered by such policy, deposit in the Collection Account from the Servicer's own funds the difference, if any, between the amount that would have been payable under a policy complying with the preceding paragraph of this Section 5.04 and the amount paid under such blanket policy. Upon the request of the Indenture Trustee, the Servicer shall cause to be delivered to the Indenture Trustee, a certified true copy of such policy.

(c) If the Mortgage Loan at the time of origination relates to a Mortgaged Property in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards as designated to the Servicer by the Sponsor, the Servicer will cause to be maintained with respect thereto a flood insurance policy in a form meeting the requirements of the current guidelines of the Federal Insurance Administration with a generally acceptable carrier in an amount representing coverage, and which provides for a recovery by the Servicer on behalf of the Issuing Entity of insurance proceeds relating to such Mortgage Loan of not less than the least of (i) the outstanding Principal Balance of the related Mortgage Loan, plus the principal balance of the related first lien, if any, (ii) the minimum amount required to compensate for damage or loss on a replacement cost basis and (iii) the maximum amount of insurance that is available under the Flood Disaster Protection Act of 1973. The Servicer shall indemnify the Issuing Entity out of the Servicer's own funds for any loss to the Issuing Entity resulting from the Servicer's failure to maintain the

Exhibit 5 - 000257

Sale and Servicing Agreement          file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 226 of 266

insurance required by this Section.

        Section 5.05. <u>Assumption and Modification Agreements</u>. When a Mortgaged Property has been or is about to be conveyed by the Mortgagor, the Servicer shall, to the extent it has knowledge of such conveyance or prospective conveyance, exercise its rights to accelerate the maturity of the related Mortgage Loan under any "due-on-sale" clause contained in the related Mortgage or Mortgage Note; <u>provided</u>, <u>however</u>, that the Servicer shall not exercise any such right if (i) the "due-on-sale" clause, in the reasonable belief of the Servicer, is not enforceable under applicable law or (ii) the Servicer reasonably believes that to permit an assumption of the Mortgage Loan would not materially and adversely affect the interest of the Noteholders. In such event, the Servicer shall enter into an assumption and modification agreement with the Person to whom such property has been or is about to be conveyed, pursuant to which such Person becomes liable under the Mortgage Note and, unless prohibited by applicable law or the mortgage documents, the Mortgagor remains liable thereon. If the foregoing is not permitted under applicable law, the Servicer is authorized to enter into a substitution of liability agreement with such Person, pursuant to which the original Mortgagor is released from liability and such Person is substituted as Mortgagor and becomes liable under the Mortgage Note. The Mortgage Loan, if assumed, shall conform in all respects to the requirements and representations and warranties of this Agreement. The Servicer shall notify the Indenture Trustee that any applicable assumption or substitution agreement has been completed by forwarding to the Indenture Trustee the original copy of such assumption or substitution agreement, which copy shall be added by the Indenture Trustee to the related Indenture Trustee's Mortgage File and which shall, for all purposes, be considered a part of such Indenture Trustee's Mortgage File to the same extent as

36

all other documents and instruments constituting a part thereof. The Servicer shall be responsible for promptly recording any such assumption or substitution agreements. In connection with any such assumption or substitution agreement, the required monthly payment on the related Mortgage Loan shall not be changed but shall remain as in effect immediately prior to the assumption or substitution, the stated maturity or outstanding Principal Balance of such Mortgage Loan shall not be changed, the Mortgage Interest Rate shall not be changed nor shall any required monthly payments of principal or interest be deferred or forgiven. Any fee collected by the Servicer for consenting to any such conveyance or entering into an assumption or substitution agreement shall be retained by or paid to the Servicer as additional servicing compensation.

        Notwithstanding the foregoing paragraph or any other provision of this Agreement, the Servicer shall not be deemed to be in default, breach or any other violation of its obligations hereunder by reason of any assumption of a Mortgage Loan by operation of law or any assumption which the Servicer may be restricted by law from preventing, for any reason whatsoever.

        Section 5.06. <u>Realization Upon Defaulted Mortgage Loans</u>. (a) The Servicer shall foreclose upon or otherwise comparably effect the ownership on behalf of the Issuing Entity of Mortgaged Properties relating to defaulted Mortgage Loans as to which no satisfactory arrangements can be made for collection of Delinquent payments and which the Sponsor has not purchased pursuant to Section 5.15, unless the Servicer reasonably believes that Net Liquidation Proceeds with respect to such Mortgage Loan would not be increased as a result of such foreclosure or other action, in which case, such Mortgage Loan will be charged-off and will become a Liquidated Mortgage Loan. The Servicer shall have no obligation to purchase any Mortgaged Property at any foreclosure sale. In connection with such foreclosure or other conversion, the Servicer shall exercise foreclosure procedures with the same degree of care and skill in their exercise or use, as it would ordinarily exercise or use under the circumstances in the conduct of their own affairs. Any amounts including Liquidation Expenses, advanced by the Servicer in connection with such foreclosure or other action shall constitute Servicing Advances.

        Pursuant to its efforts to sell any REO Property, the Servicer either itself or through an agent selected by the Servicer shall manage, conserve, protect and operate such REO Property in the same manner and to such extent as is customary in the locality where such REO Property is located and may, incident to its conservation and protection of the interests of the Servicer, rent the same, or any part thereof, as the Servicer deems to be in the best interest of the Issuing Entity for the period prior to the sale of such REO Property. The net income generated from the REO Property and the proceeds from a sale of any REO Property shall be deposited in the Collection Account.

        (b) If the Servicer has reason to believe that a Mortgaged Property which the Servicer is contemplating acquiring in foreclosure or by deed in lieu of foreclosure contains environmental or hazardous waste risks known to the Servicer, the Servicer shall notify the Indenture Trustee prior to acquiring the Mortgaged Property. The Servicer shall not institute foreclosure actions with respect to such a property if it reasonably believes that such action would not be consistent with the Accepted Servicing Practices, and in no event shall the Servicer be required to manage, operate or take any other action with respect thereto which the Servicer in good faith believes will result in "clean-up" or other liability under applicable law, unless the Servicer receives an indemnity acceptable to it in its sole discretion.

37

        (c) The Servicer shall determine, with respect to each defaulted Mortgage Loan, when it has recovered, whether through trustee's sale, foreclosure sale or otherwise, all amounts if any it expects to recover from or on account of such defaulted Mortgage Loan, whereupon such Mortgage Loan shall become a Liquidated Mortgage Loan.

Exhibit 5 - 000258

Sale and Servicing Agreement           file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024   Doc 8   Page 227 of 266

(d) Net Foreclosure Profits, if any, shall be paid directly to the Sponsor.

(e) With respect to its obligations under this Section 5.06, the Servicer shall take all such actions as it reasonably believes are consistent with Accepted Servicing Practices.

Section 5.07. Indenture Trustee to Cooperate. (a) Upon the payment in full of any Mortgage Loan or the receipt by the Servicer of a notification that payment in full will be escrowed in a manner customary for such purposes, the Servicer shall deliver to the Indenture Trustee one copy of a Request for Release. Upon receipt of such copy of the Request for Release, the Indenture Trustee shall promptly release the related Indenture Trustee's Mortgage File, in trust to (i) the Servicer (ii) an escrow agent or (iii) any employee, agent or attorney of the Indenture Trustee, in each case pending its release by the Servicer, such escrow agent or such employee, agent or attorney of the Indenture Trustee, as the case may be. Upon any such payment in full, or the receipt of such notification that such funds have been placed in escrow, the Servicer is authorized to give, as attorney-in-fact for the Indenture Trustee and the mortgagee under the Mortgage which secured the Mortgage Note, an instrument of satisfaction (or assignment of Mortgage without recourse) regarding the Mortgaged Property relating to such Mortgage, which instrument of satisfaction or assignment, as the case may be, shall be delivered to the Person or Persons entitled thereto against receipt therefor of payment in full, it being understood and agreed that no expense incurred in connection with such instrument of satisfaction or assignment, as the case may be, shall be chargeable to the Collection Account.

(b) (i) From time to time and as appropriate in the servicing of any Mortgage Loan, including, without limitation, foreclosure or other comparable conversion of a Mortgage Loan, the Indenture Trustee shall (except in the case of the payment or liquidation pursuant to which the related Indenture Trustee's Mortgage File is released to an escrow agent or an employee, agent or attorney of the Indenture Trustee), upon request of the Servicer and delivery to the Indenture Trustee of one copy of a Request for Release, release the related Indenture Trustee's Mortgage File to the Servicer and shall execute such documents as shall be necessary to the prosecution of any such proceedings, including, without limitation, an assignment without recourse of the related Mortgage to the Servicer. The Indenture Trustee shall complete in the name of the Indenture Trustee any endorsement in blank on any Mortgage Note prior to releasing such Mortgage Note to the Servicer. Such receipt shall obligate the Servicer to return the Indenture Trustee's Mortgage File to the Indenture Trustee when the need therefor by the Servicer no longer exists unless the Mortgage Loan shall be liquidated, in which case, the Servicer shall deliver one copy of a Request for Release indicating such loan has been paid in full.

<div align="center">38</div>

(ii) Each Request for Release may be delivered to the Indenture Trustee (x) via mail or courier, (y) via facsimile or (z) by such other means, including, without limitation, electronic or computer readable medium, as the Servicer and the Indenture Trustee shall mutually agree. The Indenture Trustee shall promptly release the related Indenture Trustee's Mortgage File(s) within five (5) Business Days of receipt of one copy of a properly completed Request for Release pursuant to clauses (x), (y) or (z) above or such shorter period as may be agreed upon by the Servicer and the Indenture Trustee. Receipt of a Request for Release pursuant to clauses (x), (y) or (z) above shall be authorization to the Indenture Trustee to release such Indenture Trustee's Mortgage Files, provided the Indenture Trustee has determined that such Request for Release has been executed, with respect to clauses (x) or (y) above, or approved, with respect to clause (z) above, by a Servicing Officer of the Servicer. If the Indenture Trustee is unable to release the Indenture Trustee's Mortgage Files within the time frames previously specified, the Indenture Trustee shall immediately notify the Servicer, indicating the reason for such delay, but in no event shall such notification be later than seven (7) Business Days after receipt of a Request for Release. If the Servicer, is required to pay penalties or damages due solely to the Indenture Trustee's negligent failure to release the related Indenture Trustee's Mortgage File or the Indenture Trustee's negligent failure to execute and release documents in a timely manner, the Indenture Trustee shall be liable for such penalties or damages.

(c) No costs associated with the procedures described in this Section 5.07 shall be an expense of the Issuing Entity or the Indenture Trustee and the Indenture Trustee shall have no liability or obligation whatsoever to pay or advance any such amounts, except for any penalties and damages as set forth in Section 5.07(b)(ii) above.

Section 5.08. Servicing Compensation; Payment of Certain Expenses by Servicer. The Servicer shall be entitled to receive and retain, out of collections on the Mortgage Loans for each Due Period, as servicing compensation for such Due Period, an amount (the "Servicing Fee") equal to the product of one-twelfth of the Servicing Fee Rate and the aggregate Stated Principal Balance of the Mortgage Loans as of the beginning of such Due Period. Additional servicing compensation in the form of assumption fees, late payment charges or extension and other administrative charges (other than Prepayment Charges) shall be retained by the Servicer. The Servicer shall be required to pay all expenses incurred by it in connection with its activities hereunder (including payment of all other fees and expenses not expressly stated hereunder to be payable by or from another source) and shall not be entitled to reimbursement therefor except as specifically provided herein.

Section 5.09. Annual Statement as to Compliance. The Servicer will deliver to the Issuer, the Indenture Trustee, the Rating Agencies and the Sponsor on or before March 15th of each year, beginning March 15, 2007, an Officer's Certificate of the Servicer (an "Annual Statement of Compliance") stating, that (a) a review of the activities of the Servicer, during the preceding calendar year and of its performance under this Agreement has been made under such officer's supervision and (b) to the best of such officer's

Exhibit 5 - 000259

Sale and Servicing Agreement file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 228 of 266

knowledge, based on such review, the Servicer has fulfilled all of its material obligations under this Agreement in all material respects throughout such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof. Such

39

Annual Statement of Compliance shall contain no restrictions or limitations on its use. In the event that the Servicer has delegated any servicing responsibilities with respect to the Mortgage Loans to a subservicer or subcontractor that meets the criteria in Item 1108(a)(2)(i) through (iii) of Regulation AB, the Servicer, or the related servicer (as the case may be) shall deliver a similar Annual Statement of Compliance by that subservicer or subcontractor to the Indenture Trustee, the Sponsor and the Rating Agencies as described above as and when required with respect to the servicer.

Section 5.10. <u>Assessments of Compliance and Attestation Reports</u>. The Servicer shall service and administer the Mortgage Loans in accordance with all applicable requirements of the Servicing Criteria. Pursuant to Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB, each of the Servicer and the Indenture Trustee (each, an "Attesting Party") shall deliver to the Indenture Trustee on or before March 15th of each calendar year beginning in 2007, a report regarding such Attesting Party's assessment of compliance (an "Assessment of Compliance") with the Servicing Criteria during the preceding calendar year. The Assessment of Compliance, as set forth in Regulation AB, must contain the following:

(a) A statement by such officer of its responsibility for assessing compliance with the Servicing Criteria applicable to the related Attesting Party;

(b) A statement by such officer that such Attesting Party used the Servicing Criteria attached as Exhibit H hereto, and which will also be attached to the Assessment of Compliance, to assess compliance with the Servicing Criteria applicable to the related Attesting Party;

(c) An assessment by such officer of the related Attesting Party's compliance with the applicable Servicing Criteria for the period consisting of the preceding calendar year, including disclosure of any material instance of noncompliance with respect thereto during such period, which assessment shall be based on the activities such Attesting Party performs with respect to asset-backed securities transactions taken as a whole involving the Servicer, that are backed by the same asset type as the Mortgage Loans; and

(d) A statement that a registered public accounting firm has issued an attestation report on the related Attesting Party's Assessment of Compliance for the period consisting of the preceding calendar year.

Such report at a minimum shall address each of the Servicing Criteria specified on Exhibit H hereto which are indicated as applicable to the related Attesting Party.

On or before March 15th of each calendar year beginning in 2007, each Attesting Party specified in this Section shall furnish to the Indenture Trustee and the Depositor a report (an "Attestation Report") by a registered public accounting firm that attests to, and reports on, the Assessment of Compliance made by the Servicer, as required by Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122(b) of Regulation AB, which Attestation Report must be made in accordance with standards for attestation reports issued or adopted by the Public Company Accounting Oversight Board.

The Servicer or the Indenture Trustee, as the case may be shall cause any subservicer, and each subcontractor determined by it to be "participating in the servicing function" within the

40

meaning of Item 1122 of Regulation AB, to deliver to the Indenture Trustee and the Depositor an Assessment of Compliance and Attestation Report as and when provided above along with an indication of what Servicing Criteria are addressed in such assessment.

Such Assessment of Compliance, as to any subservicer, shall at a minimum address each of the Servicing Criteria specified on Exhibit H hereto which are indicated as applicable to any "primary servicer." Notwithstanding the foregoing, as to any subcontractor (as defined in the related servicing agreement), an Assessment of Compliance is not required to be delivered unless it is required as part of a Form 10-K with respect to the Issuing Entity.

The Indenture Trustee shall also provide an Assessment of Compliance and Attestation Report, as and when provided above, which shall at a minimum address each of the Servicing Criteria specified on Exhibit H hereto which are indicated as applicable to the "Indenture Trustee." In addition, the Indenture Trustee shall deliver to the Sponsor and the Depositor an Assessment of Compliance and Attestation Report, as and when provided above, which shall at a minimum address each of the Servicing Criteria specified on Exhibit H hereto which are indicated as applicable to a "custodian."

Section 5.11. <u>Reports Filed with Securities and Exchange Commission</u>.

(a) (i) (A) Within 15 days after each Distribution Date, the Indenture Trustee shall, in accordance with industry standards,

Exhibit 5 - 000260

Sale and Servicing Agreement        file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 229 of 266

file with the Commission via the Electronic Data Gathering and Retrieval System ("EDGAR"), a Form 10-D, signed by the Servicer, with a copy of the monthly statement to be furnished by the Indenture Trustee to the Noteholders for such Distribution Date and detailing all data elements specified in Item 1121(a) of Regulation AB; provided that the Indenture Trustee shall have received no later than five (5) calendar days after the related Servicer Reporting Date, all information required to be provided to the Indenture Trustee as described in clause (a)(iv) below. Any disclosure in addition to the Monthly Statement that is required to be included on Form 10-D ("Additional Form 10-D Disclosure") shall be approved by the Depositor.

Within five (5) calendar days after the related Servicer Reporting Date, (i) the parties set forth in Exhibit I shall be required to provide, pursuant to section 5.11(a)(iv) below, to the Indenture Trustee and the Depositor, to the extent known (by a Responsible Officer in the case of the Owner Trustee), in EDGAR-compatible format at the email address set forth in Section 10.06 with respect to the Indenture Trustee, or in such other form as otherwise agreed upon by the Indenture Trustee and the Depositor and such party, the form and substance of any Additional Form 10-D Disclosure, if applicable, and (ii) the Depositor will approve, as to form and substance, or disapprove, as the case may be, the inclusion of the Additional Form 10-D Disclosure on Form 10-D. The Depositor will be responsible for any reasonable fees and expenses assessed or incurred by the Indenture Trustee in connection with including any Additional Form 10-D Disclosure on Form 10-D pursuant to this Section.

(B) After preparing the Form 10-D, the Indenture Trustee shall forward electronically a draft copy of the Form 10-D to the Depositor and the Servicer for review. No later than two (2) Business Days prior to the 15th calendar day after the related Distribution Date, either the Depositor or a senior officer of the Servicer in charge of the servicing function shall sign the

41

Form 10-D and return an electronic or fax copy of such signed Form 10-D (with an original executed hard copy to follow by overnight mail) to the Indenture Trustee. If a Form 10-D cannot be filed on time or if a previously filed Form 10-D needs to be amended, the Indenture Trustee will follow the procedures set forth in Section 5.11(a)(v). Promptly (but no later than one (1) Business Day) after filing with the Commission, the Sponsor will make available on its internet website a final executed copy of each Form 10-D. The signing party at the Depositor or the Servicer can be contacted as set forth in Section 10.06. The parties to this Agreement acknowledge that the performance by the Indenture Trustee of its duties under Sections 5.11(a)(i) and (v) related to the timely preparation and filing of Form 10-D is contingent upon such parties strictly observing all applicable deadlines in the performance of their duties under such Sections. The Indenture Trustee shall have no liability for any loss, expense, damage, claim arising out of or with respect to any failure to properly prepare and/or timely file such Form 10-D, where such failure results from the Indenture Trustee's inability or failure to receive, on a timely basis, any information from any other party hereto needed to prepare, arrange for execution or file such Form 10-D, not resulting from its own negligence, bad faith or willful misconduct.

(ii) (A) Within four (4) Business Days after the occurrence of an event requiring disclosure on Form 8-K (each such event, a "Reportable Event"), the Depositor shall prepare and file on behalf of the Issuing Entity any Form 8-K, as required by the Exchange Act. Any disclosure or information related to a Reportable Event or that is otherwise required to be included on Form 8-K ("Form 8-K Disclosure Information") shall be approved by and prepared at the direction of the Depositor.

(B) For so long as the Issuing Entity is subject to the Exchange Act reporting requirements, no later than 12:00 p.m. Eastern Standard time on the 2nd Business Day after the occurrence of a Reportable Event (i) the parties set forth in Exhibit I shall be required pursuant to Section 5.11(a)(iv) below to provide to the Depositor, to the extent known (by a Responsible Officer in the case of the Owner Trustee), in EDGAR-compatible format, or in such other form as otherwise agreed upon by the Depositor and such party, the form and substance of any Form 8-K Disclosure Information, if applicable, and (ii) the Depositor will approve, as to form and substance, or disapprove, as the case may be, the inclusion of the Form 8-K Disclosure Information on Form 8-K.

(iii) (A) Within 90 days after the end of each fiscal year of the Issuing Entity or such earlier date as may be required by the Exchange Act (the "10-K Filing Deadline") (it being understood that the fiscal year for the Issuing Entity ends on December 31st of each year), commencing in March 2007, the Indenture Trustee shall prepare and file on behalf of the Issuing Entity a Form 10-K, in form and substance as required by the Exchange Act. Each such Form 10-K shall include the following items, in each case to the extent they have been delivered to the Indenture Trustee within the applicable time frames set forth in this Agreement, (1) an annual compliance statement for the Servicer and any subservicer, as described under Section 5.09, the annual reports on assessment of compliance with Servicing Criteria for the Servicer, each subservicer and subcontractor participating in the Servicing Function, each Servicing Function Participant, the Indenture Trustee and each custodian, as described under Section 5.10, (2) the registered public accounting firm attestation report for the Servicer, and the Indenture Trustee, as described under Section 5.10, which shall identify any material instance of noncompliance, disclosure identifying such instance of noncompliance, and (3) a Sarbanes-Oxley Certification as

42

described in this Section 5.11 (a)(iii)(D) below. Any disclosure or information in addition to (1) through (3) above that is required to be included on Form 10-K ("Additional Form 10-K Disclosure") shall be determined and prepared by and approved by the Depositor.

Exhibit 5 - 000261

Sale and Servicing Agreement     file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 230 of 266

(B) No later than March 5th of each year that the Issuing Entity is subject to the Exchange Act reporting requirements, commencing in 2007, (1) the parties set forth in Exhibit I shall be required to provide pursuant to Section 5.11(a)(iv) below to the Indenture Trustee and the Depositor, to the extent known (by a Responsible Officer in the case of the Owner Trustee), in EDGAR-compatible format, at the email address set forth in Section 10.06 hereof with respect to the Indenture Trustee, or in such other form as otherwise agreed upon by the Indenture Trustee and the Depositor and such party, the form and substance of any Additional Form 10-K Disclosure, if applicable, and (2) the Depositor will approve, as to form and substance, or disapprove, as the case may be, the inclusion of the Additional Form 10-K Disclosure on Form 10-K. The Depositor will be responsible for any reasonable fees and expenses assessed or incurred by the Indenture Trustee in connection with including any Additional Form 10-K Disclosure on Form 10-K pursuant to this Section.

(C) After preparing the Form 10-K, the Indenture Trustee shall forward electronically a draft copy of the Form 10-K to the Depositor and the Servicer for review. No later than 12:00 p.m. Eastern Standard time on the 4th Business Day prior to the 10-K Filing Deadline, either the Depositor or a senior officer of the Servicer in charge of the servicing function shall sign the Form 10-K and return an electronic or fax copy of such signed Form 10-K (with an original executed hard copy to follow by overnight mail) to the Indenture Trustee. If a Form 10-K cannot be filed on time or if a previously filed Form 10-K needs to be amended, the Indenture Trustee will follow the procedures set forth in Section 5.11(a)(v). Promptly (but no later than one (1) Business Day) after filing with the Commission, the Sponsor will make available on its internet website a final executed copy of each Form 10-K. The signing party at the Depositor or the Servicer can be contacted as set forth in Section 10.06. The parties to this Agreement acknowledge that the performance by the Indenture Trustee of its duties under Sections 5.11(a)(iii) and (v) related to the timely preparation and filing of Form 10-K is contingent upon such parties strictly observing all applicable deadlines in the performance of their duties under such Section 5.09 and Section 5.10. The Indenture Trustee shall have no liability for any loss, expense, damage, claim arising out of or with respect to any failure to properly prepare and/or timely file such Form 10-K, where such failure results from the Indenture Trustee's inability or failure to receive, on a timely basis, any information from any other party hereto needed to prepare, arrange for execution or file such Form 10-K, not resulting from its own negligence, bad faith or willful misconduct.

(D) Each Form 10-K shall include a certification (the "Sarbanes-Oxley Certification"), required to be included therewith pursuant to the Sarbanes-Oxley Act. The Servicer and the Indenture Trustee, shall and the Servicer shall cause any subservicer or subcontractor engaged by it to, provide to the Person who signs the Sarbanes-Oxley Certification (the "Certifying Person"), by March 10 of each year in which the Issuing Entity is subject to the reporting requirements of the Exchange Act, a certification (each, a "Back-Up Certification"), in the form attached hereto as Exhibit J-2, upon which the Certifying Person, the entity for which the Certifying Person acts as an officer, and such entity's officers, directors and Affiliates (collectively with the Certifying Person, "Certification Parties") can reasonably rely. The senior officer of the Servicer shall

43

serve as the Certifying Person on behalf of the Issuing Entity. Such officer of the Certifying Person can be contacted as set forth in Section 10.06. In the event the Indenture Trustee is terminated or resigns pursuant to the terms of this Agreement, the Indenture Trustee shall provide a Back-Up Certification to the Certifying Person pursuant to this Section 5.11(a)(iii) with respect to the period of time it was subject to this Agreement.

(iv) With respect to any Additional Form 10-D Disclosure or Additional From 10-K Disclosure (collectively, the "Additional Disclosure") relating to the Trust Estate, the Indenture Trustee's obligation to include such Additional Information in the applicable Exchange Act report is subject to receipt from the entity that is indicated in Exhibit I as the responsible party for providing that information, if other than the Indenture Trustee, as and when required as described in Section 5.11(a)(i) through (iii) above. Each of the Servicer, Sponsor, and Depositor hereby agree to notify and provide to the extent known to the Indenture Trustee and the Depositor all Additional Disclosure relating to the Trust Estate, with respect to which such party is indicated in Exhibit I as the responsible party for providing that information.

(v) With respect to any Form 8-K Disclosure Information (collectively, the "8-K Additional Disclosure") relating to the Trust Estate, the Depositor's obligation to include such 8-K Additional Information in the applicable Exchange Act report is subject to receipt from the entity that is indicated in Exhibit I as the responsible party for providing that information, if other than the Depositor, as and when required as described in Section 5.11(a)(i) through (iii) above. Each of the Indenture Trustee, Servicer, Sponsor, and Depositor hereby agree to notify and provide to the extent known to the Depositor all 8-K Additional Disclosure relating to the Trust Estate, with respect to which such party is indicated in Exhibit I as the responsible party for providing that information.

(vi) (A) On or prior to January 30 of the first year in which the Indenture Trustee is able to do so under applicable law, the Indenture Trustee shall file a Form 15 relating to the automatic suspension of reporting in respect of the Issuing Entity under the Exchange Act.

(B) In the event that the Indenture Trustee is unable to timely file with the Commission all or any required portion of any Form 10-D or 10-K required to be filed by this Agreement because required disclosure information was either not delivered to it or delivered to it after the delivery deadlines set forth in this Agreement or for any other reason, the Indenture Trustee will immediately notify the Depositor and the Servicer. In the case of Form 10-D and 10-K, the Depositor, Servicer and Indenture Trustee will

Exhibit 5 - 000262

Sale and Servicing Agreement        file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

**Case 11-02024    Doc 8    Page 231 of 266**

cooperate to prepare and file a Form 12b-25 and a 10-DA and 10-KA as applicable, pursuant to Rule 12b-25 of the Exchange Act. In the case of Form 8-K, the Depositor will, upon receipt of all required Form 8-K Disclosure Information provide such Form 8-K Disclosure Information to the Indenture Trustee for inclusion on the next Form 10-D. In the event that any previously filed Form 10-D or 10-K needs to be amended, the Indenture Trustee (to the extent of actual knowledge) will notify the Depositor and the Servicer and such parties will cooperate to prepare any necessary 10-DA or 10-KA. Any Form 15, Form 12b-25 or any amendment to Form 8-K, 10-D or 10-K shall be signed by a senior officer of the Servicer. The Depositor and Servicer acknowledge that the performance by the Indenture Trustee of its duties under this Section 5.11(a)(v) related to the timely preparation and filing of Form 15, a Form 12b-25 or any amendment to Form 10-D or 10-K is contingent upon the Servicer and the Depositor performing their duties under this Section. The Indenture Trustee

<center>44</center>

shall have no liability for any loss, expense, damage, claim arising out of or with respect to any failure to properly prepare and/or timely file any such Form 15, Form 12b-25 or any amendments to Forms 10-D or 10-K, where such failure results from the Indenture Trustee's inability or failure to receive, on a timely basis, any information from any other party hereto needed to prepare, arrange for execution or file such Form 15, Form 12b-25 or any amendments to Forms 8-K, 10-D or 10-K, not resulting from its own negligence, bad faith or willful misconduct.

The Depositor agrees to promptly furnish to the Indenture Trustee, from time to time upon request, such further information, reports and financial statements within its control related to this Agreement, the Mortgage Loans as is necessary for the preparation and filing of all required reports with the Commission. The Indenture Trustee shall have no responsibility to file any items other than those specified in this Section 5.11; provided, however, the Indenture Trustee will cooperate with the Depositor in connection with any additional filings with respect to the Issuing Entity as the Depositor deems necessary under the Exchange Act. Copies of all reports filed by the Indenture Trustee under the Exchange Act shall be sent to the Depositor as set forth in Section 10.06.

(b) In connection with the filing of any 10-K hereunder, the Indenture Trustee shall sign a certification (a "Form of Back-Up Certification to Form 10-K Certificate," substantially in the form attached hereto as Exhibit J-2) for the Depositor regarding certain aspects of the Form 10-K certification signed by the Depositor, provided, however, that the Indenture Trustee shall not be required to undertake an analysis of any accountant's report attached as an exhibit to the Form 10-K.

(c) The Indenture Trustee shall indemnify and hold harmless the Depositor and its officers, directors and affiliates from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses arising out of or based upon the Indenture Trustee's failure to timely file any Form 10-D or Form 10-K as required by this Agreement and/or any untrue statement of a material fact or omission to state a material fact required to be stated or necessary to make the statements made not misleading contained in any information provided by the Indenture Trustee (other than the Attestation Report for the Indenture Trustee) or the Indenture Trustee's negligence, bad faith or willful misconduct in connection therewith.

The Depositor shall indemnify and hold harmless the Indenture Trustee and its officers, directors and affiliates from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses arising out of or based upon the Depositor's failure to timely deliver any information required hereunder and/or any untrue statement of a material fact or omission to state a material fact required to be stated or necessary to make the statements made not misleading contained in any information provided by the Depositor or the Depositor's negligence, bad faith or willful misconduct in connection therewith.

The Servicer shall indemnify and hold harmless the Indenture Trustee and the Depositor and their respective officers, directors and affiliates from and against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses arising out of or based upon a breach of the obligations of the Servicer under this Section 5.11 or the Servicer's negligence, bad faith or willful misconduct in connection therewith.

<center>45</center>

If the indemnification provided for herein is unavailable or insufficient to hold harmless the Depositor or the Indenture Trustee, as applicable, then the defaulting party, in connection with a breach of its respective obligations under this Section 5.11 or its respective negligence, bad faith or willful misconduct in connection therewith, agrees that it shall contribute to the amount paid or payable by the other parties as a result of the losses, claims, damages or liabilities of the other party in such proportion as is appropriate to reflect the relative fault and the relative benefit of the Depositor on the one hand and the Indenture Trustee on the other.

All information to be submitted to the Indenture Trustee as Additional Form 10-D Disclosure, Additional Form 10-K Disclosure or 8-K Additional Disclosure shall be provided to the Indenture Trustee in EDGAR compatible form at the email address in, and through use of, the form set forth as Exhibit N hereto.

Section 5.12. Access to Certain Documentation. The Servicer shall provide to the Indenture Trustee, the FDIC and the supervisory agents and examiners (as required in the latter case by applicable State and federal regulations) of each of the foregoing access to the documentation regarding the Mortgage Loans, such access being afforded without charge but only upon reasonable

Sale and Servicing Agreement        file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024   Doc 8   Page 232 of 266

request and during normal business hours at the offices of the Servicer designated by it.

Upon any change in the format of the computer tape maintained by the Servicer in respect of the Mortgage Loans, the Servicer shall deliver a copy of such computer tape to the Indenture Trustee and in addition shall provide a copy of such computer tape to the Indenture Trustee at such other times as the Indenture Trustee may reasonably request.

The Servicer shall keep confidential (including from affiliates thereof) information concerning the Mortgage Loans, except as required by law.

Section 5.13. <u>Maintenance of Fidelity Bond</u>. The Servicer shall, during the term of its service as Servicer maintain in force a fidelity bond and errors and omissions insurance in respect of its officers, employees or agents. Such bond and insurance shall comply with the requirements from time to time of Fannie Mae or Freddie Mac for Persons performing servicing for mortgage loans purchased by such association.

Section 5.14. <u>Subservicing Agreements Between the Servicer and Subservicer and Subservicers</u>. (a) The Servicer may enter into subservicing agreements for any servicing and administration of Mortgage Loans with any institution which is in compliance with the laws of each state necessary to enable it to perform its obligations under such subservicing agreement. The Servicer shall give notice to the Indenture Trustee of the appointment of any subservicer and shall furnish to the Indenture Trustee a copy of the subservicing agreement. The Servicer shall give notice to each Rating Agency of the appointment of any subservicer. For purposes of this Agreement, the Servicer shall be deemed to have received payments on Mortgage Loans when any subservicer has received such payments. Any such subservicing agreement shall be consistent with and not violate the provisions of this Agreement.

<div align="center">46</div>

(b) The Servicer may terminate any subservicing agreement in accordance with the terms and conditions of such subservicing agreement and thereafter directly service the related Mortgage Loans itself or enter into a subservicing agreement with a successor subservicer that qualifies under Subsection (a) of this Section 5.13. The Servicer shall give notice to each Rating Agency of the termination of any subservicer and the appointment of any successor subservicer.

(c) The Servicer shall not be relieved of its obligations under this Agreement notwithstanding any subservicing agreement or any of the provisions of this Agreement relating to agreements or arrangements between the Servicer and a subservicer or otherwise, and the Servicer shall be obligated to the same extent and under the same terms and conditions as if it alone were servicing and administering the Mortgage Loans. The Servicer shall be entitled to enter into any agreement with a subservicer for indemnification of the Servicer by such subservicer and nothing contained in such subservicing agreement shall be deemed to limit or modify this Agreement. The Issuing Entity shall not indemnify the Servicer for any losses due to the Servicer's negligence.

(d) Any subservicing agreement and any other transactions or services relating to the Mortgage Loans involving a subservicer shall be deemed to be between the subservicer and the Servicer alone and the Indenture Trustee and the Noteholders shall not be deemed parties thereto and shall have no claims, rights, obligations, duties or liabilities with respect to any Subservicer except as set forth in Subsection (e) of this Section 5.13 and the related Subservicing Agreement.

(e) Notwithstanding any contrary provision contained herein, in connection with the assumption of the responsibilities, duties and liabilities and of the authority, power and rights of the Servicer hereunder by the Indenture Trustee or any other successor servicer pursuant to Section 7.02, it is understood and agreed that the Servicer's rights and obligations under any subservicing agreement then in force between the Servicer and a subservicer may be assumed or terminated (without cost) by the Indenture Trustee or any other successor servicer at its option as successor to the Servicer.

The Servicer shall, upon request of the Indenture Trustee, but at the expense of the Servicer, deliver to the assuming party documents and records relating to each subservicing agreement and an accounting of amounts collected and held by it and otherwise use its best reasonable efforts to effect the orderly and efficient transfer of the subservicing agreements to the assuming party, without the payment of any fee by the Indenture Trustee, any Noteholders, notwithstanding any contrary provision in any subservicing agreement.

Section 5.15. <u>Reports to the Indenture Trustee; Collection Account Statements</u>. Not later than twenty-five (25) days after each Payment Date, the Servicer shall provide to the Indenture Trustee a statement, certified by a Servicing Officer, setting forth the status of the Collection Account as of the close of business on the last day of the Due Period preceding such Payment Date, stating that all payments required by this Agreement to be made by the Servicer on behalf of the Indenture Trustee have been made (or if any required payment has not been made by the Servicer, specifying the nature and status thereof) and showing, for the period covered by such statement, the aggregate of deposits into and withdrawals from the Collection

<div align="center">47</div>

Account and the aggregate of deposits into the Payment Account as specified in Section 6.01. Such statement shall also state the aggregate Stated Principal Balance and the aggregate unpaid principal balance of all the Mortgage Loans as of the close of business

Exhibit 5 - 000264

Sale and Servicing Agreement               file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024   Doc 8   Page 233 of 266

on the last day of the month preceding the month in which such Payment Date occurs.

Section 5.16. <u>Optional Purchase of Defaulted Mortgage Loans</u>. (a) The Depositor, in its sole discretion, shall have the right to elect (by written notice sent to the Servicer and the Indenture Trustee), but shall not be obligated, to purchase for its own account from the Issuing Entity any Mortgage Loan which is ninety (90) days or more Delinquent in the manner at the Loan Repurchase Price (except that the amount described in the definition of Loan Repurchase Price shall in no case be net of the Servicing Fee). The purchase price for any Mortgage Loan purchased hereunder shall be deposited in the Collection Account and the Indenture Trustee, upon the Indenture Trustee's receipt of written notice by the Servicer of such deposit, shall release or cause to be released to the purchaser of such Mortgage Loan the related Indenture Trustee's Mortgage File and shall execute and deliver such instruments of transfer or assignment prepared by the purchaser of such Mortgage Loan, in each case without recourse, as shall be necessary to vest in the purchaser of such Mortgage Loan any Mortgage Loan released pursuant hereto and the purchaser of such Mortgage Loan shall succeed to all the Indenture Trustee's right, title and interest in and to such Mortgage Loan and all security and documents related thereto. Such assignment shall be an assignment outright and not for security. The purchaser of such Mortgage Loan shall thereupon own such Mortgage Loan, and all security and documents, free of any further obligation to the Indenture Trustee or the Noteholders with respect thereto.

(b) After the Depositor or its Affiliate has repurchased any Mortgage Loans which are 90 days or more Delinquent in an aggregate amount equal to 1% of the Maximum Collateral Amount, then notwithstanding the foregoing, the Depositor or its Affiliate may only exercise its option pursuant to this Section 5.15 with respect to the Mortgage Loan or Mortgage Loans (including REO Mortgage Loans) that have been Delinquent for the longest period at the time of such repurchase.

(c) The Depositor may not repurchase pursuant to this Section 5.15 more than 10% of the Mortgage Loans, measured by the outstanding Principal Balance of the Mortgage Loans repurchased as a percentage of the Initial Pool Balance.

Section 5.17. <u>Reports to be Provided by the Servicer</u>. (a) By 3:00 p.m. eastern time on the second Business Day following the fifteenth (15th) day of each month (the "<u>Servicer Reporting Date</u>"), the Servicer shall deliver to the Indenture Trustee, the Underwriter, Intex and Bloomberg a Servicer Remittance Report for the related Servicer Remittance Date in an electronic format reporting on a loan-by-loan basis in such format as the Servicer and the Indenture Trustee may agree, and setting forth the following information with respect to all Mortgage Loans as of the close of business on the last Business Day of the prior calendar month (except as otherwise provided in clause (v) below):

(i) the total number of Mortgage Loans and the Aggregate Principal Balances thereof, together with the number, Aggregate Principal Balances of such Mortgage Loans and the percentage (based on the Aggregate Principal Balances of the Mortgage Loans) of the Aggregate Principal Balances of such Mortgage Loans to the Aggregate Principal Balance of all Mortgage Loans (A) 31-60 days Delinquent, (B) 61-90 days Delinquent and (C) 91 or more days Delinquent;

<div align="center">48</div>

(ii) the number, Aggregate Principal Balances of all Mortgage Loans and percentage (based on the Aggregate Principal Balances of the Mortgage Loans) of the Aggregate Principal Balances of such Mortgage Loans to the Aggregate Principal Balance of all Mortgage Loans in foreclosure proceedings and the number, Aggregate Principal Balances of all Mortgage Loans and percentage (based on the Aggregate Principal Balances of the Mortgage Loans) of any such Mortgage Loans also included in any of the statistics described in the foregoing clause (i);

(iii) the number, Aggregate Principal Balances of all Mortgage Loans and percentage (based on the Aggregate Principal Balances of the Mortgage Loans) of the Aggregate Principal Balances of such Mortgage Loans to the Aggregate Principal Balance of all Mortgage Loans relating to Mortgagors in bankruptcy proceedings and the number, Aggregate Principal Balances of all Mortgage Loans and percentage (based on the Aggregate Principal Balances of the Mortgage Loans) of any such Mortgage Loans also included in any of the statistics described in the foregoing clause (i);

(iv) the number, Aggregate Principal Balances of all Mortgage Loans and percentage (based on the Aggregate Principal Balances of the Mortgage Loans) of the Aggregate Principal Balances of such Mortgage Loans to the Aggregate Principal Balance of all Mortgage Loans relating to REO Properties and the number, Aggregate Principal Balances of all Mortgage Loans and percentage (based on the Aggregate Principal Balances of the Mortgage Loans) of any such Mortgage Loans also included in any of the statistics described in the foregoing clause (i);

(v) the weighted average Mortgage Interest Rate for the Mortgage Loans as of the Due Date occurring in the Due Period related to such Payment Date;

(vi) the weighted average remaining term to stated maturity of all Mortgage Loans;

(vii) the book value of any REO Property;

(viii) the Cumulative Realized Loss Percentage and the Rolling Six Month Delinquency Ratio as of the related Payment Date;

(ix) with respect to each Monthly Payment, the amount of such remittance allocable to principal (including a separate breakdown of any Principal Prepayment, including the date of such prepayment, and any Prepayment Charges);

<div align="right">Exhibit 5 - 000265</div>

Sale and Servicing Agreement      file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024   Doc 8   Page 234 of 266

(x) with respect to each Monthly Payment, the amount of such remittance allocable to interest;

(xi) the number and the Aggregate Principal Balance of Mortgage Loans repurchased pursuant to Section 5.15; and

49

(xii) such other loan level information as either the Indenture Trustee may reasonably request to enable it to prepare the Indenture Trustee's Remittance Report.

(b) [Reserved.]

(c) [Reserved.]

Section 5.18. [Reserved.]

Section 5.19. Delinquency Advances. If, on any Servicer Remittance Date, the Servicer determines that any Monthly Payments due during the related Due Period have not been received as of the end of the related Due Period, the Servicer shall determine the amount of any Delinquency Advance required to be made with respect to the related Payment Date. The Servicer shall include in the amount to be deposited in the Payment Account on such Servicer Remittance Date an amount equal to the Delinquency Advance, if any, which deposit may be made in whole or in part from funds in the Collection Account being held for future payment or withdrawal on or in connection with Payment Dates in subsequent months, other than any such amounts which are voluntary Principal Prepayments in full. Any funds being held for future payment to Noteholders and so used shall be replaced by the Servicer from its own funds by deposit in the Collection Account on or before the Business Day preceding any future Servicer Remittance Date to the extent that funds in the Collection Account on such Servicer Remittance Date shall be less than the Servicer Remittance Amount for such Payment Date.

The Servicer shall designate on its records the specific Mortgage Loans and related installments (or portions thereof) as to which such Delinquency Advance shall be deemed to have been made, such determination being conclusive for purposes of withdrawals from the Collection Account pursuant to Section 5.03 hereof.

Section 5.20. Indemnification; Third Party Claims. The Servicer agrees to indemnify and to hold each of the Issuing Entity, the Owner Trustee, the Depositor, the Sponsor, the Indenture Trustee and each Noteholder harmless against any and all claims, losses, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses (including attorneys' fees and expenses) that the Issuing Entity, the Owner Trustee, the Depositor, the Sponsor, the Indenture Trustee and any Noteholder (or any director, officer, employee or agent of the foregoing) may sustain in any way related to the failure of the Servicer to perform its duties and service the Mortgage Loans in compliance with the terms of this Agreement and the other Basic Documents and in connection with the Indenture as provided in Section 6.16 thereof. Each indemnified party and the Servicer shall immediately notify the other indemnified parties if a claim is made by a third party with respect to this Agreement and the other Basic Documents and the Servicer shall assume the defense of any such claim and pay all expenses in connection therewith, including reasonable counsel fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against the Issuing Entity, the Owner Trustee, the Depositor, the Sponsor, the Servicer, the Indenture Trustee and/or a Noteholder (or any director, officer, employee or agent of the foregoing) in respect of such claim. The obligations of the Servicer under this Section 5.19 arising prior to any resignation or termination of the Servicer hereunder shall survive the resignation or termination of the Servicer or the termination of this Agreement or the Indenture.

50

Section 5.21. Maintenance of Corporate Existence and Licenses; Merger or Consolidation of the Servicer. (a) The Servicer will keep in full effect its existence, rights and franchises as a corporation, will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction necessary to protect the validity and enforceability of this Agreement or any of the Mortgage Loans and to perform its duties under this Agreement and will otherwise operate its business so as to cause the representations and warranties under Section 3.01 hereof to be true and correct at all times under this Agreement.

(b) Any corporation into which the Servicer may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any corporation succeeding to all or substantially all of the business of the Servicer, shall be the successor of the Servicer, hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto provided that, such corporation meets the qualifications set forth in Section 7.02(b). The Servicer, as applicable, shall send notice of any such merger or consolidation to the Owner Trustee, the Indenture Trustee and the Depositor, as applicable.

Section 5.22. Assignment of Agreement by Servicer; Servicer Not to Resign. The Servicer shall not assign this Agreement nor resign from the obligations and duties hereby imposed on it except upon the determination that the Servicer's duties hereunder are no longer permissible under applicable law and that such incapacity cannot be cured by the Servicer, without incurring unreasonable expense. Any such determination that the Servicer's duties hereunder are no longer permissible under applicable law permitting the

Exhibit 5 - 000266

Sale and Servicing Agreement        file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 235 of 266

resignation of the Servicer, as applicable, shall be evidenced by a written Opinion of Counsel (who may be counsel for the Servicer) to such effect delivered to the Indenture Trustee, the Issuing Entity, the Depositor, the Sponsor and the Servicer, as applicable. No such resignation of the Servicer shall become effective until a successor servicer appointed in accordance with the terms of this Agreement has assumed the Servicer's responsibilities and obligations hereunder in accordance with Section 7.02. The Servicer shall provide the Indenture Trustee and the Rating Agencies with 30 days' prior written notice of its intention to resign pursuant to this Section 5.21.

Section 5.23. [Reserved.]

Section 5.24. <u>Administrative Duties</u>. (a) <u>Duties with Respect to the Basic Documents</u>. The Servicer shall perform all its duties and the duties of the Issuing Entity under the Basic Documents. In addition, the Servicer shall consult with the Owner Trustee as the Servicer deems appropriate regarding the duties of the Issuing Entity under the Basic Documents. The Servicer shall monitor the performance of the Issuing Entity and shall advise the Owner Trustee when action is necessary to comply with the Trust's duties under the Basic Documents. The Servicer shall prepare for execution by the Issuing Entity or shall cause the preparation by other appropriate Persons of all such documents, reports, filings, instruments, certificates and opinions as it shall be the duty of the Issuing Entity to prepare, file or deliver pursuant to the Basic Documents. In furtherance of the foregoing, the Servicer shall take all necessary action that is the duty of the Issuing Entity to take pursuant to the Basic Documents.

(b) <u>Duties with Respect to the Issuing Entity.</u> In addition to the duties of the Servicer set forth in this Agreement or any of the Basic Documents, the Servicer shall perform

51

such calculations and shall prepare for execution by the Issuing Entity or the Owner Trustee or shall cause the preparation by other appropriate Persons of all such documents, reports, filings, instruments, certificates and opinions as it shall be the duty of the Issuing Entity or the Owner Trustee to prepare, file or deliver pursuant to this Agreement or any of the Basic Documents or under state and federal tax and securities laws and shall take all appropriate action that it is the duty of the Issuing Entity to take pursuant to this Agreement or any of the Basic Documents. In accordance with the directions of the Issuing Entity or the Owner Trustee, the Servicer shall administer, perform, or supervise the performance of such other activities in connection with the Basic Documents as are not covered by any of the foregoing provisions and as are expressly requested by the Issuing Entity or the Owner Trustee and are reasonably within the capability of the Servicer.

In carrying out the foregoing duties under this Agreement, the Servicer may enter into transactions with or otherwise deal with any of its Affiliates; provided, however, that the terms of any such transactions or dealings shall be in accordance with any directions received from the Issuing Entity and shall be, in the Servicer's opinion, no less favorable to the Issuing Entity in any material respect.

(c) <u>Additional Information to be Furnished to the Issuing Entity</u>. The Servicer shall furnish to the Owner Trustee from time to time such additional information regarding the Issuing Entity or the Basic Documents as the Owner Trustee shall reasonably request. The Servicer shall prepare, execute and deliver all certificates or other documents required to be delivered by the Issuing Entity pursuant to the Sarbanes-Oxley Act of 2002 or the rules and regulations promulgated thereunder.

Section 5.25. <u>Advance Facility</u>.

(a) The Servicer on behalf of the Issuing Entity, is hereby authorized to enter into a facility (such an arrangement, an "Advance Facility") with any Person which provides that such Person (an "Advancing Person") may fund Delinquency Advances and/or Servicing Advances under this Agreement, although no such facility shall reduce or otherwise affect the Servicer's obligation to fund such Delinquency Advances and/or Servicing Advances. No consent of the Indenture Trustee, Noteholders or any other party shall be required before the Servicer may enter into an Advance Facility nor shall the Indenture Trustee or the Noteholders be a third party beneficiary of any obligation of an Advancing Person to the Servicer. If the Servicer enters into an Advance Facility, the Servicer and the related Advancing Person shall deliver to the Indenture Trustee at the address set forth in Section 10.06 hereof a written notice (an "Advance Facility Notice"), stating (a) the identity of the Advancing Person and (b) the identity of the Person (the "Servicer's Assignee") that will, subject to Section 5.24(b) hereof, have the right to make withdrawals from the Collection Account pursuant to Section 5.03(b) hereof to reimburse previously unreimbursed Delinquency Advances and/or Servicing Advances ("Advance Reimbursement Amounts"). If the Servicer enters into such an Advance Facility pursuant to this Section 5.24, upon reasonable request of the Advancing Person, the Indenture Trustee shall execute a letter of acknowledgment, as prepared by the Servicer confirming its receipt of written notice of the existence of such Advance Facility. To the extent that an Advancing Person purchases or funds any Delinquency Advance or any Servicing Advance and provides the Indenture Trustee with written notice acknowledged by the Servicer that such

52

Advancing Person is entitled to reimbursement directly from the Indenture Trustee pursuant to the terms of the Advance Facility, such Advancing Person shall be entitled to receive reimbursement pursuant to this Agreement for such amount to the extent provided in Section 5.24(b). Such notice from the Advancing Person must specify the amount of the reimbursement, the Section of this Agreement that permits the applicable Delinquency Advance or Servicing Advance to be reimbursed and the section(s) of the Advance Facility

Exhibit 5 - 000267

Sale and Servicing Agreement      file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024     Doc 8     Page 236 of 266

that entitle the Advancing Person to request reimbursement from the Indenture Trustee, rather than the Servicer, and include the Servicer's acknowledgment thereto or proof of an Event of Default under the Advance Facility. The Indenture Trustee shall have no duty or liability with respect to any calculation of any reimbursement to be paid to an Advancing Person and shall be entitled to rely without independent investigation on the Advancing Person's notice provided pursuant to this Section 5.24. For the avoidance of doubt, an Advancing Person whose obligations under the Advance Facility are limited to the funding of Delinquency Advances and/or Servicing Advances shall not be considered to be a subservicer hereunder.

       (b) Notwithstanding the foregoing, and for the avoidance of doubt, (i) the Servicer and/or the Servicer's Assignee shall only be entitled to reimbursement of Delinquency Advance reimbursement amounts hereunder from withdrawals from the Collection Account pursuant to Section 5.03(b) and (c) of this Agreement and shall not otherwise be entitled to make withdrawals or receive amounts that shall be deposited in the Payment Account, and (ii) none of the Indenture Trustee or the Noteholders shall have any right to, or otherwise be entitled to, receive any Delinquency Advance reimbursement amounts to which the Servicer or Servicer's Assignee, as applicable, shall be entitled pursuant to Section 5.03(b) and (c) hereof. An Advance Facility may be terminated by the joint written direction of the Servicer and the related Advancing Person. Written notice of such termination shall be delivered to the Indenture Trustee in the manner set forth in Section 10.06 hereof. Neither the Issuing Entity nor the Indenture Trustee shall, as a result of the existence of any Advance Facility, have any additional duty or liability with respect to the calculation or payment of any Delinquency Advance reimbursement amount, nor, as a result of the existence of any Advance Facility, shall the Issuing Entity or the Indenture Trustee have any additional responsibility to track or monitor the administration of the Advance Facility or the payment of Delinquency Advance reimbursement amounts to the Servicer's Assignee. The Servicer shall indemnify the Indenture Trustee, any successor Servicer and the Issuing Entity for any claim, loss, liability or damage resulting from any claim by the related Advancing Person, except to the extent that such claim, loss, liability or damage resulted from or arose out of negligence, recklessness or willful misconduct on the part of the Indenture Trustee or any successor Servicer, as the case may be, or failure by the successor Servicer to remit funds as required by this Agreement or the commission of an act or omission to act by the successor Servicer and the passage of any applicable cure or grace period, such that an Event of Default under this Agreement occurs or such entity is subject to termination for cause under this Agreement. The Servicer shall maintain and provide to any successor Servicer and, upon request, the Indenture Trustee a detailed accounting on a loan-by-loan basis as to amounts advanced by, pledged or assigned to, and reimbursed to any Advancing Person. The successor Servicer and the Indenture Trustee, as applicable, shall be entitled to rely on any such information provided by the predecessor Servicer, and the successor Servicer and the Indenture Trustee, as applicable, shall not be liable for any errors in such information.

<div align="center">53</div>

       (c) If an Advancing Person is entitled to reimbursement for any particular Delinquency Advance or Servicing Advance as set forth in Section 5.24(a), then the Servicer shall not be permitted to reimburse itself therefor under Section 5.03(b) and (c), but instead the Servicer shall include such amounts in the applicable remittance to the Indenture Trustee made pursuant to Section 5.02 to the extent of amounts on deposit in the Collection Account on the related Servicer Remittance Date. The Indenture Trustee is hereby authorized to pay to an Advancing Person reimbursements for Delinquency Advances and Servicing Advances from the Payment Account to the same extent the Servicer would have been permitted to reimburse itself for such Delinquency Advances and/or Servicing Advances in accordance with Section 5.03(b) and (c), had the Servicer made such Delinquency Advance or Servicing Advance.

       (d) All Delinquency Advances and Servicing Advances made pursuant to the terms of this Agreement shall be deemed made and shall be reimbursed on a "first in first out" (FIFO) basis. In the event the Servicer's Assignee shall have received some or all of an Delinquency Advance reimbursement amount related to Delinquency Advances and/or Servicing Advances that were made by a Person other than the Servicer or its related Advancing Person in error, then such Servicer's Assignee shall be required to remit any portion of such Delinquency Advance reimbursement amount to each Person entitled to such portion of such Delinquency Advance reimbursement amount. Without limiting the generality of the foregoing, the Servicer shall remain entitled to be reimbursed pursuant to Section 5.03(b) and (c) for all Delinquency Advances and/or Servicing Advances funded by the Servicer to the extent the related Delinquency Advance reimbursement amounts have not been assigned, sold or pledged to such Advancing Person or Servicer's Assignee.

       (e) In the event the Servicer is terminated pursuant to Section 7.01, the Advancing Person shall succeed to the terminated Servicer's right of reimbursement set forth in Section 5.03(b) and (c) to the extent of such Advancing Person's financing of Delinquency Advances or Servicing Advances hereunder then remaining unreimbursed.

       (f) Any amendment to this Section 5.24 or to any other provision of this Agreement that may be necessary or appropriate to effect the terms of an Advance Facility as described generally in this Section 5.24, including amendments to add provisions relating to a successor Servicer, may be entered into by the Indenture Trustee, the Sponsor, the Depositor, the Issuing Entity and the Servicer without the consent of any Noteholder, provided such amendment complies with Section 10.03 hereof. All reasonable costs and expenses (including attorneys' fees) of each party hereto of any such amendment shall be borne solely by the Servicer. The parties hereto hereby acknowledge and agree that: (a) the Delinquency Advances and/or Servicing Advances financed by, sold and/or pledged to an Advancing Person under any Advance Facility are obligations owed to the Servicer payable only from the cash flows and proceeds received under this Agreement for reimbursement of Delinquency Advances and/or Servicing Advances only to the

<div align="right">Exhibit 5 - 000268</div>

Sale and Servicing Agreement     file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 237 of 266

extent provided herein, and the Indenture Trustee and the Issuing Entity are not, as a result of the existence of any Advance Facility, obligated or liable to repay any Delinquency Advances and/or Servicing Advances financed by the Advancing Person; (b) the Servicer will be responsible for remitting to the Advancing Person the applicable amounts collected by it as reimbursement for Delinquency Advances and/or Servicing Advances purchased or funded by the Advancing Person, subject to the provisions of this Agreement; and (c) the Indenture Trustee shall not have any responsibility to track or monitor the administration of the financing arrangement between the Servicer and any Advancing Person.

54

---

## ARTICLE VI

## APPLICATION OF FUNDS

Section 6.01. <u>Deposits to the Payment Account</u>. By 12:00 noon (Eastern Time) on each Servicer Remittance Date, the Servicer shall remit to the Indenture Trustee for deposit in the Payment Account, from funds on deposit in the Collection Account, an amount equal to the Servicer Remittance Amount with respect to the related Payment Date, minus any portion thereof payable to the Servicer pursuant to Section 5.03.

Section 6.02. <u>Collection of Money</u>. Except as otherwise expressly provided herein, the Indenture Trustee may demand payment or delivery of all money and other property payable to or receivable by the Indenture Trustee pursuant to this Agreement, including all payments due on the Mortgage Loans in accordance with the respective terms and conditions of such Mortgage Loans and required to be paid over to the Indenture Trustee by the Servicer. The Indenture Trustee shall hold all such money and property received by it, as part of the Trust Estate and shall apply it as provided in the Indenture.

Section 6.03. <u>Application of Principal and Interest</u>. In the event that Net Liquidation Proceeds on a Liquidated Mortgage Loan are less than the Principal Balance of the related Mortgage Loan plus accrued interest thereon, or any Mortgagor makes a partial payment of any Monthly Payment due on a Mortgage Loan, such Net Liquidation Proceeds or partial payment shall be applied to payment of the related Mortgage Note as provided therein, and if not so provided, first to interest accrued at the Mortgage Interest Rate and then to principal.

Section 6.04. [Reserved.]

Section 6.05. <u>Compensating Interest</u>. Not later than the Servicer Remittance Date, the Servicer shall remit to the Indenture Trustee (without right to reimbursement therefor) for deposit into the Payment Account, an amount equal to, for all of the Mortgage Loans, the lesser of (a) the Prepayment Interest Shortfalls for all of the Mortgage Loans for the related Payment Date resulting from Principal Prepayments in full during the related Prepayment Period and (b) its aggregate Servicing Fee with respect to all of the Mortgage Loans for the related Due Period (the "<u>Compensating Interest</u>").

## ARTICLE VII

## SERVICER DEFAULT

Section 7.01. <u>Servicer Events of Default</u>. (a) The following events shall each constitute a "Servicer Event of Default" hereunder:

    (i) any failure by the Servicer to remit to the Indenture Trustee any payment required to be made by the Servicer under the terms of this Agreement (other than Servicing Advances covered by clause (ii) below and Delinquency Advances, which

55

---

shall have no cure period), which continues unremedied for one (1) Business Day after the date upon which notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Indenture Trustee or to the Servicer and Indenture Trustee by the Noteholders affected thereby evidencing Percentage Interests of at least 25%; provided however that any failed remittance cured within one Business Day of such failure shall include interest accrued at the Prime Rate (as set forth in the Wall Street Journal) on the amount of such remittance from and including the date the remittance was required to be made to and including the date the remittance was actually made;

    (ii) the failure by the Servicer to make any required Servicing Advance, which failure continues unremedied for a period of thirty (30) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Indenture Trustee or to the Servicer and the Indenture Trustee by the Noteholders affected thereby evidencing Percentage Interests of at least 25%;

    (iii) any failure on the part of the Servicer duly to observe or perform in any material respect any other covenants or agreements on the part of the Servicer contained in this Agreement, or the failure of any representation and warranty made pursuant to Section 3.01(a) hereof to be true and correct which continues unremedied for a period of thirty (30) days after the

Exhibit 5 - 000269

Sale and Servicing Agreement        file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 238 of 266

date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Indenture Trustee or to the Servicer and the Indenture Trustee by the Noteholders affected thereby evidencing Percentage Interests of at least 25%;

      (iv) a decree or order of a court or agency or supervisory authority having jurisdiction in an involuntary case under any present or future federal or state bankruptcy, insolvency or similar law or for the appointment of a conservator or receiver or liquidation in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Servicer and such decree or order shall have remained in force, undischarged or unstayed for a period of ninety (90) days;

      (v) the Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Servicer or of or relating to all or substantially all of the Servicer's property;

      (vi) the Servicer shall admit in writing its inability generally to pay its debts as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations;

      (vii) if on any Payment Date the Rolling Six Month Delinquency Ratio exceeds 23.80%;

<div align="center">56</div>

      (viii) if on any Payment Date, the Cumulative Realized Loss Percentage exceeds the following percentages on any Payment Date during the following periods:

| Payment Date Occurring During | Percentage |
|---|---|
| July 2009 to June 2010 | 6.50% |
| July 2010 to June 2011 | 7.00% |
| July 2011 to June 2012 | 7.50% |
| July 2012 and thereafter | 8.00% |

      (ix) the occurrence of an Event of Default under the Indenture.

      So long as a Servicer Event of Default shall have occurred and not have been remedied: (x) with respect solely to Section 7.01(a)(i), if such payment is in respect of Delinquency Advances or Compensating Interest owing by the Servicer and such payment is not made by 12:00 noon New York time on the second Business Day prior to the applicable Payment Date, the Indenture Trustee, upon receipt of written notice or actual knowledge by a Responsible Officer of the Indenture Trustee of such failure, shall give immediate telephonic and facsimile notice of such failure to a Servicing Officer of the Servicer and the Indenture Trustee may, and upon request of the Holders representing more than 50% of the Class Note Balance, shall, terminate all of the rights and obligations of the Servicer under this Agreement, except for the Servicer's indemnification obligation under Section 5.19, and the Indenture Trustee (if it is the successor servicer) or a successor servicer appointed in accordance with Section 7.02, shall immediately make such Delinquency Advance or payment of Compensating Interest as provided in Section 7.02 and assume, pursuant to Section 7.02 hereof, the duties of a successor servicer; (y) with respect to that portion of Section 7.01(a)(i) not referred to in the preceding clause (x) and with respect to clauses (ii), (iii), (iv), (v), (vi) and (xii) of Section 7.01(a), upon receipt of written notice or actual knowledge by a Responsible Officer of the Indenture Trustee, the Indenture Trustee shall, but only at the direction of the Majority Noteholders, by notice in writing to the Servicer and a Responsible Officer of the Indenture Trustee, and in addition to whatever rights such Noteholders may have at law or equity to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Servicer under this Agreement, except for the Servicer's indemnification obligations under Section 5.19, and in and to the Mortgage Loans and the proceeds thereof, as Servicer; and (z) with respect to clauses (vii)-(ix) of Section 7.01(a), upon receipt of written notice or actual knowledge by a Responsible Officer of the Indenture Trustee, the Indenture Trustee shall, after notice in writing to the Servicer and a Responsible Officer of the Indenture Trustee, terminate all the rights and obligations of the Servicer under this Agreement, except for the Servicer's indemnification obligations under Section 5.19, and in and to the Mortgage Loans and the proceeds thereof, as Servicer. Upon receipt by the Servicer of such written notice, all authority and power of the Servicer under this Agreement, whether with respect to the Mortgage Loans or otherwise, shall, subject to Section 7.02, pass to and be vested in another successor servicer, and another successor servicer is hereby authorized and empowered to execute and deliver, on behalf of the Servicer, as attorney-in-fact or otherwise, at the expense of the Servicer, any and all documents and other instruments and do or cause to be done all other acts or things necessary or appropriate to effect the purposes of such notice of termination, including, but not limited to, the transfer and endorsement or assignment of the Mortgage Loans and related documents. The Servicer agrees to cooperate (and to pay any related costs and expenses) with the Indenture Trustee or another

<div align="center">57</div>

successor servicer in effecting the termination of the Servicer's responsibilities and rights hereunder, including, without limitation, the transfer to another successor servicer, for administration by it of all amounts which shall at the time be credited by the Servicer to

Exhibit 5 - 000270

Sale and Servicing Agreement     file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024   Doc 8   Page 239 of 266

the Collection Account or thereafter received with respect to the Mortgage Loans. The Indenture Trustee shall promptly notify the Rating Agencies and the Swap Provider of the occurrence of a Servicer Event of Default upon discovery or receipt of notice by a Responsible Officer of the Indenture Trustee; provided, however, the Indenture Trustee shall not be obligated to monitor the Servicer's compliance with the terms hereof or to determine the occurrence of any Servicer Event of Default.

Section 7.02. <u>Indenture Trustee to Act: Appointment of Successor</u>. (a) (i) On and after the time the Servicer receives a notice of termination pursuant to Section 7.01, or the Indenture Trustee receives the resignation of the Servicer evidenced by an Opinion of Counsel pursuant to Section 5.21, or the Servicer is removed as Servicer pursuant to this Article VII, in which event the Indenture Trustee shall promptly notify the Rating Agencies, and except as otherwise provided in this Section 7.02, the Indenture Trustee (provided the Indenture Trustee receives 20 days' prior written notice) or another successor servicer shall be the successor in all respects to the Servicer in its capacity as servicer under this Agreement and the transactions set forth or provided for in this Agreement, and shall be subject to all the responsibilities, restrictions, duties, liabilities and termination provisions relating thereto placed on the Servicer by the terms and provisions of this Agreement. The Indenture Trustee or another successor servicer shall take such action, consistent with this Agreement, as shall be necessary to effect any such succession. If the Indenture Trustee or any other successor servicer is acting as Servicer hereunder, it shall be subject to termination under Section 7.01 upon the occurrence or continuation of a Servicer Event of Default applicable to it as Servicer. The Indenture Trustee hereby agrees to act as successor servicer pursuant to the terms of this Agreement upon the termination or resignation of the Servicer as provided in this Section 7.02, provided that the Indenture Trustee receives all of the necessary documents relating to the Mortgage Loans and computer records reflecting the status of the Mortgage Loans as of the date of such transfer of servicing. The Indenture Trustee and any successor servicer will not be obligated to incur any expenses or costs (including, without limitation, legal fees and the preparation and recording of all intervening assignments of mortgage) in connection with the transfer of servicing of the Mortgage Loans to the Indenture Trustee, as successor servicer, or any other successor servicer, as applicable, or to compel the performance of any obligations by any party to this Agreement. Any successor servicer and the Indenture Trustee prior to its becoming the successor servicer shall not be liable for any actions, omissions or defaults of any servicer prior to it or breaches of representations and warranties of the servicer prior to it. The Indenture Trustee or any other successor servicer, as successor servicer, shall be obligated to pay Compensating Interest pursuant to Section 6.05 in any event and to make Delinquency Advances pursuant to Section 5.18 unless, and only to the extent the successor servicer determines reasonably and in good faith that such advances would not be recoverable from the proceeds of the related Mortgage Loan pursuant to Section 5.03, such determination to be evidenced by a certification of a Responsible Officer of the successor servicer delivered to the Indenture Trustee. Furthermore, neither the Indenture Trustee nor any successor servicer shall be obligated to fund any resulting discrepancy or shortfall in the Collection Account. Upon the transfer of the servicing of the Mortgage Loans, the Indenture Trustee shall provide the successor servicer with an officer's certificate that contains: (i) a complete description of all Events of Default by the Servicer under the Agreement of which a

58

Responsible Officer of the Indenture Trustee has actual knowledge, which have not been fully cured and (ii) confirmation that the Servicer Remittance Report and the reports described in Sections 5.09 and 5.10 have been timely filed by the Servicer with the Indenture Trustee.

(i) In the event that any successor servicer is terminated or resigns pursuant to this Agreement or otherwise becomes unable to perform its obligations under this Agreement, the Indenture Trustee will appoint a successor servicer in accordance with the provisions of this Section 7.02; provided, that any successor servicer, shall satisfy the requirements set forth in Section 7.02(b) and shall be approved by the Rating Agencies.

(b) Any successor servicer hereunder (other than the Indenture Trustee) shall be a housing and home finance institution, bank or mortgage servicing institution which has been designated as an approved seller-servicer by Fannie Mae or Freddie Mac, having equity of not less than $5,000,000 as determined in accordance with GAAP, as the successor to the Servicer hereunder in the assumption of all or any part of the responsibilities, duties or liabilities of the Servicer hereunder.

(c) In the event the Indenture Trustee is the successor servicer, it shall be entitled to the same Servicing Compensation (including the Servicing Fee as adjusted pursuant to the definition thereof) and other funds pursuant to Section 5.08 hereof as the Servicer if the Servicer had continued to act as servicer hereunder.

(d) The Indenture Trustee and any successor servicer shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession. The Servicer agrees to cooperate with the Indenture Trustee and any successor servicer in effecting the termination of the Servicer's servicing responsibilities and rights hereunder and shall promptly provide the Indenture Trustee, or such successor servicer, as applicable, at the Servicer's cost and expense, all documents and records reasonably requested by it to enable it to assume the Servicer's functions hereunder and shall promptly also transfer to the Indenture Trustee, or such successor servicer, as applicable, all amounts that then have been or should have been deposited in the Collection Account by the Servicer or that are thereafter received with respect to the Mortgage Loans, including without limitation all Liquidation Proceeds and Insurance Proceeds, and payments of insurance deductible amounts by the Servicer pursuant to Section 5.04(b) with respect to all insurance claims arising during the Servicer's tenure. Any collections received by the Servicer after such removal or resignation shall be endorsed by it to the Indenture Trustee or a successor servicer, as applicable, and remitted directly to the Indenture Trustee (or, at the direction of the Indenture Trustee, to any other successor servicer). Neither the Indenture Trustee nor any other successor servicer

Exhibit 5 - 000271

Sale and Servicing Agreement      file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 240 of 266

shall be held liable by reason of any failure to make, or any delay in making, any payment hereunder or any portion thereof caused by (i) the failure of the Servicer to deliver, or any delay in delivering, cash, documents or records to it, or (ii) restrictions imposed by any regulatory authority having jurisdiction over the Servicer hereunder. The Servicer shall not resign as Servicer until a successor servicer has been appointed.

(e) In the event that the Servicer is terminated hereunder and no successor servicer has been appointed hereunder, the Indenture Trustee may appoint a successor servicer

<div align="center">59</div>

(which may be an affiliate of the Indenture Trustee) or petition a court of competent jurisdiction to appoint a successor servicer. Pending appointment of such a successor servicer hereunder, the Indenture Trustee shall be the successor servicer and act in such capacity; provided, however, that the Indenture Trustee, in its capacity as successor servicer pending appointment of another successor servicer, (i) shall be obligated to make Delinquency Advances or Servicing Advances only to the extent that the Indenture Trustee deems such advances to be recoverable, (ii) shall be obligated to make Compensating Interest payments in respect of any Payment Date only to the extent of any Servicing Fee received by the Indenture Trustee in respect of such Payment Date, (iii) shall not be obligated to perform any other duties or obligations of the Servicer hereunder until the Indenture Trustee has received all servicing records and files from the predecessor servicer and in no event later than 90 days following the termination of the Servicer; provided, however, the Indenture Trustee shall use its reasonable efforts to perform the duties and obligations of the Servicer prior to the end of such 90 day period, (iv) shall not be obligated to perform any of the administrative duties specified in Section 5.23 hereof, and (v) shall be entitled to payment of all Servicing Compensation. In connection with any appointment and assumption of duties of a successor servicer, the Indenture Trustee may make such arrangements for the compensation of such successor servicer out of payments on Mortgage Loans; provided, however, that such compensation may not be in excess of that permitted the Servicer pursuant to Section 5.08, together with other Servicing Compensation. The Servicer, the Indenture Trustee and such successor Servicer shall take such action, consistent with this Agreement, as shall be necessary to effectuate any such succession.

(f) In the event the Indenture Trustee, or any successor servicer incurs out-of-pocket expenses other than Servicing Advances or Delinquency Advances in connection with the transfer of servicing hereunder, which expenses are required to be borne by the Servicer hereunder, and such expenses are not promptly reimbursed by the Servicer or recoverable out of amounts reimbursable to the Servicer out of the Collection Account, the Indenture Trustee shall make such reimbursement to the applicable party out of funds in the Payment Account on any Payment Date after all Payments to Noteholders on such Payment Date have been made but before any distribution to the Certificateholders. The right of the Indenture Trustee to reimbursement from the Payment Account for any of the Indenture Trustee's costs and expenses in connection with the transfer of any servicing hereunder shall be in addition to any rights of the Indenture Trustee to indemnification and reimbursement under the Indenture.

(g) In the event that the Servicer is terminated or resigns hereunder, and at such time the Servicer has made unreimbursed Delinquency Advances or Servicing Advances out of its own funds,

(i) any such Delinquency Advances or Servicing Advances shall be allocated by the successor servicer in whole or in part to specific Mortgage Loans which are delinquent at the time of the transfer of servicing, which allocation shall be based on loan-level accounts of the portion of each Delinquency Advance or Servicing Advance which has been funded by the Servicer from its own funds consistently maintained by the former Servicer, or, if no such accounts exist, then in the successor servicer's discretion;

(ii) following the transfer of servicing, the successor servicer shall reimburse the former Servicer for such Delinquency Advances and Servicing Advances

<div align="center">60</div>

in accordance with the allocations determined in accordance with clause (i) above only out of the proceeds of the Mortgage Loans to which they relate and otherwise subject to Section 5.03, or, to the extent the successor servicer determines any such Delinquency Advance or Servicing Advance to be a Nonrecoverable Advance, out of any funds in the Collection Account.

(h) In connection with the termination or resignation of the Servicer hereunder, the successor Servicer shall represent and warrant that it is a member of MERS in good standing and shall agree to comply in all material respects with the rules and procedures of MERS in connection with the servicing of the Mortgage Loans that are registered with MERS, in which case the predecessor Servicer shall cooperate with the successor Servicer in causing the MERS System to be revised to reflect the transfer of servicing to the successor Servicer as necessary under MERS' rules and regulations.

Section 7.03. <u>Waiver of Defaults</u>. The Majority Noteholders may, on behalf of all Noteholders, waive any events permitting removal of the Servicer as servicer pursuant to this Article VII; provided, <u>however</u>, that the Majority Noteholders may not waive a default in making a required payment on a Note without the consent of the Holder of such Note. Upon any waiver of a past default, such default shall cease to exist, and any Servicer Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent

Exhibit 5 - 000272

Sale and Servicing Agreement                    file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024   Doc 8   Page 241 of 266

thereto except to the extent expressly so waived. Notice of any such waiver shall be given by the Indenture Trustee to the Rating Agencies.

# ARTICLE VIII

## TERMINATION

Section 8.01. <u>Termination</u>. (a) Subject to Section 8.02, this Agreement shall terminate upon notice to the Indenture Trustee of either: (i) the disposition of all funds with respect to the last Mortgage Loan and the remittance of all funds due hereunder and the payment of all amounts due and payable to the Indenture Trustee or (ii) mutual consent of the Owner Trustee, on behalf of the Issuing Entity, at the direction of all the Certificateholders, the Indenture Trustee, the Servicer, the Swap Provider (if the Swap Agreement is still outstanding) and all Noteholders in writing.

(b) In addition, subject to Section 8.02, the Sponsor may, at its sole option, cost and expense, terminate the Issuing Entity in accordance with the terms of Section 10.01 of the Indenture.

(c) If on any date, the Servicer determines that there are no outstanding Mortgage Loans and no other funds or assets in the Trust Estate other than funds in the Payment Account, the Servicer shall send a final payment notice promptly to the Indenture Trustee, who shall forward notice to each Noteholder in accordance with Section 8.01(d).

(d) Notice of any termination, specifying the Payment Date upon which the Issuing Entity will terminate and the Noteholders shall surrender their Notes to the Indenture

61

Trustee for final payment and cancellation, shall be given promptly by the Servicer to the Indenture Trustee, who shall forward the notice by letter to Noteholders mailed during the month of such final payment before the Servicer Remittance Date in such month, specifying (i) the Payment Date upon which final payment of the Notes will be made upon presentation and surrender of Notes at the office of the Indenture Trustee therein designated, (ii) the amount of any such final payment and (iii) that the Record Date otherwise applicable to such Payment Date is not applicable, payments being made only upon presentation and surrender of the Notes at the office of the Indenture Trustee therein specified.

(e) In the event that all of the Noteholders do not surrender their Notes for cancellation within six (6) months after the time specified in the above-mentioned written notice, the Indenture Trustee shall give a second written notice to the remaining Noteholders to surrender their Notes for cancellation and receive the final payment with respect thereto. If within six (6) months after the second notice, all of the Notes shall not have been surrendered for cancellation, the Indenture Trustee may take appropriate steps, or may appoint an agent to take appropriate steps, to contact the remaining Noteholders concerning surrender of their Notes and the cost thereof shall be paid out of the funds and other assets which remain subject hereto. If within nine (9) months after the second notice all the Notes shall not have been surrendered for cancellation, the Certificateholders shall be entitled to all unclaimed funds and other assets which remain subject hereto and the Indenture Trustee upon transfer of such funds shall be discharged of any responsibility for such funds and the Noteholders shall look only to the Certificateholders for payment. Such funds shall remain uninvested.

Section 8.02. <u>Additional Termination Requirements</u>. By their acceptance of the Notes, the Holders thereof hereby agree to appoint the Servicer as their attorney in fact to: (i) adopt a plan of complete liquidation (and the Noteholders hereby appoint the Indenture Trustee as their attorney in fact to sign such plan) as appropriate and (ii) to take such other action in connection therewith as may be reasonably required to carry out such plan of complete liquidation all in accordance with the terms hereof.

Section 8.03. <u>Accounting Upon Termination of Servicer</u>. Upon termination of the Servicer, the Servicer shall, at its expense:

(a) deliver to the successor servicer or, if none shall yet have been appointed, to the Indenture Trustee, the funds in any Account administered by the Servicer;

(b) deliver to the successor servicer or, if none shall yet have been appointed, to the Indenture Trustee all Mortgage Files and related documents and statements held by it hereunder and a Mortgage Loan portfolio computer tape;

(c) deliver to the successor servicer, or, if none shall yet have been appointed, to the Indenture Trustee a full accounting of all funds, including a statement showing the Monthly Payments collected by it and a statement of monies held in trust by it for the payments or charges with respect to the Mortgage Loans; and

(d) execute and deliver such instruments and perform all acts reasonably requested in order to effect the orderly and efficient transfer of servicing of the Mortgage Loans to the successor servicer and to more fully and definitively vest in such successor all rights, powers, duties, responsibilities, obligations and liabilities of the Servicer under this Agreement.

62

Exhibit 5 - 000273

Sale and Servicing Agreement        file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 242 of 266

## ARTICLE IX

### [RESERVED]

## ARTICLE X

### MISCELLANEOUS PROVISIONS

Section 10.01. <u>Limitation on Liability</u>. (a) None of the Issuing Entity, the Owner Trustee, the Depositor, the Sponsor, the Servicer, the Indenture Trustee or any of the directors, officers, employees or agents of such Persons shall be under any liability to the Issuing Entity, the Noteholders for any action taken, or for refraining from the taking of any action, in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Issuing Entity, the Owner Trustee, the Depositor, the Sponsor, the Servicer, the Indenture Trustee or any such Person against liability for any breach of warranties or representations made herein by such party, or against any specific liability imposed on each such party pursuant to this Agreement or against any liability which would otherwise be imposed upon such party by reason of willful misfeasance, bad faith or negligence in the performance of duties or by reason of failure to perform its obligations or duties hereunder. The Issuing Entity, the Owner Trustee, the Depositor, the Sponsor, the Servicer, the Indenture Trustee and any director, officer, employee or agent of such Person may rely in good faith on any document of any kind which, prima facie, is properly executed and submitted by any appropriate Person respecting any matters arising hereunder.

(b) It is expressly understood and agreed by the parties hereto that (i) this Agreement is executed and delivered by U.S. Bank Trust National Association, not individually or personally but solely as Owner Trustee under the Trust Agreement, in the exercise of the powers and authority conferred and vested in it under the Trust Agreement, (ii) each of the representations, undertakings and agreements herein made on the part of the Issuing Entity is made and intended not as personal representations, undertakings and agreements by U.S. Bank Trust National Association but is made and intended for the purpose of binding only the Issuing Entity, (iii) nothing herein contained shall be construed as creating any liability on U.S. Bank Trust National Association, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and (iv) under no circumstances shall U.S. Bank Trust National Association be personally liable for the payment of any indebtedness or expenses of the Issuing Entity or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Issuing Entity under this Agreement or any other related documents.

Section 10.02. <u>Acts of Noteholders</u>. (a) Subject to Section 7.04 and except as otherwise specifically provided herein, whenever Noteholder action, consent or approval is required under this Agreement, such action, consent or approval shall be deemed to have been taken or given on behalf of, and shall be binding upon, all Noteholders if the Majority Noteholders agree to take such action or give such consent or approval.

63

(b) The death or incapacity of any Noteholder shall not operate to terminate this Agreement or the Issuing Entity, nor entitle such Noteholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Issuing Entity, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

(c) No Noteholder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Issuing Entity, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of the Notes, be construed so as to constitute the Noteholders from time to time as partners or members of an association; nor shall any Noteholder be under any liability to any third person by reason of any action taken by the parties to this Agreement pursuant to any provision hereof.

Section 10.03. <u>Amendment</u>. (a) This Agreement may be amended from time to time by the Owner Trustee, on behalf of the Issuing Entity, the Servicer, the Depositor, Sponsor and the Indenture Trustee by written agreement, without notice to or consent of the Noteholders and without the consent of the Swap Provider to cure any ambiguity, to correct or supplement any provisions herein, to comply with any changes in the Code, or to make any other provisions with respect to matters or questions arising under this Agreement which shall not be inconsistent with the provisions of this Agreement; provided, however, that such action shall not adversely affect in any material respect the interests of any Noteholder or the Swap Provider and will not prevent the Notes from being characterized as debt for United States federal income tax purposes or cause the Issuing Entity to be subject to federal income tax, as evidenced by (i) an Opinion of Counsel, at the expense of the party requesting the change, delivered to the Indenture Trustee to such effect or (ii) a letter from each Rating Agency confirming that such action will not result in the reduction, qualification or withdrawal of the then-current ratings on the Notes. The Indenture Trustee shall give prompt written notice to the Rating Agencies and the Swap Provider of any amendment made pursuant to this Section 10.03.

(b) This Agreement may be amended from time to time by the Owner Trustee, on behalf of the Issuing Entity, the Servicer, the Depositor, the Sponsor and the Indenture Trustee, with the consent of the Noteholders representing more than 50% of the

Exhibit 5 - 000274

Sale and Servicing Agreement             file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

**Case 11-02024   Doc 8   Page 243 of 266**

outstanding Principal Balance of the Notes of each affected Class and all of the Certificateholders and with the consent of the Swap Provider (if the Swap Agreement is still outstanding and affected); provided, however, that no such amendment shall reduce in any manner the amount of, or delay the timing of, payments received on Mortgage Loans which are required to be paid on any Class of Notes without the consent of the Holders of such Class of Notes or reduce the percentage for the Holders of which are required to consent to any such amendment without the consent of the Holders of 100% of such Class of Notes affected thereby.

(c) Notwithstanding the provisions of this Section 10.03, Section 5.11 may be amended as necessary to comply with the provisions of Regulation AB without the consent of the Noteholders.

64

(d) It shall not be necessary for the consent of Holders under this Section 10.03 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof.

(e) In executing, or accepting the additional trusts created by, any supplemental indenture permitted by Article IX of the Indenture or the modifications thereby of the trusts created by the Indenture, the Indenture Trustee shall be entitled to receive, and (subject to Section 6.01 of the Indenture) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by the Indenture. The Indenture Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Indenture Trustee's own rights, duties or immunities under the Indenture or otherwise. The Servicer, on behalf of the Issuing Entity, shall cause executed copies of any supplemental indentures to be delivered to the Rating Agencies.

Section 10.04. Recordation of Agreement. To the extent permitted by applicable law, this Agreement, or a memorandum thereof if permitted under applicable law, is subject to recordation in all appropriate public offices for real property records in all of the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Servicer at the Noteholders' expense on direction and at the expense of Majority Noteholders requesting such recordation, but only when accompanied by an Opinion of Counsel to the effect that such recordation materially and beneficially affects the interests of the Noteholders or is necessary for the administration or servicing of the Mortgage Loans.

Section 10.05. Duration of Agreement. This Agreement shall continue in existence and effect until terminated as herein provided.

Section 10.06. Notices. All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given when delivered to (i) in the case of the Servicer, Accredited Home Lenders, Inc., 15090 Avenue of Science, San Diego, California 92128, Attention: Director of Operations with a copy to General Counsel; (ii) in the case of the Issuing Entity, Accredited Mortgage Loan Trust 2006-2, c/o the Owner Trustee at its Corporate Trust Office, Attention: Corporate Trust Administration; (iii) in the case of the Indenture Trustee, Deutsche Bank National Trust Company, 1761 East St. Andrew Place, Santa Ana, CA 92705-4934, Attn: Trust Administration – AC0602, provided, however, all reports, statements, certifications and information required to be provided to the Indenture Trustee pursuant to Sections 5.09, 5.10 and 5.11 shall be electronically forwarded to DBSEC.Notifications@db.com; (iv) in the case of the Sponsor, Accredited Home Lenders, Inc., 15090 Avenue of Science, San Diego, California 92128, Attention: Investor Reporting; (v) in the case of the Underwriter, Goldman, Sachs & Co., 85 Broad Street, New York, New York 10004, (vi) in the case of Standard & Poor's Rating Services, 55 Water Street, New York, New York 10004, Attention: Residential Mortgage Surveillance Group; (vii) in the case of Moody's Investors Service, Inc., 99 Church Street, New York, New York 10007, Attention: RMBS Monitoring Department, 4th Floor; (viii) in the case of the Depositor, Accredited Mortgage Loan REIT Trust, 15090 Avenue of Science, San Diego, California 92128, Attention: General Counsel; (ix) in the case of the Swap Provider, Barclays Bank PLC, 200 Park Avenue, 4th Floor, New York, New York 10166, Attention: General Counsel and (x) in the case of the Noteholders, as set forth in the Note

65

Register. Any such notices shall be deemed to be effective with respect to any party hereto upon the receipt of such notice by such party, except that notices to the Noteholders shall be effective upon mailing or personal delivery.

Section 10.07. Severability of Provisions. If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other covenants, agreements, provisions or terms of this Agreement.

Section 10.08. No Partnership. Nothing herein contained shall be deemed or construed to create a co-partnership or joint venture between the parties hereto and the services of the Servicer shall be rendered as an independent contractor and not as agent for the Noteholders.

Section 10.09. Counterparts. This Agreement may be executed in one or more counterparts and by the different parties hereto on

Exhibit 5 - 000275

Sale and Servicing Agreement       file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 244 of 266

separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same agreement.

       Section 10.10. <u>Successors and Assigns</u>. This Agreement shall inure to the benefit of and be binding upon the Issuing Entity, the Servicer, the Depositor, the Sponsor, the Indenture Trustee and the Noteholders and their respective successors and permitted assigns.

       Section 10.11. <u>Headings</u>. The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be part of this Agreement.

       Section 10.12. <u>No Petition</u>. The Servicer, by entering into this Agreement hereby covenants and agrees, and the Noteholders, by the acceptance of their Notes are deemed to covenant and agree, that they will not at any time institute against the Issuing Entity, or join in any institution against the Issuing Entity of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States Federal or state bankruptcy law in connection with any obligations relating to the Certificates, the Notes, this Agreement or any of the other Basic Documents.

       This Section 10.12 will survive for one year and one day following the termination of this Agreement.

       Section 10.13. <u>Third Party Beneficiary</u>. The parties agree that each of the Owner Trustee and the Swap Provider (if the Swap Agreement is still outstanding) is intended and shall have all rights of a third-party beneficiary of this Agreement.

       Section 10.14. <u>Intent of the Parties</u>. It is the intent of the parties hereto and Noteholders that, for federal income taxes, state and local income or franchise taxes and other taxes imposed on or measured by income, the Notes be treated as debt. The parties to this Agreement and the Holder of each Note, by acceptance of its Note, and each Beneficial Owner thereof, agree to treat, and to take no action inconsistent with the treatment of, the related Notes in accordance with the preceding sentence for purposes of federal income taxes, state and local income and franchise taxes and other taxes imposed on or measured by income.

<div align="center">66</div>

       Section 10.15. <u>Compliance With Regulation AB</u>. Each of the parties hereto acknowledges and agrees that the purpose of Sections 5.10 and 5.11 of this Agreement is to facilitate compliance by the Sponsor and the Depositor with the provisions of Regulation AB, as such may be amended or clarified from time to time. Therefore, each of the parties agrees that (a) the obligations of the parties hereunder shall be interpreted in such a manner as to accomplish compliance with Regulation AB, (b) the parties' obligations hereunder will be supplemented and modified as necessary to be consistent with any such amendments, interpretive advice or guidance, convention or consensus among active participants in the asset-backed securities markets, advice of counsel, or otherwise in respect of the requirements of Regulation AB and (c) the parties shall comply, to the extent practicable from a timing and information systems perspective, with requests made by the Sponsor or the Depositor for delivery of additional or different information as the Sponsor or the Depositor may determine in good faith is necessary to comply with the provisions of Regulation AB.

       Section 10.16. <u>GOVERNING LAW; CONSENT TO JURISDICTION; WAIVER OF JURY TRIAL</u>. (a) THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS (AS OPPOSED TO CONFLICT OF LAWS PROVISIONS) OF THE STATE OF NEW YORK.

       (b) THE TRUST, THE SERVICER, THE DEPOSITOR, THE SPONSOR, THE INDENTURE TRUSTEE HEREBY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK AND THE UNITED STATES DISTRICT COURT LOCATED IN THE BOROUGH OF MANHATTAN IN NEW YORK CITY, AND WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND CONSENTS THAT ALL SUCH SERVICE OF PROCESS BE MADE BY REGISTERED MAIL DIRECTED TO THE ADDRESS SET FORTH IN SECTION 10.06 HEREOF AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN DEPOSITED IN THE U.S. MAILS, POSTAGE PREPAID. THE ISSUER, THE DEPOSITOR, THE SPONSOR, THE SERVICER AND THE INDENTURE TRUSTEE EACH HEREBY WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS, AND ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER AND CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY THE COURT. NOTHING IN THIS SECTION 10.15 SHALL AFFECT THE RIGHT OF THE ISSUER, THE DEPOSITOR, THE SPONSOR, THE SERVICER OR THE INDENTURE TRUSTEE TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR AFFECT ANY OF THEIR RIGHTS TO BRING ANY ACTION OR PROCEEDING IN THE COURTS OF ANY OTHER JURISDICTION.

       (c) THE ISSUER, THE DEPOSITOR, THE SPONSOR, THE SERVICER, THE INDENTURE TRUSTEE AND THE SWAP PROVIDER EACH HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR IN CONNECTION WITH THIS AGREEMENT.

<div align="center">67</div>

Exhibit 5 - 000276

Sale and Servicing Agreement   file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024  Doc 8  Page 245 of 266

INSTEAD, ANY DISPUTE WILL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

[Remainder of Page Intentionally Left Blank]

68

   IN WITNESS WHEREOF, the Servicer, the Issuing Entity, the Indenture Trustee, the Depositor and the Sponsor have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

ACCREDITED HOME LENDERS, INC.,
as Sponsor and Servicer

By:   /s/ Charles O. Ryan
                                                                                                  
Name: Charles O. Ryan
Title:  Securitization Coordinator

ACCREDITED MORTGAGE LOAN
TRUST 2006-2

By:  U.S. BANK TRUST NATIONAL
    ASSOCIATION,
    not in its individual capacity, but solely as
    Owner Trustee under the Trust Agreement

By:   /s/ Patricia M. Child
Name: Patricia M. Child
Title:  Vice President

ACCREDITED MORTGAGE LOAN REIT TRUST
as Depositor

By:   /s/ Melissa Dant
Name: Melissa Dant
Title:  Senior Secondary Markets Counsel,
    Ass't Vice President, and Ass't Secretary

DEUTSCHE BANK NATIONAL TRUST
COMPANY,
as Indenture Trustee

By:   /s/ Barbara Campbell
Name: Barbara Campbell
Title:  Vice President

By:   /s/ Karlene Benvenuto
Name: Karlene Benvenuto
Title:  Authorized Signer

[Signature Page to Sale and Servicing Agreement]

69

SCHEDULE I

Exhibit 5 - 000277

Sale and Servicing Agreement

file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 246 of 266

MORTGAGE LOAN SCHEDULE

[Delivered to the Sponsor, the Servicer, the Depositor and the Trustee at the Closing]

A-1

---

APPENDIX I

DEFINED TERMS

[See Appendix I to Indenture]

---

EXHIBIT A
CONTENTS OF THE MORTGAGE FILE

With respect to each Mortgage Loan, the Mortgage File shall include each of the following items (copies to the extent the originals have been delivered to the Indenture Trustee for the benefit of the Noteholders, pursuant to Section 2.05 of the Sale and Servicing Agreement), all of which shall be available for inspection by the Noteholders, to the extent required by applicable laws:

1. the original Mortgage Note, endorsed without recourse in blank from the last endorsee thereof, including all intervening endorsements showing a complete chain of endorsement;

2. the related original Mortgage with evidence of recording indicated thereon or a copy thereof certified by the applicable recording office and if the Mortgage Loan is registered on the MERS System, such Mortgage or an assignment of the Mortgage shall reflect MERS as the mortgagee of record and shall include the MIN for such Mortgage Loan;

3. each intervening mortgage assignment, with evidence of recording indicated thereon or if the original is not available, a copy thereof certified by the applicable recording office, if any, showing a complete chain of assignment from the last assignee thereof of the related Mortgage Loan to the Sponsor (or to MERS, if the Mortgage Loan is registered on the MERS System), and noting the presence of a MIN (if the Mortgage Loan is registered on the MERS System) (which assignment may, at the Sponsor's option, be combined with the assignment referred to in subpart (4) hereof, in which case it must be in recordable form, but need not have been previously recorded);

4. unless the Mortgage Loan is recorded on the MERS System, a mortgage assignment in recordable form (which, if acceptable for recording in the relevant jurisdiction as evidenced by an Opinion of Counsel addressed to the Indenture Trustee, may be included in a blanket assignment or assignments) of each Mortgage from the Sponsor to the Indenture Trustee;

5. originals of all assumption, modification and substitution agreements in those instances where the terms or provisions of a Mortgage or Mortgage Note have been modified or such Mortgage or Mortgage Note has been assumed (if any); and

6. an original title insurance policy or title opinion (or (A) a copy of the title insurance policy or title opinion, or (B) the related binder, commitment or preliminary report, or copy thereof in which case the Sponsor hereby certifies that the original Mortgage has been delivered to the title insurance company that issued such binder, commitment or preliminary report).

A-1

---

In instances where the original recorded Mortgage or any intervening mortgage assignment or a completed assignment of the Mortgage in recordable form cannot be delivered by the Sponsor to the Indenture Trustee prior to or concurrently with the execution and delivery of this Agreement, due to a delay in connection with recording, the Sponsor may:

(a) with respect to item (3) above, in lieu of delivering such original recorded Mortgage or intervening mortgage assignment, deliver to the Indenture Trustee, a copy thereof; provided, that the Sponsor certifies that the original Mortgage has been delivered to a title insurance company for recordation after receipt of its policy of title insurance or the related binder, commitment or preliminary report; and

(b) in lieu of delivering the completed assignment in recordable form, deliver to the Indenture Trustee, the assignment in recordable form, otherwise complete except for recording information.

A-2

---

EXHIBIT B
[RESERVED]

B-1

---

Exhibit 5 - 000278

Sale and Servicing Agreement                                        file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

<span style="color:red">Case 11-02024      Doc 8      Page 247 of 266</span>

EXHIBIT C
INDENTURE TRUSTEE'S ACKNOWLEDGEMENT OF RECEIPT

June [__], 2006

Goldman, Sachs & Co.                           Accredited Home Lenders, Inc.
85 Broad Street                                15090 Avenue of Science
New York, New York 10004                       San Diego, California 92128
Accredited Mortgage Loan REIT Trust
15090 Avenue of Science
San Diego, California 92128

Re:   Sale and Servicing Agreement, dated as of June 1, 2006 among Accredited Home Lenders, Inc., as Sponsor and Servicer, Accredited Mortgage Loan REIT Trust, as depositor, Accredited Mortgage Loan Trust 2006-2, and Deutsche Bank National
      Trust Company, as Indenture Trustee

Ladies and Gentlemen:

In accordance with Section 2.06(b)(i) of the above-captioned Sale and Servicing Agreement, the undersigned, as Indenture Trustee, hereby acknowledges receipt by it in good faith without notice of adverse claims, subject to the provisions of Sections 2.04 and 2.05 of the Sale and Servicing Agreement (as such provisions relate to the Mortgage Loan), of, with respect to each Mortgage Loan, a Mortgage File containing the original Mortgage Note, except with respect to the list of exceptions attached hereto, and based on its examination and only as to the foregoing, the information set forth in items (i), (ii) (with respect to property address only, excluding zip code), (iii) and (vi) of the definition of the "Mortgage Loan Schedule" accurately reflects information set forth in the Mortgage Note, and declares that it holds and will hold such documents and the other documents delivered to it constituting the Indenture Trustee's Mortgage Files, and that it holds or will hold all such assets and such other assets included in the definition of "Trust Estate" that are delivered to it for the exclusive use and benefit of all present and future Noteholders.

The Indenture Trustee has made no independent examination of any such documents beyond the review specifically required in the above-referenced Sale and Servicing Agreement. The Indenture Trustee makes no representations as to: (i) the validity, legality, recordability, sufficiency, perfection, priority, enforceability or genuineness of any such documents or any of the Mortgage Loans identified on the Mortgage Loan Schedule, or (ii) the collectability, insurability, effectiveness or suitability of any such Mortgage Loan.

The Mortgage Loan Schedule is attached to this Receipt.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in Appendix I to the Indenture, dated as of June 1, 2006, by and between Accredited Mortgage Loan Trust 2006-2 and the Indenture Trustee.

DEUTSCHE BANK NATIONAL TRUST
COMPANY,
as Indenture Trustee

By: _____
Name:
Title:

C-2

EXHIBIT D
INITIAL CERTIFICATION OF INDENTURE TRUSTEE

_____, 2006

Goldman, Sachs & Co.                           Accredited Home Lenders, Inc.
85 Broad Street                                15090 Avenue of Science
New York, New York 10004                       San Diego, California 92128
Accredited Mortgage Loan REIT Trust
15090 Avenue of Science

Exhibit 5 - 000279

San Diego, California 92128

Re:        Sale and Servicing Agreement, dated as of June 1, 2006 among Accredited Home Lenders, Inc., as Sponsor and Servicer, Accredited Mortgage Loan REIT Trust, as depositor, Accredited Mortgage Loan Trust 2006-2, and Deutsche Bank National
<u>Trust Company, as Indenture Trustee</u>

Ladies and Gentlemen:

In accordance with the provisions of Section 2.06(b)(ii) of the above-referenced Sale and Servicing Agreement, the undersigned, as Indenture Trustee, hereby certifies that as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any Mortgage Loan paid in full or any Mortgage Loan listed on the attachment hereto), it has reviewed the documents delivered to it pursuant to Section 2.05(a) of the Sale and Servicing Agreement and has determined that, except as noted on the attachment hereto, (i) all documents required to be delivered to it pursuant to Section 2.05(a)(i)-(iv) and (vi) of the above-referenced Sale and Servicing Agreement are in its possession, (ii) such documents have been reviewed by it and appear regular on their face and have not been mutilated, damaged, torn or otherwise physically altered (handwritten additions, changes or corrections do not constitute physical alteration if they reasonably appear to have been initialed by the Mortgagor) and relates to such Mortgage Loan and (iii) based on its examination and only as to the foregoing documents, the information set forth in the Mortgage Loan Schedule as to the information in clauses (i), (ii) (with respect to property address only, excluding zip code), (iii) and (vi) of the definition of "Mortgage Loan Schedule" respecting such Mortgage Loan accurately reflects the information set forth in Indenture Trustee's Mortgage File. The Indenture Trustee has made no independent examination of such documents beyond the review specifically required in the above-referenced Sale and Servicing Agreement. The Indenture Trustee makes no representations as to: (x) the validity, legality, recordability, sufficiency, perfection, priority, enforceability or genuineness of any such documents contained in each or any of the Mortgage Loans identified on the Mortgage Loan Schedule, or (y) the collectability, insurability, effectiveness or suitability of any such Mortgage Loan.

Capitalized words and phrases used herein shall have the respective meanings assigned to them in the above-captioned Sale and Servicing Agreement.

DEUTSCHE BANK NATIONAL TRUST
COMPANY,
as Indenture Trustee

By: _____
Name:
Title:

D-1

---

EXHIBIT E
FINAL CERTIFICATION OF INDENTURE TRUSTEE

_____, 2006

Goldman, Sachs & Co.                   Accredited Home Lenders, Inc.
85 Broad Street                         15090 Avenue of Science
New York, New York 10004        San Diego, California 92128
Accredited Mortgage Loan REIT Trust
15090 Avenue of Science
San Diego, California 92128

Re:        Sale and Servicing Agreement, dated as of June 1, 2006 among Accredited Home Lenders, Inc., as Sponsor and Servicer, Accredited Mortgage Loan REIT Trust, as depositor, Accredited Mortgage Loan Trust 2006-2, and Deutsche Bank National
<u>Trust Company, as Indenture Trustee</u>

Ladies and Gentlemen:

In accordance with the provisions of Section 2.06(b)(iii) of the above-referenced Sale and Servicing Agreement, the undersigned, as Indenture Trustee, hereby certifies that as to each Mortgage Loan listed in the Mortgage Loan Schedule (other than any

Exhibit 5 - 000280

Sale and Servicing Agreement　　　　　　　file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024　　Doc 8　　Page 249 of 266

Mortgage Loan paid in full or any Mortgage Loan listed on the attachment hereto), it has reviewed the documents delivered to it pursuant to Section 2.05(a) of the Sale and Servicing Agreement and has determined that (i) all documents required to be delivered to it pursuant to Section 2.05(a)(i)-(iv) and (vi) of the above referenced Sale and Servicing Agreement are in its possession, (ii) such documents have been reviewed by it and appear regular on their face and have not been mutilated, damaged, torn or otherwise physically altered (handwritten additions, changes or corrections do not constitute physical alteration if they reasonably appear to have been initialed by the Mortgagor) and relates to such Mortgage Loan and (iii) based on its examination and only as to the foregoing documents, the information set forth in items (i), (ii) (with respect to property address only, excluding zip code), (iii) and (vi) of the definition of the Mortgage Loan Schedule respecting such Mortgage Loan that can be determined from the face of such documents accurately reflects the information set forth in the Indenture Trustee's Mortgage File. The Indenture Trustee has made no independent examination of such documents beyond the review specifically required in the above-referenced Sale and Servicing Agreement. The Indenture Trustee makes no representations as to: (x) the validity, legality, recordability, sufficiency, perfection, priority, enforceability or genuineness of any such documents contained in each or any of the Mortgage Loans identified on the Mortgage Loan Schedule, or (y) the collectability, insurability, effectiveness or suitability of any such Mortgage Loan.

　　　Capitalized words and phrases used herein shall have the respective meanings assigned to them in the above-captioned Sale and Servicing Agreement.

<div style="margin-left:50%">

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Indenture Trustee


By: _____
Name:
Title:

</div>

<div style="text-align:center">E-1</div>

---

<div style="text-align:center">

EXHIBIT F
REQUEST FOR RELEASE OF DOCUMENTS

</div>

To:　Deutsche Bank National Trust Company
　　　1761 East St. Andrew Place
　　　Santa Ana, CA 92705-4934
　　　Attn: Trust Administration – AC0602

Re:　Sale and Servicing Agreement, dated as of June 1, 2006 among Accredited Home Lenders, Inc., as Sponsor and Servicer, Accredited Mortgage Loan REIT Trust, as depositor, Accredited Mortgage Loan Trust 2006-2, and Deutsche Bank National Trust Company, as Indenture Trustee ("Custodian/Indenture Trustee")

　　　In connection with the administration of the Mortgage Loans held by you as Indenture Trustee for the Issuing Entity pursuant to the above-captioned Sale and Servicing Agreement, we request the release, and hereby acknowledge receipt, of the Indenture Trustee's Mortgage File for the Mortgage Loan described below, for the reason indicated.

Mortgage Loan Number:
Mortgagor Name, Address & Zip Code:
Reason for Requesting Documents (check one):

_____　　1.　Mortgage Paid in Full
_____　　2.　Foreclosure
_____　　3.　Substitution
_____　　4.　Other Liquidation (Repurchases, etc.)
_____　　5.　Nonliquidation Reason:　　　　　　　Reason:_____

　　　Address to which Indenture Trustee should

Deliver the Mortgage File:　　　　　　　　　　　　_____

Exhibit 5 - 000281

Sale and Servicing Agreement       file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8   Page 250 of 266

By: _____
               (authorized signer)

Issuing Entity: _____
Address: _____

Date: _____

F-1

---

## EXHIBIT G
## ACCREDITED HOME LENDERS, INC.
## OFFICER'S CERTIFICATE

I, _____, certify that:

1. I have reviewed this annual report on Form 10-K, and all reports on Form 8-K containing distribution or servicing reports filed in respect of periods included in the year covered by this annual report, of Accredited Mortgage Loan Trust 2006-2;

2. Based on my knowledge, the information in these reports, taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading as of the last day of the period covered by this annual report;

3. Based on my knowledge, the distribution or servicing information required to be provided to the trustee by the servicer under the sale and servicing, or similar, agreement is included in these reports;

4. Based on my knowledge and upon the annual compliance statement included in the report and required to be delivered to the trustee in accordance with the terms of the sale and servicing, or similar, agreement, and except as disclosed in the reports, the servicer has fulfilled its obligations under the servicing agreement; and

5. The reports disclose all significant deficiencies relating to the servicer's compliance with the minimum servicing standards based upon the report provided by an independent public accountant, after conducting a review in compliance with the Uniform Single Attestation Program for Mortgage Bankers or similar procedure, as set forth in the sale and servicing, or similar, agreement that included in these reports.

In giving the certifications above, I have reasonably relied on information provided to me by the following unaffiliated parties: _____.

Date:

_____
Name:
Title:

G-1

---

## EXHIBIT H
## SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE

Where there are multiple checks for criteria the attesting party will identify in their management assertion that they are attesting only to the portion of the distribution chain they are responsible for in the related transaction agreements.

**Key: X – obligation**

| Reg AB Reference | Servicing Criteria | Servicer | Indenture Trustee |
|---|---|---|---|

Exhibit 5 - 000282

Sale and Servicing Agreement file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 251 of 266

**General Servicing Considerations**

| Reg AB Reference | Servicing Criteria | Servicer | Indenture Trustee |
|---|---|---|---|
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | X | X |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | If applicable | If applicable |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the Pool Assets are maintained. | If become contractually obligated | If become contractually obligated |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | X | |

**Cash Collection and Administration**

| Reg AB Reference | Servicing Criteria | Servicer | Indenture Trustee |
|---|---|---|---|
| 1122(d)(2)(i) | Payments on pool assets are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified in the transaction agreements. | X | X |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel | X | X |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | X | X |

H-1

| Reg AB Reference | Servicing Criteria | Servicer | Indenture Trustee |
|---|---|---|---|
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of over collateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | X | X |
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1(b)(1) of the Securities Exchange Act. | X | X |
| 1122(d)(2)(vi) | Unissued checks are safeguarded so as to prevent unauthorized access | X | X |
| 1122(d)(2)(vii) | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | X | X |

H-2

**Investor Remittances and Reporting**

| Reg AB Reference | Servicing Criteria | Servicer | Indenture Trustee |
|---|---|---|---|
| | | | |

Exhibit 5 - 000283

Sale and Servicing Agreement | file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 252 of 266

| | | Servicer | Indenture Trustee |
|---|---|:---:|:---:|
| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of Pool Assets serviced by the Servicer. | X | X |
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | X | X |
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the Servicer's investor records, or such other number of days specified in the transaction agreements. | X | X |
| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | X | X |
| | **Pool Asset Administration** | | |
| 1122(d)(4)(i) | Collateral or security on pool assets is maintained as required by the transaction agreements or related pool asset documents. | X | X |
| 1122(d)(4)(ii) | Pool assets and related documents are safeguarded as required by the transaction agreements | | X |
| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. | X | X |
| 1122(d)(4)(iv) | Payments on pool assets, including any payoffs, made in accordance with the related pool asset documents are posted to the Servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related pool asset documents. | X | |

<center>H-3</center>

| Reg AB Reference | Servicing Criteria | Servicer | Indenture Trustee |
|---|---|:---:|:---:|
| 1122(d)(4)(v) | The Servicer's records regarding the pool assets agree with the Servicer's records with respect to an obligor's unpaid principal balance. | X | |
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's pool assets (e.g., loan modifications or reagings) are made, reviewed and approved by authorized personnel in accordance with the transaction agreements and related pool asset documents. | X | |
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. | X | |
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a pool asset is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent pool assets including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). | X | |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for pool assets with variable rates are computed based on the related pool asset documents. | X | |
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such funds are analyzed, in accordance with the obligor's pool asset documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable pool asset documents and state laws; and (C) such funds are returned to the obligor | X | |

Exhibit 5 - 000284

Sale and Servicing Agreement          file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 253 of 266

within 30 calendar days of full repayment of the related pool assets, or such other number of days specified in the transaction agreements.

H-4

| Reg AB Reference | Servicing Criteria | Servicer | Indenture Trustee |
|---|---|---|---|
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. | X | |
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the Servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. | X | |
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two business days to the obligor's records maintained by the servicer, or such other number of days specified in the transaction agreements. | X | |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. | X | |
| 1122(d)(4)(xv) | Any external enhancement or other support, identified in Item 1114(a)(1) through (3) or Item 1115 of Regulation AB, is maintained as set forth in the transaction agreements. | X | |

H-5

EXHIBIT I
FORM 10-D, FORM 8-K AND FORM 10-K
REPORTING RESPONSIBILITY

As to each item described below, the entity indicated as the Responsible Party shall be primarily responsible for reporting the information to the party identified as responsible for preparing the Securities Exchange Act Reports pursuant to Section 5.11 of the Sale and Servicing Agreement.

Under Item 1 of Form 10-D: a) items marked "8.06 statement" are required to be included in the periodic reports prepared by the Indenture Trustee under Section 8.06 of the Indenture, provided by the Indenture Trustee based on information received from the Servicer; and b) items marked "Form 10-D report" are required to be in the Form 10-D report but not the 8.06 statement, provided by the party indicated. Information under all other Items of Form 10-D is to be included in the Form 10-D report. All such information and any other Items of Form 8-K and Form 10-K set forth in this exhibit shall be sent to the Indenture Trustee and the Depositor, as applicable as set forth in Section 5.11 of the Sale and Servicing Agreement.

| Form | Item | Description | Servicer | Indenture Trustee | Owner Trustee | Depositor | Sponsor |
|---|---|---|---|---|---|---|---|
| 10-D | | Must be filed within 15 days of the distribution date for the asset-backed securities. | | | | | |
| | 1 | **Distribution and Pool Performance Information** | | | | | |
| | | *Item 1121(a) – Distribution and Pool Performance Information* | | | | | |
| | | (1) Any applicable record dates, accrual dates, determination dates for calculating distributions and actual distribution dates for the distribution period. | | X (8.06 Statement) | | | |
| | | (2) Cash flows received and the sources thereof for distributions, fees and expenses. | | X (8.06 Statement) | | | |

I-1

Sale and Servicing Agreement file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024 Doc 8 Page 254 of 266

| Form | Item | Description | Servicer | Indenture Trustee | Owner Trustee | Depositor | Sponsor |
|------|------|-------------|----------|-------------------|---------------|-----------|---------|
| | | (3) Calculated amounts and distribution of the flow of funds for the period itemized by type and priority of payment, including: | | **X (8.06 Statement)** | | | |
| | | (i) Fees or expenses accrued and paid, with an identification of the general purpose of such fees and the party receiving such fees or expenses. | | **X (8.06 Statement)** | | | |
| | | (ii) Payments accrued or paid with respect to enhancement or other support identified in Item 1114 of Regulation AB (such as insurance premiums or other enhancement maintenance fees), with an identification of the general purpose of such payments and the party receiving such payments. | | **X (8.06 Statement)** | | | |
| | | (iii) Principal, interest and other distributions accrued and paid on the asset-backed securities by type and by class or series and any principal or interest shortfalls or carryovers. | | **X (8.06 Statement)** | | | |
| | | (iv) The amount of excess cash flow or excess spread and the disposition of excess cash flow. | | **X (8.06 Statement)** | | | |
| | | (4) Beginning and ending principal balances of the asset-backed securities. | | **X (8.06 Statement)** | | | |
| | | (5) Interest rates applicable to the pool assets and the asset-backed securities, as applicable. Consider providing interest rate information for pool assets in appropriate distributional groups or incremental ranges. | | **X (8.06 Statement)** | | | |

I-2

| Form | Item | Description | Servicer | Indenture Trustee | Owner Trustee | Depositor | Sponsor |
|------|------|-------------|----------|-------------------|---------------|-----------|---------|
| | | (6) Beginning and ending balances of transaction accounts, such as reserve accounts, and material account activity during the period. | | **X (8.06 Statement)** | | | |
| | | (7) Any amounts drawn on any credit enhancement or other support identified in Item 1114 of Regulation AB, as applicable, and the amount of coverage remaining under any such enhancement, if known and applicable. | | **X (8.06 State-ment as to first portion)** | | **X (as to the amount of coverage remaining under any such enhancement)** | |
| | | (8) Number and amount of pool assets at the beginning and ending of each period, and updated pool composition information, such as weighted average coupon, weighted average remaining term, pool factors and prepayment amounts. | | **X (8.06 Statement)** | | Updated pool composition information fields to be as specified by Depositor from time to time | |

Exhibit 5 - 000286

Sale and Servicing Agreement　　　　　　　file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024　　Doc 8　　Page 255 of 266

| | | Description | Servicer | Indenture Trustee | Owner Trustee | Depositor | Sponsor |
|---|---|---|---|---|---|---|---|
| | | (9) Delinquency and loss information for the period. | X (8.06 Statement) | | | | |
| | | In addition, describe any material changes to the information specified in Item 1100(b)(5) of Regulation AB regarding the pool assets. (methodology) | X | | | | |
| | | (10) Information on the amount, terms and general purpose of any advances made or reimbursed during the period, including the general use of funds advanced and the general source of funds for reimbursements. | X (8.06 Statement) | | | | |

I-3

| Form | Item | Description | Servicer | Indenture Trustee | Owner Trustee | Depositor | Sponsor |
|---|---|---|---|---|---|---|---|
| | | (11) Any material modifications, extensions or waivers to pool asset terms, fees, penalties or payments during the distribution period or that have cumulatively become material over time. | X | | | X | X |
| | | (12) Material breaches of pool asset representations or warranties or transaction covenants. | X | | | X | X |
| | | (13) Information on ratio, coverage or other tests used for determining any early amortization, liquidation or other performance trigger and whether the trigger was met. | | X (8.06 Statement) | | | |
| | | (14) Information regarding any new issuance of asset-backed securities backed by the same asset pool, | | | | X | X |
| | | Information regarding any pool asset changes (other than in connection with a pool asset converting into cash in accordance with its terms), such as additions or removals in connection with a prefunding or revolving period and pool asset substitutions and repurchases (and purchase rates, if applicable), and cash flows available for future purchases, such as the balances of any prefunding or revolving accounts, if applicable. | X | | | X | |

I-4

| Form | Item | Description | Servicer | Indenture Trustee | Owner Trustee | Depositor | Sponsor |
|---|---|---|---|---|---|---|---|
| | | Disclose any material changes in the solicitation, credit-granting, underwriting, origination, acquisition or pool selection criteria or procedures, as applicable, used to originate, acquire or select the new pool assets. | | | | X | X |
| | | *Item 1121(b) – Pre-Funding or Revolving Period Information* | | | | X | |
| | | Updated pool information as required under Item 1121(b). | | | | | |
| | 2 | **Legal Proceedings** | | | | | |
| | | Item 1117 – Legal proceedings pending against the following entities, or their respective property, that is material to Noteholders, including proceedings known to be contemplated by governmental authorities: | | | | | |
| | | Sponsor | | | | | X |

Exhibit 5 - 000287

Sale and Servicing Agreement                                        file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024     Doc 8     Page 256 of 266

| | | | | |
|---|---|---|---|---|
| Depositor | | | X | |
| Owner Trustee | | X | | |
| Issuing entity | | | X | |
| Servicer, other Servicer servicing 20% or more of pool assets at time of report, other material servicers | X | | | |
| Indenture Trustee | | X | | |
| Custodian | | X | | |

I-5

| Form | Item | Description | Servicer | Indenture Trustee | Owner Trustee | Depositor | Sponsor |
|---|---|---|---|---|---|---|---|
| | 3 | **Sales of Securities and Use of Proceeds** | | | | | |
| | | *Information from Item 2(a) of Part II of Form 10-Q:* | | | | X | |
| | | With respect to any sale of securities by the sponsor, depositor or issuing entity, that are backed by the same asset pool or are otherwise issued by the issuing entity, whether or not registered, provide the sales and use of proceeds information in Item 701 of Regulation S-K. Pricing information can be omitted if securities were not registered. | | | | | |
| | 4 | **Defaults Upon** | | | | | |
| | | **Senior Securities** *Information from Item 3 of Part II of Form 10-Q:* | | X | | X | X |
| | | Report the occurrence of any Event of Default (after expiration of any grace period and provision of any required notice) | | | | | |
| | 5 | **Submission of Matters to a Vote of Noteholders** | | | | | |
| | | *Information from Item 4 of Part II of Form 10-Q* | X (to the extent initiated by the Servicer) | X (to the extent initiated by the Indenture Trustee) | | X (to the extent initiated by the Depositor) | X (to the extent initiated by the Sponsor) |
| | 6 | **Significant Obligors of Pool Assets** | | | | | |
| | | *Item 1112(b) – Significant Obligor Financial Information\** | | | | X | |

\* This information need only be reported on the Form 10-D for the distribution period in which updated information is required pursuant to the Item.

I-6

| Form | Item | Description | Servicer | Indenture Trustee | Owner Trustee | Depositor | Sponsor |
|---|---|---|---|---|---|---|---|
| | 7 | **Significant Enhancement Provider Information** | | | | | |
| | | *Item 1114(b)(2) – Credit Enhancement Provider Financial Information\** | | | | | |

Exhibit 5 - 000288

Sale and Servicing Agreement                        file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 257 of 266

| | | X |
|---|---|---|
| Determining applicable disclosure threshold | | X |
| Requesting required financial information or effecting incorporation by reference | | X |

*Item 1115(b) – Derivative Counterparty Financial Information\**

| | | |
|---|---|---|
| Determining current maximum probable exposure | | X |
| Determining current significance percentage | | X |
| Requesting required financial information or effecting incorporation by reference | | X |

\* This information need only be reported on the Form 10-D for the distribution period in which updated information is required pursuant to the Items.

| Form | Item | Description | Servicer | Indenture Trustee | Owner Trustee | Depositor | Sponsor |
|---|---|---|---|---|---|---|---|
| | 8 | **Other Information** | | | | | |
| | | *Disclose any information required to be reported on Form 8-K during the period covered by the Form 10-D but not reported* | The Responsible Party for the applicable Form 8-K item as indicated below. | | | | |
| | 9 | **Exhibits** | | | | | |
| | | Distribution Report | | X | | | |
| | | *Exhibits required by Item 601 of Regulation S-K, such as material agreements* | | | | X | |
| 8-K | | Must be filed within four business days of an event reportable on Form 8-K. | | | | | |

I-7

| Form | Item | Description | Servicer | Indenture Trustee | Owner Trustee | Depositor | Sponsor |
|---|---|---|---|---|---|---|---|
| | 1.01 | **Entry into a Material Definitive Agreement** | | | | | |
| | | Disclosure is required regarding entry into or amendment of any definitive agreement that is material to the securitization, even if depositor is not a party. | X | | | X | X |
| | | Examples: servicing agreement, custodial agreement. Note: disclosure not required as to definitive agreements that are fully disclosed in the prospectus | | | | | |
| | 1.02 | **Termination of a Material Definitive Agreement** | | | | | |
| | | Disclosure is required regarding termination of any definitive agreement that is material to the securitization (other than expiration in accordance with its terms), even if depositor is not a party. | X | X (only to the extent initiated by the Indenture Trustee) | | X | X |
| | | Examples: servicing agreement, custodial agreement. | | | | | |

I-8

Exhibit 5 - 000289

Sale and Servicing Agreement      file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 258 of 266

| Form | Item | Description | Servicer | Indenture Trustee | Owner Trustee | Depositor | Sponsor |
|------|------|-------------|----------|-------------------|---------------|-----------|---------|
| | 1.03 | **Bankruptcy or Receivership** | | | | | |
| | | Disclosure is required regarding the bankruptcy or receivership, if known to the Depositor, Indenture Trustee, Sponsor or Servicer, with respect to any of the following: | X | X (as to itself) | | X | X |
| | | Sponsor, Depositor, Servicer, affiliated Servicer, other Servicer servicing 20% or more of pool assets at time of report, other material servicers, Indenture Trustee, significant obligor, credit enhancer (10% or more), derivatives counterparty, custodian | | | | | |
| | 2.04 | **Triggering Events that Accelerate or Increase a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement** | | | | | |
| | | Includes an early amortization, performance trigger or other event, including event of default, that would materially alter the payment priority/distribution of cash flows/amortization schedule. | | | | X | |
| | | Disclosure will be made of events other than waterfall triggers which are disclosed in the 8.06 statement | | | | | |
| | 3.03 | **Material Modification to Rights of Noteholders** | | | | | |
| | | Disclosure is required of any material modification to documents defining the rights of Noteholders, including the Sale and Servicing Agreement | | | | X | X |

I-9

| Form | Item | Description | Servicer | Indenture Trustee | Owner Trustee | Depositor | Sponsor |
|------|------|-------------|----------|-------------------|---------------|-----------|---------|
| | 5.03 | **Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year** | | | | | |
| | | Disclosure is required of any amendment "to the governing documents of the issuing entity" | | | | X | |
| | 5.06 | **Change in Shell Company Status** | | | | | |
| | | [Not applicable to ABS issuers] | | | | X | |
| | 6.01 | **ABS Informational and Computational Material** | | | | | |
| | | [Not included in reports to be filed under Section 3.19] | | | | X | |
| | 6.02 | **Change of Servicer or Trustee** | | | | | |
| | | Requires disclosure of any removal, replacement, substitution or addition of any servicer, affiliated servicer, other servicer servicing 10% or more of pool assets at time of report, other material servicers, or trustee. | X | | | X | |
| | | Reg AB disclosure about any new servicer is also required. | X (the successor) | | | | |

Exhibit 5 - 000290

Sale and Servicing Agreement     file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 259 of 266

| | | | X (the successor) | X (the successor) |
|---|---|---|---|---|
| | Reg AB disclosure about any new trustee is also required. | | X (the successor) | X (the successor) |
| 6.03 | **Change in Credit Enhancement or Other External Support** | | | |
| | Covers termination of any enhancement in manner other than by its terms, the addition of an enhancement, or a material change in the enhancement provided. Applies to external credit enhancements as well as derivatives. | | X | X |

I-10

| Form | Item | Description | Servicer | Indenture Trustee | Owner Trustee | Depositor | Sponsor |
|---|---|---|---|---|---|---|---|
| | | Reg AB disclosure about any new enhancement provider is also required. | | | | X | |
| | 6.04 | **Failure to Make a Required Distribution** | | X | | | |
| | 6.05 | **Securities Act Updating Disclosure** | | | | | |
| | | If any material pool characteristic differs by 5% or more at the time of issuance of the securities from the description in the final prospectus, provide updated Reg AB disclosure about the actual asset pool. | | | | X | |
| | | If there are any new servicers or originators required to be disclosed under Regulation AB as a result of the foregoing, provide the information called for in Items 1108 and 1110 respectively. | | | | X | |
| | 7.01 | **7.01 Regulation FD Disclosure** | X | | | X | X |
| | 8.01 | **Other Events** | | | | | |
| | | Any event, with respect to which information is not otherwise called for in Form 8-K, that the registrant deems of importance to Noteholders. | | | | X | X |
| | 9.01 | **Financial Statements and Exhibits** | The Responsible Party applicable to reportable event. | | | | |
| **10-K** | | Must be filed within 90 days of the fiscal year end for the registrant. | | | | | |
| | 9B | **Other Information** | | | | | |
| | | Disclose any information required to be reported on Form 8-K during the fourth quarter covered by the Form 10-K but not reported | The Responsible Party for the applicable Form 8-K Item as indicated above. | | | | |
| | 15 | **Exhibits and Financial Statement Schedules** | | | | | |
| | | *Item 1112(b) – Significant Obligor Financial Information* | | | | X | |

I-11

| Form | Item | Description | Servicer | Indenture Trustee | Owner Trustee | Depositor | Sponsor |
|---|---|---|---|---|---|---|---|
| | | *Item 1114(b)(2) – Credit Enhancement Provider Financial Information* | | | | | |
| | | Determining applicable disclosure threshold | | | | | X |

Exhibit 5 - 000291

Sale and Servicing Agreement   file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024  Doc 8  Page 260 of 266

|  |  |  |  |  |
|---|---|---|---|---|
| Requesting required financial information or effecting incorporation by reference |  |  |  | X |

*Item 1115(b) – Derivative Counterparty Financial Information*

|  |  |  |  |  |
|---|---|---|---|---|
| Determining current maximum probable exposure |  |  |  | X |
| Determining current significance percentage |  |  |  | X |
| Requesting required financial information or effecting incorporation by reference |  |  |  | X |

Item 1117 – Legal proceedings pending against the following entities, or their respective property, that is material to Noteholders, including proceedings known to be contemplated by governmental authorities:

|  |  |  |  |  |
|---|---|---|---|---|
| Sponsor |  |  |  | X |
| Depositor |  |  |  | X |
| Owner Trustee |  |  | X |  |
| Issuing entity |  |  |  | X |
| Servicer, affiliated Servicer, other Servicer servicing 20% or more of pool assets at time of report, other material servicers | X |  |  |  |
| Indenture Trustee |  | X |  |  |
| Custodian |  | X |  |  |

I-12

| Form | Item | Description | Servicer | Indenture Trustee | Owner Trustee | Depositor | Sponsor |
|------|------|-------------|----------|-------------------|---------------|-----------|---------|
|  |  | Item 1119 – Affiliations and relationships between the following entities, or their respective affiliates, that are material to Noteholders: |  |  |  |  |  |
|  |  | Sponsor |  |  |  |  | X |
|  |  | Depositor |  |  |  | X |  |
|  |  | Owner Trustee |  |  | X |  |  |
|  |  | Servicer, affiliated Servicer, other Servicer servicing 20% or more of pool assets at time of report, other material servicers | X |  |  |  |  |
|  |  | Indenture Trustee |  | X |  |  |  |
|  |  | Custodian |  | X |  |  |  |
|  |  | Credit Enhancer/Support Provider |  |  |  | X |  |
|  |  | Significant Obligor |  |  |  | X |  |
|  |  | *Item 1122 – Assessment of Compliance with Servicing Criteria* | X | X |  |  |  |
|  |  | *Item 1123 – Servicer Compliance Statement* | X |  |  |  |  |

I-13

Exhibit 5 - 000292

Sale and Servicing Agreement

file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 261 of 266

EXHIBIT J-1

FORM OF CERTIFICATION TO BE PROVIDED BY THE DEPOSITOR WITH
FORM 10-K

Re: Accredited Mortgage Loan Trust, Series 2006-2 (the "Issuing Entity") Asset-Backed Notes, Series 2006-2

I, [identify the certifying individual], certify, that:

1.  I have reviewed this report on Form 10-K, and all reports on Form 10-D required to be filed in respect of the period covered by this report on Form 10-K of Accredited Mortgage Loan Trust 2006-2, Asset Backed Notes, Series 2006-2 (the "Exchange Act periodic reports");

2.  Based on my knowledge, the Exchange Act periodic reports, taken as a whole, do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, all of the distribution, servicing and other information required to be provided under Form 10-D for the period covered by this report is included in the Exchange Act periodic reports;

4.  Based on my knowledge and the servicer compliance statement required in this report under Item 1123 of Regulation AB, and except as disclosed in the Exchange Act periodic reports, the servicer has fulfilled its obligations under the sale and servicing agreement; and

5.  All of the reports on assessment of compliance with servicing criteria for asset-backed securities and their related attestation reports on assessment of compliance with servicing criteria for asset-backed securities required to be included in this report in accordance with Item 1122 of Regulation AB and Exchange Act Rules 13a-18 and 15d-18 have been included as an exhibit to this report, except as otherwise disclosed in this report. Any material instances of noncompliance described in such reports have been disclosed in this report on From 10-K.

In giving the certifications above, I have reasonably relied on information provided to me by the following unaffiliated parties: [_____].

ACCREDITED MORTGAGE LOAN REIT TRUST

By: _____
Name:
Title:
Date:

J-1

EXHIBIT J-2

FORM OF CERTIFICATION TO BE PROVIDED TO THE DEPOSITOR BY THE INDENTURE TRUSTEE

Re: Accredited Mortgage Loan Trust 2006-2 (the "Issuing Entity") Asset-Backed Notes, Series 2006-2

I, [identify the certifying individual], a [title] of Deutsche Bank National Trust Company, as Indenture Trustee, hereby certify to Accredited Mortgage Loan REIT Trust (the "Depositor"), and its officers, directors and affiliates, and with the knowledge and intent that they will rely upon this certification, that:

1.  I have reviewed the annual report on Form 10-K for the fiscal year 20[__], and all reports on Form 10-D containing distribution reports filed in respect of periods included in the year covered by that annual report, of the Depositor relating to the above-referenced issuing entity;

2.  Based on my knowledge and assuming the accuracy and completeness of the information provided to the Indenture Trustee by the Servicer, the information in these distribution reports prepared by the Indenture Trustee, taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by that annual report provided to me by the Servicer; and

3.  Based on my knowledge, the distribution information required to be provided under Form 10-D by the Indenture Trustee under the Sale and Servicing Agreement is included in these distribution reports.

Capitalized terms used but not defined herein have the meanings ascribed to them in Appendix A to the Indenture, dated June 1, 2006

Exhibit 5 - 000293

Sale and Servicing Agreement                           file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 262 of 266

(the "Indenture"), between Accredited Mortgage Loan Trust 2006-2, as issuing entity, and Deutsche Bank National Trust Company, as indenture trustee.

DEUTSCHE BANK NATIONAL TRUST
COMPANY,
as Indenture Trustee

By: _____
Name:
Title:
Date:

J-2

---

## EXHIBIT K

### OFFICER'S CERTIFICATE REGARDING ANNUAL STATEMENT OF COMPLIANCE

Accredited Mortgage Loan Trust, Series 2006-2
Asset-Backed Notes, Series 2006-2

I, _____, hereby certify that I am a duly appointed _____ of Accredited Home Lenders, Inc. (the "Servicer"), and further certify as follows:

1.    This certification is being made pursuant to the terms of the Sale and Servicing Agreement, dated as of June 1, 2006 (the "Servicing Agreement"), among Accredited Mortgage Loan Trust 2006-2, as issuing entity, Accredited Mortgage Loan REIT Trust, as depositor, the Servicer as sponsor and servicer and Deutsche Bank National Trust Company, as indenture trustee.

2.    I have reviewed the activities of the Servicer during the preceding calendar year and the Servicer's performance under the Servicing Agreement has been made under my supervision and to the best of my knowledge, based on such review, the Servicer has fulfilled all of its obligations under the Servicing Agreement in all material respects throughout the year.

Capitalized terms not otherwise defined herein have the meanings set forth in the Servicing Agreement.

Date:

_____
Name:
Title:

K-1

---

### Exhibit L

#### Form of Addition Notice

_____, 200_

VIA FEDERAL EXPRESS

Deutsche Bank National Trust Company
    1761 East St. Andrew Place
    Santa Ana, CA 92705-4934
    Attn: Trust Administration – AC0602

Re:    Sale and Servicing Agreement, dated as of June 1, 2006 among Accredited Home Lenders, Inc., as Sponsor and Servicer, Accredited Mortgage Loan REIT Trust, as Depositor, Accredited Mortgage Loan Trust 2006-2, and Deutsche Bank National Trust Company, as Indenture Trustee

Ladies and Gentlemen:

    Pursuant to Section [_____] of the above-captioned Sale and Servicing Agreement, the Depositor has designated the Subsequent Mortgage Loans (see subsequent mortgage loan schedule attached hereto) to be sold to the Issuing Entity, on

Exhibit 5 - 000294

Sale and Servicing Agreement      file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 263 of 266

_____, with an aggregate principal balance of $_____. Capitalized terms not otherwise defined herein have the meaning set forth in the Sale and Servicing Agreement.

       Please acknowledge your receipt of this notice by countersigning the enclosed copy in the space indicated below and returning it to the attention of the undersigned.

Very truly yours,

ACCREDITED MORTGAGE LOAN REIT TRUST

By: _____
Name: Melissa Dant
Title:   Senior Secondary Markets Counsel,
       Ass't Vice President, and Ass't Secretary

Acknowledged and agreed:

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Indenture Trustee

By: _____

---

**EXHIBIT M**

**DEPOSITOR'S SUBSEQUENT TRANSFER INSTRUMENT**

       Pursuant to this Depositor's Subsequent Transfer Instrument (the "Depositor's Instrument"), dated as of [_____], 2006, between Accredited Mortgage Loan REIT Trust, as depositor (the "Depositor"), Accredited Mortgage Loan Trust, Series 2006-2, as issuing entity (the "Issuing Entity") and Deutsche Bank National Trust Company, as indenture trustee, and pursuant to the Sale and Servicing Agreement, dated as of June 1, 2006 (the "Sale and Servicing Agreement"), among Accredited Home Lenders, Inc., as sponsor and servicer (the "Sponsor" and the "Servicer"), the Depositor, Accredited Mortgage Loan Trust 2006-2, as issuing entity (the "Issuing Entity") and the Indenture Trustee agree to the sale by the Depositor and the purchase by the Issuing Entity of the subsequent mortgage loans listed on the attached Mortgage Loan Schedule (the "Subsequent Mortgage Loans") in accordance with the Sale and Servicing Agreement.

       Capitalized terms used and not defined herein have their respective meanings as set forth in the definitions contained in the Sale and Servicing Agreement, which definitions are incorporated by reference herein. All other capitalized terms used herein shall have the meanings specified herein.

       Section 1. Conveyance of Subsequent Mortgage Loans.

       (a) The Depositor does hereby sell, transfer, assign, set over and convey to the Issuing Entity, without recourse, all of its right, title and interest in and to the Subsequent Mortgage Loans, all scheduled payments of principal and interest on the Subsequent Mortgage Loans due after the Subsequent Cut-off Date, and all other payments of principal and interest on the Subsequent Mortgage Loans collected after the Subsequent Cut-off Date (minus that portion of any such payment which is allocable to the period prior to the Subsequent Cut-off Date); provided, however, that no scheduled payments of principal and interest due on or before the Subsequent Cut-off Date and collected after the Subsequent Cut-off Date shall belong to the Issuing Entity pursuant to the terms of this Depositor's Instrument. The Depositor, contemporaneously with the delivery of this Depositor's Instrument, has delivered or caused to be delivered to the Indenture Trustee, at the direction of the Issuing Entity, each item set forth in Section 2.10(b) of the Sale and Servicing Agreement with respect to such Subsequent Mortgage Loans. The transfer to the Issuing Entity by the Depositor of the Subsequent Mortgage Loans identified on the attached Mortgage Loan Schedule shall be absolute and is intended by the Depositor, the Issuing Entity, the Sponsor, the Servicer, the Indenture Trustee and the Noteholders to constitute and to be treated as a sale by the Depositor.

       The parties hereto intend that the transactions set forth herein constitute a sale by the Depositor to the Issuing Entity on the Subsequent Transfer Date of all the Depositor's right, title and interest in and to the Subsequent Mortgage Loans, and other property as and to the extent described above. In the event the transactions set forth herein shall be deemed not to be a sale, the Depositor hereby grants to the Issuing Entity as of the Subsequent Transfer Date a security interest in all of the Depositor's right, title and interest in, to and under the Subsequent Mortgage Loans, and such other property, to secure all of the Depositor's obligations hereunder, and this purchase agreement shall constitute a security agreement under applicable law, and in such

Exhibit 5 - 000295

Case 11-02024    Doc 8    Page 264 of 266

event, the parties hereto acknowledge that the Indenture Trustee, in addition to holding the Subsequent Mortgage Loans for the benefit of the Noteholders, holds the Subsequent Mortgage Loans as designee and agent of the Issuing Entity. The Depositor agrees to take or cause to be taken such actions and to execute such documents, including without limitation the filing of all necessary UCC-1 financing statements filed in the State of Maryland (which shall be submitted for filing as of the Subsequent Transfer Date), any continuation statements with respect thereto and any amendments thereto required to reflect a change in the name or corporate structure of the Depositor or the filing of any additional UCC-1 financing statements due to the change in the state of incorporation of the Depositor as are necessary to perfect and protect the interests of the Issuing Entity and its assignees in each Subsequent Mortgage Loan and the proceeds thereof.

(b) The expenses and costs relating to the delivery of the Subsequent Mortgage Loans, this Depositor's Instrument and such other items required under the Mortgage Loan Purchase Agreement shall be borne by the Depositor.

(c) Additional terms of the sale are set forth on Attachment A hereto.

Section 2. <u>Representations and Warranties; Conditions Precedent</u>.

(a) The Depositor hereby affirms the representations and warranties set forth in Section 3.06 of the Sale and Servicing Agreement that relate to the Depositor and the Subsequent Mortgage Loans as of the date hereof. The Depositor hereby confirms that each of the conditions set forth in Section 2.10(b) of the Sale and Servicing Agreement are satisfied as of the date hereof and further represents and warrants that each Subsequent Mortgage Loan complies with the requirements of this Depositor's Instrument and Section 2.10(c) of the Sale and Servicing Agreement.

(b) The Depositor is solvent, is able to pay its debts as they become due and has capital sufficient to carry on its business and its obligations hereunder; it will not be rendered insolvent by the execution and delivery of this Depositor's Instrument or by the performance of its obligations hereunder nor is it aware of any pending insolvency; no petition of bankruptcy (or similar insolvency proceeding) has been filed by or against the Depositor prior to the date hereof.

(c) All terms and conditions of the Purchase Agreement are hereby ratified and confirmed; provided, however, that in the event of any conflict the provisions of this Depositor's Instrument shall control over the conflicting provisions of the Purchase Agreement.

Section 3. <u>Recordation of the Depositor's Instrument</u>.

To the extent permitted by applicable law, this Depositor's Instrument, or a memorandum thereof if permitted under applicable law, is subject to recordation in all appropriate public offices for real property records in all of the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Servicer, but only when accompanied by an Opinion of Counsel to the effect that such recordation materially and beneficially affects the interests of the Noteholders or is necessary for the administration or servicing of the Mortgage Loans.

_____

Section 4. <u>Governing Law</u>.

This Depositor's Instrument shall be construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws, without giving effect to principles of conflicts of law.

Section 5. <u>Counterparts</u>.

This Depositor's Instrument may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same instrument.

Section 6. <u>Successors and Assigns</u>.

This Depositor's Instrument shall inure to the benefit of and be binding upon the Depositor and the Issuing Entity and their respective successors and assigns. The Indenture Trustee shall be an express third party beneficiary hereto.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Depositor's Instrument as of the day and year first written above.

ACCREDITED MORTGAGE LOAN REIT TRUST,
as Depositor

By: _____
Name:
Title:

Exhibit 5 - 000296

Sale and Servicing Agreement      file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 265 of 266

ACCREDITED MORTGAGE LOAN TRUST 2006-2

By: U.S. BANK TRUST NATIONAL ASSOCIATION, not in its individual capacity, but solely as Owner Trustee under the Trust Agreement

By: _____

Name:

Title:

DEUTSCHE BANK NATIONAL TRUST COMPANY, as Indenture Trustee

By: _____

Name:

Title:

---

ACCREDITED MORTGAGE LOAN TRUST ASSET-BACKED NOTES, SERIES 2006-2

ATTACHMENT A TO DEPOSITOR'S SUBSEQUENT TRANSFER INSTRUMENT

_____ __, 200_

A.   Profile of Subsequent Mortgage Loans:

    1.   Subsequent Cut-off Date (not later than): _____ __, 200_

    2.   Subsequent Transfer Date: _____ __, 200_

    3.   Aggregate Principal Balance of the Subsequent Mortgage Loans as of the Subsequent Cut-off Date: $_____

    4.   Purchase Price: 100.00%

B.   As to all the Subsequent Mortgage Loans the subject of this Instrument:

| | | |
|---|---|---|
| I. | Longest stated term to maturity: | 360 months |
| II. | Minimum Mortgage Rate: | ____% |
| III. | Maximum Mortgage Rate: | ____% |
| IV. | WAC of all Mortgage Loans: | ____% |
| V. | WAM of all Mortgage Loans: | ____ months |
| VI. | Largest Principal Balance: | $ ____ |
| VII. | Non-owner occupied Mortgaged Properties: | ____% |
| VIII. | California concentration: | ____% |
| IX. | Condominiums: | ____% |
| X. | Single-family: | ____% |
| XI. | Weighted average term since origination: | ____ months |

---

**EXHIBIT N**

FORM OF ADDITIONAL DISCLOSURE NOTIFICATION

**SEND VIA EMAIL TO DBSec.Notifications@db.com AND VIA OVERNIGHT MAIL TO THE ADDRESS IMMEDIATELY BELOW**

Deutsche Bank National Trust Company, as trustee
1761 St. Andrew Place
Santa Ana, California 92705
Email: DBSec.Notifications@db.com

Attn.:Trust & Securities Services

Exhibit 5 - 000297

Sale and Servicing Agreement    file:///C:/Users/Lori/AppData/Local/Microsoft/Windows/Temporary Inter...

Case 11-02024    Doc 8    Page 266 of 266

RE:  **Additional Form [10-D] [10-K] [8-K] Disclosure** Required

Ladies and Gentlemen:

In accordance with Section 5.11 of the Sale and Servicing Agreement (the "Agreement"), dated as of June 1, 2006, among Accredited Mortgage Loan REIT Trust, as depositor, Accredited Home Lenders, Inc., as sponsor and servicer, Accredited Mortgage Loan Trust 2006-2, as issuing entity, and Deutsche Bank National Trust Company, as indenture trustee, the undersigned, as [                    ] hereby notifies you that certain events have come to our attention that [will] [may] need to be disclosed on Form [10-D] [10-K] [8-K].

Description of additional Form [10-D] [10-K] [8-K] Disclosure:

List of any Attachments hereto to be included in the Additional Form [10-D] [10-K] [8-K] Disclosure:

Any inquiries related to this notification should be directed to [            ] phone number [            ]; email address [            ].

[NAME OF PARTY],
As [Role]

By:  _____
Name:

Exhibit 5 - 000298