1  Robert A. Bleicher (Bar No. 111334)
   rbleicher@carr-mcclellan.com
2  J. Craig Crawford (Bar No. 238466)
   ccrawford@carr-mcclellan.com
3  CARR McCLELLAN P.C.
   216 Park Road
4  P.O. Box 513
   Burlingame, California  94011-0513
5  Telephone:      (650) 342-9600
   Facsimile:      (650) 342-7685
6
7  Attorneys for Defendant
   Deutsche Bank National Trust Company

8              UNITED STATES BANKRUPTCY COURT

9              EASTERN DISTRICT OF CALIFORNIA

10                  SACRAMENTO DIVISION

11

12 | In re | Case No.  10-44610
13 | JAMES L. MACKLIN, | Chapter  7
14 |            Debtor. | DCN:  JLM-1

15 | JAMES L. MACKLIN, | Adv. Pro. No.  11-02024-E
16 |            Plaintiff, | **DEUTSCHE BANK NATIONAL TRUST
17 | v. | COMPANY EXHIBITS TO REQUEST FOR
                                      JUDICIAL NOTICE IN SUPPORT OF ITS
18 | DEUTSCHE BANK NATIONAL | OPPOSITION TO PLAINTIFF'S MOTION
     TRUST CO., AS INDENTURE | TO REOPEN ADVERSARY
19 | TRUSTEE FOR THE ACCREDITED | PROCEEDING**
     MORTGAGE LOAN TRUST 2006-2
20 | ASSET-BACKED NOTES, et al., | **[Fed. R. Bankr. P. Rules 5010, 9024; Fed. R.
                                      Civ. P. Rule 60(b), (d)]**
21 |            Defendants. |
22 | | Date:        February 26, 2015
     | Time:        1:30 p.m.
23 | | Judge:       Hon. Ronald Sargis
     | Courtroom:   33

24

| Exhibit | Description/Date |
|---------|------------------|
| Exhibit A | Complaint filed by James Macklin in Placer County Superior Court, Case No. SCV26905 – 4/2/2010 |
| Exhibit B | DBNT Notice of Removal of Action filed in United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN - 5/3/10 |

DBNT's Exhibits to RFJN in Opposition to
Motion to Reopen Adversary Proceedings, Adv.
Pro. No. 11-02024 E

| Exhibit | Description/Date |
|---------|------------------|
| Exhibit C | DBNT's Motion to Dismiss the Complaint filed in United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN – 5/7/2010 |
| Exhibit D | James Macklin's First Amended Complaint filed in United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN – 6/4/2010 |
| Exhibit E | DBNT's Answer filed in United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN – 6/24/2010 |
| Exhibit F | DBNT's Motion for Summary Judgment filed in United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN - 8/20/10 |
| Exhibit G | Order by Judge Kendall J. Newman entered in United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN- 10/6/10 |
| Exhibit H | James Macklin's Motion for Leave to File Second Amended Complaint and Proposed Second Amended Complaint filed in United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN - 4/15/14 |
| Exhibit I | Order by Judge Kendall J. Newman entered oin United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN - 7/1/14 |
| Exhibit J | DBNT's Motion to Dismiss the Second Amended Complaint filed in United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN - 7/21/14 |
| Exhibit K | James Macklin's Opposition to DBNT's Motion to Dismiss filed in United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN - 8/4/14 |
| Exhibit L | DBNT's Reply on Motion to Dismiss the Second Amended Complaint filed in United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN - 8/14/14 |
| Exhibit M | Findings and Recommendations by Judge Kendall J. Newman entered in United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN -9/8/14 |
| Exhibit N | James Macklin's Objection to Magistrate Newman's Findings and Recommendations filed in United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN - 9/22/14 |
| Exhibit O | Order by Chief Judge Morrison C. England, Jr. adopting Magistrate Newman's Findings and Recommendations on December 29, 2014 in United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN - 12/29/14 |
| Exhibit P | Judgment entered in United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN - 1/14/15 |
| Exhibit Q | James Macklin's Rule 60 Motion filed in United States District Court, Eastern District of California, Case No. 10-cv-01097 MCE-KJN - 1/22/15 |

DBNT's Exhibits to RFJN in Opposition to Motion to Reopen Adversary Proceedings, Adv. Pro. No. 11-02024 E

1

2    Dated: February 12, 2015                    CARR McCLELLAN P.C.

3

4                                                By:   /s/  Robert A. Bleicher
                                                     Robert A. Bleicher
5                                                    Attorneys for Defendant
                                                     Deutsche Bank National Trust Company.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# EXHIBIT A

1    James L. Macklin, *pro per*
      10040 Wise Rd.
2    Auburn, Calif., 95603
      916-798-0857
3    jimmacklin@sbcglobal.net

4      **IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA**
         **IN AND FOR THE COUNTY OF PLACER**
5

6                              )   Case no:___

7    James L. Macklin, *pro se*        )
                Plaintiff,   )      **COMPLAINT (VERIFIED) AND**

8       Vs.                       )   **PETITION FOR TEMPORARY**
   **Matthew Hollingsworth,** *and/or his* )
   *successor,* individually, and in his official )   **RESTRAINING ORDER TO ESTOP**

9    capacity as **C.E.O. OF SELECT**     )   **DEFENDANT FROM SELLING,**
   **PORTFOLIO SERVICING, INC.,** *an ens* )

10   *legis being used to conceal fraud,*    )   **TRANSFERING, FORECLOSING,**
                            )   **AND/OR OTHERWISE TAKING**

11   **LINDA FELLER,** *and/or her successor,* )   **PLAINTIFF'S REAL PROPERTY**
   *individually and in her official capacity as* )

12   **C.F.O. OF SELECT PORTFOLIO**   )   **FOR;**
   **SERVICING, INC.,** *an ens legis being* )

13   *used to conceal fraud,*           )   **1. DEFENDANT'S FRAUD; AND**
                            )   **2. DEFENDANT'S USE OF A VOID**

14   **ROBERT J. JACKSON, AMY E.**   )   **CONTRACT PURSUANT TO**
   **STARRETT,** *and/or his/her successor,* )

15   individually, and in his/her official capacity )   **AMERICAN JURISPRUDENCE**
   as **ATTORNEY, AGENT OF**     )   **SECOND EDITION 46 § 203 AND**

16   **DEUTSCHE BANK NATIONAL**   )
   **TRUST CO., AS INDENTURE**    )   **3. DEFENDANT'S NUMEROUS**

17   **TRUSTEE, OR ITS' PREDECESSORS** )   **VIOLATIONS OF CALIFORNIA LAWS;**
   **OR ASSIGNS,** *an ens legis being used to* )

18   *conceal fraud,*               )          **AND**
                            )   **PLAINTIFF STATES THE CLAIM**

19   **R.K.ARNOLD** *and/or his successor,*   )   **FOR WHICH RELIEF CAN BE**
   *individually and in his official capacity as* )

20   **PRES./C.E.O. OF MORTGAGE**   )   **GRANTED PURSUANT TO:**
   **ELECTRONIC REGISTRATION**   )

21   **SYSTEMS, INC.,** *as an ens legis being* )   **F.R.Cv.P. RULE 12(b)(6)**
   *used to conceal fraud,*          )   **Judicial Notice of: Generally Accepted**

22                             )   **Accounting Principles (GAAP), Financial**

23   **AND DOES (Investors) 1-10,000,**   )   **Accounting Standards Board (FASB)**
     *et al,*                      )   **Statements, FINRA, FDIC Compliance**

24             Defendant.      )   **Regulations, Fed Rules of Evidence, 201**

25                             )      (Oral argument requested)

26                             )   Assigned to Honorable_____

27     —————————————————— )

28

1   **COMES NOW**, James L. Macklin, *pro se*, Plaintiff, on COMPLAINT for

2   Defendant's numerous acts of fraud upon the court, inclusive of any and all judicial and/or

3   non-judicial proceedings, including without limitations, Defendant's purposeful fraud in

4   attempting to appear as **CREDITOR** to the court, when in fact Defendant is well aware

5   that they are not the **CREDITOR** and, therefore, **NOT the Real Party in interest** in the

6   foreclosure matter.

7   Plaintiff hereby reserves ALL RIGHTS, including without limitations, the Right to

8   join any and all other and/or new parties that Plaintiff may discover at any time during the

9   proceeding.

10   It is now incumbent on this court to query Defendant as to Defendant's lawful

11   position in this instant matter. If Defendants refuse to stipulate in open court that

12   Defendant is the **CREDITOR** in this instant matter, this court must remove Defendant

13   from this hearing forthwith, as this court is here to settle a matter between a **CREDITOR**

14   and a **DEBTOR**.

15   Accordingly, if Defendant is not the **CREDITOR** in this Matter, then Defendant

16   has thus stipulated that Plaintiff MUST be the **CREDITOR** in this matter.

17   Defendant cannot be the **CREDITOR** in this instant matter as Defendant NEVER

18   risked any assets, nor is Defendant holding any assets.

19   No entity can be a **CREDITOR** if they don't hold the asset in question, [*i.e.: the*

20   *NOTE and/or the property*; and **Mortgage Pass-through Trusts**, *i.e. R.E.M.I.C., as*

21   *defined in TITLE 26, Subtitle A, CHAPTER 1, Subchapter M, PART II, §§ 850-862]* and

22   cannot hold assets, for if they do, their tax exempt status is violated and the Trust itself is

23   void *ab initio*.

24   Defendant MUST NOW inform this court, the I.R.S. and the S.E.C. of their status

25   of either being a **CREDITOR** or not being a **CREDITOR**.

26   Defendant's own acts of fraud upon this court, Plaintiff, and the public in general

27   are the single cause of this paradox and absent Defendant "stating the claim" they are the

28   **CREDITOR** in this matter, this court cannot hear from Defendant.

2

1    By Law and precedent and in accordance with the Supreme Court of the United

2    States, *pro se* Pleadings MAY NOT be held to the same standard as a lawyer's and/or

3    attorney's; and whose motions, pleadings and all papers may ONLY be judged by their

4    function and never their form. *See:* Haines v. Kerner; Platsky v. CIA; Anastasoff v. United

5    States; Litigants are to be held to less stringent pleading standards;

6        *See:* Haines v. Kerner, 404 U.S. 519-421; In re Haines: pro se litigants are held to

7        less stringent pleading standards than admitted or licensed bar attorneys.
Regardless of the deficiencies in their pleadings, pro se litigants are entitled to the

8        opportunity to submit evidence in support of their claims.

9        *See also:* Platsky v. C.I.A., 953 f.2d. 25; In re Platsky: court errs if court dismisses

10       the pro se litigant without instruction of how pleadings are deficient and how to
repair pleadings.

11

12      *See also:* Anastasoff v. United States, 223 F.3d 898 (8th Cir. 2000); In re

        Anastasoff: litigants' constitutional (guaranteed) rights are violated when courts

13      depart from precedent where parties are similarly situated.

14

15    **For this matter, Defendant is and/or may be: the listed Defendant, any and all**

16    **parties Defendant refuses to reveal to Plaintiff and/or this Court, irrespective of**

17    **whether or not said party and/or parties are known to this Court and/or Plaintiff**

18    **and/or Defendant, the Corporate *ens legis* entity Defendant is employed by and/or is**

19    **an officer thereof, and/or any other party and/or parties, indispensible or not, any**

20    **and all other party and/or parties receiving any pecuniary gain from, through,**

21    **and/or by Defendant's fraudulent act(s). Singular may be inclusive of plural and**

22    **plural may be inclusive of singular.**

23    **Plaintiff hereby questions and refutes the authenticity of ALL dates and/or**

24    **ALL signatures by ALL parties on ALL documents, including without limitations,**

25    **notarized documents, "contracts", "deeds", "titles", affidavits, applications,**

26    **transmittals and/or the like, including without limitations the dates and/or signatures**

27    **by notary publics, officers, employees, and any and ALL parties attesting to any and**

28

1  ALL claims, facts, accounting, transfers, recordings, publications, and/or the like,
2  etc.

3  Plaintiff disavows any and ALL implied and/or conferred and/or inferred
4  "understanding" of "*legalese*" terms now and at the time of the "signing" of any and
5  ALL of the documents pertaining to this action.

6  Plaintiff disavows any and ALL presumptions made by this Court, Defendant,
7  and any and ALL other parties when said presumption may be detrimental to
8  Plaintiff's interest and/or case.

9  Plaintiff hereby demands ALL of Plaintiff's Rights be protected by this Court,
10  including without limitations, State and federal constitutionally protected Rights,
11  God given Rights, Civil Rights, Human Rights, Rights protected by Treaty(s), and/or
12  ALL privileges and/or immunities, and/or the like.

13  Plaintiff hereby demands that this Court refuse to commit, and act to prevent
14  Defendant from committing, any and ALL acts barratrous in nature.

15  Plaintiff hereby demands ALL applicable Rules of Court, Rules of Procedures,
16  Laws, and/or Statutes be adhered to without preference for any party.

17  Plaintiff makes this statement: "I sent Defendant a Qualified Written Request,
18  a Written Notice of Loan/Credit Dispute, and a Notice of Loan Rescission, and
19  Defendant did not respond which was Defendant's confession they knew they were
20  committing fraud against me because they knew they were not the CREDITOR. If
21  Defendant had responded then Defendant would have done so because they are the
22  CREDITOR, but since Defendant did not respond as required by law for a
23  CREDITOR to do, then Defendant has confessed Defendant is not the CREDITOR.
24  That is how I discovered Defendant committed fraud against me."

25  If Defendant attempts to fight this matter in court then Defendant knowingly,
26  intelligently, and willfully must come to court without "clean hands."

27  Plaintiff comes to this court with "clean hands" and as a civilian and a laymen
28  and attempts only to seek justice and equity in accordance with California law.

1    /

2    //

3    **I.    Plaintiff hereby states the claim for which relief can be granted**

4    **pursuant to Federal Rules of Civil Procedure Rule 12(b)(6) as follows:**

5    <u>**PLAINTIFF'S CLAIMS:**</u>

6

7    1.    Plaintiff is the **CREDITOR** in this matter.

8    2.    Defendant is the **DEBTOR** in this matter.

9    3.    **Defendant is a Fictitious Payee.**

10   4.    Defendant is not the **CREDITOR,** or a lawful **ASSIGNEE of the**
11         **CREDITOR,** in this instant matter.

12   6.    Plaintiff is not the DEBTOR in this matter.

13   7.    Defendant is not **the Real Party in Interest** in this instant matter.

14
15   8.    Defendant did NOT put Defendant's assets at risk in this instant
             matter and never loaned Plaintiff anything of substance.

16
17   9.    Defendant secretly extended to Plaintiff his own credit.

18   10.   Defendant purposely destroyed the GENUINE ORIGINAL
             PROMISSORY NOTE to "securitize" the NOTE.

19
20   11.   Defendant's use of "*legalese*" in the mortgage documents as a means
             of converting Real Property from its true owner to Defendant is a
21         criminal act of "conversion through fraudulent means" and therefore
             the mortgage documents are evidence of a criminal act and cannot be
22         used by this Court in this instant matter.
             *(See: Black's Sixth; "Understand")*
23

24   12.   The United States has a primary mortgage Right and/or status on the
             real property in question and such CANNOT be circumvented by
25         Defendant's fraudulent and unlawful mortgage.

26   13.   Defendant has been paid in full for the "contract" in question.

27

28

5

**14.**  Defendant will fail to join "all indispensable parties" as such joinder would be prima facie evidence of Defendant's fraudulent act of securitizing the "PROMISSORY NOTE."

**15.**  All "investors" involved in the securitization of the "Promissory Note" are indispensable parties to this action and MUST be joined by Defendant in any rebuttal, response, reply, answer, and/or the like by Defendant.

**16.**  Defendant is using a corporate entity and/or TRUST in furtherance of fraudulent acts.

**17.**  Defendant has no immunity for Defendant's fraudulent acts.

**18.**  Defendant is jointly and severally responsible for ALL of Plaintiff's losses, cost fees, and/or damages; *including without limitations*, emotional damages, punitive damages, inclusive of but not limited to: alienation of affection from: spouse, boy and/or girl "friend", friends, children, pets, co-worker(s), client(s), customer(s), and any and all other parties effected directly and or indirectly and/or collaterally even if caused by Plaintiff's inability to deal emotionally with the financial issues; as said issues are and have been caused by Defendant's fraudulent acts.

**19.**  Defendant knowingly, intelligently, and willfully separated the Deed of Trust and/or the mortgage from the Genuine Original Promissory Note and from the allonge.

Defendant MUST rebut ANY and ALL ALLEGATIONS and/or CLAIMS with specificity, quoting facts and laws; or Defendant thereby stipulates Defendant agree with Plaintiff's ALLEGATIONS and/or CLAIMS; and Defendant forever forsake arguing against Plaintiff's allegations and/or claims in any court. Merely denying Plaintiff's allegations and/or claims are not sufficient to survive a Motion for Default and/or Summary judgment against Defendant.

Pursuant to FED.R.Cv.P. Rule 8(d) and/or all allegations and/or claims made by Plaintiff MUST be accepted as true by this Court unless said allegations and/or claims are rebutted with a preponderance of the evidence by Defendant. Any and all such avowries

and/or averments presented by Defendant must be *et hoc paratus est verificare* and done under penalty of perjury.

**RELIEF:**

1.  Defendant return the **GENUINE ORIGINAL PROMISSORY NOTE OR ITS" PROCEEDS** and ALL MONEY PAID [*by Plaintiff to Defendants, with a full disclosure of accounting of such*] to Plaintiff forthwith;

2.  If Defendant is not able to return the **GENUINE ORIGINAL PROMISSORY NOTE** to Plaintiff forthwith then Defendant is therefore admitting to Defendant's unlawful attempt to convert real property without cause and/or right.

3.  Defendant present to Plaintiff and this Court an Affidavit stipulating that Defendant has NO RIGHTS to the real property in question.

4.  Defendant returns DEED and all other documents pertaining to ownership of real property in question to Plaintiff.

5.  If Defendant **does not** STATE THE CLAIM UNDER PENALTY OF PERJURY that Defendant is the **CREDITOR** in this instant matter, Defendant agrees to accept Judgment by Default in favor of Plaintiff.

6.  If Defendant **does** STATE THE CLAIM UNDER PENALTY OF PERJURY that Defendant is the **CREDITOR** in this instant matter, Defendant agrees to deliver acknowledgement of such forthwith to the S.E.C. and the I.R.S.

**II.    Plaintiff has the Due Process Right as protected by, *inter alia,* the Fourteenth Amendment of the federal Constitution to rely on the court adhering to, *inter alia,* Fed.R.Cv.P., *inter alia*, and the federal and state Constitutions:**

Fed.R.Cv.P. Rule 1

These rules govern the procedure in the superior courts of California in all suits of a civil nature whether cognizable as cases at law or in equity. They shall be construed to secure the just, speedy, and inexpensive determination of every action.

**III.        Plaintiff questions the jurisdiction of any and ALL non-judicial proceedings known only to Plaintiff as an administrative procedure fraudulently based on an invalid and unenforceable confession of judgment presumption in the mortgage documents.**

1    Once jurisdiction is questioned the court MUST dismiss the action. Plaintiff

2    hereby questions the jurisdiction of any and all non-judicial proceedings instigated by

3    Defendant in Defendant's unlawful attempt to confiscate Plaintiff's real property.

4         Fed.R.Cv.P. Rule 12(h)(3). Waiver or preservation of certain defenses
5         A party waives all defenses and objections which that party does not present either
          by motion as hereinbefore provided, or, if that party has made no motion, in that
6         party's answer or reply, **except;**
7           **(3) Whenever it appears by suggestion of the parties or otherwise that the
            court lacks jurisdiction of the subject matter, the court shall dismiss the
8           action.**
          (*Emphasis added*)
9

10        *See: McCorkle v. First Pennsylvania Banking and Trust Co. (4th Cir. 1972) 459
          F.2d 243, 244.* "At any stage of a litigation, including the appellate, subject matter
11        jurisdiction may be questioned. By failing to do so, the parties cannot confer
          jurisdiction by consent. If the court perceives the defect, it is obligated to raise the
12        issue sua sponte."
          *See also: McCready v. White, 417 F.3d Case 1:05-cv-04743;* "Ensuring the
13        existence of subject-matter jurisdiction is the court's first duty in every lawsuit."

14

15

16   Subject-matter jurisdiction is an issue that must be considered at any stage of the

17   litigation. See 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that

18   the district court lacks subject matter jurisdiction, the case shall be remanded."); *United

19   Phosphorus, Ltd. v. Angus Chem. Co., 322 F.3d 942, 946 (7th Cir. 2003); BEM I, L.L.C.

20   v. Anthropologie, Inc., 301 F.3d 548, 551 (7th Cir. 2002)* ("[S]ubject-matter jurisdiction . .

21   . may be questioned at any time until the litigation becomes final, and sometimes even

22   later."). Even if the defense of lack of subject-matter jurisdiction is overruled, stricken, or

23   excluded by the district court, it may be reasserted at any time in the action. *See: 5B

24   Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1350, at 132

25   (3d ed. 2004) (citing Fahnestock v. Reeder, 223 F. Supp. 2d 618, 621 (E.D. Pa. 2002)).*

     Once questioned, the Defendant and/or the court MUST prove jurisdiction
26
     BEFORE proceeding with a case. This requirement has not been abrogated nor does it
27
     exclude non-judicial proceedings.
28
                                            8

1       The non-judicial foreclosure procedure requires jurisdiction as does any matter,

2   judicial, administrative or otherwise.  Defendant has attempted to circumvent jurisdiction

3   requirements by falsely claiming Defendant has met for the court the requisite elements of

4   jurisdiction, primarily that Defendant is the Real Party in Interest.

5       Defendant's claim to be the Real Party in Interest is false, fraudulent and unlawful.

6   Pursuant to, *inter alia*, Rule 17(a), Defendant must prove Defendant is the Real Party in

7   Interest, not just claim such.

8       It is a functional impossibility for Defendant to be the Real Party in Interest without

9   the GENUINE ORIGINAL PROMISSORY NOTE.  Ergo, it is a functional impossibility

10   for Defendant to prove Defendant is the Real Party in Interest without presenting to this

11   court the GENUINE ORIGINAL PROMISSORY NOTE.

12       It is an incontrovertible fact that Defendant is not in possession of the GENUINE

13   ORIGINAL PROMISSORY NOTE, and accordingly, it is an incontrovertible fact that

14   Defendant is committing fraud upon the court by falsely and/or fraudulently claiming

15   Defendant is in possession of the GENUINE ORIGINAL PROMISSORY NOTE.

16       Pursuant to law and in accordance with Plaintiff's claims; Defendants MUST

17   present to this court the GENUINE ORIGINAL PROMISSORY NOTE and prove to be

18   the **CREDITOR** in this agreement or agree to Plaintiff's demand for Judgment by Default

19   in favor of Plaintiff.

20       This COMPLAINT is supported by law which is incorporated by this

21   reference as if fully set forth, and which Plaintiff asks this Court to take judicial notice

22   thereof. This COMPLAINT is further supported by the accompanying Memorandum of

23   Points and Authorities.

24   RESPECTFULLY SUBMITTED: This 2nd day of April,  2010.

25

26

27                                                BY: _James L. Maxwell_ , agent

28                                          9

1    James L. Macklin, *pro se*

2    <u>COPYRIGHT NOTICE:</u> The above-mentioned entity is quoting citations 'as purported in'
     context to copyrighted case law, statutes, rules of court and court decision material as
3    found in books published with Federal or state funding supplied by the Citizens of the
     united States of America and intended for use by attorneys, and does so under the
4    provisions of the Fair use clause of the copyright laws of the United States.

5                              **PROPERTY**

6        This COMPLAINT is for the unlawful foreclosure proceeding initiated by

7    Defendant concerning the real property located at:

8    10040 Wise Rd, township of Auburn, state of California, [95603].

9        Parcel No. 040-040-046. Accredited Home Lenders alleged loan No.

10   0603307230/0603307231.

11       Legal description: a portion of the East half of section 18, Township 12 North,

12   Range 8 East, M.D.M., being also a portion of the tract of land shown and designated as

13   Parcel "A", as shown on the map entitled, "Parcel Map No. 70586", filed for record

14   December 14, 1973, in book 5 of Parcel Maps, pg. 16 ; except all minerals and all

15   uranium, thorium, or any other material which is or may be determined to be peculiarly

16   essential to the production of fissionable materials, whether or not of commercial value, as

17   reserved in patent from the United States of America.

18              **MEMORANDUM OF POINTS AND AUTHORITIES**

19       Diversity of jurisdiction is present in this matter as the real property in question is

20   in California and Defendant and/or other entities involved are in other states and/or

21   countries. Therefore, Plaintiff hereby invokes Erie doctrine and will accordingly use

22   California law and/or may use federal laws accordingly.

23       Defendants are committing BARRATRY by fraudulently filing documents only a

24   **CREDTIOR** and the **Real Party in Interest** may file, when in fact Defendants are **NOT**

25   the **CREDTIOR** and **NOT** the **Real Party in Interest** in this instant matter.

26       It is a functional impossibility for Plaintiff to **"understand"** the mortgage

27   documents Defendants used in their unlawful attempt to convert Plaintiff's Real Property

28

to Defendants' possession. Plaintiff's inability to "understand" the "*legalese*" used by the attorneys who wrote the mortgage documents prohibits Defendants from using said documents as evidence against Plaintiff.

In fact, Defendants' *malum in se* act of using "*legalese*" in a document to unlawfully convert real property is defined in law as "theft through unlawful conversion." Defendants cannot now use said documents to convert said property without said documents being used as prima facie evidence of Defendants' felonious act.

**This court cannot use evidence of a felonious act to assist a criminal in furtherance of a felonious act.**

*See:* Black's Law Sixth Edition:
**Understand.** To know; to apprehend the meaning; to appreciate; as, to understand the nature and effect of an act. International-Great Northern R. Co. v. Pence, Tex. Civ.App., 113 S.W.2d 206, 210. To have a full and clear knowledge of; to comprehend. Thus, to invalidate a deed on the ground that the grantor did not understand the nature of the act, the grantor must be incapable of comprehending that the effect of the act would divest him of the title to the land set forth in the deed. As used in connection with the execution of wills and other instruments, the term includes the realization of the practical effects and consequences of the proposed act. *See* Capacity.

Definitions from Bouviers Law Dictionary 1856 Edition:
**BARRATRY,** crimes. In old law French barat, baraterie, signifying robbery, deceit, fraud. In modern usage it may be defined as the habitual moving, exciting, and maintaining suits and quarrels, either at law or otherwise. 1 Inst. 368; 1 Hawk. 243.
false     2. A man cannot be indicted as a common barrator in respect of any number of and groundless actions brought in his own right, nor for a single act in right of another; for that would not make him a common barrator.
3. Barratry, in this sense, is different from maintenance (q. v.) and champerty. (q. v.)

**CHAMPERTY,** crimes. A bargain with a plaintiff or defendant, *campum partire*, to divide the land or other matter sued for between them, if they prevail at law, the champertor undertaking to carry on the suit at his own expense. 1 Pick. 416; 1 Ham.   132; 5 Monr. 416; 4 Litt. 117; 5 John. Ch. R. 44; 7 Port. R. 488. 2. This offence differs from maintenance, in this, that in the latter the person  assisting the suitor receives no benefit, while in the former he receives one half, or other portion, of the thing sued for. See Punishment; Fine; Imprisonment; 4 Bl. Com. 135. 3. This was

11

an offence in the civil law. Poth. Pand. lib. 3, t. 1; App. n. 1, tom. 3, p. 104; 15 Ves. 139; 7 Bligh's R. 369; S. C. 20 E. C. L. R. 165; 5 Moore & P. 193; 6 Carr. & P. 749; S.C. 25 E. C. L. R. 631; 1-Russ. Cr. 179 Hawk.P. C. b.1 c.84, s.5. 4. To maintan a defendant may be champerty. Hawk. P. C. b. 1, c. 84, s. 8 3 Ham. 541; 6 Monr. 392; 8 Yerg. 484; 8 John. 479; 1 John. Ch. R. 444;, 7 Wend. 152; 3 Cowen, 624; 6 Co@ven, 90

**I.    Defendants are Not the Real Party in Interest in this and the non-judicial proceeding as current possession of the GENUINE ORIGINAL PROMISSORY NOTE is a requirement for a party to be the Real Party in Interest in all proceedings pursuant to the U.C.C.**

Defendant is not and cannot be the Real Party in Interest and is committing fraud by unlawfully attempting to foreclose on real property owned by Plaintiff. Absent possession of the GENUINE ORIGINAL PROMISSORY NOTE signed by Plaintiff, Defendant cannot lawfully move forward with the non-judicial process as the non-judicial court authorities do NOT have subject matter jurisdiction.

**II.    Absent prima facie evidence that Defendant is the Real Party in Interest in this and the non-judicial proceeding, Defendant cannot be considered the Real Party in Interest in this and/or the non-judicial proceeding.**

The ONLY acceptable evidence that Defendant may be the Real Party in Interest is the GENUINE ORIGINAL PROMISSORY NOTE. Defendant did NOT present the GENUINE ORIGINAL PROMISSORY NOTE to the officers acting in the non-judicial procedure and therefore the non-judicial procedures claims to jurisdiction are and were fraudulent claims and are thus void.

**III.    Absent prima facie evidence that Defendant is the CREDITOR in this and the non-judicial proceeding, Defendant cannot be considered the CREDITOR in this and/or the non-judicial proceeding.**

The ONLY acceptable evidence that Defendant is the **CREDITOR** in this instant matter is the GENUINE ORIGINAL PROMISSORY NOTE and the full accounting showing the Defendant loaning the Plaintiff the Defendants' assets. Defendant did NOT put assets at risk in this matter. Defendant did NOT present the GENUINE ORIGINAL PROMISSORY NOTE and the complete, true and accurate accounting records to the

1   officers acting in the non-judicial procedure and therefore the non-judicial procedure

2   "claims to jurisdiction" are and were fraudulent claims and are thus void.

3   **IV.   Since Defendant is not the Real Party in Interest in this and/or the non-
4          judicial proceeding, the foreclosure is an unlawful procedure.**

5          Defendant has and is committing fraud by attempting to foreclose on real property

6   Defendant is not the lawful lien holder of.  Defendant is NOT the **CREDITOR** and NOT

7   a GENUINE HOLDER IN DUE COURSE of the GENUINE ORIGINAL PROMISSORY

8   NOTE and therefore CANNOT proceed non-judicially or judicially in any matter.

9   **V.    Defendant received a COPY of the PROMISSORY NOTE AFTER the
           PROMISSORY NOTE was determined to be in default.**

10         Defendant was fully informed the NOTE and/or mortgage was delinquent and in

11  dishonor before Defendant accepted a copy of the NOTE and/or became the HOLDER of

12  a COPY of the NOTE.

13         Even if Defendant did prove possession of the GENUINE ORIGINAL

14  PROMISSORY NOTE, which is impossible, Defendant's claims are still invalid as

15  Defendant has previously admitted knowledge the NOTE and/or mortgage was in default.

16         UCC §3-302 2(C). Holder in due course
17         A. Subject to subsection C of this section and section 3-106, subsection D,  "holder
    in due course" means the holder of an instrument if:
18         2. The holder took the instrument:
19         **(c) Without notice that the instrument is overdue or has been dishonored or
           that there is an uncured default with respect to payment of another
20         instrument    issued as part of the same series;**

21         UCC §3-305. Defenses and claims in recoupment
22         A. Except as stated in subsection B of this section, the right to enforce the
           obligation of a party to pay an instrument is subject to the following:
23         1. A defense of the obligor based on:
24         (a) Infancy of the obligor to the extent it is a defense to a simple contract;
           (b) Duress, lack of legal capacity or illegality of the transaction which, under
25         other law, nullifies the obligation of the obligor;
26         (c) Fraud that induced the obligor to sign the instrument with neither
           knowledge nor reasonable opportunity to learn of its character or its essential
27         terms; or
           (d) Discharge of the obligor in insolvency proceedings.

28

13

1

2

3

**VI.    Defendant has knowingly, with malice aforethought, violated numerous, *inter alia*, California Codes to convene the non-judicial proceeding and/or attempt to unlawfully foreclose on Plaintiff's real property.**

4

5

6

7

Plaintiff hereby submits the following Code sections as an offer of proof of an abridged list of the crimes perpetrated by Defendant in Defendant's fraudulent attempt to unlawfully convert Plaintiff's real property into Defendant's asset. Key words are in **bold** for the court's convenience.

8

9

10

Defendant's unlawful use of the non-judicial proceeding to fraudulently establish "standing" without the GENUINE ORIGINAL PROMISSORY NOTE is prima facie evidence of Defendant's guilt, and evidence of Defendant's violations of the statues.

11

12

13

In fact, Defendant could not have convened the non-judicial procedure without having violated one and possible all of the listed statutes, and probably other state and federal laws.

14

15

16

17

Plaintiff presents the following list ONLY as evidence of the non-judicial procedure's lack of jurisdiction and not as evidence of criminal activity on the part of Defendant. Accordingly, Defendant cannot disavow said claims for Plaintiff's use of criminal violations in civil litigation.

18

19

20

21

22

Presentment of false instrument for filing; classification
A person who acknowledges, certifies, notarizes, procures or offers to be filed, registered or recorded in a public office in this state an instrument he knows to be false or forged, which, if genuine, could be filed, registered or recorded under any law of this state or the United States, or in compliance with established procedure is guilty of a class 6 felony. As used in this section "instrument" includes a written instrument as defined in section 13-2001.

23

24

25

26

Criminal simulation; classification
A. A person commits criminal simulation if, with intent to defraud, such person makes, alters, or presents or offers, whether accepted or not, any object so that it appears to have an antiquity, rarity, **source**, authorship or value that it does not in fact possess.
B. Criminal simulation is a class 6 felony.

27

Obtaining a signature by deception; classification

28

14

A. A person commits obtaining a signature by deception if, with intent to defraud, such person obtains the signature of another person to a written instrument by knowingly misrepresenting or omitting any fact material to the instrument or **transaction**.

Criminal impersonation; classification
A. A person commits criminal impersonation by:
2. Pretending to be a representative of some person or organization with the intent to defraud; or
3. **Pretending to be, or assuming a false identity of,** an employee or a representative of some person **or organization** with the intent to induce another person to provide or allow access to property.
Trafficking in the identity of another person or entity; classification
A. A person commits **trafficking in the identity** of another person or **entity** if the person knowingly **sells, transfers or transmits** any personal identifying information or entity identifying information of another person or entity, including a real or fictitious person or entity, without the consent of the other person or entity for **any unlawful purpose or to cause loss** to the person or entity **whether or not the other person or entity actually suffers any economic loss**, or allowing another person to obtain or continue employment.

Defrauding secured creditors; definition; classification
A. A person commits defrauding secured creditors if the person knowingly **destroys,** removes, **conceals, encumbers, converts, sells, obtains, transfers, controls or otherwise deals** with property subject to a security interest with the intent to hinder or prevent the enforcement of that interest.

Defrauding judgment creditors; classification
A. A person commits defrauding judgment creditors if such person secretes, **assigns, conveys or otherwise disposes** of his property with the intent to defraud a judgment creditor or to prevent that property from being subjected to payment of a judgment.

Fraud in insolvency; classification
A. A person commits fraud in insolvency if, when proceedings have been or are about to be instituted for the appointment of a trustee, receiver or other person entitled to administer property for the benefit of **CREDITORs** or when any other assignment, composition or liquidation for the benefit of **CREDITORs** has been or is about to be made, such person:
2. **Knowingly falsifies any writing or record relating to the property**; or
3. Knowingly misrepresents or refuses to disclose to a receiver or other person entitled to administer property for the benefit of **CREDITORs** the existence, amount or location of the property or any other information which he could be legally required to furnish to such administration; or

15

**4. Obtains any substantial part of or interest in the debtor's estate with intent to defraud any CREDITOR.**

Possession of altered property; classification
A.  A person who is a dealer in property and recklessly possesses property the permanent identifying features of which, including serial numbers or labels, have been removed or in **any fashion altered** is guilty of a class 6 felony.

Participating in or assisting a criminal syndicate; classification
A.  A person commits participating in a criminal syndicate by:
1.  Intentionally organizing, managing, directing, supervising or financing a criminal syndicate with the intent to promote or further the criminal objectives of the syndicate; or
3.  Furnishing advice or direction in the conduct, financing or management of a criminal syndicate's affairs with the intent to promote or further the criminal objectives of a criminal syndicate; or
4.  Intentionally promoting or furthering the criminal objectives of a criminal syndicate by inducing or committing any act or omission by a public servant in violation of his official duty; or

Fraudulent schemes and artifices; classification; definition
A.  Any person who, pursuant to a scheme or artifice to defraud, knowingly obtains any benefit by means of false or fraudulent pretenses, representations, promises or material omissions is guilty of a class 2 felony.
B.  Reliance on the part of any person shall not be a necessary element of the offense described in subsection A of this section.

Fraudulent schemes and practices; willful concealment; classification
A.  Notwithstanding any provision of the law to the contrary, in any matter related to the business conducted by any department or agency of this state or any political subdivision thereof, any person who, pursuant to a scheme or artifice to defraud or deceive, knowingly falsifies, conceals or covers up a material fact by any trick, scheme or device or makes or uses any **false writing or document** knowing such writing or document contains any false, fictitious or fraudulent statement or entry is guilty of a class 5 felony.
B.  For the purposes of this section, "agency" includes a public agency as defined by section 38-502, paragraph 6.

Money laundering; classification; definitions
A.  A person is guilty of money laundering in the first degree if the person does any of the following:
1.  Knowingly initiates, organizes, plans, finances, directs, manages, supervises or is in the business of money laundering in violation of subsection B of this section.

B. A person is guilty of money laundering in the second degree if the person does any of the following:

1. Acquires or maintains an interest in, transacts, transfers, transports, receives or conceals the existence or nature of racketeering proceeds knowing or having reason to know that they are the proceeds of an offense.

2. Makes property available to another by transaction, transportation or otherwise knowing that it is intended to be used to facilitate racketeering.

3. Conducts a transaction knowing or having reason to know that the property involved is the proceeds of an offense and with the intent to **conceal or disguise** the    nature, location, **source, ownership or control of the property** or the intent to    facilitate racketeering.

4. Intentionally or knowingly makes a false statement, misrepresentation or false certification or makes a false entry or omits a material entry in any application, financial statement, account record, customer receipt, report or other document that is filed or required to be maintained or filed under title 6, chapter 12.

5. Intentionally or knowingly evades or attempts to evade any reporting requirement under section 6-1241, whether by structuring transactions as described in 31 Code of Federal Regulations part 103, by causing any financial institution, money transmitter, trade or business to fail to file the report, by failing to file a required report or record or by any other means.

6. Intentionally or knowingly provides any false information or fails to disclose information that causes any licensee, authorized delegate, money transmitter, trade or business to either:

(a) Fail to file any report or record that is required under section 6-1241.

(b) File such a report or record that contains a material omission or misstatement of fact.

7. Intentionally or knowingly falsifies, conceals, covers up or misrepresents or attempts to falsify, conceal, cover up or misrepresent the identity of any person in connection with any transaction with a financial institution or money transmitter.

8. In connection with a transaction with a financial institution or money transmitter, intentionally or knowingly makes, uses, offers or presents or attempts to make, use, offer or present, whether accepted or not, a forged instrument, a falsely altered or completed written instrument or a written instrument that contains any materially false personal identifying information.

9. If the person is a money transmitter, a person engaged in a trade or business or any employee of a money transmitter or a person engaged in a trade or business, intentionally or knowingly accepts false personal identifying information from any person or otherwise knowingly incorporates false personal identifying information into any report or record that is required by section 6-1241.

10. Intentionally conducts, controls, manages, supervises, directs or owns all or part of a money transmitting business for which a license is required by title 6, chapter 12 unless the business is licensed pursuant to title 6, chapter 12 and complies with the money transmitting business registration requirements under 31 United States Code section 5330.

C.  A person is guilty of money laundering in the third degree if the person intentionally or knowingly does any of the following:

1.  In the course of any transaction transmitting money, confers or agrees to confer anything of value on a money transmitter or any employee of a money transmitter that is intended to influence or reward any person for failing to comply with any requirement under title 6, chapter 12.

2.  Engages in the business of receiving money for transmission or transmitting money, as an employee or otherwise, and receives anything of value upon an agreement or understanding that it is intended to influence or benefit the person for failing to comply with any requirement under title 6, chapter 12.

D.  In addition to any other criminal or civil remedy, if a person violates subsectionA or B of this section as part of a pattern of violations that involve a total of one   hundred thousand dollars or more in any twelve month period, the person is subject to forfeiture of substitute assets in an amount that is three times the amount that was involved in the pattern, including conduct that occurred before and after the twelve month period.

E.  Money laundering in the third degree is a class 6 felony.  Money laundering in the second degree is a class 3 felony.  Money laundering in the first degree is a class 2 felony.

Residential mortgage fraud; classification; definitions

A.  A person commits residential mortgage fraud if, with the intent to defraud, the person does any of the following:

1.  Knowingly makes any deliberate **misstatement, misrepresentation** or material omission during the mortgage lending process that is relied on by a mortgage lender, **borrower** or other party to the mortgage lending process.

2.  Knowingly **uses** or facilitates the use of any deliberate **misstatement, misrepresentation** or material omission during the mortgage lending process that is relied on by a mortgage lender, **borrower** or other party to the mortgage lending process.

3.  Receives any proceeds or other monies in connection with a residential mortgage loan that the person knows resulted from a violation of paragraph 1 or 2 of this subsection.

4.  **Files or causes to be filed with the office of the county recorder of any county of this state any residential mortgage loan document that the person knows to contain a deliberate misstatement, misrepresentation or material omission.**

B.  An offense involving residential mortgage fraud shall not be based solely on information that is lawfully disclosed under federal disclosure laws, regulations and interpretations related to the mortgage lending process.

VII.   **Defendant CANNOT use the confession of judgment as written in the mortgage for any proceeding, judicial, non-judicial, and/or otherwise.**

1    California law requires the power of attorney for the confession of judgment to be

2    signed AFTER the indebtedness became due and payable. Therefore, any clause in the

3    mortgage pertaining to such is void and does not give Right and/or cause for Defendant to

4    claim confession of judgment authority and/or right.

5

6    Judgment by confession **shall not be entered upon a note**, bond or other
     **instrument** in writing for the payment of money under the authority of a power of

7    attorney to confess judgment thereon, unless such authority is executed and
     acknowledged on a day subsequent to the date on which the indebtedness to be

8    confessed became due and payable.

9

10   **VIII.  Defendant cannot claim *res judicata* for standing from any decision in the
           non-judicial proceeding as jurisdiction of the non-judicial proceeding is and

11         was in question, and therefore Defendant's standing remains in question.**

12   Whereas the non-judicial proceeding may only claim jurisdiction in accordance

13   with a valid confession of judgment and/or attorney's warrant, the fact neither the

14   confession of judgment nor the attorney's warrant were valid causes the non-judicial

15   proceeding to not have jurisdiction. Decision made in any proceeding that lack

16   jurisdiction are void.

17   Fraudulent statements in an affidavit invalidate said affidavit.

18   Failure of a confession of judgment to meet all five (5) elements required

19   invalidates said confession of judgment.

20   **IX.    Defendant's use of a Notary Public who has a "beneficial interest" in the
           process for the non-judicial proceeding is invalid.**

21
22   The Notary Public used by Defendant and/or Defendant's attorneys has a financial

23   and/or business interest with the Defendant and/or Defendant's attorneys and therefore

24   said Notary Public's actions are in violation of the, *inter alia*, Notary's Code of Ethics

25   and accordingly the Notary's verification is fraudulent and thus void.

26   CALIFORNIA NOTARY PUBLIC REFERENCE MANUAL, page 2
     Second paragraph:

27   This means, a notary public cannot be a "party to the transaction" or a "party

28   to the instrument" and the notary public cannot have any financial or beneficial

interest in the transaction, no matter how small.  A notary public has a financial interest in a transaction if he or she will gain (or lose) something of value in the transaction.  A notary public has beneficial interest in a transaction if the document will benefit the notary in some way.

Last paragraph:
"If a jurat is performed, the document signer is also required to vouch for the truthfulness of the document."

Prohibited conduct; incomplete documents; signatures of relatives
B.  A notary public is an impartial witness and shall not notarize the notary's own signature or the signatures of any person who is related by marriage or adoption.

X.     **Plaintiff disputes ALL signatures by ALL other parties and demands verification   by prima facie evidence, affidavit, and non-hearsay testimony to validate ALL signatures.**

There are numerous instances of Defendants Notary Public notarizing documents with; incorrect dates; fraudulent signatures; attestations done absent parties being present; perjurous statements of claims of being sworn; dates that do not correlate to events; etc.

ALL documents notarized MUST be correct or the whole process itself is void and Defendant is required by law to prove the process is valid once questioned.

XI.    **Plaintiff disputes ALL claims of service of process by Defendants in ALL matters concerning the non-judicial foreclosure process**

To contest a cognovit clause on federal due-process grounds, a judgment debtor must plead specific facts sufficient to support a claim that he or she did not voluntarily, intelligently, and knowingly waive the right to prejudgment notice and hearing.  *See: F.D.I.C. v. Aaronian, 93 F.3d 636 (9th Cir. 1996).*

In some states, the practice of ex parte entry of judgment by confession is in disrepute, and notice must be given to the debtor before entry of judgment.  *See: First Mut. Corp. v. Grammercy & Maine, Inc., 176 N.J. Super. 428, 423 A.2d     680 (Law Div.1980).*

A state statute may provide that a judgment by confession may not be entered as a final judgment, effective in all respects as a judgment after trial, until the prothonotary

1   gives written notice to the obligor by certified mail, return receipt requested, of an

2   opportunity for judicial determination as to whether the obligor understandingly waived

3   the right to notice and an opportunity to be heard prior to the entry of final judgment.

4   *See: Cheidem Corp. v. Farmer, 449 A.2d 1061 (Del. Super. Ct. 1982).*

5        Any errors in the service of process is considered by law a "fatal error" and the

6   whole process is then considered void. Absent fully correct process of service Defendant

7   has no authority to proceed with a foreclosure on any party and/or property.

8        Defendant is then required by law to cease and desist with said foreclosure process

9   and may only begin again once if and only if Plaintiff's claims are proved invalid.

**XII.   Plaintiff disputes ALL claims by Defendant that there is ANY amount due
on the mortgage in question as said mortgage has been paid in full,
directly   and/or indirectly, by one or more of the following: Credit Default
Swaps,   "bailout funds", mortgage insurance, loan loss insurance,
government agencies, signature of party, etc.**

XIII.   Defendant did receive "bail out" and/or "TARP" funds from the government
and/or private quasi-government institutions that did in fact "pay-off" some or
all of Defendant's "mortgages" and/or other financial deals.

It is incumbent on Defendant to prove the mortgage in question WAS NOT paid-

off and/or Defendant was enumerated directly and/or indirectly for the mortgage in

question.

In fact, absent prima facie evidence controverting Plaintiff's claim that Defendant

was reimbursed in some way by some entity for the mortgage in question, Defendant is

agreeing that said mortgage is paid in full.

Defendant MUST therefore present for inspection to the Plaintiff a complete list

with accounting of ALL funds received correlated to ALL mortgages paid and not paid

before continuing with any foreclosure attempt on the property and/or mortgage in

question.

Defendant's failure to produce for inspection said accounting documents is

Defendant's agreement that the mortgage in question is paid in full. There is no law

dictating who is required to pay for a mortgage for it to be considered paid in full.

1    In fact, Plaintiff believes the mortgage was and is paid in full and Defendant is

2    attempting to fraudulently convert real property through a conspiracy involving numerous

3    parties unknown to Plaintiff.

4    Therefore the forensic accounting of the original 'loan' should be submitted for

5    inspection, to reveal the true source of the funding of the 'loan'

6    **XIII.  Plaintiff disputes and hereby rebuts any and all statements in any and all**
7    **Affidavits submitted by Defendant and/or Defendant's agents**

8    Confession of judgment without issuance or service of process
     A. A party may appear in person or by an agent or attorney before a justice
9    of the peace without issuance or service of process and confess judgment
     for an amount within the jurisdiction of the justice of the peace, and such
10   judgment shall be entered thereon upon the filing by Plaintiff, his agent or
11   attorney of an affidavit of the justness of Plaintiff's claim.
     B. Where the judgment is confessed by an agent or attorney, the warrant of
12   agent or attorney authorizing the confession shall be filed with the justice
13   and noted in the docket.

14   **XIV.  Legal definitions laymen may not be presumed to know and/or understand.**

15   Definitions a "laymen" would not likely understand and would require a BAR

16   licensed attorney to define and explain before a "laymen" may be considered "knowingly,

17   understanding, and willfully" agreeing to numerous legal definitions that ONLY

18   competent counsel would be familiar with.  Absent Defendant proving Plaintiff had

19   knowledge of the following terms, Defendant cannot lawfully claim Plaintiff knowingly,

20   intelligently, and willfully agreed to any mortgage containing said terms and/or concepts.

21   **Black's Law Dictionary 6th Edition:**
22
23   *Cognovit judgment.*  *See* Cognovit judgment; *also, Confession Of judgment, below.*

24   *Confession of judgment.*  At common law, judgment entered where Defendant, instead of
     entering plea, confessed action, or withdrew plea and confessed action.
25   Judgment where a Defendant gives the Plaintiff a cognovit or written confession of the
     action by virtue of which the Plaintiff enters judgment. The act of a debtor in permitting
26   judgment to be entered against him by his creditor, for a stipulated sum, by a written
     statement to that effect or by warrant of attorney, without the institution of legal
27   proceedings of any kind; voluntary submission to court's jurisdiction. O'Hara v. Manley,
28

140 Pa.Super. 39, 12 A.2d 820, 822. Such agreements for confession of judgment are void in many states; *e.g.* Mass.G.L. c. 231, § 13A.

The negotiability of an instrument is not affected by a term authorizing a confession of judgment if the instrument is not paid when due. U.C.C. § 3-112. *See also* Cognovit judgment.

*Cognovit judgment.* Confession of judgment by debtor. Written authority of debtor and his direction for entry of judgment against him in the event he shall default in payment. Such provision in a debt instrument or agreement permits the creditor or his attorney on default to appear in court and confers judgment against the debtor. Such agreements are prohibited, or greatly restricted, in many states; though, where permitted, the constitutionality of such has been upheld. D. H. Overmyer Co., Inc. v. Frick Co., 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124. *See* Cognovit note; Judgment *(Confession of judgment).*

*Cognovit note.* An extraordinary note which authorizes an attorney to confess judgment against person or persons signing it. It is written authority of a debtor and a direction by him for entry of a judgment against him if obligation set forth in note is not paid when due. Such judgment may be taken by any person holding the note, which cuts off every defense which maker of note may otherwise have and it likewise cuts off all rights of appeal from any judgment taken on it. Jones v. John Hancock Mut. Life Ins. Co., D.C.Mich., 289 F.Supp. 930, *935. See* Cognovit judgment; Judgment *(Confession of judgment).*

*Warrant of attorney.* An instrument in writing, addressed to one or more attorneys therein named, authorizing them, generally, to appear in any court, or in some specified court, on behalf of the person giving it, and to confess judgment in favor of some particular person therein named, in an action of debt. It usually contains a stipulation not to bring any action, or any writ of error, or file a bill in equity, so as to delay him; such writing usually being given as security for obligation on which judgment was authorized, and in such procedure service of process is not essential. *See* Judgment *(Confession of Judgment).*

*Seisin.* Possession of real property under claim of freehold estate. The completion of the feudal investiture, by which the tenant was admitted into the feud, and performed the rights of homage and fealty. Possession with an intent on the part of him who holds it to claim a freehold interest. Right to immediate possession according to the nature of the estate. Williams v. Swango, 365 Ill. 549, 7 N.E.2d 306, 309.

*Actual seisin.* Possession of the freehold by the pedis positio of one's self or one's tenant or agent, or by construction of law, as in the case of a state grant or a conveyance under the statutes of uses, or (probably) of grant or devise where there is no actual adverse possession; it means actual possession as distinguished from constructive possession or possession in law.

**Constructive seisin.** Seisin in law where there is no seisin in fact; as where the state issues a patent to a person who never takes any sort of possession of the lands granted, he has constructive seisin of all the land in his grant, though another person is at the time in actual possession.

**Equitable seisin.** A seisin which is analogous to legal seisin; that is, seisin of an equitable estate in land. Thus a mortgagor is said to have equitable seisin of the land by receipt of the rents.

**Seisin in deed.** Actual possession of the freehold; the same as actual seisin or seisin in fact. Roetzel v. Beal, 196 Ark. 5, 116 S.W.2d 591, 593.

**Seisin in law.** A right of immediate possession according to the nature of the estate. As the old doctrine of corporeal investiture is no longer in force, the delivery of a deed gives seisin in law.

**Seized.** A person is "seized" within Fourth Amendment when police officer restrains person's freedom to walk away. State v. Ochoa, 112 Ariz. 582, 544 P.2d 1097, 1099. It exists when reasonable person would feel that he was not free to leave. U.S. v. Albert, C.A.N.C., 816 F.2d 958, 960. See Seizure. The status of legally owning and possessing real estate. See Seisin.

**Seizure.** The act of taking possession of property, e.g., for a violation of law or by virtue of an execution of a judgment. Term implies a taking or removal of something from the possession, actual or constructive, of another person or persons. Molina v. State, 53 Wis.2d 662, 193 N.W.2d 874, 877.

A "seizure" of property (under Fourth Amendment) occurs when there is some meaningful interference with an individual's possessory interest in that property. U.S. v. Jacobsen, U.S.Minn., 466 U.S. 109, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85.

**Parol.** A word; speech; hence, oral or verbal. Expressed or evidenced by speech only; as opposed to be writing or by sealed instrument.

**Parol contract.** An oral contract as distinguished from a written or formal contract. **Understand.** To know; to apprehend the meaning; to appreciate; as, to understand the nature and effect of an act. International-Great Northern R. Co. v. Pence, Tex. Civ.App., 113 S.W.2d 206, 210. To have a full and clear knowledge of; to comprehend. Thus, to invalidate a deed on the ground that the grantor did not understand the nature of the act, the grantor must be incapable of comprehending that the effect of the act would divest him of the title to the land set forth in the deed. As used in connection with the execution of wills and other instruments, the term includes the realization of the practical effects and consequences of the proposed act. See Capacity.

1   *Capable.* Susceptible; competent; qualified; fitting; possessing legal power or capacity.
2   Able, fit or adapted for. *See* Capacity.

3   *Capacity.* Legal qualification *(i.e.* legal age), competency, power or fitness. Mental ability
    to understand the nature and effects of one's *acts.*
4   **XV.    Discussion of confession of judgment clause as it pertains to the mortgage in
5           question and the use of such in the non-judicial foreclosure of Plaintiff's Real
            Property.**

6       Defendant is attempting to non-judicially foreclose on real property in accordance

7   with the presumption of the "confession of judgment" concept (hereafter cognovit clause)

8   in the mortgage/deed of trust (hereafter mortgage) is and was valid. It is a functional

9   impossibility for a cognovit clause to be valid in the State of California pursuant to *stare*

10  *decisis* applicable to mortgage document signing unless an attorney represented Plaintiff

11  throughout the negotiations of the mortgage.

12      Defendant is fully aware Plaintiff was NOT represented by a BAR licensed

13  attorney at any point during the mortgage and/or purchase process that lead to the

14  mortgage being agreed upon by either party. As such, the mortgage is void *ab initio*, not

15  just voidable, but void and in fact did never lawfully exist pursuant to California law.

16      It is now incumbent on Defendant and/or Defendant's attorney to claim as their

17  defense in this matter before proceeding with any other defense, that Plaintiff was not

18  required nor entitled to competent counsel during the mortgage negotiations and signing,

19  in contradiction to the *stare decisis* pertaining to cognovit clauses in any and all contracts

20  and/or mortgages.

21      Accordingly, Defendant must therefore establish an argument against law and set

22  new precedent in violation of, *inter alia*, Fed.R.Cv.P. Rule 11(a):

23
24          "......it is well grounded in fact and is warranted by existing law or a good
            faith argument for the extension, modification, or **reversal of existing law**;
25          and that it is not interposed for any improper purpose, such as to harass or to
            **cause unnecessary delay or needless increase in the cost of litigation."**
26          *(Emphasis added)*

27  American Jurisprudence, Second Edition, Judgments
28

IV. Particular Kinds of Judgments, D. Judgment by Confession, 6. Practice and Procedure Topic Summary Correlation Table References

§ 230. Notice and hearing, West's Key Number Digest, Federal Civil Procedure 2396, West's Key Number Digest, Judgment 29 to 70

*See:* D. H. Overmyer Co. Inc., of Ohio v. Frick Co., 405 U.S. 174, 92 S. Ct. 775, 31 L. Ed. 2d 124

"A maker of a confession of judgment voluntarily, intelligently, and knowingly waives due-process rights it otherwise possesses to prejudgment notice and hearing, and does so with full awareness of the legal consequences, when:

(1) the cognovit does not involve unequal bargaining power or overreaching;

(2) the agreement is not a contract of adhesion;

(3) the cognovit provision is obtained for adequate consideration;

(4) the cognovit is a product of negotiations carried on by parties with the advice of competent counsel; and

(5) the maker, despite cognovit, is not defenseless under state law."

Plaintiff hereby claims all five (5) elements required for a cognovit clause to be valid in California have been purposely violated by Defendant to deprive Plaintiff of Plaintiff's Civil Rights under color of state law.

A single violation of any one element is all that is required to void the mortgage.

### Verified explanation of the five (5) elements of cognovit, as they pertain to this instant matter, and as such, prima facie evidence the five (5) elements of cognovit have not been met

(1) Defendant had an unequal bargaining power and Defendant was overreaching by:

i) Plaintiff is a laymen and as such did not have the requisite knowledge to discover Defendant's numerous acts of concealment and/or fraud concerning the "legal definitions" of words and/or language used in the mortgage document;

ii) Defendant is familiar with the "legal definitions" of the words and/or language of the mortgage and purposely, with malicious intent, confused Plaintiff and mis-represented the meanings of numerous words and/or the functionality of the language in the mortgage document(s);

26

1    iii) Defendant was overreaching the potential of Plaintiff's "understanding" the

2    mortgage and the words and/or language used in the mortgage, as said, was obviously

3    designed and written in such a way to purposely confuse laymen;

4    (2) The mortgage is, without controversy, an adhesion contract as Defendant openly

5    refuses to allow ANY change to the mortgage documents.

6    *See:* Cubic Corp. v. Marty, 4 Dist. 185., C.A.3d. 438, 229 Cal. Rptr 828, 833;
     Standard Oil Co. of Calif. v. Perkins, C.A.Or., 347, F.2d 379, 383 "Distinctive

7    feature of adhesion contract is that weaker party has no realistic choice as to its
     terms."

8    (3) There can be no adequate consideration when nothing is given for something.

9    Defendant required Plaintiff to unknowingly give up Plaintiff's Right to Due Process yet

10   Defendant gave absolutely nothing in return for Plaintiff's Right.

11   Black's Sixth Edition, page 39: Such as is equal, or reasonably proportioned, to the
     value for that which it is given.

12   *See:* Nissen v. Miller, 44 N.M. 487, 105 P.2d. 324, 326 "Equal to some given

13   occasion or work."
     *See also*: Town of Winchester v. Cox, 129 Conn. 106, 26 A2.d 592, 597 "Such only

14   as puts injured party in as good condition as he would have been if injury if injury

15   had not been inflicted."

16   (4)    "Competent counsel" as used when referring to contract negotiations in Arizona

17   CAN ONLY mean a BAR licensed attorney. Fed.R.Civ.P., *inter alia*, Rule 6 deals with

18   "duties of counsel" and accordingly ONLY references and applies to BAR licensed

19   attorneys. Defendant has no bases and no grounds to claim "competent counsel" can mean

20   anything other than a BAR licensed attorney. If, in fact and on the record, Defendant's

21   attorney even attempts to claim in this matter that "competent counsel" can mean

22   something other than a BAR licensed attorney then this court shall immediately report

23   Defendant to the CALIFORNIA BAR for his fraudulent effort and violation of his

24   contract with the CALIFORNIA BAR.

25   The courts in Arizona have made numerous decisions relating to "competent

26   counsel" when referring to contracts and all of such state unequivocally that said counsel

27   MUST be, and may ONLY be, a licensed attorney.

28   **The following issue is absolutely incontrovertible under California Law:**

27

1       **ANY MORTGAGE THAT IS NOT A PRODUCT OF NEGOTIATIONS**

2       **CONDUCTED BY A COMPETENT BAR LICENSED ATTORNEYS IS**

3       **VOID *AB INITIO* AND CANNOT BE ENFORCED IN ANY JUDICIAL**

4       **AND/OR NON-JUDICIAL PROCEEDING IN CALIFORNIA.**

5       **In fact, if Defendant is not willing to claim for the record that Plaintiff was not**

6 **required to have advice of counsel for the mortgage in question to be valid, then**

7 **Defendant has agreed that the mortgage in question is void.**

8       **Also, in fact, if Defendant does agree that Plaintiff was required to have advice**

9 **of counsel for the mortgage to be valid, yet Defendant is well aware that Plaintiff did**

10 **not have advice of counsel, then Defendant is thereby confessing to the crime of**

11 **barratry if Defendant does not agree to a summary judgment in favor of Plaintiff.**

12 (5) Defendant's attempt at non-judicial foreclosure, and therefore his defense, is based

13 solely upon the claim that Plaintiff is defenseless under state law due to the "confession of

14 judgment" clause in the mortgage.

15       It is well established that court is adversarial in nature, yet contracts are agreements

16 between parties to prevent disputes. Accordingly, rules for specific contractual agreements

17 such as mortgages have been decided by precedent to prevent parties from using the court

18 to take advantage of weaker parties. The legality of a non-judicial foreclosure is not the

19 issue before this court. More correctly stated the requirement of "confession of judgment"

20 is the primary controversy this court must determine. The determination of the validity of

21 "confession of judgment" must rely on the *stare decisis* as previously stated.

22       Plaintiff hereby states and claims as an offer of proof in this matter, it is not

23 lawfully possible for this court to determine the mortgage in question is valid unless this

24 court determines that:

25 1. Defendant and Plaintiff had equal bargaining power and Defendant's requests in the

26 mortgage were not overreaching;

27 2. Plaintiff could have altered the terms and conditions of the mortgage and the Defendant

28 would have still consummated the deal;

1   3. Plaintiff was adequately compensated for his loss and that Plaintiff understood he was

2   voluntarily, knowingly, and intelligently agreeing to said loss;

3   4. Plaintiff was advised by a BAR licensed attorney through out the mortgage process;

4   5. Plaintiff has a defense against the cognovit clause based in law irrespective of

5   Defendant's claims.

6   6. Defendant has risked assets in the mortgage.

7        Absent a conclusion based in fact and California law that all five (5) elements of a

8   cognovit clause have been met, then this court may only determine that the mortgage in

9   question is VOID *ab initio* and that Plaintiff is the true lawful owner of the real property in

10  question.

11  **XVI.**       **VERIFIED STATEMENTS OF FACTS AND**

12                **ALLEGATIONS BASED ON VERIFIED FACTS**

13       Plaintiff, avers that, prior to, during and up to a recent event, Plaintiff had no

14  knowledge whatsoever as to particular terms contained within the Deed of Trust, which,

15  Plaintiff learned much later, contained, *inter alia,* a small and somewhat hidden and/or

16  disguised provision, known as a Power of Sale Clause that, Plaintiff now finds Defendant

17  wanton to, individually and severally invoke, in order to literally confiscate Plaintiff's

18  property without due process.

19       Whereas, normally, at minimum, each page of an important (life-altering)

20  document, such as a Deed of Trust, would require initialing of the party executing it, as to

21  signify the obligor's acknowledgement thereof. Defendants furthered their concealment by

22  not only directing Plaintiff away from certain terms/clauses and the like, but are wholly

23  without evidence via initialing of these terms/clauses, that would have otherwise alerted

24  Plaintiff to the extent of what rights were truly being abrogated.

25       Plaintiff believes and therefore avers, that Defendants willfully and intentionally

26  concealed the aforesaid Clauses, and any irrevocability thereafter imparted to the sole

27  detriment of Plaintiff, including, but not limited to, the preclusion to commence any action

28  in defense of Plaintiff's rights, for the expressed purpose of depriving an otherwise

unknowing Plaintiff of fundamental rights to Due Process, by nothing less than despicable and clearly unconscionable means.

Federal questions of constitutionality arise from the conduct and nature of Defendants' actions, both individually and collectively, insofar as to the inherent rights that may be otherwise enjoyed by Plaintiff, as insured under the Fifth and Fourteenth Amendments to the United States Constitution; and, as to certain statutorily clothed tetherings upon ones rights; particularly, a Power of Sale clause, and the irrevocable means by which it attaches, in defiance of the Supremacy Clause of the United States Constitution.

The Fourteenth Amendment to the United States Constitution reads, in pertinent part, "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Plaintiff states that Amendment V of the Constitution of the United States provides the same answer being raised by the Plaintiff, that: **"No person shall be deprived of life, liberty, or property without due process of law." A similar provision exists in all the state constitution; the phrases "Due Course of Law", and the "Law of the Land" are sometimes used; but all three of these phrases have the same meaning and that applies conformity with the ancient and customary laws of the English people or laws indicated by parliament.** *Davidson v. New Orleans 96 U.S. 97, 24, L Ed 616.*

The Supremacy Clause of the United States Constitution, Article VI, paragraph 2, mandates that State judges, regardless of state constitutional considerations, and laws enacted to the contrary, by effectuating the united States Constitution and its amendments as being the "supreme law of the land".

30

The Supremacy Clause reads in pertinent part, "This Constitution and the Laws of the United States in Pursuance thereof; and all treaties made or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every state shall be bound thereby, any Thing in the Constitution or the Laws of any State to the contrary notwithstanding."

The Due Process Clause of the United States Constitution requires "timely individual notice..., before their property can be adversely affected". *See Volkswagenwerk Aktiengesallschaft v. Schlunk, 486 U.S. 694,707 (1988)*

Plaintiff was (unknowingly) deprived of Due Process (and other) rights, as guaranteed under the Fourteenth Amendment of the United States Constitution and, the California State Constitution; as, Defendants', in the first instance, through unconscionable means, caused to be executed a certain Deed of Trust, which, unknown, nor otherwise explained to Plaintiff, lacked the proper "Notice", having substituted in lieu of, an obscure and/or as yet detected provision for the unfettered power of sale of Plaintiff's property.

Notice is a Due Process issue, which in the absence thereof, constitutes the abrogation of Plaintiff's substantive and procedural due process rights as afforded under the **Fifth (5th)** and **Fourteenth (14th) Amendments**, guaranteed Plaintiff by the **United States Constitution**.

*Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306 (1950)* ("*An elemental and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and to afford them an opportunity to present their objections.*")

The Constitution of the United States and California makes it illegal for any one to take property without just compensation and by this amendment (5th) there can be no proceeding against life, liberty, or property which may result in the observance of those general rules established in our system of Jurisprudence for the security of private rights

31

which guarantees to each citizen the equal protection of the laws and prohibits a denial

thereof by any Federal official." *(See rights) Bolling v. Sharpe, 327 U.S. 497. U.S. vs*

*Kuwzbzva (DC-CAL) 56F Supp. 716.*

The terms "due process of law" and "natural rights" as used in the Federal

Constitution and/or the Declaration of Independence, have been repeatedly declared to be

the exact equivalent of the phrase "law of the land" as used in the *Magna Charta. 16 Am.*

*Jur. 2d 547;*

Plaintiff hereby incorporates paragraphs one (1) through thirty-nine (39) of the

*Magna Carta* as if they are set forth at length herein.

Upon information and belief of Plaintiff, a power of sale clause, whether evidenced

or not, within a Deed of Trust, is akin in performance to a cognovit note and/or confession

of judgment, however, it operates far more insidiously; as, it specifically robs the

(unknowing) maker of certain or otherwise assured rights and remedies, including, but not

limited to Due Process, and redress by appeal, while wholly evading the requisite (form

and manner of) noticing as encumbering cognovits or confessions.

Upon information and belief of Plaintiff, the hidden power of sale clause, which in

effect, creates a cognovit note/confession of judgment, as irrevocably granted in a Deed of

Trust, does just that; it creates conditions that are in violation of the California

Constitution.

WHAT IS A COGNOVIT NOTE? A cognovit note is not an ordinary note. It is

indeed an extraordinary note, which authorizes an attorney to confess judgment against the

person or persons signing it. It is written authority of the debtor and a direction by them

for the entry of a judgment against debtor, if the obligation set forth in the note is not paid

when due.

Such a judgment (of confession) may be taken by any person or any company

holding the note, only if specifically and diligently pointed out and discussed as to the

legal ramifications in so doing, for it cuts off every defense which the maker of the note

32

1    might otherwise possess. It likewise cuts off all rights of appeal from any judgment taken

2    on it.

3        According to The United States Supreme Court, "a cognovit note is the ancient

4    legal device by which the debtor consents in advance to the holder's obtaining a judgment

5    without notice or hearing, and possibly even with the appearance, on the debtor's behalf,

6    of an attorney designated by the debtor".

7        Justice Blackmun, expressing the unanimous view of the court in *Overmyer v.*

8    *Frick, 405 U.S. 174, 92 S.Ct. 775, L.Ed.2d 124 (1972),* stated the criteria for establishing

9    constitutionality of a Cognovit Note is not determined upon the theory of the note **but the**

10   **method used by both parties to afford each other due process** protection afforded by

11   the Fourteenth Amendment. *(Emphasis added)*

12       Justice Blackmun stated, "...[i]t was held that (1) a cognovit clause was not, per

13   se, violative of the Fourteenth Amendment due process requirements as to prejudgment

14   notice and hearing, and (2) under the facts in the instant case, (*Overmyer*) due process was

15   not violated by the entry of the confessed judgment, since the record established that **the**

16   **debtor had knowingly and voluntarily waived its rights to notice and hearing, with**

17   **full awareness of the legal consequences,** by executing the cognovit note, which was

18   **supported by consideration** from the creditor, and which had resulted **from negotiations**

19   **between the parties of equal bargaining power,..."** *Id (Emphasis added)*

20       Justice Douglas, joined by Justice Marshall concurring, stated, in effect that, (1)

21   **the record must establish that a clear and unmistakable, voluntarily and intelligently**

22   **valid waiver of the debtor's constitutional rights,** (2)... a trial judge was required to

23   vacate a judgment obtained through a cognovit clause when presented sufficient evidence

24   of an affirmative defense to pose a jury question, a preponderance of evidence burden not

25   being imposed, and (3) the preponderance of the evidence in the (present) case does not

26   support even a conclusionary finding that Plaintiff was even aware of the existence of any

27   cognovit note, let alone intentionally, deliberately, knowingly and intelligently waive due

28   process rights.

33

1    Justice Douglas, further observed, "Debtors receive the benefit of credit at a lower

2    rate of interest than they would receive if they did not give the creditor the right to confess

3    judgment against them. Nevertheless, **the right to be heard in court is central to our**

4    **system of justice, and, as with other constitutional rights, there is no presumption of**

5    **waiver.**" *Overmyer, 405, U.S. 174, 31 L. 2d 124, 92S.Ct. 775 (1972) and its companion*

6    *case, Swarb v. Lennox, 405 U.S. 191, 31 L. ed.2d 138, 92 S.Ct. 767 (1972) and at 186,*

7    *188._(Emphasis added)*

8    Based upon the Defendants' lack of credible evidence and/or proof that Plaintiff

9    ever waived or was ever advised of legal detriment upon the signing of what must be

10   characterized, at best, as a hidden cognovit clause, is just preposterous and is sufficient to

11   warrant presentation to a jury.

12   In order to help determine the validity of the cognovit note and/or confession of

13   judgment before this Court, one must concede that the mentioned contract containing the

14   hidden clause, was never explained to the Plaintiff, so Plaintiff was never aware of

15   waiving Fourteenth Amendment rights through a contract of adhesion (*illegal and/or void*

16   *contract*) or the product of disparity in the parties' bargaining power.

17   Most contracts of adhesion are either procedural and/or substantively

18   unconscionable and, the unconscionability alone should void the cognovit clause of this

19   adhesion contract.

20   Plaintiff is aware that in a civil proceeding, acquiescence in the loss of

21   fundamental rights will not be presumed, and, that the rights to due process in a civil

22   judgment are subject to waiver. Plaintiff emphatically states that the contract of adhesion

23   was a take it or leave it offer and the cognovit clause was never an issue raised with

24   emphasis, or even raised at all, by the Defendants during the signing ceremonies.

25   Based upon the Plaintiff's recent extensive study of cognovit notes for this

26   matter; (1) this contract was never open to any negotiations, for it was a contract of

27   adhesion, as the parties were not parties of equal bargaining power; (2) the Defendants

28   never gave the Plaintiff any extra consideration in order to obtain any confession of

judgment (cognovit note) clause, nor was the cognovit note issued under any other substantial benefit and/or consideration including and not limited to a reduction in installment payments or reduction in interest rates; (3) there was no contention or acknowledgment that the Plaintiff was aware of the legal (detrimental) consequences of the cognovit provision; (4) this Court should vacate this prejudgment (confession of judgment or cognovit note) as a matter of law for showing that Plaintiff's natural Rights to due process were violated.

The clear lack of evidence that Plaintiff ever intentionally, deliberately, and/or knowingly waived due process rights is further supported by this very Complaint.

**Natural rights cannot be waived even if that is the intent of the Plaintiff.**

At all times material to this Complaint Plaintiff never waived Constitutional rights to a trial by jury under any circumstances, much less willingly, knowingly, or intentionally.

The United States Supreme Court and the great majority of State Supreme Courts have all adopted the concept as; State's that use cognovit procedure was found unconstitutional, unless, the debtor knowingly and understandingly consented to the authorization to confess judgment.

*In National Equipment Rental, Ltd. v. Szukent, 375, U.S. 311 (1962)*, the Court observed: "It is settled …that parties to a contract may agree in advance to submit to the jurisdiction of a given court, to permit notice to be served by the opposing party, or even to waive notice altogether." *Id., at 315-316.*

And, in *Boddie v. Connecticut*, supra, the Court acknowledges that "the hearing required by due process is subject to waiver." *401 U.S., at 378-379.* In another case on point is from New Jersey when the Chief Justice described in a rather condescending tone, "a cognovit note is the loosest way of binding a man's property that was devised in any civilized country." *Alderman v. Diament, 7 N.J. L. 197, 198.*

1    The Supreme Court clarified another part of cognovit note when the Court stated,

2    "we do not presume acquiescence in the loss of fundamental rights, *Ohio Bell Tel., Co. v.*

3    *Public Utilities Comm'n, 301 U.S. 292, 307 (1937),* that standard was fully satisfied here."

4    The United States Supreme Court makes it very clear that any one may waive

5    their due process rights and/or any other right but in order to do so, one must intentionally,

6    knowingly, deliberately, and voluntarily do so.

7    The consequences or legal detriment to waiving one's Rights must be based only

8    upon an intelligent decision having been presented with the consequences of entering into

9    an agreement having a cognovit clause, (note and/or confession of judgment clause).

10    Because a cognovit note deprives the debtor knowledge and of notice that their

11    property is being seized, without recourse, or, without benefit of hearing or appeal, courts

12    demand **"clear and convincing evidence"** that the written waiver is **"voluntary,**

13    **knowing, and intelligently made**." The question of waiver is factual not presumptive.

14    This, a jury must decide.

15    The Plaintiff is now schooled in the confession of judgment theory through

16    Defendants' application of a hidden within, cognovit note, and, agrees that the knowing

17    and voluntary waiver of one's due process Rights would be pertinent, if, it was truly

18    evident in the present case. Plaintiff agrees that the due process rights to notice and

19    hearing prior to a civil judgment are subject to waiver.

20    Because the cognovit note deprives the debtor of notice that their property is

21    about to be seized, without benefit of hearing, or right to appeal,, courts demand "clear

22    and convincing evidence" that the written waiver was "voluntary, knowing, and

23    intelligently made."

24    In order for the Defendants to substantially support their position that Plaintiff did

25    voluntarily waive due process rights, Plaintiff states that there was never any warning

26    paragraph, bold letters, bold sentences and/or no warning statement to merit any concern

27    on behalf of the Plaintiff. One would think to guarantee this basic constitutional question,

28

36

which is now before this court, the Defendants should have a warning such as the

following warning to serve as an example:

> **"WARNING –By signing this paper you give up your right**
> **to notice and court trial. If you do not pay on time a court**
> **judgment may be taken against you without your knowledge**
> **and the powers of a court can be used to collect from you or**
> **your employer regardless of any claims you may have against**
> **the creditor whether for returned goods, faulty goods, failure**
> **on their part to comply with the agreement, or any other cause."**

Plaintiff once again reiterates that Plaintiff was never made aware of any cognovit

note and/or confession of judgment at the time of their entering into the contract with the

Defendants, or that, Plaintiff ever knowingly waived any Constitutionally guaranteed

Rights. Defendants never spent any time on this subject with Plaintiff.

After carefully examining the executed documents Plaintiff still cannot find any

specific references that Plaintiff has, in any way, waived any Constitutionally guaranteed

Rights upon execution of Defendants' documents.

Based upon further review, the Plaintiff never witnessed and/or was never

verbally instructed, concerning the loss of Due Process Rights. Any one may give up their

Rights, but, only those specifically bargained for.

Further, Plaintiff never knowingly, intelligently, and voluntarily waived Rights to

notice and hearing, and, was wholly unaware of the legal consequences appertaining

thereto.

Other factors that this Court must take into consideration, besides the

unconstitutionality of the purposefully disguised confession of judgment, and/or the

cognovit note incognito; but also must consider contracts of adhesions are procedurally

and substantively unconscionable contracts and contract foundations built upon mistakes,

inadvertence, excusable negligence, newly discovered information, fraudulent

conveyance, misrepresentation and fraud in the inducement in violation of Federal and

California State law; are void *ab initio*.

1     The very existence of a contract is the very heart of our commercial system as both

2   parties operate in good faith and any **"illegal provisions of the contract are "void," and**

3   **thus those provisions were never part of a validly formed contract."** *Three Valleys*

4   *Mun. Water Dist. v. E.F. Hutton & Co., 925 F.2d 1136, 1140 (9th Cir. 1991),* and

5   "voidness" challenges go to the very existence of a contract provision, and are not merely

6   a defense to a legally formed contract." And one valid defense that the Defendants are

7   raising is **"unconscionability is not merely a defensive doctrine but rather it goes to**

8   **the predicate of whether a contract was validly formed in the first place."** *California*

9   *Grocers Ass'n, Inc. v. Bank of America, 22 Cal.App.4th 205, 217 1994):* and the "Doctrine

10   of Unconscionability," procedural and/or substantively are the tools to determine the

11   validity of any contract thus ignoring for now the four main elements of a contract.

12     Plaintiff is raising the unconscionability aspect of the mortgage (*ARS 47-2302*

13   *Unconscionable contract or clause*) as referenced in "*Blake v. Ecker, 93 Cal.App.4th 728,*

14   *742 (2001)"* **(the substantive element of unconscionability "traditionally involves**

15   **contract terms that are so one-sided as to 'shock the conscience' or that impose harsh**

16   **or oppressive terms."**) (*Emphasis added*) (*citing Armendariz, 24 Cal.4th at 114*).

17   Anyone who would knowingly agree to a non-judicial foreclosure, where the illegally

18   appointed bank trustee has the power to foreclose on your home at his and/or her whim, is

19   ludicrous and would have to be totally incompetent.

20     The contract is procedurally unconscionable if "the contract is a standard-form

21   contract, drafted by the party with superior bargaining power, which relegates to the other

22   party the option of adhering to its terms without **modification or rejecting the contract**

23   **entirely.;**"; *Flores v. Transamerica HomeFirst, Inc.*, 93 Cal.App.4th 846, 853 (2001)

24   (same); *Mercuro v. Superior Court*, 96 Cal.App.4th 167, 174 (2002), *rev. denied*.

25     Plaintiff states emphatically that this Court should grant the temporary injunction to

26   allow Defendants sufficient time to disprove that the Deed of Trust is, in fact, a contract

27   void ab initio, and, to dispute Plaintiff's averment to the contrary, that the creation of the

28   contract is supported by a clear and convincing intent of the Plaintiff, for existence of

1   **mutual or reciprocal assent.** *Sanford v. Abrams (1888) 24 Fla 181, 2 So 373; Ross v.*

2   *Savage (1913) 66 Fla 106, 63 So 148; McCay v. Sever (1929) 98 Fla 710, 124 So 44;*

3   *United State Rubber Products, Inc. v. Clark (1941) 145 Fla 631, 200 So 385; Mann v.*

4   *Thompson (1958, Fla App D1) 100 So 2d 634.*

5       The Plaintiff hereby states that for a valid contract to exist with the Defendants

6   and/or any entity, the contract must have **assent be to a certain and definite proposition.**

7   For example, this Court, operating under cold neutrality, should demand that both sides

8   produce all the substantial records, including and not limited to the accounting records for

9   a determination as far as consideration. *Fincher v. Belk-Sawyer Co. (1961, Fla App D3)*

10  *127 So 2d 130; Goff v. Indian Lake Estates, Inv. (1965, Fla App D2) 178 So 2d 910;*

11  *Hewitt v. Price (1969, Fla App D3) 222 So 2d 247.*

12      The Plaintiff contends that without **a meeting of the minds of the parties on an**

13  **essential element (consideration), there can be no enforceable contract.** *Hettenbaugh*

14  *v. Keyes-Ozon-Fincher Ins., Inc. (1962, Fla App D3) 147 So 2d 328; Goff v. Indian Lake*

15  *Estates, Inc. (1965, Fla App D2) 178 So 2d 910.*

16      The Plaintiff has established enough doubt as to the validity of an enforceable

17  contract that this court is required to determine the enforceability of the contract and

18  determined what party breached the terms and conditions of the contract and in order to

19  form a valid contract, **the parties must have a distinct understanding,** common to both,

20  **and without doubt or difference. Unless all understand alike, there can be no assent,**

21  **and therefore no contract.** *Webster Lumber Co. v. Lincoln (1927) 94 Fla 1097, 115 So*

22  *498; Minsky's Follies of Florida, Inc v. Sennes (1953 206 F2d 1; O'neill v. Corporate*

23  *Trustees, Inc. (1967) 376 F2d 818.*

24      The Plaintiff hereby declares that the Defendants have greatly injured the Plaintiff

25  through and not limited to misrepresentation, truth in lending, UDAP and unjust

26  enrichment as a result of the Defendant's deliberate, conspired, intentional, and malicious

27  fraud. Further, Defendants' and/or their counsel have violated, inter alia, the Professional

28  Code of Conduct and procured this illegal and/or voidable contract which lacks the

essential elements of real assent and obtained the Plaintiff's Signature as **result of the exercise of duress or undue influence by the other party, or procured by the fraud of one of the parties, lacks the essential element of real assent and may be avoided by the injured party.** *Wall v. Bureau of Lathing and Plastering (1960, Fla App D3) 117 So 2d 767.*

Being that the Plaintiff is asking for this court to protect Plaintiff's due process rights and stay the sale and provide the Plaintiff with their right to a Trial by Jury for the Plaintiff never agreed to a non-judicial foreclosure and any entity must prove compliance with all the terms and conditions and specifically consideration and substantiate **actual assent by the parties upon exactly the same matters is indispensable to the formation of a contract.** *Bullock v. Hardwick (1947) 158 Fla 834, 30 So 2d 539: Hettenbaugh v. Keyes- Ozon - Fincher Ins. , Inc (1962, Fla App D3) 147 So 2d 328: General Finance Corp. V. Stratton (1963 Fla App D1) 156 So 2d 664.*

Unconscionability is deemed to exist when a two-prong test is met, that is, when it is established that both procedural and substantive unconscionability exist. *Blake v. Ecker, 93 Cal App 4th 728 (2001). According to Restatement of Contracts (2nd Ed. 1990) commentary accompanying section 208.*

Most state unconscionability jurisprudence is sub-divided into two branches: substantive and procedural. Substantive unconscionability refers to oppressively one-sided and harsh terms of a contract, while procedural unconscionability involves the manner and process by which the terms become part of the contract including unequal bargaining power and hidden contract terms. *Comb v. PayPal Inc., Case No. C-02-1227 and C-02-2777 USDC CA No.  Dist. San Jose Div (9th Cir. 2002); Blake, supra; Kloss v. Edward D. Jones & Co., 2002 MT 129; 310 Mont. 123; 54 P3d 1; 2002 Mont. LEXIS 223 (MT Sup Ct 2002).*

The process by which a contract comes into existence is at the heart of procedural unconscionability such that the contract in question is typically one of adhesion. *Flores v. Transamerica HomeFirst, Inc., 93 Cal App 4th 846 (2001).*

40

Analysis of unconscionability begins with an inquiry into whether the contract (Deed of Trust) was a contract of adhesion i.e., a standardized contract, imposed upon the subscribing party without an opportunity to negotiate the terms and the conditions is an oppressive, "take it or leave it offer," an inequality of bargaining position when under scrutiny are so one sided that the terms and conditions are so supportive of the superior bargaining power and actually detrimental or no real negotiations and an absence of meaningful choice through an unequal bargaining position of the weaker party. *Armendariz v. Foundation Health Psychcare Services, Inc., 24 Cal.4th 83, 113, 99 Cal. Rptr. 2d 745, 6 P.3d 669 (2000). Graham v. Scissor-Tail, Inc., 28 Cal.3d 807, 819, 171 Cal. Rptr. 604, 623 P.2d 165 & n.16 (1981).*

Plaintiff never agreed to place their property in an irrevocable trust, nor, did Plaintiff ever knowingly agree to have their home subject to a power of sale clause. As a matter of fact, Plaintiff hereby declares that they have never heard of that term power of sale, and, what that term meant, until recently.

Plaintiff likewise, did not know that the term "seised" imparted a wholly different connotation than "seized", whereby, upon recent understanding of Plaintiff, "seised" indicates that Plaintiff actually owned their property free and clear, without encumbrance, prior to signing a Deed of Trust, without benefit of consideration.

The concept of seising, dates back to the middle ages when the serfs, who were made to consider themselves not worthy of owning land, would actually give their properties through seising (gave it away absolutely free) to their masters. Today this unconscionable practice is still being utilized by bankers, constituting an unjust enrichment, through concealment and deception and outright ignorance on this Plaintiff, who suffers from the least susceptible and/or susceptible consumer syndrome.

Plaintiff now challenges this practice as being procedural and substantively unconscionable; Clauses contained in this referenced contract (Deed of Trust) should be challenged by this court as the Deed of Trust, did not and does not represent the true intentions of the Plaintiff.

41

1   Plaintiff would not knowingly agree to the placing of an irrevocable trust against

2   their home by any mortgage company and/or banker and would not have given their

3   property to anyone through the middle ages policy of seising. At trial, it would become

4   apparent that the trier of facts could not find an objectively clear and unambiguous

5   expression of mutual intent of these objectionable and substantively unconscionably

6   shocking terms.

7   In the absence of conflicting parol evidence, the interpretation of a written contract

8   is essentially a judicial function subject to independent review by this Court or on appeal.

9   A trial court's threshold determination as to whether there is an ambiguity permitting the

10   admission of parol evidence is also a question of law subject to independent review.

11   If parol evidence is admissible, and the competent parol evidence is in conflict, the

12   construction of the contract becomes a question of fact. However, if the parol evidence is

13   not conflicting, the appellate court will independently construe the writing.

14   The duty of this Court is to schedule a hearing and permit the Defendants to

15   actually produce documented evidence that Plaintiff, understood that Plaintiff was already

16   lawfully seised of property by signing the Deed of Trust, and thereafter, knowingly,

17   intentionally, and, deliberately agreed to a (unseen) power of sale clause, and, irrevocable

18   grant, executed, without consideration, to the sole benefit of Defendants.

19   However, this Court should also recognize the risk that such provisions may be

20   included in a trust deed or mortgage without the debtor's knowledge or understanding.

21   Clauses such as this are often termed "dragnet" or "anaconda," as by their broad and

22   general terms they enwrap the unsuspecting debtor in the folds of indebtedness and

23   deceptive practices (concealing deceptively, the power of sale clause in which Plaintiff

24   never was told and/or knew that it was actually part of the alleged contract).

25   The proponent of a dragnet clause bears the burden of establishing that the parties

26   intended all existing or contemporaneous clauses to be included within its scope. A trust

27   deed containing a dragnet clause that is printed on a standard bank form is considered a

28   **contract of adhesion** under California law.

42

1    Although **contracts of adhesion** are generally enforceable according to their terms,

2    a provision contained in such a contract cannot be enforced if it does not fall within the

3    reasonable expectations of the weaker or adhering party.

4        This Court should examine a number of factors in determining whether broadly

5    worded dragnet clauses (Seised and irrevocable trust) was mutually intended by the parties

6    to be included in the terms and conditions: (1) the language and specificity of the dragnet

7    clause; (2) whether the parties were aware of the dragnet clause and appreciated its

8    significance and would have benefited by their existence; (3) were the clauses

9    procedurally and/or substantively unconscionable and benefited the one party at the

10   expense of the other party taking into account the degree of negotiability being exerted

11   upon the smaller party with inferior bargaining position against the larger party with

12   superior bargaining power.

13       The Defendant's intentional concealment of the Power of Sale Clause in the Deed

14   of Trust further insures Plaintiff's allegations of deceptive intentions of the Defendants.

15       Plaintiff hereby avers that for this Court to precede with this sale, this Court must

16   find an objective and clear unambiguous expression of mutual intent to where the Plaintiff

17   intentionally, deliberately, knowingly desired to place the home into a non-revocable trust,

18   to allow the Defendant's to have the home seised, power of sale and knowingly waived

19   due process rights including and not limited to trial by jury. This Court has in its inherent

20   authority, the duty to stop this "Deed of Trust Sale" upon the unsuspecting mortgagor in

21   the folds of indebtedness embraced and secured in the mortgage which Plaintiff did not

22   contemplate or understand their presence or implications.

23       However, "[t]here are two judicially imposed limitations on the enforcement of

24   adhesion contracts or provisions thereof. The first is that such a contract or provision

25   which does not fall within the reasonable expectations of the weaker or 'adhering' party

26   will not be enforced against him . . . The second - a principle of equity applicable to all

27   contracts generally - is that a contract or provision, even if consistent with the reasonable

28

43

expectations of the parties, will be denied enforcement if, considered in its context, it is unduly oppressive or unconscionable.

The irrevocable trust, the hidden power of sale clause, due process violations and the seising clauses are four examples of Plaintiff being involved with procedural and substantive violations of unconscionability, thus voiding this contract from its incipience.

A contract of adhesion is "a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it" *(Armendariz v. Foundation Health Psychcare Serv., 24 Cal 4th 83 at 113 (2000); reflected in Martinez v. Master Protection Corp., 118 Cal. App. 4th 107; 2004 Cal. App. LEXIS 638  (2004)* -- is not unconscionable merely because of disparity of the parties' bargaining position *(Gilmer v. Interstate/Johnson Lane Corp., 500 US 20; 114 L. Ed. 2d 26, 111 St. Ct. 1647 (1991).* Rather, the procedural unconscionability must co-exist with substantive components that include harsh or one-sided results that "shock the conscience". *Soltani v. West. & So. Life Ins. Co., 258 F.3d 1038 (9th Cir. 2001);  Ferguson v. Countrywide Credit Industries, Inc., 298 F.3d 778; 2002 U.S. App. LEXIS 14739 (9th Cir. 2002); Circuit City Stores, Inc. v. Mantor, 335 F.3d 1101; 2003 U.S. App. LEXIS 14607 (9th Cir. 2003).*

When a party to a contract possesses far greater bargaining power (Defendants and/or any entity) than another party (Plaintiff), or when the stronger party pressures, harasses, or compels another party into entering into a contract, "'oppression and, therefore, procedural unconscionability, are present." *Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, at 1172 (9th Cir. 2003) (quoting Ferguson v. Countrywide Credit Indus., Inc., 298 F.3d 778 (9th Cir. 2002); Kinney v United HealthCare Services, Inc., 70 Cal App 4th 1322 (1999).*

Substantive unconscionability addresses the fairness of the term in dispute. It traditionally involves contract terms that are so one-sided as to "shock the conscience," or impose harsh or oppressive terms. Historically, courts looked to the common law for discerning the existence of substantive unconscionability as in *Rakoff, Contracts of*

44

1    *Adhesion: An Essay in Reconstruction, 96 Harv. L. Rev. 1173, 1179-1180 (1983);*

2    *Slawson, Mass Contracts: Lawful Fraud in California, 48 S. Cal. L. Rev. 1, 12-13 (1974);*

3    *K. Llewellyn, The Common Law Tradition 370-371 (1960).*

4        "The common law, recognizing that standardized form contracts account for a

5    significant portion of all commercial agreements...subjects terms in contracts of adhesion

6    to scrutiny for reasonableness." Judge J. Skelly Wright set out the state of the law

7    succinctly in *Williams v. Walker-Thomas Furniture Co., 121 U. S. App. D. C. 315, 319-*

8    *320, 350 F. 2d 445, 449-450 (1965)* (footnotes omitted):

9        "Ordinarily, one who signs an agreement without full knowledge of its terms might

10   be held to assume the risk that he has entered a one-sided bargain. But when a party of

11   little bargaining power, and hence little real choice, signs a commercially unreasonable

12   contract with little or no knowledge of its terms, it is hardly likely that Plaintiff's consent,

13   or even an objective manifestation of Plaintiff's consent, was ever given to all of the

14   terms. In such a case the usual rule that the terms of the agreement are not to be

15   questioned should be abandoned and the court should consider whether the terms of the

16   contract are so unfair that enforcement should be withheld."

17   Pursuant to the Declaratory Judgment Act, this Honorable Court may enter a declaratory

18   judgment to determine the rights of the Plaintiff, regarding the aforesaid claims and

19   controversies arising therefrom.

20   **TEMPORARY RESTRAINING ORDER**

21        The primary purpose of a temporary restraining order is to prevent irreparable

22   injury and harm caused without right to the Plaintiff, and, to allow time for determining

23   the legal rights, status and relations of the Plaintiff and the Defendants.

24        A temporary restraining order is absolutely necessary in the present instance to

25   speedily effectuate the rights and status of Plaintiff in relation to the Defendants as well as

26   delineate the authority of each of the Defendants in their actions as taken against the

27   Plaintiff.

28

1    Delay in granting Plaintiff's request for a temporary restraining order will result in

2    irreparable harm and injury to Plaintiff, without ability to otherwise address Plaintiff's

3    grievances to the degree and means that would be otherwise availed.

4    Temporary restraining order is proper when (1) a reasonable likelihood of success;

5    (2) irreparable harm; (3) the balance of harms is in the movant's favor; and (4) the public

6    interest is favorably impacted.

7    An actual controversy exists between Plaintiff and Defendants, both individually

8    and collectively, as Defendants continue to usurp Plaintiff's rights, unabated, in the

9    wholesale deprivation of Plaintiff's rights and, abrogation of Plaintiff's property.

10    Additional litigation is imminent and inevitable, pending this court's determination

11    of the controversy, that in the absence thereof, Plaintiff will be forced to proceed in

12    securing their rights, as opposed to Defendants meritless and/or unlawful actions

13    undertaken against Plaintiff.

14    Plaintiff clearly has a direct, substantial and present interest in the controversy.

15    A temporary restraining order will aid in ending the controversy, or in the

16    alternative, clearly establish the rights of Plaintiff and the authority and/or lack thereof, of

17    Defendant(s).

18    As to element (1), Plaintiff is highly likely to be successful in litigation as

19    Defendant have no evidence to substantiate their fraud.

20    As to element (2), absent the temporary restraining order, Defendant will steal

21    Plaintiff's property and convert said property, in which case a third party may be harmed

22    by Defendant's criminal activity.

23    As to element (3), Defendant's fraud will greatly harm Plaintiff.

24    As to element (4), it is in the public interest to prevent criminal enterprises from

25    committing fraud against the people.

26    **DECLARATORY RELIEF**

27

28

46

1    Pursuant to the Declaratory Judgment Act, this Honorable Court may enter a
2    declaratory judgment to determine the rights of the Plaintiff, regarding the aforesaid
3    claims and controversies arising therefrom.
4    The primary purpose of a declaratory judgment is to quickly determine issues, if
5    left otherwise delayed, will cause irreparable injury and harm to the Plaintiff, and, to
6    afford certain relief from uncertainty and insecurity by effectively determining the legal
7    rights, status and relations of the Plaintiff and the Defendants.
8    A declaratory judgment is absolutely necessary in the present instance to speedily
9    effectuate the rights and status of Plaintiff in relation to the Defendants as well as
10    delineate the authority of each of the Defendants in their actions as taken against the
11    Plaintiff.
12    Delay in granting Plaintiff's request for a declaratory judgment will result in
13    irreparable harm and injury to Plaintiff, without ability to otherwise address Plaintiff's
14    grievances to the degree and means that would be otherwise availed.
15    Declaratory judgments are proper when (1) an actual controversy exists, (2)
16    litigation appears imminent and inevitable, (3) the Plaintiff has a direct, substantial and
17    present interest, and (4) the declaration sought will be of practical help in ending the
18    controversy.
19    An actual controversy exists between Plaintiff and Defendants, both individually
20    and collectively, as Defendants continue to usurp Plaintiff's rights, unabated, in the
21    wholesale deprivation of Plaintiff's rights and, abrogation of Plaintiff's property.
22    Additional litigation is imminent and inevitable, pending this court's determination
23    of the controversy, that in the absence thereof, Plaintiff will be forced to proceed in
24    securing their rights, as opposed to Defendants meritless and/or unlawful actions
25    undertaken against Plaintiff.
26    Plaintiff clearly has a direct, substantial and present interest in the controversy.
27
28

47

1    A declaratory judgment will aid in ending the controversy, or in the alternative,

2    clearly establish the rights of Plaintiff and the authority and/or lack thereof, of

3    Defendant(s).

4

5    **INJUNCTIVE RELIEF**

6    Plaintiff's right to injunctive relief seems clear: An injunction is absolutely

7    necessary to avoid a further and yet greater injury, as result of Defendants continued and

8    unbridled actions.

9    It is abundantly clear from the foregoing cause(s) as stated herein, that, sufficient

10   grounds to warrant an injunction have been established, until, all facts are fully and

11   properly clarified, as, to be accomplished following the completion of discovery.

12   It is averred that Defendants, both individually and collectively, have acted in bad

13   faith, in their attempts to unlawfully wrestle Plaintiff's property.

14   It is averred that Defendants, whether individually and/or collectively, have entered

15   certain documents into the public record, for the purpose of reliance thereupon, which,

16   Plaintiff believes are not supported by the facts, should this Court allow them to be

17   brought to light.

18   Plaintiff will be irreparably harmed, without effective recourse, should this Court

19   deny Plaintiff's plea for injunctive relief; whereas, Defendants will not be so harmed,

20   should this court grant Plaintiff's relief, pending the full and complete adjudication of

21   salient issues as raised in this complaint.

22   Because of the intentional deceptive nature of the Defendants, this Court should

23   grant the temporary injunction in the name of justice and a matter of good law. **"Where**

24   **administrative action may result in the loss of property and/or life, or of all that**

25   **makes life worth living, and doubt as to the extent of power delegated to**

26   **administrative officials is to be resolved in citizen's favor and court must be**

27

28

especially sensitive to the citizen's rights where proceeding is non-judicial." *United States v. Minker, 350 U.S. 179; 76 S. Ct. 281 (1956).*

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S PETITION

### HOW AND WHY THE BANK MUST SWITCH CURRENCY

1. NOT FULFILL THE LOAN AGREEMENT

2. OBTAIN YOUR MORTGAGE NOTE WITHOUT INVESTING ONE CENT

3. FORCING YOU TO LABOR TO PAY INTEREST ON THE CONTRACT

4. THE BANK REFUSES TO FULFILL THE CONTRACT

5. MAKES YOU A DEPOSITOR NOT A BORROWER

The oldest scheme throughout History is the changing of currency. Remember the moneychangers in the temple? They changed currency as a business. You would have to convert to Temple currency in order to buy an animal for sacrifice. The Temple Merchants made money by the exchange. The Bible calls it unjust weights and measures, and judges it to be an abomination. Jesus cleared the Temple of these abominations. Our Christian Founding Fathers did the same. Ben Franklin said in his autobiography, "...the inability of the colonists to get the power to issue their own money permanently out of the hands of King George III and the international bankers was the prime reason for the revolutionary war." The year 1913 was the third attempt by the European bankers to get their system back in place within the United States of America. President Andrew Jackson ended the second attempt in 1836. What they could not win militarily in the Revolutionary War they attempted to accomplish by a banking money scheme which allowed the European Banks to own the mortgages on nearly every home, car, farm, ranch, and business **at no cost to**

**the bank.** Requiring "We the People" to pay interest on the equity we lost and the bank got free.

Today people believe that cash and coins back up the all checks. If you deposit $100 of cash, the bank records the cash as a bank asset (debit) and credits a Demand Deposit Account (DDA), saying that the bank owes you $100. For the $100 liability the bank owes you, you may receive cash or write a check. If you write a $100 check, the $100 liability your bank owes you is transferred to another bank and that bank owes $100 to the person you wrote the check to. That person can write a $100 check or receive cash. So far there is no problem.

Remember one thing however, for the check to be valid there must first be a deposit of money to the bank's **ASSETS**, to make the check (liability) good. The liability is like a **HOLDING ACCOUNT** claiming that money was deposited to make the check good.

Here then, is how the switch in currency takes place.

The bank advertises it loans' money. The bank says, "Sign here". However the bank never signs because they know they are not going to lend you theirs, or other depositor's money. Under the law of bankruptcy of a nation, the mortgage note acts like money. The bank makes it look like a loan but it is not. **It is an exchange.**

**The bank receives the equity in the home you are buying, for free, in exchange for an unpaid bank liability that the bank cannot pay, without returning the mortgage note. If the bank had fulfilled its end of the contract, the bank could not have received the equity in your real property for free.**

**The bank receives your mortgage note without investing or risking one-cent.**

**The bank sells the mortgage note, receives cash or an asset that can then be converted to cash and still refuses to 'loan' you their or other depositors' money or pay the liability it owes you.** On a $100,000 loan the bank does not give up $100,000. The bank receives $100,000 in cash or an asset and issues a $100,000 liability (check) the bank has no intention of paying. The $100,000 the bank received in the alleged loan is the equity (lien on property) the bank received without investment, and it is the $100,000 the individual lost in equity to the bank. The $100,000 equity the individual lost to the bank, which demands he/she repay plus interest.

The loan agreement the bank told you to sign said "LOAN." The bank broke that agreement. The bank now owns the mortgage note without loaning anything. The bank then deposited the mortgage note in an account they opened under your name without your authorization or knowledge. The bank withdrew the money without your authorization or knowledge using a forged signature. The bank then claimed the money was the banks' property, which is a fraudulent conversion and a blatant lie.

The mortgage note was deposited or debited (asset) and credited to a Direct Deposit Account, (DDA) (liability). The credit to DDA (liability) was used from which to issue the check. The bank just switched the currency. The bank demands that you cannot use the same currency, which the bank deposited (promissory notes or mortgage notes) to discharge your mortgage note. The bank refuses to loan you other depositors' money, or pay the liability it owes you for having deposited your mortgage note.

1 　　　.　To pay this liability the bank must return the mortgage note to you. However

2 instead of the bank paying the liability it owes you, the bank demands you use these

3

4 unpaid bank liabilities, created in the alleged loan process, as the new currency. Now you

5 must labor to earn the bank currency (unpaid liabilities created in the alleged loan process)

6 to pay back the bank. What the bank received for free, the individual lost in equity.

7 If you tried to repay the bank in like kind currency, (which the bank deposited without

8

9 your authorization to create the check they issued you), then the bank claims the

10 promissory note is not money. They want payment to be in legal tender (check book

11 money).

12 　　　The mortgage note is the money the bank uses to buy your property in the

13 foreclosure. They get your real property at no cost. If they accept your promissory note to

14

15 discharge the mortgage note, the bank can use the promissory note to buy your home if

16 you sell it. Their problem is, the promissory note stops the interest and there is no lien on

17 the property. If you sell the home before the bank can find out and use the promissory note

18 to buy the home, the bank lost nothing. The bank claims they have not bought the home at

19

20 no cost. Question is, what right does the bank have to receive the mortgage note at no cost

21 in direct violation of the contract they wrote and refused to sign or fulfill.

22 　　　By demanding that the bank fulfill the contract and not change the currency, the

23 bank must deposit your second promissory note to create check book money to end the

24

25 fraud, putting everyone back in the same position they where, prior to the fraud, in the first

26 place. Then all the homes, farms, ranches, cars and businesses in this country would be

27 redeemed and the equity returned to the rightful owners (the people). If not, every time the

28

homes are refinanced the banks get the equity for free. You and I must labor 20 to 30 years full time as the bankers sit behind their desks, laughing at us because we are too stupid to figure it out or to force them to fulfill their contract.

The $100,000 created inflation and this increases the equity value of the homes. On an average homes are refinanced every 7 ½ years. When the home is refinanced the bank again receives the equity for free. What the bank receives for free the alleged borrower loses to the bank.

According to the Federal Reserve Banks' own book of Richmond, Va. titled "YOUR MONEY" page seven, "**...demand deposit accounts are not legal tender...**" If a promissory note is legal tender, the bank must accept it to discharge the mortgage note. The bank changed the currency from the money deposited, (mortgage note) to check book money (liability the bank owes for the mortgage note deposited) forcing us to labor to pay interest on the equity, in real property (real estate) the bank received for free. This cost was not disclosed in **NOTICE TO CUSTOMER REQUIRED BY FEDERAL LAW, Federal Reserve Regulation Z.**

When a bank says they gave you credit, they mean they credited your transaction account, leaving you with the presumption that they deposited other depositors money in the account. The fact is they deposited your money (mortgage note). The bank cannot claim they own the mortgage note until they loan you their money. If the bank deposits your money, they are to credit a Demand Deposit Account under your name, so you can write checks and spend your money. In this case they claim your money is their money.

1  Ask a criminal attorney what happens in a fraudulent conversion of your funds to the

2  bank's use and benefit, without your signature or authorization.

3
   What the banks could not win voluntarily, through deception they received for free.
4
5  Several presidents, John Adams, Thomas Jefferson, and Abraham Lincoln believed that

6  banker capitalism was more dangerous to our liberties than standing armies. U.S.

7  President James A. Garfield said, "Whoever controls the money in any country is absolute

8
   master of industry and commerce."
9
10 The Chicago Federal Reserve Bank's book,"Modern Money Mechanics", explains

11 exactly how the banks expand and contract the checkbook money supply forcing people

12 into foreclosure. This could never happen if contracts were not violated and if we received

13
   equal protection under the law of Contract.
14
15 ### HOW THE BANK SWITCHES THE CURRENCY

16 This is a repeat worded differently to be sure you understand it.

17 ***You must understand the currency switch.***

18
19 The bank does not loan money. The bank merely switches the currency. The

20 alleged borrower created money or currency by simply signing the mortgage note. The

21 bank does not sign the mortgage note because they know they will not loan you their

22 money. The mortgage note acts like money. To make it look like the bank loaned you

23
   money the bank deposits your mortgage note (lien on property) as money from which to
24
25 issue a check. No money was loaned to legally fulfill the contract for the bank to own the

26 mortgage note. By doing this, the bank received the lien on the property without risking or

27 using one cent. The people lost the equity in their homes and farms to the bank and now

28

they must labor to pay interest on the property, which the bank got for free and the people lost.

The check is not money, the check merely transfers money and by transferring money the check acts LIKE money. The money deposited is the mortgage note. *If the bank never fulfills the contract to loan money, then the bank does not own the mortgage note.* The deposited mortgage note is still your money and the checking account they set up in your name, which they credited, from which to issue the check, is still your money. They only returned your money in the form of a check. Why do you have to fulfill your end of the agreement if the bank refuses to fulfill their end of the agreement? If the bank does not loan you their money they have not fulfilled the agreement, the contract is void.

**You created currency by simply signing the mortgage note.** The mortgage note has value because of the lien on the property and because of the fact that you are to repay the loan. The bank deposits the mortgage note (currency, MN) to create a check (currency, BM) (bank money). Both currencies cost nothing to create. By law the bank cannot create currency (BM a check) without first depositing currency, (MN) or legal tender. For the check to be valid there must be MN or BM **as legal tender,** but the bank accepted currency (MN) as a deposit without telling you and without your authorization.

The bank withdrew your money, which they deposited without telling you and withdrew it without your signature, in a fraudulent conversion scheme, which can land the bankers in jail but is played out in every City and Town in this nation on a daily basis.

**Without loaning you money, the bank deposits your money (MN), withdraws it and claims it is the bank's money and that it is their money they loaned you.**

55

It is not a loan, it is merely an exchange of one currency for another, they'll owe you the money, which they claimed they were to loan you. If they do not loan the money and merely exchange one currency for another, the bank receives the lien on your property for free. What they get for free you lost and must labor to pay back at interest.

If the banks loaned you legal tender, they could not receive the liens on nearly every home, car, farm, and business for free. The people would still own the value of their homes. The bank must sell your currency (MN) for legal tender so if you use the bank's currency (BM), and want to convert currency (BM) to legal tender they will be able to make it appear that the currency (BM) is backed by legal tender. The bank's currency (BM) has no value without your currency (MN). The bank cannot sell your currency (MN) without fulfilling the contract by loaning you their money. They never loaned their money, they merely exchanged one currency for another. The bank received your currency for free, without making any loan or fulfilling the contract, changing the cost and the risk of the contract wherein they refused to sign, knowing that it is a change of currency and not a loan.

If you use currency (MN), the same currency the bank deposited to create currency (BM), to pay the loan, the bank rejects it and says you must use currency (BM) or legal tender. The bank received your currency (MN) and the bank's currency (BM) for free without using legal tender and without loaning money thereby refusing to fulfill the contract. Now the bank switches the currency without loaning money and demands to receive your labor to pay what was not loaned or the bank will use your currency (MN) (mortgage note) to buy your home in foreclosure. The Revolutionary war was fought to

stop these bank schemes. The bank has a written policy to expand and contract the currency (BM), creating recessions, forcing people out of work, allowing the banks to obtain your property for free.

If the banks loaned legal tender, this would never happen and the home would cost much less. If you allow someone to obtain liens for free and create a new currency, which is not legal tender and you must use legal tender to repay. This changes the cost and the risk.

Under this bank scheme, even if everyone in the nation owned their homes and farms debt free, the banks would soon receive the liens on the property in the loan process. The liens the banks receive for free are what the people lost in property, and now must labor to pay interest on. The interest would not be paid if the banks fulfilled the contract they wrote. If there is equal protection under the law and contract, you could get the mortgage note back without further labor. Why should the bank get your mortgage note and your labor for free when they refuse to fulfill the contract they wrote and told you to sign?

Sorry for the redundancy, but it is important for you to know by heart their "shell game", I will continue in that redundancy as it is imperative that you understand the principle. The following material is case law on the subject and other related legal issues as well as a summary.

## LOGIC AS EVIDENCE

The check was written without deducting funds from SA or CD allowing the MN to become the new, pool of money owed to DDA, SA, CD with DDA, SA, CD increasing by

the amount of the MN. In this case the bankers sell the MN for FRBN's or other assets while still owing the liability for the MN sold and without the bank giving up any-FRBN'S.

If the bank had to part with FRBN'S, and without the benefit of checks to hide the fraudulent conversion of the MN from which it issues the check, the bank fraud would be exposed.

FRBN's are the only money called legal tender. If only FRBN's are deposited for the credit to DDA- SACD, and if the bank wrote a check for the MN, the check then transfers FRBN's and the bank gives the borrower a bank asset. There is no increase in the check book money supply that exists in the loan process.

The bank policy is to increase bank liabilities; DDA, SK, CD, by the MN. If the MN is money, then the bank never gave up a bank asset. The bank simply used fraudulent conversion of ownership of the MN. The bank cannot own the MN until the bank fulfills the contract.

The check is not the money; the money is the deposit that makes the check good. In this case, the mortgage note is the money from which the check is issued. Who owns the MN when the MN is deposited? The borrower owns the MN because the bank never paid money for the MN and never loaned money (bank asset). The bank simply claimed the bank owned the MN without paying for it and deposited the MN from which the check was issued. This is fraudulent conversion. The bank risked nothing! Not even one penny was invested. They never took money out of any account, in order to own the MN, as

1  proven by the bookkeeping entries, financial ratios, the balance sheet, and of course the

2  bank's literature. The bank simply never complied with the contract.

3
   If the MN is not money, then the check is check kiting and the bank is insolvent
4
5  and the bank still never paid. If the MN is money, the bank took our money without

6  showing us the deposit, and without paying for it, which is fraudulent conversion. The

7  bank claimed it owned the MN without paying for it, then sold the MN, took the cash and

8
9  never used the cash to pay the liability it owed for the check the bank issued. The liability

10 means that the bank still owes the money. The bank must return the MN or the cash it

11 received in the sale, in order to pay the liability. Even if the bank did this, the bank still

12 never loaned us the bank's money, which is what 'loan' means. The check is not money but

13
   merely an order to pay money. If the mortgage note is money then the bank must pay the
14
15 check by returning the MN.

16    The only way the bank can pay FRBN's for the check issued is to sell the MN for

17 FRBN's. FRBN's are non-redeemable in violation of the UCC. The bank forces us to trade

18
   in non-redeemable private bank notes of which the bank refuses to pay the liability owed.
19
20 When we present the FRBN's for payment the bank just gives us back another FRBN

21 which the bank paid 2 ½ cents for per bill regardless of denomination.

22    What a profit for the bank!

23
   The check issued can only be redeemed in FRBN's, which the bank obtained by
24
25 selling the MN that they paid nothing for.

26

27

28

1  The bank forces us to trade in bank liabilities, which they never redeem in an asset.

2  We the people are forced to give up our assets to the bank for free, and without cost to the

3  bank.

4

5  This is fraudulent conversion making the contract, which the bank created with

6  their policy of bookkeeping entries, illegal and the alleged contract null and void.

7  The bank has no right to the MN or to a lien on the property, until the bank performs

8  under the contract.

9

10  The bank had less than ten percent of FRBN's to back up the bank liabilities in

11  DDA, SA, or CD's. A bank liability to pay money is not money. When we try and repay

12  the bank in like funds (such as is the bank's policy to deposit from which to issue checks)

13

14  they claim it is not money. The bank's confusing and deceptive trade practices and their

15  alleged contracts are unconscionable.

16  **SUMMARY OF DAMAGES**

17  The bank made the alleged borrower a depositor by depositing a $100,000

18  negotiable instrument, which the bank sold or had available to sell for approximately

19

20  $100,000 in legal tender. The bank did not credit the borrower's transaction account

21  showing that the bank owed the borrower the $100,000. Rather the bank claimed that the

22  alleged borrower owed the bank the $100,000, then placed a lien on the borrower's real

23  property for $100,000 and demanded loan payments or the bank would foreclose.

24

25  The bank deposited a non-legal tender negotiable instrument and exchanged it for

26  another non-legal tender check, which traded like money, using the deposited negotiable

27  instrument as the money deposited. The bank changed the currency without the borrower's

28

authorization. First by depositing non legal tender from which to issue a check (which is non-legal tender) and using the negotiable instrument (your mortgage note), to exchange for legal tender, the bank needed to make the check appear to be backed by legal tender.

No loan ever took place. **Which shell hides the little pea?**

The transaction that took place was merely a change of currency (without authorization), a negotiable instrument for a check. The negotiable instrument is the money, which can be exchanged for legal tender to make the check good. An exchange is not a loan. The bank exchanged $100,000 for $100,000. There was no need to go to the bank for any money. The customer (alleged borrower) did not receive a loan, the alleged borrower lost $100,000 in value to the bank, which the bank kept and recorded as a bank asset and never loaned any of the bank's money.

In this example, the damages are $100,000 plus interest payments, which the bank demanded by mail. The bank illegally placed a lien on the property and then threatened to foreclose, further damaging the alleged borrower, if the payments were not made. A depositor is owed money for the deposit and the alleged borrower is owed money for the loan the bank never made and yet placed a lien on the real property demanding payment.

**Damages exist in that the bank refuses to loan their money.** The bank denies the alleged borrower equal protection under the law and contract, by merely exchanging one currency for another and refusing repayment in the same type of currency deposited. The bank refused to fulfill the contract by not loaning the money, and by the bank refusing to be repaid in the same currency, which they deposited as an exchange for another currency.

A debt tender offered and refused is a debt paid to the extent of the offer. The bank has no authorization to alter the alleged contract and to refuse to perform by not loaning money, by changing the currency and then refusing repayment in what the bank has a written policy to deposit.

The seller of the home received a check. The money deposited for the check issued came from the borrower not the bank. The bank has no right to the mortgage note until the bank performs by loaning the money.

In the transaction the bank was to loan legal tender to the borrower, in order for the bank to secure a lien. The bank never made the loan, but kept the mortgage note the alleged borrower signed. This allowed the bank to obtain the equity in the property (by a lien) and transfer the wealth of the property to the bank without the bank's investment, loan, or risk of money. Then the bank receives the alleged borrower's labor to pay principal and Usury interest. What the people owned or should have owned debt free, the bank obtained ownership in, and for free, in exchange for the people receiving a debt, paying interest to the bank, all because the bank refused to loan money and merely exchanged one currency for another. This places you in perpetual slavery to the bank because the bank refuses to perform under the contract. The lien forces payment by threat of foreclosure. The mail is used to extort payment on a contract the bank never fulfilled. If the bank refuses to perform, then they must return the mortgage note. If the bank wishes to perform, then they must make the loan. The past payments must be returned because the bank had no right to lien the property and extort interest payments. The bank has no right to sell a mortgage note for two reasons. The mortgage note was deposited and the money

62

1    withdrawn without authorization by using a forged signature and; two, the contract was

2    never fulfilled. The bank acted without authorization and is involved in a fraud thereby

3    damaging the alleged borrower.

4

5    **Excerpts from "Modem Money Mechanics" Pages 3 & 6**
     What Makes Money Valuable? In the United States neither paper currency nor deposits
6    have value as commodities. Intrinsically, a dollar bill is just a piece of paper, deposits
     merely book entries. Coins do have some intrinsic value as metal, but generally far less
7    than face value.
     Then, bankers discovered that they could make loans merely by giving their promises to
8    pay, or bank notes, to borrowers, in this way, banks began to create money. More notes
     could be issued than the gold and coin on hand because only a portion of the notes
9    outstanding would be presented for payment at any one time. Enough metallic money had
     to be kept on hand, of course, to redeem whatever volume of notes was presented for
10   payment.
     Transaction deposits are the modem counterpart of bank notes. It was a small step from
11   printing notes to making book entries crediting deposits of borrowers, which the
     borrowers in turn could "spend" by writing checks, thereby "printing" their own money.

12   **Notes, exchange just like checks.**

13   How do open market purchases add to bank reserves and deposits? Suppose the Federal
     Reserve System, through its trading desk at the Federal Reserve Bank of New York, buys
14   $10,000 of Treasury bills from a dealer in U.S. government securities. In today's world of
     Computer financial transactions, the Federal Reserve Bank pays for the securities with an
15   "electronic" check drawn on itself. Via its "Fedwire" transfer network, the Federal Reserve
     notifies the dealer's designated bank (Bank A) that payment for the securities should be
16   credited to (deposited in) the dealer's account at Bank A. At the same time, Bank A's
     reserve account at the Federal Reserve is credited for the amount of the securities
17   purchased. The Federal Reserve System has added $10,000 of securities to its assets,
     which it has paid for, in effect, by creating a liability on itself in the form of bank reserve
18   balances. These reserves on Bank A's books are matched by $10,000 of the dealer's
     deposits that did not exist before.
19   If business is active, the banks with excess reserves probably will have opportunities to
     loan the $9,000. Of course, they do not really pay out loans from money they receive as
20   deposits. If they did this, no additional money would be created. What they do when they
     make loans is to accept promissory notes in exchange for credits to tile borrower's
21   transaction accounts. Loans (assets) and deposits (liabilities) both rise by $9,000. Reserves
     are unchanged by the loan transactions. But the deposit credits constitute new additions to
22   the total deposits of the banking system.

23   PROOF BANKS DEPOSIT NOTES AND ISSUE BANK CHECKS. THE CHECKS ARE
     ONLY AS GOOD AS THE PROMISSORY NOTE. NEARLY ALL BANK CHECKS
24   ARE CREATED FROM PRIVATE NOTES. FEDERAL RESERVE BANK NOTES
     ARE A PRIVATE CORPORATE NOTE (HJR 192) WE USE NOTES TO DISCHARGE
25   NOTES.
     Excerpt from booklet Your Money, page 7:
26   Other M1 Money
     While demand deposits, traveler's checks, and interest-bearing accounts with unlimited
27   checking authority are not legal tender, they are usually acceptable in payment for
     purchases of goods and services.
28

1    The booklet, "Your Money", is distributed free of charge. Additional copies may be
obtained by writing to: **Federal Reserve Bank of Richmond Public Services**
2    **Department P.O. Box 27622 Richmond, Virginia 23261**

3
### CREDIT LOANS AND VOID CONTRACTS: CASE LAW

4
1. "In the federal courts, it is well established that a national bank has not power to
5    lend its credit to another by becoming surety, endorser, or guarantor for him.'"
<u>Farmers and Miners Bank v. Bluefield Nat 'l Bank</u>, 11 F 2d 83, 271 U.S. 669.

6
2. "A national bank has no power to lend its credit to any person or corporation . . .
7    <u>Bowen v. Needles Nat. Bank</u>, 94 F 925 36 CCA 553, certiorari denied in 20 S.Ct
1024, 176 US 682, 44 LED 637.

8
3. "The doctrine of ultra vires is a most powerful weapon to keep private corporations
9    within their legitimate spheres and to punish them for violations of their corporate
charters, and it probably is not invoked too often ... <u>Zinc Carbonate Co. v. First
10    National Bank</u>, 103 Wis 125, 79 NW 229. <u>American Express Co. v. Citizens State
Bank</u>, 194 NW 430.

11
4. "A bank may not lend its credit to another even though such a transaction turns out
12    to have been of benefit to the bank, and in support of this a list of cases might be
cited, which would *look like a catalog of ships*." [Emphasis added] <u>Norton Grocery
13    Co. v. Peoples Nat. Bank</u>, 144 SE 505. 151 Va 195.
5. "It has been settled beyond controversy that a national bank, under federal Law
14    being limited in its powers and capacity, cannot lend its credit by guaranteeing the
debts of another. All such contracts entered into by its officers are ultra vires . . ."
15    <u>Howard & Foster Co. v. Citizens Nat'l Bank of Union</u>, 133 SC 202, 130 SE
759(1926).

16
6. ". . . checks, drafts, money orders, and bank notes are not lawful money of the
17    United States ..." <u>State v. Neilon</u>, 73 Pac 324, 43 Ore 168.

18
7. "Neither, as included in its powers not incidental to them, is it a part of a bank's
19    business to lend its credit. If a bank could lend its credit as well as its money, it
might, if it received compensation and was careful to put its name only to solid
20    paper, make a great deal more than any lawful interest on its money would amount
to. If not careful, the power would be the mother of panics, . . . Indeed; lending
21    credit is the exact opposite of lending money, which is the real business of a bank,
for while the latter creates a liability in favor of the bank, the former gives rise to a
22    liability of the bank to another. *I Morse. Banks and Banking* 5th Ed. Sec 65;
*Magee, Banks and Banking*, 3rd Ed. Sec 248." <u>American Express Co. v. Citizens
State Bank</u>, 194 NW 429.

23
8. "It is not within those statutory powers for a national bank, even though solvent, to
24    lend its credit to another in any of the various ways in which that might be done."
<u>Federal Intermediate Credit Bank v. L 'Herrison</u>, 33 F 2d 841, 842 (1929).

25
9. "There is no doubt but what the law is that a national bank cannot lend its credit or
26    become an accommodation endorser." National Bank of Commerce v. Atkinson, 55
E 471.

27
10. "A bank can lend its money, but not its credit." <u>First Nat'l Bank of Tallapoosa v.
28    Monroe</u>. 135 Ga 614, 69 SE 1124, 32 LRA (NS) 550.

11. ".. . The bank is allowed to hold money upon personal security; but it must be money that it loans, not its credit." Seligman v. Charlottesville Nat. Bank, 3 Hughes 647, Fed Case No.12, 642, 1039.

12. "A loan may be defined as the delivery by one party to and the receipt by another party of, a sum of money upon an agreement, express or implied, to repay the sum with or without interest." Parsons v. Fox 179 Ga 605, 176 SE 644. Also see Kirkland v. Bailey, 155 SE 2d 701 and United States v. Neifert White Co., 247 Fed Supp 878, 879.

13. "The word 'money' in its usual and ordinary acceptation means gold, silver, or paper money used as a circulating medium of exchange . . ." Lane v. Railey 280 Ky 319, 133 SW 2d 75.

14. "A promise to pay cannot, by argument, however ingenious, be made the equivalent of actual payment ..." Christensen v. Beebe, 91 P 133, 32 Utah 406.

15. "A bank is not the holder in due course upon merely crediting the depositors account." Bankers Trust v. Nagler, 229 NYS 2d 142, 143.

16. "A check is merely an order on a bank to pay money." Young v. Hembree, 73 P2d 393.

17. "Any false representation of material facts made with knowledge of falsity and with intent that it shall be acted on by another in entering into contract, and which is so acted upon, constitutes 'fraud,' and entitles party deceived to avoid contract or recover damages." Barnsdall Refining Corn. v. Birnam Wood Oil Co... 92 F 26 817.

18. "Any conduct capable of being turned into a statement of fact is representation. There is no distinction between misrepresentations effected by words and misrepresentations effected by other acts." Leonard v. Springer 197 Ill 532. 64 NE 301.

19. "If any part of the consideration for a promise be illegal, or if there are several considerations for an unseverable promise one of which is illegal, the promise, whether written or oral, is wholly void, as it is impossible to say what part or which one of the considerations induced the promise." Menominee River Co. v. Augustus Spies L & C Co., 147 Wis 559. 572; 132 NW 1122.

20. "The contract is void if it is only in part connected with the illegal transaction and the promise single or entire." Guardian Agency v. Guardian Mut. Savings Bank, 227 Wis 550, 279 NW 83.

21. "It is not necessary for rescission of a contract that the party making the misrepresentation should have known that it was false, but recovery is allowed even though misrepresentation is innocently made, because it would be unjust to allow one who made false representations, even innocently, to retain the fruits of a bargain induced by such representations." Whipp v. Iverson, 43 Wis 2d 166.

22. "Each Federal Reserve Bank is a separate corporation owned by commercial banks in its region ..." Lewis v. United States, 680 F 20 1239 (1982).

23. In a Debtor's RICO action against its creditor, alleging that the creditor had collected an unlawful debt, an interest rate (where all loan charges were added together) that exceeded, in the language of the RICO Statute, "twice the enforceable rate." The Court found no reason to impose a requirement that the Plaintiff show that the Defendant had been convicted of collecting an unlawful debt, running a "loan sharking" operation. The debt included the fact that exaction of a usurious interest rate rendered the debt unlawful and that is all that is necessary to support the Civil RICO action. <u>Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank,</u> 755 F2d 239, Cert. denied, 473 US 906 (1985).

24. The Supreme Court found that the Plaintiff in a civil RICO action need establish only a criminal "violation" and not a criminal conviction. Further, the Court held that the Defendant need only have caused harm to the Plaintiff by the commission of a predicate offense in such a way as to constitute a "pattern of Racketeering activity." That is, the Plaintiff need not demonstrate that the Defendant is an organized crime figure, a mobster in the popular sense, or that the Plaintiff has suffered some type of special Racketeering injury; all that the Plaintiff must show is what the Statute specifically requires. The RICO Statute and the civil remedies for its violation are to be liberally construed to affect the congressional purpose as broadly formulated in the Statute. <u>Sedima, SPRL v. Imrex Co.,</u> 473 US 479 (1985).

## DEFINITIONS TO KNOW WHEN EXAMINING A BANK CONTRACT

1. **BANK ACCOUNT:** A sum of money placed with a bank or banker, on deposit, by a customer, and subject to be drawn out on the latter's check.

2. **BANK:** whose business it is to receive money on deposit, cash checks or drafts, discount commercial paper, make loans and issue promissory notes payable to bearer, known as bank notes.

3. **BANK CREDIT:** A credit with a bank by which, on proper credit rating or proper security given to the bank, a person receives liberty to draw to a certain extent agreed upon.

4. **BANK DEPOSIT:** Cash, checks or drafts placed with the bank for credit to depositor's account. Placement of money in bank, thereby, creating contract between bank and depositors.

5. **DEMAND DEPOSIT:** The right to withdraw deposit at any time.

6. **BANK DEPOSITOR:** One who delivers to, or leaves with a bank a sum of money subject to his order.

7. **BANK DRAFT:** A check, draft or other form of payment.

8. **BANK OF ISSUE-** Bank with the authority to issue notes which are intended to circulate as currency.

9. **LOAN:** Delivery by one party to, and receipt by another party, a sum of money upon agreement, express or implied, to repay it with or without interest.

10. **CONSIDERATION:** The inducement to a contract. The cause, motive, price or impelling influences, which induce a contracting, party to enter into a contract. The reason or material cause of a contract. (See illegal consideration and impossible consideration.)

11. **check**- A draft drawn upon a bank and payable on demand, signed by the maker or drawer, containing an unconditional promise to pay a certain sum in money to the order of the payee. The Federal Reserve Board defines a check as, "...*a draft or order upon a bank or banking house purporting to be drawn upon a deposit of funds for the payment at all events of, a certain sum of money to a certain person therein named, or to him or his order, or to bearer and payable instantly on demand of.*"

## QUESTIONS ONE MIGHT ASK THE BANK IN AN INTERROGATORY

1. Did the bank loan gold or silver to the alleged borrower?

2. Did the bank loan credit to the alleged borrower?

3. Did the borrower sign any agreement with the bank, which prevents the borrower from repaying the bank in credit?

4. Is it true that your bank creates check book money when the bank grants loans, simply by adding deposit dollars to accounts on the bank's books, in exchange, for the borrower's mortgage note?

5. Has your bank, at any time, used the borrower's mortgage note, "promise to pay", as a deposit on the bank's books from which to issue bank checks to the borrower?

6. At the time of the loan to the alleged borrower, was there one dollar of Federal Reserve Bank Notes in the bank's possession for every dollar owed in Savings Accounts, Certificates of Deposits and check Accounts (Demand Deposit Accounts) for every dollar of the loan?

7. According to the bank's policy, is a promise to pay money the equivalent of money?

8. Does the bank have a policy to prevent the borrower from discharging the mortgage note in "like kind funds" which the bank deposited from which to issue the check?

9. Does the bank have a policy of violating the Deceptive Trade Practices Act?

10. When the bank loan officer talks to the borrower, does the bank inform the borrower that the bank uses the borrowers mortgage note to create the very money the bank loans out to the borrower?

11. Does the bank have a policy to show the same money in two separate places at the same time?

12. Does the bank claim to loan out money or credit from savings and certificates of deposits while never reducing the amount of money or credit from savings accounts or certificates of deposits, which customers can withdraw from?

13. Using the banking practice in place at the time the loan was made, is it theoretically possible for the bank to have loaned out a percentage of the Savings Accounts and Certificates of Deposits?

14. If the answer is "no" to question #13, explain why the answer is no.

15. In regards to question #13, at the time the loan was made, were there enough Federal Reserve Bank Notes on hand at the bank to match the figures represented by every Savings Account and Certificate of Deposit and checking Account (Demand Deposit Account)?

16. Does the bank have to obey, the laws concerning, Commercial Paper; Commercial Transactions, Commercial Instruments, and Negotiable Instruments?

17. Did the bank lend the borrower the bank's assets, or the bank's liabilities?

18. What is the complete name of the banking entity, which employs you, and in what jurisdiction is the bank chartered?

19. What is the bank's definition of "Loan Credit"?

20. Did the bank use the borrowers assumed mortgage note to create new bank money, which did not exist before the assumed mortgage note was signed?

21. Did the bank take money from any Demand Deposit Account (DDA), Savings Account (SA), or a Certificate of Deposit (CD), or any combination of any DDA, SA or CD, and loan this money to the borrower?

22. Did the bank replace the money or credit, which it loaned to the borrower with the borrower's assumed mortgage note?

23. Did the bank take a bank asset called money, or the credit used as collateral for customers' bank deposits, to loan this money to the borrower, and/or did the bank use the borrower's note to replace the asset it loaned to the borrower?

24. Did the money or credit, which the bank claims to have loaned to the borrower, come from deposits of money or credit made by the bank's customers, excluding the borrower's assumed mortgage note?

25. Considering the balance sheet entries of the bank's loan of money or credit to the borrower, did the bank directly decrease the customer deposit accounts (i.e. DDA, SA, and CD) for the amount of the loan?

26. Describe the bookkeeping entries referred to in question #13.

27. Did the bank's bookkeeping entries to record the loan and the borrower's assumed mortgage note ever, at any time, directly decrease the amount of money or credit from any specific bank customer's deposit account?

28. Does the bank have a policy or practice to work in cooperation with other banks or financial institutions use borrower's mortgage note as collateral to create an offsetting amount of new bank money or credit or check book money or DDA generally to equal the amount of the alleged loan?

29. Regarding the borrowers assumed mortgage loan, give the name of the account which was debited to record the mortgage.

30. Regarding the bookkeeping entry referred to in Interrogatory #17 states the name and purpose of the account, which was credited.

31. When the borrower's assumed mortgage note was debited as a bookkeeping entry, was the offsetting entry a credit account?

32. Regarding the initial bookkeeping entry to record the borrower's assumed mortgage note and the assumed loan to the borrower, was the bookkeeping entry credited for the money loaned to the borrower, and was this credit offset by a debit to record the borrower's assumed mortgage note?

33. Does the bank currently or has it ever at anytime used the borrower's assumed mortgage note as money to cover the bank's liabilities referred to above, i.e. DDA, SA and CD?

34. When the assumed loan was made to the borrower, did the bank have every DDA, SA, and CD backed up by Federal Reserve Bank Notes on hand at the bank?

35. Does the bank have an established policy and practice to emit bills of credit which it creates upon its books at the time of making a loan agreement and issuing money or so-called money of credit, to its borrowers?

## SUMMARY OF THIS SECTION

The bank advertised it would loan money, which is backed by legal tender. Is not that what the symbol $ means? Is that not what the contract said? Do you not know there is no agreement or contract in the absence of mutual consent? The bank may say that they gave you a check, you owe the bank money. This information shows you that the check came from the money the alleged borrower provided and the bank never loaned any money from other depositors.

**I've shown you the law and the bank's own literature to prove my case.** All the bank did was trick you. They get your mortgage note without investing one cent, by making you a depositor and not a borrower. **The key to the puzzle is, the bank did not sign the contract. If they did they must loan you the money. If they did not sign it, chances are, they deposited the mortgage note in a checking account and used it to issue a check without ever loaning you money or the bank investing one cent.**

Our Nation, along with every State of the Union, entered into Bankruptcy, in 1933. This changes the law from "gold and silver" legal money and "common law" to the law of

69

bankruptcy. Under Bankruptcy law the mortgage note acts like money. Once you sign the mortgage note it acts like money. The bankers now trick you into thinking they loaned you legal tender, when they never loaned you any of their money.

The trick is they made you a depositor instead of a borrower. They deposited your mortgage note and issued a bank check. **Neither the mortgage note nor the check is legal tender.** The mortgage note and the check are now money created that never existed, prior. The bank got your mortgage note for free without loaning you money, and sold the mortgage note to make the bank check appear legal. The borrower provided the legal tender, which the bank gave back in the form of a check. If the bank loaned legal tender, **as the contract says,** for the bank to legally own the mortgage note, then the people would still own the homes, farms, businesses and cars, nearly debt free and pay little, if any interest. **By the banks not fulfilling the contract by loaning legal tender, they make the alleged borrower, a depositor. This is a fraudulent conversion of the mortgage note. A Fraud is a felony.**

The bank had no intent to loan, making it promissory fraud, mail fraud, wire fraud, and a list of other crimes a mile long. How can they make a felony, legal? They cannot! Fraud is fraud!

The banks deposit your mortgage note in a checking account. The deposit becomes the bank's property. They withdraw money without your signature, and call the money, the banks money that they loaned to you. The bank forgot one thing. If the bank deposits your mortgage note, then the bank must credit your checking account claiming the bank owes you $100,000 for the $100,000 mortgage note deposited. The credit of $100,000 the

1  bank owes you for the deposit allows you to write a check or receive cash. They did not

2  tell you they deposited the money, and they forget to tell you that the $100,000 is money

3  the banks owe you, not what you owe the bank. You lost $100,000 and the bank gained

4

5  $100,000. For the $100,000 the bank gained, the bank received government bonds or cash

6  of $100,000 by selling the mortgage note. For the loan, the bank received $100,000 cash,

7  the bank did not give up $100,000.

8

9      Anytime the bank receives a deposit, the bank owes you the money. You do not

10  owe the bank the money.

11      If you or I deposit anyone's negotiable instrument without a contract authorizing it,

12  and withdraw the money claiming it is our money, we would go to jail. If it was our policy

13  to violate a contract, we could go to jail for a very long time. You agreed to receive a loan,

14  not to be a depositor and have the bank receive the deposit for free. What the bank got for

15

16  free (lien on real property) you lost and now must pay with interest.

17      If the bank loaned us legal tender (other depositors' money) to obtain the mortgage

18  note the bank could never obtain the lien on the property for free. By not loaning their

19  money, but instead depositing the mortgage note the bank creates inflation, which costs

20

21  the consumer money. Plus the economic loss of the asset, which the bank received for

22  free, in direct violation of any signed agreement.

23      We want equal protection under the law and contract, and to have the bank fulfill

24  the contract or return the mortgage note. **We want the judges, sheriffs, and lawmakers**

25

26  **to uphold their oath of office and to honor and uphold the founding fathers U.S.**

27  **Constitution. Is this too much to ask?**

28

71

1   What is the mortgage note? The mortgage note represents your future loan

2   payments. A promise to pay the money the bank loaned you. What is a lien? The lien is a

3   security on the property for the money loaned.

4

5   How can the bank promise to pay money and then not pay? How can they take a

6   promise to pay and call it money and then use it as money to purchase the future payments

7   of money at interest? Interest is the compensation allowed by law or fixed by the parties

8   for the use or forbearance of borrowed money. The bank **never invested any money** to

9

10   receive **your** mortgage note. What is it they are charging interest on?

11   The bank received an asset. They never gave up an asset. Did they pay interest on

12   the money they received as a deposit? A check issued on a deposit received from the

13   borrower cost the bank nothing? Where did the money come from that the bank invested

14

15   to charge interest on?

16   The bank may say we received a benefit. What benefit? Without their benefit we

17   would receive equal protection under the law, which would mean we did not need to give

18   up an asset or pay interest on our own money! Without their benefit we would be free and

19

20   not enslaved. We would have little debt and interest instead of being enslaved in debt and

21   interest. The banks broke the contract, which they never intended to fulfill in the first

22   place. We got a check and a house, while they received a lien and interest for free, through

23   a broken contract, while we got a debt and lost our assets and our country. The benefit is

24

25   the banks, who have placed liens on nearly every asset in the nation, without costing the

26   bank one cent. Inflation and working to pay the bank interest on our own money is the

27   benefit. Some benefit! **What a Shell Game. The Following case (next pages between**

28

72

1  "start" - "end" highlighted in yellow) was an actual trial concerning the issues we

2  have covered. The Judge was extraordinary in-that he had a grasp of the

3  Constitution that I haven't seen often enough in our courts. This is the real thing,

4  absolutely true. This case was reviewed by the Minnesota Supreme Court on their

5  own motion. The last thing in the world that the Bankers and the Judges wanted was

6  case law in favor against the Bankers. However, this case law is real.

7

8  STATE OF MINNESOTA IN JUSTICE COURT COUNTY OF SCOTT
   TOWNSHIP OF CREDIT RIVER CASE NO: 19144
9  MARTIN V. MAHONEY, JUSTICE
   FIRST BANK OF MONTGOMERY, Plaintiff, Vs. Jerome Daly, Defendant.
10 JUDGMENT AND DECREE

11 The above entitled action came on before the court and a jury of 12 on December 7, 1968

12 at 10:00 a.m. Plaintiff appeared by its President Lawrence V. Morgan and was represented

13 by its Counsel Theodore R. Mellby, Defendant appeared on his own behalf

14 A jury of Talesmen were called, impaneled and sworn to try the issues in this case.

15 Lawrence V. Morgan was the only witness called for plaintiff and defendant testified as

16 the only witness in his own behalf

17 Plaintiff brought this as a Common Law action for the recovery of the possession of lot

18 19, Fairview Beach, Scott County, Minn. Plaintiff claimed titled to the Real Property in

19 question by foreclosure of a Note and Mortgage Deed dated May 8, 1964 which plaintiff

20 claimed was in default at the time foreclosure proceedings were started. Defendant

21 appeared and answered that the plaintiff created the money and credit upon its own books

22 by bookkeeping entry as the legal failure of consideration for the Mortgage Deed and

23 alleged that the Sheriff's sale passed no title to plaintiff. The issues tried to the jury were

24 whether there was a lawful consideration and whether Defendant had waived his rights to

25 complain about the consideration having paid on the note for almost 3 years. Mr. Morgan

26 admitted that all of the money or credit which was used as a consideration was created

27 upon their books that this was standard banking practice exercised by their bank in

28 combination with the Federal Reserve Bank of Minneapolis, another private bank, further

   that he knew of no United States Statute of Law that gave the Plaintiff the authority to do

this. Plaintiff further claimed that Defendant by using the ledger book created credit and by paying on the Note and Mortgage waived any right to complain about the consideration and that Defendant was estopped from doing so. At 12:15 on December 7, 1968 the Jury returned a unanimous verdict for the Defendant. Now therefore by virtue of the authority vested in me pursuant to the Declaration of Independence, the Northwest Ordinance of 1787, the Constitution of the United States and the Constitution and laws of the State Minnesota not inconsistent therewith.

## IT IS HEREBY ORDERED, ADJUDGED AND DECREED

1. That Plaintiff is not entitled to recover the possession of lot 19, Fairview Beach, Scott County, Minnesota according to the plat thereof on file in the Register of Deeds office. That because of failure of a lawful consideration the note and Mortgage dated May 8, 1964 is null and void.

2. That the Sheriffs sale of the above described premises held on June 26, 1967 is null and void, of no effect.

3. That Plaintiff has no right, title or interest in said premises or lien thereon, as is above described.

4. That any provision in the Minnesota Constitution and any Minnesota Statute limiting the Jurisdiction of this Court is repugnant to the Constitution of the United States and to the Bill of Rights of the Minnesota Constitution and is null and void and that this Court has Jurisdiction to render complete Justice in this cause.

5. That Defendant is awarded costs in the sum of $75.00 and execution is hereby issued therefore.

6. A 10 day stay is granted.

The following memorandum and any supplemental memorandum made and filed by this Court in support of this judgment is hereby made a part hereof by reference.

BY THE COURT

Dated December 9, 1969

MARTIN V. MAHONEY

Justice of the Peace Credit River Township Scott County, Minnesota

## MEMORANDUM

74

1    The issues in this case were simple. There was no material dispute on the facts for the jury
2    to resolve. Plaintiff admitted that it, in combination with the Federal Reserve Bank of
3    Minneapolis, which are for all practical purposes because of their interlocking activity and
4    practices, and both being Banking Institutions Incorporated under the laws of the United
5    States, are in the Law to be treated as one and the same Bank, did create the entire
6    $14,000.00 in money or credit upon its own books by bookkeeping entry. That this was
7    the Consideration used to support the Note dated May 8, 1964 and the Mortgage of the
8    same date. The Money and credit first came into existence when they credited it. Mr.
9    Morgan admitted that no United States Law of Statute existed which gave him the right to
10   do this. A lawful consideration must exist and be tendered to support the note. (See
11   Anheuser Busch Brewing Co. v. Emma Mason, 44 Minn. 318, 46 NW 558.) The Jury
12   found there was no lawful consideration and I agree Only God can create something of
13   value out of nothing. Even if defendant could be charged with waiver or estoppel as a
14   matter of law this is no defense to the plaintiff. The law leaves wrongdoers where it finds
15   them. ( See sections 50, 5 1, and 52 of Am Jur 2d "Actions" on page 584.") No action will
16   lie to recover on a claim based upon, or in any manner depending upon, a fraudulent,
17   illegal, or immoral transaction or contract to which plaintiff was a party. Plaintiffs act of
18   creating is not authorized by the Constitution and Laws of the United States, is
19   unconstitutional and void, and is not lawful consideration in the eyes of the law to support
20   anything or upon which any lawful rights can be built. Nothing in the Constitution of the
21   United States limits the jurisdiction of this Court, which is one of original jurisdiction with
22   right of trial by jury guaranteed. This is a Common Law Action. Minnesota cannot limit or
23   impair the power of this Court to render complete justice between the parties. Any
24   provisions in the Constitution and laws of Minnesota which attempt to do so is repugnant
25   to the Constitution of the United States and void. No question as to the Jurisdiction of this
26   Court was raised by either party at the trial. Both parties were given complete liberty to
27   submit any and all facts and law to the jury, at least in so far as they saw it. No complaint
28   was made by Plaintiff that Plaintiff did not receive a fair trial. From the admissions made
     by Mr. Morgan the path of duty was made direct and clear for the jury. Their verdict could

1  not reasonably have been otherwise. Justice was rendered completely and without

2  purchase, conformable to the law in this Court on December 7, 1968.

3  **BY THE COURT**

4  **MARTIN V. MAHONEY**

5  **Justice of the Peace Credit River Township Scott County, Minnesota**

6  **Note:** It has never been doubted that a note given on a consideration, which is prohibited

7  by law is void. It has been determined independent of Acts of Congress, that sailing under

8  the license of an enemy is illegal. The emission of Bills of Credit upon the books of these

9  private Corporations for the purposes of private gain is not warranted by the Constitution

10  of the United States and is unlawful. See Craig v. @ 4 peters reports 912, This Court can

11  tread only that path which is marked out by duty. M.V.M.

12  **JUDGE MARTIN MAHONEY DECISION WAS AS FOLLOWS**

13  "For the Justice's fees, the First National Bank deposited @ the Clerk of the District Court

14  the two Federal Reserve Bank Notes. The Clerk tendered the Notes to me (the Judge). As

15  Judge my sworn duty compelled me to refuse the tender. This is contrary to the

16  Constitution of the United States. The States have no power to make bank notes a legal

17  tender. Only gold and silver coin is a lawful tender." (See American Jurist on Money 36

18  sec. 13.)

19  "Bank Notes are a good tender as money unless specifically objected to. Their consent and

20  usage is based upon the convertibility of such notes to coin at the pleasure of the holder

21  upon presentation to the bank for redemption. When the inability of a bank to redeem its

22  notes is openly avowed they instantly lose their character as money and their circulation as

23  currency ceases." (See American Jurist 36-section 9). "There is no lawful consideration for

24  these Federal Reserve Bank Notes to circulate as money. The banks actually obtained

25  these notes for cost of printing - A lawful consideration must exist for a Note. As a matter

26  of fact, the "Notes" are not Notes at all, as they contain no promise to pay." (See 17

27  American Jurist section 85, 215) "The activity of the Federal Reserve Banks of Minnesota,

28  San Francisco and the First National Bank of Montgomery is contrary to public policy and

contrary to the Constitution of the United States, and constitutes an unlawful creation of

money, credit and the obtaining of money and credit for no valuable consideration.

1  Activity of said banks in creating money and credit is not warranted by the Constitution of
2  the United States." "The Federal Reserve Banks and National Banks exercise an exclusive
3  monopoly and privilege of creating credit and issuing Notes at the expense of the public
4  which does not receive a fair equivalent. This scheme is obliquely designed for the benefit
5  of an idle monopoly to rob, blackmail, and oppress the producers of wealth. "The Federal
6  Reserve Act and the National Bank Act are, in their operation and effect, contrary to the
7  whole letter and spirit of the Constitution of the United States, for they confer an unlawful
8  and unnecessary power on private parties; they hold all of our fellow citizens in
9  dependence; they are subversive to the rights and liberation of the people." "These Acts
10 have defiled the lawfully constituted Government of the United States. The Federal
11 Reserve Act and the National Banking Act are not necessary and proper for carrying into
12 execution the legislative powers granted to Congress or any other powers vested in the
13 Government of the United States, but on the contrary, are subversive to the rights of the
14 People in their rights to life, liberty, and property." (See Section 462 of Title 31 U. S.
   Code).
15 "The meaning of the Constitutional provision, 'NO STATE SHALL make anything but
16 Gold and Silver Coin a legal tender ' payment of debts' is direct, clear, unambiguous and
17 without any qualification. This Court is without authority to interpolate any exception. My
18 duty is simply to execute it, as and to pronounce the legal result. From an examination of
19 the case of Edwards v. Kearsey, Federal Reserve Bank Notes (fiat money) which are
20 attempted to be made a legal tender, are exactly what the authors of the Constitution of the
21 United States intend to prohibit. No State can make these Notes a legal tender. Congress is
22 incompetent to authorize a State to make the Notes a legal tender. For the effect of binding
23 Constitution provisions see Cooke v. Iverson. This fraudulent Federal Reserve System and
24 National Banking System has impaired the obligation of Contract promoted disrespect for
25 the Constitution and Law and has shaken society to its foundation." (See 96 U.S. Code
   595 and 108 M 388 and 63 M 147)
26 "Title 31, U.S. Code, Section 432, is in direct conflict with the Constitution insofar, at
27 least, that it attempts to make Federal Reserve Bank Notes a legal tender. The Constitution
28 is the Supreme Law of the Land. Section 462 of Title 31 is not a law, which is made in

77

1   pursuance of the Constitution. It is unconstitutional and void, and I so hold. Therefore, the

2   two Federal Reserve Bank Notes are Null and Void for any lawful purpose in so far as this

3   case is concerned and are not a valid deposit of $2.00 with the Clerk of the District Court

4   for the purpose of effecting an Appeal from this Court to the District Court." "However, of

5   these Federal Reserve Bank Notes, previously discussed, and that is that the Notes are

6   invalid, because of a theory that they are based upon a valid, adequate or lawful

7   consideration. At the hearing scheduled for January 22, 1969, at 7:00 P.M., Mr. Morgan

8   appeared at the trial; he appeared as a witness to be candid, open, direct, experienced and

9   truthful. He testified to years of experience with the Bank of America in Los Angeles, the

    Marquette National Bank of Minnesota and the First National Bank of Minnesota. He

10  seemed to be familiar with the operation of the Federal Reserve System. He freely

11  admitted that his Bank created all of the money and credit upon its books with which it

12  acquired the Note and Mortgage of May 8, 1964. The credit first came into existence when

13  the Bank created it upon its books. Further, he freely admitted that no United States Law

14  gave the Bank the authority to do this. This was obviously no lawful consideration for the

15  Note.

16  The Bank parted with absolutely nothing except a little ink. In this case, the evidence was

17  on January 22, 1969 that the Federal Reserve Bank obtained the Notes for this seems to be

18  conferred by Title 12 USC Section 420. The cost is about 9/10th of a cent per Note

19  regardless of the amount of the Note. The Federal Reserve Banks create all of the money

20  and credit upon their books by bookkeeping entries by which they acquire United States

21  Securities. The collateral required to obtain the Note is, by section 412 USC, Title 12, a

22  deposit of a like amount of bonds. Bonds which the Banks acquire by creating money and

    credit by bookkeeping entry."

23  "No rights can be acquired by fraud. The Federal Reserve Bank Notes are acquired

24  through the use of unconstitutional statutes and fraud." "The Common Law requires a

25  lawful consideration for any contract or Note. These Notes are void for failure at a lawful

26  consideration at Common Law, entirely apart from any Constitutional consideration. Upon

27  this ground, the Notes are ineffectual for any purpose. This seems to be the principal

28  objection to paper fiat money and the cause of its depreciation and failure down through

78

1   the ages. If allowed to continue, Federal Reserve Bank Notes will meet the same fate.

2   From the evidence introduced on January 22, 1969, this Court finds that as of March 18,

3   1969, all Gold and Silver backing is removed from Federal Reserve Bank Notes." "The

4   law leaves wrongdoers where it finds them. (See I Mer. Jur 2nd on Actions Section

5   550)."Slavery and all its incidents, including Peonage, thralldom, and debt created by

6   fraud is universally prohibited in the United States. This case represents but another

7   refined form of Slavery by the Bankers. Their position is not supported by the Constitution

8   of the United States. The People have spoken their will in terms, which cannot be

9   misunderstood. It is indispensable to the preservation of the Union and independence and

10  liberties of the people that this Court, adhere only to the mandate of the Constitution and

11  administer it as it is written. I, therefore, hold these Notes in question void and not

    effectual for any purpose." (4) January 30, 1969

12  Judge Martin V. Mahoney

13  Justice of the Peace Credit River Township

14              **CREDIT LOANS AND VOID CONTRACTS PERFECT**
15              **OBLIGATION AS TO A HUMAN BEING AS TO A BANK**

16          Furthermore, Plaintiff, is offering this Memorandum of law in order for the Court

17  to advance it's understanding of the complex legal issues, present and embodied in the

18  Common Law, with authorities, law and cases in support of, which will constitute the

19  following facts:

20

21  Defendant and other privately owned banks are making loans of "credit" with the intended

22  purpose of circulating "credit" as "money". Other financial institutions and individuals

23  may "launder" bank credit that they receive directly or indirectly from privately owned

24  banks. This collective activity is unconstitutional, unlawful, in violation of Common Law,

25

26  U.S. Code and the principles of equity. Such activity and underlying contracts have long

27  been held void, by State Courts, Federal Courts and the U.S. Supreme Court. This

28

Memorandum will demonstrate through authorities and established common law, that

credit "money creation" by privately owned bank corporations is not really "money

creation" at all. It is the trade specialty and artful illusion of law merchants, which use old-

time trade secrets of the Goldsmiths, to entrap the borrower and unjustly enrich the lender

through usury and other unlawful techniques. Issues based on law and the principles of

equity, which are within the jurisdiction of this Court, will be addressed.

### THE GOLDSMITHS

In his book, *Money and Banking* (8th Edition, 1984), Professor David R.

Kamerschen writes on pages 56 -63: "The first bankers in the modern sense were the

goldsmiths, who frequently accepted bullion and coins for storage ... One result was that

the goldsmiths temporarily could lend part of the gold left with them . . . These loans of

their customers' gold were soon replaced by a revolutionary technique. When people

brought in gold, the goldsmiths gave them notes promising to pay that amount of gold on

demand. The notes, first made payable to the order of the individual, were later changed to

bearer obligations. In the previous form, a note payable to the order of Jebidiah Johnson

would be paid to no one else unless Johnson had first endorsed the note ... But notes were

soon being used in an unforeseen way. The note holders found that, when they wanted to

buy something, they could use the note itself in payment more conveniently and let the

other person go after the gold, which the person rarely did ...The specie, then tended to

remain in the goldsmiths' vaults. . . . The goldsmiths began to realize that they might profit

handsomely by issuing somewhat more notes than the amount of specie they held. . .

These additional notes would cost the goldsmiths nothing except the negligible cost of

80

1    printing them, yet the notes provided the goldsmiths with funds to lend at interest . . . .And

2    they were to find that the profitability of their lending operations would exceed the profit

3    from their original trade. The goldsmiths became bankers as their interest in manufacture

4
5    of gold items to sell was replaced by their concern with credit policies and lending

6    activities . . . They discovered early that, although an unlimited note issue would be

7    unwise, they could issue notes up to several times the amount of specie they held. The key

8
9    to the whole operation lay in the public's willingness to leave gold and silver in the bank's

10   vaults and use the bank's notes. This discovery is the basis of modern banking: On page

11   74, Professor Kamerschen further explains the evolution of the credit system: "Later the

12   goldsmiths learned a more efficient way to put their credit money into circulation. They

13
14   lent by issuing additional notes, rather than by paying out in gold. In exchange for the

15   interest-bearing note received from their customer (in effect, the loan contract), they gave

16   their own non-interest bearing note. Each was actually borrowing from the other ... The

17   advantage of the later procedure of lending notes rather than gold was that . . . more notes

18
19   could be issued if the gold remained in the vaults ... Thus, through the principle of bank

20   note issuance, *banks learned to create money in the form of their own liability*." [Emphasis

21   Added]

22                          **MODERN MONEY MECHANICS**

23           Another publication which explains modern banking as learned from the

24
25   Goldsmiths is *Modern Money Mechanics* (5th edition 1992), published by the Federal

26   Reserve Bank of Chicago which states beginning on page 3: "It started with the

27   goldsmiths ..." At one time, bankers were merely middlemen. They made a profit by

28
                                        81

accepting gold and coins brought to them for safekeeping and lending the gold and coins

to borrowers. But the goldsmiths soon found that the receipts they issued to depositors

were being used as a means of payment. Then, bankers discovered that they could make

loans merely by giving borrowers their promises to pay, or bank notes… In this way,

banks began to create money ... Demand deposits are the modern counterpart of bank

notes . . . It was a small step from printing notes to making book entries to the credit of

borrowers which the borrowers, in turn, could 'spend' by writing checks, thereby printing

*their own* money." [Emphasis added]

### HOW BANKS CREATE MONEY

In the modern sense, banks create money by creating "demand deposits." Demand

deposits are merely "book entries" that reflect how much lawful money the bank owes its

customers. Thus, all deposits are called demand deposits and are the bank's liabilities. The

bank's assets are the vault cash plus all the "IOUs" or promissory notes that the borrower

signs when they borrow either money or credit. When a bank lends its cash (legal money),

it loans its assets, but when a bank lends its "credit" it lends its liabilities. The lending of

credit is, therefore, the exact opposite of the lending of cash (legal money).

At this point, we need to define the meaning of certain words like "lawful money",

"legal tender", "other money" and "dollars". The terms "Money" and "Tender" had their

origins in Article 1, Sec. 8 and Article 1, Sec. 10 of the *Constitution of the United States*.

12 U.S.C. §152 refers to "gold and silver coin as lawful money of the United States" and

was unconstitutionally repealed in 1994 in that Congress **can not delegate** any portion of

their constitutional responsibility without Amendment. The term "legal tender" was

originally cited in 31 U.S.C.A. §392 and is now re-codified in 31 U.S.C.A. §5103 which

states: "United States coins and currency . . . are legal tender for all debts, public charges,

taxes, and dues." The common denominator in both "lawful money" and "legal tender

money" is that the United States Government issues both.

With Bankers, however, we find that there are two forms of money – one is

government-issued, and privately owned banks such as Defendant, (Name of Bank) Bank,

issue the other. As we have already discussed government issued forms of money, we

must now scrutinize privately issued forms of money.

All privately issued forms of money today are based upon the liabilities of the

issuer. There are three common terms used to describe this privately created money. They

are "credit", "demand deposits" and "checkbook money". In the Sixth edition of Blacks

Law Dictionary, p.367 under the term "Credit" the term "Bank credit" is described as:

"Money bank owes or will lend a individual or person". It is clear from this definition that

"Bank credit" which is the "money bank owes" is the bank's liability. The term

"checkbook money" is described in the book *"I Bet You Thought"*, published by the

privately owned Federal Reserve Bank of New York, as follows: "Commercial banks

create checkbook money whenever they grant a loan, simply by adding deposit dollars to

accounts on their books to exchange for the borrowers IOU . . . ." The word "deposit" and

"demand deposit" both mean the same thing in bank terminology and refer to the bank's

liabilities. For example, the Chicago Federal Reserves publication, *"Modern Money*

*Mechanics"* states: "Deposits are merely book entries ... Banks can build up deposits by

increasing loans ... Demand deposits are the modern counterpart of bank notes. It was a

small step from printing notes to making book entries to the credit of borrowers which the

borrowers, in turn, could 'spend' by writing checks. Thus, it is demonstrated in "Modern

Money Mechanics" how, under the practice of fractional reserve banking, a deposit of

$5,000 in cash could result in a loan of credit/checkbook money/demand deposits of

$100,000 if reserve ratios set by the Federal Reserve are 5% (instead of 10%).

In a practical application, here is how it works. If a bank has ten people who each

deposit $5,000 (totaling $50,000) in cash (legal money) and the bank's reserve ratio is 5%,

then the bank will lend twenty times this amount, or $1,000,000 in "credit" money. What

the bank has actually done, however, is to write a check or loan its credit with the intended

purpose of circulating credit as "money." Banks know that if all the people who receive a

check or credit loan come to the bank and demand cash, the bank will have to close its

doors because it doesn't have the cash to back up its check or loan. The bank's check or

loan will, however, pass as money as long as people have confidence in the illusion and

don't demand cash. Panics are created when people line up at the bank and demand cash

(legal money), causing banks to fold as history records in several time periods, the most

recent in this country was the panic of 1933.

## THE PROCESS OF PASSING CHECKS OR
## CREDIT AS MONEY IS DONE QUITE SIMPLY

A deposit of $5,000 in cash by one person results in a loan of $100,000 to another

person at 5% reserves. The person receiving the check or loan of credit for $100,000

usually deposits it in the same bank or another bank in the Federal Reserve System. The

check or loan is sent to the bookkeeping department of the lending bank where a book

entry of $100,000 is credited to the borrower's account. The lending bank's check that

84

created the borrower's loan is then stamped "Paid" when the account of the borrower is

credited a "dollar" amount. The borrower may then "spend" these book entries (demand

deposits) by writing checks to others, who in turn deposit their checks and have book

entries transferred to their account from the borrower's checking account. However, two

highly questionable and unlawful acts have now occurred. The first was when the bank

wrote the check or made the loan with insufficient funds to back them up. The second is

when the bank stamps its own "Not Sufficient Funds" check "paid" or posts a loan by

merely crediting the borrower's account with book entries the bank calls "dollars."

Ironically, the check or loan seems good and passes as money -- unless an emergency

occurs via demands for cash - or a Court challenge -- and the artful, illusion bubble,

bursts.

## DIFFERENT KINDS OF MONEY

The book, "*I Bet You Thought*", published by the Federal Reserve Bank of New

York, states: "Money is any generally accepted medium of exchange, not simply coin and

currency. Money *doesn't* have to be intrinsically valuable, *be issued by a government* or be

in any special form." [Emphasis added] Thus we see that privately issued forms of money

only require public confidence in order to pass as money. Counterfeit money also passes

as money as long as nobody discovers it's counterfeit. Like wise, "bad" checks and

"credit" loans pass as money so long as no one finds out they are unlawful. Yet, once the

fraud is discovered, the values of such "bank money" like bad check's ceases to exist.

There are, therefore, two kinds of money -- government issued legal money and privately

issued unlawful money.

## DIFFERENT KINDS OF DOLLARS

The dollar once represented something intrinsically valuable made from gold or silver. For example, in 1792, Congress defined the silver dollar as a silver coin containing 371.25 grains of pure silver. The legal dollar is now known as "United States coins and currency." However, the Banker's dollar has become a unit of measure of a different kind of money. Therefore, with Bankers there is a "dollar" of coins and a dollar of cash (legal money), a "dollar" of debt, a "dollar" of credit, a "dollar" of checkbook money or a "dollar" of checks. When one refers to a dollar spent or a dollar loaned, he should now indicate what kind of "dollar" he is talking about, since Bankers have created so many different kinds.

A dollar of bank "credit money" is the exact opposite of a dollar of "legal money". The former is a liability while the latter is an asset. Thus, it can be seen from the earlier statement quoted from *I Bet You Thought*, that money can be privately issued as: "Money doesn't have to ... be issued by a government or be in any special form." It should be carefully noted that banks that issue and lend privately created money demand to be paid with government issued money. However, payment in like kind under natural equity would seem to indicate that a debt created by a loan of privately created money can be paid with other privately created money, without regard for "any special form" as there are no statutory laws to dictate how either private citizens or banks may create money.

## BY WHAT AUTHORITY?

By what authority do state and national banks, as privately owned corporations, create money by lending their credit --or more simply put - by writing and passing "bad"

checks and "credit" loans as "money"? Nowhere can a law be found that gives banks the authority to create money by lending their liabilities.

Therefore, the next question is, if banks are creating money by passing bad checks and lending their credit, where is their authority to do so? From their literature, banks claim these techniques were learned from the trade secrets of the Goldsmiths. It is evident; however, that money creation by private banks is not the result of powers conferred upon them by government, but rather the artful use of long held "trade secrets." Thus, unlawful money creation is not being done by banks as corporations, but unlawfully by bankers.

**Article I, Section 10, para. 1 of the** *Constitution of the United States of America* **specifically states that no state shall "... coin money, emit bills of credit, make any thing but gold and silver coin a Tender in Payment of Debts**, pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligations of Contracts . . ." [Emphasis added]

**The states, which grant the Charters of state banks also, prohibit the emitting of Bills of credit by not granting such authority in bank charters.** It is obvious that "We the people" never delegated to Congress, state government, or agencies of the state, the power to create and issue money in the form of checks, credit, or other "bills of credit." The Federal Government today does not authorize banks to emit, write, create, issue and pass checks and credit as money. But banks do, and get away with it! Banks call their privately created money nice sounding names, like "credit", "demand deposits", or "checkbook money". However, the true nature of "credit money" and "checks" does not change regardless of the poetic terminology used to describe them. Such money in common use by privately owned banks is illegal under Art. 1, Sec. 10, para. 1 of the

87

Constitution of the United States of America, as well as unlawful under the laws of the

United States and of this State.

## VOID "ULTRA VIRES" CONTRACTS

The courts have long held that when a corporation executes a contract beyond the scope of

its charter or granted corporate powers, the contract is void or "ultra vires".

1. In _Central Transp. Co. v. Pullman_, 139 U.S. 60, 11 S. Ct. 478, 35 L. Ed. 55, the court said: "A contract _ultra vires_ being unlawful and void, not because it is in itself immoral, but because the corporation, by the law of its creation, is incapable of making it, the courts, while refusing to maintain any action upon the unlawful contract, have always striven to do justice between the parties, so far as could be done consistently with adherence to law, by permitting property or money, parted with on the faith of the unlawful contract, to be recovered back, or compensation to be made for it. In such case, however, the action is not maintained upon the unlawful contract, nor according to its terms; but on an implied contract of the defendant to return, or, failing to do that, to make compensation for, property or money which it has no right to retain. To maintain such an action is not to affirm, but to disaffirm, the unlawful contract."

2. "When a contract is once declared ultra vires, the fact that it is executed · does not validate it, nor can it be ratified, so as to make it the basis of suitor action, nor does the doctrine of estoppel apply." _F& PR v. Richmond_, 133 SE 898; 151 Va 195.

3. "A national bank ... cannot lend its credit to another by becoming surety, indorser, or guarantor for him, such an act ; is ultra vires . . ." _Merchants' Bank v. Baird_ 160 F 642. (Additional cases are cited as footnotes at the end of this Memorandum.)

## THE QUESTION OF LAWFUL CONSIDERATION

The issue of whether the lender who writes and passes a "bad" check or makes a

"credit" loan has a claim for relief against the borrower is easy to answer, providing the

lender can prove that he gave a lawful consideration, based upon lawful acts. But did the

lender give a lawful consideration? **To give a lawful consideration, the lender must**

**prove that he gave the borrower lawful money such as coins or currency. Failing**

**that, he can have no claim for relief in a court at law against the borrower as the**

**lender's actions were ultra vires or void from the beginning of the transaction.**

88

It can be argued that "bad" checks or "credit" loans that pass as money are valuable; but so are counterfeit coins and currency that pass as money. It seems unconscionable that a bank would ask homeowners to put up a homestead as collateral for a "credit loan" that the bank created out of thin air. Would this court of law or equity allow a counterfeiter to foreclose against a person's home because the borrower was late in payments on an unlawful loan of counterfeit money? Were the court to do so, it would be contrary to all principles of law.

The question of valuable consideration in the case at bar, does not depend on any value imparted by the lender, but the false confidence instilled in the "bad" check or "credit" loan by the lender. In a court at law or equity, the lender has no claim for relief. The argument that because the borrower received property for the lender's "bad" check or "credit" loan gives the lender a claim for relief is not valid, unless the lender can prove that he gave lawful value. The seller in some cases who may be holding the "bad" check or "Credit" loan has a claim for relief against the lender or the borrower or both, but the lender has no such claim.

## **BORROWER RELIEF**

Since we have established that the lender of unlawful or counterfeit money has no claim for relief under a void contract, the last question should be, does the borrower have a claim for relief against the lender? First, if it is established that the borrower has made no payments to the lender, then the borrower has no claim for relief 'against the lender for money damages. But the borrower has a claim for relief to void the debt he owes the

89

lender for notes or obligations unlawfully created by an ultra vires contract for lending "credit" money.

**The borrower, the Courts have long held, has a claim for relief against the lender to have the note, security agreement, or mortgage note the borrower signed declared null and void.**

The borrower may also have claims for relief for breach of contract by the lender for not lending "lawful money" and for "usury" for charging an interest rate several times greater than the amount agreed to in the contract for any lawful money actually risked by the lender. For example, if on a $100,000 loan it can be established that the lender actually risked only $5,000 (5% Federal Reserve ratio) with a contract interest rate of 10%, the lender has then loaned $95,000 of "credit" and $5,000 of "lawful money". However, while charging 10% interest ($10,000) on the entire $100,000. The true interest rate on the $5,000 of "lawful money" actually risked by the lender is 200% which **violates Usury laws of this state.**

**If no "lawful money" was loaned, then the interest rate is an infinite percentage. Such techniques the bankers say were learned from the trade secrets of the Goldsmiths. The Courts have repeatedly ruled that such contracts with borrowers are wholly void from the beginning of the transaction, because banks are not granted powers to enter into such contracts by either state or national charters.**

## ADDITIONAL BORROWER RELIEF

In Federal District Court the borrower may have additional claims for relief under "Civil RICO" Federal Racketeering laws (18 U.S.C. §1964). The lender may have

established a "pattern of racketeering activity" by using the U.S. Mail more than twice to

collect an unlawful debt and the lender may be in violation of 18 U.S.C. §§§§1341, 1343,

1961 and 1962.

The borrower has other claims for relief if he can prove there was or is a conspiracy

to deprive him of property without due process of law under. (42 U.S.C.§§§1983

(Constitutional Injury), 1985(Conspiracy) and 1986 ("Knowledge" and "Neglect to

Prevent" a U.S. Constitutional Wrong). Under 18 U.S.C.A.§ 241 (Conspiracy) violators,

"shall be fined not more than $10,000 or imprisoned not more than ten (10) years or both."

In a Debtor's RICO action against its creditor, alleging that the creditor had collected an

unlawful debt, an interest rate (where all loan charges were added together) that exceeded,

in the language of the RICO Statute, "twice the enforceable rate." The Court found no

reason to impose a requirement that the Plaintiff show that the Defendant had been

convicted of collecting an unlawful debt, running a "loan sharking" operation. The debt

included the fact that exaction of a usurious interest rate rendered the debt unlawful and

that is all that is necessary to support the Civil RICO action. Durante Bros. & Sons, Inc. v.

Flushing Nat'l Bank. 755 F2d 239, Cert. denied, 473 US 906 (1985).

The Supreme Court found that the Plaintiff in a civil RICO action, need establish

only a criminal "violation" and not a criminal conviction. Further, the Court held that the

Defendant need only have caused harm to the Plaintiff by the commission of a predicate

offense in such a way as to constitute a "pattern of Racketeering activity." That is, the

Plaintiff need not demonstrate that the Defendant is an organized crime figure, a mobster

in the popular sense, or that the Plaintiff has suffered some type of special Racketeering

injury; all that the Plaintiff must show is what the Statute specifically requires. The RICO

Statute and the civil remedies for its violation are to be liberally construed to effect the

congressional purpose as broadly formulated in the Statute. Sedima, SPRL v. Imrex Co.,

473 US 479 (1985).

Aside from any legal obligation, there exists a societal and moral obligation enure

to both the Plaintiff and the Defendant in that if you were to defuse a Bomb, and you

completed the task 99% correct, you are still dead. Plaintiff believes that his position on

the law is sound, but fears grievous repercussions throughout the financial community if

he should prevail. The credit for money scheme is endemic throughout our society and

could have devastating effects on the national economy.

Plaintiff believes that another approach may be explored as follows:

## PERFECT OBLIGATION AS TO A HUMAN BEING

That which is borrowed is wealth. Labor created that wealth, so it is money

notwithstanding its form. Consideration is promised in advance by the Promissor of the

Note, in the nature of principal and interest payments for the consideration provided by the

lender, which is his personal wealth created by his labor.

A Mortgage Note or Promissory Note secures the position of the lender and if there

is default on the promise to pay then the borrower has agreed to accept the strict

foreclosure remedy provided by state statutes.

Then the borrower obligated themselves to pay back the principal and pay for the

use of it, in the form of interest for the years over which the principal is to be paid back.

**When payments stop there is a prima facie injury to the lender.** When payments stop

1  the lender has strict foreclosure procedure in state court to remedy the pay back of the

2  balance of the principal.

3
4          Judgment to foreclose on the property is granted upon the mere proof that payments

5  have ceased as promised. The property is sold to cover the unpaid balance; deficiency

6  judgment may be needed. All is right with the world. Here the lender would be prejudiced

7  if complete and swift remedy were not available. Absent such remedy the government

8
9  would be party to placing the lender into a condition of involuntary servitude to the

10  borrower.

11              **PERFECT OBLIGATION AS TO A BANK**

12          In years past banks and savings and loans institutions enjoyed the remedy outlined

13  above. The reason was they were lending out money belonging to their depositors and

14
15  there was prima facie injury to the depositors upon the mere proof that payments had

16  ceased. Thereby the bank as well as the government would be party to creating a condition

17  of involuntary servitude upon the depositors if strict foreclosure remedy were not

18
19  available. Today depositors are not in jeopardy of being injured when a person borrows

20  money from a bank. The bank does not lead their money, only their credit in the amount of

21  the loan (paper accounting). Hence no prima facie injury exists to either the depositors or

22  the bank upon the mere proof that payments cease. Injury is based upon the payments

23  made as to the credit line.

24
25              **PERFECT OR IMPERFECT OBLIGATION**

26          A perfect obligation is one recognized and sanctioned by positive law; one of

27  which the fulfillment can be enforced by the aid of the law. But if the duty created by the

28

obligation operates only on the moral sense, without being enforced by any positive law, it is called an "imperfect obligation," and creates no right of action, nor has it any legal operation. The duty of exercising gratitude, charity, and the other merely moral duties are examples of this kind of obligation. Edwards v. Keaney, 96 U.S. 595, 600, 24 L.Ed. 793. Government approved the Federal Reserve Bank, Inc., as the Central Banking system for the United States, and it's policy is reviewed by Congress albeit, in a haphazard manner. The Federal Reserve authorizes it's "private money" "Federal Reserve Bank Notes" to be used by lending institutions such as member banks, to operate upon a system of fractionalizing. The nature of which is that they do not lend either their money or the money of the depositors, the money is created out of thin air, by the mere stroke of a pen. When there is no consideration in jeopardy of being returned, then the obligation is to make the bank injury proof, to the extent of the obligation, which would be to make them whole.

The only legal obligation is based upon the moral issue, which under the law is an Imperfect Obligation, to return to them their property, which isn't wealth, but credit. A Promissory Note is signed under "economic compulsion" when, the "loan" will not be consummated unless and until the borrower signs it. Thus, performing the act of signing a Promissory Note cannot be considered voluntary.

The discharging of the credit is based upon social, economic, and moral standards to make the bank whole, if injury is claimed, in any court action where default on the Promissory Note is on record and where the bank fails to verify an injury, the bank cannot enforce a promise to pay consideration where they provided no consideration. For the

1   bank to be able to force upon the defendant an amount over and above the credit, is to

2   force upon the defendants a debt that goes to the control of their labor against their will.

3   This condition would be Peonage, which has be en abolished in this country.

4
5   (42 U.S.C. § 1994, and 18 U.S.C. §1581.)

6       The question then arises as to when is the obligation discharged, to put the bank in

7   a position, where there is no record of injury to it?

8
9                    **BANK CREDIT LOAN EXAMPLE**

10      When a person borrows $100,000.00 at 10 % interest amortized over 30 years at a

11  cost of 4 points, is not the $4,000.00 for points the profit to the bank? In the paperwork the

12  borrower is charged the $4,000.00 for points. In essence the bank only provides

13  $96,000.00 for a $100,000.00 loan, thereby causing the cost of the loan to be more than
14
15  $100,000.00. Example: the borrower's cost of the Note is 10 % of $100,000.00, or

16  $10,000.00 for the bank's investment of $96,000.00. $10,000.00 divided by $96,000.00 =

17  10.42 annual percentage rate (APR). In this process the profit to the bank is received at the

18
19  closing table. **This raises the question at what point in making payments can the**

20  **holder of the Note no longer sustain injury?**

21      Monthly payments should be $878.00 for a $100,000.00 loan at 10 % interest

22  amortized over 30 years [$8.78 per $1,000.00 = $8.78 x 100 = $878.00/month]. The

23  $100,000.00 loan divided by $878.00/monthly payments = 113.4 payments; or after
24
25  making 114 payments x $878.00 a total of $100,092.00 has been paid.

26      After 114 payments the credit lined provided by the loan has been discharged. Does

27  injury exist to the bank after the 114th payment? The answer is NO. Where the credit line

28
                                    95

1    of $100,000.00 is discharged, where is the injury? There is only injury to the bank where

2    payments have not been made for 9 ½ years (114 payments).

3
4        If payments stop before the 114th payment then whatever injury exists must be

5    based upon a verified complaint of injury; e.g, that which remains to discharge the credit

6    line after 57 payments is approximately $50,000.00 [57 x $878.00 = $50,046.00].

7    **WHAT HAPPENS WHEN PAYMENTS STOP AFTER THE 114TH PAYMENT?**

8        The plan is for the borrower to pay $878.00 x 360 payments; or $316,080.00 (over
9
10   30 years) for a credit line of $100,000.00.

11       The first payment of $878.00 includes principal of $55.00 and interests $833.00.

12   When payments stop prematurely the bank uses the state's strict foreclosure laws color

13   ably as if the bank's wealth or the wealth of the depositors is in jeopardy of being returned.
14
15   "Colorable transaction, one presenting an appearance which does not correspond with the

16   reality, and, ordinarily, an appearance intended to conceal or to deceive. (Black's Law

17   Dictionary 6th Edition.)

18       Is, or is not, a transaction with the bank colorable?
19
20       Plaintiff believes if the borrower stops the payments before the credit line is

21   exhausted then it can be charged that the borrower intended to injure the bank; but that the

22   bank intends to injure the borrower if the borrower has made 114 payments and the bank

23   forecloses intending for the court to rule in their favor. Plaintiff believes that forced
24
25   collection of anything over the $100,000.00 is injury to the borrower and is a debt that

26   goes to control their labor against their will. Enforcement of this service is a prohibited

27   condition of peonage.

28

It is taken that the plaintiff permits the Bank to use the court's process and the state's strict foreclosure procedures as if the bank arranged for consideration to be part of the transaction when the Plaintiff does not refuse to accept the enforcement of this service for the reason that they can only make a defense based upon a verified complaint of injury to the bank since the bank provided no consideration in the transaction. Plaintiff has yet to see a verified complaint of injury filed in these proceedings.

In the example where 114 payments had been made, and then payments stop, the credit line is discharged. The bank however, based upon the former practice (policy) will claim through a third party, their attorney, using the records color ably in a non verified complaint, that an outstanding balance of approximately $90,000.00 exists on the 30 year amortized Promissory Note as if the bank provided consideration.

**Under such circumstances the foreclosure procedure used intends to injure the Plaintiffs where there is no verified complaint of injury to defend against.**

**Due process is violated when the court makes judgment in favor of the bank upon the mere proof that the borrower stopped making payments. There is no verified complaint of injury to the bank; thereby the strict foreclosure procedure has the result of the court, imposing injury to the Plaintiff in an amount certain.**

Plaintiffs believe the enforcement of this service is peonage. Plaintiffs argue that if the borrower does not refuse to accept for cause, without dishonor, the rebuttable presumptions in the non-verified complaint then they accept being controlled by the court's process and the proceedings is to the non-verified claims. If the Plaintiffs make a proper record (by affidavit) of refusing to accept the non-verified complaint and

1   proceedings and their reasons are not controverted with evidence (by affidavit) then a

2   record is made that the claims in the non-verified complaint are irrefutable presumptions.

3   Bailey v. Alabama, 219 U.S. 2193.

4

5        **Absent a verified complaint of a damaged party, the Plaintiff having**

6   **repaid the principle of the original loan, can not be held to peonage for the**

7   **satisfaction of an imperfect obligation.**

8        <u>CONTINUATION OF CASE CITES IN SUPPORT</u>
9   <u>THE FOLLOWING CASE CITES ALSO SUPPORT THIS MEMORANDUM</u>

10   1.  "A bank may not lend its credit to another even though such a transaction turns out
        to have been of benefit to the bank, and in support of this a list of cases might be
11      cited, which would *look like a catalog of ships*." [Emphasis added] <u>Norton Grocery</u>
        <u>Co. v. Peoples Nat. Bank</u>, 144 SE 505. 151 Va 195.
12
     2.  "In the federal courts, it is well established that a national bank has not power to
13      lend its credit to another by becoming surety, indorser, or guarantor for him.'"
        Farmers and Miners Bank v. Bluefield <u>Nat'l Bank</u>, 11 F 2d 83, 271 U.S. 669.
14
     3.  "A national bank has no power to lend its credit to any person or corporation . . .
15      <u>Bowen v. Needles Nat. Bank</u>, 94 F 925 36 CCA 553, certiorari denied in 20 S.Ct
        1024, 176 US 682, 44 LED 637.
16
     4.  "The doctrine of ultra vires is a most powerful weapon to keep private corporations
17      within their legitimate spheres and to punish them for violations of their corporate
        charters, and it probably is not invoked too often .. . <u>Zinc Carbonate Co. v. First</u>
18      <u>National Bank</u>, 103 Wis 125, 79 NW 229. <u>American Express Co. v. Citizens State</u>
        <u>Bank</u>, 194 NW 430.
19
     5.  "It has been settled beyond controversy that a national bank, under federal Law
20      being limited in its powers and capacity, cannot lend its credit by guaranteeing the
        debts of another. All such contracts entered into by its officers are ultra vires . . ."
21      <u>Howard & Foster Co. v. Citizens Nat'l Bank of Union</u>, 133 SC 202, 130 SE
        759(1926).
22
     6.  ". . . checks, drafts, money orders, and bank notes are not lawful money of the
23      United States ..." <u>State v. Neilon</u>, 73 Pac 324, 43 Ore 168.

24   7.  "Neither, as included in its powers not incidental to them, is it a part of a bank's
        business to lend its credit. If a bank could lend its credit as well as its money, it
25      might, if it received compensation and was careful to put its name only to solid
        paper, make a great deal more than any lawful interest on its money would amount
26      to. If not careful, the power would be the mother of panics, . . . Indeed, lending
        credit is the exact opposite of lending money, which is the real business of a bank,
27      for while the latter creates a liability in favor of the bank, the former gives rise to a
        liability of the bank to another. *I Morse. Banks and Banking* 5th Ed. Sec 65;
28

*Magee, Banks and Banking*, 3rd Ed. Sec 248." <u>American Express Co. v. Citizens State Bank</u>, 194 NW 429.

8. "It is not within those statutory powers for a national bank, even though solvent, to lend its credit to another in any of the various ways in which that might be done." <u>Federal Intermediate Credit Bank v. L 'Herrison</u>, 33 F 2d 841, 842 (1929).

9. "There is no doubt but what the law is that a national bank cannot lend its credit or become an accommodation endorser." <u>National Bank of Commerce v. Atkinson</u>, 55 E 471.

10. "A bank can lend its money, but not its credit." <u>First Nat'l Bank of Tallapoosa v. Monroe</u> . 135 Ga 614, 69 SE 1124, 32 LRA (NS) 550.

11. "... the bank is allowed to hold money upon personal security; but it must be money that it loans, not its credit." <u>Seligman v. Charlottesville Nat. Bank</u>, 3 Hughes 647, Fed Case No.12, 642, 1039.

12. "A loan may be defined as the delivery by one party to, and the receipt by another party of, a sum of money upon an agreement, express or implied, to repay the sum with or without interest." Parsons v. Fox 179 Ga 605, 176 SE 644. Also see <u>Kirkland v. Bailey</u>, 155 SE 2d 701 and <u>United States v. Neifert White Co.</u>, 247 Fed Supp 878, 879.

13. "The word 'money' in its usual and ordinary acceptation means gold, silver, or paper money used as a circulating medium of exchange . . ." <u>Lane v. Railey</u> 280 Ky 319, 133 SW 2d 75.

14. "A promise to pay cannot, by argument, however ingenious, be made the equivalent of actual payment ..." <u>Christensen v. Beebe</u>, 91 P 133, 32 Utah 406.

15. "A bank is not the holder in due course upon merely crediting the depositors account." <u>Bankers Trust v. Nagler</u>, 229 NYS 2d 142, 143.

16. "A check is merely an order on a bank to pay money." <u>Young v. Hembree</u>, 73 P2d 393.

17. "Any false representation of material facts made with knowledge of falsity and with intent that it shall be acted on by another in entering into contract, and which is so acted upon, constitutes 'fraud,' and entitles party deceived to avoid contract or recover damages." <u>Barnsdall Refining Corn. v. Birnam Wood Oil Co.</u> 92 F 26 817.

18. "Any conduct capable of being turned into a statement of fact is representation. There is no distinction between misrepresentations effected by words and misrepresentations effected by other acts." <u>Leonard v. Springer</u> 197 Ill 532. 64 NE 301.

19. "If any part of the consideration for a promise be illegal, or if there are several considerations for an unseverable promise one of which is illegal, the promise, whether written or oral, is wholly void, as it is impossible to say what part or which one of the considerations induced the promise." <u>Menominee River Co. v. Augustus Spies L & C Co.</u>, 147 Wis 559-572; 132 NW 1122.

20. "The contract is void if it is only in part connected with the illegal transaction and the promise single or entire." <u>Guardian Agency v. Guardian Mut. Savings Bank</u>, 227 Wis 550, 279 NW 83.

21. "It is not necessary for rescission of a contract that the party making the misrepresentation should have known that it was false, but recovery is allowed even though misrepresentation is innocently made, because it would be unjust to allow one who made false representations, even innocently, to retain the fruits of a bargain induced by such representations." <u>Whipp v. Iverson</u>, 43 Wis 2d 166.

22. "Each Federal Reserve bank is a separate corporation owned by commercial banks in its region ..." <u>Lewis v. United States</u>, 680 F 20 1239 (1982).

## LAW OF THE CASE

The law of the case is decreed as follows:

It is the public policy of this state that public agencies exist to aid in the conduct of the people's business....The people of this state do not yield their sovereignty to the agencies which serve them.

In enacting this chapter, the Legislature finds and declares that the public commissions, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business....The people of this State do not yield their sovereignty to the agencies which serve them.

Laws, whether organic or ordinary, are either written or unwritten.

A written law is that which is promulgated in writing, and of which a record is in existence.

The organic law is the Constitution of Government, and is altogether written. Other written laws are denominated statutes. The written law of this State is therefore contained in its Constitution and statutes, and in the Constitution and statutes of the United States.

Any judicial record may be impeached by evidence of a want of jurisdiction in the Court or judicial officer, of collusion between the parties, or of fraud in the party offering the record, in respect to the proceedings.

...at the Revolution, the sovereignty devolved on the people; and they are truly the sovereigns of the country, but they are sovereigns without subjects...with none to govern but themselves..... [CHISHOLM v. GEORGIA (US) 2 Dall 419, 454, 1 L Ed 440, 455 DALL (1793) pp471-472.]

The very meaning of 'sovereignty' is that the decree of the sovereign makes law. [American Banana Co. v. United Fruit Co., 29 S.Ct. 511, 513, 213 U.S. 347, 53 L.Ed. 826, 19 Ann.Cas. 1047.]

The people of this State, as the successors of its former sovereign, are entitled to all the rights which formerly belonged to the King by his prerogative. [Lansing v. Smith, 4 Wend. 9 (N.Y.) (1829), 21 Am.Dec. 89 10C Const. Law Sec. 298; 18 C Em.Dom. Sec. 3, 228; 37 C Nav.Wat. Sec. 219; Nuls Sec. 167; 48 C Wharves Sec. 3, 7.]

A consequence of this prerogative is the legal *ubiquity* of the king. His majesty in the eye

1  of the law is always present in all his courts, though he cannot personally distribute
2  justice. (Fortesc.c.8. 2Inst.186) His judges are the mirror by which the king's image is
   reflected. 1 Blackstone's Commentaries, 270, Chapter 7, Section 379.

3  ....This declaration of rights may not be construed to impair or deny others retained by the
   people."
4
   The state cannot diminish rights of the people. [Hertado v. California, 100 US 516.]
5
   The assertion of federal rights, when plainly and reasonably made, is not to be defeated
6  under the name of local practice. [Davis v. Wechsler, 263 US 22, 24.]

7  Where rights secured by the Constitution are involved, there can be no rule making or
   legislation which would abrogate them. [Miranda v. Arizona, 384 US 436, 491.]
8
   There can be no sanction or penalty imposed upon one because of this exercise of
9  constitutional rights. [Sherer v. Cullen, 481 F 946.]

10  Whereas, the people of Arizona have presented a constitution....and which, on due
    examination, is found to be republican in its form of government....
11
    Republican government. One in which the powers of sovereignty are vested in the people
12  and are exercised by the people, either directly, or through representatives chosen by the
    people, to whom these powers are specially delegated. [In re Duncan, 139 U.S. 449, 11
13  S.Ct. 573, 35 L.Ed. 219; Minor v. Happersett, 88 U.S. (21 Wall.) 162, 22 L.Ed. 627."
    Black's Law Dictionary, Fifth Edition, p. 626.]
14
    The State of Arizona is an inseparable part of the United States of America, and the
15  United States Constitution is the supreme law of the land.

16  This Constitution, and the Laws of the United States which shall be made in Pursuance
    thereof; and all Treaties made, or which shall be made, under the Authority of the United
17  States, shall be the supreme Law of the Land; and the Judges in every State shall be bound
    thereby; any Thing in the Constitution or Laws of any State to the Contrary
18  notwithstanding. [Constitution for the United States of America, Article VI, Clause 2.]
    Conspiracy against rights: If two or more persons conspire to injure, oppress, threaten, or
19  intimidate any person in any State, Territory, Commonwealth, Possession, or District in
    the free exercise or enjoyment of any right or privilege secured to him by the Constitution
20  or laws of the United States, or because of his having so exercised the same; or If two or
    more persons go in disguise on the highway, or on the premises of another, with intent to
21  prevent or hinder his free exercise or enjoyment of any right or privilege so secured - They
    shall be fined under this title or imprisoned not more than ten years, or both; and if death
22  results from the acts committed in violation of this section or if such acts include
    kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit
23  aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or
    imprisoned for any term of years or for life, or both, or may be sentenced to death. [18,
24  USC 241]

25  Deprivation of rights under color of law: Whoever, under color of any law, statute,
    ordinance, regulation, or custom, willfully subjects any person in any State, Territory,
26  Commonwealth, Possession, or District to the deprivation of any rights, privileges, or
    immunities secured or protected by the Constitution or laws of the United States, or to
27  different punishments, pains, or penalties, on account of such person being an alien, or by
    reason of his color, or race, than are prescribed for the punishment of citizens, shall be
28  fined under this title or imprisoned not more than one year, or both; and if bodily injury

1   results from the acts committed in violation of this section or if such acts include the use,
    attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined
2   under this title or imprisoned not more than ten years, or both; and if death results from
    the acts committed in violation of this section or if such acts include kidnapping or an
3   attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual
    abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of
4   years or for life, or both, or may be sentenced to death. [18, USC 242]

5   Property rights of citizens: All citizens of the United States shall have the same right, in
    every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase,
6   lease, sell, hold, and convey real and personal property. [42 USC 1982]

7   Civil action for deprivation of rights: Every person who, under color of any statute,
    ordinance, regulation, custom, or usage, of any State or Territory or the District of
8   Columbia, subjects, or causes to be subjected, any citizen of the United States or other
    person within the jurisdiction thereof to the deprivation of any rights, privileges, or
9   immunities secured by the Constitution and laws, shall be liable to the party injured in an
    action at law, suit in equity, or other proper proceeding for redress, except that in any
10  action brought against a judicial officer for an act or omission taken in such officer's
    judicial capacity, injunctive relief shall not be granted unless a declaratory decree was
11  violated or declaratory relief was unavailable. For the purposes of this section, any Act of
    Congress applicable exclusively to the District of Columbia shall be considered to be a
12  statute of the District of Columbia. [42 USC 1983]

13  Conspiracy to interfere with civil rights: Depriving persons of rights or privileges: If two
    or more persons in any State or Territory conspire or go in disguise on the highway or on
14  the premises of another, for the purpose of depriving, either directly or indirectly, any
    person or class of persons of the equal protection of the laws, or of equal privileges and
15  immunities under the laws; or for the purpose of preventing or hindering the constituted
    authorities of any State or Territory from giving or securing to all persons within such
16  State or Territory the equal protection of the laws; or if two or more persons conspire to
    prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from
17  giving his support or advocacy in a legal manner, toward or in favor of the election of any
    lawfully qualified person as an elector for President or Vice President, or as a Member of
18  Congress of the United States; or to injure any citizen in person or property on account of
    such support or advocacy; in any case of conspiracy set forth in this section, if one or
19  more persons engaged therein do, or cause to be done, any act in furtherance of the object
    of such conspiracy, whereby another is injured in his person or property, or deprived of
20  having and exercising any right or privilege of a citizen of the United States, the party so
    injured or deprived may have an action for the recovery of damages occasioned by such
21  injury or deprivation, against any one or more of the conspirators. [42 USC 1985(3)]
    Action for neglect to prevent: Every person who, having knowledge that any of the
22  wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be
    committed, and having power to prevent or aid in preventing the commission of the same,
23  neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party
    injured, or his legal representatives, for all damages caused by such wrongful act, which
24  such person by reasonable diligence could have prevented; and such damages may be
    recovered in an action on the case; and any number of persons guilty of such wrongful
25  neglect or refusal may be joined as defendants in the action; and if the death of any party
    be caused by any such wrongful act and neglect, the legal representatives of the deceased
26  shall have such action therefor, and may recover not exceeding $5,000 damages therein,
    for the benefit of the widow of the deceased, if there be one, and if there be no widow,
27  then for the benefit of the next of kin of the deceased. But no action under the provisions
    of this section shall be sustained which is not commenced within one year after the cause
28  of action has accrued. [42 USC 1986]

COURT. The person and suit of the sovereign; the place where the sovereign sojourns with his regal retinue, wherever that may be. [Black's Law Dictionary, 5th Edition, page 318.]

COURT. An agency of the sovereign created by it directly or indirectly under its authority, consisting of one or more officers, established and maintained for the purpose of hearing and determining issues of law and fact regarding legal rights and alleged violations thereof, and of applying the sanctions of the law, authorized to exercise its powers in the course of law at times and places previously determined by lawful authority. [Isbill v. Stovall, Tex.Civ.App., 92 S.W.2d 1067, 1070; Black's Law Dictionary, 4th Edition, page 425]

COURT OF RECORD. To be a court of record a court must have four characteristics, and may have a fifth. They are:
A. A judicial tribunal having attributes and exercising functions independently of the person of the magistrate designated generally to hold it [Jones v. Jones, 188 Mo.App. 220, 175 S.W. 227, 229; Ex parte Gladhill, 8 Metc. Mass., 171, per Shaw, C.J. See, also, Ledwith v. Rosalsky, 244 N.Y. 406, 155 N.E. 688, 689][Black's Law Dictionary, 4th Ed., 425, 426]

B. Proceeding according to the course of common law [Jones v. Jones, 188 Mo.App. 220, 175 S.W. 227, 229; Ex parte Gladhill, 8 Metc. Mass., 171, per Shaw, C.J. See, also, Ledwith v. Rosalsky, 244 N.Y. 406, 155 N.E. 688, 689][Black's Law Dictionary, 4th Ed., 425, 426]

C. Its acts and judicial proceedings are enrolled, or recorded, for a perpetual memory and testimony. [3 Bl. Comm. 24; 3 Steph. Comm. 383; The Thomas Fletcher, C.C.Ga., 24 F. 481; Ex parte Thistleton, 52 Cal 225; Erwin v. U.S., D.C.Ga., 37 F. 488, 2 L.R.A. 229; Heininger v. Davis, 96 Ohio St. 205, 117 N.E. 229, 231]

D. Has power to fine or imprison for contempt. [3 Bl. Comm. 24; 3 Steph. Comm. 383; The Thomas Fletcher, C.C.Ga., 24 F. 481; Ex parte Thistleton, 52 Cal 225; Erwin v. U.S., D.C.Ga., 37 F. 488, 2 L.R.A. 229; Heininger v. Davis, 96 Ohio St. 205, 117 N.E. 229, 231.][Black's Law Dictionary, 4th Ed., 425, 426]

E. Generally possesses a seal. [3 Bl. Comm. 24; 3 Steph. Comm. 383; The Thomas Fletcher, C.C.Ga., 24 F. 481; Ex parte Thistleton, 52 Cal 225; Erwin v. U.S., D.C.Ga., 37 F. 488, 2 L.R.A. 229; Heininger v. Davis, 96 Ohio St. 205, 117 N.E. 229, 231.][Black's Law Dictionary, 4th Ed., 425, 426]
The following persons are magistrates: ...The judges of the superior courts.... [California Penal Code, Sec. 808.]

...our justices, sheriffs, mayors, and other ministers, which under us have the laws of our land to guide, shall allow the said charters pleaded before them in judgement in all their points, that is to wit, the Great Charter as the common law.... [Confirmatio Cartarum, November 5, 1297, *Sources of Our Liberties* Edited by Richard L. Perry, American Bar Foundation]

Henceforth the writ which is called Praecipe shall not be served on any one for any holding so as to cause a free man to lose his court. [Magna Carta, Article 34].

If any claim, statement, fact, or portion in this action is held inapplicable or not valid, such decision does not affect the validity of any other portion of this action.
The singular includes the plural and the plural the singular.

103

1  The present tense includes the past and future tenses; and the future, the present.
2  The masculine gender includes the feminine and neuter.

3

# NATIONAL CURRENCY ACT
(later called "NATIONAL BANK ACT")

June 3, 1864

CHAP. CVI. — *An Act to provide a National Currency, secured by a Pledge of United States Bonds, and to provide for the Circulation and Redemption thereof.*

1865, ch. 78, §§ 6, 7.
Post, p. 484.

Currency bureau established.

Comptroller of the currency.

Appointment.

Term of office.

Salary.

Deputy comptroller.

Clerks.

Comptroller to take oath within what time.

Bond.

Oath and bond of deputy comptroller.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That there shall be established in the treasury department a separate bureau, which shall be charged with the execution of this and all other laws that may be passed by congress respecting the issue and regulation of a national currency secured by United States bonds. The chief officer of the said bureau shall be denominated the comptroller of the currency, and shall be under the general direction of the Secretary of the Treasury. He shall be appointed by the President, on the recommendation of the Secretary of the Treasury, by and with the advice and consent of the Senate, and shall hold his office for the term of five years unless sooner removed by the President, upon reasons to be communicated by him to the Senate; he shall receive an annual salary of five thousand dollars; he shall have a competent deputy, appointed by the secretary, whose salary shall be two thousand five hundred dollars, and who shall possess the power and perform the duties attached by law to the office of comptroller during a vacancy in such office and during his absence or inability; he shall employ, from time to time, the necessary clerks to discharge such duties as he shall direct, which clerks shall be appointed and classified by the Secretary of the Treasury in the manner now provided by law. Within fifteen days from the time of notice of his appointment the comptroller shall take and subscribe the oath of office prescribed by the constitution and laws of the United States; and he shall give to the United States a bond in the penalty of one hundred thousand dollars, with not less than two responsible sureties, to be approved by the Secretary of the Treasury, conditioned for the faithful discharge of the duties of his office. The deputy-comptroller so appointed shall also take the oath of office prescribed by the constitution and laws of the United States, and shall give a like bond in the penalty of fifty thousand dollars. The comptroller and deputy-comptroller shall not, either directly or indirectly, be interested in any association issuing national currency under the provisions of this act.

Not to be interested in any banking association.

Seal of currency bureau,

and where to be kept.

Certain papers under such seal to be evidence.

Impression may be upon paper.

SEC. 2. *And be it further enacted,* That the comptroller of the currency, with the approval of the Secretary of the Treasury, shall devise a seal, with suitable inscriptions, for his office, a description of which, with a certificate of approval by the Secretary of the Treasury, shall be filed in the office of the Secretary of State with an impression thereof, which shall thereupon become the seal of office of the comptroller of the currency, and the same may be renewed when necessary. Every certificate, assignment, and conveyance executed by the comptroller, in pursuance of any authority conferred on him by law, and sealed with his seal of office, shall be received in evidence in all places and courts whatsoever; and all copies of papers in

1   the office of the comptroller, certified by him and authenticated by the said seal, shall in all cases be evidence equally and in like manner as the original. An impression of such seal directly on the paper shall be as valid as if made on wax or wafer.

2

3   **Rooms for currency bureau.**   SEC. 3. *And be it further enacted,* That there shall be assigned to the comptroller of the currency by the Secretary of the Treasury suitable rooms in the treasury building for conducting the business of the currency bureau, in which shall be safe and secure fire-proof vaults, in which it shall be the duty of the comptroller to deposit and safely keep all the plates not necessarily in the possession of engravers or printers, and other valuable things belonging to his department; and the comptroller shall from time to time furnish necessary furniture, stationery, fuel, lights, and other proper conveniences for the transaction of the said business.

4   **Fire-proof vaults.**

5

6   **Furniture, &c.**

7

8   **Term "United States Bonds" to include what.**   SEC. 4. *And be it further enacted,* That the term "United States Bonds," as used in this act, shall be construed to mean all registered bonds now issued, or that may hereafter be issued, on the faith of the United States by the Secretary of the Treasury in pursuance of law.

9

10   SEC. 5. *And be it further enacted,* That associations for carrying on the business of banking may be formed by any number of persons, not less in any case than five, who shall enter into articles of association, which shall specify in general terms the object for which the association is formed, and may contain any other provisions, not inconsistent with provisions of this act, which the association may see fit to adopt for the regulation of the business of the association and the conduct of its affairs, which said articles shall be signed by the persons uniting to form the association, and a copy of them forwarded to the comptroller of the currency, to be filed and preserved in his office.

11

12   **Banking associations, how may be formed.**

13

14

15   **Organization certificate to specify,**   SEC. 6. *And be it further enacted,* That the persons uniting to form such an association shall, under their hands, make an organization certificate, which shall specify—

16

17   **name,**   First. The name assumed by such association, which name shall be subject to the approval of the comptroller.

18   **place of business,**   Second. The place where its operations of discount and deposit are to be carried on, designating the state, territory, or district, and also the particular county and city, town, or village.

19

20   **capital and shares,**   Third. The amount of its capital stock, and the number of shares into which the same shall be divided.

21   **names &c., of shareholders,**   Fourth. The names and places of residence of the shareholders, and the number of shares held by each of them.

22   **purpose of certificate.**   Fifth. A declaration that said certificate is made to enable such persons to avail themselves of the advantages of this act.

**Certificate to be acknowledged.**   The said certificate shall be acknowledged before a judge of some court of record or a notary public, and such certificate, with the acknowledgement thereof authenticated by the seal of such court or notary, shall be transmitted to the comptroller of the currency, who shall record and carefully preserve the same in his office. Copies of such certificate, duly certified by the comptroller, and authenticated by his seal of office, shall be legal and sufficient evidence in all courts and places within the United States, or the jurisdiction of the government thereof, of the existence of such association, and of every other matter or thing which could be proved by the production of the original certificate.

23

24

25   **Copies under seal to be evidence.**

26

27

28   **Amount of capital to**   SEC. 7. *And be it further enacted,* That no association shall be organized

105

1    *be not less than, &c.*    under this act, with a less capital than one hundred thousand dollars, nor in a

*Proviso.*    city whose population exceeds fifty thousand persons, with a less capital

2    than two hundred thousand dollars: *Provided,* That banks with a capital of

not less than fifty thousand dollars may, with the approval of the Secretary

3    of the Treasury, be organized in any place the population of which does not

exceed six thousand inhabitants.

4    *Associations when to*    SEC. 8. *And be it further enacted,* That every association formed pursuant to

*be corporations and*    the provisions of this act shall, from the date of the execution of its

5    *when to commence*    organization certificate, be a body corporate, but shall transact no business

*business.*    except such as may be incidental to its organizatin and necessarily

6    *Seal.*    preliminary, until authorized by the comptroller of the currency to

commence the business of banking. Such association shall have power to

7    *May continue twenty*    adopt a corporate seal, and shall have succession by the name designated in

*years, unless, &c.*    its organizatin certificate, for the period of twenty years from its

8    *General powers.*    organization, unless sooner dissolved according to the provisions of its

*Directors and officers.*    articles of association, or by the act of its shareholders owning two thirds of

9    *By-laws.*    its stock, or unless the franchise shall be forfeited by a violation of this act;

by such name it may make contracts, sue and be sued, complain and defend,

10    in any court of law and equity as fully as natural persons; it may elect or

appoint directors, and by its board of directors appoint a president, vice-

11    president, cashier, and other officers, define their duties, require bonds of

them and fix the penalty thereof, dismiss said officers or any of them at

12    pleasure, and appoint others to fill their places, and exercise under this act

all such incidental powers as shall be necessary to carry on the business of

13    banking by discounting and negotiating promissory notes, drafts, bills of

exchange, and other evidences of debt; by receiving deposits; by buying and

14    selling exchange, coin, and bullion; by loaning money on personal security;

by obtaining, issuing, and circulating notes according to the provisions of

15    this act; and its board of directors shall also have power to define and

regulate by by-laws, not inconsistent with the provisions of this act, the

16    manner in which its stock shall be transferred, its directors elected or

appointed, its officers appointed, its property transferred, its general

17    business conducted, and all the privileges granted by this act to associations

organized under it shall be exercised and enjoyed; and its usual business

18    shall be transacted at an office or banking house located in the place

specified in its organization certificate.

19    *Directors;*    SEC. 9. *And be it further enacted,* That the affairs of every association shall

*qualifications;*    be managed by not less than five directors, one of whom shall be the

20    *one to be president.*    president. Every director shall, during his whole term of service, be a citizen

*Oath.*    of the United States; and at least three fourths of the directors shall have

21    resided in the state, territory, or district in which such association is located

one year next preceding their election as directors, and be residents of the

22    same during their continuance in office. Each director shall own, in his own

right, at least ten shares of the capital stock of the association of which he is

23    a director. Each director, when appointed or elected, shall take an oath that

he will, so far as the duty devolves on him, diligently and honestly

24    administer the affairs of such association, and will not knowingly violate, or

willingly permit to be violated, any of the provisions of this act, and that he

25    is the bona fide owner, in his own right, of the number of shares of stock

required by this act, subscribed by him, or standing in his name on the books

26    of the association, and that the same is not hypothecated, or in any way

pledged, as security for any loan or debt; which oath, subscribed by himself,

27    and certified by the officer before whom it is taken, shall be immediately

transmitted to the comptroller of the currency, and by him filed and

28

106

preserved in his office.

SEC. 10. *And be it further enacted,* That the directors of any asscociation first elected or appointed shall hold their places until their successors shall be elected and qualified. All subsequent elections shall be held annually on such day in the month of January as may be specified in the articles of association; and the directors so elected shall hold their places for one year, and until their successors are elected and qualified. But any director ceasing to be the owner of the requisite amount of stock, or having in any other manner become disqualified, shall thereby vacate his place. Any vacancy in the board shall be filled by appointment by the remaining directors, and any director so appointed shall hold his place until the next election. If from any cause an election of directors shall not be made at the time appointed, the association shall not for that cause be dissolved, but an election may be held on any subsequent day, thirty days' notice thereof in all cases having been given in a newspaper published in the city, town, or county in which the association is located; and if no newspaper is published in such city, town, or county, such notice shall be published in a newspaper published nearest thereto. If the articles of association do not fix the day on which the election shall be held, or if the election should not be held on the day fixed, the day for the election shall be designated by the board of directors in their by-laws, or otherwise: *Provided,* That if the directors fail to fix the day, as aforesaid, shareholders representing two thirds of the shares may.

SEC. 11. *And be it further enacted,* That in all elections of directors, and in deciding all questions at meetings of shareholders, each shareholder shall be entitled to one vote on each share of stock held by him. Shareholders may vote by proxies duly authorized in writing; but no officer, clerk, teller, or book-keeper of such association shall act as proxy; and no shareholder whose liability is past due and unpaid shall be allowed to vote.

SEC. 12. *And be it further enacted,* That the capital stock of any association formed under this act shall be divided into shares of one hundred dollars each, and be deemed personal property and transferable on the books of the association in such manner as may be prescribed in the by-laws or articles of association; and every person becoming a shareholder by such transfer shall, in proportion to his shares, succeed to all the rights and liabilities of the prior holder of such shares, and no change shall be made in the articles of association by which the rights, remedies, or security of the existing creditors of the association shall be impaired. The shareholders of each association formed under the provisions of this act, and of each existing bank or banking association that may accept the provisions of this act, shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such association to the extent of the amount of their stock therein at the par value thereof, in addition to the amount invested in such shares; except that shareholders of any banking association now existing under state laws, having not less than five millions of dollars of capital actually paid in, and a surplus of twenty per centum on hand, both to be determined by the comptroller of the currency, shall be liable only to the amount invested in their shares; and such surplus of twenty per centum shall be kept undiminished, and be in addition to the surplus provided for in this act; and if at any time there shall be a deficiency in said surplus of twenty per centum, the said banking association shall not pay any dividends to its shareholders until such deficiency shall be made good; and in case of such deficiency, the comptroller of the currency may compel said banking association to close its business and wind up its affairs under the provisions of this act. And the

*Margin notes:*

Term of office of directors.

Elections.

Vacancies, how filled.

Voting and proxies.

Capital stock to be divided into shares.

Transfer.

Rights of existing creditors not to be impaired.

Individual liability.

When comptroller may withhold certificate.

107

comptroller shall have authority to withhold from an association his certificate authorizing the commencement of business, whenever he shall have reason to suppose that the shareholders thereof have formed the same for any other than the legitimate objects contemplated by this act.

Increase of capital stock.

Maximum.

SEC. 13. *And be it further enacted,* That it shall be lawful for any association formed under this act, by its articles of association , to provide for an increase of its capital from time to time, as may be deemed expedient, subject to the limitations of this act: *Provided,* That the maximum of such increase in the articles of association shall be determined by the comptroller of the currency; and no increase of capital shall be valid until the whole amount of such increase shall be paid in, and notice thereof shall have been transmitted to the comptroller of the currency, and his certificate obtained specifying the amount of such increase of capital stock, with his approval thereof, and that it has been duly paid in as part of the capital of such

Minimum.

association. And every association shall have power, by the vote of shareholders owning two thirds of its capital stock, to reduce the capital of such association to any sum not below the amount required by this act, in the formation of associations: *Provided,* That by no such reduction shall its capital be brought below the amount required by this act for its outstanding circulation, nor shall any such reduction be made until the amount of the proposed reduction has been reported to the comptroller of the currency and his approval thereof obtained.

Amount to be paid in before commencing business.

Remainder, when to be paid.

SEC. 14. *And be it further enacted,* That at least fifty per centum of the capital stock of every association shall be paid in before it shall be authorized to commence business; and the remainder of the capital stock of such association shall be paid in instalments of at least ten per centum each on the whole amount of the capital as frequently as one instalment at the end of each succeeding month from the time it shall be authorized by the comptroller to commence business; and the payment of each instalment shall be certified to the comptroller, under oath, by the president or cashier of the association.

Proceedings, if shareholder fails to pay instalments.

Stock of delinquent shareholders to be sold.

SEC. 15. *And be it further enacted,* That if any shareholder, or his assignee, shall fail to pay any instalment on the stock when the same is required by the foregoing section to be paid, the directors of such association may sell the stock of such delinquent shareholder at public auction, having given three weeks' previous notice thereof in a newspaper published and of general circulation in the city or county where the association is located, and if no newspaper is published in said city or county, then in a newspaper published nearest thereto, to any person who will pay the highest price therefor, and not less than the amount due thereon, with the expenses of advertisement and sale; and the excess, if any, shall be paid to the delinquent shareholder. If no bidder can be found who will pay for such stock the amount due thereon to the association, and the cost of advertisement and sale, the amount previously paid shall be forfeited to the association, and such stock shall be sold as the directors may order, within six months from the time of such forfeiture, and if not sold it shall be cancelled and deducted from the capital stock of the association; and if such cancellation and reduction shall reduce the capital of the association below the minimum of capital required by this act, the capital stock shall, within thirty days from the date of such cancellation, be increased to the requirements of the act, in default of which a receiver may be appointed to close up the business of the association according to the provisions of the fiftieth section of this act.

United States registered bonds to be

SEC. 16. *And be it further enacted,* That every association, after having complied with the provisions of this act, preliminary to the commencement

108

1    comptroller shall have authority to withhold from an association his
2    certificate authorizing the commencement of business, whenever he shall
     have reason to suppose that the shareholders thereof have formed the same
     for any other than the legitimate objects contemplated by this act.

3    **Increase of capital**    SEC. 13. *And be it further enacted,* That it shall be lawful for any
     **stock.**    association formed under this act, by its articles of association , to provide
4    **Maximum.**    for an increase of its capital from time to time, as may be deemed expedient,
     subject to the limitations of this act: *Provided,* That the maximum of such
5    increase in the articles of association shall be determined by the comptroller
     of the currency; and no increase of capital shall be valid until the whole
6    amount of such increase shall be paid in, and notice thereof shall have been
     transmitted to the comptroller of the currency, and his certificate obtained
7    specifying the amount of such increase of capital stock, with his approval
     thereof, and that it has been duly paid in as part of the capital of such
8    **Minimum.**    association. And every association shall have power, by the vote of
     shareholders owning two thirds of its capital stock, to reduce the capital of
9    such association to any sum not below the amount required by this act, in
     the formation of associations: *Provided,* That by no such reduction shall its
10   capital be brought below the amount required by this act for its outstanding
     circulation, nor shall any such reduction be made until the amount of the
11   proposed reduction has been reported to the comptroller of the currency and
     his approval thereof obtained.

12   SEC. 14. *And be it further enacted,* That at least fifty per centum of the
     capital stock of every association shall be paid in before it shall be
13   **Amount to be paid in**    authorized to commence business; and the remainder of the capital stock of
     **before commencing**    such association shall be paid in instalments of at least ten per centum each
14   **business.**    on the whole amount of the capital as frequently as one instalment at the end
     **Remainder, when to**    of each succeeding month from the time it shall be authorized by the
15   **be paid.**    comptroller to commence business; and the payment of each instalment shall
     be certified to the comptroller, under oath, by the president or cashier of the
16   association.

17   **Proceedings, if**    SEC. 15. *And be it further enacted,* That if any shareholder, or his assignee,
     **shareholder fails to**    shall fail to pay any instalment on the stock when the same is required by
18   **pay instalments.**    the foregoing section to be paid, the directors of such association may sell
     **Stock of delinquent**    the stock of such delinquent shareholder at public auction, having given
19   **shareholders to be**    three weeks' previous notice thereof in a newspaper published and of general
     **sold.**    circulation in the city or county where the association is located, and if no
20   newspaper is published in said city or county, then in a newspaper published
     nearest thereto, to any person who will pay the highest price therefor, and
21   not less than the amount due thereon, with the expenses of advertisement
     and sale; and the excess, if any, shall be paid to the delinquent shareholder.
22   If no bidder can be found who will pay for such stock the amount due
     thereon to the association, and the cost of advertisement and sale, the
23   amount previously paid shall be forfeited to the association, and such stock
     shall be sold as the directors may order, within six months from the time of
24   such forfeiture, and if not sold it shall be cancelled and deducted from the
     capital stock of the association; and if such cancellation and reduction shall
25   reduce the capital of the association below the minimum of capital required
     by this act, the capital stock shall, within thirty days from the date of such
26   cancellation, be increased to the requirements of the act, in default of which
     a receiver may be appointed to close up the business of the association
27   according to the provisions of the fiftieth section of this act.

28   **United States**    SEC. 16. *And be it further enacted,* That every association, after having
     **registered bonds to be**    complied with the provisions of this act, preliminary to the commencement

108

1    deposited with
     treasurer to an amount    of banking business under its provisions, and before it shall be authorized to
2    equal to one third of       commence business, shall transfer and deliver to the treasurer of the United
     the capital stock.           States any United States registered bonds bearing interest to an amount not
3    Deposit to be                less than thirty thousand dollars nor less than one third of the capital stock
     increased;                   paid in, which bonds shall be deposited with the treasurer of the United
4    may be diminished.           States and by him safely kept in his office until the same shall be otherwise
                                   disposed of, in pursuance of the provisions of this act; and the Secretary of
5                                  the Treasury is hereby authorized to receive and cancel any United States
                                   coupon bonds, and to issue in lieu thereof registered bonds of like amount,
6                                  bearing a like rate of interest, and having the same time to run; and the
                                   deposit of bonds shall be, by every association, increased as its capital may
7                                  be paid up or increased, so that every association shall at all times have on
                                   deposit with the treasurer registered United States bonds to the amount of at
8                                  least one third of its capital stock actually paid in: *Provided*, That nothing in
                                   this section shall prevent an association that may desire to reduce its capital
9                                  or to close up its business and dissolve its organization from taking up its
                                   bonds upon returning to the comptroller its circulation notes in the
10                                 proportion hereinafter named in this act, nor from taking up any excess of
                                   bonds beyond one third of its capital stock and upon which no circulating
                                   notes have been delivered.

11                                 SEC. 17. *And be it further enacted*, That whenever a certificate shall have
                                   been transmitted to the comptroller of the currency, as provided in this act,
12                                 and the association transmitting the same shall notify the comptroller that at
                                   least fifty per centum of its capital stock has been paid in as aforesaid, and
13                                 that such association has complied with all the provisions of this act as
                                   required to be complied with before such association shall be authorized to
14   Comptroller to               commence the business of banking, the comptroller shall examine into the
     examine and                  condition of such association, ascertain especially the amount of money paid
15   determine if                 in on account of its capital, the name and place of residence of each of the
     association can              directors of such association, and the amount of the capital stock of which
16   commence business.           each is the bona fide owner, and generally whether such association has
                                   complied with all the requirements of this act to entitle it to engage in the
17                                 business of banking; and shall cause to be made and attested by the oaths of
                                   a majority of the directors and by the president or cashier of such
18                                 association, a statement of all the facts necessary to enable the comptroller
                                   to determine whether such association is lawfully entitled to commence the
19                                 business of banking under this act.

20   When association is          SEC. 18. *And be it further enacted*, That if, upon a careful examination of
     found entitled to             the facts so reported, and of any other facts which may come to the
21   commence business,           knowledge of the comptroller, whether by means of special commission
     comptroller to give          appointed by him for the purpose of inquiring into the condition of such
22   certificate.                 association, or otherwise, it shall appear that such association is lawfully
     Certificate to be            entitled to commence the business of banking, the comptroller shall give to
23   published.                   such association a certificate, under his hand and official seal, that such
                                   association has complied with all the provisions of this act required to be
24                                 complied with before being entitled to commence the business of banking
                                   under it, and that such association is authorized to commence said business
25                                 accordingly; and it shall be the duty of the association to cause said
                                   certificate to be published in some newspaper published in the city or county
26                                 where the association is located for at least sixty days next after the issuing
                                   thereof: *Provided*, That if no newspaper is published in such city or county
27                                 the certificate shall be published in a newspaper published nearest thereto.

     Transfers of bonds by        SEC. 19. *And be it further enacted*, That all transfers of United States bonds
28   association, to be            which shall be made by any association under the provisions of this act shall

<table>
<tr><td>1</td><td>made to the treasurer in trust.</td><td rowspan="9">be made to the treasurer of the United States in trust for the association, with a memorandum written or printed on each bond, and signed by the cashier or some other officer of the association making the deposit, a receipt therefor to be given to said association, or by the comptroller of the currency, or by a clerk appointed by him for that purpose, stating that it is held in trust for the association on whose behalf such transfer is made, and as security for the redemption and payment of any circulating notes that have been or may be delivered to such association. No assignment or transfer of any such bonds by the treasurer shall be deemed valid or of binding force and effect unless countersigned by the comptroller or the currency. It shall be the duty of the comptroller of the currency to keep in his office a book in which shall be entered the name of every association from whose accounts such transfer of bonds is made by the treasurer, and the name of the party to whom such transfer is made; and the par value of the bonds so transferred shall be entered therein; and it shall be the duty of the comptroller, immediately upon countersigning and entering the same, to advise by mail the association from whose account such transfer was made of the kind and numerical designation of the bonds and the amount thereof so transferred.</td></tr>
</table>

| | | |
|---|---|---|
| 1 | made to the treasurer in trust. | |
| 2 | How executed. | |
| 3 | Comptroller to keep transfer book, &c. | |

1 — made to the treasurer in trust.
2 — How executed.
3 — Comptroller to keep transfer book, &c.

be made to the treasurer of the United States in trust for the association, with a memorandum written or printed on each bond, and signed by the cashier or some other officer of the association making the deposit, a receipt therefor to be given to said association, or by the comptroller of the currency, or by a clerk appointed by him for that purpose, stating that it is held in trust for the association on whose behalf such transfer is made, and as security for the redemption and payment of any circulating notes that have been or may be delivered to such association. No assignment or transfer of any such bonds by the treasurer shall be deemed valid or of binding force and effect unless countersigned by the comptroller or the currency. It shall be the duty of the comptroller of the currency to keep in his office a book in which shall be entered the name of every association from whose accounts such transfer of bonds is made by the treasurer, and the name of the party to whom such transfer is made; and the par value of the bonds so transferred shall be entered therein; and it shall be the duty of the comptroller, immediately upon countersigning and entering the same, to advise by mail the association from whose account such transfer was made of the kind and numerical designation of the bonds and the amount thereof so transferred.

10-15 — Transfers to be countersigned and entered. Books to be accessible.

SEC. 20. *And be it further enacted,* That it shall be the duty of the comptroller of the currency to countersign and enter in the book, in the manner aforesaid, every transfer or assignment of any bonds held by the treasurer presented for his signature; and the comptroller shall have at all times during office hours access to the books of the treasurer, for the purpose of ascertaining the correctness of the transfer or assignment presented to him to countersign; and the treasurer shall have the like access to the book above mentioned, kept by the comptroller, during office hours, to ascertain the correctness of the entries in the same; and the comptroller shall also at all times have access to the bonds on deposit with the treasurer, to ascertain their amount and condition.

16-18 — Associations, after transfer, may receive circulating notes. 1865, ch. 82. *Post,* p. 498.

19-20 — Limit of amount.

SEC. 21. *And be it further enacted,* That upon the transfer and delivery of bonds to the treasurer, as provided in the foregoing section, the association making the same shall be entitled to receive from the comptroller of the currency circulating notes of different denominations, in blank, registered and countersigned as hereinafter provided, equal in amount to ninety per centum of the current market value of the United States bonds so transferred and delivered, but not exceeding ninety per centum of the amount of said bonds at the par value thereof, if bearing interest at a rate not less than five per centum per annum; and at no time shall the total amount of such notes, issued to any such association, exceed the amount at such time actually paid in of its capital stock.

21-22 — Entire circulation not to exceed $300,000,000.
23 — Comptroller to prepare the notes.
24 — Denominations.
25 — Notes to express what. Devices.
27 — Notes under $5.

SEC. 22. *And be it further enacted,* That the entire amount of notes for circulation to be issued under this act shall not exceed three hundred millions of dollars. In order to furnish suitable notes for circulation, the comptroller of the currency is hereby authorized and required, under the direction of the Secretary of the Treasury, to cause plates and dies to be engraved, in the best manner to guard against counterfeiting and fraudulent alterations, and to have printed therefrom, and numbered, such quantity of circulating notes, in blank, of the denominations of one dollar, two dollars, three dollars, five dollars, ten dollars, twenty dollars, fifty dollars, one hundred dollars, five hundred dollars, and one thousand dollars, as may be required to supply, under this act, the associations entitled to receive the same; which notes shall express upon their face that they are secured by United States bonds, deposited with the treasurer of the United States by the written or engraved signatures of the treasurer and register, and by the

110

1   imprint of the seal of the treasury; and shall also express upon their face the
2   promise of the association receiving the same to pay on demand, attested by
    the signatures of the president or vice-president and cashier. And the said
3   notes shall bear such devices and such other statements, and shall be in such
    form, as the Secretary of the Treasury shall, by regulation, direct: *Provided*,
4   That not more than one sixth part of the notes furnished to an association
    shall be of a less denomination than five dollars, and that after specie
5   payments shall be resumed no association shall be furnished with notes of
    less denomination than five dollars.

**When notes may be**
**circulated as money;**
6   SEC. 23. *And be it further enacted*, That after any such association shall
    have caused its promise to pay such notes on demand to be signed by the
7   president or vice-president and cashier thereof, in such manner as to make
**to be received for all**
**dues, except, &c.**
    them obligatory promissory notes, payable on demand, at its place of
8   business, such association is hereby authorized to issue and circulate the
    same as money; and the same shall be received at par in all parts of the
9   United States in payment of taxes, excises, public lands, and all other dues
**Post notes, &c., not to**
    to the United States, except for duties on imports; and also for all salaries
10  **be issued.** and other debts and demands owing by the United States to individuals,
    corporations, and associations within the United States, except interest on
11  the public debt, and in redemption of the national currency. And no such
    association shall issue post notes or any other notes to circulate as money
12  than such as are authorized by the foregoing provisions of this act.

**Worn-out and**
13  **mutilated notes.** SEC. 24. *And be it further enacted*, That it shall be the duty of the
    comptroller of the currency to receive worn-out or mutilated circulating
14  notes issued by any such banking association, and also, on due proof of the
    destruction of any such circulating notes, to deliver in place thereof to such
15  association other blank circulating notes to an equal amount. And such
    worn-out or mutilated notes, after a memorandum shall have been entered in
16  the proper books, in accordance with such regulations as may be established
    by the comptroller, as well as all circulating notes which shall have been
17  paid or surrendered to be cancelled, shall be burned to ashes in presence of
    four persons, one to be appointed by the Secretary of the Treasury, one by
18  the comptroller of the currency, one by the treasurer of the United States,
    and one by the association, under such regulations as the Secretary of the
19  Treasury may prescibe. And a certificate of such burning, signed by the
    parties so appointed, shall be made in the books of the comptroller, and a
    duplicate thereof forwarded to the association whose notes are thus
20  cancelled.

**Associations to**
**examine annually its**
21  SEC. 25*And be it further enacted*, That it shall be the duty of every banking
    association having bonds deposited in the office of the treasurer of the
**bonds deposited, and**
    United States, once or oftener in each fiscal year, and at such time or times
22  **make certificate.** during the ordinary business hours as said officer or officers may select, to
    examine and compare the bonds so pledged with the books of the
23  comptroller and the accounts of the association, and, if found correct, to
    execute to the said treasurer a certificate setting forth the different kinds and
24  the amounts thereof, and that the same are in the possession and custody of
**Examination of**
    the treasurer at the date of such certificate. Such examination may be made
25  **associations.** by an officer or agent of such association, duly appointed in writing for that
    purpose, whose certificate before mentioned shall be of like force and
26  validity as if executed by such president or cashier; and a duplicate signed
    by the treasurer shall be retained by the association.

**Deposited bonds to be**
27  **held exclusively to** SEC. 26. *And be it further enacted*, That the bonds transferred to and
    deposited with the treasurer of the United States, as hereinbefore provided,
**secure circulation.**
28  by any banking association for the security of its circulating notes, shall be

111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Provision as to interest.*

*If bonds depreciate, security to be made good.*

*Bonds may be exchanged, if, &c.;*

*may be returned upon cancellation of circulating notes. Proviso.*

*The countersigning and delivery of circulating notes, except as permitted by this act, made unlawful. Penalty.*

*Associations may hold, &c., certain real estate.*

*Real estate.*

held exclusively for that purpose, until such notes shall be redeemed, except as provided in this act; but the comptroller of the currency shall give to any such banking association powers of attorney to receive and appropriate to its own use the interest on the bonds which it shall have transferred to the treasurer; but such powers shall become inoperative whenever such banking association shall fail to redeem its circulating notes as aforesaid. Whenever the market or cash value of any bonds deposited with the treasurer of the United States, as aforesaid, shall be reduced below the amount of the circulation issued for the same, the comptroller of the currency is hereby authorized to demand and receive the amount of such depreciation in other United States bonds at cash value, or in money, from the association receiving said bills, to be deposited with the treasurer of the United States as long as such depreciation continues. And said comptroller, upon the terms prescribed by the Secretary of the Treasury, may permit an exchange to be made of any of the bonds deposited with the treasurer by an association for other bonds of the United States authorized by this act to be received as security for circulating notes, if he shall be of opinion that such an exchange can be made without prejudice to the United States, and he may direct the return of any of said bonds to the banking association which transferred the same, in sums of not less than one thousand dollars, upon the surrender to him and the cancellation of a proportionate amount of such circulating notes: *Provided,* That the remaining bonds which shall have been transferred by the banking association offering to surrender circulating notes shall be equal to the amount required for the circulating notes not surrendered by such banking association, and that the amount of bonds in the hands of the treasurer shall not be diminished below the amount required to be kept on deposit with him by this act: *And provided,* That there shall have been no failure by such association to redeem its circulating notes, and no other violations by such association of the provisions of this act, and that the market or cash value of the remaining bonds shall not be below the amount required for the circulation issued for the same.

SEC. 27. *And be it further enacted,* That it shall be unlawful for any officer acting under the provisions of this act to countersign or deliver to any association, or to any other company or person, any circulating notes contemplated by this act, except as hereinbefore provided, and in accordance with the true intent and meaning of this act. And any officer who shall violate the provisions of this section shall be deemed guilty of a high misdemeanor, and on conviction thereof shall be punished by fine not exceeding double the amount so countersigned and delivered, and imprisonment not less than one year and not exceeding fifteen years, at the discretion of the court in which he shall be tried.

SEC. 28. *And be it further enacted,* That it shall be lawful for any such association to purchase, hold, and convey real estate as follows: —

First. Such as shall be necessary for its immediate accommodation in the transaction of its business.

Second. Such as shall be mortgaged to it in good faith by way of security for debts previously contracted.

Third. Such as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings.

Fourth. Such as it shall purchase at sales under judgments, decrees, or mortgages held by such association, or shall purchase to secure debts due to said association.

Such associations shall not purchase or hold real estate in any other case or for any other purpose than as specified in this section. Nor shall it hold possession of any real estate under mortgage, or hold the title and possession of any real estate purchased to secure any debts due to it for a longer period than five years.

*No person, &c., to be liable to association for more than, &c.*

SEC. 29. *And be it further enacted,* That the total liabilities to any association, of any person, or of any company, corporation, or firm for money borrowed, including in the liabilities of a company or firm the liabilities of the several members thereof, shall at no time exceed one tenth part of the amount of the capital stock of such association actually paid in:

*Certain discounts not to be included.*

*Provided,* That the discount of bona fide bills of exchange drawn against actually existing values, and the discount of commercial or business paper actually owned by the person or persons, corporation, or firm negotiating the same shall not be considered as money borrowed.

*Rate of interest.*

*Penalty for taking greater interest.*

SEC. 30. *And be it further enacted,* That every association may take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidences of debt, interest at the rate allowed by the laws of the state or territory where the bank is located, and no more, except that where by the laws of any state a different rate is limited for banks of issue organized under state laws, the rate so limited shall be allowed for associations organized in any such state under this act. And when no rate is fixed by the laws of the state or territory, the bank may take, receive, reserve, or charge a rate not exceeding seven per centum, and such interest may be taken in advance, reckoning the days for which the note, bill, or other evidence of debt has to run. And the knowingly taking, receiving, reserving, or charging a rate of interest greater than aforesaid shall be held and adjudged a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon.

*Action to be commenced in two years.*

And in case a greater rate of interest has been paid, the person or persons paying the same, or their legal representatives, may recover back, in any action of debt, twice the amount of interest thus paid from the association taking or receiving the same: *Provided,* That such action is commenced within two years from the time the usurious transaction occurred. But the purchase, discount, or sale of bona fide bill of exchange, payable at another place than the place of purchase, discount, or sale, at not more than the current rate of exchange for sight drafts in addition to the interest, shall not be considered as taking or receiving a greater rate of interest.

*Amount of money to be kept on hand.*

*Liabilities not to be increased until reserve is made good.*

*Money deposited for redemption of circulation in certain cities to be included.*

*Clearing-house certificates to be deemed lawful money for this purpose.*

*Charleston and Richmond.*

*If association fails,*

SEC. 31. *And be it further enacted,* That every association in the cities hereinafter named shall, at all times, have on hand, in lawful money of the United States, an amount equal to at least twenty-five per centum of the aggregate amount of its notes in circulation and its deposits; and every other association shall, at all times, have on hand, in lawful money of the United States, an amount equal to at least fifteen per centum of the aggregate amount of its notes in circulation, and of its deposits. And whenever the lawful money of any association in any of the cities hereinafter named shall be below the amount of twenty-five per centum of its circulation and deposits, and whenever the lawful money of any other association shall be below fifteen per centum of its circulation and deposits, such associations shall not increase its liabilities by making any new loans or discounts otherwise than by discounting or purchasing bills of exchange payable at sight, nor make any dividend of its profits until the required proportion between the aggregate amount of its outstanding notes of circulation and deposits and its lawful money of the United States shall be restored: *Provided,* That three fifths of said fifteen per centum may consist of

1    *after notice, to make good its reserve.*    balances due to an association available for the redemption of its circulating
2    notes from associations approved by the comptroller of the currency,
organized under this act, in the cities of Saint Louis, Louisville, Chicago,
Detroit, Milwaukie, New Orleans, Cincinnati, Cleveland, Pittsburg,
3    Baltimore, Philadelphia, Boston, New York, Albany, Leavenworth, San
Francisco, and Washington City: *Provided, also,* That clearing-house
4    certificates, representing specie or lawful money specially deposited for the
purpose of any clearing-house association, shall be deemed to be lawful
5    money in the possession of any association belonging to such clearing-house
holding and owning such certificate, and shall be considered to be a part of
6    the lawful money which such association is required to have under the
foregoing provisions of this section: *Provided,* That the cities of Charleston
7    and Richmond may be added to the list of cities in the national associations
of which other associations may keep three fifths of their lawful money,
8    whenever, in the opinion of the comptroller of the currency, the condition of
the southern states will warrant it. And it shall be competent for the
9    comptroller of the currency to notify any association, whose lawful money
reserve as aforesaid shall be below the amount to be kept on hand as
10    aforesaid, to make good such reserve; and if such association shall fail for
thirty days thereafter so to make good its reserve of lawful money of the
11    United States, the comptroller may, with the concurrence of the Secretary of
the Treasury, appoint a receiver to wind up the business of such association,
12    as provided in this act.

13    *Circulation to be redeemed in New York at par.*    SEC. 32. *And be it further enacted,* That each association organized in any
of the cities named in the forgoing section shall select, subject to the
14    approval of the comptroller of the currency, an association in the city of
*Certain associations to select place for redemption of circulation.*    New York, at which it will redeem its circulating notes at par. And each of
15    such associations may keep one half of its lawful money reserve in cash
deposits in the city of New York. And each association not organized within
16    the cities named in the preceeding section shall select, subject to the
*Proceedings in case of failure.*    approval of the comptroller of the currency, an association in either of the
17    cities named in the preceding section at which it will redeem its circulating
notes at par, and the comptroller shall give public notice of the names of the
18    associations so selected at which redemptions are to be made by the
respective associations, and of any change that may be made of the
19    association at which the notes of any association are redeemed. If any
association shall fail either to make the selection or to redeem its notes as
20    *Each association to take notes of other associations.*    aforesaid, the comptroller of the currency may, upon receiving satisfactory
evidence thereof, appoint a receiver, in the manner provided for in this act,
21    to wind up its affairs: *Provided,* That nothing in this section shall relieve any
association from its liability to redeem its circulating notes at its own
22    counter, at par, in lawful money, on demand: *And provided, further,* That
every association formed or existing under the provisions of this act shall
23    take and receive at par, for any debt or liability to said association, any and
all notes or bills issued by any association existing under and by virtue of
this act.

24    *Dividends.*    SEC. 33. *And be it further enacted,* That the directors of any association
25    may, semi-annually, each year, declare a dividend of so much of the nett
profits of the association as they shall judge expedient; but each association
26    *Surplus funds.*    shall, before the declaration of a dividend, carry one tenth part of its nett
profits of the preceding half year to its surplus fund until the same shall
27    amount to twenty per centum of its capital stock.

SEC. 34. *And be it further enacted,* That every association shall make to the
28    *Associations to report to comptroller*    comptroller of the currency a report, according to the form which may be

114

| | |
|---|---|
| 1 | quarterly. |
| 2 | Contents of report.<br>Penalty for failing to<br>report. |
| 3 | Comptroller to publish<br>abstracts. |
| 4 | Monthly statements. |
| 5 | - |

prescribed by him, verified by the oath or affirmation of the president or cashier of such association; which report shall exhibit in detail, and under appropriate heads, the resources and liabilities of the association before the commencement of business on the morning of the first Monday of the month of January, April, July, and October of each year, and shall transmit the same to the comptroller within five days thereafter. And any bank failing to make and transmit such report shall be subject to a penalty of one hundred dollars for each day after five days that such report is delayed beyond that time. And the comptroller shall publish abstracts of said reports in a newspaper to be designated by him for that purpose in the city of Washington, and the separate report of each association shall be published in a newspaper in the place where such association is established, or if there be no newspaper at such place, then in a newspaper published at the nearest place thereto, at the expense of the association making such report. In addition to the quarterly reports required by this section, every association shall, on the first Tuesday of each month, make to the comptroller of the currency a statement, under the oath of the president or cashier, showing the condition of the association making such statement, on the morning of the day next preceding the date of such statement, in respect to the following items and particulars, to wit: average amount of loans and discounts, specie, and other lawful money belonging to the association, deposits, and circulation. And associations in other places than those cities named in the thirty-first section of this act shall also return the amount due them available for the redemption of their circulation.

SEC. 35. *And be it further enacted,* That no association shall make any loan or discount on the security of the shares of its own capital stock, nor be the purchaser or holder of any such shares, unless such security or purchases shall be necessary to prevent loss upon a debt previously contracted in good faith; and stock so purchased or acquired shall, within six months from the time of its purchase, be sold or disposed of at public or private sale, in default of which a receiver may be appointed to close up the business of the association, according to the provisions of this act.

SEC. 36. *And be it further enacted,* That no association shall at any time be indebted, or in any way liable, to an amount exceeding the amount of its capital stock at such times actually paid in and remaining undiminished by losses or otherwise, except on the following accounts, that is to say: —

First. On account of its notes in circulation.

Second. On account of moneys deposited with, or collected by, such association.

Third. On account of bills of exchange or drafts drawn against money actually on deposit to the credit of such association, or due thereto.

Fourth. On account of liabilities to its stockholders for dividends and reserved profits.

SEC. 37. *And be it further enacted,* That no association shall, either directly or indirectly, pledge or hypothecate any of its notes of circulation, for the purpose of procuring money to be paid in on its capital stock, or to be used in its banking operations, or otherwise; nor shall any association use its circulating notes, or any part thereof, in any manner or form, to create or increase its capital stock.

SEC. 38. *And be it further enacted,* That no association, or any member thereof, shall, during the time it shall continue its banking operations, withdraw, or permit to be withdrawn, either in form of dividends or

| | |
|---|---|
| 14 | Associations not to<br>make loans, &c., on |
| 15 | the security of their<br>own stock, &c. |
| 17 | Indebtedness not to |
| 18 | exceed capital stock,<br>&c. |
| 24 | Associations not to<br>hypothecate |
| 25 | circulating notes, for,<br>&c.; |
| 27 | not to withdraw any<br>portion of their capital. |
| 28 | Losses. |

115

Bad debts.

otherwise, any portion of its capital. And if losses shall at any time have been sustained by any such association equal to or exceeding its undivided profits then on hand, no dividend shall be made; and no dividend shall ever be made by any association, while it shall continue its banking operations, to an amount greater than its nett profits then on hand, deducting therefrom its losses and bad debts. And all debts due to any association, on which interest is past due and unpaid for a period of six months, unless the same shall be well secured, and shall be in process of collection, shall be considered bad debts within the meaning of this act: *Provided,* That nothing is this section shall prevent the reduction of the capital stock of the association under the thirteenth section of this act.

What to be deemed bad debts.

SEC. 39. *And be it further enacted,* That no associaiton shall at any time pay out on loans or discounts, or in purchasing drafts or bills of exchange, or in payment of deposits, or in any other mode pay or put in circulation the notes of any bank or banking association which shall not, at any such time, be receivable, at par, on deposit and in payment of debts by the association so paying out or circulating such notes; nor shall it knowingly pay out or put in circulation any notes issued by any bank or banking association which at the time of such paying out or putting in circulation is not redeeming its circulating notes in lawful money of the United States.

Association not to pay out certain notes.

SEC. 40. *And be it further enacted,* That the president and cashier of every such association shall cause to be kept at all times a full and correct list of the names and residences of all the shareholders, in the association, and the number of shares held by each, in the office where its business is transacted; and such list shall be subject to the inspection of all the shareholders and creditors of the association, and the officers authorized to assess taxes under state authority, during business hours of each day in which business may be legally transacted; and a copy of such list, on the first Monday of July in each year, verified by the oath of such president or cashier, shall be transmitted to the comptroller of the currency.

List of names of shareholders and residences to be kept;

to be subject to inspection;

to be sent to comptroller.

SEC. 41. *And be it further enacted,* That the plates and special dies to be procured by the comptroller of the currency for the printing of such circulating notes shall remain under his control and direction, and the expenses necessarily incurred in executing the provisions of this act respecting the procuring of such notes, and all other expenses of the bureau, shall be paid out of the proceeds of the taxes or duties now or hereafter to be assessed on the circulation, and collected from associations organized under this act. And in lieu of all existing taxes, every association shall pay to the treasurer of the United States, in the months of January and July, a duty of one half of one per centum each half year from and after the first day of January, eighteen hundred and sixty-four, upon the average amount of its notes in circulation, and a duty of one quarter of one per centum each half year upon the average amount of its deposits, and a duty of one quarter of one per centum each half year, as aforesaid, on the average amount of its capital stock beyond the amount invested in United States bonds; and in case of default in the payment thereof by any association, the duties aforesaid may be collected in the manner provided for the collection of United States duties of other corporations, or the treasurer may reserve the amount of said duties out of the interest, as it may become due, on the bonds deposited with him by such defaulting association. And it shall be the duty of each association, within ten days from the first days of January and July of each year, to make a return, under the oath of its president or cashier, to the treasurer of the United States, in such form as he may prescribe, of the average amount of its notes in circulation, and of the average amount of its

Comptroller to keep control of plates and special dies.

Expenses to be borne by associations.

Duty upon circulation, deposits, and capital stock to be paid semi-annually.

How collected if not paid in time.

Return of circulation, &c., to be made.

Penalty for default.

Shares not hereby exempted from taxation by state authority.

Limit of state tax.

Real estate to be taxed.

1
2
3
4
5
6
7
8
9
10
11
12
13

deposits, and of the average amount of its capital stock, beyond the amount invested in United States bonds, for the six months next preceding said first days of January and July as aforesaid, and in default of such return, and for each default thereof, each defaulting association shall forfeit and pay to the United States the sum of two hundred dollars, to be collected either out of the interest as it may become due such association on the bonds deposited with the treasurer, or, at his option, in the manner in which penalties are to be collected of other corporations under the laws of the United States; and in case of such default the amount of the duties to be paid by such association shall be assessed upon the amount of notes delivered to such association by the comptroller of the currency, and upon the highest amont of its deposits and capital stock, to be ascertained in such other manner as the treasurer may deem best: *Provided,* That nothing in this act shall be construed to prevent all the shares in any of the said associations, held by any person or body corporate, from being included in the valuation of the personal property of such person or corporation in the assessment of taxes imposed by or under state authority at the place where such bank is located, and not elsewhere, but not at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state: *Provided, further,* That the tax so imposed under the laws of any state upon the shares of any of the associations authorized by this act shall not exceed the rate imposed upon the shares in any of the banks organized under authority of the state where such association is located: *Provided, also,* That nothing in this act shall exempt the real estate associations from either state, county, or municipal taxes to the same extent, according to its value, as other real estate is taxed.

14
15
16
17
18
19
20
21
22
23
24

**How associations may be closed.**

**Proceedings.**

SEC. 42. *And be it further enacted,* That any association may go into liquidation and be closed by the vote of its shareholders owning two thirds of its stock. And whenever such vote shall be taken it shall be the duty of the board of directors to cause notice of this fact to be certified, under the seal of the association, by it president or cashier, to the comptroller of the currency, and publication thereof to be made for a period of two months in a newspaper published in the city of New York, and also in a newspaper published in a city or town in which the association is located, and if no newspaper be there published, then in the newspaper published nearest thereto, that said association is closing up its affairs, and notifying the holders of its notes and other creditors to present the notes and other claims against the association for payment. And at any time after the expiration of one year from the time of the publication of such notice as aforesaid, the said association may pay over to the treasurer of the United States the amount of its outstanding notes in the lawful money of the United States, and take up the bonds which said association has on deposit with the treasurer for the security of its circulating notes; which bonds shall be assigned to the bank in the manner specified in the nineteenth section of this act, and from that time the outstanding notes of said association shall be redeemed at the treasury of the United States, and the said association and the shareholders thereof shall be discharged from all liabilities therefor.

25
26
27
28

**Treasurer to execute duplicate receipts.**

**Redeemed notes to be mutilated, &c.**

SEC. 43. *And be it further enacted,* That the treasurer, on receiving from an association lawful money for the payment and redemption of its outstanding notes, as provided for in the preceding section of this act, shall execute duplicate receipts therefor, one to the association and the other to the comptroller of the currency, stating the amount received by him, and the purpose for which it has been received, which amount shall be paid into the treasury of the United States, and placed to the credit of such association

117

upon redemption account. And it shall be the duty of the treasurer, whenever he shall redeem any of the notes of said association, to cause the same to be mutilated, and charged to the redemption account of said association; and all notes so redeemed by the treasurer shall, every three months, be certified to and burned in the manner prescribed in the twenty-fourth section of this act.

*State banks may become national associations.*

*Mode of procedure.*

SEC. 44. *And be it further enacted*, That any bank incorporated by special law, or any banking institution organized under a general law of any state, may, by authority of this act, become a national association under its provisions, by the name prescribed in its organization certificate; and in such case the articles of association and organization certificate required by this act may be executed by a majority of the directors of the bank or banking institution; and said certificate shall declare that the owners of two thirds of the capital stock have authorized the directors to make such certificate and to change and convert the said bank or banking institution into a national association under this act. And a majority of the directors, after executing said articles of association and organization certificate, shall have power to execute all other papers, and to do whatever may be required to make its organization perfect and complete as a national association. The shares of any such bank may continue to be for the same amount each as they were before said conversion, and the directors aforesaid may be the directors of the association until others are elected or appointed in accordance with the provisions of this act; and any state bank which is a stockholder in any other bank, by authority of state laws, may continue to hold its stock, although either bank, or both, may be organized under and have accepted the provisions of this act. When the comptroller shall give to such association a certificate, under his hand and official seal, that the provisions of this act have been complied with, and that it is authorized to commence the business of banking under it, the association shall have the same powers and privileges, and shall be subject to the same duties, responsibilities, and rules, in all respects as are prescribed in this act for other associations organized under it, and shall be held and regarded as an association under this act: *Provided, however,* That no such association shall have a less capital than the amount prescribed for banking associations under this act.

*Associations, when so designated, may be depositaries of public moneys, except, &c.;*

*may be financial agents.*

*Designated depositaries to pay promptly;*

*to receive national currency bills at par.*

SEC. 45. *And be it further enacted*, That all associations under this act, when designated for that purpose by the Secretary of the Treasury, shall be depositaries of public money, except receipts from customs, under such regulations as may be prescribed by the Secretary; and they may also be employed as financial agents of the government; and they shall perform all such reasonable duties, as depositaries of public moneys and financial agents of the government, as may be required of them. And the Secretary of the Treasury shall require of the associations thus designated satisfactory security, by the deposit of United States bonds and otherwise, for the safe-keeping and prompt payment of the public money deposited with them, and for the faithful performance of their duties as financial agents of the government: *Provided,* That every association which shall be selected and designated as receiver or depositary of the public money shall take and receive at par all of the national currency bills, by whatever association issued, which have been paid in to the government for internal revenue, or for loans or stocks.

*If associations fail to redeem their circulation, the notes may be protested, unless, &c.*

SEC. 46. *And be it further enacted*, That if any such association shall at any time fail to redeem, in the lawful money of the United States, any of its circulating notes, when payment thereof shall be lawfully demanded, during the usual hours of business, at the office of such association, or at its place of redemption aforesaid, the holder may cause the same to be protested, in

118

Notices of protest, &c., to be forwarded to comptroller.

Association not to do business further, except, &c.

Notes not to be protested in certain cases.

one package, by a notary-public, unless the president or cashier of the association whose notes are presented for payment, or the president or cashier of the association at the place at which they are redeemable, shall offer to waive demand and notice of the protest, and shall, in pursuance of such offer, make, sign, and deliver to the party making such demand an admission in writing, stating the time of the demand, the amount demanded, and the fact of non-payment thereof; and such notary-public, on making such protest, or upon receiving such admission, shall forthwith forward such admission or notice of protest to the comptroller of the currency, retaining a copy thereof. And after such default, on examination of the facts by the comptroller, and notice by him to the association, it shall not be lawful for the association suffering the same to pay out any of its notes, discount any notes or bills, or otherwise prosecute the business of banking, except to receive and safely keep money belonging to it, and to deliver special deposites: *Provided,* That if satisfactory proof be produced to such notary-public that the payment of any such notes is restrained by order of any court of competent jurisdiction, such notary-public shall not protest the same; and when the holder of such notes shall cause more than one note or package to be protested on the same day, he shall not receive pay for more than one protest.

Fees of notary.

Upon notice of failure to redeem circulation, comptroller to send special agent to ascertain facts,

when to declare securities forfeited,

to notify holders of notes to present them for payment,

to pay notes and cancel bonds.

SEC. 47. *And be it further enacted,* That on receiving notice that any such association has failed to redeem any of its circulating notes, as specified in the next preceding section, the comptroller of the currency, with the concurrence of the Secretary of the Treasury, may appoint a special agent (of whose appointment immediate notice shall be given to such association) who shall immediately proceed to ascertain whether such association has refused to pay its circulating notes in the lawful money of the United States, when demanded as aforesaid, and report to the comptroller the fact so ascertained; and if, from such protest or the report so made, the comptroller shall be satisfied that such association has refused to pay its circulating notes as aforesaid and is in default, he shall, within thirty days after he shall have received notice of such failure, declare the United States bonds and securities pledged by such association forfeited to the United States, and the same shall thereupon be forfeited accordingly. And thereupon the comptroller shall immediately give notice in such manner as the Secretary of the Treasury shall, by general rules or otherwise, direct, to the holders of the circulating notes of such association to present them for payment at the treasury of the United States, and the same shall be paid as presented in lawful money of the United States; whereupon said comptroller may, in his discretion, cancel an amount of bonds pledged by such association equal at current market rates, not exceeding par, to the notes paid. And it shall be lawful for the Secretary of the Treasury, from time to time, to make such regulations respecting the disposition to be made of such circulating notes after presentation thereof for payment as aforesaid, and respecting the perpetuation of the evidence of the payment thereof as may seem to him proper; but all such notes, on being paid, shall be cancelled. And for any deficiency in the proceeds of the bonds pledged by such association, when disposed of as hereinafter specified, to reimburse to the United States the amount so expended in paying the circulating notes of such association, the United States shall have a first and paramount lien upon all the assets of such association; and such deficiency shall be made good out of such assets in preference to any and all other claims whatsoever, except the necessary costs and expenses of administering the same.

The United States to have priority of lien upon assets for any deficiency in redemption of circulation.

Bonds pledged as

SEC. 48. *And be it further enacted,* That whenever the comptroller shall

119

| | |
|---|---|
| 1 | *security may be sold at auction;* |
| 2 | |
| 3 | |
| 4 | |
| 5 | *or at private sale.* |
| 6 | |
| 7 | *Proviso.* |
| 8 | |
| 9 | *Comptroller may* |
| 10 | *appoint a receiver to close affairs of* |
| 11 | *defaulting association.* |
| 12 | *Bond and duties of receiver, &c.* |
| 13 | *If association denies that it has failed to* |
| 14 | *redeem its notes, it may apply to the* |
| 15 | *courts for an injunction.* |
| 16 | *Proceedings.* |

1  become satisfied, as in the last preceding section specified, that any
2  association has refused to pay its circulating notes as therein mentioned, he
3  may, instead of cancelling the United States bonds pledged by such
4  association, as provided in the next preceding section, cause so much of
   them as necessary to redeem the outstanding circulating notes of such
   association to be sold at public auction in the city of New York, after giving
   thirty days' notice of such sale to such association.

5  SEC. 49. *And be it further enacted,* That the comptroller of the currency
6  may, if he shall be of opinion that the interests of the United States will be
7  best promoted thereby, sell at private sale any of the bonds pledged by such
   association, and receive therefor either money or the circulating notes of
   such failing association: *Provided,* That no such bonds shall be sold by
8  private sale for less than par, nor less than the market value thereof at the
   time of sale: *And provided, further,* That no sales of any such bonds, either
9  public or private, shall be complete until the transfer thereof shall have been
   made with the formalities prescribed in this act.

10 SEC. 50. *And be it further enacted,* That on becoming satisfied, as specified
11 in this act, that any association has refused to pay its circulating notes as
12 therein mentioned, and is in default, the comptroller of the currency may
13 forthwith appoint a receiver, and require of him such bond and security as he
14 shall deem proper, who, under the direction of the comptroller, shall take
15 possession of the books, records, and assets of every description of such
16 association, collect all debts, dues, and claims belonging to such association,
17 and, upon the order of a court of record of competent jurisdiction, may sell
18 or compound all bad or doubtful debts, and, on a like order, sell all the real
19 and personal property of such association, on such terms as the court shall
20 direct; and may, if necessary to pay the debts of such association, enforce
21 the individual liability of the stockholders provided for by the twelfth
22 section of this act; and such receiver shall pay over all money so made to the
23 treasurer of the United States, subject to the order of the comptroller of the
24 currency, and also make report to the comptroller of the currency of all his
25 acts and proceedings. The comptroller shall thereupon cause notice to be
26 given, by advertisement in such newspapers as he may direct, for three
27 consecutive months, calling on all persons who may have claims against
   such association to present the same, and to make legal proof thereof. And
   from time to time the comptroller, after full provision shall have been first
   made for refunding to the United States any such deficiency in redeeming
   the notes of such association as is mentioned in this act, shall make a ratable
   dividend of the money so paid over to him by such receiver on all such
   claims as may have been proved to his satisfaction or adjudicated in a court
   of competent jurisdiction; and from time to time, as the proceeds of the
   assets of such association shall be paid over to him, he shall make further
   dividends, as aforesaid, on all claims previously proved or adjudicated; and
   the remainder of such proceeds, if any, shall be paid over to the shareholders
   of such association, or their legal representatives, in proportion to the stock
   by them respectively held: *Provided, however,* That if such association
   against which proceedings have been so instituted, on account of any alleged
   refusal to redeem its circulating notes as aforesaid, shall deny having failed
   to do so, such association may, at any time within ten days after such
   association shall have been notified of the appointment of an agent, as
   provided in this act, apply to the nearest circuit, or district, or territorial
   court of the United States, to enjoin further proceedings in the premises; and
   such court, after citing the comptroller of the currency to show cause why
   further proceedings should not be enjoined, and after the decision of the

120

court or finding of a jury that such association has not refused to redeem its circulating notes, when legally presented, in the lawful money of the United States, shall make an order enjoining the comptroller, and any receiver acting under his direction, from all further proceedings on account of such alleged refusal.

SEC. 51. *And be it further enacted,* That all fees for protesting the notes issued by any such banking association shall be paid by the person procuring the protest to be made, and such banking association shall be liable therefor; but no part of the bonds pledged by such banking association, as aforesaid, shall be applied to the payment of such fees. And all expenses of any preliminary or other examinations into the condition of any association shall be paid by such association; and all expenses of any receivership shall be paid out of the assets of such association before distribution of the proceeds thereof.

SEC. 52. *And be it further enacted,* That all transfer of the notes, bonds, bills of exchange, and other evidences of debt owing to any association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, with a view to prevent the application of its assets in the manner prescribed by this act, or with a view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void.

**SEC. 53.** ***And be it further enacted,*** **That if the directors of any association shall knowingly violate, or knowingly permit any of the officers, agents, or servants of the association to violate any of the provisions of this act, all the rights, privileges, and franchises of the association derived from this act shall be thereby forfeited. Such violation shall, however, be determined and adjudged by a proper circuit, district, or territorial court of the United States, in a suit brought for that purpose by the comptroller of the currency, in his own name, before the association shall be declared dissolved. And in cases of such violation, every director who participated in or assented to the same shall be held liable in his personal and individual capacity for all damages which the association, its shareholders, or any other person, shall have sustained in consequences of such violation.**

SEC. 54. *And be it further enacted,* That the comptroller of the currency, with the approbation of the Secretary of the Treasury, as often as shall be deemed necessary or proper, shall appoint a suitable person or persons to make an examination of the affairs of every banking association, which person shall not be a director or other officer in any association whose affairs he shall be appointed to examine, and who shall have power to make a thorough examination into all the affairs of the association, and, in doing so, to examine any of the officers and agents thereof on oath; and shall make a full and detailed report of the condition of the association to the comptroller. And the association shall not be subject to any other visitorial powers than such as are authorized by this act, except such as are vested in the several courts of law and chancery. And every person appointed to make such examinatin shall receive for his services at the rate of five dollars for each day by him employed in such examination, and two dollars for every twenty-five miles he shall necessarily travel in the performance of his duty, which shall be paid by the association by him examined.

Fees for protest and other expenses, how to be paid.

Transfers, assignments, &c., in contemplation of insolvency, &c., to be void.

Penalty upon directors for violations of this act.

Violation, how to be determined.

Personal liability.

Comptroller may appoint person to examine the affairs of any association.

Duty of such examiner.

Pay.

121

SEC. 55. *And be it further enacted,* That every president, director, cashier, teller, clerk, or agent of any association, who shall embezzle, abstract, or wilfully misapply any of the moneys, funds, or credits of the association, or shall, without authority from the directors, issue or put in circulation any of the notes of the association, or shall, without such authority, issue or put forth any certificate of deposit, draw any order or bill of exchange, make any acceptance, assign any note, bond, draft, bill of exchange, mortgage, judgment, or decree, or shall make any false entry in any book, report, or statement of the association, with intent, in either case, to injure or defraud the association or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of any such association, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by imprisonment not less than five nor more than ten years.

*Penalty upon officers, &c., of association for embezzlement, &c., of funds.*

SEC. 56. *And be it further enacted,* That all suits and proceedings arising out of the provisions of this act, in which the United States or its officers or agents shall be parties, shall be conducted by the district attorneys of the several districts, under the direction and supervision of the solicitor of the treasury.

*District attorneys to conduct certain suits.*

SEC. 57. *And be it further enacted,* That suits, actions, and proceedings, against any association under this act, may be had in any circuit, district, or territorial court of the United States held within the district in which such association may be established; or in any state, county, or municipal court in the county or city in which said association is located, having jurisdiction in similar cases: *Provided, however,* That all proceedings to enjoin the comptroller under this act shall be had in a circuit, district, or territorial court of the United States, held in the district in which the association is located.

*In what courts, suits, &c., under this act may be prosecuted.*

*Proceedings for injunctions to be in what courts.*

SEC. 58. *And be it further enacted,* That every person who shall mutilate, cut, deface, disfigure, or perforate with holes, or shall unite or cement together, or do any other thing to any bank bill, draft, note, or other evidence of debt, issued by any such association, or shall cause or procure the same to be done, with intent to render such bank bill, draft, note, or other evidence of debt unfit to be reissued by said association, shall, upon conviction, forfeit fifty dollars to the association who shall be injured thereby, to be recovered by action in any court having jurisdiction.

*Penalty for mutilating notes to make them unfit for reissue.*

SEC. 59. *And be it further enacted,* That if any person shall falsely make, forge, or counterfeit, or cause or procure to be made, forged, or counterfeited, or willingly aid or assist in falsely making, forging, or counterfeiting, any note in imitation of, or purporting to be in imitation of, the circulating notes issued under the provisions of this act, or shall pass, utter, or publish, or attempt to pass, utter, or publish, any false, forged, or counterfeited note, purporting to be issued by any association doing a banking business under the provisions of this act, knowing the same to be falsely made, forged, or counterfeited, or shall falsely alter, or cause or procure to be falsely altered, or willingly aid or assist in falsely altering, any such circulating notes, issued as aforesaid, or shall pass, utter, or publish, or attempt to pass, utter, or publish, as true, any falsely altered or spurious circulating note issued, or purporting to have been issued, as aforesaid, knowing the same to be falsely altered or spurious, every such person shall be deemed and adjudged guilty of felony, and being thereof convicted by due course of law shall be sentenced to be imprisoned and kept at hard labor for a period of not less than five years, nor more than fifteen years, and fined in a sum not exceeding one thousand dollars.

*Penalty for counterfeiting notes, for knowingly uttering, &c.,*

1  for engraving, &c.,  SEC. 60. *And be it further enacted,* That if any person shall make or
2  plates for forging  engrave, or cause or procure to be made or engraved, or shall have in his
   notes, &c.,  custody or possession any plate, die, or block after the similitude of any
3  for having blank notes,  plate, die, or block from which any circulating notes issued as aforesaid
   &c., with intent,  shall have been prepared or printed, with intent to use such plate, die, or
4  for having paper, &c.  block, or cause or suffer the same to be used, in forging or counterfeiting
   any of the notes issued as aforesaid, or shall have in his custody or
5  .  possession any blank note or notes engraved and printed after the similitude
   of any notes issued as aforesaid, with intent to use such blanks, or cause or
6  suffer the same to be used, in forging or counterfeiting any of the notes
   issued as aforesaid, or shall have in his custody or possession any paper
7  adapted to the making of such notes, and similar to the paper upon which
   any such notes shall have been issued, with intent to use such paper, or
8  cause or suffer the same to be used, or forging or counterfeiting any of the
   notes issued as aforesaid, every such person, being thereof convicted by due
9  course of law, shall be sentenced to be imprisoned and kept to hard labor for
   a term not less than five or more than fifteen years, and fined in a sum not
10  exceeding one thousand dollars.

   Comptroller to report  SEC. 61. *And be it further enacted,* That it shall be the duty of the
11  annually to congress.  comptroller of the currency to report annually to congress at the
   commencement of its session —

12  Contents of report.  First. A summary of the state and condition of every association from
   whom reports have been received the preceding year, at several dates to
13  which such reports refer, with an abstract of the whole amount of banking
   Contents of  capital returned by them, of the whole amount of their debts and liabilities,
14  comptroller's report to  the amount of circulating notes outstanding, and the total amount of means
   congress.  and resources, specifying the amount of lawful money held by them at the
15  times of their several returns, and such other information in relation to said
   associations as, in his judgment, may be useful.

16  Second. A statement of the associations whose business has been closed
   during the year, with the amount of their circulation redeemed and the
17  amount outstanding.

18  Third. Any amendment to the laws relative to banking by which the
   system may be improved, and the security of the holders of its notes and
   other creditors may be increased.

19  Fourth. The names and compensation of the clerks employed by him, and
20  the whole amount of the expenses of the banking department during the
   year. And such report shall be made by or before the first day of December
21  in each year, and the usual number of copies for the use of the senate and
   house, and one thousand copies for the use of the department, shall be
22  printed by the public printer and in readiness for distribution at the first
   meeting of congress.

23  Repeal of act of 1863,  SEC. 62. *And be it further enacted,* That the act entitled "An act to provide a
   ch.58.  national currency, secured by a pledge of United States stocks, and to
24  Vol. xii. p. 665.  provide for the circulation and redemption thereof," approved February
   Saving clauses.  twenty-fifth, eighteen hundred and sixty-three, is hereby repealed: *Provided,*
25  That such repeal shall not effect any appointments made, acts done, or
   proceedings had, or the organization, acts, or proceedings of any association
26  organized or in the process of organization under the act aforesaid: *And*
   *provided, also,* That all such associations so organized or in process of
27  organization shall enjoy all the rights and privileges granted, and be subject
   to all the duties, liabilities, and restrictions imposed by this act, and with the
28  approval of the comptroller of the currency, in lieu of the name specified in

123

1    their respective organization certificates, may take any other name preferred
by them and duly certified to the comptroller, without prejudice to any right
2    acquired under this act, or under the act hereby repealed; but no such change
shall be made after six months from the passage of this act: *Provided, also,*
3    That the circulation issued or to be issued by such association shall be
considered as a part of the circulation provided for in this act.

4    SEC. 63. *And be it further enacted,* That persons holding stock as executors,
administrators, guardians, and trustees, shall not be personally subject to any
5    Executors, trustees,    liabilities as stockholders; but the estates and funds in their hands shall be
&c., holding stock, not    liable in like manner and to the same extent as the testator, intestate, ward,
6    to be personally liable.    or person interested in said trust-funds would be if they were respectively
living and competent to act and hold the stock in their own names.
7    Act may be altered or    SEC. 64. *And be it further enacted,* That congress may at any time amend,
repealed.    alter, or repeal this act.
8

9    Approved, June 3, 1864.

10

11

12

13

14

15

16                              **CONCLUSION**

17

18    Plaintiff respectfully seeks this Court to do their constitutional duty (Oath) that this

19    Court is required to under their Constitutional oath to protect and defend the

20    Constitutional rights of the individual against this corporate giant and ask this Court to

21    protect the Plaintiffs rights according to the **"Law of the land," "due process of law,"**

22    **and "due course of law"** are synonymous. *People v. Skinner, Cal., 110 P.2d 41, 45; State*

23    *v. Rossi, 71, R.I. 284, 2d 323, 326; Direct Plumbing Supply Company v. City of Dayton,*

24    *138 Ohio*

25    *St. 540, 38 N.E. 2d 70, 72, 137 A.L.R. 1058; Stoner v. Higginson, 316 Pa. 481, 175 A. 527,*

26    *531.*

27    All litigants have a Constitutional right to have their claims adjudicated according

28    to the rule of precedent. *See: Anastasoff v. United States, 223 F.3d 898 (8th Cir. 2000).*

124

1  The Plaintiff never knew that Plaintiff was entering into a non-judicial foreclosure
2  contract and was never advised about unknowingly waving Federal and State
3  Constitutional rights to have a trial by Jury.  **"We are bound to interpret the**
4  **Constitution in the light of the law as it existed at the time it was adopted."** *Mattox v.*
5  *U.S., 86 S.Ct. 237 (1938).*

6  **"Nothing can be more material to the obligation than the means of**
7  **enforcement.** Without the remedy the contract may, indeed, in the sense of the law, be
8  said not to exist, and its obligation to fall within the class of those moral and social duties
9  **which depend for their fulfillment wholly upon the will of the individual. The ideas of**
10  **validity and remedy are inseparable, and both are parts of the obligation, which is**
11  **guaranteed by the Constitution against invasion. The obligation of a contract 'is the**
12  **law which binds the parties to perform their agreement."** *RED CROSS LINE  vs.*
13  *ATLANTIC FRUIT COMPANY. 264 U.S. 109, 68 L. Ed. 582, 44 S. Ct. 274 February 18,*
14  *1924 Decided.*

15
16
17
18  For want of all of the above, Plaintiff now seeks this honorable Court's immediate
19  intervention for the re-establishment and/or protection of Plaintiff's rights. Plaintiff
20  believes, in consideration of all of the foregoing, that Plaintiff has established just and
21  proper cause for this Court to immediately intervene, by enjoining Defendants from any
22  further action, lest further, irreparable harm and injury, and loss of property befall
23  Plaintiff; and, to further issue declaratory relief consistent herewith.

24
25  **WHEREAS;** Plaintiff states the claims, and as an offer of proof, hereby accuses
26  Defendant of committing acts of perjury by; Defendant claiming to be in possession of the
27  GENUINE ORIGINAL PROMISSORY NOTE; and Defendant claiming to be the
28

1   GENUINE HOLDER IN DUE COURSE; and the Defendant claiming to be the

2   **CREDITOR.**

3      **THEREFORE;** Defendants MUST present for inspection to Plaintiff and this

4   court the GENUINE ORIGINAL PROMISSORY NOTE **or** Defendants MUST agree to

5   Judgment by Default in favor of Plaintiff.

6      **FURTHERMORE;** Plaintiff states the claim: "the GENUINE ORIGINAL

7   PROMISSORY NOTE does not exist," accordingly there is **NO** GENUINE HOLDER IN

8   DUE COURSE, Defendant is NOT the GENUINE HOLDER IN DUE COURSE and

9   Defendant is NOT the **CREDITOR** in this instant matter; and therefore no entity has the

10  right to foreclose on the Plaintiff's real property in question in this instant matter.

11     **ALSO FURTHERMORE;** Plaintiff states the claim the GENUINE ORIGINAL

12  PROMISSORY NOTE was "purposely destroyed" by Defendant in furtherance of

13  Defendants' fraudulent and unlawful acts to "securitize" the NOTE.

14     **ALSO FURTHERMORE;** Plaintiff states the claim Defendant has committed

15  fraud and is committing fraud upon the court by claiming a COPY OF A PROMISSORY

16  NOTE as a GENUINE ORIGINAL PROMISSORY NOTE, and claiming to be the

17  CREDITOR regarding this issue.

18     **ALSO FURTHERMORE;** Plaintiff respectfully prays this court to grant Plaintiff

19  declaratory and injunctive relief, consistent with the findings of the aforesaid, including,

20  but not limited to, enjoining the above-named Defendants, as well as any party, yet

21  unnamed Defendant(s), from Selling, Converting, or, by any means whatsoever,

22  Dispossessing Plaintiff of Property, until all Facts, are Clarified, as to be determined

23  following the completion of discovery, which is now pending, and, to provide Plaintiff,

24  thereafter,  Oral Argument, and/or any other relief this court deems just and proper.

25  RESPECTFULLY SUBMITTED: This 2nd day of April,  2010.

26

27

28

BY: _____, Agent
James L. Macklin, *pro se*
Signed reserving all my rights at UCC 1-308
James L. Macklin, *pro se*
10040 Wise Rd
Auburn, Calif., 95603
916-798-0857
jimmacklin@sbcglobal.net

## VERIFICATION OF James L. Macklin

I, James L. Macklin, declare as follows:

1. I am named as the Plaintiff in the above-entitled matter.

2. I have read the foregoing COMPLAINT and know the facts therein stated to be true and correct.

3. I declare, under penalty of perjury pursuant to the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge and belief.

_____
James L. Macklin, *pro per*

## CERTIFICATE OF SERVICE

**ORIGINAL** and **ONE COPY** delivered to Placer County Superior Court this 2nd day of April, 2010.

I HEREBY CERTIFY that a true and correct copy of the above COMPLAINT has been furnished by certified U.S. Mail on this 2nd day of April, 2010 to:

Certified Mail Return Receipt # 7009 2250 0004 3571 3763
Select Portfolio Servicing, Inc.
ATTN: **MATTHEW HOLLINGSWORTH, LINDA FELLER** *and/or his/her successor*
3815 S.W. Temple
Salt Lake City, Utah, 84115-4412

127

1

Certified Mail Return Receipt # 7009 2250 0004 3571 3770

2   Deutsche Bank National Trust Co., As Indenture Trustee.
ATTN: **ROBERT J. JACKSON, ATTORNEY, AGENT,** *and/or his successor*

3   1761 Saint Andrews Place
Santa Ana, CA 92705

4

Certified Mail Return Receipt # 7009 2250 0004 3571 3787

5   Mortgage Electronic Registration Systems, Inc.,
Attn: **R.K. Arnold** *and/or his successor*

6   P.O. Box 2026, Flint, Mi., 48501-2026

7

8

9                  BY: _James J. Macklin_ , agent

10                     James L. Macklin, *pro se*
Signed reserving all my rights at UCC 1-308

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASE NO.

SCV 26905

# A CASE MANAGEMENT CONFERENCE HAS BEEN SCHEDULED:

DATE:  **August 3, 2010**
TIME:  **10:00 A.M. If your case number starts with "S-CV"**
       **11:00 A.M. If your case number starts with "M-CV"**
DEPT:  **40 - 10820 Justice Center Drive, Roseville, California**

## IF YOU DO NOT HAVE AN ATTORNEY, READ THIS:

The judge does **not** decide whether you win or lose your case at this court date. If you do not file an "Answer," or other "responsive pleading," you will automatically lose this case, usually before this court date. The Answer or responsive pleading must be given to the court clerk within 30 days of the day you received the Summons, along with a filing fee or application for waiver of court fees.

You can get free help filling out your Answer or responsive pleading at the court's Legal Help Center. Call 916-408-6446 or go to the court's website at www.placercourts.org and select "Legal Help Center/Self Help" for information about the Legal Help Center.

## INFORMATION ABOUT CASE MANAGEMENT CONFERENCES:

Fifteen calendar days before the Case Management Conference, you must file and serve a completed Case Management Statement (CM-110).

You do not need to come to court for the first Case Management Conference. You can see the court's proposed orders 12 calendar days before the Case Management Conference on the court's website, www.placercourts.org. Select "Tentative Rulings and Calendar Notes", then "Civil CMC." If you do not have Internet access, call the court at 916-408-6000 to get the information.

At the First Case Management Conference, the court will make orders which may include: redesignating the class currently assigned; exempting the case from dispositional time goals; referring the case to arbitration; transferring the case to Limited Jurisdiction; assigning the case to a particular judge for all purposes; assigning a trial date; assigning the case as a short cause trial matter; identifying the case as one which may be protracted; identifying the case as one which may be amenable to early settlement; establishing a discovery cut-off; scheduling the exchange of expert witness information; scheduling a mandatory settlement conference; scheduling a final case management conference; or, other orders to achieve the interests of justice and timely disposition of the case.

**The court does not provide a court reporter** at Case Management Conferences or Law & Motion hearings. If you want the proceedings reported, you must provide your own court reporter at your own expense.

IF YOU WANT TO APPEAR BY TELEPHONE, YOU MUST CONTACT **COURT CALL** TOLL FREE, AT 888-882-6878, AT LEAST TWO (2) COURT DAYS PRIOR TO THE APPEARANCE TO ARRANGE FOR THIS. YOU MUST PAY **COURT CALL** TO USE THIS SERVICE UNLESS YOU HAVE BEEN GRANTED A FEE WAIVER BY THE COURT.

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>James L. Macklin, In Pro Per<br>10040 Wise Rd.<br>Auburn, Calif., 95603 | FOR COURT USE ONLY |
|---|---|

TELEPHONE NO.: **916-798-0857**   FAX NO.:

ATTORNEY FOR *(Name):*

SUPERIOR COURT OF CALIFORNIA, COUNTY OF **PLACER**
STREET ADDRESS: PO Box 619072
MAILING ADDRESS:
CITY AND ZIP CODE: Roseville, Ca., 95661-9072
BRANCH NAME: Bill Santucci Justice Ctr.

CASE NAME:
Macklin v. Matthew Hollingsworth et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: SCV 26905 |
|---|---|---|
| [✓] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder<br>Filed with first appearance by defendant *(Cal. Rules of Court, rule 3.402)* | JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[✓] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [✓] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [✓] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [✓] Substantial amount of documentary evidence
   d. [✓] Large number of witnesses
   e. [✓] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a.[✓] monetary   b.[✓] nonmonetary; declaratory or injunctive relief   c.[ ] punitive
4. Number of causes of action *(specify):* Three(3)
5. This case [ ] is [✓] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: April 5th, 2010
James L. Macklin
*(TYPE OR PRINT NAME)*   ▶ *(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)*

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>www.courtinfo.ca.gov |
|---|---|---|

American LegalNet, Inc.
www.FormsWorkflow.com

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Linda Feller, or successor C.F.O.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

James L. Macklin

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp) or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* | CASE NUMBER:<br>*(Número del Caso):*<br>SCV 26905 |
|---|---|

Placer County Superior Court, Bill Santucci Justice Ctr.

10820 Justice Ctr. Dr., Roseville, Ca., 95678

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

James L. Macklin, 670 Auburn-Folsom Rd. #106-303, Auburn, Cal., 95603, 916-798-0857

| DATE: April 5th, 2010<br>*(Fecha)* | Clerk, by<br>*(Secretario)* | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. [✓] as an individual defendant.
2. [✓] as the person sued under the fictitious name of *(specify):*
   Select Portfolio Servicing, Inc.
3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)     [ ] CCP 416.60 (minor)
   [ ] CCP 416.20 (defunct corporation)     [ ] CCP 416.70 (conservatee)
   [ ] CCP 416.40 (association or partnership)     [ ] CCP 416.90 (authorized person)
   [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

| FOR COURT USE ONLY |
| --- |
| *(SOLO PARA USO DE LA CORTE)* |

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Matthew Hollingsworth

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

James L. Macklin

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* | CASE NUMBER: <br> *(Número del Caso):* <br> SCV 26905 |
| --- | --- |

Superior Court of California, Placer County
10820 Justice Ctr. Dr., Roseville, Ca., 95678

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
James L. Macklin, 670 Auburn-Folsom Rd. #106-303, Auburn, Calif., 95603

| DATE: April 5th, 2010 <br> *(Fecha)* | Clerk, by <br> *(Secretario)* | , Deputy <br> *(Adjunto)* |
| --- | --- | --- |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [✓] as an individual defendant.
2. [✓] as the person sued under the fictitious name of *(specify):*
   Select Portfolio Servicing, Inc.

3. [ ] on behalf of *(specify):*

   under: [ ] CCP 416.10 (corporation)        [ ] CCP 416.60 (minor)
   [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
   [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
   [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use <br> Judicial Council of California <br> SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 <br> www.courtinfo.ca.gov <br> American LegalNet, Inc. <br> www.FormsWorkflow.com |
| --- | --- | --- |

**CM-015**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| James L. Macklin, In Pro Per<br>10040 Wise Rd.<br>Auburn, Calif., 95603<br>TELEPHONE NO.: 916-798-0857    FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* jimmacklin@sbcglobal.net<br>ATTORNEY FOR *(Name):* | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF PLACER
STREET ADDRESS: PO Box 619072
MAILING ADDRESS: Roseville, Ca., 95661-9072
CITY AND ZIP CODE:
BRANCH NAME: Bill Santucci Justice Ctr.

| PLAINTIFF/PETITIONER: James L. Macklin | CASE NUMBER:<br>SCV 26905 |
|---|---|
| DEFENDANT/RESPONDENT: Matthew Hollingsworth, et al. | JUDICIAL OFFICER: |
| **NOTICE OF RELATED CASE** | DEPT.: |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: Deutsche Bank v. Jason Macklin; et al.
   b. Case number: MCV 45238
   c. Court: [✓] same as above
             [ ] other state or federal court *(name and address):*
   d. Department: Not Specified
   e. Case type: [✓] limited civil  [ ] unlimited civil  [ ] probate  [ ] family law  [ ] other *(specify):*
   f. Filing date: Mar. 26, 2010
   g. Has this case been designated or determined as "complex?"  [ ] Yes  [✓] No
   h. Relationship of this case to the case referenced above *(check all that apply):*
      [ ] involves the same parties and is based on the same or similar claims.
      [ ] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.
      [✓] involves claims against, title to, possession of, or damages to the same property.
      [ ] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.
          [ ] Additional explanation is attached in attachment 1h
   i. Status of case:
      [✓] pending
      [ ] dismissed  [ ] with  [ ] without prejudice
      [ ] disposed of by judgment

2. a. Title:
   b. Case number:
   c. Court: [ ] same as above
             [ ] other state or federal court *(name and address):*
   d. Department:

Page 1 of 3

Form Approved for Optional Use
Judicial Council of California
CM-015 [Rev. July 1, 2007]

**NOTICE OF RELATED CASE**

Cal. Rules of Court, rule 3.300
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

CM-015

| PLAINTIFF/PETITIONER:   James L. Macklin | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Matthew Hollingsworth, et al. | |

2. *(continued)*

   e.  Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f.  Filing date:

   g.  Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h.  Relationship of this case to the case referenced above *(check all that apply):*

       ☐ involves the same parties and is based on the same or similar claims.

       ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

       ☐ involves claims against, title to, possession of, or damages to the same property.

       ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

          ☐ Additional explanation is attached in attachment 2h

   i.  Status of case:

       ☐ pending

       ☐ dismissed ☐ with ☐ without prejudice

       ☐ disposed of by judgment

3.  a.  Title:

   b.  Case number:

   c.  Court: ☐ same as above

       ☐ other state or federal court *(name and address):*

   d.  Department:

   e.  Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f.  Filing date:

   g.  Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h.  Relationship of this case to the case referenced above *(check all that apply):*

       ☐ involves the same parties and is based on the same or similar claims.

       ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

       ☐ involves claims against, title to, possession of, or damages to the same property.

       ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

          ☐ Additional explanation is attached in attachment 3h

   i.  Status of case:

       ☐ pending

       ☐ dismissed ☐ with ☐ without prejudice

       ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: April 5th, 2010

James L. Macklin ▶ *(signature)*

  (TYPE OR PRINT NAME OF PARTY OR ATTORNEY)         (SIGNATURE OF PARTY OR ATTORNEY)

CM-015 [Rev. July 1, 2007]        **NOTICE OF RELATED CASE**        Page 2 of 3

**CM-015**

| PLAINTIFF/PETITIONER:  James L. Macklin | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Matthew Hollingsworth, et al. | |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service.  The notice must be served on all known parties in each related action or proceeding.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

   965 Kidder Ct., Auburn, Calif., 95603 (Home)

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*

   a. [✓]  deposited the sealed envelope with the United States Postal Service.

   b. [  ]  placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:

   a. on *(date):* April 5th, 2010

   b. from *(city and state):* Auburn, Calif.

4. The envelope was addressed and mailed as follows:

   a. Name of person served:
   Matthew Hollingsworth
   Street address: 3815 Temple
   City: Salt Lake City
   State and zip code: Utah, 84115-4412

   b. Name of person served:
   R.K. Arnold/M.E.R.S.
   Street address: PO Box 2026
   City: Flint
   State and zip code: Mi., 48501-2026

   c. Name of person served:
   Robert J. Jackson, Agent for Deutsche Bank Nat'l Trust
   Street address: 1761 Saint Andrews Pl.
   City: Santa Ana
   State and zip code: Ca., 92705

   d. Name of person served:

   Street address:
   City:
   State and zip code:

[  ]  Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: April 5th, 2010

Victoria D. Sweigart
_____
(TYPE OR PRINT NAME OF DECLARANT)

▶  _____
(SIGNATURE OF DECLARANT)

**POS-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| James L. Macklin<br>10040 Wise Rd.<br>Auburn, Calif., 95603<br>In Pro Per<br>TELEPHONE NO.: 916-798-0857   FAX NO. *(Optional):*<br>E-MAIL ADDRESS *(Optional):* jimmacklin@sbcglobal.net<br>ATTORNEY FOR *(Name):* | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF PLACER
STREET ADDRESS:   PO Box 619072
MAILING ADDRESS:
CITY AND ZIP CODE:   Roseville, Ca., 95661-9072
BRANCH NAME:   BillSantucci Justice Ctr.

PLAINTIFF/PETITIONER: James L. Macklin, In Pro Per

DEFENDANT/RESPONDENT: Select Portfolio Servicing, Inc.

| | |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | CASE NUMBER:<br>SCV 26905<br>Ref. No. or File No.: |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:

   a. ☑ summons

   b. ☑ complaint

   c. ☐ Alternative Dispute Resolution (ADR) package

   d. ☐ Civil Case Cover Sheet *(served in complex cases only)*

   e. ☐ cross-complaint

   f. ☐ other *(specify documents):*

3. a. Party served *(specify name of party as shown on documents served):*
   "SPS, Inc.", Matthew Hollingsworth, Pres., C.E.O., Agent and in his individual capacity

   b. ☐ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*

4. Address where the party was served:
   3815 Temple, Salt Lake City, Ut., 84115-4412

5. I served the party *(check proper box)*

   a. ☐ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):*          (2) at *(time):*

   b. ☐ **by substituted service.** On *(date):*          at *(time):*          I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*          from *(city):*          or ☐ a declaration of mailing is attached.

      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10
American LegalNet, Inc.
www.FormsWorkflow.com

| PLAINTIFF/PETITIONER: James L. Macklin, In Pro Per | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Select Portfolio Servicing, Inc. | SCV 26905 |

5. c. ☑ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):* April 2nd, 2010     (2) from *(city):* Auburn, Calif.

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.*) (Code Civ. Proc., § 415.30.)*

    (4) ☑ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
  a. ☐ as an individual defendant.
  b. ☑ as the person sued under the fictitious name of *(specify):* Select Portfolio Servicing, Inc.
  c. ☐ as occupant.
  d. ☐ On behalf of *(specify):*
    under the following Code of Civil Procedure section:

    ☐ 416.10 (corporation)     ☐ 415.95 (business organization, form unknown)
    ☐ 416.20 (defunct corporation)     ☐ 416.60 (minor)
    ☐ 416.30 (joint stock company/association)     ☐ 416.70 (ward or conservatee)
    ☐ 416.40 (association or partnership)     ☐ 416.90 (authorized person)
    ☐ 416.50 (public entity)     ☐ 415.46 (occupant)
    ☐ other:

7. **Person who served papers**
  a. Name: Victoria D. Sweigart
  b. Address: 965 Kidder Ct., Auburn, Calif., 95603
  c. Telephone number: 916-390-0151
  d. The fee for service was: $ 0
  e. I am:
    (1) ☑ not a registered California process server.
    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
    (3) ☐ a registered California process server:
      (i) ☐ owner ☐ employee ☐ independent contractor.
      (ii) Registration No.:
      (iii) County:

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal** and I certify that the foregoing is true and correct.

Date: April 2nd, 2010

Victoria D. Sweigart          ▶ *(signature)*
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| James L. Macklin, In Pro Per<br>10040 Wise Rd.<br>Auburn, Calif., 95603<br><br>TELEPHONE NO.: 916-798-0857   FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*: jimmacklin@sbclgobal.net<br>ATTORNEY FOR *(Name)*: | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF PLACER
STREET ADDRESS: PO Box 619072
MAILING ADDRESS:
CITY AND ZIP CODE: Roseville, Ca., 95661-9072
BRANCH NAME: Bill Santucci Justice Ctr.

PLAINTIFF/PETITIONER: James L. Macklin, Pro Per

DEFENDANT/RESPONDENT: Deutsche Bank Nat'l Trust Co., as Indenture Trustee

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>SCV 26905 |
|---|---|

TO *(insert name of party being served)*: Matthew Hollingsworth, Pres., C.E.O.

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: April 2nd, 2010

Victoria D. Sweigart
_____
(TYPE OR PRINT NAME)

▶ _____
(SIGNATURE OF SENDER--MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:

1. [✓] A copy of the summons and of the complaint.

2. [ ] Other *(specify)*:

*(To be completed by recipient)*:

Date this form is signed:

▶

_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

_____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Code of Civil Procedure,<br>§§ 415.30, 417.10<br>www.courtinfo.ca.gov<br>American LegalNet, Inc.<br>www.USCourtForms.com |
|---|---|---|

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| James L. Macklin, In Pro Per<br>10040 Wise Rd.<br>Auburn, Calif., 95603<br><br>TELEPHONE NO.: 916-798-0857    FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*: jimmacklin@sbclgobal.net<br>ATTORNEY FOR *(Name)*: | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF PLACER
STREET ADDRESS: PO Box 619072
MAILING ADDRESS:
CITY AND ZIP CODE: Roseville, Ca., 95661-9072
BRANCH NAME: Bill Santucci Justice Ctr.

PLAINTIFF/PETITIONER: James L. Macklin, Pro Per

DEFENDANT/RESPONDENT: Deutsche Bank Nat'l Trust Co., as Indenture Trustee

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER:<br>SCV 26905 |
|---|---|

TO *(insert name of party being served)*: Matthew Hollingsworth, Pres., C.E.O.

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: April 2nd, 2010

Victoria D. Sweigart
_____
(TYPE OR PRINT NAME)

► *Victoria Sweigart* (signature)
(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:

1. [✓]  A copy of the summons and of the complaint.
2. [  ]  Other *(specify)*:

*(To be completed by recipient)*:

Date this form is signed:

►

_____
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

_____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>POS-015 [Rev. January 1, 2005] | NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL | Code of Civil Procedure,<br>§§ 415.30, 417.10<br>www.courtinfo.ca.gov<br><br>American LegalNet, Inc.<br>www.USCourtForms.com |
|---|---|---|

Schedule package pickup right from your home or office

*Print postage online - Go to usps.com/postageonline*

$5.10   US POSTAGE        $4.90    US POSTAGE
PRIORITY MAIL            APR 5 2010   Mailed from ZIP 95603
APR 5 2010              Flat Rate Envelope, Priority Mail
Mailed from ZIP 95603

**PLEASE PRESS FIRMLY**        : FIRML         endicia.com        071V00556382

CORRECTION        071V00556382

**CERTIFIED MAIL**

## Flat Rate
## Mailing Envelope

**For Domestic and International Use**

*Visit us at usps.com*

7009 2250 0004 3571 3763



**UNITED STATES POSTAL SERVICE**

Any amount of mailable material may be enclosed, as long as the envelope is not modified, and the contents are entirely confined within the envelope with the adhesive provided as the means of closure.

**INTERNATIONAL RESTRICTIONS APPLY:**

**4-POUND WEIGHT LIMIT ON INTERNATIONAL APPLIES**

Customs forms are required. Consult the *International Mail Manual* (IMM) at po.usps.gov or ask a retail associate for details.

From/*Expéditeur:*

To:/*Destinataire:*

SELECT PORTFOLIO SERVICES, INC
ATTN: MATTHE HOLLINGSWORTH
3815 TEMPLE
SALT LAKE CITY, UT 84115-4412



USPS packaging products have been awarded Cradle to Cradle Certification℠ for their ecologically-intelligent design. For more information go to mbdc.com/usps

Cradle to Cradle Certified℠ is a certification mark of MBDC.

Country of Destination/*Pays de destination:*



Recycled
Paper

EP14F

# EXHIBIT B

# EXHIBIT B

1  Robert A. Bleicher (Bar No. 111334)
   rbleicher@carr-mcclellan.com
2  Lori A. Lutzker (Bar No. 124589)
   llutzker@carr-mcclellan.com
3  CARR, McCLELLAN, INGERSOLL, THOMPSON & HORN
   Professional Law Corporation
4  216 Park Road
   P.O. Box 513
5  Burlingame, California  94011-0513
   Telephone:    (650) 342-9600
6  Facsimile:    (650) 342-7685

7  Attorneys for Defendants Matthew Hollingsworth, Robert J.
   Jackson, Amy E. Starrett, and R.K. Arnold
8

9              **UNITED STATES DISTRICT COURT**

10            **EASTERN DISTRICT OF CALIFORNIA**

11  James L. Macklin, *pro se*,                    Case No.

12                    Plaintiff,                   **NOTICE OF REMOVAL OF ACTION
                                                   UNDER 28 U.S.C. §1441(b) (FEDERAL
13          Vs.                                    QUESTION AND DIVERSITY)**

14  **Matthew Hollingsworth**, *and/or his
    successor*, individually, and in his official
15  capacity as **C.E.O. OF SELECT
    PORTFOLIO SERVICING, INC.**, *an ens
16  legis being used to conceal fraud*,

17  **LINDA FELLER**, *and/or her successor,
    individually and in her official capacity as*
18  **C.F.O. OF SELECT PORTFOLIO
    SERVICING, INC.**, *an ens legis being used
19  to conceal fraud*,

20  **ROBERT J. JACKSON, AMY E.
    STARRETT**, *and/or his/her successor*,
21  individually, and in his/her official capacity as
    **ATTORNEY, AGENT OF DEUTSCHE
22  BANK NATIONAL TRUST CO., AS
    INDENTURE TRUSTEE, OR ITS'
23  PREDECESSORS OR ASSIGNS**, *an ens
    legis being used to conceal fraud*,
24
    **R.K. ARNOLD**, *and/or his successor,
25  individually and in his official capacity as*
    **PRES./C.E.O. OF MORTGAGE
26  ELECTRONIC REGISTRATION
    SYSTEMS, INC.**, *as an ens legis being used
27  to conceal fraud*,

28

29801-00001\iManage\3189087.3

DEFENDANTS' NOTICE OF REMOVAL OF CIVIL ACTION

**AND DOES (Investors) 1-10,000**, et al,

               Defendant.

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

        PLEASE TAKE NOTICE that Defendants Matthew Hollingsworth, Robert J. Jackson, Amy E. Starrett, and R.K. Arnold hereby remove to this Court the state court action described below.

        1.     Defendants first received notice of this action on or about, April 7, 2010, when Defendant Matthew Hollingsworth received by certified mail a copy of the Summons and Complaint in Case No. SCV 29605, entitled *James L. Macklin, pro se, v. Matthew Hollingsworth, et al.*, pending in the Superior Court of California for the County of Placer (the "State Court Action"). Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings, and orders in the State Court Action that have been served upon Defendant Hollingsworth is attached as **Exhibit A.** Defendants initiated this removal within 30 days, as required by 28 U.S.C. § 1446(b).

        2.     Defendant R.K. Arnold received a copy of the Summons and Complaint on April 12, 2010. Defendants Robert J. Jackson and Amy Starrett received a copy of the Summons and Complaint on April 29, 2010. Defendant Linda Feller, identified in the complaint's caption as the C.F.O. of Select Portfolio Servicing, Inc.( a Utah corporation with its principal place of business in Salt Lake City, Utah), has not been served. Linda Feller, in fact, is unknown to Select Portfolio Servicing, Inc— she is not and has never been an employee Select Portfolio Servicing, Inc.

JURISDICTION

        3.     This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. §1331 and is one which may be removed to this Court by Defendants pursuant to the provisions of 28 U.S.C. §1441(b) in that it appears to be based on the United States Constitution (see, e.g., Complaint pp. 31:3-32:7); 18 U.S.C. §§ 241,1341, 1343, 1961, 1962, 1964, 1983, 1985, 1986 (*Id.* at pp. 90:25-92:13); and the National Bank Act (*Id.* at pp. 104:4-124:9).

        4.     Alternatively or in addition, this action is a civil action of which this Court has original jurisdiction under 28 U.S.C. §1332 and is one which may be removed to this Court by

DEFENDANTS' NOTICE OF REMOVAL OF CIVIL ACTION

1    Defendants pursuant to the provisions of 28 U.S.C. §1441(b) in that it is a civil action between a

2    citizen of different states and the matter in controversy exceeds $75,000 exclusive of interest and

3    costs.

4        5.    The Complaint does not contain any jurisdictional allegations regarding Plaintiff

5    or of Defendants.  However, diversity is present because Plaintiff James Macklin is a citizen of

6    California, Defendant Matthew Hollingsworth is a citizen of Utah, and Defendant R. K. Arnold is

7    a citizen of Virginia.

8        6.    The Complaint also names as defendants Robert J. Jackson and Amy E. Starrett.

9    Jackson and Starrett are citizens of California.  However, their citizenship should be disregarded

10   for purposes of determining jurisdiction under 28 U.S.C. §1332 and 28 U.S.C. §1441(b) because

11   their joinder is a "sham" or "fraudulent joinder."  The Complaint does not have a single factual or

12   legal allegation against either Jackson and Starrett, who are merely the attorneys of record on the

13   eviction action pending against Plaintiff in Placer County Superior, *Deutsche Bank National Trust*

14   *Co. v. Macklin*, Case No. M-CV-45238.  With no cause of action stated against Jackson and

15   Starrett and their statements as attorneys of record protected by the litigation privilege under

16   California law (*see Kolar v. Donahue, McIntosh & Hammerton,* 145 Cal.App.4th 1532 (2006)

17   [litigation privilege shields attorneys from liability for virtually all torts except malicious

18   prosecution]), their joinder is clearly a "sham" and they should be disregarded for purposes of

19   assessing diversity jurisdiction. *See McCabe v. General Foods Corp.*, 811 F.2d 1336, 1339 (9th

20   Cir. 1987) ["If a plaintiff fails to state a cause of action against a resident defendant, and the

21   failure is obvious according to the settled rules of the state, the joinder of the resident defendant is

22   fraudulent."].

23       7.    Defendant Linda Feller is unknown to any of Defendants; she is not and has never

24   been an employee Select Portfolio Servicing, Inc, a Utah Corporation with its principal place of

25   business in Salt Lake City, Utah.  The same "sham" or "fraudulent joinder" analysis applies to

26   Linda Fuller, as well: the Complaint has no factual allegations against her and no causes of action

27   are directed toward her.

28

29801-00001\iManage\3189087.3                      3

DEFENDANTS' NOTICE OF REMOVAL OF CIVIL ACTION

1      8.    The amount in controversy exceeds $75,000. "In actions seeking declaratory or

2 injunctive relief, it is well established that the amount in controversy is measured by the value of

3 the object of the litigation." *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333,

4 347 (1977). "[T]he value of the thing sought to be accomplished by the action may relate to

5 either or any party to the action." *McCauley v. Ford Motor Co.*, 264 F.3d 952, 958 (9th Cir. 2001)

6 (citing *Ridder Bros. Inc. v. Blethen*, 142 F.2d 395, 399 (9th Cit. 1944)).

7      9.    To the extent intelligible, Plaintiff's Complaint appears to arise out of a judgment

8 of foreclosure regarding his property in Auburn, California. The amount due on Plaintiff's loan

9 for the property is $643,295.20 as of April 22, 2010, and the amount of the debt at the time of the

10 Trustee sale of the property was $623,986.20.

11      <u>VENUE AND INTRADISTRICT ASSIGNMENT</u>

12      10.    Venue is proper in this district under 28 U.S.C. § 1441(a) because this District

13 Court embraces the place where the action was pending. Assignment to this Division is proper

14 because the Complaint in this action was initially filed in the Superior Court of California, Placer

15 County, which resides within and is encompassed by this Division. See 28 U.S.C. §§ 1441(a),

16 1442(a), and 1446; see also L.R. 3-2(d).

17 Dated: May 3, 2010                 CARR, McCLELLAN, INGERSOLL,
18                               THOMPSON & HORN Professional Law Corporation

19

20                               By:_____

21                                    Robert A. Bleicher
                               Attorneys for Defendants Matthew
22                           Hollingsworth, Robert J. Jackson, Amy E.
                                Starrett, and R.K. Arnold

23

24

25

26

27

28

# EXHIBIT C

# EXHIBIT C

1   Robert A. Bleicher (Bar No. 111334)
    rbleicher@carr-mcclellan.com
2   Lori A. Lutzker (Bar No. 124589)
    llutzker@carr-mcclellan.com
3   CARR, McCLELLAN, INGERSOLL, THOMPSON & HORN
    Professional Law Corporation
4   216 Park Road
    P.O. Box 513
5   Burlingame, California  94011-0513
    Telephone:    (650) 342-9600
6   Facsimile:    (650) 342-7685

7   Attorneys for Defendants
    Matthew Hollingsworth, Robert J. Jackson, Amy E. Starrett,
8   and R.K. Arnold

9                       UNITED STATES DISTRICT COURT

10                      EASTERN DISTRICT OF CALIFORNIA

11   JAMES L. MACKLIN,                    Case No.  2:10-CV-01097-FCD-KJN

12              Plaintiff,                **MEMORANDUM OF POINTS AND
                                          AUTHORITIES IN SUPPORT OF
13   v.                                   DEFENDANTS' MOTION FOR FAILURE
                                          TO STATE A CLAIM UPON WHICH
14   MATTHEW HOLLINGSWORTH, ET            RELIEF CAN BE GRANTED [Fed. R. Civ.
     AL.,                                 P., Rule 12(b)(6)]**
15
                Defendants.               Date:        June 18, 2010
16                                        Time:        10:00 a.m.
                                          Courtroom:   2
17                                        Judge:       Hon. Frank C. Damrell, Jr.

18
         Defendants Matthew Hollingsworth, Robert J. Jackson, Amy E, Starrett, and R.K. Arnold
19
     ("Defendants") submit the following Memorandum of Points and Authorities in support of their
20
     Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted, pursuant to
21
     Fed. R. Civ. P., Rule 12(b)(6).
22
         I.      INTRODUCTION
23
         Plaintiff James Macklin filed a 128 page Complaint in Placer County Superior Court on
24
     April 2, 2010, which Defendants timely removed on May 3, 2010.  Despite its length, the
25
     Complaint, which appears to concern a foreclosure sale of Mr. Macklin's home, completely lacks
26
     any discernable and coherent factual allegations or identifiable causes of action that plausibly
27
     suggest a claim against the Defendants.  As such, the Complaint fails to meet the pleading
28

1    standards of the Federal Rules of Civil Procedure and the requirements of *Ashcroft v. Iqbal*, 556

2    U.S.___, 129 S.Ct. 1937 (2009).  Accordingly, Defendants ask the Court to dismiss the

3    Complaint for failure to state a claim upon which relief can be granted.

4            II.      STATEMENT OF FACTS

5            The best that Defendants can discern from the Complaint is that Mr. Macklin's property

6    was foreclosed and he is attempting to raise issues with the Deed of Trust, Promissory Note, and

7    the Power of Sale Clause in the Deed of Trust for the property.  As to the Defendants, however,

8    the Complaint does not contain a single factual assertion regarding their conduct and how they

9    purportedly engaged in acts that plausibly give rise to a claim for relief against any of them.

10   Instead, nearly every line of the Complaint is argument, periodically infused with the word

11   "fraud," terms such as "barratry" and "champetry," and laced with other wide ranging references

12   to countless statutes, cases, rules, Constitutional provisions, legal theories, ideas, and definitions,

13   none of which are factually connected to Defendants.

14           III.     ARGUMENT

15           The Supreme Court's guidance in *Iqbal,* coupled with the pleading requirement of Rules 8

16   and 9 of the Federal Rules of Civil Procedure, require the dismissal of Mr. Macklin's Complaint

17   because it does not—and in fact cannot—state a claim upon which relief can be granted.

18           Dismissal under Fed. R. Civ. P., Rule 12 (b)(6) is proper where there is either a "lack of a

19   cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal

20   theory."  *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990); *Greahling v.*

21   *Village of Lombard, Ill.*, 58 F.3d 295, 297 (7th Cir. 1995).  As a general matter, in resolving a

22   Rule 12(b)(6) motion, the court must (1) construe the complaint in the light most favorable to the

23   plaintiff; (2) accept as true all well-pleaded factual allegations; and (3) determine whether the

24   plaintiff can prove any set of facts to support a claim that would merit relief.  *Cahill v. Liberty*

25   *Mutual Ins. Co.*, 80 F.3d 336, 337-338 (9th Cir. 1996).  Despite this general rule, however, a

26   court is not required to accept as true "allegations that are merely conclusory, unwarranted

27   deductions of fact, or unreasonable inferences."  *In re Gilead Sciences Securities Lit.*, 536 F.3d

28   1049, 1055 (9th Cir. 2008) (citation omitted).  Indeed, the district court clearly has the discretion

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF DEFENDANTS' RULE 12(b)(6) MOTION

1   to grant a Rule 12(b)(6) motion without leave to amend where "it is clear that the complaint could

2   not be saved by an amendment." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d

3   940, 946 (9th Cir. 2006).

4        Recent decisions by the Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544

5   (2007) and *Iqbal, supra*, have made it clear that to survive a Rule 12(b)(6) motion,

6          a complaint must contain sufficient factual matter, accepted as true,
   to "state a claim to relief that is plausible on its face."…A claim has
7   facial plausibility when the plaintiff pleads factual content that
   allows the court to draw the reasonable inference that the defendant
8   is liable for the misconduct alleged….The plausibility standard is
   not akin to a "probability requirement," but asks for more than a
9   sheer possibility that a defendant has acted unlawfully.

10        *Id.* at 556 U.S.___, 129 S.Ct. 1937, 1949 (citations omitted).

11        The cornerstone of a sufficiently plead complaint, of course, is Fed.R.Civ.P., Rule 8,

12   which requires a plaintiff to "plead a short and plain statement of the elements of his or her claim,

13   identifying the transaction or occurrence giving rise to the claim and the elements of the prima

14   facie case." *Bautista v. Los Angeles County*, 216 F.3d 837, 840 (9th Cir. 2000).  The complaint,

15   therefore, cannot merely allege that a wrong has been committed and then demand relief.  Rather,

16   the complaint must give fair notice and state the claim's elements plainly and succinctly; it must

17   allege at least with a sufficient degree of particularity the overt facts which the defendant engaged

18   in to support the claim.  *Jones v. Community Redev. Agency*, 733 F.2d 646, 649 (9th Cir. 1984).

19   As the Court held in *Twombly, supra*, at 557, "[w]ithout some factual allegation in the complaint,

20   it is hard to see how a claimant could satisfy the requirement of providing not only "fair notice"

21   of the nature of the claim, but also "grounds" on which the claim rests."

22        The fundamental deficiencies of Mr. Macklin's Complaint appear on each of the 128

23   pages of his filing, they are incurable, and they require the dismissal of his Complaint.  There is

24   not a single factual statement regarding any of the Defendants and their purported conduct that (a)

25   puts them on fair notice of the nature of the claims Mr. Macklin is making against them and (b)

26   that allows the court to determine whether, drawing on "its judicial experience and common

27   sense" (*Iqbal, supra*, 556 U.S.___, 129 S.Ct. at 1949-1950), he has stated a plausible claim for

28   relief.  Instead, Defendants and the court are faced with 128 pages of disconnected legal citations,

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF DEFENDANTS' RULE 12(b)(6) MOTION

1    irrelevant doctrines, ruminations, speculations, analysis and argument, all loosely connected to

2    the apparent foreclosure of his home and completely disconnected from the Defendants.  Even

3    under pre-*Iqbal/Twombly* standards, plaintiff's Complaint lacks any cognizable legal theory

4    sufficiently supported by alleged facts involving the Defendants, and it is therefore totally

5    deficient.  With the heightened pleading requirements now mandated by the Supreme Court, Mr.

6    Macklin's Complaint irretrievably fails to state a claim upon which relief can be granted.

7        Mr. Macklin's sprinkling of the word "fraud" in the Complaint does not cure its elemental

8    deficiency.  Allegations of fraud must meet the heightened standards of Fed. R. Civ. P., Rule 9(b),

9    which requires Mr. Macklin to state with particularity the circumstances that constitute the fraud.

10   *In Re Glenfed, Inc. Securities Litigation*, 42 F.3d 1541, 1547-1548 (9th Cir. 1994) (en banc)

11   *superseded by statute on other grounds as stated in Marksman Partners, L.P. v. Chantal Pharm.*

12   *Corp., 927 F.Supp. 1297 (C.D.Cal. 1996).*  The Complaint merely inveighs "fraud" or its

13   synonyms and derivations without any semblance of the supporting factual particularity required

14   by Rule 9(b).  Accordingly, to the extent the Complaint seeks to allege "fraud," the factual

15   deficiency of his Complaint supports dismissal on that basis, as well.

16       Although Mr. Macklin is a pro se litigant, he is not exempted from the pleading

17   requirements mandated by the Federal Rules of Civil Procedure and the Supreme Court.  As the

18   Court of Appeals stated, "[t]he hazards which beset a layman when he seeks to represent himself

19   are obvious.  He who proceeds pro se with full knowledge and understanding of the risks does so

20   with no greater rights than a litigant represented by a lawyer, and the trial court is under no

21   obligation to become an "advocate" for or to assist and guide the pro se layman through the trial

22   thicket."  *Jacobsen v. Filler*, 709 F.2d 1362, 1364 n.5 (9th Cir. 1986).  Mr. Macklin's Complaint

23   lacks specific allegations regarding any of the Defendants and it fails to give the Defendants fair

24   notice of his claims in a plain and succinct manner.  Defendants' motion to dismiss should

25   therefore be granted.

26   ///

27   ///

28   ///

1

IV.   CONCLUSION

2

For the reasons set forth above, Defendants request that the court grant their Motion to

3

Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

4

5

Dated: May 7, 2010                           CARR, McCLELLAN, INGERSOLL,
                                             THOMPSON & HORN

6                                            Professional Law Corporation

7

8                                            By:_____/s/ Robert Bleicher_____
                                                Robert A. Bleicher
9                                               Attorneys for Defendants
                                                Matthew Hollingsworth, Robert J. Jackson,
10                                              Amy E. Starrett, and R.K. Arnold

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF DEFENDANTS' RULE 12(b)(6) MOTION

# EXHIBIT D

# EXHIBIT D

James L.Macklin, *pro-se*

10040 Wise Rd.,
Auburn,
California,
95603.



FILED

JUN - 4 2010

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
              DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

**James L.Macklin**, *pro-se*

   Plaintiff,

   vs.

**SELECT PORTFOLIO SERVICING, INC.,** represented by the C.E.O Mathew Hollingsworth, *and/or his successor,* in his official capacity

**MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.,** represented by R.K.Arnold *and/or his successor,* in his official capacity

**DEUTSCHE BANK NATIONAL TRUST CO., AS INDENTURE TRUSTEE, OR ITS' PREDECESSORS OR AGENTS,**

) Case No.: 2:10-CV-1097 KJM

)
)
)
)
)
)
**) AMENDED COMPLAINT FOR**
**) TEMPORARY RESTRAINING**
**) ORDER TO ESTOP THE**
**) DEFENDANTS FROM SELLING,**
**) TRANSFERRING, FORECLOSING**
  **AND/OR OTHERWISE TAKING**
  **THE PLAINTIFF'S REAL**
  **PROPERTY,**

**UNLAWFUL OR FRAUDULENT BUSINESS ACT OR PRACTICE,**

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS,**

**VIOLATION OF DUE PROCESS,**

**FRAUD BY CONCEALMENT,**

**BREACH OF CONTRACT,**

Amended Complaint for temporary restraining order - 1

**BREACH OF FIDUCIARY DUTY**

represented   by   Robert   J.
Jackson, Amy E.Starret, *and/or*
*his successor,* in his official
capacity

**AND   DOES   (investors,**
**indispensable parties)**

Defendants.

---

James L. Mackiln, the Plaintiff herein, residing at 10040 Wise
Rd., Auburn, California, 95603 in his complaint against Select
Portfolio Servicing, Inc., Deutsche Bank National Trust Co. as
Indenture Trustee for the Beneficial Holders of Mortgage Loan
Trust 2006-2 Asset Backed Notes, and Mortgage Electronic
Registration Systems, Inc., alleges the following upon
information and belief:

**DEFENDANTS**

The Loan Servicer, Select Portfolio Servicing, Inc., is a
registered Corp. within the State of California and has
represented themselves as a debt collector with right, title
and interest, but is merely a Fictitious Payee. Matthew

Hollingsworth is the C.E.O of Select Portfolio Servicing, Inc. At all times mentioned herein, Select Portfolio Servicing, Inc. is doing business within the statutory boundaries of the State of California.

Accredited Home Lenders, Inc. (not named herein) has filed for bankruptcy in April, 2009 and is the party named as Beneficiary in the Deed of Trust. They have nominated Mortgage Electronic Registration Systems, Inc. (MERS) solely as a "nominee beneficiary" in the said Deed. Therefore, in all of the subsequent assignments made by MERS, the assignee can be conferred with only the status as a "Nominee" and have no beneficial interest to the deed. *See: In re Weisband (Ariz.); Mtg. Elec. Reg. Sys., Inc. v. Neb. Dept. of Banking and Finance, 704 N.W. 2d 784, 786-87(Neb, 2005)(MERS represented that it "only holds legal title to members' mortgages in a nominee capacity and is contractually prohibited from exercising any rights with respect to the mortgages..*"; In re Sheridan, 2009 WL 631355, *4(Bankr. D. Idaho 2009); In re Mitchell, 2009 WL 1044368, *3-4(Bankr. D. Nev. 2009); In re Jacobson, 402 B.R. 359, 367 (Bankr. W.D. Wash. 2009).*

At all times mentioned herein, Accredited Home Lenders, Inc. was conducting business within the statutory boundaries of the State of California.

At all times mentioned herein, Mortgage Electronic Registration Systems, Inc. is carrying out its' business

1   within the statutory boundaries of the State of California.
2   However, MERS, Inc. is not, and has not been registered with
3   the California Dept. of Corporations, since 2004 and is in
4   violation of many state laws, including, but not limited to:
5   **Cal. Revenue and Taxation Code §§ 23304, 23305(A).** *RULE OF*
6   *LAW: During suspension, a Corporation is, in fact, "shorn of*
7   *all rights, save those expressly reserved by the statutes."*
8   **(Ransome Crummey Co. v. Superior Court, (1922)188 Cal. 393,**
9   **397.) referring to Cal. Bank & Corp. Franchise Act § 32).** I
10  contend that among the rights lost by a suspended Corporation
11  are the rights to conduct business or pursue legal matters in
12  a Court of Law or non-judicially. (See appeal of **Al Tirpa &**
13  **Assoc. 97-SBE-007, Feb 26, 1997). Revenue and Taxation Code**
14  **section 25962.1 makes it a crime for any person to purport to**
15  **exercise the powers of a Corporation which has been suspended**
16  **pursuant to Revenue & Taxation Code section 23301.**
17
18  Indeed, in ***UNITED STATES v. STANDARD BEAUTY SUPPLY STORES,***
19  ***INC.***, No. 75-2258, 9th cir., 561 F2d 774; 1977 US App. Lexis
20  *11446 (1977) the Court reasoned: "...to back up the*
21  *suspension, the California Legislature also provided that any*
22  *contract made in violation of 23301 was voidable at the*
23  *instance of other parties to the contract, see Cal. Rev. & Tax*
24  *Code 23304 (West 1970), and that any person purporting to*
25  *exercise the Corporate powers, rights and privileges would be*
26  *subject to criminal penalties and fines, see Id. §*
27  *25962.1...".*
28

Deutsche Bank National Trust Co. is the 'Indenture Trustee' on behalf of the Holders of the Notes of Accredited Home Lenders Inc. and was assigned limited interest by MERS. Robert J.Jackson and Amy E. Starrett, who are attorneys of record for non judicial foreclosure, are acting as Agents for Deutsche Bank National Trust Co. At all times mentioned herein, Deutsche Bank National Trust is doing business within the statutory boundaries of the State of California.

Wells Fargo Bank Mortgage Div. (not yet named herein) is the broker behind the loan transaction. At all times mentioned herein, Wells Fargo is doing business within the statutory boundaries of the State of California.

The Plaintiff is not aware of the true names and capacities of the Investors/Indispensible parties (Defendants), sued as **DOES** and, therefore, sues these Defendants by such fictitious names. Each of these fictitiously named Defendants is responsible in some manner for the activities alleged in this Complaint. Plaintiff requests leave of this Court to amend and identify the parties for inclusion in this matter at a later date.

Any allegation on any corporate or other business entity in the complaint would mean that the said defendant did the acts alleged through its officers, directors, employees, agents and/or representatives while they were acting within their actual or ostensible scope of authority.

1

2

### JURISDICTION AND VENUE

3    This Court assumes original jurisdiction in the instant matter

4    under 28 U.S.C. 1332 which provides that

5    *(a) The district courts shall have original jurisdiction of*

6    *all civil actions where the matter in controversy exceeds the*

7    *sum or value of $75,000, exclusive of interest and costs, and*

8    *is between - (1) citizens of different States; (2) citizens of*

9    *a State and citizens or subjects of a foreign state; (3)*

10   *citizens of different States and in which citizens or subjects*

11   *of a foreign state are additional parties; and (4) a foreign*

12   *state, defined in section 1603(a) of this title, as plaintiff*

13   *and citizens of a State or of different States.*

14

15   Thus in spite of the fact that the Plaintiff is a citizen of

16   California, while the Defendant corporate entities are all

17   located at different States; since the value of the subject

18   matter in question is $659,000.00, as well as the amount

19   mentioned in the Note is the same, the matter in controversy

20   thus exceeds the sum or value of $75,000, exclusive of

21   interest and costs, thereby conferring jurisdiction to this

22   Court.

23

24   As claimed in the 'Notice of removal of the action,' of the

25   Defendants, the Defendants Robert J. Jackson, and Amy E.

26   Starret who are attorneys on record, on the eviction action

27   pending against the Plaintiff in the Placer County Superior,

28   [*Deutsche Bank National Trust Co. v. Macklin* [Case No. M-CV-

Amended Complaint for temporary restraining order - 6

45238]], cannot seek protection by any 'litigation privilege' under California law, since "California Civil Code section 47, subdivision 2 confers an absolute privilege, it attaches only to **statements or publications**, but *not actions* of the person invoking the privilege." (***Westlake Community Hospital v. Superior Court***, (1976) 17 Cal.3d 465, 482, 131 Cal.Rptr. 90, 551 P.2d 410) Here the attorneys of record (Defendants) have colluded with the other Defendants in committing the fraudulent act of Wrongful Foreclosure, unlawful conversion, and negligent infliction of emotional distress, thereby giving way to a genuine cause of action against them in this matter. In addition to this, the Attorneys are acting as agents of Deutsche Bank National Trust, as Indenture Trustee and therefore are in concert with Defendants knowingly, willfully and intentionally, having the legal knowledge of the herein stated violations of law.

## STATEMENT OF FACTS

The Plaintiff had availed a "loan" from Accredited Home Lenders, Inc. based on a Deed of Trust. The real property that was kept as security for the loan transaction is his primary dwelling. Accredited Home Lenders, Inc. (Beneficiary) incorporated Mortgage Electronic Registration Systems, Inc. (MERS) as the "nominee beneficiary" in the Deed. In accordance with this, a Note was issued by the Plaintiff valued at $659,000 for the benefit of the alleged "Lender", Accredited Home Lenders. However, Plaintiff was in contract to receive a

loan from the purported "Lender" and became aware that the
Lender never loaned him anything, rather, the Lender **exchanged**
Plaintiffs' Note for a check which was provided by a third
party warehouse lender at a **discount** to Lender (undisclosed to
borrower), thus, changing the substance of the terms of the
contract. The Lender subsequently received a "spread" (un-
disclosed) of the discount amount and the actual amount
purported in the contract of approximately 2.5% of the value
of the loan. Since the Lender never risked any of its' own
assets, it could never be harmed and, therefore, did not show
equal or valuable consideration in the transaction. Plaintiff
shall evidence these facts at trial and possesses the actual
Sale & Servicing Agreement, Trust Indenture, and all
subsequent accounting from the original transaction inclusive
of the securitization chain of accounting.

In the original loan application, the Plaintiff's income was
grossly over-stated by the Broker, Wells Fargo Bank Mortgage.
They also placed false information on his period of service in
the current job, showing it as 7 years, while it was only 2
years and a total of 10.5 years experience in the industry,
while it was only 4 years. And Defendants relied on a
statement by co-Defendants that Plaintiff lived in the home
for more than five (5) years when plaintiff had only lived
there for less than a year, this was done to facilitate a
"seasoned" residence and further evidences the willing nature
of fraudulent practices employed by Defendants with full
knowledge and intent. They had knowingly lied on this loan

application to qualify the Plaintiff for the said loan. The lender, and all subsequent parties to the transaction, in turn relied heavily upon this information without verifying it.

The Deed of Trust was signed on April 19th 2006 (though dated as April 14<sup>th,</sup> 2006), while the Note was signed by the Plaintiff on April 14<sup>th,</sup> 2006 itself. The Deed was filed for public record at the Placer County Recorder's Office.

The re-payment of the alleged debt commenced in May, 2006, and continued until August, 2008 when Plaintiff made a claim of genuine doubt regarding the 'true identity' of his creditor as well as disputing the authenticity of his signature in the crucial loan related documents. Though he tried to bring to the attention of the Defendants (documented through an administrative record kept by Plaintiff) the fraudulent information in the loan documents, they blatantly ignored all of his assertions. Plaintiff rescinded his signature pursuant to the remedies within TILA well within the time allowed by statute. Defendants did not answer timely, and when they did, it was without lawful authority and specifically did not qualify as a lawful response, never having followed it's responsibilities under a qualified rescission. **Reg. Z §§ 226.15(a)(2), 226.23(a)(2), Official Staff Commentary § 226.23(a)(2)-1 and 15 U.S.C. § 1635(b) and other applicable law contained in the Federal Truth In Lending Act (TILA). Service of the Notice of Rescission was done in accordance with the above named laws by Certified Mail with Return**

*Receipt of proof of Delivery to the Defendants and is proof of Notification pursuant to the Official Staff Commentary, 226.2(a)(22)-2. See In re Moore, 117 B.R. 135 (Bankr. E.D. Pa. 1990). The Statute and Regulation specify,  By Rule Of Law, that the security interest, promissory note or Lien arising by operation of law on the property becomes automatically void.*

Mortgage Electronic Registration System Inc. (MERS, who is the "nominee beneficiary" in the Deed), later made a restricted assignment of the Deed to Deutsche Bank National Trust Co. by making them the Indenture Trustee in the Deed of Trust. However, the assignment came three months **after** Deutsche Bank had made a Substitution of Trustee, **without authority**, to Quality Loan Services, Inc. in order to implement the wrongful foreclosure action. This Trustee who had, in fact, only the status as that of a "nominee beneficiary", without any adequate *locus-standi* against the Plaintiff in the said loan transaction, initiated fraudulent sales and foreclosure proceedings against him through Select Portfolio Services, Inc. (Debt Collectors), who acted as their agents.

This action is thus based on the Defendant's numerous acts of fraud upon the Plaintiff, the Court and upon the People of California, inclusive of any and all Trustee sales, judicial or non-judicial proceedings, as well as the Defendant's purposeful fraud in attempting to appear as a CREDITOR to the Court, while fully aware of the fact that none of the

Defendants are the CREDITOR, and, therefore, NOT THE REAL PARTY IN INTEREST in the wrongful foreclosure matter.

The Defendants have clearly failed to appear before this Honorable Court with 'clean hands,' while the Plaintiff is genuinely seeking justice under Federal Law and California Code.

## CAUSES OF ACTION

Plaintiff respectfully submits as follows:

## I. THE NON-JUDICIAL FORECLOSURE INITIATED BY THE DEFENDANTS IS VOID AND ILLEGAL

### 1. The Defendants lack Authority and standing to conduct the Trustee Sale and non-judicial foreclosure

It is hereby submitted before this Honorable Court that the Defendants herein fail to possess the required authority and standing to initiate the Trustee sale and foreclosure proceedings against the Plaintiff, as they are neither the 'creditors' nor the 'real party in interest' in the instant case, thereby making the Trustee sale and non-judicial foreclosure initiated by them against the Plaintiff's real property void.

Since, in the instant case, the loan transaction was based on a Deed of Trust, the 'power of sale' under the alleged Deed has been conferred on the alleged Trustee (Deutsche Bank National Trust). For the Trustee to conduct the Trustee sale and foreclosure, they are required to be the 'real party in interest.'

The 'real party in interest' is defined as a person "`who has the right to sue under the substantive law. It is the person who owns or holds title to the claim or property involved, as opposed to others who may be interested or benefit by the litigation." **(O'Flaherty v. Belgum (2004), 115 Cal.App.4th 1044)**

As per the Deed of Trust, Accredited Home Lenders, Inc., (lender) named Mortgage Electronic Registration Systems Inc. (MERS) as the "nominee beneficiary". And there was a separation of the Deed of Trust and the Promissory note at the time of the transaction, whereby MERS was made the holder of the Deed of Trust.

"The practical effect of splitting the deed of trust from the Note is to make it impossible for the holder of the Note to foreclose, unless the holder of the deed of trust is the agent of the holder of the Note. Without the agency relationship, the person holding only the Note lacks the power to foreclose in the event of default. The person holding only the deed of trust will never experience default because only the holder of

the note is entitled to payment of the underlying obligation." *Bellistri v. Ocwen Loan Servicing, LLC*, **284 S.W.3d 619, 623 (Mo. App. 2009)** From the facts available at hand, it cannot be inferred that there existed such an agency relationship between MERS and the Holder of the Note, as there doesn't exist any Agency Agreement.

**US Bankruptcy Court, Eastern Dist. Of California: Honorable Ronald H. Sargis, Sacramento, Ca., May 20, 2010, Case No.10-21656-E-11   Ricky Walker; To wit: "Under California law, to perfect the transfer of mortgage paper as collateral the owner should physically transfer the Note to the transferee. Bear v. Golden Plan of California, Inc., 829 F.2d 705, 709(9th Cir.1986). Without physical transfer, the sale of the Note could be invalid as a fraudulent conveyance, Cal. Civil Code 3440, or as unperfected Cal. Comm. Code 9313-9314, see Roger Bernhardt, California mortgage and Deed of Trusts, and foreclosure litigation 1.26 (4th Ed. 2009)".** Since it is well settled law that the Note and the Deed are inseparable, any and all assignees of the Deed, as an incident to the Note, are invalid on their face and constitute evidence of the fraud perpetrated upon Plaintiff, the People of California and this Court.

MERS later transferred their limited interest under the Deed of Trust to Deutsche Bank, making them the **"Nominee"** by way of an assignment. There is no evidence to show that the Note was also transferred to MERS along with the Deed, nor can there

possibly be due to the sale and subsequent securitization of the Note. And they are found to have miserably failed in presenting the 'Genuine Original Promissory Note' before the officers acting in the non-judicial foreclosure, which is suggestive of the fact that they are not in possession of the Genuine Original Promissory Note.

It is a settled position in law that "the Deed of Trust is a mere incident of the debt that it secures and an assignment of the debt carries with it the security instrument. Therefore, a Deed of Trust is inseparable from the debt and always abides with the debt. It has no market or ascertainable value apart from the obligation it secures. A Deed of Trust has no assignable quality independent of the debt, it may not be assigned or transferred apart from the debt, and an attempt to assign the Deed Of Trust without a transfer of the debt is without effect." (*La Salle Bank Nat. Ass'n v. Lamy*, **2006 WL 2251721, at *2 (N.Y. Sup. 2006)**)) (unpublished opinion)

MERS, not being the owner of the Note, would be entitled to transfer only whatever interest that they had in the Deed of Trust, and nothing more. This is quite evident from the legal maxim— "*Nemo plus juris transferre ad alium potest quam ipse habet*" meaning 'no one can transfer a greater right than he himself has.' It was observed in the recent case of **Landmark Nat. Bank v. Kesler**, **216 P.3d 158 (Kan. Sup. Ct., 2009**) that "any attempt to transfer the beneficial interest of a trust deed without ownership of the note is void" and is consistent with California law. Thus, by way of the assignment, there

cannot be a transfer of the note or the beneficial interest in the Deed. Deutsche Bank merely **"steps into the shoes"** of the "nominee beneficiary" with no right, title, or interest whatsoever.

Select Portfolio Servicing, Inc., who acted as the debt collector in violation of FDCPA § 1692 et. seq., and in the case herein, performed their activities as an agent and in the limited capacity of "Attorney-in-Fact" for the Trustee (Deutsche Bank). Since "an agent has no implied authority to do what the principal is not empowered to do." (**Amalgamated Clothing W'K'Rs v. Kiser, 174 Va. 229 (Va, 1939))** it can be inferred that the Debt collector (agent) cannot be deemed to be a 'real party in interest' which the alleged principal has failed in also. Thus, the Trustee sale and foreclosure proceedings initiated by the Defendants are void and without authority.

### 2. The Defendants lack standing as a Holder in Due Course

UCC 3-302(3)defines a "holder in due course": **(a)** *Subject to subsection (c) and Section 3-106(d), "holder in due course" means the holder of an instrument if:*

*(2) the holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains*

*an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in Section 3-306, and (vi) without notice that any party has a defense or claim in recoupment described in Section 3-305(a).*

*(c) Except to the extent a transferor or predecessor in interest has rights as a holder in due course, a person does not acquire rights of a holder in due course of an instrument taken (i) by legal process or by purchase in an execution, bankruptcy, or creditor's sale or similar proceeding, (ii) by purchase as part of a bulk transaction not in ordinary course of business of the transferor, or (iii) as the successor in interest to an estate or other organization.*

The Defendants in the instant case have not been able to produce the 'genuine original promissory note' before the non-judicial officers at the foreclosure proceedings, which would be the only evidence to show that they are the 'real party in interest'. The Plaintiff hereby contends that even if the Defendants are found to be in possession of the note, they cannot fall under the definition of a 'holder in due course' as provided under the UCC 3-302(3).

This is because of the fact that the Defendant herein would have received a copy of the Note after the Note was determined to be in default. The Defendant was fully informed that the Note and/or the Mortgage was disputed, delinquent and was in dishonor before he became a holder of the copy of the Note. Thus even if the Defendant did prove the possession of the

Genuine Original Promissory Note, the Defendant's claims are
still invalid as he would not amount to a "Holder in due
Course" as provided by the Uniform Commercial Code § 3-302.

### 3. Violation of Fair Debt Collection Practices Act

The Plaintiff hereby submits before this Court that Select
Portfolio Servicing, Inc. (debt collector) has violated the
Fair Debt Collection Practices Act, 15 U.S.C.§1692g(b)by
failing to comply with the procedural requirements under the
Act.

15 U.S.C. Section 1692 (g) (b) provides that *"If the consumer
notifies the debt collector in writing within the thirty-day
period* **(or within three years of discovering TILA violations)**
**described in subsection (a)** *of this section that the debt, or
any portion thereof, is disputed, or that the consumer
requests the name and address of the original creditor, the
debt collector shall cease collection of the debt, or any
disputed portion thereof, until the debt collector obtains
verification of the debt or a copy of a judgment, or the name
and address of the original creditor, and a copy of such
verification or judgment, or name and address of the original
creditor, is mailed to the consumer by the debt collector."*

The Plaintiff in this case contends that the reason for his
default in repayment of the loan amount due, was his genuine
doubt regarding the true amount owed and the underlying

1    applications used, being filled with false information, and
2    the true identity of the creditor. He accordingly raised a
3    formal dispute as to the authenticity of his signatures and
4    the actual accounting of the transaction in its' entirety. But
5    request for an explanation was fully ignored and neglected by
6    the Defendants, bringing about a violation of 15 U.S.C.
7    Section 1692 (g)(b). Factual evidence of the lawful requests
8    and subsequent failures at law by Defendants shall be provided
9    by Plaintiff at trial.

10

11    **II. BREACH OF FIDUCIARY DUTY AND VIOLATION OF THE TRUTH IN**
12    **LENDING ACT (Regulation Z)**

13

14    **1. Disclosure Requirements**

15

16    "The elements of a cause of action for breach of fiduciary
17    duty are: 1) the existence of a fiduciary duty; 2) a breach of
18    the fiduciary duty; and 3) resulting damage." (***Pellegrini v.***
19    ***Weiss*****, 165 Cal. App.4th 515, 524, 81 Cal.Rptr.3d 387 (2008))**

20

21    Under California law, "A mortgage broker owes a fiduciary duty
22    to their client." **(Cal. Civ.Code § 2079.24; *Zimmer v. Nawabi*,**
23    **566 F.Supp.2d 1025 (E.D.Cal.2008))** This duty obligates the
24    brokers to "make a full and accurate disclosure of the terms
25    of a loan to borrowers and to act always in the utmost good
26    faith toward them." **(*Wyatt*, 24 Cal.3d at 782, 157 Cal.Rptr.**
27    **392, 598 P.2d 45 (citing *Rattray v. Scudder*, 28 Cal.2d 214,**
28    **223, 169 P.2d 371 (1946)).**

§ 226.17 of the Truth in Lending Act mandates the 'General Disclosure Requirements', whereby the creditor is duty bound to make the disclosures clearly and conspicuously in writing, in a form that the consumer may keep. Under sub-section (c) the disclosures thus made *shall reflect the terms of the legal obligation between the parties. And if any information necessary for an accurate disclosure is unknown to the creditor, the creditor shall make the disclosure based on the best information reasonably available at the time the disclosure is provided to the consumer, and shall state clearly that the disclosure is an estimate*(§ 226.17 (2) (i)). In addition to this, § 226.18 details the 'Content of disclosures.'

In the instant matter the Defendants clearly had the fiduciary duty under the Deed of Trust, to protect the Plaintiff's interest, while granting the loan. By showing an enhanced amount as the Plaintiff's income, for the purpose of obtaining the loan, the broker failed to perform their duty towards the Plaintiff, by breaching the disclosure requirements under the Truth in Lending Act. While the Lender also owed a contractual duty to the Plaintiff to verify the information received from the broker through the Plaintiff's tax returns, bank account statements, and other financial documents which were provided as a "full document loan" by the Plaintiff. This is because TILA mandates the creditors provide their borrowers with clear and accurate disclosures of borrowers' rights, finance

charges, the amount financed, and the annual percentage rate.
(15 U.S.C. §§ 1632, 1635, 1638)

The factual information available are indicative of the fact
that the Broker had intentionally marked his income in the
loan application document as $29,000 per month while his tax
returns clearly indicated an income of approximately $8,000
per month. And on the second mortgage application, they showed
his income as $23,000 per month which was still almost triple
his actual income. The loan document indicated a total of
$65,000 in cash in his bank account, which was not ever there,
and the home was valued at only $615,000 in the second
(subordinate financing) loan, while being valued at
$685,000.00 for the first loan. This represents false and
misleading information provided by the lender/broker to be
relied upon by possible investors and being transmitted across
state lines on U.S. Government forms. They also placed more
false information pertaining to his vocation, where his job
experience in the current job was marked as 7 years instead of
2 years (actual) and a total of 10.5 years in the industry,
while it was only 4 years.   Defendants profited by these
actions, which were self-serving and were done knowingly and
intentionally in order to reap profits for all participants in
the loan/securitization scheme and was perpetrated upon many
other California residents.

The Defendants, again, with the *malafide* intention of
converting the Plaintiff's real property from its' true owner

to the Defendants, introduced "legalese" into the Deed, which the Plaintiff was unable to understand in its real sense. In addition to this they fraudulently damaged the 'genuine original promissory note' issued by the Plaintiff to securitize the Note. The Defendants, through these wrongful means, thus could initiate the Trustee sale and foreclosure proceeding with the support of the erroneous information provided by the broker/lender and further profit by the "Credit Enhancements" provided for by the mortgage loan trust investments in the form of default swaps, loan loss insurance, and various other investments designed for the specific purpose of profiting from the assured default of thousands of fraudulent loans. All of this was by design and the Plaintiff has the supporting securitization chain of documents which shall be produced at trial.

## 2. Right to Rescission

The Truth in lending Act, § 226.23 (a) grants the Consumers with the right to rescind the loan under certain situations. 15 U.S.C. § 1635(a) provides that in the case of a consumer credit transaction in which the creditor acquires a security interest in property to be used as the principal residence of the obligor, the obligor "*shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information or rescission forms.* "*An obligor who exercises their right to rescind*" is not liable for any finance or other

*charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon rescission."* (Id. at § 1635(b)) This right was never disclosed to Plaintiff in the timely and lawful manner in which the law provides.

The only requirement to be satisfied, for the obligor to exercise the right to rescind, is that he must *"notify the creditor of the rescission by mail, telegram, or other means of written communication."* (12 C.F.R. § 226.23(a)(2)) And within 20 days of receiving notice of rescission, *"the creditor shall return to the obligor any money or property given as earnest money, down payment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction."*

Plaintiff herein clearly asserts that he sent the Defendants a Qualified Written Request/Notice of Loan Rescission, received by Defendants via certified mail on Feb. 12, 2009, while the Defendants did not timely respond to this. This is a substantive breach of the Defendants' duty to act under TILA. ***See: TILA, Reg. Z, 12 CFR 226.23:... "the security agreement signed with a lender can be rescinded if they have not provided the proper disclosures. Although home mortgages are exempt from some rescissions, this option becomes available if they begin foreclosure and they stated an incorrect amount of debt."*** Plaintiff has factual evidence in his possession that

1    Defendants did receive third party payments into the Trust
2    payment account through the mechanism of TARP/TARF funds,
3    credit default swaps, credit enhancements through ancillary
4    investments by the Trust, over-collateralization, loan loss
5    insurance, and a variety of other payments. Defendants were
6    aware of these payments and their effect upon amounts
7    allegedly owed under the Note, and have purposely secreted
8    these amounts so as to protect the interests of the Indenture
9    Trustee, Swap Provider, Note insurer, and Owner Trustee, all
10   of whom are Beneficial Holders of the underlying trust.
11   Pursuant to the Deed of Trust signed by Plaintiff, there is a
12   specific priority of application of funds received by the
13   Trust which states: 1. Payment of interest on the Note, 2.
14   Payment of Principle on the Note, etc.. Trust administrators
15   have elected to ignore their duties to the Borrower and
16   investor, while taking investment profits, TARP funds, and all
17   other methods of payment for their own unjust enrichment.
18   Plaintiffs' original signature, payments and Note along with
19   investors funds are the source of these profits, without
20   disclosure from the alleged "Creditor".

21

22   **In re Pearl Maxwell, 281 B.R. 101: Full disclosure was not**
23   **given and therefore an unconscionable contract.**

24

25   This can also be conceived as a confession of the Defendant
26   that they are committing fraud, knowing that they are not the
27   'creditor' and that they are not the 'real party in interest'
28   in the instant matter, as "Silence can only be equated with

fraud where there is a legal or moral duty to speak or when an inquiry left unanswered would be intentionally misleading." **(United States v. Kis, 658 F.2d, 526 (7th Cir. 1981) Cert Denied, 50 U.S. L.W. 2169; S. Ct. March 22, (1982))**

Since the Mortgage Loan Trust, AMLT 2006-2, where the Note allegedly is held as trust property, is, in fact, a REMIC Trust, Deutsche Bank is treating the Notes as debt, and therefore cannot possibly be a creditor. And, pursuant to the Trust Indenture, the investors who possess "Book-Entry Notes" with a certificated interest, not right, title, and interest in the underlying Notes, are merely the recipients of the trust profits at a given rate pre-determined long before the loan transaction was ever even contemplated. Thus, the entire accounting of the actual Payment Account of the mortgage loan trust, along with ancillary accounts authorized in trust, must be brought forward to determine the true condition of the alleged debt owed, if any, by Plaintiff.

## 3. Prohibited acts or practices in connection with credit secured by a consumer's principal dwelling

TILA prohibits certain acts and practices in connection with the credit secured by the consumer's principal dwelling. One such act is the **'misrepresentation of value of consumer's dwelling.'** According to § 226.36(1) in connection with a consumer credit transaction secured by a consumer's principal dwelling, no creditor or mortgage broker, and no affiliate of a creditor or mortgage broker shall directly or indirectly

coerce, influence, or otherwise encourage an appraiser to misstate or misrepresent the value of such dwelling. And a creditor who knows, at or before loan consummation, of a violation of this shall not extend credit based on such appraisal unless the creditor documents that it has acted with reasonable diligence to determine that the appraisal does not materially misstate or misrepresent the value of such dwelling. The face of the two separate loan applications, filled in by the Broker on behalf of the Lender, evidence a disparity in the amount of $65,000.00. This is fraud in the inducement, and breach of contract and duty by Defendants. It may also constitute criminal activities by Defendants.

The Plaintiff has been able to show that the loan was obtained by the broker by intentionally incorporating incorrect information in the loan documents, as it pertains to the value of the consumer's dwelling. Additionally the lender, when granting the loan, negligently relied upon this false and misleading information, and conferred him with a loan, which was not lawful under the statutory regulations. The lender failed to exercise due diligence to determine as to whether there was any misstatement in the loan documents as regards to the value of the dwelling. This has given way to a patent violation of TILA.

**III. THE ACTS OF THE DEFENDANTS AMOUNT TO FRAUD BY CONCEALMENT**

"Concealment is a species of fraud or deceit." (*Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC*, 162 Cal. App.4th 858, 868, 76 Cal.Rptr.3d 325 (2008)) The following elements must be proven to establish a fraud by concealment claim: 1) the defendant concealed or suppressed a material fact, 2) the defendant was under a duty to disclose the fact to the plaintiff, 3) the defendant intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, 4) the plaintiff was unaware of the fact and would not have acted as he did had he known of the concealed or suppressed fact, and 5) the plaintiff sustained damages as a result of the concealment or suppression of the fact (*Lovejoy v. AT & T Corp.*, 92 Cal.App.4th 85, 96, 92 Cal.App.4th 1016F, 111 Cal. Rptr.2d 711 (2001))

From the aforementioned contentions it has been established that there has been an infringement of the disclosure requirements by the Defendants by way of an active concealment of certain material facts. By obtaining sanction for a loan, for a higher amount than what the application deserved, the Defendants have been able to receive a proportionally greater amount of fees, investment profits and bonuses which he otherwise would not have enjoyed. Added to this, the lender, by neglecting to verify the veracity of the loan documents, has permitted the loan without verifying *viability* of future payment. The intention to commit fraud, or knowingly act upon the fraud of another, is quite explicit from this. The

recipient of the fruits of the fraud is just as culpable as the party executing the fraud.

The aspect of intentional fraud can further be proved from the Defendant's act of issuing the Plaintiff a check for loan purposes, without utilizing their own assets, exchanging the Plaintiff's Note at a discount, without disclosure of the fact, thereby changing the substance of the terms of the alleged loan. This was fully done by Defendants without the Plaintiff's knowledge and with forethought and malice.

## IV. **THERE HAS BEEN A VIOLATION OF THE PLAINTIFF'S FUNDAMENTAL RIGHT UNDER 'DUE PROCESS' DUE TO LACK OF NOTICE**

In the Deed of Trust between the Plaintiff and the Defendant, the Defendant intentionally concealed the existence of certain hidden clauses, especially the one known as the 'Power of Sale Clause', which grants power to the Defendant to sell Plaintiffs' property without due process. The Plaintiff was not given Notice of this clause, which is now being used by the Defendants to unlawfully confiscate the Plaintiff's real property. This has resulted in a clear-cut violation of the Plaintiff's fundamental right to due process (as guaranteed by the 14th Amendment to the US Constitution and the Constitution of California).

*"Procedural due process mandates that an individual be afforded notice and an opportunity for a hearing before he is*

deprived of any significant property interest" (**Randone v. Appellate Department** (1971) 5 Cal.3d 536, 541, 96 Cal.Rptr. 709, 488 P.2d 13) *"When notice is a person's due process, which is a mere gesture, it is not due process. The means employed must be such as one desirous of actually informing the [person] who might reasonably adopt to accomplish it."* (**Mullane v. Central Hanover Bank & Trust Co.**, (1950) 339 U.S. 306) A hidden 'power of sale clause' in a deed would in effect create a cognovit note/ confession of judgment, thereby creating conditions for the violation of the California Constitution.

In addition to this, the non-judicial foreclosure in California is governed by a comprehensive statutory scheme which provides that "upon default by the trustor, the beneficiary may declare a default and proceed with a non-judicial foreclosure sale. The foreclosure process is commenced by the recording of a notice of default and election to sell by the trustee. After the notice of default is recorded, the trustee must wait three calendar months before proceeding with the sale. After the three-month period has elapsed, a notice of sale must be published, posted and mailed 20 days before the sale and recorded 14 days before the sale." (Civ. Code, § 2924 et seq) "To be effective, a copy of the notice of trustee's sale—at least 20 days prior to the sale— must be mailed by registered or certified mail, postage prepaid, to the trustor, sent to his or her last known address

if different from the address listed on the deed of trust"
(Civ. Code, § 2924b, subd. (b)(2))

It is submitted before this court that the Defendants have
intentionally omitted to act in accordance with these
provisions. All assignments have been falsely presented to the
Placer county Recorders' Office as evidence of right, title
and interest, while purporting to Plaintiff that Defendants
have "duly perfected" title through the statute. Plaintiff
shall evidence to this Court the actual recorded substitution
of trustee, Corporate assignment of trustee, and other
recorded documents used by Defendants to unlawfully secure
Plaintiffs' property without lawful authority. This represents
unlawful conversion and theft by Defendants. All recorded
documents used by Defendants are without lawful authority and
have been altered and falsified to meet their self-serving
interests. Plaintiff shall produce these documents at trial.

## V. THE DEFENDANTS HAVE ENGAGED IN UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS ACTS AND PRACTICES

Section 17200 of California Unfair Competition Law creates a
cause of action for an 'unlawful, unfair or fraudulent
business act or practice.' Its coverage has been described as
"sweeping, embracing anything that can properly be called a
business practice and at the same time is forbidden by law."
(*Cel-Tech Communs., Inc. v. L.A. Cellular Tel. Co.,* **20 Cal.4th
163, 83 Cal.Rptr.2d 548, 560, 973 P.2d 527 (1999)**

## 1. RESPA violation

The Plaintiff's claim for unfair business practices can be gathered upon defendants' violation of the Real Estate Settlement Procedures Act, since the Business and Professions Code section 17200 'borrows' violations of other laws and treats them as unlawful business practices independently actionable under section 17200," (*Farmers*, **2 Cal.4th at 383, 6 Cal.Rptr.2d 487, 826 P.2d 730;** *Monaco* **v.** *Bear Stearns Residential Mortgage. Corp.*, **554 F.Supp.2d 1034 (C.D.Cal.2008))**

Section 2605 (a) of the Real Estate Settlement Procedures Act directs each person who makes a federally related mortgage loan to disclose to each person who applies for the loan, at the time of application for the loan, whether the servicing of the loan may be assigned, sold, or transferred to any other person at any time while the loan is outstanding.

In the instant case, the entire loan transaction was based on a Deed of Trust wherein the Plaintiff was not made aware of the lender's intention to split the Note and the Deed. MERS was made the "nominee beneficiary" in the deed and was unlawfully conferred with limited interest in the Deed. Since MERS, Inc. has had no registration with the California Dept. of Corporations since 2004, this assignment is void and possibly criminal. The nominee beneficiary then assigned their

interests to Deutsche Bank, by appointing them as the 'Indenture Trustee.' The Loan servicer herein, i.e. Select Portfolio Servicing Inc., acted as an agent for the Trustee in collecting the debt. The Plaintiff was never informed about these unlawful assignments, either in the Deed of Trust or anytime afterwards.

This is an unfair and fraudulent business practice that the Defendants have demonstrated.

**2. Defendants have engaged in predatory lending**

"Predatory lending" is a term generally used to characterize a range of abusive and aggressive lending practices, including deception or fraud, charging excessive fees and interest rates, **making loans without regard to a borrower's ability to repay,** or refinancing loans repeatedly over a short period of time to incur additional fees without any economic gain to the borrower. (*American Financial Services Association v. City of Oakland,* 104 P.3d 813, 34 Cal.4th 1239, 23 Cal.Rptr.3d 453 (Cal. 01/31/2005))

The Court has given a wide interpretation to the aspect of 'predatory lending.' It is hereby respectfully submitted, that this Honorable Court may deem, from the facts stated above and the arguments advanced herein, that this case is one fit and proper to infer that the Defendants' activities would amount to predatory lending and that their fraudulent acts have given them unjust enrichment and have caused great harm and negligent infliction of emotional distress.

## VI. THE PLAINTIFF HAS SUFFERED INJURY DUE TO THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

To state a claim for intentional infliction of emotional distress, Plaintiff must allege (1) outrageous conduct by Defendants, (2) Defendants intentionally caused or recklessly disregarded the probability of causing emotional distress, (3) Plaintiff suffered severe or extreme emotional distress, and (4) Defendants' outrageous conduct was the actual and proximate cause of their emotional distress. **(Trerice v. Blue Cross of Cal., 209 Cal.App.3d 878, 883, 257 Cal.Rptr. 338 (1989)**

Conduct is said to be outrageous if it is "so extreme as to exceed all bounds of that usually tolerated in a civilized society." Id.

In the instant case, the several acts of the Defendants have jointly inflicted severe emotional distress to the Plaintiff, as a result of which his only dwelling household is itself at stake now. The loan transaction in its entirety turned out to be a sham, whereby the Plaintiff was found to have undergone traumatic events throughout this insidious process. Each of the entities involved in the transaction, having a statutory and legal duty to the Plaintiff, have betrayed him and the law. It is submitted that the aforesaid outrageous conduct of

the Defendants are beyond the level of tolerance of the Plaintiff and the public at large.

The Court of Appeals in **Russell v. Massachusetts Mut. Life Ins. Co., 722 F.2d 482 (C.A.9 (Cal.) 1983**, stated that the award of compensatory damages shall "remedy the wrong and make the aggrieved individual whole," which meant not merely contractual damages for loss of plan benefits, but relief "that will compensate the injured party for all losses and injuries sustained as a direct and proximate cause of the breach of fiduciary duty," including "damages for mental or emotional distress."

This Honorable Court may give due considerations to the distress and agony the Plaintiff herein has endured, while adjudicating. Plaintiff has accrued over 4,000 hours of intense study, at his own expense, in order to defend his property. Plaintiff has been injured by Defendants' own knowing and intentional acts.

## VII.   CLAIM FOR INJUNCTIVE RELIEF

A temporary restraining order and permanent injunction is absolutely necessary in the present case to speedily effectuate the rights and status of Plaintiff in relation to the Defendants as well as to delineate the authority of each of the Defendants in their actions taken against the Plaintiff. Any delay in granting the Plaintiff's request for a

temporary restraining order will result in irreparable injury to the Plaintiff. A temporary restraining order is proper when (a) there is a reasonable likelihood of success (b) irreparable injury (c) balance of convenience which is in favor of the Plaintiff (d) the public interest is favorably impacted.

An actual controversy does exist between the Plaintiff and the Defendants both individually as well as collectively. If the Defendants continue to usurp the Plaintiff's rights, it would result in a complete deprivation of the Plaintiff's property. Pending the determination of this controversy by this Honorable Court, additional litigation is inevitable. In the absence thereof, the Plaintiff will be forced to proceed in securing his rights, as opposed to the Defendants meritless action undertaken against the Plaintiff.

It is here forth submitted that denial of the injunctive relief would cause the Plaintiff immediate, and irreparable injury, as he would lose his only residence if it were foreclosed. It has been held by the Court that "a loss of a preliminary residence is irreparable injury." **(Avila v. Stearns Lending Inc., 2008 WL 1378231, at \*3 (C.D. Cal. April 7, 2008))** Since the property at issue is his primary residence, Plaintiff's claim for legal remedy against the defendants i.e., damages would be inadequate without grant of injunction. Plaintiff asserts that his Amended Complaint

therefore meets the equitable criteria for stating a cause of action for injunctive relief.

## PRAYER FOR RELIEF

The following are the reliefs sought for in the instant matter:

1) Defendant should return the 'Genuine Original Promissory Note' or its proceeds and all the money paid by the Plaintiff to the Defendant, with full disclosure of accounting of such, to the Plaintiff forthwith,

2) If the Defendant is not able to return the 'Genuine Original Promissory Note' to the Plaintiff then the Defendant should be deemed to be admitting his unlawful attempt to convert real property without cause and/or right

3) Defendant present to the Plaintiff and to this Court an Affidavit stating that he has no right to the real property in question

4) Defendant return the DEED and other documents pertaining to ownership of the real property in question to the Plaintiff

5) If the Defendant DOES NOT state the claim under penalty of perjury that the Defendant is the Creditor in the instant matter, the Defendants agree to accept the judgment by default in favor of Plaintiff

6) If the Defendant DOES state the claim under penalty of perjury that the Defendant is the Creditor in the instant matter, the Defendants agree to deliver acknowledgement of such forthwith to the S.E.C, the I.R.S. and the State of California and County of Placer for restitution of the various fees and taxes it has avoided through the mechanism of tax exempt status of the mortgage loan trust and the treatment of the Notes as debt.

Dated: 3rd day of June, 2010

James L. Macklin,
Pro-se

# EXHIBIT E

# EXHIBIT E

1   Robert A. Bleicher (Bar No. 111334)
    rbleicher@carr-mcclellan.com
2   Lori A. Lutzker (Bar No. 124589)
    llutzker@carr-mcclellan.com
3   CARR, McCLELLAN, INGERSOLL, THOMPSON & HORN
    Professional Law Corporation
4   216 Park Road
    P.O. Box 513
5   Burlingame, California  94011-0513
    Telephone:    (650) 342-9600
6   Facsimile:     (650) 342-7685

7   Attorneys for Defendants
    Select Portfolio Servicing, Inc., Mortgage Electronic
8   Registration Systems, Inc., and Deutsche Bank National Trust
    Co.

9                       UNITED STATES DISTRICT COURT

10                     EASTERN DISTRICT OF CALIFORNIA

11

12  JAMES L. MACKLIN,                          Case No.  2:10-CV-01097-FCD-KJN

13              Plaintiff,                     ANSWER OF DEFENDANTS SELECT
                                               PORTFOLIO, INC., MORTGAGE
14  v.                                         ELECTRONIC REGISTRATION SYSTEMS,
                                               INC., AND DEUTSCHE BANK NATIONAL
15  SELECT PORTFOLIO SERVICING,                TRUST CO. TO AMENDED COMPLAINT
    INC., et al.,
16
                Defendants.
17

18          Defendants Select Portfolio Servicing, Inc., Mortgage Electronic Registration Systems,

19  Inc., and Deutsche Bank National Trust Co. (hereinafter "SPS", "MERS", Deutsche Bank, or

20  Defendants) as and for their answer to the amended complaint plaintiff James L. Macklin

21  (hereinafter "Plaintiff") hereby admit, deny, and allege upon information and belief, as follows:

22                                  DEFENDANTS

23          1.      SPS admits the allegations in the Amended Complaint at 2:25-3:4 that it is a

24  corporation registered to do business and does business in the State of California, and that

25  Matthew Hollingsworth is its Chief Executive Officer.

26          2.      Plaintiff's allegations in the Amended Complaint at 3:6-25 involve persons or

27  entities other than these answering Defendants and otherwise consist of legal argument, and

28

1    therefore no response is required from these answering Defendants.  To the extent 3:6-25 contain

2    factual allegations against these answering Defendants, Defendants deny the allegations.

3        3.    MERS admits the allegations in the Amended Complaint at 3:27-4:27 that it has

4    not been registered to with the California Department of Corporations since 2004 and denies that

5    it is in violation of any state laws.  The remaining allegations consist of legal argument, and

6    therefore no response is required from these answering Defendants.  To the extent 3:27-4:27

7    contain factual allegations against these answering Defendants, Defendants deny the allegations.

8        4.    Deutsche Bank admits the allegations in the amended complaint at 5:1-8 that it is

9    doing business in the State of California and that Robert E. Jackson and Amy E. Starrett are its

10   attorneys of record in a foreclosure action involving plaintiff James Macklin.  Deutsche Bank

11   denies the remainder of the allegations in 5:1-8.

12       5.    Plaintiff's allegations in the Amended Complaint at 5:10-13 involve persons or

13   entities other than these answering Defendants and therefore no response is required from these

14   answering Defendants.

15       6.    Plaintiff's allegations in the Amended Complaint at 5:15-22 involve persons or

16   entities other than these answering Defendants and therefore no response is required from these

17   answering Defendants. To the extent 5:15-22 contain factual allegations against these answering

18   Defendants, Defendants deny the allegations.

19       7.    Defendants deny the allegations in the Amended Complaint at 5:23-27.

20                        JURISDICTION AND VENUE

21       8.    Defendants admit that allegation in the Amended Complaint at 6:3-22 that the

22   Court has original jurisdiction pursuant to §§8 U.S.C. 1332.

23       9.    Defendant Deutsche Bank admits the allegation in the Amended Complaint at

24   6:24-7:16 that Robert J. Jackson and Amy E. Starret are attorneys of record in the action entitled

25   *Deutsche Bank National Trust Co. v. Macklin*, California Superior Court, Placer County, Case

26   No. M-CV-45238.  The remainder of Plaintiff's allegations in the Amended Complaint at 6:24-

27   7:16 involve persons or entities other than these answering Defendants and otherwise consist of

28   legal argument, and therefore no response is required from these answering Defendants.  To the

1   extent 6:24-7:16 contain factual allegations against these answering Defendants, Defendants deny

2   the allegations.

3         10.    Defendants admit the allegations in the Amended Complaint at 7:20-8:15 that

4   Plaintiff received a loan for real property from Accredited Home Lenders, Inc. and that MERS

5   was the nominee beneficiary on the Deed of Trust for the property at issue in this action. The

6   remainder of Plaintiff's allegations in the Amended Complaint at 7:20-8:15 involve persons or

7   entities other than these answering Defendants and otherwise consist of legal argument, and

8   therefore no response is required from these answering Defendants. To the extent 7:20-8:15

9   contain factual allegations against these answering Defendants, Defendants deny the allegations.

10         11.    Defendants lack knowledge or information sufficient to form a belief as to the

11   allegations in the Amended Complaint at 8:17-9:3 and on that basis deny all such allegations.

12   The remainder of Plaintiff's allegations in the Amended Complaint at 8:17-9:3 involve persons or

13   entities other than these answering Defendants and otherwise consist of legal argument, and

14   therefore no response is required from these answering Defendants. To the extent 8:17-9:3

15   contain factual allegations against these answering Defendants, Defendants deny the allegations.

16         12.    Defendants admit the allegations in the Amended Complaint at 9:5-8 that a Deed

17   of Trust for the subject property was signed on or about April 19, 2006 and a Promissory Note

18   was signed by plaintiff on or about April 14, 2006.

19         13.    Defendants admit the allegations in the Amended Complaint at 9:10-10:6 that

20   Plaintiff made payments on the subject property commencing in May, 2006 through August,

21   2008. The remainder of Plaintiff's allegations in the Amended Complaint at 9:10-10:6 involve

22   persons or entities other than these answering Defendants and otherwise consist of legal

23   argument, and therefore no response is required from these answering Defendants. To the extent

24   9:10-10:6 contain factual allegations against these answering Defendants, Defendants deny the

25   allegations.

26         14.    MERS admits that the allegations in the Amended Complaint at 10:8-20 that it

27   assigned the Deed of Trust to Deutsche Bank. The remainder of Plaintiff's allegations in the

28   Amended Complaint at 10:8-20 involve persons or entities other than these answering Defendants

1    and otherwise consist of legal argument, and therefore no response is required from these

2    answering Defendants. To the extent 10:8-20 contain factual allegations against these answering

3    Defendants, Defendants deny the allegations.

4         15.    Defendants deny the allegations in the Amended Complaint at 10:22-11:7. The

5    remainder of Plaintiff's allegations in the Amended Complaint at 10:22-11:7 involve persons or

6    entities other than these answering Defendants and otherwise consist of legal argument, and

7    therefore no response is required from these answering Defendants. To the extent 10:22-11:7

8    contain factual allegations against these answering Defendants, Defendants deny the allegations.

9                                  CAUSES OF ACTION

10        16.    Defendants deny the allegations contained in the Amended Complaint at 11:19-26.

11        17.    Defendants deny the allegations in the Amended Complaint at 12:1-6.

12        18.    The allegations in the Amended Complaint at 12:8-12 consist of legal argument,

13    and therefore no response is required from these answering Defendants. To the extent 12:8-12

14    contain factual allegations against these answering Defendants, Defendants deny the allegations.

15        19.    The allegations in the Amended Complaint at 12:15-20 involve persons or entities

16    other than these answering Defendants and therefore no response is required from these

17    answering Defendants, except that MERS admits that it was the nominee of the Deed of Trust as

18    apparently alleged in the amended complaint at 12:15-20.

19        20.    The allegations in the Amended Complaint at 12:22-13:6 consist of legal

20    argument, and therefore no response is required from these answering Defendants. To the extent

21    12:22-13:6 contain factual allegations against these answering Defendants, Defendants deny the

22    allegations.

23        21.    The allegations in the Amended Complaint at 13:8-23 consist of legal argument,

24    and therefore no response is required from these answering Defendants. To the extent 13:8-23

25    contain factual allegations against these answering Defendants, Defendants deny the allegations.

26        22.    The allegations in the Amended Complaint at 13:25-14:17 consist of legal

27    argument, and therefore no response is required from these answering Defendants. To the extent

28

1  13:25-14:17 contain factual allegations against these answering Defendants, Defendants deny the

2  allegations.

3        23.    The allegations in the Amended Complaint at 14:19-15:4 consist of legal

4  argument, and therefore no response is required from these answering Defendants.  To the extent

5  14:19-15:4 contain factual allegations against these answering Defendants, Defendants deny the

6  allegations.

7        24.    The allegations in the Amended Complaint at 15:6-17 consist of legal argument,

8  and therefore no response is required from these answering Defendants.  To the extent 15:6-17

9  contain factual allegations against these answering Defendants, Defendants deny the allegations.

10        25.    The allegations in the Amended Complaint at 15:21-16:12 consist of legal

11  argument, and therefore no response is required from these answering Defendants.  To the extent

12  15:21-16:12 contain factual allegations against these answering Defendants, Defendants deny the

13  allegations.

14        26.    The allegations in the Amended Complaint at 16:14-21 consist of legal argument,

15  and therefore no response is required from these answering Defendants.  To the extent 16:14-21

16  contain factual allegations against these answering Defendants, Defendants deny the allegations.

17        27.    The allegations in the Amended Complaint at 16:23-17:3 consist of legal

18  argument, and therefore no response is required from these answering Defendants.  To the extent

19  16:23-17:3 contain factual allegations against these answering Defendants, Defendants deny the

20  allegations. .

21        28.    The allegations in the Amended Complaint at 17:7-24 consist of legal argument,

22  and therefore no response is required from these answering Defendants.  To the extent 17:7-24

23  contain factual allegations against these answering Defendants, Defendants deny the allegations.

24        29.    Defendants deny the factual allegations contained in the Amended Complaint at

25  17:26-18:9.  The remainder of Plaintiff's allegations in the Amended Complaint at 17:26-18:9

26  involve persons or entities other than these answering Defendants and otherwise consist of legal

27  argument, and therefore no response is required from these answering Defendants.  To the extent

28

1    17:26-18:9 contain factual allegations against these answering Defendants, Defendants deny the

2    allegations.

3        30.    The allegations in the Amended Complaint at 18:16-19:14 consist of legal

4    argument, and therefore no response is required from these answering Defendants. To the extent

5    18:16-19:14 contain factual allegations against these answering Defendants, Defendants deny the

6    allegations.

7        31.    Defendants deny that they owed a fiduciary duty to plaintiff as alleged in the

8    Amended Complaint at 19:15-20:2. The remainder of Plaintiff's allegations in the Amended

9    Complaint at 19:15-20:2 involve persons or entities other than these answering Defendants and

10   otherwise consist of legal argument, and therefore no response is required from these answering

11   Defendants. To the extent 19:15-20:2 contain factual allegations against these answering

12   Defendants, Defendants deny the allegations.

13       32.    The allegations in the Amended Complaint at 20:4-25 involve persons or entities

14   other than these answering Defendants, and therefore no response is required from these

15   answering Defendants. To the extent 20:4-25 contain factual allegations against these answering

16   Defendants, Defendants deny the allegations.

17       33.    The allegations in the Amended Complaint at 20:27-21:15 involve persons or

18   entities other than these answering Defendants, and therefore no response is required from these

19   answering Defendants. To the extent 20:27-21:15 contain factual allegations against these

20   answering Defendants, Defendants deny the allegations. Defendants deny any factual allegations

21   made against them in the amended complaint at 20:27-21:15.

22       34.    The allegations in the Amended Complaint at 21:19-22:5 consist of legal

23   argument, and therefore no response is required from these answering Defendants. To the extent

24   21:19-22:5 contain factual allegations against these answering Defendants, Defendants deny the

25   allegations.

26       35.    The allegations in the Amended Complaint at 22:7-16 consist of legal argument,

27   and therefore no response is required from these answering Defendants. To the extent 22:7-16

28   contain factual allegations against these answering Defendants, Defendants deny the allegations.

1    36.    After reasonable investigation, SPS lacks information to admit or deny the

2    allegation in the Amended Complaint at 22:18-23:20 that on or about February 12, 2009 plaintiff

3    sent a letter to SPS and, on that basis, it denies the allegation.  The remainder of Plaintiff's

4    allegations in the Amended Complaint at 22:18-23:20 involve persons or entities other than these

5    answering Defendants and otherwise consist of legal argument, and therefore no response is

6    required from these answering Defendants.  To the extent 22:13-23:20 contain factual allegations

7    against these answering Defendants, Defendants deny the allegations.

8    37.    Defendants deny that they committed any fraud as alleged in the Amended

9    Complaint at 23:25-24:17.  The remainder of the allegations in the Amended Complaint at 23:25-

10   24:17 consist of legal argument, and therefore no response is required from these answering

11   Defendants.  To the extent 23:25-24:17 contain factual allegations against these answering

12   Defendants, Defendants deny the allegations.

13   38.    The allegations in the Amended Complaint at 24:22-25:12 involve persons or

14   entities other than these answering Defendants and otherwise consist of legal argument, and

15   therefore no response is required from these answering Defendants.  To the extent 24:22-25:12

16   contain factual allegations against these answering Defendants, Defendants deny the allegations.

17   39.    The allegations in the Amended Complaint at 25:14-24 involve persons or entities

18   other than these answering Defendants and otherwise consist of legal argument, and therefore no

19   response is required from these answering Defendants.  To the extent 25:14-24 contain factual

20   allegations against these answering Defendants, Defendants deny the allegations.

21   40.    The allegations in the Amended Complaint at 26:1-14 consist of legal argument,

22   and therefore no response is required from these answering Defendants.  To the extent 26:1-14

23   contain factual allegations against these answering Defendants, Defendants deny the allegations.

24   41.    Defendants deny any allegations of concealment that may be alleged in the

25   Amended Complaint at 26:16-27:2.  The remainder of Plaintiff's allegations in the Amended

26   Complaint at 26:16-27:2 involve persons or entities other than these answering Defendants and

27   otherwise consist of legal argument, and therefore no response is required from these answering

28

1    Defendants.  To the extent 26:16-27:2 contain factual allegations against these answering

2    Defendants, Defendants deny the allegations.

3        42.      Defendants deny any allegations of fraud that may be alleged in the amended

4    complaint at 27:4-10.  The remainder of Plaintiff's allegations in the Amended Complaint at 27:4-

5    10 involve persons or entities other than these answering Defendants and otherwise consist of

6    legal argument, and therefore no response is required from these answering Defendants.  To the

7    extent 27:4-10 contain factual allegations against these answering Defendants, Defendants deny

8    the allegations.

9        43.      The allegations in the Amended Complaint at 27:15-25 involve persons or entities

10   other than these answering Defendants and otherwise consist of legal argument, and therefore no

11   response is required from these answering Defendants.  To the extent 27:15-25 contain factual

12   allegations against these answering Defendants, Defendants deny the allegations.

13       44.      The allegations in the Amended Complaint at 27:27-28:11 consist of legal

14   argument, and therefore no response is required from these answering Defendants.  To the extent

15   27:27-28:11 contain factual allegations against these answering Defendants, Defendants deny the

16   allegations.

17       45.      The allegations in the Amended Complaint at 28:13-29:2 consist of legal

18   argument, and therefore no response is required from these answering Defendants.  To the extent

19   28:13-29:2 contain factual allegations against these answering Defendants, Defendants deny the

20   allegations.

21       46.      The allegations in the Amended Complaint at 29:4-17 involve persons or entities

22   other than these answering Defendants and otherwise consist of legal argument, and therefore no

23   response is required from these answering Defendants.  To the extent 29:4-17 contain factual

24   allegations against these answering Defendants, Defendants deny the allegations.

25       47.      The allegations in the Amended Complaint at 29:22-28 consist of legal argument,

26   and therefore no response is required from these answering Defendants.  To the extent 29:22-28

27   contain factual allegations against these answering Defendants, Defendants deny the allegations.

28

48.     The allegations in the Amended Complaint at 30:4-12 consist of legal argument, and therefore no response is required from these answering Defendants. To the extent 30:4-12 contain factual allegations against these answering Defendants, Defendants deny the allegations.

49.     The allegations in the Amended Complaint at 30:14-19 consist of legal argument, and therefore no response is required from these answering Defendants. To the extent 30:14-19 contain factual allegations against these answering Defendants, Defendants deny the allegations.

50.     Defendant MERS admits the allegations in the Amended Complaint at 30:21-31:6 that it is not been registered with the California Department of Corporations since 2004. MERS further admits that it assigned its beneficial interest in the Deed of Trust to Deutsche Bank. Deutsch Bank admits that it was the assignee of the Deed of Trust and SPS admits that it was the servicer of the loan to purchase the subject property. The remainder of Plaintiff's allegations in the Amended Complaint at 30:21-31:6 involve persons or entities other than these answering Defendants and otherwise consist of legal argument, and therefore no response is required from these answering Defendants. To the extent 30:21-31:6 contain factual allegations against these answering Defendants, Defendants deny the allegations.

51.     The allegations in the Amended Complaint at 31:8-9 consist of legal argument, and therefore no response is required from these answering Defendants. To the extent 31:8-9 contain factual allegations against these answering Defendants, Defendants deny the allegations.

52.     The allegations in the Amended Complaint at 31:12-20 consist of legal argument, and therefore no response is required from these answering Defendants. To the extent 31:12-20 contain factual allegations against these answering Defendants, Defendants deny the allegations.

53.     The allegations in the Amended Complaint at 31:21-28 consist of legal argument, and therefore no response is required from these answering Defendants. To the extent 31:21-28 contain factual allegations against these answering Defendants, Defendants deny the allegations.

54.     The allegations in the Amended Complaint at 32:5-13 consist of legal argument, and therefore no response is required from these answering Defendants. To the extent 32:5-13 contain factual allegations against these answering Defendants, Defendants deny the allegations.

55.    The allegations in the Amended Complaint at 32:15-17 consist of legal argument, and therefore no response is required from these answering Defendants. To the extent 32:15-17 contain factual allegations against these answering Defendants, Defendants deny the allegations.

56.    Defendants deny that they have inflicted any emotional distress as alleged in the Amended Complaint at 32:19-33:2. The remainder of Plaintiff's allegations in the Amended Complaint at 32:19-33:2 involve persons or entities other than these answering Defendants and otherwise consist of legal argument, and therefore no response is required from these answering Defendants. To the extent 32:19-33:2 contain factual allegations against these answering Defendants, Defendants deny the allegations.

57.    The allegations in the Amended Complaint at 33:4-12 consist of legal argument, and therefore no response is required from these answering Defendants. To the extent 33:4-12 contain factual allegations against these answering Defendants, Defendants deny the allegations.

58.    Defendants deny the allegations in the Amended Complaint at 33:14-19.

59.    Defendants deny the allegations in the Amended Complaint at 33:23-34:6.

60.    Defendants deny the allegations in the Amended Complaint at 34:8-16.

61.    Defendants deny the allegations in the Amended Complaint at 34:18-35:2.

### AFFIRMATIVE DEFENSES

1.    As a first affirmative defense, defendants allege that the amended complaint and each cause of action therein fails to state the facts sufficient to constitute a cause of action against defendants.

2.    As a second affirmative defense, defendants allege that the causes of action are barred by applicable statutes of limitation including 12 U.S.C. §§ 2605, 2607 and 2608; 15 U.S.C. § 1640(e) and California Code of Civil Procedure §§ 336, 337, 338, 340 and 343.

3.    As a third affirmative defense, defendants allege that plaintiff unreasonably delayed in filing his amended complaint, that defendants have been unduly and severely prejudiced by the delay, and his claims are therefore barred under the doctrine of laches.

4.    As a fourth affirmative defense, defendants allege that plaintiff's claims are barred under the doctrine of estoppel.

1    5.    As a fifth affirmative defense, defendants allege that plaintiff has engaged in

2    conduct and activities sufficient to constitute a waiver of any alleged conduct by defendants, if

3    any, all which has unduly and severely prejudiced defendants in their defense of this action,

4    thereby barring or diminishing plaintiff's claims under the doctrine of waiver.

5    6.    As a sixth affirmative defense, defendants allege that plaintiff's claims are barred

6    by the doctrines of collateral estoppel and res judicata.

7    7.    As a seventh affirmative defense, defendants allege that plaintiff has unclean

8    hands with respect to the transactions alleged in the amended complaint and, therefore, is barred

9    from maintaining his complaint.

10    8.    As an eighth affirmative defense, defendants allege that plaintiff's complaint is

11    frivolous and not based on good faith as to defendants within the meaning of Rule 11 of the

12    Federal Rules of Civil Procedure and therefore defendants are entitled to recover their reasonable

13    expenses, including attorneys' fees in defending this action.

14    9.    As a ninth affirmative defense, defendants are informed and believe, and thereon

15    allege, that plaintiff has failed to name an indispensable and/or necessary party.

16    10.    As a tenth affirmative defense, defendants allege that they have appropriately,

17    completely and fully discharged and performed any and all obligations and legal duties arising

18    out of the matters alleged in the amended complaint.

19    11.    As an eleventh affirmative defense, defendants allege that plaintiff consented to all

20    acts that were performed by defendants as alleged in the amended complaint.

21    12.    As a twelfth affirmative defense, defendants allege that defendants acted

22    reasonably and exercised good faith.

23    13.    As a thirteenth affirmative defense, defendants allege that plaintiff has failed to

24    pay, tender, or offer to pay the secured debt, or at least all of the delinquencies and costs due for

25    redemption before commencing his action.

26    14.    As a fourteenth affirmative defense, defendants allege that the damages suffered

27    by plaintiff, if any, were the direct and proximate result of the actions of plaintiff and/or other

28    parties, persons, corporations or entities other than these answering defendants and that the

1    liability of these defendants, if any, is limited in direct proportion to the percentage of fault

2    actually attributed to these answering defendants, if any.

3        15.    As a fifteenth affirmative defense, defendants allege that plaintiff has failed to

4    exercise reasonable care and diligence to avoid loss and to minimize damages and, therefore,

5    plaintiff may not recover for losses which could have been prevented by reasonable efforts on

6    plaintiff's own part, or by expenditures that might reasonably have been made and, therefore,

7    plaintiff's recovery, if any, should be reduced by the failure of plaintiff to mitigate his damages, if

8    any.

9        16.    As a sixteenth affirmative defense, defendants allege that the injuries and damages

10   of which plaintiff complains were proximately caused or contributed to by the acts of plaintiff

11   and/or the defendants, persons and/or entities and that said acts or an intervening or a superseding

12   cause of injuries and damages, if any, of which the plaintiff complains, thus barring the plaintiff

13   from any recovery against these answering defendants.

14       17.    As a seventeenth affirmative defense, defendants allege that any recovery by

15   plaintiff against defendants is subject to these answering defendants' right to offset.

16       18.    As an eighteenth affirmative defense, defendants allege that the damages suffered

17   by plaintiff, if any, were the direct and proximate result of the acts and omissions of plaintiff.

18       19.    As a nineteenth affirmative defense, defendants allege that plaintiff has engaged in

19   conduct and activities with respect to the transaction described in the amended complaint, and is

20   estopped from asserting any claims or damages or seeking any relief against these answering

21   defendants.

22       20.    As a twentieth affirmative defense, defendants allege that plaintiff engaged in

23   improper, retaliatory, and bad faith conduct against these answering defendants and thus

24   plaintiff's recovery is barred or reduced proportionately to reflect such conduct.

25       21.    As a twenty-first affirmative defense, defendants allege that discovery is ongoing

26   and defendants reserve the right to raise additional affirmative defenses at trial.

27   ///

28   ///

1      WHEREFORE, Defendants Select Portfolio Servicing, Inc., Mortgage Electronic

2 Registration Systems, Inc., and Deutsche Bank National Trust Co. pray for judgment as follows:

3      1.    That plaintiff take nothing by way of the amended complaint.

4      2.    For costs of suit incurred herein, including investigative costs and attorneys' fees,

5 and;

6      3.    For such other and further relief as the Court deems just and proper.

7

8 Dated: June 24, 2010               CARR, McCLELLAN, INGERSOLL,
THOMPSON & HORN
9                        Professional Law Corporation

10

11                 By: _____

12                    Robert A. Bleicher
Attorneys for Defendants
13                    Select Portfolio Servicing, Inc., Mortgage
Electronic Registration Systems, Inc., and
14                    Deutsche Bank National Trust Co.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT F

# EXHIBIT F

1  Robert A. Bleicher (Bar No. 111334)
   rbleicher@carr-mcclellan.com
2  Lori A. Lutzker (Bar No. 124589)
   llutzker@carr-mcclellan.com
3  CARR, McCLELLAN, INGERSOLL, THOMPSON & HORN
   Professional Law Corporation
4  216 Park Road
   P.O. Box 513
5  Burlingame, California  94011-0513
   Telephone:    (650) 342-9600
6  Facsimile:    (650) 342-7685

7  Attorneys for Defendants
   Select Portfolio Servicing, Inc., Mortgage Electronic Registration
8  Systems, Inc., and Deutsche Bank National Trust Co.

9                  UNITED STATES DISTRICT COURT

10                 EASTERN DISTRICT OF CALIFORNIA

11 | JAMES L. MACKLIN,                    | Case No.  2:10-CV-01097-FCD-KJN
12 |              Plaintiff,              | **DEFENDANTS SELECT PORTFOLIO,
   |                                      | INC., MORTGAGE ELECTRONIC
13 | v.                                   | REGISTRATION SYSTEMS, INC., AND
   |                                      | DEUTSCHE BANK NATIONAL TRUST
14 | SELECT PORTFOLIO SERVICING,          | CO.'S NOTICE OF MOTION FOR
   | INC., et al.,                        | SUMMARY JUDGMENT OR, IN THE
15 |                                      | ALTERNATIVE, SUMMARY
   |              Defendants.             | ADJUDICATION AND MEMORANDUM
16 |                                      | OF POINTS AND AUTHORITIES IN
   |                                      | SUPPORT**
17 |                                      |

Date:           September 23, 2010
Time:           10:00 a.m.
Courtroom:      25
Judge:          Hon. Kendall J. Newman

1 | TO PLAINTIFF:

2      PLEASE TAKE NOTICE that on September 23, 2010, at 10:00 a.m., or as soon thereafter

3 | as the matter may be heard, in Courtroom 25 of the above-entitled Court located at 501 I Street,

4 | Sacramento, California, Defendants Select Portfolio Servicing, Inc. ("SPS"), Mortgage Electronic

5 | Registration Systems, Inc. ("MERS"), and Deutsche Bank National Trust Co. ("Deutsche Bank")

6 | will and do move this Court, the Honorable Kendall J. Newman presiding, for summary judgment

7 | or, in the alternative, summary adjudication pursuant to Federal Rules of Civil Procedure, Rule

8 | 56.

9      This motion will be and is based on this Notice of Motion, the attached Memorandum of

10 | Points and Authorities, the declaration of Diane Weinberger, and the Separate Statement of

11 | Undisputed Facts filed herewith, the pleadings and papers already on file in this action, and on

12 | such other and further matters as the Court may consider before or at the hearing of this motion.

13

14 | Dated: August 19, 2010

15             CARR, McCLELLAN, INGERSOLL, THOMPSON & HORN
            Professional Law Corporation

16

17

18        By:_____

19                  Lori A. Lutzker
               Attorneys for Defendants
      Select Portfolio Servicing, Inc., Mortgage Electronic

20      Registration Systems, Inc., and Deutsche Bank National
                  Trust Co.

21

22

23

24

25

26

27

28

29801-00001\iManage\3208539.3            Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ................................................................................................. 1

II.   FACTS .................................................................................................................. 1

III.  LEGAL ANALYSIS ............................................................................................. 2

    A.    Summary Judgment Standard ................................................................. 2

    B.    Plaintiff's Failure To Tender Precludes His Attack On The Foreclosure ............... 3

    C.    Defendants Have Standing ....................................................................... 4

    D.    The Fair Debt Collection Practices Act Is Inapplicable .......................... 6

    E.    Defendants Do Not Owe Plaintiff A Fiduciary Duty .............................. 7

    F.    Any Alleged Right To Rescind Under The Truth In Lending Act Is Time-
        Barred ....................................................................................................... 8

    G.    Defendants Did Not Breach TILA By Misrepresenting The Value Of The
        Dwelling ................................................................................................... 8

    H.    Defendants Did Not Commit Fraud ........................................................ 9

    I.    Defendants Did Not Violate Plaintiffs' Constitutional Due Process Rights ......... 10

    J.    California Law Was Followed ................................................................. 11

    K.    California's Unfair Competition Law Was Not Violated ....................... 11

        1.    RESPA .......................................................................................... 12

        2.    "Predatory Lending" .................................................................... 14

    L.    There Was No Intentional Infliction Of Emotional Distress ................. 14

    M.    Plaintiff Has No Right To Injunctive Relief .......................................... 15

IV.   CONCLUSION ................................................................................................... 16

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

1

## TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*Aguero v. MortgageIT, Inc.*, 2009 U.S. Dist. LEXIS 75515 (E.D. Cal. Aug. 10, 2009) ............... 14

5

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).................................................... 10

6

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ........................................................... 3

7

*Apao v. Bank of N.Y.*, 324 F.3d 1091, 1095 (9th Cir. 2003) ......................................................... 10

8

*Arnolds Management Corp. v. Eischen* (1984) 158 Cal.App.3d 575, 578-580 .............................. 4

9

*Beach v. Ocwen Fed. Bank*, 523 U.S. 410 (U.S. 1998)................................................................... 8

10

*Benham v. Aurora Loan Servs.*, No. C-09-2059 SC, 2009 U.S. Dist. LEXIS 91287, at *10-11
(N.D. Cal. Oct. 1, 2009) ......................................................................................................... 12, 13

11

12

*Berenice Thoreau de la Salle v. America's Wholesale Lender*, 2010 U.S. Dist. LEXIS 36319 (E.D.
Cal. Apr. 13, 2010)................................................................................................................ 5, 6, 10

13

*Bogdan v. Countrywide Home Loans*, 2010 U.S. Dist. LEXIS 28889 (E.D. Cal. Mar. 25, 2010) 13

14

*Bojorquez v. Gutierrez*, No. C 09-03684 SI, 2010 U.S. Dist. LEXIS 28302 (N.D. Cal. Mar. 25,
2010) at *20 ............................................................................................................................. 7, 14

15

16

*Bradler v. Craig*, 274 Cal.App.2d 466, 473, 476 (1969) ............................................................... 7

17

*Cal-Tech Communications v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1990)....................... 12

18

*Candelo v. Ndex West, LLC*, 2008 U.S. Dist. LEXIS 105926, 2008 WL 5382259, at *4 (E.D. Cal.
Dec. 23, 2006)............................................................................................................................... 6

19

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ...................................................................... 2

20

*Christensen v. Superior Court*, 54 Cal.3d 868, 903, (1991) ....................................................... 14

21

*Coyotzi v. Countrywide Fin. Corp.*, No. 09-1036, 2009 U.S. Dist. LEXIS 91084, *53 (E.D. Cal.
Sept. 16, 2009) ......................................................................................................................... 5, 15

22

23

*Cross v. Downey Sav. & Loan Ass'n,* No. CV 09-317 CAS (SSx), 2009 WL 481482, at *5 (C.D.
Cal. Feb. 23, 2009)..................................................................................................................... 7, 9

24

*D. H. Overmyer Co. Inc., of Oh. v. Frick Co.*, 405 U.S. 174, 177, 92 S. Ct. 775, 31 L. Ed. 2d 124
(1972) ..................................................................................................................................... 10, 11

25

26

*Davidson v. City of Westminster*, 32 Cal.3d 197, 201 (1982)...................................................... 14

27

*Demery v. Arpaio*, 378 F.3d 1020, 1026 (9th Cir.2004) .............................................................. 16

28

*Derakhshan v. Mortg. Elec. Registration Sys.*, 2009 U.S. Dist. LEXIS 63176 (C.D. Cal. June 29,

- ii -                          Defendants' Notice of Motion for Summary
                                                                                        Judgment and Supporting Memorandum

# TABLE OF AUTHORITIES
**(continued)**

Page(s)

2009) ........................................................................................................................ 14

*D'Onofrio v. United States Bank*, No. 09-3701, 2009 U.S. Dist. LEXIS 95057, *4 (N.D. Cal. Oct 13, 2009) ..................................................................................................................... 8

*Earl v. Wachovia Mortg. FSB*, 2010 U.S. Dist. LEXIS 57552, 7-8 (D. Ariz. June 8, 2010) ........ 10

*Emery v. Vista Int'l Serv. Ass'n*, 95 Cal.App.4th 952, 962 (2002) ................................................ 11

*Farmers Ins. Exchange v. Superior Court*, 2 Cal.4th 377, 383 (1992).......................................... 12

*Fletcher v. Western Nat'l Life Ins. Co.*, 10 Cal.App.3d 376, 397, 89 Cal. Rptr. 78 (Ct. App. 1970). ............................................................................................................................. 14, 15

*Fox & Carskadon Financial Corp. v. San Francisco Fed. Sav. & Loan Assn.* (1975) 52 Cal.App.3d 484, 488, 489 ............................................................................................ 7

*Fpci Re-Hab 01 v. E & G Invs.*, 207 Cal.App.3d 1018, 1022 (1989)............................................ 4

*Gamboa v. Tr. Corps & Cent. Mortg. Loan Servicing Co.*, 2009 U.S. Dist. LEXIS 19613, *11 (N.D. Cal. Mar. 12, 2009) ......................................................................................... 6

*Guessous v. Chrome Hearts, LLC*, 179 Cal.App.4th 1177, 1187 (2009), citation omitted ........... 15

*Huerta v. Ocwen Loan Servicing, Inc.,* No. 09-5822 JF, 2010 U.S. Dist. LEXIS 17970, *11 (N.D. Cal. Mar. 1, 2010) ........................................................................................ 7

*Hutchinson v. Del. Sav. Bank*, FSB, 410 F. Supp. 2d 374, 383 (D.N.J. 2006) ............................. 12

*Kachlon v. Markowitz,* 168 Cal.App.4th 316, 334 (2008) ............................................................ 5

*Karlsen v. American Sav. & Loan Assoc.* (1971) 15 Cal.App.3d 112, 117 ..................................... 4

*King v. California*, 784 F.2d 910, 915 (9th Cir. 1986). 15 USCS 1635(f) ................................. 8, 9

*Labra v. Cal-Western Reconveyance Corp.*, 2010 U.S. Dist. LEXIS 23165 (N.D. Cal. Mar. 11, 2010) .......................................................................................................................... 4

*Lee v. Aurora Loan Servs.*, 2010 U.S. Dist. LEXIS 56094, 4-5 (N.D. Cal. May 18, 2010).......... 12

*Lomboy v. SCME Mortgage Bankers*, No. 09-1160, 2009 U.S. Dist. LEXIS 44158, * 12-13 (N.D. Cal. May 26, 2009) ...................................................................................... 5, 6, 13, 14

*Marks v. Ocwen Loan Servicing*, No. 07-2133, 2009 U.S. Dist. LEXIS 35251, 2009 WL 975792, at *7 (N.D. Cal. Apr. 10, 2009)............................................................................... 7

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)............................. 3

*McDowell v. Watson*, 59 Cal.App.4th 1155, 1159....................................................................... 15

*McGill v. Wachovia Mortg., FSB Loan*, 2010 U.S. Dist. LEXIS 43393, 22-23 (E.D. Cal. Mar. 3,

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page(s)**

3    2010).) ...................................................................................................................... 12

4    *Mesde v. Am. Brokers Conduit*, 2009 U.S. Dist. LEXIS 59632 (N.D. Cal. June 30, 2009) ........... 6

5    *Miguel v. Country Funding Corp.*, 309 F.3d 1161, 1164 (9th Cir. 2002)........................................ 8

6    *Mortgage Electronic Registration Systems, Inc. v. Brosnan*, 2009 WL 3647125, (N.D. Cal. 2009)
........................................................................................................................................... 13

7

8    *Nymark v. Heart Fed. Savings & Loan Assn.*, 231 Cal.App.3d 1089, 1096 (1991) ........................ 7

9    *Phillips v. Fremont Inv. & Loan*, 2009 U.S. Dist. LEXIS 122152, 2009 WL 4898259, *2 (D. Ariz.
Dec. 11, 2009)................................................................................................................... 10

10    *Pineda v. Reyes*, No. 09-1938, 2009 U.S. Dist. LEXIS 96853, *26-28 (S.D. Cal. Oct. 20, 2009) 15

11    *Putkkuri v. ReconTrust Co.*, 2009 U.S. Dist. LEXIS 32, 2009 WL 32567, at *2 (S.D. Cal. Jan. 5,
2009) .................................................................................................................................. 6

12

13    *Reynoso v. Paul Fin., LLC*, 2009 U.S. Dist. LEXIS 106555, 7-8 (N.D. Cal. Nov. 16, 2009)... 5, 15

14    *Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d
898, 902 (9th Cir. 1987)...................................................................................................... 3

15    *Ross v. Creel Printing & Publishing Co.*, 100 Cal.App.4th 736, 745 (2002)................................. 15

16    *Scott v. Wells Fargo Home Mortg., Inc.*, 326 F. Supp. 2d 709, 718 (E. D. Va.), aff'd, 67 Fed.
Appx. 238 (4th Cir. 2003)................................................................................................... 6

17

18    *Shell Oil Co. v. Richter*, 52 Cal.App.2d 164, 168 (1942) ............................................................. 15

19    *Sicairos v. NDEX West, LLC*, 2009 U.S. Dist. LEXIS 11223, *7 (S.D. Cal. 2009) ........................ 5

20    *Singh v. Wash. Mut. Bank*, No. C-09-2771 MMC, 2009 U.S. Dist. LEXIS 73315, at *16 (N.D.
Cal. Aug. 19, 2009)........................................................................................................... 12

21    *Swanson v. EMC Mortgage Corp.*, 2009 U.S. Dist. LEXIS 107912, 2009 WL 3627925 (E.D. Cal.
2009) .............................................................................................................................. 5, 13

22

23    *Swartz v. KPMG LLP*, 476 F.3d 756, 765-66 (9th Cir. 2007) ........................................................ 9

24    *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)......... 3

25    *Tsien v. Wells Fargo Home Mortg.*, 2010 U.S. Dist. LEXIS 52804 (N.D. Cal. May 28, 2010) ..... 7

26    *Wachtel v. West*, 476 F.2d 1062, 1065-1666 (6th Cir.  cert. de. 414 U.S. 874 (1973) ................... 9

27    *Wagner v. Benson*, 101 Cal.App.3d 27, 34-35 (1980) .................................................................... 7

28    *Watts v. Decision One Mortg. Co.*, No. 09-43 2009 U.S. Dist. LEXIS 59694 (S.D. Cal. July 13,
2009) ................................................................................................................................... 7

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Woods v. Greenpoint Mortg. Funding, Inc.*, 2010 U.S. Dist. LEXIS 41492, 25-26 (E.D. Cal. Apr. 27, 2010) ................................................................................................................. 7

*Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987) ........................... 3

*Yamamoto v. Bank of N.Y.*, 329 F.3d 1167 (9th Cir. 2003) ............................................... 4

*Yulaeva v. Greenpoint Mortgage Funding, Inc.*, No. CIV. S-09-1504 LKK, 2009 U.S. Dist. LEXIS 79094, at *44 (E.D. Cal. Sept. 3, 2009) ........................................................ 12

**Statutes**

12 U.S.C. § 2605 ............................................................................................................... 12

12 U.S.C. § 2607 ............................................................................................................... 12

12 U.S.C. § 2608 ............................................................................................................... 12

15 U.S.C. § 1635 ................................................................................................................. 8

15 U.S.C. § 1635(a) ............................................................................................................ 8

15 U.S.C. § 1640(e) ............................................................................................................ 9

15 U.S.C. § 1692(a)(6) ....................................................................................................... 6

15 U.S.C. § 1692(a)(6)(A) .................................................................................................. 6

15 U.S.C. § 1692(g)(b) ....................................................................................................... 6

28 U.S.C. § 2283 ............................................................................................................... 15

42 U.S.C. § 1983 ............................................................................................................... 10

15 U.S.C.S. 1635(f) ........................................................................................................ 8, 9

Cal. Civ. Code § 1487 ......................................................................................................... 3

Cal. Civ. Code § 1493 ......................................................................................................... 4

Cal. Civ. Code § 1494 ......................................................................................................... 4

Cal. Civ. Code § 1495 ......................................................................................................... 4

Cal. Civ. Code, § 2924 ........................................................................................................ 5

Cal. Civ. Code, § 2924(a)(1) ........................................................................................... 5, 6

Cal. Civ. Code § 2924(b)(4) ............................................................................................... 5

Cal. Civ. Code § 2934(a) .................................................................................................... 5

- v -

1

## TABLE OF AUTHORITIES
### (continued)

2

Page(s)

3   Cal. Corp. Code §§ 167, 171 .................................................................................... 13

4   Cal. Corp. Code § 191(c)(7) ..................................................................................... 13

5   Cal. Corp. Code § 191(d)(3) ..................................................................................... 13

6   Cal. Corp. Code § 2105(a). ....................................................................................... 13

7   **Other Authorities**

8   California Business and Professions Code § 17200 .................................................... 11

9   U.S. Const. amend. XIV ............................................................................................ 10

10  **Rules**

11  Fed. R. Civ. P. 56(c) ............................................................................................... 2, 3

12  Fed. R. Civ. P. 56(e) .................................................................................................. 3

13  Fed. R. Civ. P. 9(b) .................................................................................................... 9

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

1  ## MEMORANDUM OF POINTS AND AUTHORITIES

2  ## I.  INTRODUCTION

3  Plaintiff James Macklin objects to the foreclosure of property located at 10040 Wise Road

4  in Auburn, California (the "Property") -- even though he does not contest that he borrowed

5  $659,000 and stopped making payments on the Note.  His complaint consists of only conclusory

6  allegations and legal arguments, many of which have nothing to do with these Defendants, who

7  did not make the loan or act as his loan broker.  Deutsche Bank is the Lender's assignee.  MERS

8  is the beneficiary under the Deed of Trust.  SPS is the loan servicer.

9  The caption on the first amended complaint purports that the pleading alleges seven

10  claims.  The first amended complaint is so vague, ambiguous, and largely unintelligible that

11  Defendants are unsure exactly what claims are being asserted.  This motion reflects Defendants'

12  good faith effort to address all possible claims being asserted in the first amended complaint.

13  However many there are, it will be established that none of them are legally or factually viable.

14  ## II.  FACTS

15  The material facts are undisputed and straightforward.  Plaintiff's claims are all based

16  upon activities relating to a residential mortgage loan transaction.  In April, 2006, Plaintiff

17  borrowed $659,000 from Accredited Home Lenders, Inc. (the "Lender").  The loan was secured

18  by a deed of trust for $532, 000 (the "Deed of Trust") and a junior deed of trust for $127,000.

19  The Deed of Trust named MERS as beneficiary and as nominee for the Lender.  (Undisputed Fact

20  Nos. 1-3.)

21  Plaintiff made some of his loan payments, but subsequently became delinquent in his loan

22  payments and the foreclosure process was initiated.  (Undisputed Fact No. 4.)

23  On December 8, 2008, Windsor Management Co., as agent for MERS, recorded a Notice

24  of Default and Election to Sell under Deed of Trust.  (Undisputed Fact No. 5.)

25  MERS, as nominee for the Lender, assigned the Deed of Trust to Deutsche Bank, as

26  Indenture Trustee, on Behalf of the Holders of the Accredited Mortgage Loan Trust 2006-2 Asset

27  Backed Notes ("Deutsche Bank Trust").  (Undisputed Fact No. 6.)  SPS began servicing the Deed

28  of Trust on March 1, 2009 and is the current loan servicer and attorney-in-fact for the Deutsche

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

29801-00001\iManage\3208539.3

1    Bank Trust, the owner of the Deed of Trust. (Undisputed Fact No. 7.)

2         On March 10, 2009, Windsor Management Co. recorded a Notice of Trustee's sale.

3    (Undisputed Fact No. 8.)

4         On August 21, 2009, Deutsche Bank substituted Quality Loan Service Corp. as Trustee

5    under the Deed of Trust.  (Undisputed Fact No. 9.)

6         Between November 23 and November 25, 2009, Quality Loan Service Corp. recorded,

7    served on Plaintiff by certified mail, posted on the property, and published a Notice of Trustee's

8    Sale advising Plaintiff that unless he paid $577,103.98, the property would be sold on December

9    14, 2009.  (Undisputed Fact No. 10.)

10         Plaintiff never tendered payment and the property was sold.   At the time of the sale, the

11    amount of the unpaid debt with costs was $623,986.20.  Plaintiff has not offered to tender the

12    amounts due under the loan.  (Undisputed Fact No. 11.)

### III. LEGAL ANALYSIS

14    A.    **Summary Judgment Standard**

15         Summary judgment is appropriate when it is demonstrated that the standard set forth in

16    Federal Rules of Civil Procedure Rule 56(c) is met.  "The judgment sought should be rendered if .

17    . . there is no genuine issue as to any material fact, and that the movant is entitled to judgment as

18    a matter of law." Fed. R. Civ. P. 56(c).

19                 Under summary judgment practice, the moving party always bears
the initial responsibility of informing the district court of the basis

20                 for its motion, and identifying those portions of "the pleadings,
depositions, answers to interrogatories, and admissions on file,

21                 together with the affidavits, if any," which it believes demonstrate
the absence of a genuine issue of material fact.

22
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

23         "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue,

24    a summary judgment motion may properly be made in reliance solely on the 'pleadings,

25    depositions, answers to interrogatories, and admissions on file.'"  *Id.*  "[A] complete failure of

26    proof concerning an essential element of the nonmoving party's case necessarily renders all other

27    facts immaterial."  *Id.* at 323.  In such a circumstance, summary judgment should be granted, "so

28

- 2 -

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

1    long as whatever is before the district court demonstrates that the standard for entry of summary

2    judgment, as set forth in Rule 56(c), is satisfied." *Id.*

3       If the moving party meets its initial responsibility, the burden then shifts to the opposing

4    party to establish that a genuine issue as to any material fact actually does exist. *Matsushita*

5    *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In attempting to establish the

6    existence of this factual dispute, the opposing party may not rely upon the allegations or denials

7    of its pleadings, but is required to tender evidence of specific facts. Fed. R. Civ. P. 56(e);

8    *Matsushita, supra*, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in

9    contention is material, i.e., that it might affect the outcome of the suit under the governing law.

10    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec.*

11    *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). He must also establish that the dispute is

12    genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

13    party. *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir. 1987).

14       All reasonable inferences that may be drawn from the facts placed before the court must

15    be drawn in favor of the opposing party. *Matsushita, supra,* 475 U.S. at 587. Nevertheless,

16    inferences are not drawn out of the air, and it is the opposing party's obligation to produce a

17    factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602

18    F.Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to

19    demonstrate a genuine issue, the opposing party "must do more than simply show that there is

20    some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not

21    lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

22    *Matsushita, supra,* 475 U.S. at 586 (citation omitted).

23    B.    **Plaintiff's Failure To Tender Precludes His Attack On The Foreclosure**

24       The entire complaint purports to challenge Defendants' attempt to conduct a valid

25    foreclosure sale on the property. However, as a precondition to challenging a foreclosure sale,

26    the borrower must, in good faith and with the ability to perform, make an unconditional offer to

27    pay, or pay, the secured debt prior to the foreclosure sale. Cal. Civ. Code §§ 1487 (full

28    performance), 1493 (good faith), 1494 (unconditional), 1495 (offer or must have the ability to

- 3 -

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

29801-00001\iManage\3208539.3

1    perform).

2        The failure to tender bars any cause of action challenging the foreclosure, including

3    causes of action for wrongful foreclosure, to set aside the sale, and cancellation of the trustee's

4    deed. Cal. Civ. Code §§ 1487, 1493, 1494, 1495; see also *Arnolds Management Corp. v. Eischen*

5    (1984) 158 Cal.App.3d 575, 578-580 ["an action to set aside a trustee's sale for irregularities in

6    sale notice or procedure should be accompanied by an offer to pay the full amount of the debt for

7    which the property was security."]; *Karlsen v. American Sav. & Loan Assoc.* (1971) 15

8    Cal.App.3d 112, 117.

9        This "tender rule" is based upon the equitable maxim that a court of equity will not order a

10   useless act performed. *Arnolds, supra*, at 578-579. "To hold otherwise would permit plaintiffs to

11   state a cause of action without the necessary element of damage to themselves." *Id.* at 580. "The

12   rationale behind the rule is that if plaintiffs could not have redeemed the property had the sale

13   procedures been proper, any irregularities in the sale did not result in damages to the plaintiffs."

14   *Fpci Re-Hab 01 v. E & G Invs.*, 207 Cal.App.3d 1018, 1022 (1989).

15       In *Yamamoto v. Bank of N.Y.*, 329 F.3d 1167 (9th Cir. 2003), the plaintiffs refinanced a

16   mortgage loan; their loan was assigned to the assignee. The plaintiffs defaulted and attempted to

17   rescind the loan, claiming that they were not provided with disclosures required by TILA.

18   Although the district court found a triable issue of fact existed as to whether the plaintiffs

19   received the disclosures, the district court granted summary judgment for the assignee because the

20   plaintiffs were unable to tender the loan proceeds. The appellate court affirmed that the district

21   court had the discretion to condition rescission on tender of the proceeds.

22       Here, the foreclosure was the inevitable result of Plaintiff's default. Since he has not

23   alleged an ability to tender the amount due, he cannot claim to have been damaged. See *Labra v.*

24   *Cal-Western Reconveyance Corp.*, 2010 U.S. Dist. LEXIS 23165 (N.D. Cal. Mar. 11, 2010).

25   C.    **Defendants Have Standing**

26       As best Defendants can tell, Plaintiff is asserting that only the Lender has standing to

27   foreclose or that no one has standing because the original note has been "split" from the Deed of

28

29801-00001\iManage\3208539.3

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

1    Trust.[1]  Neither reflects a correct understanding of the law.

2          Under California Civil Code section 2924(a)(1), a "trustee, mortgagee or beneficiary or

3    any of their authorized agents may conduct the foreclosure process." *Coyotzi v. Countrywide Fin.*

4    *Corp.*, No. 09-1036, 2009 U.S. Dist. LEXIS 91084, *53 (E.D. Cal. Sept. 16, 2009).  Indeed,

5    under California law one of the primary duties of the trustee is "to initiate nonjudicial foreclosure

6    on the property upon the trustor's default, resulting in a sale of the property." *Kachlon v.*

7    *Markowitz,* 168 Cal.App.4th 316, 334 (2008).   The beneficiary is free to make a substitution of

8    the trustee in order to conduct the foreclosure sale. See *Id.*; Cal. Civ. Code §§ 2934(a),

9    2924(b)(4).

10          In *Reynoso v. Paul Fin., LLC*, 2009 U.S. Dist. LEXIS 106555, 7-8 (N.D. Cal. Nov. 16,

11    2009), MERS was initially named as beneficiary and, accordingly, possessed the power of sale

12    upon default, which it could transfer to a trustee.  MERS later transferred its interest to BNYM,

13    which in turn named Quality as the substituted trustee.  The court held that Quality held the right

14    to initiate the foreclosure sale.  See also *Berenice Thoreau de la Salle v. America's Wholesale*

15    *Lender*, 2010 U.S. Dist. LEXIS 36319 (E.D. Cal. Apr. 13, 2010) ["Defendant MERS is the

16    nominee, as established by the Deed of Trust, and has the right to initiate foreclosure

17    proceedings."], citing *Swanson v. EMC Mortgage Corp.*, 2009 U.S. Dist. LEXIS 107912, 2009

18    WL 3627925 (E.D. Cal. 2009) [MERS is properly designated beneficiary under deed of trust and

19    has authority to commence non-judicial foreclosures].  There simply is no legal authority for the

20    proposition that only the Lender can foreclose.

21          Likewise, the idea that possession of the original note is a prerequisite to foreclosure has

22    been consistently rejected by this court and others.  *Reynoso v. Paul Fin., LLC*, 2009 U.S. Dist.

23    LEXIS 106555, 14-15 (N.D. Cal. Nov. 16, 2009) ["Under Civil Code section 2924, no party

24    needs to physically possess the promissory note."]; *Sicairos v. NDEX West, LLC*, 2009 U.S. Dist.

25    LEXIS 11223, *7 (S.D. Cal. 2009), citing Cal. Civ. Code, § 2924(a)(1); *Lomboy v. SCME*

26    *Mortgage Bankers*, No. 09-1160, 2009 U.S. Dist. LEXIS 44158, * 12-13 (N.D. Cal. May 26,

27

28    [1] See First Amended Complaint, pp. 11:13-17:3.

29801-00001\iManage\3208539.3

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

1   2009) ["Under California law, a trustee need not possess a note in order to initiate foreclosure

2   under a deed of trust."]; *Mesde v. Am. Brokers Conduit*, 2009 U.S. Dist. LEXIS 59632 (N.D. Cal.

3   June 30, 2009), citing *Putkkuri v. ReconTrust Co.*, 2009 U.S. Dist. LEXIS 32, 2009 WL 32567, at

4   *2 (S.D. Cal. Jan. 5, 2009) ["[p]ursuant to section 2924(a)(1) of the California Civil Code, the

5   trustee of a Deed of Trust has the right to initiate the foreclosure process.  Production of the

6   original note is not required to proceed with a non-judicial foreclosure."]; *Candelo v. Ndex West,*

7   *LLC*, 2008 U.S. Dist. LEXIS 105926, 2008 WL 5382259, at *4 (E.D. Cal. Dec. 23, 2006) ["[n]o

8   requirement exists under the statutory framework to produce the original note to initiate non-

9   judicial foreclosure."].

10  D.    **The Fair Debt Collection Practices Act Is Inapplicable**

11          Plaintiff alleges that SPS violated 15 U.S.C. 1692(g)(b), the Fair Debt Collection Practices

12  Act ("FDCPA").[2]  The assertion is premised on the idea that SPS is a "debt collector."  The

13  statute defines "debt collectors" to include "any person . . . in any business the principal purpose

14  of which is the collection of any debts, or who regularly collects or attempts to collect, directly or

15  indirectly, debts owed or due or asserted to be owed or due another. . . ."  15 U.S.C. 1692(a)(6).

16          The courts have repeatedly held that mortgagees and mortgage servicing companies are

17  not debt collectors under the FDCPA and the California nonjudicial foreclosure statutes.

18  *Berenice Thoreau de la Salle v. America's Wholesale Lender*, 2010 U.S. Dist. LEXIS 36319, 2-3

19  (E.D. Cal. Apr. 13, 2010), citing *Scott v. Wells Fargo Home Mortg., Inc.*, 326 F. Supp. 2d 709,

20  718 (E. D. Va.), aff'd, 67 Fed. Appx. 238 (4th Cir. 2003) ["mortgagors [sic] and mortgage

21  servicing companies" are not debt collectors under FDCPA]; 15 U.S.C. § 1692(a)(6)(A) [under

22  FDCPA, "debt collector" is defined as one who collects consumer debts owed to another, not

23  including an officer or employee of a creditor while collecting debts in the name of the creditor].

24  The law is clear:  foreclosing on a property pursuant to a deed of trust is not "debt collection"

25  within the meaning of the FDCPA.  *Gamboa v. Tr. Corps & Cent. Mortg. Loan Servicing Co.*,

26  2009 U.S. Dist. LEXIS 19613, *11 (N.D. Cal. Mar. 12, 2009).

27

28  _____

[2] See First Amended Complaint, pp. 17:5-18:9.  This claim does not appear to be directed at the other Defendants.

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

1  E.    **Defendants Do Not Owe Plaintiff A Fiduciary Duty**

2       Plaintiff's next claim seems to be for breach of fiduciary duty.[3]  None of Defendants owes

3  a fiduciary duty to Plaintiff.  "As a general rule, a financial institution owes no duty of care to a

4  borrower when the institution's involvement in the loan transaction does not exceed the scope of

5  its conventional role as a mere lender of money."  *Nymark v. Heart Fed. Savings & Loan Assn.*,

6  231 Cal.App.3d 1089, 1096 (1991), citing *Wagner v. Benson* (1980) 101 Cal.App.3d 27, 34-35;

7  *Fox & Carskadon Financial Corp. v. San Francisco Fed. Sav. & Loan Assn.* (1975) 52

8  Cal.App.3d 484, 488, 489; *Bradler v. Craig* (1969) 274 Cal.App.2d 466, 473, 476.  "Thus, for

9  example, a lender has no duty to disclose its knowledge that the borrower's intended use of the

10  loan proceeds represents an unsafe investment.  *Wagner v. Benson, supra*, 101 Cal.App.3d at pp.

11  33-35.  A lender does not have a duty to disclose to a borrower that he does not have the ability to

12  repay the loan.  *Cross v. Downey Sav. & Loan Ass'n,* No. CV 09-317 CAS (SSx), 2009 WL

13  481482, at *5 (C.D. Cal. Feb. 23, 2009).

14       This rule applies to loan servicers as well.  *Tsien v. Wells Fargo Home Mortg.*, 2010 U.S.

15  Dist. LEXIS 52804 (N.D. Cal. May 28, 2010), citing *Bojorquez v. Gutierrez*, No. C 09-03684 SI,

16  2010 U.S. Dist. LEXIS 28302 (N.D. Cal. Mar. 25, 2010) at *20; *Huerta v. Ocwen Loan*

17  *Servicing, Inc.,* No. 09-5822 JF, 2010 U.S. Dist. LEXIS 17970, *11 (N.D. Cal. Mar. 1, 2010)

18  [requiring plaintiff to allege how defendants exceeded the scope of their conventional role as a

19  loan servicers such that they assumed a fiduciary duty].  This court has agreed:  see *Woods v.*

20  *Greenpoint Mortg. Funding, Inc.*, 2010 U.S. Dist. LEXIS 41492, 25-26 (E.D. Cal. Apr. 27, 2010),

21  citing *Watts v. Decision One Mortg. Co.*, No. 09-43 2009 U.S. Dist. LEXIS 59694 (S.D. Cal. July

22  13, 2009) and *Marks v. Ocwen Loan Servicing*, No. 07-2133, 2009 U.S. Dist. LEXIS 35251, 2009

23  WL 975792, at *7 (N.D. Cal. Apr. 10, 2009) ["loan servicer does not owe a fiduciary duty to a

24  borrower beyond the duties set forth in the loan contract."]

25       There is no basis in law or fact for the claim that any of Defendants owed Plaintiff a

26  fiduciary duty.

27

28  ───────────
[3] First Amended Complaint, pp. 18:11-21:15.

29801-00001\iManage\3208539.3

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

F.    **Any Alleged Right To Rescind Under The Truth In Lending Act Is Time-Barred**

Under the heading "Right to Rescission," Plaintiff claims that he has a right to rescission under the Truth in Lending Act, 15 U.S.C. § 1635(a) ("TILA").[4]  A TILA claim begins to run when on the date the transaction underlying the alleged violations was "consummated." *King v. California*, 784 F.2d 910, 915 (9th Cir. 1986). 15 USCS 1635(f) completely extinguishes the right to rescind a home loan transaction after **three years**; a borrower may *not* assert the right of rescission as an affirmative defense in the lender's collection action brought more than three years after the transaction's consummation. *Beach v. Ocwen Fed. Bank*, 523 U.S. 410 (U.S. 1998).

The expiration for the right of rescission cannot be tolled because "§ 1635 is a statute of repose, depriving the courts of subject matter jurisdiction when a § 1635 claim is brought outside the three year limitation period." *Miguel v. Country Funding Corp.*, 309 F.3d 1161, 1164 (9th Cir. 2002); see also *Beach v. Ocwen Fed. Bank, supra*, 523 U.S. at 417 ["Section 1635(f) . . . talks not of a suit's commencement but of a right's duration . . . ."]; *D'Onofrio v. United States Bank*, No. 09-3701, 2009 U.S. Dist. LEXIS 95057, *4 (N.D. Cal. Oct 13, 2009) ["The three-year statute of limitation for TILA rescission claims is absolute; it cannot be tolled."].

Plaintiff alleges he has a right to rescind under TILA.  The loan was made in April 14, 2006.  The complaint was filed on April 2, 2010.  Plaintiff waited almost four years to make a TILA claim.  The right to rescission, if any existed, is time-barred.

G.    **Defendants Did Not Breach TILA By Misrepresenting The Value Of The Dwelling**

Next, Plaintiff recites that TILA is violated by making misrepresentations or encouraging an appraiser to make misrepresentations about the value of his dwelling.[5]  None of Defendants was involved in the loan origination.  None of them had anything to do with the valuation of the dwelling.  Plaintiff recognizes this as well.  He claims that the "Broker on behalf of the Lender" misrepresented the value and the Lender negligently relied on the misrepresentation.  Leaving aside the fact that a lender does not have a duty to disclose to a borrower that he does not have the

---

[4] First Amended Complaint, pp. 21:17-24:17.
[5] First Amended Complaint, pp. 24:19-25:24.

- 8 -

Defendants' Notice of Motion for Summary Judgment and Supporting Memorandum

1  ability to repay the loan (*Cross v. Downey Sav. & Loan Ass'n, supra*, No. CV 09-317 CAS (SSx),

2  2009 WL 481482, at *5), these allegations do not indicate that Defendants have any liability.

3      Further, Plaintiff's claims are time-barred.  As discussed above, Plaintiff had three years

4  to seek rescission.  15 U.S.C.S. § 1635(f).  A damages claim must be filed within one year from

5  the inception of the transaction.  15 U.S.C. § 1640(e); *King v. California*, 784 F.2d 910, 913-15

6  (9th Cir. 1986), cert. den. 484 U.S. 802 (1987); *Wachtel v. West*, 476 F.2d 1062, 1065-1666 (6th

7  Cir. cert. de. 414 U.S. 874 (1973).  This complaint was not filed until almost four years after the

8  loan was taken.

9  H.    **Defendants Did Not Commit Fraud**

10     Plaintiff alleges that Defendants committed fraud by concealment.[6]  Exactly what fraud

11  was allegedly committed is a mystery.  Fraud claims asserted in federal court must comply with

12  the requirements of Federal Rule of Civil Procedure 9(b), which provides that allegations of fraud

13  must be stated with particularity.  Fed. R. Civ. P. 9(b).  "Rule 9(b) does not allow a complaint to

14  merely lump multiple defendants together but require[s] plaintiffs to differentiate their allegations

15  when suing more than one defendant . . . and inform each defendant separately of the allegations

16  surrounding his alleged participation in the fraud."  *Swartz v. KPMG LLP*, 476 F.3d 756, 765-66

17  (9th Cir. 2007).  Plaintiff's fraud cause of action fails to meet these standards.

18     Plaintiff seems to allege that Defendants were under a duty to disclose that the loan was

19  for a higher amount than what the application deserved.  Defendants did not originate the loan; it

20  is an absurdity to say that they concealed from Plaintiff material facts about the loan.

21  Furthermore, as discussed above, not even the lender had the duty to disclose that the borrower

22  does not have the ability to repay.  *Cross v. Downey Sav. & Loan Ass'n, supra,* No. CV 09-317

23  CAS (SSx), 2009 WL 481482, at *5.  None of Defendants had a duty to disclose that the loan was

24  too large and, indeed, they did not even have the opportunity to do so.

25     Plaintiff's allegations include that by sanctioning a loan for a higher amount than what the

26  application deserved, Defendants increased their fees and the Lender did not utilize its own assets

27

28  _____
[6] First Amended Complaint, p. 25:26, see also pp. 26:1-27:10.

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

1   in making the loan and exchanged the Note at a discount.  Again, none of Defendants were

2   involved in the origination of this loan.  And, in any event, none of these actions caused damage

3   to Plaintiff.

4   I.      **Defendants Did Not Violate Plaintiffs' Constitutional Due Process Rights**

5          Plaintiff's complaint alleges violations of due process.[7]  Plaintiff's claims must arise, then,

6   under 42 U.S.C. § 1983. A claim under section 1983, however, only exists when the alleged

7   deprivation was committed "under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526

8   U.S. 40, 49-50 (1999); see U.S. Const. Amend. XIV ["[n]o state shall … deprive any person of

9   life, liberty, or property, without due process of law … [or] deny to any person within its

10  jurisdiction the equal protection of the laws."].  In other words, a private contract between

11  nongovernmental parties cannot be the basis of a violation of the Fourteenth Amendment, which

12  applies only to governmental entities. *Phillips v. Fremont Inv. & Loan*, 2009 U.S. Dist. LEXIS

13  122152, 2009 WL 4898259, *2 (D. Ariz. Dec. 11, 2009).

14         This case concerns a non-judicial foreclosure predicated on a contract signed by private

15  parties.  A private remedy such as non-judicial foreclosure does not involve state action.  *Apao v.*

16  *Bank of N.Y.*, 324 F.3d 1091, 1095 (9th Cir. 2003); *Earl v. Wachovia Mortg. FSB*, 2010 U.S. Dist.

17  LEXIS 57552, 7-8 (D. Ariz. June 8, 2010).  A cause of action alleging a violation of due process

18  in a complaint challenging the foreclosure of a home fails where the defendants are not state

19  actors.  *Berenice Thoreau de la Salle v. America's Wholesale Lender*, 2010 U.S. Dist. LEXIS

20  36319 (E.D. Cal. Apr. 13, 2010).  Defendants are not state actors.

21         Plaintiff also alleges that his due process rights were violated because the deed-of-trust is

22  an unenforceable as a "cognovit note."  The same claim was made in *Earl v. Wachovia Mortg.*

23  *FSB*, 2010 U.S. Dist. LEXIS 57552, 8-9 (D. Ariz. June 8, 2010).  The court dismissed the claim

24  with prejudice:

25              "The cognovit is the ancient legal device by which the debtor
                consents in advance to the holder's obtaining a judgment without
26              notice or hearing, and possibly even with the appearance, on the
                debtor's behalf, of an attorney designated by the holder." *D. H.*

27

28  [7] First Amended Complaint, pp. 27:12-28:11.

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

29801-00001\iManage\3208539.3

*Overmyer Co. Inc., of Oh. v. Frick Co.*, 405 U.S. 174, 177, 92 S. Ct. 775, 31 L. Ed. 2d 124 (1972). This claim, the Court assumes is also a constitutional claim, as the Supreme Court has held that cognovit notes, under certain circumstances can violate due process rights. See *Id.* at 187 ("Our holding necessarily means that a cognovit clause is not, per se, violative of Fourteenth Amendment due process."). Plaintiff appears to argue that the power-of-sale clause authorizing a non-judicial foreclosure in the deed-of-trust is cognovit because non-judicial foreclosure does not allow for a hearing in a court of law. A non-judicial foreclosure, is, by definition, not a judicial proceeding, and a power-of-sale clauses does not allow a creditor to seek judgment against a debtor, but merely allow the creditor to obtain title to the collateral as a result of default. Accordingly, no judicial proceeding was contemplated or took place at which Plaintiff was denied notice or not permitted to appear. There was, then, no state action which might support a constitutional claim. Additionally, the facts asserted do not demonstrate in any way whatsoever that the deed-of-trust was a cognovit note. In short, Plaintiff cannot proceed under a cognovit note theory and this Court must dismiss her claim with prejudice.

This is exactly the case here. Summary judgment should be granted.

### J.   California Law Was Followed

Next, Plaintiff discusses California's non-judicial statutory foreclosure law.[8] He claims Defendants did not adhere to it because the assignments have been falsely presented. This claim is unintelligible. To the extent Plaintiff is rearguing Defendants' standing to foreclose, that issue has been addressed.

### K.   California's Unfair Competition Law Was Not Violated

Plaintiff claims that Defendants violated the Unfair Competition Law ("UCL"), California Business and Professions Code §§ 17200 et seq., which forbids acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice."[9] Cal. Bus. & Prof. Code § 17200.

A defendant's liability must be based on his or her personal participation in the unlawful practices. *Emery v. Vista Int'l Serv. Ass'n*, 95 Cal.App.4th 952, 962 (2002). Accordingly, Plaintiff must have facts showing that SPS engaged in an unlawful, unfair or fraudulent business act or practice; other facts showing that MERS engaged in an unlawful, unfair or fraudulent business act or practice; and additional facts showing that Deutsche Bank engaged in an unlawful,

---

[8] First Amended Complaint, pp. 28:13-29:17.
[9] First Amended Complaint, pp. 29:19-31:28.

- 11 -

Defendants' Notice of Motion for Summary Judgment and Supporting Memorandum

1  unfair or fraudulent business act or practice.  There are no such facts.

2  Also the UCL "borrows" violations of other laws when committed pursuant to a business

3  activity.  *Farmers Ins. Exchange v. Superior Court*, 2 Cal.4th 377, 383 (1992).  Accordingly, a

4  cause of action under the UCL must be based on some predicate act that violates **another law**.

5  *Cal-Tech Communications v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1990).  Plaintiff claims

6  that the other laws are 12 U.S.C. §§ 2605 et seq., the Real Estate Settlement Procedures Act

7  ("RESPA"), and "predatory lending."  Neither saves Plaintiff's UCL claim.

8      1.  **RESPA**

9  Plaintiff claims that the RESPA was violated because he was not made aware of the

10  Lender's intention to "split the Note and the Deed" and MERS is not registered with the

11  California Department of Corporations so the assignment to MERS is unlawful.

12  To begin with, the claims under RESPA are time-barred.  An action alleging a violation of

13  12 U.S.C. § 2605 must be brought within three years of the violation; an action alleging violations

14  of §§ 2607 or 2608 must be brought within one year of the violation. The date from which the

15  statute of limitations commences to run is the date the loan transaction closed, here, April 2006.

16  (See *Lee v. Aurora Loan Servs.*, 2010 U.S. Dist. LEXIS 56094, 4-5 (N.D. Cal. May 18, 2010);

17  *McGill v. Wachovia Mortg., FSB Loan*, 2010 U.S. Dist. LEXIS 43393, 22-23 (E.D. Cal. Mar. 3,

18  2010).)  It has been almost four years since this loan transaction closed.  Accordingly, Plaintiff

19  cannot state a claim under the UCL based on a violation of RESPA.

20  Further, a claim for a RESPA violation must include facts showing how the plaintiff

21  suffered actual harm due to the defendant's actions.  See *Benham v. Aurora Loan Servs.*, No. C-

22  09-2059 SC, 2009 U.S. Dist. LEXIS 91287, at *10-11 (N.D. Cal. Oct. 1, 2009); *Singh v. Wash.*

23  *Mut. Bank*, No. C-09-2771 MMC, 2009 U.S. Dist. LEXIS 73315, at *16 (N.D. Cal. Aug. 19,

24  2009).  While courts interpret this requirement liberally, the plaintiff must at least show what the

25  plaintiff lost or how the plaintiff suffered actual harm. *McGill v. Wachovia Mortg.*, FSB Loan,

26  2010 U.S. Dist. LEXIS 43393, 20-22 (E.D. Cal. Mar. 3, 2010), citing *Yulaeva v. Greenpoint*

27  *Mortgage Funding, Inc.*, No. CIV. S-09-1504 LKK, 2009 U.S. Dist. LEXIS 79094, at *44 (E.D.

28  Cal. Sept. 3, 2009); *Hutchinson v. Del. Sav. Bank*, FSB, 410 F. Supp. 2d 374, 383 (D.N.J. 2006).

- 12 -

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

1    Whether they are RESPA violations or not, Plaintiff did not suffer any harm as a result of

2  not being made aware of the lender's intention to "split the Note and the Deed" and the purported

3  fact that MERS is not registered with the California Department of Corporations.  In *Benham v.*

4  *Aurora Loan Servs.*, 2010 U.S. Dist. LEXIS 11189 (N.D. Cal. Feb. 9, 2010), the complaint was

5  dismissed with prejudice because, among other things, the pleading did nothing to suggest that

6  the plaintiff would not have suffered a foreclosure if MERS had been registered with the

7  California Secretary of State, or had not participated in the transactions leading up to the

8  foreclosure.  The same is true here.

9    As for the allegation that MERS is not registered with the California Secretary of State,

10  MERS has been the victim of identity theft.  The "Mortgage Electronic Registration Systems,

11  Inc." name was registered with California by an unrelated individual.  It is the imposter-MERS

12  which is listed as a suspended corporation by the California Secretary of State.  See *Mortgage*

13  *Electronic Registration Systems, Inc. v. Brosnan*, 2009 WL 3647125, (N.D. Cal. 2009).

14    In any event, MERS is not required to register with the California Secretary of State.

15  MERS is a Delaware corporation (Undisputed Fact No. 16.) and is, therefore, as a foreign

16  corporation in the State of California.  *See* Cal. Corp. Code §§ 167, 171.  A foreign corporation is

17  required to obtain a certificate of qualification from the Secretary of State before it *transacts*

18  *intrastate business*.  (Cal. Corp. Code § 2105(a).)  Intrastate business does not include "creating

19  evidences of debt or mortgages, liens or security interests on real or personal property."  Cal.

20  Corp. Code § 191(c)(7).  In addition, "[t]he ownership of any loans and the enforcement of any

21  loans by trustee's sale, judicial process or deed in lieu of foreclosure or otherwise" are also

22  exempted.  Cal. Corp. Code § 191(d)(3).

23    MERS is not transacting intrastate business within the meaning of the statute.  It performs

24  only the exempted activities.  Numerous courts, including this one, have recognized that MERS

25  has standing in cases like this. See *Bogdan v. Countrywide Home Loans*, 2010 U.S. Dist. LEXIS

26  28889 (E.D. Cal. Mar. 25, 2010), citing *Swanson v. EMC Mortg. Corp.*, 2009 U.S. Dist. LEXIS

27  107912, 2009 WL 3627925, *9 (E.D.Cal. 2009) [MERS properly acted as a beneficiary under

28  Corporations Code sections 191(c)(7) and (d)(3)]; *Lomboy v. SCME Mortg. Bankers*, 2009 U.S.

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

1   Dist. LEXIS 44158, 2009 WL 1457738, *3 (N.D. Cal. 2009) [same]; *Derakhshan v. Mortg. Elec.*

2   *Registration Sys.*, 2009 U.S. Dist. LEXIS 63176 (C.D. Cal. June 29, 2009) [MERS not required to

3   obtain a certificate of qualification from the Secretary of State because it was not transacting

4   intrastate business].

5          2.      **"Predatory Lending"**

6          Defendants are unaware of any legally recognized claim called "predatory lending."

7   Plaintiff does not provide any state or federal law that supports such a claim.  There are no

8   statutes governing "predatory lending" separate and distinct from the specific claims already

9   brought by Plaintiff.  See *Bojorquez v. Gutierrez*, 2010 U.S. Dist. LEXIS 28302 (N.D. Cal. Mar.

10  25, 2010).  There is no common law cause of action for "predatory lending."  *Aguero v.*

11  *MortgageIT, Inc.*, 2009 U.S. Dist. LEXIS 75515 (E.D. Cal. Aug. 10, 2009).

12         Just as fundamentally, Plaintiff's claim that Defendants engaged in "predatory lending" is

13  based upon the same factual allegations as Plaintiff's other claims.  As discussed above, all of

14  those claims are defective.

15  L.     **There Was No Intentional Infliction Of Emotional Distress**

16         Plaintiff alleges a claim of intentional infliction of emotional distress.[10]  To plead a claim

17  for intentional infliction of emotional distress, Plaintiff must allege (1) extreme and outrageous

18  conduct by Defendants with the intention of causing, or reckless disregard of the probability of

19  causing, emotional distress; (2) Plaintiff's suffering severe or extreme emotional distress; and (3)

20  actual and proximate causation of the emotional distress by Defendants' outrageous conduct.

21  *Christensen v. Superior Court*, 54 Cal.3d 868, 903, (1991).

22         Conduct is only "extreme and outrageous" when it was "so extreme as to exceed all

23  bounds of that usually tolerated in a civilized community."  *Davidson v. City of Westminster*, 32

24  Cal.3d 197, 201 (1982) (citation omitted).   For emotional distress to be severe, it must be "of

25  such substantial quantity or enduring quality that no reasonable man in a civilized society should

26  be expected to endure it."  (*Fletcher v. Western Nat'l Life Ins. Co.*, 10 Cal.App.3d 376, 397, 89

27

28  [10] First Amended Complaint, pp. 32:1-33:19.

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

1    Cal. Rptr. 78 (Ct. App. 1970).)

2        In *Ross v. Creel Printing & Publishing Co.*, 100 Cal.App.4th 736, 745 (2002), the court

3    observed that "[i]n the context of debt collection, courts have recognized that the attempted

4    collection of a debt by its very nature often causes the debtor to suffer emotional distress." But

5    the court held that something more than mere debt collection must be alleged to sustain an

6    intentional infliction of emotional distress claim. *Id.* It is well-settled that something more than

7    normal debt collection practices that would rise to the level of "extreme and outrageous" conduct

8    is necessary to state a claim for intentional infliction of emotional distress. *Reynoso v. Paul Fin.,*

9    *LLC*, 2009 U.S. Dist. LEXIS 106555, 35-37 (N.D. Cal. Nov. 16, 2009), citing *Pineda v. Reyes*,

10   No. 09-1938, 2009 U.S. Dist. LEXIS 96853, *26-28 (S.D. Cal. Oct. 20, 2009) [dismissing

11   intentional infliction of emotional distress claim in wrongful foreclosure suit]; *Coyotzi v.*

12   *Countrywide Fin. Corp.*, No. 09-1036, 2009 U.S. Dist. LEXIS 91084, *27 (E.D. Cal. Sept. 16,

13   2009) [same].)

14       Defendants' actions in foreclosing on the property cannot, as a matter of law, constitute

15   intentional infliction of emotional distress.

16   M.    **Plaintiff Has No Right To Injunctive Relief**

17       Lastly, Plaintiff seeks injunctive relief to prevent foreclosure.[11] "Injunctive relief is a

18   remedy, not a cause of action." *Guessous v. Chrome Hearts, LLC*, 179 Cal.App.4th 1177, 1187

19   (2009), citation omitted. Since injunctive relief is a remedy, a separate, valid cause of action

20   must exist before injunctive relief may be granted. (*Shell Oil Co. v. Richter*, 52 Cal.App.2d 164,

21   168 (1942); see also *McDowell v. Watson*, 59 Cal.App.4th 1155, 1159.) As shown above,

22   Plaintiff has no valid claims.

23       Furthermore, an injunction against the foreclosure action would be barred by the Anti-

24   Injunction Act, 28 U.S.C. § 2283 which provides:

25           A court of the United States may not grant an injunction to stay
             proceedings in a State court except as expressly authorized by Act
26           of Congress, or where necessary in aid of its jurisdiction, or to
             protect or effectuate its judgments.
27

28   [11] First Amended Complaint, pp. 33:21-35:2.

- 15 -

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

29801-00001\iManage\3208539.3

1    In addition, the foreclosure process is complete.  There are no acts to enjoin.  A suit for

2    injunctive relief is normally moot upon the termination of the conduct at issue, unless there is a

3    likelihood of recurrence.  *Demery v. Arpaio*, 378 F.3d 1020, 1026 (9th Cir.2004).  Plaintiff's

4    claim is moot.

5                                IV.  **CONCLUSION**

6        SPS, MERS, and Deutsche Bank respectfully request that the Court grant summary

7    judgment against Plaintiff.  In the alternative, they request that the Court dismiss those claims as

8    to which there are no genuine issue as to any material fact and to which they are entitled to

9    judgment as a matter of law.

10

11   Dated: August 19, 2010

12                        CARR, McCLELLAN, INGERSOLL, THOMPSON & HORN
                         Professional Law Corporation

13

14

15                        By:  _____
                                    Lori A. Lutzker
16                              Attorneys for Defendants
                         Select Portfolio Servicing, Inc., Mortgage Electronic
17                       Registration Systems, Inc., and Deutsche Bank National
                                    Trust Co.

18

19

20

21

22

23

24

25

26

27

28

29801-00001\iManage\3208539.3

Defendants' Notice of Motion for Summary
Judgment and Supporting Memorandum

# EXHIBIT G

# EXHIBIT G

1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10    JAMES L. MACKLIN,

11              Plaintiff,              No. 2:10-cv-01097 FCD KJN PS

12        vs.

13    SELECT PORTFOLIO SERVICING,
      et al.
14              Defendants.            ORDER

15    _____/

16          In light of plaintiff's voluntary petition for bankruptcy, IT IS HEREBY

17    ORDERED that:

18          1. This action is STAYED effective immediately pursuant to 11 U.S.C. § 362.

19    The court must therefore defer further consideration of the matters pending in the instant case

20    until the bankruptcy action is terminated or the parties have obtained relief from the automatic

21    stay.

22          2. The hearing on defendants' motion for summary judgment and the status

23    conference set for October 7, 2010 at 10:00 a.m. are hereby VACATED.

24    ////

25    ////

26    ////

1

3.  The parties shall notify the court within ten (10) days of the resolution of the bankruptcy proceedings.

**IT IS SO ORDERED**.

DATED:  October 6, 2010

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT H

# EXHIBIT H

1    JAMES MACKLIN
2    PO BOX 789
     Crystal Bay, Nevada  89402
3    Telephone: (530) 888-9600
4    Fax: 530-888-9600
     jimlmacklin@yahoo.com
5    IN PRO PER




**FILED**

APR 15 2014

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
          DEPUTY CLERK

6

7

8                        UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JAMES L. MACKLIN,                      Case No: 2:10-cv-1097-FCD-KJN PS

12                 Plaintiff,
                                            **NOTICE OF MOTION AND MOTION**
13          vs.                             **FOR LEAVE TO FILE SECOND**
                                            **AMENDED COMPLAINT AND**
14   MATTHEW HOLLINGSWORTH, ET al.,         **PROPOSED SECOND AMENDED**
                                            **COMPLAINT**
15                 Defendant(s).
                                            Judge: Hon. Kendall J. Newman
16

17

18

19   TO THE COURT, PARTIES AND THEIR ATTORNEYS:

20      **PLEASE TAKE NOTICE** that Plaintiff, James Macklin, individually, hereby gives Notice of

21   Motion and Motions this court for leave to amend the Complaint in this case.

22      Pursuant to Federal Rules of Civil Procedure Rule 15 (a) (2), *Other Amendments*: In all other

23   cases, a party may amend its pleading only with the opposing party's written consent or the

24   court's leave. The court should freely give leave when justice so requires.

25      In its Order dated March 7th, 2014, the Court Ordered Plaintiff Macklin to file a motion for

26   leave to file a second amended complaint along with a proposed second amended complaint.

27   Plaintiff therefore submits this Motion and Second Amended Complaint pursuant to the Order.

28

                                           - 1 -

     MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND
                        AMENDED COMPLAINT

1  The proposed amendment will add causes of action for: Breach of Contract, Truth In Lending
2  Act Violations, Cancellation of Instrument, Violation of Equal Credit Opportunity Act, Violation
3  of Fair Credit Reporting Act, California Business & Professions Code § 17200 and Illegal
4  Contract. This motion is brought on grounds that justice requires this second amendment and that
5  the proposed amendment will not prejudice Defendant, is timely, is not the result of bad faith or
6  dilatory motive, and the amendment is not futile. This motion is based on this Notice of Motion
7  and Motion, the Memorandum of Points and Authorities included below, the Declaration of
8  James Macklin, the pleadings and papers on file, both herein, and all pleadings, filed documents
9  and papers in the Eastern District Bankruptcy Court, Sacramento Division, Case No. 10-44610
10 (BR Dckt. No. 1 et. seq.) and upon such other matters as may be presented to the Court at the
11 time of the hearing.

12

13

14  Dated: _Apr 11, 2014_              _____

15                                         James L. Macklin, Pro Per

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

1  JAMES MACKLIN
2  PO BOX 789
   Crystal Bay, Nevada  89402
3  Telephone: (530) 888-9600
4  Fax: 530-888-9600
5  jimlmacklin@yahoo.com
6  IN PRO PER
7
8            **UNITED STATES DISTRICT COURT**
9         **FOR THE EASTERN DISTRICT OF CALIFORNIA**
10
11
12
13  JAMES L. MACKLIN,                    Case No: 2:10-cv-1097-FCD-KJN PS
14              Plaintiff,               **MEMORANDUM OF POINTS AND**
15       vs.                            **AUTHORITIES IN SUPPORT OF**
16                                      **MOTION FOR LEAVE TO FILE SECOND**
    MATTHEW HOLLINGSWORTH, ET al.,      **AMENDED COMPLAINT**
17
18              Defendant(s).
19
20                                       Judge: Hon. Kendall J. Newman
21         **MEMORANDUM OF POINTS AND AUTHORITIES**
22       Plaintiff filed this action in Placer County Superior Court, Defendants removed this
23  action based on 28 U.S.C. § 1331 and 28 U.S.C. § 1332. (Dckt. No. 2). After removal, Plaintiff
24  filed a First Amended Complaint. (Dckt. No. 13). The Action arises out of a controversy of
25  purported contract. Having requested of Defendants consent to amend the complaint, and having
26  been refused (See: Joint CMC Statement), Plaintiff now moves to file a Second Amended
27  Complaint to add additional parties, legal theories and causes of action, which have recently
28  come to light.

**MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND
AMENDED COMPLAINT**

1    **STATEMENT OF FACTS AND RELEVANT PROCEDURAL HISTORY**

2          Plaintiff commenced this action seeking damages against Defendants for wrongful

3    conduct and acts that prejudiced Plaintiff. Plaintiff substantially relied, to his detriment, upon

4    false representations made by Defendants. Plaintiff has recently discovered that additional

5    Parties were complicit in these predicate acts and that these Parties have become necessary

6    Parties that were previously unknown to Plaintiff through the deceitful and purposefully complex

7    acts of Defendants and their cohorts. The newly added Defendants have made public admissions

8    as to their illegal acts that were previously unavailable to Plaintiff.

9    **LEGAL ARGUMENT**

10   1.    Federal Rules of Civil Procedure ("FRCP") Rule 20 (a)(2)(A) & (B) Permissive Joinder

11   of Parties, (a) Persons who may be joined (2) Defendants: "Persons…may be joined in one

12   action if: (A) any right to relief is asserted against them jointly, severally, or  in  the alternative

13   with respect to or arising out of the same transaction, occurrence or series of transactions or

14   occurrences and; (B) any questions of fact or law common to all defendants will arise in the

15   action."

16   FRCP Rule 60 (d): Other Powers to Grant Relief. This rule does not limit the court's power to:

17   (1) entertain an independent action to relieve a party from a judgment, order or proceeding, (3)

18   set aside a judgment for Fraud on the Court. Also see: FRCP Rule 15(c), Relation Back of

19   Amendments.

20

21   2.    Plaintiff signed for a debt obligation that named "Accredited Home Lenders, Inc." as a

22   lender of funds. Plaintiff supplied Defendants Wells Fargo & Co's wholly owned subsidiary,

23   Wells Fargo Home Mortgage ("WFHM"), and Deutsche Bank National Trust Co. as trustee for

24   the Accredited Mortgage Loan Trust 2006-2 REMIC trust ("DBNTC") as purported successor in

25   interest to Accredited Home Lenders, Inc., with his full employment and income history,

26   including his U.S. Federal tax returns for the years 2005-2006. Defendants WFHM and DBNTC

27   (as purported assignee) falsely placed an income onto Plaintiff's loan application that indicated

28   income of $370,000.00 per year. Plaintiff's U.S. tax returns (2005-2006) both showed Plaintiff's

- 4 -

1    income was only $56,000.00 and $86,000.00 per year respectively. Plaintiff was not aware of

2    this income falsification. Defendants were both aware, ratified the false information, but had a

3    duty to not extend the loan to Plaintiff under TILA §§§§ 1602(f), 1635(f), 1639(a)(1), 1639(h)

4    [prohibiting extensions of credit without regard to payment ability of consumer], 12 CFR

5    226.1(c), 226.2(a)(22)-2; and under Cal. Civ. Code § 1789.13 (d), (g) and (h).

6        3.    California Civil Code § 1789.12 (a) "Credit services organization means a person who

7    sells, provides, or performs, or represents that he or she can or will sell, provide or perform, any

8    of the following services, in return for the payment of money or other valuable consideration":

9        (2) "Obtaining a loan or other extension of credit for a buyer". Defendant, Wells Fargo, is

10   governed by this section of the Code by offering to obtain a loan for Plaintiff Macklin.

11

12       4.    Cal. Civ. Code § 1789.13: "A credit services organization and its salespersons, agents,

13   representatives, and independent contractors who sell or attempt to sell the services of a credit

14   services organization shall not do any of the following:

15       (d) Make … a statement that is untrue or misleading and that is known, or that by the

16   exercise of reasonable care should be known, to be untrue or misleading, to a consumer credit

17   reporting agency or to a person who has extended credit to a buyer or to whom a buyer is

18   applying for an extension of credit, such as statements concerning a buyer's identification, home

19   address, creditworthiness, credit standing, or credit capacity;

20       (g) Make or use untrue or misleading representations in the offer or sale of the services of a

21   credit services organization, including either of the following:

22       (h) Engage, directly or indirectly, in an act, practice, or course of business that operates or

23   would operate as a fraud or deception upon a person in connection with the offer or sale of the

24   services of a credit services organization."

25   **DEFENDANT DEUTSCHE BANK, AS TRUSTEE, CARRIES FULL LIABILITY AS**

26   **PURPORTED ASSIGNEE**

27

28

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND
AMENDED COMPLAINT

5.   Assignee liability is well settled law in California, when the assignee takes the benefit of a contract, it also assumes all of the liabilities and the assignor stands only as a surety for the performance of the obligation by the assignee. *Walker v. Phillips*, 205 Cal. App. 2d 26 (Cal. App. 2d Dist. 1962). "Whatever conditions or limitations attached to the beneficiaries' interest prior to the assignment apply against the assignee". *Gilberts' Law Summary on Trusts*, 13th Ed. § 442. The assignee then assumes rights to sue for damages against the assignor for the repudiation or malfeasance. *Nashville Lodging Co. v. FDIC*, 934 F. Supp. 449 (D.D.C. 1996).

6.   California Financial Code § 4973 governs "covered" consumer loans in California. Plaintiff's loan is a "covered loan" as defined by the Code.

7.   California Financial Code § 4973 (f) (1): "A person who originates covered loans shall not make or arrange a covered loan unless at the time the loan is consummated, the person reasonably believes the consumer, or consumers, when considered collectively in the case of multiple consumers, will be able to make the scheduled payments to repay the obligation based upon a consideration of their current and expected income, current obligations, employment status, and other financial resources, other than the consumer's equity in the dwelling that secures repayment of the loan….The consumer shall be presumed to be able to make the scheduled payments to repay the obligation if, at the time the loan is consummated, the **consumer's total monthly debts**, including amounts owed under the loan, do not exceed 55 % of the consumer's monthly gross income, as verified by the credit application, the consumer's financial statement, a credit report, financial information provided to the person originating the loan by or on behalf of the consumer, or any other reasonable means." (Emph. mine). Plaintiff's loan obligations alone ($2715.00/mo.[1st deed] + $1196.00/mo. [2nd deed] = $3911.00, or 55%) were known to Defendants as they provided both loans simultaneously to Plaintiff. Those amounts exceeded the percentages governed by the preceding Code requirements, *id*. Plaintiff's **total monthly debts** exceeded this statutory provision by more than 20%. It was a financial certainty, and statutory violation, that the predatory, illegal loan would fail.

## PROPOSED DEFENDANT'S WELLS FARGO & CO. ADMISSIONS POST-BANKRUPTCY AUTOMATIC STAY

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND AMENDED COMPLAINT

1    7.    Defendants WFHM and DBNTC (as purported assignee) did use false information that

2    was knowingly and speciously placed on to Plaintiff's loan application by Defendant WFHM

3    and ratified by Defendant DBNTC's predecessor in interest in order to falsely qualify him for a

4    consumer loan transaction subject to this case. Proposed Defendant "WELLS" subsequently

5    admitted to identical abuses in the following Matter, Plaintiff asks this court to take judicial

6    notice (Fed. R. Evid., Rule 201) of the same Matter: *UNITED STATES OF AMERICA,*

7    *BEFORE THE BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,*

8    *WASHINGTON, D.C. In the Matter of: WELLS FARGO & COMPANY, San Francisco,*

9    *California and WELLS FARGO FINANCIAL, INC., Des Moines, Iowa.* **Docket Nos. 11-094-**

10   **B-HC1, 11-094-I-HC1, 11-094-B-HC2, 11-094-I-HC2, Order to Cease and Desist and Order**

11   **of Assessment of a Civil Money Penalty Issued Upon Consent.** This Order was issued on July

12   20th, 2011 and was signed by "Jennifer Johnson" (Bd. Of Governors, Fed. Res. System), "James

13   Strother" (Wells Fargo & Co.) and "Dean Anderson" (Wells Fargo Financial).

14   8.    Wells Fargo & Co. and its subsidiary(ies) substantially admitted to the following, an

15   excerpt from the Consent Order: "Income Document Alteration or Falsification... internal

16   controls were not adequate to detect and prevent instances when certain of its sales personnel, in

17   order to meet sales performance standards and receive incentive compensation, **altered or**

18   **falsified income documents and inflated prospective borrowers' incomes to qualify those**

19   **borrowers for loans that they would not otherwise have been qualified to receive."**

20   9.    The illegality of the transaction is central to Plaintiff's case. Proposed Defendant

21   Wells Fargo & Co. entered into such Consent Order *after* the time of the filing of this Complaint

22   in this court, and after the Bankruptcy Adversary Proceeding described herein. Plaintiff should

23   be entitled to add new Defendant Wells Fargo as a result of *newly admitted* acts that are directly

24   related to this case and which were not available at the time the case was filed. FRCP Rule 15 et.

25   seq. Courts are bound to apply a policy of great liberality in permitting amendments "at any

26   stage of the proceedings, up to and including trial," absent prejudice to the adverse party. See

27   *Atkinson v. Elk Corp.* 109 (2003) Cal.App. 4th 739, 761. Prejudice cannot result against

28

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND
AMENDED COMPLAINT

1  Defendant DBNTC as it substantially may rely upon the security of the real property barring a

2  negative trial result and has a right to an action against the assignor, *id*, ¶ 5.

3      10.      Plaintiff should be allowed to avoid the effect of earlier inaccurate or incomplete

4  pleadings, including proper parties, by including in the complaint a satisfactory explanation why

5  the earlier pleadings are incorrect. Absent such explanation, however, the self-destructive

6  allegations in the earlier pleading or discovery response are "read into" the complaint, and

7  allegations inconsistent therewith treated as sham and disregarded. See *Owens v. Kings*

8  *Supermarket* (1988) 198 Cal. App. 3d 379, 384. Plaintiff should be allowed to join Wells Fargo

9  because there may be a split of liability as to the false documents used by the defendants and the

10 court shall make such a determination based on all of the facts, not a convoluted version without

11 any prior notice of the Wells Fargo admissions.

12     11.      Plaintiff was precluded from the requisite knowledge of the blatantly falsified

13 documents until discovery was sent in this case but, due to his filing of the bankruptcy, a

14 subsequent stay was placed on this case until recently, by Order of the court. Plaintiff received

15 only "blank" loan documents at closing of the transaction and received the overtly deceptive

16 versions of the falsified documents from Defendant DBNTC's counsel literally days prior to the

17 bankruptcy being filed and staying this case.

18                              **ILLEGAL CONTRACT**

19

20     12.      Paragraphs 1-11 are incorporated as though fully stated herein.

21     13.      As one authority has noted, "[t]he law has a long history of recognizing the general rule

22 that certain contracts, though properly entered into in all other respects, will not be enforced... if

23 found to be contrary to public policy." (15 Corbin on Contracts (2003) § 79.1, p. 1 (Corbin); see

24 also *Wong v. Tenneco, Inc.* (1985) 39 Cal.3d 126, 135 [""""No principle of law is better settled

25 than that a party to an illegal contract cannot come into a court of law and ask to have his illegal

26 objects carried out . . .""" "]; *Lewis & Queen v. N. M. Ball Sons* (1957) 48 Cal.2d 141, 150 ["the

27 courts generally will not enforce an illegal bargain or lend their assistance to a party who seeks

28 compensation for an illegal act"]; Winfield, Public Policy in the English Common Law (1928)

- 8 -

1  42 Harv. L.Rev. 76.)  Such agreements are "traditionally referred to as 'illegal contracts,'" even

2  though they "are functionally described as contracts unenforceable on grounds of public policy."

3  (Rest.3d Restitution & Unjust Enrichment (Tent. Draft No. 3, Mar. 22, 2004) § 32, com. a, p.

4  154 (Tentative Draft).)[5].

5      14.      California statutes require that a contract have "a lawful object." (Civ. Code, § 1550,

6  subd. (3); see Civ. Code, § 1596.)  Otherwise, the contract is void.  (Civ. Code, § 1598.)  Civil

7  Code section 1668 provides that a contract that has as its object a violation of law is "against the

8  policy of the law."  Civil Code section 1667 states that "unlawful" is "1.  Contrary to an express

9  provision of law; [¶] 2.  Contrary to the policy of express law, though not expressly prohibited;

10  or, [¶] 3.  Otherwise, contrary to good morals."  (See also Civ. Code, §§ 1441 ["A condition in a

11  contract, the fulfillment of which is . . . unlawful . . . is void"], 1608 ["If any part of a single

12  consideration for one or more objects, or of several considerations for a single object, is

13  unlawful, the entire contract is void"].)  California courts have stated that an illegal contract

14  "may not serve as the foundation of any action, either in law or in equity" (*Tiedje v. Aluminum

15  Taper Milling Co.* (1956) 46 Cal.2d 450, 453-454), and that when the illegality of the contract

16  renders the bargain unenforceable, "'[t]he court will leave them [the parties] where they were

17  when the action was begun'" (*Wells v. Comstock* (1956) 46 Cal.2d 528, 532; see *also Kolani v.

18  Gluska* (1998) 64 Cal.App.4th 402, 408, disapproved on other grounds in *Bonifield v. County of

19  Nevada* (2001) 94 Cal.App.4th 298 ["illegal contracts are void"]).

20      15.      All Defendants were fully aware of the illegality of the contract by virtue of

21  admissions made during discovery in this case just prior to the bankruptcy filing, which

22  automatically stayed this case. Plaintiff's exhibits within the adversary proceeding in the

23  bankruptcy (Case No. 11-02024, Dckt. No. 308) as supplied by Defendant, DBNTC, show that

24  the loan and its attendant documents (i.e., loan application, underwriting, income verification, tax

25  returns, etc.) were materially falsified and ratified by Defendants, thus, illegally qualifying

26  Plaintiff for a predatory loan.

27

28

- 9 -

1    16.    The express prohibitions by law are codified at: California Financial Code § 4973 (f)
2  (1); Cal. Civ. Code § 1789.13; California Civil Code § 1789.12, and TILA, *id*. Thus, **the**
3  **contract is void**, not voidable, as an operation of law. The court in the bankruptcy lacked subject
4  matter jurisdiction as to enforcing the terms of the contract by these strict prohibitions.
5  Defendant(s) have admitted to the illegality of the contract, yet proceeded to enforce the illegal
6  contract by means of enacting a Fraud upon the court through the use of recorded instruments
7  that were ***presumptively*** true, based on the illegal contract's terms and conditions. California
8  courts have stated that an illegal contract "may not serve as the foundation of any action, either
9  in law or in equity" (*Tiedje v. Aluminum Taper Milling Co.* (1956) 46 Cal.2d 450, 453-454).

10    17.    Plaintiff first learned of the falsity of the loan application through discovery in this
11  case, but was precluded from bringing such evidence until this case was effectively re-activated
12  by the Order in March, 2014. Justice demands that this court allow the amended Complaint to
13  include the new Defendants Wells Fargo & Co. and the illegally substituted trustee, Quality Loan
14  Services, Inc. See: *California Golf v. Cooper* (2008) 163 Cal. App. 4th 1053, 1070. "Whenever a
15  court becomes aware that a contract is illegal, it has a duty to refrain from entertaining an action
16  to enforce the contract". The bankruptcy court and this court have such a duty by the undisputed,
17  un-refuted record (Dckt. No. 308, *id.*).

18    18.    California law includes federal law. (*People ex rel. Happell v. Sischo* (1943) 23
19  Cal.2d 478, 491 [Federal law is "the supreme law of the land (U.S. Const., art. VI, sec. 2) to the
20  same extent as though expressly written into every state law"]; 6A Corbin on Contracts, supra, §
21  1374, p. 7 ["Under our Constitution, national law is also the law of every separate State"].)
22  Thus, a violation of federal law is a violation of law for purposes of determining whether or not a
23  contract is unenforceable as contrary to the public policy of California. Truth In Lending Act
24  ("TILA") §§§§ 1602(f), 1635(f), 1639(a)(1), 1639(h) [prohibiting extensions of credit without
25  regard to payment ability of consumer], 12 CFR 226.1(c), 226.2(a)(22)-2; *See*: 15 U.S.C. §
26  1639c (a)(1) "**In General**: In accordance with regulations prescribed by the Bureau, no creditor
27  may make a residential mortgage loan unless the creditor makes a reasonable and good faith
28  determination based on verified and documented information that, at the time the loan is

- 10 -

1  consummated, the consumer has a reasonable ability to repay the loan, according to its terms,

2  and all applicable taxes, insurance (including mortgage guarantee insurance), and assessments."

3  (3) "**Basis for determination:**

4     A determination under this subsection of a consumer's ability to repay a residential mortgage

5  loan shall include ***consideration*** of the consumer's credit history, current income, expected

6  income the consumer is reasonably assured of receiving, current obligations, debt-to-income

7  ratio or the residual income the consumer will have after paying non-mortgage debt and

8  mortgage-related obligations, employment status, and other financial resources other than the

9  consumer's equity in the dwelling or real property that secures repayment of the loan. A creditor

10 shall determine the ability of the consumer to repay using a payment schedule that fully

11 amortizes the loan over the term of the loan". Under the strict terms of Plaintiff's loan, the loan

12 was due to re-set at an even higher monthly payment, thus, skyrocketing the 55% Debt-to-

13 Income ratio prohibition to **over 75%** of Plaintiff's gross income, a material violation of the

14 lending laws herein. (*See* also Civ. Code, §§ 1441 ["A condition in a contract, the fulfillment of

15 which is . . . unlawful . . . is **void**"], 1608 ["If any part of a single ***consideration*** for one or more

16 objects, or of several considerations for a single object, is unlawful, the entire contract is **void**"]".

17    15 U.S.C. § 1639c (a) (4) **Income verification**

18    A creditor making a residential mortgage loan shall verify amounts of income or assets that

19 such creditor relies on to determine repayment ability, including expected income or assets, by

20 reviewing the consumer's Internal Revenue Service Form W–2, tax returns, payroll receipts,

21 financial institution records, or other third-party documents that provide reasonably reliable

22 evidence of the consumer's income or assets. In order to safeguard against fraudulent reporting,

23 any consideration of a consumer's income history in making a determination under this

24 subsection shall include the verification of such income by the use of—

25    (A) Internal Revenue Service transcripts of tax returns; or

26

27    (B) a method that quickly and effectively verifies income documentation by a third party

28 subject to rules prescribed by the Bureau.

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND
AMENDED COMPLAINT

19.     Based upon the foregoing authorities, the contract subject to this suit has been void by operation of law *ab initio*. The previous court in the bankruptcy lacked authority to make any final judgments under *Stern v. Marshall*, 131 S. Ct. 2594 (2011) and *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.* (*Marathon*), 458 U.S. 50 (1982) as described and defined in Plaintiff's Joint CMC Statement. Therefore, any and all previous Orders, findings and Judgments are subject to this court's authority solely and may not be viewed as either authoritative or controlling.

20.     Plaintiff asks this court to allow amendment to include additional causes of action as defined herein, and to add Defendants Wells Fargo & Co. and Quality Loan Services, Inc. as parties necessary to join based on their conducts and admissions as fully described and admitted herein.

22.     Plaintiff includes all of the exhibits admitted in the bankruptcy Adversary Proceeding No. 11-02024, Dckt. No. 308, which include: Falsified Loan Application (Ex. 14, Dckt. 308), Defendant's admitted evidence of "Full Doc" Loan, evidence of timely rescission by Plaintiff of illegal loan (Ex. 7, Dckt 308), U.S. Tax returns used to complete illegal contract loan application (Ex. 14, Dckt. 308), Note and Deed of Trust executed by Defendants used in qualifying illegal loan (Ex. 1 & 2, Dckt. 308), "wiring instructions" (Ex. 18, Dckt. 308) evidencing that named lender on the note and deed of trust never funded the predatory, illegal loan transaction.

## CONCLUSION

Plaintiff has sufficiently shown cause for this Court to allow the Second Amended Complaint, attached hereto, to be considered by this Court. Plaintiff has adequately and timely followed the Court's Order in providing the "why and when" of necessary amendments in this case.

Respectfully Submitted,

_____          Date: April 11th, 2014

James L. Macklin, Plaintiff in Pro Per.

- 12 -

1   JAMES MACKLIN

2   PO BOX 789

    Crystal Bay, Nevada  89402
3
    Telephone: (530) 888-9600
4
    Fax: 530-888-9600
5
    jimlmacklin@yahoo.com
6   IN PRO PER

7

8               **UNITED STATES DISTRICT COURT**

9
                **FOR THE EASTERN DISTRICT OF CALIFORNIA**
10

11

12

13      JAMES L. MACKLIN,                    | Case No: 2:10-cv-1097-FCD-KJN PS

14                    Plaintiff,              | **PLAINTIFF'S   [PROPOSED]   SECOND
                                             | AMENDED COMPLAINT FOR:**
15

16      vs.                                   | **ILLEGAL CONTRACT,**

17      SELECT PORTFOLIO SERVICING, INC.,     | **BREACH OF CONTRACT,**

18      WELLS FARGO & CO., QUALITY LOAN      | **VIOLATION OF TRUTH IN  LENDING
                                             | ACT,**
19      SERVICES, INC., DEUTSCHE BANK         | **VIOLATION OF EQUAL CREDIT
                                             | OPPORTUNITY ACT,**
20      NATIONAL TRUST CO., AS TRUSTEE FOR
                                             | **VIOLATION  OF FAIR CREDIT
21      THE "ACCREDITED MORTGAGE LOAN         | REPORTING ACT,**

22      TRUST SERIES 2006-2" CERTIFICATE      | **VIOLATION OF CAL. BUSINESS &
                                             | PROFESSIONS CODE § 17200**
23      HOLDERS, ET al.,
                                             | Judge: Hon. Kendall J. Newman
24                    Defendant(s).

25      **Comes now Plaintiff**, James Macklin, and complains against Defendants named herein,

26  as follows:

27
                          **VENUE AND JURISDICTION**
28

                                    - 13 -

1    This Court assumes original jurisdiction in the instant matter under 28 U.S.C. § 1332
2  which provides that:

3    (a)  The district courts shall have original jurisdiction of all civil actions where the matter in
4        controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is
5        between    (1) citizens of different States; (2) citizens of a State and citizens or subjects
6        of a foreign state; (3) citizens of different States and in which citizens or subjects of a
7        foreign state are additional parties; and (4) a foreign state, defined in section 1603(a) of
8        this title, as plaintiff and citizens of a State or of different States.

9                                                    **PARTIES**

10
11    Defendant WELLS Fargo & Co. ("WELLS"), as the parent Company of Wells Fargo
12  Home Mortgage, maintains a business address at 420 Montgomery St., San Francisco, CA.,
     94163. WELLS offers consumer loans, business banking services and standard banking services
13  to California residents at all times relevant hereto.
14

15    Defendant Quality Loan Service Corporation ("Quality") maintains an address of 2141
16  5th Ave, San Diego, CA., 92101. Quality is a privately held company offering comprehensive
     trustee services to the wholesale lending and loan servicing industry. Quality was and is
17  operating under the laws of California at all times relevant hereto.
18

19    Defendant Deutsche Bank National Trust Co., as trustee for the Accredited Mortgage
20  Loan Trust 2006-2 ("DBNTC") maintains a business address at 1761 E. St. Andrews Place,
21  Santa Ana, Ca., 92705-4943. DBNTC is a private held company and specializes in trustee
22  services for the banking and loan servicing markets. DBNTC is and was operating under the laws
23  of California at all times relevant hereto.

24    Defendant, Select Portfolio Servicing, Inc. ("Select"), maintains its primary business
25  address in Salt Lake City, Utah. Select was formerly known as "Fairbanks Capital Corp." In
26  November 2003, Fairbanks Capital Corp. and Fairbanks Capital Holding Corp. agreed to pay $40
27  million to settle with the FTC and the U.S. Department of Housing and Urban Development
28  (HUD), which charged them with engaging in a number of unfair, deceptive, and illegal practices

- 14 -

1   in the servicing of subprime mortgage loans. The Commission distributed the $40 million as

2   redress to affected consumers. The settlement also imposed a number of specific limitations on

3   Fairbanks's ability to charge fees and engage in certain practices when servicing mortgage loans.

4   In early 2004, Fairbanks changed its name to Select Portfolio Servicing, Inc. and SPS Holding

5   Corp. Fairbanks changed its name to Select Portfolio Servicing effective June 30, 2004

6   according to its Articles of Amendment. In 2005, Select Portfolio Servicing was purchased by

7   Credit Suisse, a financial services company, headquartered in Zürich, Switzerland. According to

8   a Securities and Exchange Commission report (CFN: 1-6862) filed August 12, 2005, Credit

9   Suisse First Boston (USA), Inc. now known as Credit Suisse, purchased Select Portfolio

10  Servicing and its parent holding company for $144.4 million. Credit Suisse's Investment Banking

11  Strategy included "the acquisition of Select Portfolio Servicing, a mortgage servicing company."

12  Select is registered to do business in California.

13                          **FACTUAL BACKGROUND**

14      In January, 2006, Plaintiff was ordered by the family law court in Placer County to have

15  an evaluation of value of his residence for the purposes of a marital settlement in Plaintiff's

16  pending divorce.

17

18      Plaintiff went to his local business branch of Wells Fargo Bank, located in Loomis, Ca.

19  Plaintiff was advised to contact Wells Fargo's "Home Mortgage" division located in Roseville,

20  Ca. to complete the process of valuing his home and applying for a loan to settle the marriage

21  estate, which he did. Plaintiff was assigned to a "broker", Christine Medina, from the Roseville

22  office of WELLS. Plaintiff was required to provide WELLS with his financial statements for the

23  previous two (2) tax years, along with bank statements and U.S. tax returns. Plaintiff complied

24  with all required documents at the request of WELLS.

25      Plaintiff was then "telephone interviewed" as to his income, place of residence, time on

26  the job, and all manner of information as was asked of him during the interview. Plaintiff was

27  notified by telephone by agent Medina of WELLS that he was qualified for a loan that would

28  effectively "cash-out" newly acquired equity as a result of his residence being over-valued at by

                                - 15 -

1    WELLS. Plaintiff, due to the order of the family law court, complied with the court's order to re-
2    finance his home.

3    Plaintiff was asked by WELLS employee Medina to come to the Roseville office to sign
4    the loan papers. When Plaintiff arrived at the bank's closing offices, he was put into a small
5    cubicle room with a notary present for the signing. Plaintiff was never provided with any
6    contracts to review prior to the meeting. Plaintiff was advised by a "manager" of the office that
7    the notary was due to be in a signing in Folsom, Ca. within an hour and that this signing would
8    need to commence immediately with the assistance of pre-delegated "yellow tabs" to facilitate a
9    quick and efficient signing. Plaintiff was then guided through the signing and had completed the
10    signing of all necessary documents within a period of less than 15 minutes. Plaintiff was never
11    given the opportunity to review the documents and was sent home with no copies of the
12    documents.

13    Plaintiff was called later that week and told to come back the following week to pick up
14    the loan documents. Plaintiff did return the following week and picked up a large file folder that
15    contained the purported contract documents, however, Plaintiff later learned that documents
16    were blank and contained only miniscule information. Plaintiff was told by WELLS that this was
17    customary and not to worry because the originals were in the custody of a master document
18    custodian under bank policy.

19    Plaintiff made every installment payment due under the contract until August, 2008. This
20    was when Plaintiff had noticed that no principal was being paid down through his payments.
21    Plaintiff contacted the loan servicer and asked why this was. The loan servicer notified him that
22    the loan was an interest-only loan. Plaintiff was never told that his loan was interest-only and
23    was, in fact, told that the loan was a fully amortized, standard performing "principal and interest"
24    loan by WELLS employee Medina.

25    Plaintiff executed a dispute in writing to the loan servicer challenging the validity of the
26    loan. Plaintiff was then contacted by counsel for the "beneficiary", Law offices of "Ronald
27    Roup". Plaintiff subsequently rescinded the loan timely and in writing to the Law offices of
28

- 16 -

1   Ronald Roup. Mr. Roup's office replied with a letter indicating that the loan was not rescinded,
2   by offering legal advice to Plaintiff through a writing (See: Dckt. 308, Bkr. Case No. 11-02024,
3   In Re Macklin, "rescission letter").

4       In May, 2010, Plaintiff had the instant matter removed to this court's jurisdiction from
5   the Placer County Superior Court. Plaintiff entered a First Amended Complaint which was a
6   dense, 127 page diatribe crafted by Plaintiff without any experience or training. Plaintiff admits
7   that the pleading was inadequate and did not offer this court any means of deciphering plausible
8   claims or causes of action.

9       Plaintiff subsequently filed a bankruptcy on September 16th, 2010. The case was filed by
10  Plaintiff just days after receiving voluminous documents from Defendant's counsel which
11  Plaintiff could not reasonably or timely extract any meaningful claims or causes that would allow
12  him to offer this court a revised or amended complaint.

13
14      Plaintiff filed an adversary proceeding in the bankruptcy on January 13th, 2011. The case
15  was prosecuted by a series of counsel on behalf of plaintiff, who could not, or would not,
16  properly represent Plaintiff's interests. All three counselors were admonished by the court that
17  their pleadings and papers were, at some point...deficient. So deficient, in the case of the Motion
18  for Summary Judgment filed by Plaintiff's counsel, Daniel Hanecak, that the court quantified the
19  motion as "one of the most anemic in all my years on the bench".

20      Because the bankruptcy court does not have the authority granted by Congress to issue
21  final judgments (See: *Stern v. Marshall*, 131 S. Ct. 2594 (2011) and *Northern Pipeline*
22  *Construction Co. v. Marathon Pipe Line Co.* (Marathon), 458 U.S. 50 (1982), Plaintiff now may
23  fully and lawfully complete the original Complaint filed in the Superior Court in Placer County
24  back in 2010.

25      At the time of the original complaint filed by Plaintiff, there was no possible way of
26  Plaintiff having knowledge of certain causes of action that are included in this second amended
27  complaint. For example, the admissions made by Proposed Defendant, WELLS, were not

28

- 17 -

available to Plaintiff until the time of the Consent Order issued in the Matter on July 20th, 2011 (See: MPA in support of the Motion for Leave to Amend, ¶ 7).

Plaintiff also points to the discovery items that were sent to him just days prior to the bankruptcy being filed. This discovery included admissions made by the Defendants WELLS and DBNTC wherein the falsified income information was inserted by Defendant WELLS and ratified by Defendant DBNTC as the successor-in-interest to Accredited Home Lenders, the same company that is named as the REMIC Trust beneficiary (Accredited Mortgage Loan Trust 2006-2, Deutsche Bank National Trust Co., as trustee).

Because Plaintiff sufficiently alleges that DBNTC carries full liability as purported assignee, DBNTC stands as the proper Defendant here (See: Plaintiff's Memorandum of Points & Authorities, ¶ 5). Plaintiff, however, does not admit that the debt obligation is valid and does not admit that DBNTC ever properly or timely was conveyed any interest in Plaintiff's purported obligation.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

1.    Defendants, and each of them together, have all engaged in practices that are against public policy in California.

2.    Defendant WELLS has admitted to falsifying income requirements and other various items necessary in order to lawfully qualify a consumer for a loan. This admission came two years after Plaintiff commenced this action at Placer County Superior Court. WELLS did admit to: "Income Document Alteration or Falsification... internal controls were not adequate to detect and prevent instances when certain of its sales personnel, in order to meet sales performance standards and receive incentive compensation, altered or falsified income documents and inflated prospective borrowers' incomes to qualify those borrowers for loans that they would not otherwise have been qualified to receive." (See: Plaintiff's Memorandum of Points and Authorities in support of Motion for Leave to Second Amended Complaint and request for judicial notice of the matter).

- 18 -

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND AMENDED COMPLAINT

3.  Defendant WELLS acted as a "Credit Service Organization" under California Civil Code § 1789.12 (a): "Credit services organization means a person who sells, provides, or performs, or represents that he or she can or will sell, provide or perform, any of the following services, in return for the payment of money or other valuable consideration":

4.  (2) "Obtaining a loan or other extension of credit for a buyer". Defendant, Wells Fargo, is governed by this section of the Code by offering to obtain a loan for Plaintiff Macklin.

5.  Cal. Civ. Code § 1789.13: "A credit services organization and its salespersons, agents, representatives, and independent contractors who sell or attempt to sell the services of a credit services organization shall not do any of the following:

(d) Make … a statement that is untrue or misleading and that is known, or that by the exercise of reasonable care should be known, to be untrue or misleading, to a consumer credit reporting agency or to a person who has extended credit to a buyer or to whom a buyer is applying for an extension of credit, such as statements concerning a buyer's identification, home address, creditworthiness, credit standing, or credit capacity;

(g) Make or use untrue or misleading representations in the offer or sale of the services of a credit services organization, including either of the following:

(h) Engage, directly or indirectly, in an act, practice, or course of business that operates or would operate as a fraud or deception upon a person in connection with the offer or sale of the services of a credit services organization."

6.  Defendant WELLS had a duty to not falsify or offer false or deceptive information as it relates Plaintiff's loan application. Plaintiff materially relied on WELLS to his detriment and has subsequently lost possession of his home as a result of WELLS' false and deceptive business practices when employees of WELLS placed false income information on to Plaintiff's loan application documents. The false information included, but was not limited to:

- 19 -

1    the amount of income Plaintiff actually earned for the years 2005-2006, the amount of time
2    Plaintiff actually lived in the subject property, the amount of time Plaintiff was employed in his
3    field of employment, the actual value of the subject property. All of these falsifications were
4    done by Defendant WELLS in order to wrongfully "qualify" him for a loan that was statutorily
5    prohibited. See also: Truth In Lending (TILA) 15 U.S.C. § 1639c (a) (4) Income verification:

6           *"A creditor making a residential mortgage loan shall verify amounts of*
7           *income or assets that such creditor relies on to determine repayment ability,*
8           *including expected income or assets, by reviewing the consumer's Internal*
9           *Revenue Service Form W–2, tax returns, payroll receipts, financial institution*
10          *records, or other third-party documents that provide reasonably reliable*
11          *evidence of the consumer's income or assets. In order to safeguard against*
12          *fraudulent reporting, any consideration of a consumer's income history in*
13          *making a determination under this subsection shall include the verification of*
14          *such income by the use of—*

15          *(A) Internal Revenue Service transcripts of tax returns; or*

16          *(B) a method that quickly and effectively verifies income documentation by a*
17          *third party subject to rules prescribed by the Bureau."*

18
19          7.      Defendant DBNTC, as purported assignee[1] of the predatory loan contract, ratified
20   the actions of Defendant WELLS. DBNTC had a duty to reject the falsified loan application
21   under 15 U.S.C. § 1639c (a) (4) Income verification, *id.*

22          8.      Defendant DBNTC carries all benefits and liabilities under the false loan as if
23   they were the originator of the loan. This premise is well settled law in California.

24
25
26
27
_____
28   [1].    Gilberts' Law Summary on Trusts, 13th Ed. § 442. "Whatever conditions or limitations attached to the
     beneficiaries' interest prior to the assignment apply against the assignee."

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND
AMENDED COMPLAINT

1        9.      The loan contract is governed by the Uniform Commercial Code, or the California

2   Commercial Code as adopted by California's legislature. The specific Article that governs the

3   subject transaction is Article 9 of the Code, *id.*

4        10.     Under Plaintiff's promissory note at section 5, "Borrower's Right to Pay", the

5   contract states that the borrower has "…the right to make payments of principal at any time

6   before they are due. A payment of principal only is known as a 'prepayment.' *When I make a*

7   *prepayment, I will tell the Note Holder in writing that I am doing so.*" The Italicized sentence of

8   this Section constitutes an undertaking to do an act in addition to the payment of money. Under

9   3-104(a)(3) of the UCC, a promissory note **cannot be an instrument** if it contains such an

10   undertaking; the rules of negotiability apply only to promises to pay money, not to other, non-

11   monetary understandings. Sending a notice is an act "in addition to the payment of money," and

12   the note's language clearly constitutes an "undertaking" to perform that act. Thus, the instrument

13   is not negotiable and the rules of Article 3 of the UCC (including the holder-in-due-course

14   protections) do not apply. See: UCC § 9-109(a)(3) states that Article 9 applies to any sale of a

15   "promissory note," which is defined in § 9-102(a)(65) as "an instrument that evidences a promise

16   to pay a monetary obligation, [or] does not evidence an order to pay . .".

17        11.     Plaintiff' loan, as an asset, must have conveyed to the Accredited Mortgage Loan

18   Trust 2006-2 Trust ("AMLT") under the "Law of Assignments". The Pooling and Servicing

19   Agreement ("PSA") terms trump the normal Article 3 and 9 Rules as an "otherwise agreed

20   provision" under 1-302 of the UCC and therefore the notes in a securitized trust are transferred

21   by assignment and by Negotiation. Section 1-302(a) of the UCC states that "*except as otherwise*

22   *provided in subsection (b) or elsewhere in (the Uniform Commercial Code), the effect of the*

23   *provisions of (the Uniform Commercial Code) may be varied by agreement.*" Sub-Section (b) of

24   Section 1-302 then states that the "*obligations of good faith, diligence, reasonableness, and care*

25   *prescribed (the Uniform Commercial Code) may not be disclaimed by agreement. The parties, by*

26   *agreement, may determine the standard by which the performance of those obligations is*

27   *measured if those standards are not manifestly unreasonable. Whenever (the Uniform*

28   *Commercial Code) requires an action to be taken within a reasonable time, a time that is not*

1    *manifestly unreasonable may be fixed by the agreement.*" Finally, 1-302(c) provides that "*the*
2    *presence in certain provisions of (the Uniform Commercial Code) of the phrase 'unless*
3    *otherwise agreed', or words of similar import, does not imply that the effect of the other*
4    *provisions may not be varied by agreement under this section.*" The Comments to 1-302 provide
5    among other things that this Section "*addresses the effectiveness of contractual provisions that*
6    *select an exclusive or a non-exclusive form of transfers and negotiation of instruments.*" Also,
7    these Comments make it clear that the parties by agreement may not make an instrument
8    "negotiable" unless it otherwise complies with Section 3-104 of the UCC. Similarly, the
9    Comments state that the parties by agreement may not avoid the applications of UCC Article 9 to
10   a transaction that falls within its scope (See Comments to 9-109). And, the Assignment Rules are
11   set and structured by the PSA and the collateral Mortgage Loan Sales Agreements as the same
12   relate to the PSA.

13        12.    Defendant DBNTC was precluded from receiving Plaintiff's debt obligation as a
14   matter of law under Internal Revenue Code § 860 D, F & G. Because the loan is an "impaired
15   asset", due to the false means by which it was obtained, DBNTC cannot, and has not ever, shown
16   that it lawfully acquired the debt obligation. DBNTC made an election to a specific tax treatment
17   under the laws of the Real Estate Mortgage Investment Conduit ("REMIC") at I.R.C. Rule 860
18   et. seq. This decision was made prior to Plaintiff ever signing for the fatally defective loan.

19        13.    The tax definition of ownership, and thus standing, applies to mortgage notes
20   claimed as assets of the subject REMIC trust[2].

21        14.    Assuming arguendo that the loan was not falsified, which Plaintiff specifically
22   states that it was, Plaintiff's loan, as an asset of the AMLT 2006-2 trust, must also have
23   conveyed into the trust on or before the trusts' closing date, June 1st, 2006. See: I.R.C. Rule
24   860D(a)(4), the asset must be lawfully conveyed within 90 days of the closing date or it is a
25   prohibited transaction. Defendant DBNTC has offered an assignment, dated in 2009, that

27   _____
28   [2]    Bradley T. Borden & David J. Reiss, Beneficial Ownership and the REMIC Classification Rules, 28 TAX
     MGMT. REAL EST. J. 274 (Nov. 7, 2012).

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND
AMENDED COMPLAINT

1    purports to act as the conveyance into the **closed** AMLT 2006-2 Trust. Under the Statute of
2    Frauds, this conveyance works as the sole writing that attempts to convey an interest in real
3    property to DBNTC, as trustee for the AMLT 2006-2 trust. This obvious deception is a fraud on
4    its face under the law of the REMIC trust. See: case No. 11-02024, Dckt. No. 308; "Assignment
5    of Deed of Trust".

6        15.    Plaintiff alleges that he is, in fact, a party to the AMLT Pooling & Servicing
7    Agreement, if the REMIC Trust ever lawfully held the subject loan as an asset. Plaintiff alleges
8    that Defendant DBNTC and WELLS entered into agreements (PSA, Master Sales and Servicing
9    Agreement) prior to Plaintiff's contract, that substantially relied on Plaintiff's, and others
10   similarly situated, payment stream in order to receive the benefit of zero (0) % tax rates on the
11   income received from the Plaintiff's loan obligation by the REMIC Trust. Plaintiff alleges that
12   the "Step Transaction Doctrine" applies in this case[3], which, as a result of the several
13   transactions being treated as one under the Doctrine, Plaintiff is an intended party to the
14   transaction (PSA).

15       16.    Plaintiff alleges that the transactions, together, meet with a minimum of at least
16   one of the three (3) tests under the Doctrine, i.e.; (1) the binding commitment test, (2) the
17   interdependence test, or, (3) the end results test.

### FIRST CAUSE OF ACTION: ILLEGAL CONTRACT

18
19

20       17.    Plaintiff re-alleges and incorporates by reference all sections of the foregoing
21   Complaint.

22       18.    California statutes require that a contract have "a lawful object." (Civ. Code, §
23   1550, subd. (3); see Civ. Code, § 1596.) Otherwise the contract is void. (Civ. Code, § 1598.).
24   Plaintiff alleges that Defendants have all unlawfully exercised rights which did not accrue under

25

---

26   [3] The step transaction doctrine originated from a common law principle in *Gregory v. Helvering*, 293 U.S. 465
     (1935) that allowed the court to re-characterize a tax-motivated transaction.; "As early as 1938, the United States
27   Supreme Court has indicated that "a given result at the end of a straight path is not made a different result because
     reached by following a devious path." *Commissioner v. Clark*, 489 U.S. 726, 738 (1989).; (*Shuwa Investments Corp.
28   v. County of Los Angeles* (1991) 1 Cal.App.4th 1635, 1648-1649. *Shuwa*, supra, at p. 1648.; *McMillin-
     BCED/Miramar Ranch North v. County of San Diego* (1995) 31 Cal.App.4th 545, 556.)

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND
AMENDED COMPLAINT

1  the unlawful contract herein (the consumer loan contract consisting of all attendant documents,
2  including the loan application, underwriting transmittal, Promissory Note, Deed of Trust, Notice
3  of Default, Substitution of Trustee, Assignment of Deed of Trust).

4        19.    Plaintiff alleges that the consumer finance contract complained of herein is void.

5        20.    Plaintiff alleges that Defendants acquired the contract complained of herein by
6  use of deceptive and false means. Those false means are: Defendant WELLS wrote false
7  information into Plaintiff's loan application as a consideration for a consumer loan, Defendant
8  DBNTC, as purported assignee of the false loan, ratified the false acts of WELLS where they had
9  a duty to refrain from executing a loan in favor of Plaintiff, Defendant Quality acted in concert
10  with Defendant DBNTC as an agent to falsely make a declaration of a default where none
11  existed, Defendant Select, as purported loan servicer, gave directions to Defendant Quality to
12  deliver and record an acceleration of debt where no default existed and while relying upon the
13  void contract. Defendants then took Plaintiff's home by way of non-judicial foreclosure while
14  falsely invoking California Civil Code § 2924.

15        21.    Cal. Civil Code § 1668 provides that a contract that has as its object a violation of
16  law is "against the policy of the law." Civil Code § 1667 states that "unlawful" is "1. *Contrary*
17  *to an express provision of law*; [¶] 2. *Contrary to the policy of express law, though not*
18  *expressly prohibited*; or, [¶] 3. *Otherwise contrary to good morals*." (See also Civ. Code, §§
19  1441 ["A condition in a contract, the fulfillment of which is . . . unlawful . . . is void"], 1608 ["If
20  any part of a single consideration for one or more objects, or of several considerations for a
21  single object, is unlawful, the entire contract is void"].) Plaintiff alleges that his income is a
22  ***consideration*** of the formation of the contract (See below: ¶¶24, 25), as is his time of residence
23  at his existing home at the time of the application being falsified by Defendant(s). Plaintiff
24  alleges that Defendant WELLS materially violated the legislative intent of the above statutes to
25  the detriment of Plaintiff. Plaintiff substantially relied on Defendants' acts and omissions, as do
26  others in California.

27
28

- 24 -

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND
AMENDED COMPLAINT

1      22.     Plaintiff alleges that an unlawful contract cannot form the basis of any action, at

2 law or in equity. Plaintiff alleges that Defendants, and all of them, used an illegal contract to

3 dispossess Plaintiff of his home, as considered as unique and irreplaceable.

4      23.     Plaintiff alleges that the term "legislation" as including "any fixed text enacted by

5 a body with authority to promulgate rules, including not only statutes, but constitutions and local

6 ordinances, as well as administrative regulations issued pursuant to them." (Rest.2d Contracts,

7 supra, § 178, com. a, p. 7.)[7]. Plaintiff alleges that Defendants, and all of them, have violated

8 the legislative intent of: Civ. Code, § 1550, subd. (3), Civ. Code, § 1596 Civ. Code, § 1596, Civ.

9 Code, § 1598, Civil Code § 1668, Civil Code § 1667. Plaintiff alleges that Defendants had a duty

10 to Plaintiff to act within the legislative scope of those statutes and to refrain from harming

11 Plaintiff and his rights under such Codes. Plaintiff alleges that Defendants were fully aware of

12 the actions that were taken by each of them while playing their roles in dispossessing Plaintiff of

13 his property through the use of an illegal contract.

14      24.     15 U.S.C. § 1639c (a)(1) "In General: In accordance with regulations prescribed

15 by the Bureau, no creditor may make a residential mortgage loan unless the creditor makes a

16 reasonable and good faith determination based on verified and documented information that, at

17 the time the loan is consummated, the consumer has a reasonable ability to repay the loan,

18 according to its terms, and all applicable taxes, insurance (including mortgage guarantee

19 insurance), and assessments." (3) "Basis for determination:

20      25.     A determination under this subsection, *id.*, of a consumer's ability to repay a

21 residential mortgage loan shall include ***consideration*** of the consumer's credit history, current

22 income, expected income the consumer is reasonably assured of receiving, current obligations,

23 debt-to-income ratio or the residual income the consumer will have after paying non-mortgage

24 debt and mortgage-related obligations, employment status, and other financial resources other

25 than the consumer's equity in the dwelling or real property that secures repayment of the loan.

26      26.     Plaintiff alleges that Defendants have violated federal law and that a violation of

27 those laws is a violation of state law (U.S. Constitution, Article VI, sec. 2: the supreme law of

28

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND
AMENDED COMPLAINT

the land). Plaintiff alleges that Defendants, and all of them, have violated public policy in exercising a void contract against Plaintiff and attempting to have a court enforce a knowingly false, illegal and void contract.

27.    Plaintiff and others similarly situated have been, and will be, harmed as a direct result of the proximate acts and omissions of Defendants unless this court intervenes.

### SECOND CAUSE OF ACTION: BREACH OF CONTRACT

28.    Plaintiff re-alleges and incorporates by reference all sections of the foregoing Complaint.

29.    Fed. R. Civ. Proc. 8(e)(2) permits the use of alternate or hypothetical pleading if: i. by the nature of the circumstances the Plaintiff would not know which allegations are right.

30.    Plaintiff alleges that there is a possible contract relationship between Plaintiff and Defendants, if found to be a valid contract. Plaintiff does not admit as to the veracity or legality of the contract, however, Plaintiff pleads in the alternative to such a finding.

31.    Plaintiff alleges that Defendant, and or its agents, elected to record, or caused to be recorded, a deed of trust, a substitution of trustee, an assignment of deed of trust and a Notice of Default against Plaintiffs' interest in his property. While recorded instruments are presumed valid, the mere act of recordation does not authenticate its validity, rather, evidence to support such instrument is required. See: Cal. Evid. Code §1271, requiring a Declaration establishing the sources of information and the manner and time of preparation were such as to indicate trustworthiness; Code of Civ. Procedure §437c, subd. (d), where a supporting Declaration must be made on personal knowledge and "show affirmatively that the affiant is competent to testify to the matters stated therein".

32.    Plaintiff alleges that he has lost, or risks losing permanently, contract rights in both a deed of trust and a note that were unlawfully conveyed because of the acts of Defendants. Plaintiff also alleges that as a direct and proximate result of Defendant's acts, omissions and

- 26 -

1    false statements made in the false instrument, that his ability to obtain credit and/or to maintain
2    credit has been damaged by Defendant.

3        33.    Plaintiff alleges that at sec. 22 of Plaintiff's deed of trust, it states that the party
4    who executes a Notice of Default has a duty first to notice borrower of their right to "an action to
5    assert the non-existence of a default". This notice is a contractual provision and must be afforded
6    to borrower thirty (30) days prior to the acceleration and notice of default. Plaintiff alleges that
7    Defendants failed to strictly adhere to the contractual provision herein and has harmed Plaintiff
8    as a direct result of such a material breach of the contract. Such a breach precludes Defendants
9    from invoking the statute at sec. 2924 of the Cal. Civil Code.

10        34.    Plaintiff alleges that no thirty (30) day notice was given to Plaintiff and that
11    Defendant did not timely, or ever, send notice to Plaintiff of a right to an action as described in
12    ¶32. Plaintiff is exercising his contractual right to assert the non-existence of the default
13    described and defined in the false instrument.

14
15        35.    Plaintiff alleges that the breach by Defendant(s), described in ¶33, entitles
16    Plaintiff to relief from any action arising from such a breach, judicial or non-judicial.

17        36.    Plaintiff alleges that this breach also violates Plaintiff's rights under Cal. Civ.
18    Code §2924. Defendant is first bound to abide by the contract rights of Plaintiff prior to invoking
19    the statute. Defendant did not strictly comply with Plaintiff's contract rights and was therefore,
20    as a condition precedent, prohibited from invoking the non-judicial foreclosure statute in
21    California, id. See: Doctrine of First Material Breach.

22        37.    Plaintiff alleges that he has been damaged in an amount to be determined at the
23    time of trial.

24    **THIRD CAUSE OF ACTION: VIOLATION OF EQUAL CREDIT**
25    **OPPORTUNITY ACT, 15 U.S.C. §1691(d)(2)**

26        38.    Plaintiff re-alleges and incorporates by reference all sections of the foregoing
27    Complaint.

28

- 27 -

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND
AMENDED COMPLAINT

1    39.    The Equal Credit Opportunity Act ("ECOA") was intended to protect persons

2    from creditor trespasses against their ability to obtain, or maintain, fair credit. Plaintiff alleges

3    that Defendants are subject to the Act.

4    40.    The ECOA, codified at: 15 U.S.C. §1691(d)(2), defines an adverse action as a:

5    "denial or revocation of credit, a change in the terms of an existing arrangement, or a refusal to

6    grant credit in substantially the amount or on substantially the terms requested." 15 U.S.C.

7    §1691e, of the same Act, states that "any creditor who fails to comply with any requirement

8    imposed under this subchapter shall be liable to the aggrieved applicant for any actual damages

9    sustained by such applicant". Plaintiff alleges that damages have resulted from Defendants acts

10    against his rights which amount to a taking of Plaintiff's property, valued at $689,000.00 at the

11    time of the taking by Defendants.

12    41.    Plaintiff alleges that all Defendants acted in concert together as agents, employees

13    and affiliates of one another.

14

15    42.    Plaintiff alleges that Defendants, and their agents, substantially and materially

16    violated Plaintiff's rights under the ECOA by revoking and changing the terms of an existing

17    credit arrangement without cause. Defendants did execute and perform these illegal and

18    oppressive acts with full knowledge and Notice from Plaintiff that those acts were without

19    authority and were based on false or baseless information from a party other than the true

20    beneficiary of the contract, if such a contract is found to be enforceable.

21    43.    Plaintiff alleges that Defendant, and its agents, materially breached the ECOA by

22    failing to give Plaintiff thirty (30) days' notice of an adverse action, as required under the Act,

23    prior to executing and recording a notice of default, which was the acceleration of the debt.

24    44.    Plaintiff alleges that he has been damaged financially, emotionally and physically

25    by the Defendant(s) as a direct and proximate result of Defendant's actions and/or in-actions,

26    material misrepresentations with malice and material omissions.

27    45.    Plaintiff alleges that a "default", as described in the Notice of Default, was never

28    declared by any beneficiary and is not a material breach of the contract. Defendants have never

- 28 -

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND
AMENDED COMPLAINT

1  evidenced or supported their Notice of Default with any form of accounting or Declaration, as
2  made by the purported beneficiary, the "AMLT 2006-2 Trust". Plaintiff alleges that Defendants,
3  and all of them, falsified the Notice of Default by inserting language that, while following most
4  of the required language for such a notice, may be refuted by Plaintiff. Plaintiff hereby refutes
5  every statement made in the Notice of Default as being false and without any foundation
6  whatsoever. Plaintiff alleges that the loan obligation was performing per contract terms at the
7  time that the Notice of Default was executed by Defendant Quality at the request of Defendant
8  Select. Defendant DBNTC, as purported beneficiary never ratified or authorized Select to
9  execute the Notice.

10      46.    Plaintiff alleges that there was never a default as was defined and described in the
11  false Notice of Default. Plaintiff has a duty to defend title against all others as defined in the
12  deed of trust.

### FOURTH CAUSE OF ACTION: VIOLATION OF THE FAIR CREDIT REPORTING ACT

15      47.    Plaintiff re-alleges and incorporates by reference all sections of the foregoing
16  Complaint.

18      48.    Pursuant to 15 USC §1681 (s) (2) (b), Plaintiff is entitled to maintain a private
19  cause of action against Defendant for an award of damages in an amount to be proven at the time
20  of trial for all violations of the Fair Credit Reporting Act  ("FCRA") which caused actual
21  damages to Plaintiff, including emotional distress and humiliation.

22      49.    Plaintiff alleges that Defendants are all subject to the Act as defined above, *id.*

23      50.    Plaintiff is entitled to recover damages from Defendant for negligent non-
24  compliance with the Fair Credit Reporting Act pursuant to 15 USC§1681 (n) (a) (2) in an amount
25  to be proven at the time of trial.

26      51.    Plaintiff alleges that Defendant breached its duty under the statute, *id.*, and elected
27  to ignore Plaintiff's warning about the false information contained in the Notice of Default

- 29 -

1  instrument because the Defendant DBNTC receives payments from a third party loan servicer,

2  Select, to execute this, and tens of thousands exactly like this, false instrument.  Once put on

3  notice by Plaintiff, Defendant speciously ignored its equal contractual duty to Plaintiff and its

4  statutory duties to further its own economic interests at the peril and expense of plaintiff.

5       52.    Plaintiff has been harmed as a direct and proximate result of Defendant's

6  disregard for his contract rights in an amount to be determined at trial. These damages consist of

7  emotional, financial, contractual and his ability to maintain or acquire reasonable credit through

8  a standardized credit score, as reported by the three major credit reporting agencies ("CRA's").

9       53.    Plaintiff is entitled to relief under FCRA. Plaintiff requests leave of court to

10  amend this action upon further discovery.

11

12              **FIFTH CAUSE OF ACTION: VIOLATION OF TRUTH IN LENDING ACT**

13       54.    Plaintiff re-alleges and incorporates by reference all sections of the foregoing

14  Complaint.

15       55.    Plaintiff alleges that Defendants are subject to the Truth in Lending Act ("TILA")

16  at 15 U.S.C. § 1639c (a) (4) Income verification.

17       56.    Plaintiff alleges that the time for an action began to toll upon his discovery of

18  material violations made by Defendants because those predicate acts were not discovered until

19  discovery was received by Plaintiff in this case in September, 2010. The falsified documents

20  were only discovered in November, 2010, by Plaintiff while examining the discovery. Plaintiff

21  had already stayed this case as a result of the bankruptcy filing in September, 2010. Plaintiff had

22  no reasonable means of discovering these violations until the case was stayed, thus, the statute

23  tolls.

24       57.    Plaintiff now brings this action timely and as a matter of federal law.

25

26       58.    Defendants WELLS and DBNTC, as successor in interest to the original "lender",

27  Accredited Home Lenders, Inc., had separate duties under this Act.

28

- 30 -

1      59.     15 U.S.C. § 1639c (a)(1) "In General: In accordance with regulations prescribed
2 by the Bureau, no creditor may make a residential mortgage loan unless the creditor makes a
3 reasonable and good faith determination based on verified and documented information that, at
4 the time the loan is consummated, the consumer has a reasonable ability to repay the loan,
5 according to its terms, and all applicable taxes, insurance (including mortgage guarantee
6 insurance), and assessments." (3) *Basis for determination*:

7      *A determination under this subsection of a consumer's ability to repay a*
8 *residential mortgage loan shall include consideration of the consumer's credit*
9 *history, current income, expected income the consumer is reasonably assured of*
10 *receiving, current obligations, debt-to-income ratio or the residual income the*
11 *consumer will have after paying non-mortgage debt and mortgage-related*
12 *obligations, employment status, and other financial resources other than the*
13 *consumer's equity in the dwelling or real property that secures repayment of the*
14 *loan. A creditor shall determine the ability of the consumer to repay using a*
15 *payment schedule that fully amortizes the loan over the term of the loan". Under*
16 *the strict terms of Plaintiff's loan, the loan was due to re-set at an even higher*
17 *monthly payment, thus, skyrocketing the 55% Debt-to-Income ratio prohibition to*
18 *over 75% of Plaintiff's gross income, a material violation of the lending laws*
19 *herein. (See also Civ. Code, §§ 1441 ["A condition in a contract, the fulfillment of*
20 *which is . . . unlawful . . . is void"], 1608 ["If any part of a single consideration*
21 *for one or more objects, or of several considerations for a single object, is*
22 *unlawful, the entire contract is void"]".*

23      60.     Plaintiff alleges that Defendant WELLS did falsify Plaintiff's loan application and
24 materially violated the legislative intent of this statute, *id.* As a result of WELLS' predicate act,
25 Defendant DBNTC's predecessor in interest illegally accepted the loan without verifying the
26 known information that was provided by Plaintiff to the Defendant, WELLS. Defendant
27 DBNTC, as successor to the named "lender" Accredited, also had a duty under this Act to refuse
28 the loan as it substantially relied on facts known by both parties to be false. The loan was

- 31 -

1    accepted by DBNTC's predecessor as a "full doc" loan package with Plaintiff's U.S. tax returns

2    readily available to the Parties.

3        61.    Plaintiff did timely and lawfully rescind the loan and was summarily refused such

4    a lawful rescission by counsel, Ronald Roup, on behalf of DBNTC. What Roup did next was

5    nothing short of illegal as he offered Plaintiff legal advice and counsel in the form of a letter

6    from his office to Plaintiff (See: Adv. Pro. No. 11-02024, DCKT No. 308, Rescission Letter to

7    Roup).

8        62.    Plaintiff alleges that the loan application was materially falsified by Defendant

9    WELLS and ratified by Defendant DBNTC. Select and Quality, as Co-Defendants, were

10   complicit in the acts herein by an agency relationship which they carried out with impugnity.

11

12       63.    Defendant WELLS has substantially admitted to these exact violations in the

     Consent Orders issued in the Matter: **UNITED STATES OF AMERICA, BEFORE THE**

13   **BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, WASHINGTON,**

14   **D.C.** In the Matter of: WELLS FARGO & COMPANY, San Francisco, California and WELLS

15   FARGO FINANCIAL, INC., Des Moines, Iowa. Docket Nos. 11-094-B-HC1, 11-094-I-HC1,

16   11-094-B-HC2, 11-094-I-HC2, Order to Cease and Desist and Order of Assessment of a Civil

17   Money Penalty Issued Upon Consent. This Order was issued on July 20th, 2011 and was signed

18   by "Jennifer Johnson" (Bd. Of Governors, Fed. Res. System), "James Strother" (Wells Fargo &

19   Co.) and "Dean Anderson" (Wells Fargo Financial). Plaintiff asks this court to take judicial

20   notice of the above named *Order to Cease and Desist and Order of Assessment of Civil Money*

21   *Penalty Issued Upon Consent.*

22
         64.    Wells Fargo & Co. and its subsidiary(ies) substantially admitted to the following,
23
     an excerpt from the Consent Order: "Income Document Alteration or Falsification... internal
24
     controls were not adequate to detect and prevent instances when certain of its sales personnel, in
25
     order to meet sales performance standards and receive incentive compensation, **altered or**
26
     **falsified income documents and inflated prospective borrowers' incomes to qualify those**
27
     **borrowers for loans that they would not otherwise have been qualified to receive.**" This
28

- 32 -

1  admission was not available to Plaintiff until July 20th, 2011 and is material in that it involves the
2  exact issues in this case.

3       65.       Plaintiff alleges that Defendant WELLS knew, or had a duty to know, that its
4  employees, agents and other affiliates were falsifying loan documents in order to gain financial
5  advantage over Plaintiff without considering the falsity of their representations and the
6  devastating results it would have on Plaintiff and others similarly situated.

7       66.       Plaintiff substantially relied on representations made by Defendants as being true
8  and accurate to this detriment.
9
10      67.       Plaintiff has lost possession of his property and has suffered untold emotional,
11  physical and financial damages as a direct and proximate result of Defendants' acts and
12  omissions.

13      68.       Plaintiff is entitled to relief under the Act and shall quantify damages at the time
14  of trial of this matter.

15           **SIXTH CAUSE OF ACTION: VIOLATION OF CALIFORNIA BUSINESS &**
16                          **PROFESSIONS CODE 17200**

17      69.       Plaintiff re-alleges and incorporates by reference all sections of the foregoing
18  Complaint.
19
20      70.       Plaintiff alleges that Defendants, and all of them, are subject to Cal. Bus. & Prof.
21  Code 17200.

22      71.       California Business and Professions Code §17200 et seq. prohibits acts of unfair
23  competition, which means and includes any "fraudulent business practice" and conduct which is
24  "likely to deceive" and is "fraudulent" within the meaning of §17200.

25      72.       As more fully described above, the acts and practices of Defendants are likely to
26  deceive, constituting a fraudulent business act or practice. See, in particular, foregoing Counts 1-
27  5. This conduct is ongoing and continues to this day.

28

73.     Specifically, and as set forth with greater particularity in preceding paragraphs, the named Defendants, and each of them, have engaged and are engaging in deceptive business practices with respect to mortgage servicing, assignments of deeds of trust and the filing of fraudulent foreclosure documents and related matters by, *inter alia*:

> A) Executing false loan transactions with intent to foreclose at a later time and keeping the illicit profits reaped therein,
>
> B) Failure to comply with California laws regarding the ability for a party to repay a loan,
>
> C) Falsifying loan documents for the benefit of the parties thereto and then using known false instruments to eject those homeowners from their homes,
>
> D) Filing known false instruments into court records and having the judiciary rely upon those known false instruments.

74.     California Penal Code §115 prohibits the use of a false instrument. It is a class C felony to execute and record such an instrument. Defendants, and all of them, as a pattern and practice, use these types of false instruments to the damage of Plaintiff and others similarly situated in California.

75.     Plaintiff alleges that the named Defendants' misconduct, as alleged herein, gave, and has given, Defendants, and each of them, an unfair competitive advantage over their competitors.    The scheme implemented by Defendants, in collusion with one another, is specifically designed to defraud California consumers and enrich Defendants at the expense of consumers in this State.

76.     By reason of the foregoing, Defendants should be enjoined from continuing such practices pursuant to California Business & Professions Code §§17203 and 17204.    Plaintiff has suffered injury in fact, including but not limited to, the loss of his real property, severe emotional distress and damage to his creditworthiness. In addition Defendant DBNTC and Select has assessed costs and fees against Plaintiff associated with the wrongful foreclosure activities of the

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND AMENDED COMPLAINT

1  |  defendants. Undoubtedly, other members of the public, similarly have fallen victim to
2  |  Defendants' deceptive schemes, and are likely to be injured as well.

3  |  77.    The harm to Plaintiff and to member of the general public outweighs the utility (if
4  |  any) of Defendants' policies and practices. Consequently, their policies and practices constitute
5  |  unlawful business acts or practices within the meaning of Business & Professions Code §17200.
6  |  Moreover, the foregoing conduct promotes an incipient violation of a consumer law, or violates
7  |  the policy or spirit of such law or otherwise significantly threatens or harms competition.

8  |  78.    Plaintiffs are therefore entitled to injunctive relief and attorney's fees as available
9  |  under Business & Professions Code §17200 et seq. and related sections. The acts and practices
10 |  described in the foregoing paragraphs are unfair and violate the Business & Professions Code
11 |  because they constitute violations of all the statutes previously listed above.

12 |  **WHEREFORE, Plaintiffs pray the Court for an Order and Decree that:**
13 |

14 |  **a. Defendants WELLS and DBNTC,  Pursuant to Business & Professions**
15 |  **Code §17203,  their successors, agents and assigns, representatives,**
16 |  **employees, and all persons who act in concert with them, are**
17 |  **permanently enjoined from committing all acts of unfair competition in**
18 |  **violation of §17200 including, but not limited to, the violations identified**
19 |  **in  Counts 1-5 of Plaintiffs' Complaint;**
20 |  **b. Plaintiff is entitled to an award of statutory attorney's fees;**
21 |  **c. Plaintiff is entitled to statutory damages including damages available**
22 |  **under relevant private attorney general statutes;**
23 |  **d. Defendant Select is permanently enjoined from acting as a loan servicer**
24 |  **as a result of an illegal loan;**
25 |  **e. Defendant DBNTC is stripped of any authority as purported beneficiary**
26 |  **of the illegal loan transaction described in Count 1, Illegal Contract;**
27 |
28 |

- 35 -

f.  The Note and Deed of Trust that was executed under false pretenses is deemed an illegal contract and the court shall return the parties as it found them prior to the contract;

g.  Defendant Quality is enjoined from acting as an agent for Defendants DBNTC and Select as a result of the illegal contract;

h.  Plaintiff is entitled to exemplary and special damages as a result of Defendant's predicate acts,

i.  Any other relief that this court deems just and proper.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants and each of them as set forth below: The damages claimed by Plaintiffs exceed $75,000.

1.  For an order forever enjoining the defendants, and each of them, their agents, representatives, successors and assigns, from initiating and pursuing foreclosure activity against the plaintiff relating to the Subject Property;

2.  For an order compelling said Defendants, and each of them, to transfer legal title and possession of the Subject Property to Plaintiff herein;

3.  For a finding and determination that Plaintiff is the rightful holders of the title to the property and that Defendants herein, and each of them, have no estate, right, title, lien or interest in said property;

4.  For a judgment forever enjoining said defendants, and each of them, from claiming any estate, right, title, lien or interest in the Subject Property;

5.  For a judgment that not one of the Defendants has any unencumbered legal interest in both the Note and DOT;

6.  Plaintiff further prays that the court issue an Order and Decree canceling the Note, Deed of Trust, NOD and Notices of Trustee Sale finding same void as to Plaintiff and

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND AMENDED COMPLAINT

1 | that the court instruct the clerk to execute a full deed of reconveyance of the Deed of Trust in
2 | favor of Plaintiff.

3 |          7.  For general, consequential and special damages according to proof;

4 |          8.  For punitive damages in an amount sufficient to deter the fraudulent
5 | conduct set forth with particularity in Count 1 of this Complaint in the future;
6 |

7 |          9.  For reasonable attorney's fees;

8 |          10. For costs of suit herein; and

9 |          12. For such other and further relief as the court deems just and proper.
10 |

11 |

12 |     Respectfully Submitted,

13 |     _____          Date: April 14, 2014

14 |     James Macklin, Pro Per

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

- 37 -
MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND
AMENDED COMPLAINT

**DECLARATION OF JAMES MACKLIN**

      I, James, make this Declaration in support of the Complaint filed herein. I am over the age of eighteen (18) years and am competent to testify to the matters herein. I make this Declaration under penalty of perjury and under the laws of the United States:

1.  I did not earn the amount of money that was placed onto a loan application by Defendants in this case that was used to qualify me for a loan by Wells Fargo.

2.  I earned substantially less than what was purported to be my income in the subject loan application.

3.  I was not aware of the amounts of money that the loan application falsely stated that I earned.

4.  I did not lawfully qualify for the loan that was transacted using false information regarding my income.

5.  I did lose possession of my real property located at 10040 Wise Rd, Auburn, California, 95603 as a result of the false instruments used by Defendants in this case.

6.  I did provide Defendants in this case with my true and correct U.S. tax returns that showed that I earned substantially less than what was placed onto my loan application by Defendants.

7.  I have been damaged as a result of Defendant's acts.

Respectfully Submitted,

_James Mackl_         Date: _Apr. 14, 2014_

James Macklin, Pro Per

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND AMENDED COMPLAINT

**PROOF OF SERVICE:**

I am over the age of 18 and not a party to this action.

I am a resident of or employed in the county where the mailing occurred; my home address is: 305 Tuscarora Dr., Crystal Bay, Nv., 89402.

On April 15th, 2014, I served the following document(s) described as: Notice of Motion and Motion for Leave to file second amended complaint, Second Amended Complaint[X] (By U.S. Mail). I deposited such envelope in the mail at Crystal Bay, Nevada with postage thereon fully prepaid. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

Service list:

1. Defendant Wells Fargo & Co., 420 Montgomery St., San Francisco, CA., 94163. *CSC - 2710 Gateway Oaks Dr. #150N. Sacramento, CA., 95833*

2. Defendant Select Portfolio Servicing, Inc., Counsel Carr McClellean, Ingersoll, Thompson & Horn, 216 Park Rd., Burlingame Ca., 94011-0513

3. Deutsche Bank Nat'l Trust Co., as Trustee for AMLT 2006-2 Trust, Carr McClellean, Ingersoll, Thompson & Horn, 216 Park Rd., Burlingame Ca., 94011-0513.

4. Defendant Quality Loan Services, Inc. agent for service: Bounlet Louvan, 2141 5th Ave., San Diego, Ca., 92101

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: April 15th, 2014

Victoria Sweigart.

- 39 -

MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT/PROPOSED SECOND AMENDED COMPLAINT

# <u>EXHIBIT I</u>

# <u>EXHIBIT I</u>

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JAMES L. MACKLIN,                          No.  2:10-cv-1097 MCE KJN PS

12                    Plaintiff,

13         v.                                    ORDER

14    MATTHEW HOLLINGSWORTH, et al.,

15                    Defendants.

16

17          Presently before the court is plaintiff James Macklin's ("plaintiff") motion for leave to

18    amend his complaint for a second time.  (ECF No. 40.)  On March 17, 2014, the court ordered

19    plaintiff to file a motion for leave to file a Second Amended Complaint along with a proposed

20    Second Amended Complaint.  (ECF No. 39.)  In compliance with this order, plaintiff filed a

21    motion for leave to amend on April 15, 2014.  (ECF No. 40.)  Plaintiff has attached a proposed

22    Second Amended Complaint to his motion.[1]  (Id. at 13-38.)

23          Plaintiff states in his motion for leave to amend that he seeks to add Wells Fargo & Co.

24    ("Wells Fargo") and Quality Loan Service Corporation ("Quality Loan") as new defendants and

25    ─────────────────────
      [1] Pursuant to the court's March 17, 2014 order, defendants have not filed an opposition to

26    plaintiff's motion for leave to amend.  The court stated in this previous order that it would assess
      plaintiff's motion and proposed Second Amended Complaint and would direct defendants to file a

27    statement of opposition, if any, only if the court determined that such a response would be
      necessary.  (ECF No. 39 at 2.)

28

                                                 1

1  both proposed parties are named as defendants in the proposed Second Amended Complaint.[2]

2  (ECF No. 40 at 12.)  Furthermore, plaintiff seeks to add causes of action for illegal contract,

3  breach of contract, violations of the Equal Credit Opportunity Act, violations of the Fair Credit

4  Reporting Act, violations of the Truth in Lending Act, and violations of California's Unfair

5  Competition Law.[3]  Plaintiff states in his motion that he only recently became aware of the

6  alleged involvement of Wells Fargo and Quality Loan in the acts underlying plaintiff's claims and

7  of the facts underlying plaintiff's proposed new claims while this case was stayed during the

8  pendency of plaintiff's bankruptcy proceedings.

9         Federal Rule of Civil Procedure 15(a)(2) governs plaintiff's request for leave to amend.

10  Rule 15(a)(2) provides that "a party may amend its pleading only with the opposing party's

11  written consent or the court's leave."  Fed. R. Civ. P. 15(a)(2).  Rule 15(a)(2) further provides that

12  "[t]he court should freely give leave when justice so requires," id., and the Ninth Circuit Court of

13  Appeals has stated that "requests for leave should be granted with 'extreme liberality.'"  Moss v.

14  U.S. Secret Serv., 572 F.3d 962, 972 (9th Cir. 2009) (citation omitted).  However, the Court of

15  Appeals has also cautioned that "liberality in granting leave to amend is subject to several

16  limitations," which include "undue prejudice to the opposing party, bad faith by the movant,

17  futility, and undue delay."  Cafasso v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1058 (9th

---

18
19  [2] The court notes that plaintiff does not name Mortgage Electronic Registration Systems, Inc. as a
    defendant in the proposed Second Amended Complaint even though it was named as a defendant
20  in the First Amended Complaint.  Plaintiff is cautioned that the court cannot refer to a prior
    complaint, brief, exhibits, or other filings to make plaintiffs' Second Amended Complaint
21  complete. Local Rule 220 requires that an amended complaint be complete in itself without
    reference to any prior pleading. Thus, once the Second Amended Complaint is filed, it supersedes
22  the First Amended Complaint, which no longer serves any function in the case.  Accordingly,
    because plaintiff no longer names Mortgage Electronic Registration Systems, Inc. in his proposed
23  Second Amended Complaint, a grant of plaintiff's motion will effectively result in a dismissal of
    Mortgage Electronic Registration Systems, Inc. from this case.
24
25  [3] Plaintiff does not include in his proposed Second Amended Complaint claims for violations of
    the Fair Debt Collection Practices Act, fraud by concealment, Fourteenth Amendment Due
26  Process violations, Real Estate Settlement Procedures Act violations, and intentional infliction of
    emotional distress, which are all stated in the First Amended Complaint. Accordingly, a grant of
27  plaintiff's motion will effectively result in a dismissal of these claims because the court can no
    longer refer to plaintiff's First Amended Complaint if it is to grant plaintiff's motion for leave to
28  amend.

1    Cir. 2011) (citations and quotation marks omitted); <u>accord</u> <u>AmerisourceBergen Corp. v. Dialysist</u>

2    <u>West, Inc.</u>, 465 F.3d 946, 951 (9th Cir. 2006).

3       Additionally, in regards to the permissive joinder of parties, Federal Rule of Civil

4    Procedure 20(a)(2) provides:

5       **(a) Persons Who May Join or Be Joined**. . . .

6         **(2) Defendants.**  Persons . . . may be joined in one action as defendants if:

7

8           (A) any right to relief is asserted against them jointly, severally, or
in the alternative with respect to or arising out of the same transaction, occurrence,
or series of transactions or occurrences; and

9

10           (B) any question of law or fact common to all defendants will arise
in the action.

11

12       This rule is conjunctive in nature, requiring an adequate showing under Rule 20(a)(2)(A)

13    and Rule 20(a)(2)(B).   In essence, a plaintiff may bring a claim against multiple defendants so

14    long as (1) the claim arises out of the same transaction or occurrence, or series of transactions and

15    occurrences, and (2) there are commons questions of law or fact.  Fed. R. Civ. P. 20(a)(2);

16    <u>Coughlin v. Rogers</u>, 130 F.3d 1348, 1351 (9th Cir. 1997); <u>Desert Empire Bank v. Insurance Co.</u>

17    <u>of North America</u>, 623 F.3d 1371, 1375 (9th Cir. 1980).  Only if the defendants are properly

18    joined under Rule 20(a) will the Court review the other claims to determine if they may be joined

19    under Federal Rule of Civil Procedure 18(a), which permits the joinder of multiple claims against

20    the same party.[4]

21       Plaintiff's proposed amendment to add Wells Fargo and Quality Loan as defendants

22    plainly satisfies the requirements of Federal Rule of Civil Procedure 20(a)(2).  As to Rule

23    20(a)(2)(A)'s "same transaction, occurrence, or series of transactions or occurrences"

24    requirement, plaintiff has satisfactorily alleged that Wells Fargo and Quality Loan were involved

25    in the origination, underwriting, servicing, and foreclosure of the residential home loan that forms

26

27    [4] Federal Rule of Civil Procedure 18(a) states that "[a] party asserting a claim, counterclaim, crossclaim, or third-party claim may join, as independent or alternative claims, as many claims as it has against an opposing party."

28

3

1    the basis of plaintiff's causes of action stated in the Second Amended Complaint. These

2    allegations also satisfy Rule 20(a)(2)(B)'s requirement of the presence of a common question of

3    law or fact common in the action.

4        While the undersigned is cognizant of the fact that the currently-named defendants have

5    not been granted an opportunity to oppose plaintiff's motion for leave to amend[5] and of the fact

6    that they earlier expressed a desire to oppose such a motion if one were made (see ECF No. 37 at

7    9), it does not appear that they will suffer undue prejudice as a result of a grant of plaintiff's

8    motion. While this case has had quite a prolonged history, primarily due to the automatic stay

9    imposed during plaintiff's bankruptcy proceedings, no discovery has taken place, no pre-trial

10   deadlines have been set, and no defendants have yet answered the First Amended Complaint.

11   Additionally, there is no indication from the record that the proposed amendment is futile, is

12   motivated by bad faith, or that plaintiff acted with undue delay in bringing the present motion.

13   Accordingly, the undersigned grants plaintiff leave to amend in light of the policies favoring

14   liberal amendment.

15       Based on the foregoing, IT IS HEREBY ORDERED that:

16       1. Plaintiff's motion for leave to amend his complaint (ECF No. 40) is granted.

17       2. Plaintiff's proposed Second Amended Complaint found at docket entry 40 at pages 13

18   through 38 is deemed the operative complaint and shall be served as plaintiff's "Second Amended

19   Complaint."

20       3. The Clerk of Court is directed to issue, and serve on plaintiff, a summons as to

21   defendant Wells Fargo & Co.

22       4. The Clerk of Court is directed to issue, and serve on plaintiff, a summons as to

23   defendant Quality Loan Service Corporation.

24

25   [5] The court stated in its March 17, 2014 order that defendants need not file an opposition to
     plaintiff's motion to amend and that the court would "direct defendants to file an opposition to the
26   motion if the court determine[d] that such a response w[ould] be necessary." (ECF No. 39 at 2.)
     After assessing plaintiff's motion and proposed Second Amended Complaint, the court has
27   determined that an opposition will not be necessary because, for the reasons noted above,
     plaintiff's proposed amendments will not cause defendants any undue prejudice under the
28   circumstances and do not appear to be futile, made in bad faith, or made with a motive to delay.

1        5.  Defendants Wells Fargo & Co. and Quality Loan Service Corporation shall file an

2    answer or other response to plaintiff's Second Amended Complaint within 21 days of being

3    served with the summons and Second Amended Complaint.

4        6.  On or before July 21, 2014, defendants who have already appeared in this case and are

5    still named in plaintiff's Second Amended Complaint shall file an answer or other response to

6    plaintiff's Second Amended Complaint.

7        IT IS SO ORDERED.

8    Dated:  July 1, 2014

9    KENDALL J. NEWMAN
     UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>EXHIBIT J</u>

# <u>EXHIBIT J</u>

1   Robert A. Bleicher (Bar No. 111334)
    rbleicher@carr-mcclellan.com
2   J. Craig Crawford (Bar No. 238466)
    ccrawford@carr-mcclellan.com
3   CARR, McCLELLAN, INGERSOLL,
    THOMPSON & HORN
4   Professional Law Corporation
    216 Park Road
5   P.O. Box 513
    Burlingame, California  94011-0513
6   Telephone:    (650) 342-9600
    Facsimile:    (650) 342-7685
7
    Attorneys for Defendants
8   Select Portfolio Servicing, Inc., and
    Deutsche Bank National Trust Co.
9

10                  UNITED STATES DISTRICT COURT

11                  EASTERN DISTRICT OF CALIFORNIA

12

13   JAMES L. MACKLIN,                    Case No.  2:10-cv-1097-MCE-KJN PS

14              Plaintiff,                **MEMORANDUM OF POINTS AND
                                          AUTHORITIES IN SUPPORT**
15   v.                                   **DEFENDANTS SELECT PORTFOLIO
                                          SERVICING, INC., AND DEUTSCHE
16   MATTHEW HOLLINGSWORTH, et al.,       BANK NATIONAL TRUST CO.'S
                                          MOTION TO DISMISS**
17              Defendants.               **[Fed. R. Civ. P., Rule 12(b)(6)]**

18                                        Date:       August 21, 2014
                                          Time:       10:00 a.m.
19                                        Courtroom   25
                                          Judge:      Hon. Kendall J. Newman
20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page(s)**

3    I.     INTRODUCTION ..................................................................................................... 1

4    II.    FACTUAL BACKGROUND ..................................................................................... 1

     III.   PROCEDURAL BACKGROUND ............................................................................. 3

5           A.    The Unlawful Detainer Case ......................................................................... 3

6           B.    The Superior Court and District Court Civil Actions ................................... 3

7           C.    The Bankruptcy Case and Bankruptcy Stay ................................................. 4

            D.    The Adversary Proceeding ............................................................................ 4

8           E.    Resumption of the Unlawful Detainer ........................................................... 6

9           F.    Appeal and Affirmation of the Unlawful Detainer Judgment........................ 6

10          G.    Withdrawal of the Bankruptcy Reference ..................................................... 6

            H.    Resumption of the Adversary Proceeding and Further Motion to Amend ........... 8

11          I.     Summary Judgment for Deutsche Bank......................................................... 10

12   IV.    LEGAL STANDARD ............................................................................................... 11

13   V.     LEGAL ARGUMENT .............................................................................................. 12

            A.    Macklin's claims against Deutsche Bank and SPS are barred by the
14                doctrine of res judicata ................................................................................ 12

15                1.    Deutsche Bank and SPS may properly raise the affirmative defense
                        of res judicata by way of a Rule 12 motion to dismiss ........................... 12

16                2.    The Ninth Circuit's res judicata law applies to Macklin's SAC .............. 13

                  3.    The Judgment bars Macklin's claims against DBNT and SPS ................. 13

17          B.    Macklin's claims against Deutsche Bank and SPS otherwise fail ...................... 18

18                1.    The first cause of action for illegal contract is not a recognized
                        cause of action ......................................................................................... 18

19                2.    The second cause of action for breach of contract fails to state a
20                      claim ........................................................................................................ 20

21                3.    The third cause of action for violation of the Equal Opportunity
                        Credit Act fails to state a claim ............................................................... 22

22                4.    The fourth cause of action for FCRA fails to state a claim...................... 23

23                5.    The fifth cause of action for TILA fails to state a claim......................... 23

                  6.    The sixth cause of action for UCL fails to state a claim ......................... 24

24   VI.    CONCLUSION ......................................................................................................... 25

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Levine v. Blue Shield of California*, 189 Cal. App. 4th 117, 1136 (2010) ..................................... 25

*Aerojet–General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir.), cert. denied, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975) ....................................................................................................... 17

*Allen v. McCurry*, 449 U.S. 90, 94 (1980) .......................................................................................... 14

Alpert's Newspaper Delivery Inc. v. N.Y. Times Co., 876 F.2d 266, 270 (2d Cir.1989) ............. 16

*Ashcroft v. Iqbal*, 556 U.S. ___, 129 S. Ct. 1937 (2009) ........................................................... 11, 20

*Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990) ........................................ 12

*Bautista v. Los Angeles County*, 216 F.3d 837, 840 (9th Cir. 2000) ............................................ 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................... 11, 12, 20

*Bisno v. Sax*, 175 Cal.App.2d 714, 724-25 (1959) ....................................................................... 21

*Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-338 (9th Cir. 1996) ............................... 1, 12

*Chicago, R.I. & P. Ry. Co. v. Schendel*, 270 U.S. 611, 621 (1926) ............................................... 17

*Cisneros v. Instant Capital Funding Group*, 263 F.R.D. 595, 610 (E.D. Cal. 2009) ................... 25

*Conway v. Geithner*, 2012 WL 1657156 (N.D. Cal. May 10, 2012) ........................................... 13

*Day v. Moscow*, 955 F.2d 807, 811 (2d Cir.1992) ...................................................................... 12

*In re Gilead Sciences Securities Lit.*, 536 F.3d 1049, 1055 (9th Cir. 2008) ................................. 12

*Gorham-DiMaggio v. Countrywide Home Loans, Inc.*, N.D.N.Y.2008, 592 F.Supp.2d 283, affirmed 421 Fed.Appx. 97, 2011 WL 1681998 ........................................................................... 22

*In re Gottheiner*, 703 F.2d 1136, 1140 (9th Cir.1983) ................................................................. 16

*Gramm v. Lincoln*, 257 F.2d 250, 255 n.6 (9th Cir. 1958) .......................................................... 13

*Greahling v. Village of Lombard*, Ill., 58 F.3d 295, 297 (7th Cir. 1995) .................................... 12

*Headwaters, Inc. v. United States Forest Serv.*, 399 F.3d 1047, 1052 (9th Cir. 2005) ................ 15

*ITT Rayonier*, 627 F.2d at 1003 .............................................................................................. 16, 17

*In re Imperial Corporation of America*, 92 F.3d 1503, 1505 (9th Cir.1996) ............................... 17

*Jefferson School of Social Science v. Subversive Activities Control Board*, 331 F.2d 76 (D.C.Cir.1963) ............................................................................................................................... 17

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Jones v. Community Redev. Agency*, 733 F.2d 646, 649 (9th Cir. 1984)....................................... 11

*Lee v. Los Angeles,* 250 F.3d 668, 688–89 (9th Cir.2001)............................................................. 1

*Levy v. Cohen*, 19 Cal.3d 165 ..................................................................................................... 13

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2006).............. 12

*Marin v. HEW, Health Care Fin. Agency*, 769 F.2d 590, 594 (9th Cir. 1985).............................. 13

*Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir.2001) ............................ 14

*Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326-27 (1979) ............................................ 23

*Richards v. Jefferson County*, 517 U.S. 793, 798 (1996)........................................................... 16

*Schanll v. Hertz Corp.*, 78 Cal. App. 4th 1144, 1167 (2000)..................................................... 25

*In re Schimmels*, 127 F.3d 875, 881 (9th Cir. 1997)................................................................. 16

*Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir.1984) ......................................................... 12

*Shaw v. Hahn*, 56 F.3d 1128, 1131–32 (9th Cir.1995) .............................................................. 16

*Southwest Airlines Co. v. Texas International Airlines, Inc.*, 546 F.2d 84, 94 (5th Cir.), cert.
denied, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977) ........................................................ 17

*Southwest Airlines Co.*, 546 F.2d at 95 .................................................................................... 17

*St. Paul Fire & Marine Ins. Co. v. Weiner*, 606 F.2d 864, 868 (9th Cir. 1979) .......................... 13

*Stratosphere Litig. L.L.C. v. Grand Casinos, Inc.*, 298 F.3d 1137, 1143 n. 3 (9th Cir.2002) ....... 14

*Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency*,
322 F.3d 1064, 1077 (9th Cir.2003)............................................................................. 13, 14, 15

*U.S. v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir.2003) ................................................................. 1

*United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1003 (9th Cir.1980)..................................... 16

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
578 F.3d 1016, 1021-22 (9th Cir. 2009) ..................................................................................... 12

*Weller v. HSBC Mortgage Servs., Inc.*, 971 F. Supp. 2d 1072, 1077 (D. Colo. 2013)........... 19, 24

*Western Radio Servs. Co., Inc. v. Glickman*, 123 F.3d 1189, 1192 (9th Cir.1997) ...................... 13

*Western Systems, Inc. v. Ulloa*, 958 F.2d 864, 871 (9th Cir.1992)............................................ 14

*Younger v. Jensen*, 26 Cal.3d 397, 411 (1980) ......................................................................... 13

1

## TABLE OF AUTHORITIES
### (continued)

2
Page(s)

3    Statutes

4    11 U.S.C. § 1635 ................................................................................................. 9

5    15 U.S.C. § 1602 ................................................................................................. 8

6    15 U.S.C. § 1641(e)(1) ........................................................................................ 8

7    15 U.S.C. § 1641(e)(1)(A) ................................................................................... 9

8    15 U.S.C. 226.34(a)(4)(ii)(A) .............................................................................. 9

9    Business and Professions Code § 17200 ............................................................. 5

10   California Business & Professions Code § 17200 .............................................. 10

11   California Business & Professions Code § 17200 .............................................. 10

12   Rules

13   12 C.F.R. § 226.32(e)(1) ...................................................................................... 8

14   12 C.F.R. § 226.34 ............................................................................................... 8

15   12 C.F.R. §§ 1026.15(d)(3) ................................................................................ 10

16   Fed. R. Civ. Proc. Rule 8(c) ......................................................................... 12, 20

17   Fed. R. Civ. Proc. Rule 8 .................................................................................... 11

18   Fed. R. Civ. Proc. Rule 12(b)(6) .................................................................. 11, 12

19   Treatises

20   4 B. Witkin, California Procedure, Judgments, 156(b) (2d ed. 1971) ............... 13

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

Plaintiff James L. Macklin's Second Amended Complaint ("SAC") has already been resolved as to defendants Select Portfolio Servicing, Inc ("SPS") and Deutsche Bank National Trust Co. ("DBNT").  The issues he alleges in his SAC were litigated in the Adversary Complaint he filed in the bankruptcy court and resolved when the Honorable Ronald H. Sargis granted DBNT's cross-motion for summary judgment and entered judgment for DBNT and against Mr. Macklin.  The allegedly "new" issues he now asserts could have been—and actually were—raised and adjudicated in the Adversary Proceeding.  To the extent these "new" causes of action relate to a new transaction nucleus of fact, they would be time barred.  Mr. Macklin has had ample opportunity to plead and prove his claims against DBNT and SPS.  That he has not been able to eight years later confirms that he has no cognizable claims.  Defendants respectfully request that the Court dismiss the SAC without leave to amend.

## II.   FACTUAL BACKGROUND

While the factual record has been fully developed during the four years the parties have been litigating this dispute, for purposes of this motion the relevant facts include the allegations in the SAC, documents incorporated by reference but not physically attached to the complaint, and judicially noticeable matters of public record.  *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-338 (9th Cir. 1996); *U.S. v. Ritchie,* 342 F.3d 903, 907-08 (9th Cir.2003); *Lee v. Los Angeles,* 250 F.3d 668, 688–89 (9th Cir.2001) (internal citations omitted).

Mr. Macklin contacted a local Wells Fargo & Company ("Wells Fargo") home mortgage broker to complete the appraisal and loan process to obtain a new residential loan on his then current residence (the "Property").  As part of the loan process, Mr. Macklin alleged that he submitted financial statement, tax returns, and bank statements.  (SAC, 15:21-22)  Following a telephone interview, Wells Fargo notified Mr. Macklin that he qualified for a new loan that would allow him to draw on the existing equity in the Property.  (*Id.*, 15:25-16:2)

Mr. Macklin appeared at a local Wells Fargo branch to sign his loan documents.  (*Id.*, 16:3-12).  Mr. Macklin admits that he signed all of the loan documents but claims that he did not

1  have sufficient time to review them before doing so.  (*Id.*)  Mr. Macklin nonetheless left without

2  copies of the documents he just signed.  (*Id.*)  Mr. Macklin returned to Wells Fargo the following

3  week to pick up his loan documents.  (*Id.*, 16:13-18)  Mr. Macklin did not review these

4  documents either, only later discovering that the documents he picked up from Wells Fargo were

5  "blank" and contained "minuscule information."  (*Id.*)  Wells Fargo explained to Mr. Macklin that

6  the appearance of the documents was customary because the original documents were safely kept

7  by the bank's custodian. (*Id.*)

8         In April 2006, Macklin borrowed $659,000 from Accredited Home Lenders, Inc. (the

9  "AHL").  At that time, Macklin executed a promissory note (the "Note") in favor of AHL.  (SAC,

10  ¶ 10; Declaration of Robert A. Bleicher ("Bleicher Decl.,") ¶ 2, Ex. 1)  The loan was secured by a

11  deed of trust for $532,000 (the "Deed of Trust") and a junior deed of trust for $127,000.

12  (Bleicher Decl., ¶ 3, Ex. 2)

13         Mr. Macklin defaulted on his obligations in August 2008.  (SAC, 16:19-20)  Mr. Macklin

14  claims that he then learned for the first time that the loan he agreed to was an interest only loan

15  instead of the fully-amortized loan his Wells Fargo mortgage broker had lead him to believe.  (*Id.*,

16  16:20-21)  Mr. Macklin contacted the loan servicer in a failed attempt to rescind the loan.  (SAC,

17  16: 21-17:3)  Mr. Macklin was advised that he had not rescinded the loan. (*Id.*; Bleicher Decl., ¶¶

18  4-5, Exs. 3-4)

19         The foreclosure process was initiated.  On December 8, 2008, Windsor Management Co.,

20  as agent for MERS, recorded a Notice of Default.  (Request for Judicial Notice ("RJN"), Ex. 6.

21  On January 30, 2008, MERS as nominee of AHL substituted Windsor Management Co. as trustee

22  the trustee.  (*Id.*, Ex. 7).  On March 10, 2009, Windsor recorded a Notice of Trustee's Sale.  (*Id.*,

23  Ex. 8)  On August 21, 2009, DBNT directed the execution of a "Substitution of Trustee," naming

24  Quality Loan Service Corp. the new trustee.  *Id.*, 8.  On November 17, 2009, MERS, as nominee

25  for the Lender, executed an Assignment of Deed of Trust to Deutsche Bank, as Indenture Trustee,

26  on Behalf of the Holders of the Accredited Mortgage Loan Trust 2006-2 Asset Backed Notes.

27  *Id.*, Ex. 9.  The Substitution of Trustee was recorded on November 25, 2009.  QLS, as substituted

28  trustee, then caused a Notice of Trustee's Sale to be recorded on November 25, 2009.  *Id.*, Ex. 10.

1    The Assignment of Deed of Trust was recorded the next business day at 08:00.  *Id.*

2            Plaintiff did not offer to tender the amounts due under the loan, and the Property was sold

3    at a foreclosure sale on December 14, 2009.  *Id.*, Ex. 11.  At the time of the sale, the amount of

4    the unpaid debt with costs was $623,986.20.  *Id.*  A foreclosure deed was recorded on December

5    21, 2009, vesting title in Deutsche Bank as the purchaser at the foreclosure sale.  *Id.*

6
                        **III.    PROCEDURAL BACKGROUND**
7

8            This dispute between Mr. Macklin, bankruptcy trustees, and various current and former

9    defendants began over four years ago.  Over those four years, this dispute has been litigated in

10   five trial and appellate courts, before returning once again to this Court.  A brief recitation of this

11   circuitous path demonstrates just how vigorously Mr. Macklin has fought and how thoroughly

12   this dispute has been adjudicated.

13           **A.    The Unlawful Detainer Case.**

14           After purchasing the Property at the trustee's sale in December 2009, DBNT filed its

15   complaint for unlawful detainer three months later on March 26, 2010.  Mr. Macklin answered

16   the complaint soon thereafter.

17           With the case at issue, DBNT filed a motion for summary judgment on August 24, 2010.

18   Mr. Macklin filed his opposition on September 2, 2010.  On September 15, 2010, the court issued

19   a tentative ruling to grant DBNT's motion for summary judgment.  At the hearing on September

20   16, 2010, Mr. Macklin appeared with a copy of a voluntary bankruptcy petition.

21           **B.    The Superior Court and District Court Civil Actions.**

22           On April 2, 2010, Plaintiff filed a 127-page civil complaint in Placer County Superior

23   Court against DBNT and other defendants, alleging various claims related to the origination,

24   underwriting and servicing of a residential home loan for which he applied and received (Case

25   No. SCV 26905) (the "Superior Court Action").  (RJN, Ex. 12; a copy of the docket is attached as

26   Exhibit 1 to RJN).  DBNT removed the action on May 3, 2010 to this Court, Case No. 2:10-cv-

27   01097-FCD-KJN (the "Civil Action").  A copy of the docket in the Civil Action is attached as

28   Exhibit 2 to RJN.

1    Following removal and DBNT's motion to dismiss the complaint (RJN, Ex. 3 at ECF No.

2    9), Plaintiff filed a First Amended Complaint.  (Request for Judicial Notice, Ex. 13)  This

3    complaint alleges various causes of action related to Plaintiff's residential home loan.

4    Specifically, the First Cause of Action alleges that the foreclosure sale failed to be conducted in

5    compliance with California's statutory scheme for non-judicial foreclosure sales.

6    DBNT and SPS answered and subsequently moved for summary judgment.  (RJN, Ex. 2

7    at ECF Nos. 15-16)  Plaintiff opposed the motion and objected to DBNT's evidence.  (*Id.*, ECF

8    Nos. 17-19).  DBNT and SPS replied.  (*Id.*, ECF 20)  The hearing was set for September 23,

9    2010.

10       **C.    The Bankruptcy Case and Bankruptcy Stay.**

11   On September 16, 2010, the day of the summary judgment hearing in the Unlawful

12   Detainer Action and one week before the hearing on DBNT and SPS's motion for summary

13   judgment in the Civil Action, Mr. Macklin filed a Chapter 13 bankruptcy petition in Case No. 10-

14   44610 (the "Bankruptcy Case").[1]  (A copy of the docket in the Bankruptcy Case is attached as

15   Exhibit 3 to RJN).  Plaintiff's case was subsequently converted to a proceeding under Chapter 7.

16   (RJN, Ex. 3 at ECF Nos. 31, 32)

17   As a result of the Bankruptcy case, Mr. Macklin was able to take advantage of the

18   automatic bankruptcy stay of the Unlawful Detainer Case pursuant to 11 U.S.C. section 362.

19   Accordingly, the Placer County Superior Court stayed by the Unlawful Detainer Case.  Likewise,

20   over the objection of DBNT and SPS, the District Court ruled that the bankruptcy stay operated to

21   stay Mr. Macklin's prosecution of the Civil Action.  (RJN, Ex. 1 at ECF No. 25).

22       **D.    The Adversary Proceeding.**

23   On January 13, 2011, Macklin filed his Complaint in the adversary proceeding, Case No.

24

25   _____

[1] Although only days before the District Court was set to rule on DBNT's motion for summary judgment, the true

26   motive for the timing of Plaintiff's bankruptcy filing was a hearing on a summary judgment motion in an unlawful
     detainer action DBNT brought against Plaintiff and his son to regain the premises that served as security of the loan

27   at issue in the Civil Action and Adversary Proceeding.  (Placer County Superior Court Case No. MCV 45238).  The
     day before Plaintiff's bankruptcy filing, the unlawful detainer court issued a tentative ruling granting summary
     judgment in favor of DBNT.  Although stayed from entering an order against Plaintiff, the Court entered summary

28   judgment as to Plaintiff's son.

1   11-002024 (the "Adversary Proceeding").  (RJN, Ex. 14)  A copy of the docket in the Adversary

2   Proceeding is attached as Exhibit 4 to RJN.  The Complaint alleged six causes of action:  (1) a

3   determination of the nature, extent and validity of any lien held by DBNT; (2) a determination

4   that the underlying note has been satisfied or converted to unsecured debt; (3) damages for

5   DBNT's violation of the Truth-in-Lending Act by failing to notify Macklin that it obtained an

6   interest in the mortgage loan; (4) fraudulent conveyance of the assignments and trust deeds; (5)

7   libel; and (6) quiet title to the Wise Road Property.  (RJN, Ex. 14)

8        On May 19, 2011, the Court entered a preliminary injunction related to the foreclosure

9   sale and disposition of the Property.  (RJN, Ex. 15)  On May 20, 2011, following a hearing and

10  argument, the Court granted DBNT's Motion to Dismiss.  (RJN, Ex. 4 at ECF No. 97)  The Court

11  granted Macklin leave to amend the Complaint as to his third, fourth, fifth and sixth causes of

12  action, as well as to allege any affirmative claims arising out of his first and second causes of

13  action.  (*Id.*)  The Court did not grant leave to amend the first and second causes of action.  (*Id.*)

14       On June 17, 2011, Plaintiff filed his First Amended Complaint in the Adversary

15  Proceeding ("FAC").  (RJN, Ex. 16)  On August 3, 2011, DBNT filed a motion to dismiss the

16  FAC.  (RJN, Ex. 4 at ECF No. 150.)  Following hearing, the Court issued its order dismissing all

17  but two of the causes of action.  (RJN, Ex. 18)[2]

18       In relevant part, the Bankruptcy Court granted Deutsche Bank's motion **with prejudice** as

19  to the first (Truth in Lending Act), second (Real Estate Settlement Procedures Act), third (Fair

20  Credit Reporting Act), fourth (Fraud), fifth (Unjust Enrichment), sixth (Civil RICO), seventh

21  (Business and Professions Code § 17200) and eighth (Breach of Security Agreement) causes of

22  action.  (*Id.*)  The Court, however, allowed Mr. Macklin to proceed with his causes of action for

23  Wrongful Foreclosure and Quiet Title.  DBNT answered the surviving causes of action on

24  February 28, 2012.  (*Id.*, Ex 4 at ECF No. 228.)

25

26  ─────────────────

27  [2] In a procedurally improper attempt to avoid dismissal of his first amended complaint, Mr., Macklin filed a Motion to Re-Argue" the motion to dismiss the first amended complaint and to file a further amended complaint.  (RJN, Ex. 4 at ECF No. 295)  The Court denied Mr. Macklin's attempts to re-characterize his pleadings and arguments.  (RJN, Ex. 4 at ECF No 220)

28

### E.    Resumption of the Unlawful Detainer.

DBNT obtained relief of the bankruptcy stay on February 4, 2011.  (RJN, Ex. 3 at ECF No. 100)  DBNT later vacated a preliminary injunction related to its prosecution of the Unlawful Detainer Action on September 20, 2011.  (RJN, Ex. 4 at ECF No. 100)  Two years after it purchased the Property, DBNT was once again free to seek possession of the Property.

DBNT filed its motion for summary judgment in the Unlawful Detainer action on October 21, 2011.  Mr. Macklin  filed his opposition, along with a request for even more time, on October 28, 2011.  As it had done one year earlier, the Court again issued a tentative ruling granting summary judgment of DBNT.  Following a hearing on the motion on November 3, 2012, the trial court adopted its tentative on December 8, 2012. (RJN, Ex. 17)

### F.    Appeal and Affirmation of the Unlawful Detainer Judgment.

Before DBNT could take steps to acquire possession of the Property, and even before the order and judgment were entered, Mr. Macklin sought a stay pending appeal.  On December 20, 2011, the Court granted Mr. Macklin a temporary stay to permit the parties to more fully brief the propriety of a stay under these circumstances.  As was the case when Mr. Macklin sought injunctive relief, this stay was conditioned upon Mr. Macklin's posting of an undertaking.  Also as with Mr. Macklin's prior injunctive relief, he soon defaulted on his obligations.  The trial court ordered the stay vacated on February 23, 2012.

Following a hearing on August 16, 2012, the Appellate Division of the Placer County Superior Court affirmed the trial court's summary judgment in favor of DBNT.  (RJN, Ex 22).

### G.    Withdrawal of the Bankruptcy Reference.

Although the District Court had previously declined to allow the Civil Action to proceed during the bankruptcy case, DBNT sought to avoid duplicative litigation of the Adversary Proceeding and the Civil Action by requesting that the District Court withdraw the bankruptcy reference in Case No. 2-12-cv-01752-GEB-JFM (the "Withdrawal Case") so that the Adversary Proceeding could be consolidated with the Civil Action.  A copy of docket form the Withdrawal Case is attached as Exhibit 5 to the RJN.  DBNT filed this motion on June 29, 2012.  (RJN Ex. 19)  Mr. Macklin opposed the motion.  (RJN, Ex. 20)  In opposing the motion, Mr. Macklin

1    argued:

2              …. Deutsche highlights the depth **the bankruptcy court has delved
               into the facts of the case already**. To start at the beginning with a
3              new judge, would be a huge waste of judicial resources and the time
               the Bankruptcy Court put into the case in making its rulings. The
4              court has already delved into the documents including all the
               county recorder documents, the Mortgage back security trust and its
5              Master Sales and Servicing Agreement (almost 1000 pages), as well
               as all of the documents produced by Mr. Macklin and Deutsche in
6              the case. **Another court will have to repeat that same review that
               the Bankruptcy court has already undertaken.**

7              To re-educate a new court on the issues falls squarely within the
8              consideration of costs to the parties of whether to withdraw the
               reference. . . . Mr. Macklin should not have to incur additional
9              attorneys fees and costs because Deutsche wants **a second bite at
               the issues which have already been adjudicated by the Bankruptcy
10             court….**

11   *Id.* at pp. 6 (emphasis added).

12             Consistent with Mr. Macklin's argument, the District Court denied the motion to

13   withdraw the reference.  (RJN, Ex. 21)  Particularly compelling to the District Court was the

14   Bankruptcy Court's intimate familiarity with the dispute and ability to make proposed findings of

15   fact and conclusions of law:

16             …[T]he bankruptcy court 'has a better vantage point from which to
17             make proposed findings of fact and conclusions of law in the first
               instance.'  [Citation]  Further, Deutsche has not shown that judicial
18             efficiency would be promoted by consolidating the Adversary
               Proceeding with the "pending" Civil Action since that action has
19             been stayed since October 6, 2010, and the judge to whom the
               action was assigned, the Honorable Frank C. Damrell, retired
20             during the pendency of the stay. [Citation]

21             'In sum, none of [Deutsche's] arguments support its contention that
22             withdrawal of the reference would promote an efficient use of
               judicial resources.  Indeed, for this Court to become familiar with
23             the facts and law of [the Adversary Proceeding] would **duplicate
               much of what [the bankruptcy court] has already accomplished.**'

24   (*Id.,* at 6-7) (emphasis added).  Implicit in the District Court's logic is that efficiency would not

25   be served because the Bankruptcy Court, who was more familiar the facts and procedure of the

26   dispute, would render a decision making it later unnecessary for the District Court to later resume

27   litigation of the dispute.

28

**H.      Resumption of the Adversary Proceeding and Further Motion to Amend.**

Following the District Court's directive that the parties' resolve their dispute in the

Adversary Proceeding instead of the Civil Action, the parties resumed litigation before the

Bankruptcy Court.  Undeterred by the Court's prior stern admonitions, Mr. Macklin ***yet again***

moved the court to amend his complaint on October 4, 2012.  (*See* RJN, Ex. 23)  Yet again,

Mr. Macklin sought to add causes of action for TILA (two theories) and California Business &

Professions Code section 17200.  (*Id.*)  And yet again the Bankruptcy Court rejected Mr.

Macklin's attempts.  (RJN, Ex. 24)

Frustrated with Mr. Macklin's inability to state a cogent claim on these theories despite

numerous attempts and guidance from the Court, the Court noted Mr. Macklin's repeated efforts

to  blame the posture and insufficiency of his case upon his prior counsel, as he does again here,

without ever providing a meritorious argument for amendment.  (RJN, Ex. 25 at 5-6)

In particular, the Bankruptcy Court reviewed each cause of action Mr. Macklin now seeks

to advance under TILA and UCL.  With respect to Mr. Macklin's proposed Second Amended

Complaint's alleged TILA violation for failure to verify income, the Bankruptcy Court held:

> The Plaintiff seeks to amend his cause of action by adding a second
> count under TILA for failure to verify his income. The court ***finds***
> no requirement under the applicable statute (15 U.S.C. § 1602) or
> regulation (Regulation Z, 12 C.F.R. § 226.32) to verify income in
> this transaction.
>
> The Plaintiff in his Points and Authorities asserts a violation of 12
> C.F.R. § 226.32(e)(1). The court is unable to find this statute,
> finding § 226(d)(8)(iii) as the final text in § 226.32. FN.1. Since the
> Plaintiff has cited Reg. Z, 12 C.F.R. § 226.34 to support an income
> verification requirement and 15 U.S.C. § 1641(e)(1) to support
> assignee liability, the court has reviewed the issue in this light.
>
> Subsection (a) of 12 C.F.R. § 226.34 cites meeting the requirements
> of § 226.32 as a condition precedent to the application of § 226.34.
> The Plaintiff has not plead that this transaction meets those
> requirements.  Exhibit B, attached to the motion, is a copy of the
> Note that shows a 6.125% interest rate. Dckt. 290, Ex. B.
>
> Section 226.32(a)(1)(I) applies only to loans that are more than
> eight (8) percent above the current Treasury rate for a similar term.
> Subsection (ii) indicates it would apply to loans where more than
> eight (8) percent was spent on points and fees. Section
> 226.32(a)(2)(I) indicates it does not apply to a residential mortgage
> transaction. The court finds that a 6.125% interest rate cannot be

1    more than eight percent above a Treasury rate, even if that rate was
     zero. The Plaintiff has not pled that he has met this condition
2    precedent.

3    The court finds the condition precedent was not met, hence the
     lender had no requirement to verify income under TILA for this
4    transaction, thus no TILA violation.

5    With respect to the proposed Second Amended Complaint's claim of assignee liability for

6    failure to verify income, the Bankruptcy Court found:

7    The plaintiff argues that liability for TILA violations at signing
     extend to Deutsche Bank National Trust Company as an assignee of
8    the deed of trust. To be liable for TILA violations as an assignee,
     the TILA violation must be apparent on the face of the disclosure
9    statement from the assignor. 15 U.S.C. § 1641(e)(1)(A).

10   To support that the violation was plain on its face, the Plaintiff cites
     Reg. Z, 15 U.S.C. 226.34(a)(4)(ii)(A) requiring the lender to verify
11   income or assets relied upon to determine the borrower's ability to
     repay by using IRS forms or other reasonably reliable documents.
12   To support a TILA violation, the lack of income documentation as
     described by this statute must make it apparent to a purchaser of the
13   note that a violation existed at inception. The Plaintiff does not
     allege the disclosure statement would make it apparent that a
14   violation existed at inception to a later purchaser of the note.

15   As discussed above, the court does not find a TILA violation linked
     to income verification. Assuming arguendo there is an income
16   verification requirement, the court finds the Plaintiff has not plead
     how a person purchasing the note would realize there was a failure
17   to verify income from the documents accompanying the note. The
     Plaintiff alleges that his production of the documents would make it
18   apparent if someone researched the materials supporting the
     disclosure statement. Requiring research to validate the disclosure
19   statement against underlying documentation does not make a
     violation plain on its face.
20
     Presumably there would be an assertion in the contract language
21   that such had been checked. As such, Deutsche Bank National Trust
     Company would have a fraud action against the seller, but unlikely
22   that assignee liability would arise. The court finds in the alternative
     that the falsified income contained within the disclosure statement
23   would not appear plain on its face to a future purchaser.

24
     With respect to Mr. Macklin's attempt to litigate rescission under TILA, the Bankruptcy
25
     Court found:
26
     The Plaintiff argues that under 11 U.S.C. § 1635, the Plaintiff has
27   an absolute right to rescind for TILA violations. Plaintiff asserts
     only notice to the lender is required to effect rescission. The court
28   finds the Plaintiff was entitled send a notice of his intent to rescind,

however, the court finds the time to litigate the validity of the
rescission has passed.

. . .

The court follows the controlling Ninth Circuit precedent finding
the one−year statute of limitations began when the lender made
clear its intention not to unwind the transaction in the March 31,
2009 letter from Roup & Associates.

In the alternative, the court finds that the Plaintiffs Notice of
Rescission was not a proper notice of rescission because it did not
offer to tender the loan principal. 12 C.F.R. §§ 1026.15(d)(3),
1026.23(d)(3).  As such, the Plaintiffs right to assert TILA
violations would have expired at the later of 3 years or sale of the
property, which occurred on December 19, 2009.

With respect to the cause of action under California Business & Professions Code section

17200, the Bankruptcy Court found numerous issues:

The Plaintiff has reiterated his claim under California Business &
Professions Code § 17200 et seq. The Points and Authorities seek
to amend the complaint to plead a violation of California's Unfair
Competition Law (UCL) under the unlawful prong based on the
TILA violations.

The Plaintiff has alleged two different basis for his TILA violations,
failure to verify income and failure to rescind following
notification. The court has addressed both of these issues above and
found no support for the alleged TILA violations. Since no
violation was found, the Plaintiffs pleading of unlawful acts fails to
support the motion to amend the UCL cause of action.

In the alternative, the court finds that Plaintiff has failed to plead
sufficiently Deutsche Bank National Trust Company liability since
it was not a party to any of stated TILA violations.

In the end, despite numerous attempts in the Adversary Proceeding  to allege something

more than a technical violation of in the nonjudicial process, including alleged wrongdoing in the

loan process, underwriting, funding, administration, default and foreclosure, Mr. Macklin was left

to proceed on his two surviving causes of action for wrongful foreclosure and quiet title.

**I.        Summary Judgment for Deutsche Bank.**

With the pleadings finally settled, Mr. Macklin moved for summary judgment on his

wrongful foreclosure and quiet title causes of action. (RJN, Ex. 4 at ECF No. 307)  DBNT cross-

moved for judgment on the undisputed factual record.  (RJN, Ex. 4 at ECF No. 314)  On May 24,

1   2013, the Court entered summary judgment in favor of DBNT and against Mr. Macklin.  (RJN,

2   Exs. 26-27)  Judgment was entered on July 2, 2013 (the "Judgment").  (RJN, Ex. 28)

3       Predictably, Mr. Macklin moved to vacate the judgment, again casting the blame on his

4   three prior attorneys rather than the merits of his case.  (RJN, Ex. 4 at ECF No. 338)  The Court

5   denied the motion.  (RJN, Exs. 29-30)

6       Mr. Macklin appealed the Judgment.  (RJN, Ex. 4 at ECF No. 361)  The Ninth Circuit

7   Bankruptcy Appellate Panel ("BAP") dismissed the appeal for lack of jurisdiction.  (RJN, Ex. 31)

8   Mr. Macklin now attempts to revive his resolved and dismissed claims in this forum.

9
10                          **IV.    LEGAL STANDARD**

11      The cornerstone of a sufficiently plead complaint is Federal Rule of Civil Procedure Rule

12  8, which requires a plaintiff to "plead a short and plain statement of the elements of his or her

13  claim, identifying the transaction or occurrence giving rise to the claim and the elements of the

14  prima facie case."  *Bautista v. Los Angeles County*, 216 F.3d 837, 840 (9th Cir. 2000).  The

15  complaint, therefore, cannot merely allege that a wrong has been committed and then demand

16  relief.  Rather, the complaint must give fair notice and state the claim's elements plainly and

17  succinctly; it must allege at least with a sufficient degree of particularity the overt facts which the

18  defendant engaged in to support the claim.  *Jones v. Community Redev. Agency*, 733 F.2d 646,

19  649 (9th Cir. 1984).

20      Recent decisions by the Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544

21  (2007) and *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S. Ct. 1937 (2009) make it clear that to survive a

22  Rule 12(b)(6) motion,

23          … a complaint must contain sufficient factual matter, accepted as
            true, to "state a claim to relief that is plausible on its face."  A claim
24          has facial plausibility when the plaintiff pleads factual content that
            allows the court to draw the reasonable inference that the defendant
25          is liable for the misconduct alleged….The plausibility standard is
            not akin to a "probability requirement," but asks for more than a
26          sheer possibility that a defendant has acted unlawfully.

27  *Iqbal*, 556 U.S. at __, 129 S. Ct. at 1949 (citations omitted).  Thus, in order to survive a Rule

28  12(b)(6) motion, the complaint must allege "more than labels and conclusions" or a "formulaic

1    recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.

2        The Supreme Court's guidance in *Iqbal/Twombly*, coupled with the pleading requirement

3    of Rule 8, require dismissal under Rule 12 (b)(6) where there is either a "lack of a cognizable

4    legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory."

5    *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990); *Greahling v. Village of*

6    *Lombard*, Ill., 58 F.3d 295, 297 (7th Cir. 1995).

7        Although the general rule in resolving a Rule 12(b)(6) motion is to construe the complaint

8    in the light most favorable to the plaintiff and accept as true all well-pleaded factual allegations,

9    *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-338 (9th Cir. 1996), a court is not required to

10   accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or

11   unreasonable inferences." *In re Gilead Sciences Securities Lit.*, 536 F.3d 1049, 1055 (9th Cir.

12   2008) (citation omitted).  Likewise, the court need not accept as true allegations that contradict

13   facts which may be judicially noticed by the court.  *Von Saher v. Norton Simon Museum of Art at*

14   *Pasadena*, 578 F.3d 1016, 1021-22 (9th Cir. 2009).

15       Where "it is clear that the complaint could not be saved by an amendment," the Court may

16   grant a Rule 12(b)(6) motion without leave to amend.  *Livid Holdings Ltd. v. Salomon Smith*

17   *Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2006).

18                               **V.    LEGAL ARGUMENT**

19       Macklin alleges six different causes of action against the defendants.  None of these

20   causes of action state a viable claim against defendants DBNT and SPS.

21       **A.    Macklin's claims against Deutsche Bank and SPS are barred by the doctrine**
            **of res judicata.**
22

                 **1.    Deutsche Bank and SPS may properly raise the affirmative defense of**
23                      **res judicata by way of a Rule 12 motion to dismiss.**

24

25       A defendant may move to dismiss a complaint pursuant to Rule 12 on grounds that the

     complaint, or a portion thereof, is barred by the doctrine of res judicata so long as doing so does
26
     not raise any disputed issues of fact.  *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir.1984);
27
     *Day v. Moscow*, 955 F.2d 807, 811 (2d Cir.1992); Fed. R. Civ. Proc. 8(c).  Where the res judicata
28

1   argument is based on the plaintiff's complaint in the present case and the plaintiff's dismissed or

2   adjudicated complaint in another case, the res judicata argument does not raise a disputed issue of

3   fact.  See *Conway v. Geithner*, 2012 WL 1657156 (N.D. Cal. May 10, 2012).

4               **2.      The Ninth Circuit's res judicata law applies to Macklin's SAC.**

5               In determining the applicable res judicata doctrine, the Ninth Circuit holds that a federal

6   district court sitting in diversity must apply the res judicata law of the state in which it sits.

7   *Gramm v. Lincoln*, 257 F.2d 250, 255 n.6 (9th Cir. 1958) (federal court sitting in diversity

8   jurisdiction applies claim preclusion law of the forum state); see also *St. Paul Fire & Marine Ins.*

9   *Co. v. Weiner*, 606 F.2d 864, 868 (9th Cir. 1979) (federal court sitting in federal question

10  jurisdiction applies claim preclusion law of the forum state).  Thus, California's res judicata law

11  controls this diversity suit.

12              Under California law, however, when determining the res judicata effect of a prior federal

13  court judgment, the court should apply federal standards.  *Younger v. Jensen*, 26 Cal.3d 397, 411

14  (1980); *Levy v. Cohen*, 19 Cal.3d 165, 172-73; 4 B. Witkin, California Procedure, Judgments,

15  156(b) (2d ed. 1971).  Therefore, federal res judicata standards apply to determine the preclusive

16  effect of the prior Judgment in the Adversary Proceeding.

17              **3.      The Judgment bars Macklin's claims against DBNT and SPS.**

18              The doctrine of res judicata provides that a final judgment on the merits bars further

19  claims by the parties or their privies based on the same cause of action.  *Tahoe–Sierra Pres.*

20  *Council v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir.2003).

21              It prohibits the re-litigation of any claims that were not only actually raised but also could

22  have been raised in the prior action.  *Western Radio Servs. Co., Inc. v. Glickman*, 123 F.3d 1189,

23  1192 (9th Cir.1997).  It is immaterial whether the claims asserted subsequent to the judgment

24  were actually pursued in the action that led to the judgment; rather, the relevant inquiry is whether

25  they could have been brought.  *Tahoe–Sierra Pres. Council*, 322 F.3d at 1078.  This broad scope

26  effectuates the doctrine's purpose of "reliev[ing] parties of the cost and vexation of multiple law

27  suits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance

28  on adjudication." *Marin v. HEW, Health Care Fin. Agency*, 769 F.2d 590, 594 (9th Cir. 1985)

1    (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).

2         The Ninth Circuit holds that three elements must be present in order for res judicata to be

3    applicable: (**1**) an identity of claims; (**2**) a final judgment on the merits; and (**3**) the same parties

4    or privity between the parties.  *Stratosphere Litig. L.L.C. v. Grand Casinos, Inc.*, 298 F.3d 1137,

5    1143 n. 3 (9th Cir.2002) (citing *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713

6    (9th Cir.2001)).

7              **a.       The claims in the Adversary Proceeding and SAC in the Civil
                           CourAction are identical.**
8

9         An identity of claims exists when two suits arise from the same transactional nucleus of

10   facts.  *Tahoe–Sierra Pres. Council*, 322 F.3d at 1078.  Two events are part of the same

11   transaction or series of transactions where the claims share a factual foundation such that they

12   could have been tried together.  *Western Systems, Inc. v. Ulloa*, 958 F.2d 864, 871 (9th Cir.1992).

13   "Different theories supporting the same claim for relief must be brought in the initial action." *Id*.

14        Here, the transactional nucleus of facts governing the claims that could have (and were)

15   brought in the Adversary Proceeding encompasses all issues related to Mr. Macklin's refinancing

16   of his residential mortgage with Wells Fargo in 2006, the terms of his residential loan, the

17   servicing of his residential loan, and the nonjudicial foreclosure on the Property following a

18   declared default on the residential loan.  (*See generally* Adversary Proceeding)  Mr. Macklin had

19   numerous opportunities to amend his complaint and was very broad in his allegations, which

20   included far-reaching conspiracies implicating the mortgage-backed securities industry.

21        Now, Mr. Macklin attempts to assert claims arising out of the same nucleus of fact at issue

22   in the Adversary Proceeding, an action based on the same events he asserts here:  the residential

23   loan application process, the underwriting of the loan, the servicing of the loan, and the

24   foreclosure process.  (*See generally*, SAC)

25        Indeed, the Honorable Ronald Sargis considered and rejected many of the exact same

26   theories that Mr. Macklin now seeks to add to his SAC when the Court denied Mr. Macklin leave

27   to file a second amended complaint in the Adversary Proceeding.  (RJN, Exs. 24-25)  Although

28   these theories were never expressly added to the pleadings in the Adversary Proceeding, this is no

1  excuse to the bar of res judicata.  To the contrary, Mr. Macklin's argument that his prior counsel

2  could have, but failed to, plead these causes of action in the Adversary Proceeding is an

3  admission that there is an identity of claims in the two cases.

4         Mr. Macklin's attempt to attach different labels to these same claims does not take save

5  them.  *Tahoe-Sierra Pres. Council*, 322 F.3d at 1077-78 ("The fact that res judicata depends on

6  an "identity of claims" does not mean that an imaginative attorney may avoid preclusion by

7  attaching a different legal label to an issue that has, or could have, been litigated.")  There is an

8  identity of claims in the Adversary Proceeding and the Civil Action.  The first requirement of res

9  judicata is satisfied.

10              **b.      The Adversary Proceeding resulted in a final judgment on the
                          merits.**

11

12         The second requirement of res judicata is that the prior action must have resulted in a final

13  judgment.  Like the other requirements of the doctrine, the requirement that the prior litigation

14  resulted in a final judgment is interpreted broadly so as to include not only judgments but also

15  voluntary and involuntary dismissals of an action with prejudice.  *See Headwaters, Inc. v. United*

16  *States Forest Serv.*, 399 F.3d 1047, 1052 (9th Cir. 2005).

17         Here, the Adversary Proceeding resulted in summary judgment.  (RJN, Exs. 26-27)  The

18  Bankruptcy Court entered judgment on July 2, 2013 (the "Judgment").  (RJN, Ex. 28)  The

19  judgment is a final judgment for res judicata purposes.  Mr. Macklin cannot get a second attempt

20  at litigating these claims in a different forum in hopes of obtaining a different result.

21              **c.      Macklin, DBNT and SPS were parties to the Adversary
                          Proceeding.**

22

23         The third requirement of res judicata is privity of parties.  The Ninth Circuit holds that

24  "privity is a ***flexible concept*** dependent on the particular relationship between the parties in each

25  individual set of cases." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322

26  F.3d 1064, 1081-82 (9th Cir. 2003).  On one end of the concept, there is an obvious privity where

27  the parties are identical.  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322

28  F.3d 1064, 1081 (9th Cir. 2003).

On the other end, privity may still exist even if the parties are not identical so long as "there is 'substantial identity' between parties, that is, when there is sufficient commonality of interest." *In re Gottheiner*, 703 F.2d 1136, 1140 (9th Cir.1983) (citation omitted); see also Stratosphere Litigation, 298 F.3d at 1142 n. 3 (finding privity when a party is "so identified in interest with a party to former litigation that he represents precisely the same right in respect to the subject matter involved") (citation omitted); *Shaw v. Hahn*, 56 F.3d 1128, 1131–32 (9th Cir.1995) (finding privity when the interests of the party in the subsequent action were shared with and adequately represented by the party in the former action); *United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1003 (9th Cir.1980) ("[A] 'privy' may include those whose interests are represented by one with authority to do so.").

The Ninth Circuit elaborated on this fluid relationship in *In re Schimmels*, 127 F.3d 875, 881 (9th Cir. 1997), as follows:

> Federal courts have deemed several relationships "sufficiently close" to justify a finding of "privity" and, therefore, preclusion under the doctrine of *res judicata*: "First, a non-party who has succeeded to a party's interest in property is bound by any prior judgment against the party. Second, a non-party who controlled the original suit will be bound by the resulting judgment. Third, federal courts will bind a non-party whose interests were represented adequately by a party in the original suit." In addition, "privity" has been found where there is a "substantial identity" between the party and nonparty, where the nonparty "had a significant interest and participated in the prior action," and where the interests of the nonparty and party are "so closely aligned as to be virtually representative." Finally, a relationship of privity can be said to exist when there is an "express or implied legal relationship by which parties to the first suit are accountable to non-parties who file a subsequent suit with identical issues."

See also *Richards v. Jefferson County*, 517 U.S. 793, 798 (1996) ("Moreover, although there are clearly constitutional limits on the 'privity' exception, the term 'privity' is now used to describe various relationships between litigants that would not have come within the traditional definition of that term."); *Alpert's Newspaper Delivery Inc. v. N.Y. Times Co.*, 876 F.2d 266, 270 (2d Cir.1989) ("The issue is one of substance rather than the names in the caption of the case; the inquiry is not limited to a traditional privity analysis."); *ITT Rayonier*, 627 F.2d at 1003 ("Courts are no longer bound by rigid definitions of parties or their privies for purposes of applying

1    collateral estoppel or res judicata.").

2           Thus, "privity"—for the purposes of applying the doctrine of res judicata—is a legal

3    conclusion "designating a person so identified in interest with a party to former litigation that he

4    represents precisely the same right in respect to the subject matter involved." *Southwest Airlines*

5    *Co. v. Texas International Airlines, Inc.*, 546 F.2d 84, 94 (5th Cir.), cert. denied, 434 U.S. 832, 98

6    S.Ct. 117, 54 L.Ed.2d 93 (1977) (citing *Jefferson School of Social Science v. Subversive Activities*

7    *Control Board*, 331 F.2d 76 (D.C.Cir.1963)).

8           Applying these guiding principles, federal courts have deemed several relationships

9    "sufficiently close" to justify a finding of "privity" and, therefore, preclusion under the doctrine

10   of res judicata:

11   •    A non-party who controlled the original suit will be bound by the resulting
          judgment;

12   •    A non-party whose interests were represented adequately by a party in the original
13        suit;

14   •    Where there is a "substantial identity" between the party and nonparty;

15   •    Where the interests of the nonparty and party are "so closely aligned as to be
16        'virtually representative'"; and

17   •    When there is an "express or implied legal relationship by which parties to the first
          suit are accountable to non-parties who file a subsequent suit with identical
18        issues."

19   *Southwest Airlines Co.*, 546 F.2d at 95; *ITT Rayonier*, 627 F.2d at 1003 (citing *Chicago, R.I. & P.*

20   *Ry. Co. v. Schendel*, 270 U.S. 611, 621 (1926)' " *id.* (quoting *Aerojet–General Corp. v. Askew*,

21   511 F.2d 710, 719 (5th Cir.), cert. denied, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975)).

22   Finally, a relationship of privity can be said to exist *Id.*;  *See also In re Imperial Corporation of*

23   *America*, 92 F.3d 1503, 1505 (9th Cir.1996).

24          Here, there can be no doubt that there is privity between Mr. Macklin and DBNT.

25   Mr. Macklin purchased his claims against DBNT from the Chapter 7 Trustee so that he could

26   pursue the claims individually.  (RJN Ex. 3 at ECF No. 136)  Mr. Macklin was thereafter the

27   plaintiff.  DBNT was and at all times remained the defendant throughout the Adversary

28   Proceeding.  Mr. Macklin now seeks to bring the same claims against DBNT in the Civil Action.

1    There is an identity of parties, so the requirement as to Mr. Macklin and DBNT is satisfied.

2              Privity also exists between Mr. Macklin and SPS.  Although SPS was a non-party in the

3    Adversary Proceedings, the allegations in the SAC confirm that the requisite close relationship

4    and substantial identity exists between DBNT and SPS for res judicata purposes.  The SAC

5    alleges that "Defendant [DBNT] is the trustee for the Accredited Mortgage Loan Trust 2006-2."

6    (SAC, pp. 14)  In this capacity, DBNT was the assignee of the beneficial interest in the loan.  (*Id.*,

7    ¶ 7 at pp. 20).  SPS is a mortgage servicing company (Id. at pp. 14-15).  Relevant here, SPS was

8    the loan servicer for his residential loan.  (*Id.*, at pp. 16-17)  Mr. Macklin alleges an agency

9    relationship between DBNT and SPS.  (*Id.*, ¶ 62)  There is not a single cause of action in the

10   Adversary Complaint and the SAC that attempts to distinguish the alleged conduct of DBNT

11   from that of SPS.  To the contrary, Mr. Macklin has always joined the purported actions of DBNT

12   and SPS, and therefore SPS's interests in the Adversary Complaint were adequately represented

13   by DBNT.  The dismissal with prejudice of those claims in the Adversary Proceeding as to DBNT

14   is consequently res judicata as to SPS, as well.

15             The claims in the SAC are therefore barred as to DBNT and SPS by the doctrine of res

16   judicata.  DBNT and SPS request that the Court dismiss the SAC with prejudice.

17       **B.        Macklin's claims against Deutsche Bank and SPS otherwise fail.**

18             To the extent Macklin's claims are not barred by res judicata, his claims nonetheless fail.

19   The causes of action in the SAC fair no better than their predecessors did in the Adversary

20   Proceeding.  Mr. Macklin's vague and conspiratorial allegations fail to coalesce into a legally

21   cognizable theory.  To the contrary, the purported wrongdoing by DBNT and SPS are based on

22   unsubstantiated and legally unrecognized theories of agency and assignment related to conduct

23   that is not unlawful.

24       **1.        The first cause of action for illegal contract is not a recognized cause of
                     action.**
25

26             Although it is difficult to comprehend specifically what Mr. Macklin alleges, particularly

27   with respect to DBNT and SPS, Mr. Macklin appears to allege that, due to the various defendants'

28   unlawful conduct, an enforceable contract was not formed.  On the one hand, Mr. Macklin alleges

1    that Wells Fargo failed to confirm his income.  (SAC, ¶ 23)  In the alternative, Mr. Macklin

2    appears to allege that Wells Fargo fraudulently induced him into entering in to a contract he could

3    not perform. [3]  (*Id.*, ¶ 20)  Either way, these allegations all focus on Wells Fargo's alleged

4    misrepresentation of Mr. Macklin's income, whether intentional or negligent, and have nothing to

5    do with DBNT and SPS. [4]

6         The basis of Mr. Macklin's allegation that the contract is void and illegal clearly establish

7    that Mr. Macklin's claim is directed towards Wells Fargo.  Mr. Macklin seeks to invoke 15

8    United States Code section 1639c, subdivision (a)(1) for the proposition that: "no **creditor** may

9    **make** a residential mortgage loan unless the creditor makes a reasonable and good faith

10   determination … that … the consumer has a reasonable ability to repay the loan ….."  Although

11   Mr. Macklin makes many allegations, he does not allege that DBNT or SPS were a creditor who

12   made a "residential mortgage loan."

13        Moreover, even if Mr. Macklin had alleged as much, any failure to comply with Section

14   1639 of the Dodd-Frank Act would not render Mr. Macklin's loan contracts void.  This is because

15   Mr. Macklin entered in to the operative loan agreement in August 2006.  The Dodd Frank

16   amendment's effective date was not until four years later, on July 21, 2010.  Courts interpreting

17   this provision have declared that it does not operate retroactively.  *Weller v. HSBC Mortgage*

18   *Servs., Inc.*, 971 F. Supp. 2d 1072, 1077 (D. Colo. 2013).  Thus, the loan agreements were not

19   illegal at the time they were entered into, meaning that they did not become illegal based on

20   subsequently enacted non-retroactive legislation.

21   _____

22   [3] Although it is unclear how these allegations pertain to the "illegal contract" cause of action, Mr. Macklin includes
     argumentative allegations that the contract fails because (1) the Note was not a negotiable instrument under UCC
23   section 3.104(a)(3) because prepayments required notice, and (2) that Note was not timely transferred to the trust
     before the closing date.  The Bankruptcy Court considered these arguments before rejecting them.  (RJN, _ at 11-12,
24   14; AP Dckt. No. 98).  The Bankruptcy Court squarely  rejected Mr. Macklin's argument regarding untimely transfer
     of the Note into the trust on grounds that Macklin was not a party to the trust relevant agreements.  Despite Mr.
25   Macklin's conclusory allegation that he is now a party to these agreements, other courts have rejected this argument.
     *See In re Davies* (9th Cir., Mar. 24, 2014, 12-60003) 2014 WL 1152800 at *2; *Zapata v. Wells Fargo Bank*, N.A.
26   (N.D. Cal., Dec. 10, 2013, C 13-04288 WHA) 2013 WL 6491377 (citing cases).

27   [4] Mr. Macklin apparently alleges that DBNT could not have received the Note into the REMIC because, as a result of
     Wells Fargo's allegedly fraudulent conduct, the Note was an impaired asset.  (SAC, ¶¶ 12-13)  Mr. Macklin
28   advanced similar variations of this argument in the Adversary Proceeding, which argument was also rejected

Finally, even if Mr. Macklin could allege an illegal contract that somehow implicates DBNT and SPS (as opposed to mere rescission), Mr. Macklin must allege the relevant conduct in far greater detail. From what Mr. Macklin has alleged, the conduct at issue triggers the heightened pleading requirements of *Iqbal/Twombly*, particularly here where his contentions are a premised upon claims of vaguely stated purposeful or fraudulent conduct that falls woefully short of the requisite "who, what, where, when, how, and why." All that Mr. Macklin alleges is that DBNT, "as purported assignee of the false loan, ratified the false acts of [Wells Fargo] where [it] had a duty to refrain from executing a loan in favor of [Mr. Macklin]." For its part, SPS "as purported loan servicer, gave directions to Defendant [Quality Loan Serving, Inc.] to deliver and record an acceleration of debt where no default existed and while relying upon the void contract." Collectively, DBNT, SPS, and the other defendants each "played their roles in dispossessing [Mr. Macklin] of his property." (SAC, ¶ 23). Such conclusory and unsubstantiated allegations do not satisfy the pleading requirements of mandated by *Iqbal/Twombly* and Rule 8.

**2.      The second cause of action for breach of contract fails to state a claim.**

Mr. Macklin's second cause of action alleges that "Defendant(s)" materially breached the Deed of Trust by failing to notify Mr. Macklin of a default and his right to assert the non-existence of a default 30 days prior to acceleration. (SAC, ¶ 33) Mr. Macklin alleges that, in failing to comply with this provision of the Deed of Trust, "Defendant(s)" prevented him from asserting the non-existence of the default." As a result, Mr. Macklin exercises this contractual right and seeks to prevent "Defendant" from invoking the nonjudicial foreclosure statute. The second cause of action fails for several reasons.

First, Mr. Macklin's allegations are contradicted by judicially noticeable facts. The Placer County Recorder's Office shows that Accredited Home Lenders, Inc. provided Mr. Macklin a Notice of Default stating that Mr. Macklin was in default of his obligation and providing him more than 30 days to pay the delinquent amount before the remaining obligation would be accelerated and the Property would be sold. (RJN, ¶ 6) There was no breach of the Deed of Trust. *Moreover, as the Notice of Default demonstrates, it was Accredited Home Lenders, not DBNT or SPS, who was the lender at the time the notice was provided.*

1    Second, even if Mr. Macklin's allegations were not contradicted by judicially noticed

2    facts, Mr. Macklin still does not allege a material breach.  Accepting Mr. Macklin's allegations as

3    true, he did not receive an acceleration notice 30 days before acceleration of his debt and Notice

4    of Default.  Relevant here, Paragraph 22 merely provides:  "Lender shall give notice to Borrower

5    **prior to acceleration** following Borrower's breach of any covenant or agreement in this Security

6    Instrument …").  If there was a breach of this provision, this breach would relate only to the

7    "Lender's" right to accelerate the debt.  Put another way, the injury to Mr. Macklin would extend

8    only to Mr. Macklin's right to reinstate the loan at the non-accelerated default amount.  *See Bisno*

9    *v. Sax*, 175 Cal.App.2d 714, 724-25 (1959) (partial payment of delinquent amount absent

10   acceleration precludes lender from proceedings with foreclosure).

11   Here, Mr. Macklin admits that he ceased making payments in August 2008 after

12   "discovering" that the loan he obtained was an interest-only loan.  (SAC, pp. 16).  Mr. Macklin

13   does not allege that he tried at any time after August 2008 to make any payments on the loan, that

14   he paid the delinquent amount, or that he would have done so absent acceleration.  Assuming

15   DBNT (or SPS) breached Paragraph 22 of the Deed of Trust, such breach was clearly immaterial.

16   Third, Mr. Macklin's claim is barred by res judicata as discussed above.  Relevant here,

17   Mr. Macklin previously alleged a "breach of trust instrument" cause of action, alleging that

18   DBNT breached the terms of the Deed of Trust.  (RJN, Ex. 16, at ¶ 37)  That claim was dismissed

19   with prejudice.  (RJN, Ex. 18 at 37-38)  Mr. Macklin also alleges that he is entitled to "relief from

20   any action arising from such a breach, judicial or nonjudicial" and that DBNT was "prohibited

21   from invoking the non-judicial foreclosure statute in California."  The Placer County Superior

22   Court already approved the foreclosure sale.  The Placer County Appellate Division affirmed this

23   decision.  Judge Sargis ruled in favor of DBNT on this issue of the foreclosure sale's compliance

24   with California's statutes controlling nonjudicial foreclosure.  This issue has been fully litigated

25   and resolved in two courts.  Because there is no available relief, the cause of action should be

26   dismissed.

27

28

**3.    The third cause of action for violation of the Equal Opportunity Credit Act fails to state a claim.**

Mr. Macklin alleges that "Defendants" violated the EOCA by revoking his credit without a proper reason or following its own preconditions to doing so when they failed to provide him thirty days first notice before declaring a default and because there was no default under the terms of the loan agreements because the loan appeared to be performing under the terms of the trust, e.g., lender placed insurance covered Mr. Macklin's defaults.  Mr. Macklin's claims fail for several reasons.

First, Mr. Macklin lacks standing under the EOCA to bring a claim based on alleged wrongful conduct related to the servicing of an existing loan.  A lender's act of declaring a default on an existing credit line, even if otherwise discriminatory, is not an "adverse action" under the EOCA because a mortgagor is not an applicant.  *Gorham-DiMaggio v. Countrywide Home Loans, Inc.*, N.D.N.Y.2008, 592 F.Supp.2d 283, affirmed 421 Fed.Appx. 97, 2011 WL 1681998 (holding that mortgagor was not an applicant within the plain meaning of the ECOA, and therefore, could not invoke its protections, where any discrimination directed at mortgagor occurred during the servicing of her existing loan, and even after she defaulted, she did not apply for a new loan).  Here, Mr. Macklin admits that he was already approved for his loan at the time of DBNT's and SPS's alleged wrongful conduct.  Indeed, the alleged wrongful conduct concerns the declaration of default and termination of existing credit.  These actions are not covered by the EOCA.

Second, even if Mr. Macklin did have standing, judicially noticeable facts contradict the predicate conduct Mr. Macklin alleges to have occurred, i.e., initiation of a Trustee's Sale without prior notice of acceleration. (cite to those facts)

Third, Mr. Macklin persists in advancing the argument that, although he "made every installment payment due under the contract until August, 2008," there was nonetheless "no default" because the loan servicer covered his payments pursuant to a contract with the Trustee. (SAC, ¶ 45)  Mr. Macklin advanced this same argument several times in the Adversary Proceeding.  Each time, Judge Sargis soundly rejected it.  (*See, e.g.* RJN, Ex. 18, at 24-25.)  The issue of whether there was a default or not is precluded by the doctrine of collateral estoppel

1    *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326-27 (1979).  Mr. Macklin cannot in this

2    Civil Action base claims and causes of action on issues resolved against him in the Adversary

3    Proceeding.

4        **4.    The fourth cause of action for FCRA fails to state a claim.**

5        Mr. Macklin alleges that he warned "Defendant" about false information contained in the

6    Notice of Default but that "Defendant" ignored this warning and proceeded with the trustee's

7    sale.  While it is unclear from the vague allegations what precise "warning" he provided,

8    Mr. Macklin is presumably referring to the only alleged correspondence he had with defendants,

9    i.e., his letter he sent to the loan servicer, which elicited a response that Mr. Macklin had not

10   rescinded his loan.  (SAC, at pp. 16-17)  Mr. Macklin sent this letter in January 2009.  (Bleicher

11   Decl., Ex. 3)  He received a response in March 2009.  (*Id.*, Ex. 4).  Mr. Macklin's claims are

12   barred.

13       Mr. Macklin is precluded from bringing this claim under the doctrines of res judicata and

14   collateral estoppel.  In the Adversary Proceeding, Mr. Macklin alleged almost the identical claim

15   as the Third Cause of Action in his First Amended Complaint.  (RJN, Ex. 16, ¶ 75)  That claim

16   was dismissed with prejudice.  (RJN, Ex. 18, at pp 23-26)  The claims are therefore barred by res

17   judicata and collateral estoppel.

18       Even if these claims were not barred, Mr. Macklin still has not stated a claim.  Mr.

19   Macklin admits that he made all payments until August 2008.  (SAC, pp. 16).  Thereafter, Mr.

20   Macklin stopped making payments on this Note.  (*See id.; see also* AP Dckt., 120, at ¶ 75.B)  Mr.

21   Macklin was in default.  He admits as much.  For purposes of the FCRA, although Mr. Macklin

22   may have disputed the amount of default, the fact of default was not in dispute.  There is no

23   FCRA violation for DBNT's or SPS's failure to furnish any information based on these

24   allegations.

25       **5.    The fifth cause of action for TILA fails to state a claim.**

26       Mr. Macklin alleges that DBNT, as successor to the original lender, Accredited Home

27   Lenders, Inc., accepted the loan without verifying the information that was provided by Mr.

28   Macklin to Wells Fargo.  Mr. Macklin also alleges that DBNT and SPS failed to honor his

1   rescission request.  This claim fails.

2          First, this issue was previously decided by the Bankruptcy Court.  In dismissing the First

3   Amended Complaint in the Adversary Proceeding, Judge Sargis found that the so-called

4   rescission letter "was not a rescission, but a demand by Macklin to be paid money, have his note

5   returned to him, and be given property free and clear of the deed of trust."  (RJN, Ex. 18, at pp.

6   19).  Likewise, in denying Mr. Macklin leave to file a second amended complaint, Judge Sargis

7   found that there was no TILA violation for failure to verify income on Mr. Macklin's loan.  (RJN,

8   Exs. 24-25).

9          Second, Mr. Macklin cannot invoke the protections of 15 U.S.C. section 1639c when his

10  loan originated several years before enactment of this Dodd Frank amendment.  The loan at issue

11  originated in August 2006.  The effective date of the Dodd–Frank amendment is July 21, 2010,

12  four years later.  The Todd Frank amendments are not retroactive to loans that predate its

13  effective date.  *Weller v. HSBC Mortgage Servs., Inc.*, 971 F. Supp. 2d 1072, 1077 (D. Colo.

14  2013).

15         Neither DBNT nor SPS committed any TILA violation.  The Bankruptcy Court informed

16  Mr. Macklin of this fact several times.  This result is not changed merely because Mr. Macklin

17  now finds himself in a new forum.

18                    **6.        The sixth cause of action for UCL fails to state a claim.**

19         Mr. Macklin alleges that DBNT and SPS engaged in unfair competition in violation of

20  Business & Professions Code section 17200 ("UCL") by participating in fraudulent business

21  practices which were likely to deceive and did deceive Mr. Macklin.  In particular, Mr. Macklin

22  alleges the following unfair practices:

23      •   "Executing false loan transactions with the intent to foreclose at a later time and
            keeping the illicit profits reaped therein";

24      •   "Failing to comply with California laws regarding the ability for a party to repay a
25          loan";

26      •   "Falsifying loan documents for the benefit of the parties thereto and then using
            known false documents to eject those homeowners from their homes"; and

27
28      •   "Filing known false instruments into court records and having the judiciary rely
            upon those known false instruments."

1    Mr. Macklin's claims fare no better in the UCL context than they did as stand-alone claims.

2        To state a claim under the UCL, Mr. Macklin must allege that DBNT and SPS committed

3    a business act that is unlawful, fraudulent or unfair.  *Levine v. Blue Shield of California*, 189 Cal.

4    App. 4th 117, 1136 (2010).  In order to be "unlawful," the act must violate some underlying law.

5    *Cisneros v. Instant Capital Funding Group*, 263 F.R.D. 595, 610 (E.D. Cal. 2009).  To be

6    "fraudulent," the act must likely deceive the public.  *Schanll v. Hertz Corp.*, 78 Cal. App. 4th

7    1144, 1167 (2000).  To be "unfair," there must be a prima facie case of harm borne out of a

8    business practice that violates a legislatively-declared policy.

9        A review of the complaint reveals a disconnect between the facts and what Mr. Macklin

10   would have to plead and prove in order to prevail on his UCL cause of action.  Mr. Macklin

11   cannot  allege a violation of any law, therefore his claims cannot be unlawful.   Mr. Macklin has

12   not alleged any unfair practice or any legislatively-declared policy with respect to his admitted

13   default and DBNT's exercise of its power of sale.  To the contrary, this practice is prima facie

14   fair, which fairness on these facts has been confirmed by several different Courts.  Finally,

15   although Mr. Macklin makes vague and unsubstantiated claims of fraud, he has not – and cannot

16   – allege any specifics to this far-reaching conspiracy or demonstrate how he was actually harmed

17   by it.  DBNT and SPS request that the UCL claim be dismissed with prejudice.

18                              **VI.    CONCLUSION**

19       Mr. Macklin has pled, litigated and lost his  case against DBNT and SPS.  That he has

20   failed at every turn indicates that there is no cause of action.  The Bankruptcy Court already

21   reached this result.  Mr. Macklin cannot force DBNT and SPS to continue to litigate this same

22   dispute until he gets the result he desires.  DBNT and SPS respectfully request that the Court put

23   an end to this dispute once and for all.

24   Dated:      July 21, 2014             CARR, McCLELLAN, INGERSOLL, THOMPSON &
                                          HORN Professional Law Corporation
25
                                         By: */s/ Robert A. Bleicher*
26                                       _____
                                             Robert A. Bleicher/J. Craig Crawford
27                                           Attorneys for Plaintiff, Select Portfolio Servicing,
                                             Inc., and Deutsche Bank National Trust Co.
28

# EXHIBIT K

# EXHIBIT K

JAMES MACKLIN
PO BOX 789
Crystal Bay, Nevada  89402
Telephone: (530) 888-9600
Fax: 530-888-9600
jimlmacklin@yahoo.com
IN PRO SE

**FILED**

AUG   4 2014

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

# UNITED STATES DICTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES L. MACKLIN,<br><br>Plaintiff,<br><br>vs.<br><br>SELECT PORTFOLIO SERVICING, INC.,<br>DEUTSCHE BANK NAT'L TRUST CO., AS<br>TRUSTEE FOR THE<br>CERTIFICATEHOLDERS OF<br>ACCREDITED MORTGAGE LOAN TRUST<br>SERIES 2006-2, WELLS FARGO & CO.,<br>QUALITY LOAN SERVICING, Inc., Et al.,<br><br>Defendant(s). | Case No: 2:10-cv-1097-FCD-KJN PS<br><br>**PLAINTIFF'S OPPOSITION TO<br>DEFENDANTS SELECT PORTFOLIO<br>SERVICING, INC., AND DEUTSCHE<br>BANK NAT'L TRUST CO., AS TRUSTEE<br>FOR THE CERTIFICATEHOLDERS OF<br>ACCREDITED MORTGAGE LOAN<br>TRUST SERIES 2006-2'S MOTION TO<br>DISMISS [Fed. R. Civ. P., Rule 12(b)(6)]**<br><br>Date: August 21st, 2014<br>Time: 10:00 a.m.<br>Courtroom: 25<br>Judge: Hon. Kendall J. Newman |

TO THE COURT, PARTIES AND THEIR ATTORNEYS:

**PLEASE TAKE NOTICE** that Plaintiff, James Macklin, individually, Opposes Defendants Select Portfolio Servicing, Inc. ("SPS") and DEUTSCHE BANK NAT'L TRUST CO., AS TRUSTEE FOR THE CERTIFICATEHOLDERS OF ACCREDITED MORTGAGE LOAN TRUST SERIES 2006-2 ("DBNTC") Motion to Dismiss under Fed. R. Civ. P. 12 (b)(6).

## LEGAL STANDARD

1.    For purposes of a motion to dismiss, the plaintiff's allegations are taken as true, and the Court must construe the complaint in the light most favorable to the plaintiff. *Jenkins v.*

- 1 -

1   *McKeithen*, 395 U.S. 411, 421 (1969). To defeat such a motion, the factual allegations must

2   simply be "enough to raise a right to relief above the speculative level…on the assumption

3   that all the allegations in the complaint are true (even if doubtful in fact*). " Bell Atlantic Corp.*

4   *v. Twombly*, 550 U.S. 544 (2007), (quoting 5 Charles Alan Wright & Arthur R. Miller,

5   Federal Practice and Procedure § 1216 (3d ed. 2004)).

6   2.    The court must draw all reasonable inferences in the plaintiff's favor, *Doe v. United*

7   *States*, 419 F.3d 1058, 1062 (9th Cir. 2005), and presume that general allegations embrace

8   those specific facts that are necessary to support the claim," *Lujan v. Nat'l Wildlife Fed.*, 497

9   U.S. 871, 889 (1990).    Thus, factual disputes are properly resolved only on summary

10  judgment or at trial, not on a motion to dismiss. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327

11  (1986).

12  3.    Defendants here attempt to cloak a summary judgment-style dismissal in the form of a

13  Rule 12(b)(6) Motion.

14

15                                    **ARGUMENT**

16  4.    The Motion should be overruled because the allegations of the Complaint control and

17  there are material facts in dispute, making this Motion, or Summary Judgment, inappropriate.

18  Plaintiff's statements are definite and the facts are all well pleaded and evidenced such that a

19  controversy is before this court.

20  5.    Defendants have summarily ignored the legal effect of *Stern v. Marshall*, 131 Sup. Ct.

21  2594 (2011) and *Northern Pipeline Const. Co. v. Marathon Pipeline Co.* (*Marathon*) 458 U.S.

22  50 (1982).    Throughout Defendants Motion, the consistent theme is that somehow, the

23  Bankruptcy court's rulings are controlling. Both *Marathon* and *Stern v. Marshall* control

24  otherwise. **(See: Def's MTD MPA's, Pg. 6, Ln. 7-8 "…raised and *adjudicated* in the**

25  **Adversary Proceeding")** [Emph. mine].

26  6.    Plaintiff's corpus of his Complaint revolves around the common law principals of

27  contract, from which all other claims arise as a result of the actions of Defendants. Plaintiff

28

                                        - 2 -

1   has sufficiently pleaded facts which, taken as true, form the necessary elements of a common

2   law action. Under *Stern*, Chief Justice Roberts issued his Ruling in the form of a syllogism:

3       "*Major Premise: Congress may create non-Article III courts with power to*

4           *issue final judgments only for territories, the military and public rights*

5           *matters.*

6       *Minor Premise: The state law claim of Vickie Lynn Marshall does not involve*

7           *the territories, the military or public rights matters.*

8
9       *Conclusion: It is unconstitutional for the bankruptcy court to issue a final*

10          *judgment over Vickie Lynn Marshall's claim.*"

11  7.      There is no preclusive effect of either Res Judicata or Estoppel when the Article I judge

12  in Macklin's Bankruptcy Adversary Proceeding made rulings relevant to his claims. Plaintiff

13  has stated no claims involving the Territories, the military or public rights matters, therefore,

14  under *Stern*, there is no preclusive effect by which Defendants may rely stemming from any

15  of Macklin's previously stated claims, whether or not dismissed by the lower Article I court.

16  8.      Defendant continually states as facts, which are wholly unsupported by competent fact

17  witness or by competent fact Declaration, numerous assertions that fall short of evidence or

18  testimony. (Def's MTD, MPA's, Pg. 6, Ln. 10-11: "That he has not been able to eight years

19  later confirms that he has no cognizable claims"). **(Def's MTD, MPA's, Pg. 7, Ln. 8: "In**

20  **April 2006, Macklin borrowed $659,000.00 from Accredited Home Lenders, Inc.").**

21  Macklin specifically has disputed that Accredited Home Loans, Inc. ("AHL") ever loaned him

22  any money (Plaintiff's Mot. For Leave to Amend, Pg. 4, Ln. 21-22: "Plaintiff signed for a

23  debt obligation that ***named*** Accredited…"). Now see: **Def's DOC No. 47-8, RFJN, Exhibit**

24  **"F"**. This is the wiring instruction used in Plaintiff's loan closing as it was entered into the

25  record of the previous Bankruptcy Adversary Proceeding and noticed herein by Defendant.

26  **Special notice by the court should be taken here.** The wiring instructions specifically show

27  that Accredited Home Lenders, Inc. did not, in fact, wire funds to Macklin's escrow, rather, an

28  unknown bank named "Centennial Bank of Colorado" was responsible for sending the funds.

- 3 -

Centennial was never identified within the closing documents anywhere in any document reviewed or signed by Macklin. This is a material fact in dispute. This one simple fact defeats Defendant's defenses under Rule 12(b)(6). Accredited, although named as a lender in the Note and Deed, never advanced any consideration and were never at risk of loss in the actual transaction that funded Macklin's loan. This is a contract dispute with facts to support the allegation that are undisputed and entered into this court's record by Defendants themselves, thus acting as an admission, or statement, against interest.

9.    Defendant then states **(Def's MTD, MPA's Pg. 7, Ln. 13)**: "Mr. Macklin defaulted on his obligations..." This statement is purely Hearsay and states facts not in evidence. Because Macklin clearly and specifically has refuted the facts contained in the Notice of Default ("NOD"), no conclusion may be drawn from the Bleicher Declaration or the instrument. An evidentiary hearing is the very least that Macklin is entitled to under this scenario. This statement cannot form the foundation for a Rule 12(b)(6) Motion. Macklin's facts are to be taken as true and only a trier-of-fact may make a determination as to the truthfulness of the facts after Macklin has an opportunity to fully discover competent fact witnesses that may have executed the NOD.

## TRUTH IN LENDING ACT

10.    **Def's MTD, MPA's, Pg. 7, Ln. 16-17**: "Mr. Macklin contacted the loan servicer in a failed attempt to rescind the loan. Mr. Macklin was advised that he had not rescinded the loan." Defendants again attempt to put Hearsay into the record. Counsel Bleicher, in his Declaration, makes legal conclusions and may not state facts that he does not personally know. Bleicher inappropriately attempts to testify as to the veracity of a rescission of which he has no personal knowledge. Mr. Macklin did, in fact, timely rescind and cancel the debt pursuant to TILA. See: **Plaintiff's Exhibit 1**, Amicus Brief by Chief Counsel for the United States Consumer Finance Protection Bureau ("CFPB"), **Plaintiff's Exhibit 2, Merritt v. Countrywide, 9th Cir**. (For Publication, July 16, 2014.) See: **Plaintiff RFJN** attached hereto and made part of this Opposition to MTD.

OPPOSITION TO DEFENDANTS MOTION TO DISMISS

11. Congress granted the CFPB the authority to interpret and promulgate rules regarding TILA (12 USC §§ 5481(12)(O), 5512(b)(1), 5581(b)(1). Defendants stated in their MTD (Pg. 29, Ln. 9-13) "…Macklin cannot invoke the protections of 15 U.S.C. sec. 1639 c when his loan originated several years before the enactment of the Dodd Frank Amendment." Defendant is misplaced in their reading of the Amendment. The amendment *did* grant authority for CFPB to interpret and apply TILA, and the Bureau is now "the primary source for interpretation and application of truth-in-lending law," *Household Credit Servs. V. Pfenning*, 541 U.S. 232, 238 (2004). Thus, CFPB's interpretations of its own Act are the benchmark under which courts must apply the Act.

12. Congress enacted TILA in 1968, contrary to Defendants position, the Act, and its attendant provisions, inure to the benefit of Plaintiff herein. TILA requires lenders to provide "clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, borrower's disclosures and borrower's rights". *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998). §125 of the Act, 15 U.S.C. § 1635, also provides consumers a statutory right to rescind certain types of mortgage loans by giving timely notice to their lenders. Specifically, the right to rescind applies to open-end and closed-end loans secured by a lien on the consumers principal dwelling". See generally 12 C.F.R. §§ 1026.15, 1026.23. The right to rescind does not apply to first mortgages. Plaintiff sufficiently alleged that his loan was subject to governance under TILA in his SAC as a refinance loan.

13. Under *Merritt v. Countrywide, 9th Cir, July 16, 2014* (Approved for publication), the 9th Circuit declined to extend the previous mis-application of *Yamamoto v. Bank of New York*, 329 F. 3d 1167 (9th Cir. 2003), the panel held that an allegation of tender or ability to tender is not required. The panel also held that only at summary judgment may a court order the statutory sequence of TILA rescission altered and require tender before rescission, and then, only on a case-by-case basis, once the creditor has established a potentially viable defense.

14. Exactly like Macklin in this case, the Merritts consummated a refinance of their home loan in 2006. They also received blank loan documents at closing with no proper right of

- 5 -

1    rescission documents and no proper disclosures. Quoting *Merritt*: "Under TILA, an obligor

2    has the "right to rescind . . . until midnight of the third business day following the

3    consummation of the transaction or the delivery of the information and rescission required

4    under this section... whichever is later." 15 U.S.C. § 1635(a). "Regardless of whether the

5    required information and forms have been delivered, [the] obligor's right of rescission shall

6    expire three years after the date of consummation of the transaction, or upon the sale of the

7    property." *Id.* § 1635(f).

8    From *Merritt:* "The TILA rescission provisions set out the following sequence of events for

9    pursuing rescission: **First**, the obligor must notify [notice by U.S. Mail is sufficient] the

10   creditor of his intention to rescind, *id.* § 1635(a); **then**, within 20 days after receipt of

11   notice of rescission, the creditor must return to the obligor any security interest, *id.* § 1635(b);

12   **and lastly,** "[u]pon the performance of the creditor's obligations under this section **[i.e., upon**

13   **return of the security interest],** the obligor shall tender the property to the creditor." *Id.*

14   These procedures "shall apply except when otherwise ordered by a court." *Id.* This sequence

15   ("first, then and lastly") is mandatory.

16   "Notably, '[t]he sequence of rescission and tender set forth in § 1635(b) is a reordering of the

17   common law rules governing rescission." *Williams v. Homestake Mortg. Co.*, 968 F.2d 1137,

18   1140 (11th Cir. 1992) (citing 17A Am. Jur. 2d Contracts § 590, at 600–01 (1991)).

19   Specifically, "[a]lthough tender of consideration received is an equitable prerequisite to

20   rescission, the requirement was abolished by the Truth in Lending Act." *Palmer v. Wilson,*

21   502 F.2d 860, 861 (9th Cir. 1974) "Under § 1635(b)," consequently, all that the consumer

22   need do is notify the creditor of his intent to rescind. The agreement is then automatically

23   rescinded and the creditor must, ordinarily, tender first. Thus, rescission under § 1635 places

24   the consumer in a much stronger bargaining position than he enjoys under the traditional rules

25   of rescission." *Merritt v. Countrywide*, 9th Cir. [Emph. mine].

26   15.   Macklin has sufficiently alleged that he rescinded his loan timely. Defendant judicially

27   noticed the rescission letter mailed and tendered by Macklin, this rescission notice came

28

OPPOSITION TO DEFENDANTS MOTION TO DISMISS

1    exactly 2 years and 10 months after the transaction was consummated (Loan date: April 14th,

2    2006; Rescission on Feb 12th, 2009), thus, complying with the rescission requirements of

3    TILA, *id.* (See: **Def's Decl., DOC 45-2, Exhibits 3 & 4**). When Ronald Roup, as agent for the

4    purported beneficiary, responded with argument and did not tender the money back to

5    Macklin, a material breach of TILA was perfected by Defendants or their predecessors in

6    interest.

7    16. **Assignee's Liability**: An assignee is liable for statutory damages for violations by failure

8        of disclosure TILA requirements by its predecessors and its own violation if it fails to

9        respond properly to a rescission notice. *Palmer v. Champion Mortg.*, 465 F.3d 24, 27 (1st

10       Cir. 2006) ("if a creditor does not respond to a rescission request within twenty days, the

11       debtor may file suit in federal court to enforce the rescission right). See also U.S.C. §

12       1635(b). Defendant DBNTC is purporting to be the assignee of Accredited, the original

13       *named* lender (not necessarily the true lender under the evidence before this court). SPS

14       admits that it is acting as an agent of DBNTC **(See "privity" argument by Defendants**

15       **in Def's MTD, MPA, Pg's. 20-22).** Defendants are liable for damages under TILA. In

16       fact, DBNTC purports to have been the owner of the debt since the closing date of the

17       REMIC trust on June 1st, 2006 (See: **Plaintiff's RFJN, Exhibit 3, Pooling & Servicing**

18       **Agreement for "AMLT 2006-2 Trust" [Def. DBNTC]**). The AMLT 2006-2 Pooling &

19       Servicing Agreement ("PSA") is a permanent record within the U.S. Securities &

20       Exchange Commission's records at www.sec.gov/EDGAR and is deemed self-

21       authenticating evidence under **Fed. R. of Evid. Rule 902(5).**

22   17. There is a statutory requirement governing DBNTC's principal trust at Internal Revenue

23       Code §§ 860D, F & G, that qualified loans must transfer into the trust on or before 90

24       days after the closing date of the REMIC. Thus, if they truly received the loan in trust

25       prior to its mandatory closing date, then DBNTC stands as the party liable under TILA

26       not as an assignee, but as the transferee well before Macklin tendered his rescission. In

27       either case, DBNTC and its agent, SPS, are fully liable for the violations under TILA,

28       *Palmer v. Champion Mortg., id.* Plaintiff does not admit that DBNTC did, in fact, acquire

- 7 -

the debt of Macklin before the trust's closing date pursuant to the assignment of deed evidenced by Defendants (**See Def's RFJN, DOC 47-8, Ex. J**).

18. Defendants other defense here is that Macklin was precluded from exercising his TILA rights by virtue of the Dodd/Frank Act. This is preposterous. The Act simply applied the authority of CFPB to the existing TILA legislative intent and the Rules promulgated thereunder. Thus, the Exhibit attached hereto (**Plaintiff's Exhibit 1**), serves as a written authority by the CFPB (as a governmental agency, CFPB's authority is self-authenticating) for the TILA claims of Macklin, and not the letter written by Ronald Roup, who essentially was handing out bad legal advice to Plaintiff by informing him that his rescission was "not a rescission". See: **Def's Decl of Robert Bleicher, Exhibits 3 & 4.** Roup's letter smacks of fraud and deceit and invokes the punitive nature of TILA on its face.

19. The Bankruptcy court neither had the authority to "inform" Macklin of any facts related to his TILA claim (Def's MTD, Pg. 29, Ln. 15-16), nor to adjudicate the claim. See: "By reversing the traditional sequence for **common law rescission claims**, TILA 'shift[s] significant leverage to consumers,' consistent with the statute's general consumer-protective goals. Lea Krivinskas Shepard, *It's All About the Principal: Preserving Consumers' Right of Rescission under the Truth in Lending Act*, 89 N. C. L. Rev. 171, 188 (2010). Because TILA claims are **common law claims**, arising out of contract, *Stern v. Marshall, id.*, controls over the Article I court's lack of judicial authority.

20. Under TILA, once a written notice is mailed to the creditor, or his agent, the act of rescission is complete. The only form for rebutting the effect of the rescission falls on the creditor, who must file an action to repudiate the rescission, otherwise, after twenty (20) days runs from the receipt of the written notice, the creditor must have returned the borrower's money (within 20 days of receipt) and then file an action repudiating the rescission. Macklin rescinded his loan in February, 2009, 2 years and 9 months after the loan was written. This is within the three (3) years established by TILA for a timely rescission. The time for an action

- 8 -

OPPOSITION TO DEFENDANTS MOTION TO DISMISS

1    to be filed by Macklin is not delineated or mandated anywhere in TILA. See: **Plaintiffs**

2    **Exhibit 1, Amicus Brief, Pg. 5, Par. 3; Pg. 6, Par. 1; Pg. 6, Par. 4; Pg. 7, Par's 1- 2.**

3    21.  On April 28th, 2014, the U.S Supreme Court granted certiorari to petitioners in *Jesinoski*

4    *v. Countrywide Home Loans[1]*. Appellant's briefs are filed and Respondent Briefs are due

5    shortly. The court will decide a deepening Circuit split that has developed since 2012. In its

6    Brief, the CFPB summarily decimates the 9th Circuits reading, and incorrect holding, under

7    *Beach,* and *Yamamoto, id.* Because the CFPB is authorized to promulgate its own rules, the

8    Court is expected to view CFPB's authority as binding and all-inclusive.

9    22.  "Further, [the *Merritt*] approach better comports with the TILA statutory text, which

10   prescribes an **enforcement sequence** except when "otherwise ordered by a court." 15 U.S.C.

11   § 1635(b). If all obligors had to allege ability to tender payment when seeking rescission and

12   so allege in a complaint for enforcement of the rescission obligation, then (1) the requirement

13   of doing so would no longer be an *exception,* and the requirement would not be "otherwise

14   ordered by a court," as a complaint initiates suit before any court order issues". *Merritt, id.*

15   **23.**  Plaintiff asks this court to see **Plaintiff's Exhibits 4, 5 and 6, Loan Application,**

16   **Underwriting Instructions/Tax Returns and Truth In Lending Disclosures.** The complete

17   disregard for Plaintiff's actual income, as defined by his tax returns which were provided to

18   Defendant's predecessors in interest, is evidenced within those Exhibits. Defendants admit

19   that these exhibits are bona fide as they were provided to Plaintiff by Defendant during

20   discovery in this case back in 2010. Plaintiff never earned the amounts disclosed in the

21   application and the amounts are a clear violation of disclosures under TILA and under

22   California law. **See: Plaintiff's Mem. Of Pts. & Auth., Motion for Leave, Declaration of**

23   **James Macklin.**

24

25   _____

26   [1] National Housing Law Project's Housing Law Bulletin. See Clare Lakewood, Certiorari Granted in TILA Circuit
     Split: How Can Borrowers Rescind Their Mortgages?, 44 HOUS. L. BULL. 103 (June 2014). Ms.

27   Lakewood is a volunteer at NHLP and is admitted as a barrister and Solicitor of the High Court of Australia and the
     Supreme Court of Western Australia (2009).

28   2 Jesinoski v. Countrywide Home Loans Inc., 729 F.3d 1092 (8th Cir. 2013), cert. granted, 82
     U.S.L.W. 3366 (U.S. Apr. 28, 2014) (No. 13-684).

-9-

24.    Defendants attack on Plaintiff's claim under TILA fails as a substantive matter based on these facts. No ruling made by the Bankruptcy court is binding against Macklin related to his TILA claims. Defendant lacks authority upon which to base a Rule 12(b)(6) Motion. Macklin filed his original Complaint against Defendants on April 13th, 2009, exactly 6 days before the 3 year statute would have run out. Its subsequent removal to this court came later. This assumes arguendo that the court would impose a strict time limitation for filing suit, which TILA does not address in its legislative intent or the plain language of the statute. Plaintiff is entitled to relief under TILA by operation of law and by all of the facts contained herein. Defendant cannot dispose of this claim under Rule 12(b)(6).

## ILLEGAL CONTRACT

25.    California Civil Code § 1608 codifies the doctrine of illegality and provides that "[i]f any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." Under Civil Code § 1667 , "unlawful" is broadly defined as that which is contrary to an express provision of law; contrary to the policy of express law, though not expressly prohibited; or, otherwise contrary to good morals. In determining illegality, the extent of enforceability and the remedy granted depends upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts. (*Asdourian v. Araj* (1985) 38 Cal.3d 276, 282).

26.    The consequences of an illegal contract can be harsh. Once a contract is deemed illegal and void, the court will refuse to enforce the contract and leave the parties as it finds them. (*Yoo v. Jho* (2007) 147 Cal.App.4th 1249, 1251. Illegality of contract also precludes the enforcement of attorney fee provisions in contracts. ( *Id.* at 1256).

27.    Illegality in a contract can be raised by any party or the Court even if it is not plead in the answer. As stated by the California Court of Appeals in *Fellom v. Adams* (1969) 274 Cal.App.2d 855, 863, "the court has both the power and duty to ascertain the true facts in order that it may not unwittingly lend its assistance to the consummation or encouragement of

- 10 -

## OPPOSITION TO DEFENDANTS MOTION TO DISMISS

1    what public policy forbids. It is immaterial that the parties, whether by inadvertence or

2    consent, even at the trial do not raise the issue."

3    28.   Defendant incorrectly presumes that the illegal contract cause of action is inappropriate;

4    conversely, Plaintiff clearly provides remedy for this by pleading in the alternative under

5    FRCP Rule 8(d)(2). (**Macklin SAC, Pg. 26, Par. 29 – 30**). Fed. R. Civ. Proc. 8(d)(2) permits

6    the use of alternate or **hypothetical pleading** if:  by the nature of the circumstances the

7    Plaintiff would not know which allegations are right.

8    29.   Plaintiff alleges that there is a *possible* contract relationship between Plaintiff and

9    Defendants, if found to be a valid contract. Plaintiff does not admit as to the veracity or

10   legality of the contract, however, Plaintiff pleads in the alternative to such a finding.

11

12   30.   This type of hypothetical pleading is exactly what is contemplated under Rule 8(d)(2).

13   Macklin is forced to hypothecate based on the unknown decision by the court as to whether or

     not the contract was ever legally formed. This forms the basis for a primary fact in Plaintiff's

14   case. If the court were to determine the contract was valid, Plaintiff sufficiently pleaded

15   alternatively in the SAC.

16

17   31.   Plaintiff has alleged sufficient facts, taken as true, and supported substantially by the

18   record, which form a valid cause of action. Should the court determine that the contract was

19   formed illegally, controlling case law dictates that the Breach of Contract cause would serve

20   as moot. Upon a finding of a void contract, the parties shall be returned to the position the

21   court finds them in prior to the contract being illegally formed. **See: Plaintiff's SAC, Pg. 24,**

22   **Par. 21.**        "Cal. Civil Code § 1668 provides that a contract that has as its object a violation

23   of law is "against the policy of the law."  Civil Code § 1667 states that "unlawful" is "1.

24   Contrary to an express provision of law;  [¶] 2.  Contrary to the policy of express law, though

25   not expressly prohibited; or, [¶] 3.  Otherwise contrary to good morals."  (See also Civ. Code,

26   §§ 1441 ["A condition in a contract, the fulfillment of which is . . . unlawful . . . is void"],

27   1608 ["If any part of a single consideration for one or more objects, or of several

28   considerations for a single object, is unlawful, the entire contract is void"].)   Plaintiff

- 11 -

OPPOSITION TO DEFENDANTS MOTION TO DISMISS

1   sufficiently alleges that his income is a consideration of the formation of the contract". Even if

2   TILA were not controlling, which it undoubtedly is, California law also precludes Defendants

3   from disposing this cause of action. **See: Plaintiff's SAC; Illegal Contract; Mem. Of Pts. &**

4   **Auth., Mot. For Leave to Amend, Illegal Contract.**

### UNLAWFUL DETAINER JUDGMENT

32.  Defendant next turns to the Unlawful Detainer action as a purported authority under
which Macklin is deemed as precluded from bringing the instant causes of action. Defendant
is once again attempting to dissuade this court from actually viewing and adjudicating facts
that were never at issue in the Superior court's Unlawful Detainer decision.

33.  It is well established that Unlawful Detainer is a summary proceeding where issues such
as Plaintiff's (TILA, Breach of Contract, ECOA) are, in fact, precluded from consideration.
See: "It is argued that the issue is not in the unlawful detainer action because title cannot be
tried in such a summary proceeding. Conceding that to be the general rule, it is not applicable
where the validity of the trustee's sale is attacked. If he has not pursued the terms of the trust
deed and the statute the trustee's deed passes only a vulnerable title. [3] "In an action for
unlawful detainer, section 1161a therefore necessarily requires proof that the property was
'duly sold in accordance with Section 2924 of the Civil Code,' and that 'the title under the sale
has been duly perfected.' (Italics ours.)". The Superior Court in Macklin's Unlawful Detainer
action, specifically refused to hear any argument as to the merits of the chain of title
documents, relying solely upon the recorded instruments as being valid…without ever hearing
the merits of the title issues or Federal claims. (*Seidell v. Anglo-California Trust Co.,* 55
Cal.App.2d 913, 920 [132 P.2d 12].) To same effect, see *Hewitt v. Justice's Court,* 131
Cal.App. 439, 443 [21 P.2d 641]; *Mortgage Guarantee Co. v. Smith,* 9 Cal.App. [174
Cal.App.2d 621] 2d 618, 619 [50 P.2d 835]; *Freeze v. Salot,* 122 Cal.App.2d 561, 564 [266
P.2d 140]; *Altman v. McCollum,* 107 Cal.App.2d Supp. 847, 856-857 [236 P.2d 914]; *Bliss v.
Security-First Nat. Bank,* 81 Cal.App.2d 50, 58 [183 P.2d 312].

- 12 -

1   34.  Not one of the core causes of action here were ever heard by the lower court, thus, no

2   preclusion is appropriate. Rule 12(b)(6) motion is not applicable where there has never been

3   an adjudication of the facts in a prior action, especially when Defendants argued that Macklin

4   had no right to bring such facts. The record of the lower court speaks for itself.

5                              **WITHDRAWAL OF BANKRUPTCY**

6   35.  This argument has no merit whatsoever. Plaintiff easily dismisses this argument by

7   Defendant under the principals of *Stern v. Marshall, id.* The withdrawal, whether valid or not,

8   is not a factor in this motion. *Stern* defeats Defendants defenses under Rule 12(b)(6).

9
10                       **DEFENDANTS LEGAL STANDARD ARGUMENT FAILS**

11  36.  Defendant states (**Def's MTD, MPA's, Pg. 17, Ln. 7-14**): "Although the general rule in

12  resolving a Rule 12(b)(6) motion is to construe the complaint in the light most favorable to the

13  plaintiff and accept as true all well-pleaded factual allegations, *Cahill v. Liberty Mutual Ins.*

14  *Co.*, 80 F.3d 336, 337-338 (9th Cir. 1996), a court is not required to accept as true "allegations

15  that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re*

16  *Gilead Sciences Securities Lit.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (citation omitted).

17  Likewise, the court need not accept as true allegations that contradict facts which may be

18  judicially noticed by the court. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 578

19  F.3d 1016, 1021-22 (9th Cir. 2009).

20  37.  The above argument not only defeats Defendant's own arguments, the specific cases

21  repeatedly support Plaintiff's well-pleaded causes of action. In each of Plaintiff's causes of

22  action, Plaintiff has met his burden of pleading specific facts without ever reaching an

23  unwarranted deduction or unreasonable inference. The court may not deem any of the

24  judicially noticed documents proffered by Defendants as being true or factual in their recitals,

25  other than the fact that the documents exist or were recorded. Macklin sufficiently has

26  rebutted any presumption of truth throughout his pleadings before this court. The court's

27  record as provided by Defendants themselves, evidence the very facts that are in dispute.

28

OPPOSITION TO DEFENDANTS MOTION TO DISMISS

1    When facts are in dispute, Rule 12(b)(6) does not offer a mechanism for Defendants to
2    summarily dismiss the Plaintiff's action.

3    38.    Defendant cites to Federal Res Judicata standards **(Def's MTD, MPA's, Pg. 18, Ln. 12
4    – 16)** "Under California law, however, when determining the <u>res judicata effect of a prior
5    federal court judgment</u>, the court should apply federal standards. *Younger v. Jensen*, 26 Cal.3d
6    397, 411 (1980); *Levy v. Cohen*, 19 Cal.3d 165, 172-73; 4 B. Witkin, California Procedure,
7    Judgments, 156(b) (2d ed. 1971). Therefore, <u>federal res judicata standards apply</u> to determine
8    the preclusive effect of the prior Judgment in the Adversary Proceeding". The prior effect of a
9    federal court judgment (Bkrptcy) does not apply in this case [Emph. mine]. *Stern v. Marshall*,
10    *id.,* disposes of this theory, yet, Defendant continues to ignore the U.S. Supreme Court's
11    majority opinion in Defendant's attempt to fog the obvious.

12    39.    Defendants admit that an Article I judge has issued rulings and dismissals of claims
13    **(Def's MTD, MPA's, Pg. 19, Ln. 25-26)**: "Indeed, the Honorable Ronald Sargis considered
14    and rejected many of the exact same theories that Mr. Macklin now seeks to add to his SAC."
15    Again, without so much as an honorable mention, Defendants have completely set aside the
16    decisions made by Chief Justice Roberts in *Stern v. Marshall, id.* All claims made by Macklin
17    are substantively creatures of a contract. **(Plaintiff's Mot. For Leave to Amend, Ln. 24-25)**:
18    "The Action arises out of a controversy of purported contract."

19    40.    Defendant then relies on "privity" arguments as between Macklin and DBNTC. This
20    form of argument is not only dismissed by *Stern, id.,* but was argued in the opposite by
21    Defendant in the Bankruptcy Adversary Proceeding, vehemently. **(Def's MTD, MPA's, Pg.
22    22, Ln. 24).** "Here, there can be no doubt that there is privity between Mr. Macklin and
23    DBNT." Defendants specifically argued that Macklin was not in privity with DBNTC and
24    was precluded from invoking any rights under the Pooling & Servicing Agreement ("PSA").
25    After Defendant's argument, the court quantified the PSA as a "backroom deal" that Macklin
26    was not an intended third party beneficiary. Plaintiff has addressed this mis-concept in his
27    SAC by asserting an intended third party beneficial interest by virtue of the Step Transaction

28

- 14 -

1 Doctrine. **(Plaintiff's SAC, Pg. 23, Ln. 12)**: "…the 'Step Transaction Doctrine' applies in

2 this case". The step transaction doctrine originated from a common law principle in *Gregory*

3 *v. Helvering*, 293 U.S. 465 (1935) that allowed the court to re-characterize a tax-motivated

4 transaction.; "As early as 1938, the United States Supreme Court has indicated that "a given

5 result at the end of a straight path is not made a different result because reached by following

6 a devious path." *Commissioner v. Clark*, 489 U.S. 726, 738 (1989); (*Shuwa Investments Corp.*

7 *v. County of Los Angeles* (1991) 1 Cal.App.4th 1635, 1648-1649. *Shuwa, supra*, at p. 1648.;

8 *McMillin-BCED/Miramar Ranch North v. County of San Diego* (1995) 31 Cal.App.4th 545,

9 556.).

10 41.   Defendants made an election of special treatment under the Internal Revenue Laws of

11 the United States at I.R.C. Rule 860D et. seq. **(See: Plaintiff's Exhibit 3, Pooling &**

12 **Servicing Agreement – Election of REMIC).** Defendant's REMIC trust election is a tax

13 motivated transaction that necessarily involved Macklin's loan as a purported asset of the tax

14 structured trust, or, "REMIC" (Real Estate Mortgage Investment Conduit). Plaintiff has

15 sufficiently alleged that the series of transactions in forming the corpus of the trust relied

16 upon, were interdependent upon, and resulted in the transactions, including Macklin's loan

17 transaction, being qualified under the Doctrine, *id.* The trust, as purported beneficiary to

18 Macklin's debt obligation and payment stream, enjoys a special tax free status under the

19 special moniker of "REMIC".

20 42.   This set of facts clearly shows that Defendant has failed to carry its burden of proving

21 that no controversy exists, or that Macklin has failed to allege facts sufficient to support his

22 claims. Rule 12(b)(6) cannot dispose of any of the claims.

### BREACH OF CONTRACT/NOTICE OF DEFAULT

43.   *Generes v. Justice Court* (1980) 106 Cal.App. 3d 678; *People v. Baender* (1924) 68
Cal.App. 49.   "Every person who files a false or forged document or instrument with the
County Recorder that affects title to, or places an encumbrance on, or places an interest
secured by a mortgage or deed of trust on, real property….with knowledge that the document

- 15 -

1   is false or forged is punishable by statute Cal.Pen.Code 115.5(a). Defendants DBNTC, SPS

2   and Quality loan Services, Inc. ("QLS") all participated in the execution of a false instrument.

3   Under the language used in **all** instruments exhibited and evidenced by Defendants, DBNTC

4   instructed Defendants SPS and QLS to execute and record the instruments against Plaintiff's

5   interests.

6   44.   The face of the NOD instrument states: "That by reason thereof, the present beneficiary

7   under such deed of trust, has executed and delivered to said duly appointed trustee, a written

8   Declaration of Default.." **(DOC No. 47-8, Exhibit D, Def's BK Exhibits from BK Adv.**

9   **Pro.).** This statement is what it purports to be in the instrument, a "Declaration". Yet, no

10  evidence has ever been brought by Defendants that would support the recitals contained in the

11  instrument. See: *Tomczak v. Ortega* 50 Cal. Rptr. 20, 240 Cal. App. 2d 902, "no substantial

12  evidence to support such recital" was found and the notice of default and subsequent trustee's

13  deed upon sale were determined as void and of no legal effect." See: *Wolfe v. Lipsy* (App. 2

14  Dist. 1985) 209 Cal.Rptr. 801, 163 Cal.App.3d 633. Quieting Title 34(5); *Angell v. Superior*

15  *Court* (Verdugo Trustee Service Corp.) (1999) 73 Cal. App. 4th 691 [86 Cal Rptr. 2d 657].

16  45.   In *City of Los Angeles v. Morgan*, 105 Cal. App. 2d 726 (1951) the court stated: "the

17  purpose of the recording statutes is to provide notice...whether valid or invalid...if invalid

18  instruments are recorded, no notice is given." Because Plaintiff alleges sufficiently that there

19  was no default, as described and defined in the Notice of Default ("NOD"), and no evidence

20  to support the recitals contained in the NOD has been proffered by Defendants, Defendants

21  are without any authority to have executed the instrument. Defendants have had years to

22  produce this evidence, without even a scintilla of proof of the recitals. Defendants shall have

23  such an opportunity in discovery in this case.

24  46.   Defendants are also misinformed in their representations to this court **(Def's MTD,**

25  **MPA Pg. 25, Ln. 22-27):** "First, Mr. Macklin's allegations are contradicted by judicially

26  noticeable facts. The Placer County Recorder's Office shows that Accredited Home Lenders,

27  Inc. provided Mr. Macklin a Notice of Default stating that Mr. Macklin was in default of his

28

- 16 -

1   obligation and providing him more than 30 days to pay the delinquent amount before the

2   remaining obligation would be accelerated and the Property would be sold". **(RJN, ¶ 6)**

3   "There was no breach of the Deed of Trust." This statement presumes truth in the recitals in

4   the NOD. Plaintiff has rebutted that presumption timely.

5   47.   Specifically, at sec. 22 of the Macklin Deed **(Bleicher Decl., DOC 45-2, Ex. 2, Deed of**

6   **Trust)**, it states "Lender shall give notice to borrower, **prior to acceleration** following

7   borrower's breach of any covenant or agreement... the notice shall further inform borrower of

8   the right...to bring a court action to assert the non-existence of a default or any other defense

9   of borrower." The contract specifically states that borrower is entitled to notice of his right to

10  assert the non-existence of a default ***prior to the acceleration.***

11  48.   The NOD clearly and unambiguously declares the acceleration of the debt by stating:

12  "..has declared and does hereby declare all sums secured thereby immediately due and

13  payable and has elected to cause the trust property to be sold..." Borrower, Macklin, never

14  received any notice of his right to assert the non-existence of a default. Borrower Macklin also

15  never received any notice of any alleged default prior to this NOD being filed against him.

16  This is a material breach of the contract by Defendants. Borrower was entitled to 30 days'

17  notice **prior to the acceleration, the acceleration is contained within the NOD.** Because

18  there was a material breach by Defendants prior to any valid allegation of breach by Plaintiff,

19  Defendants were precluded from demanding performance against Macklin until their material

20  breach was cured. MILLER & STARR, supra note 249, § 10:5. "Moreover, because a deed of

21  trust is a contract, the courts will construe it, together with the note and any agreement of sale,

22  using rules of contract interpretation".

23  49.   "It is elementary that one party to a contract cannot compel another to perform while he

24  himself is in default. While the performance of an allegation can be satisfied by allegations in

25  general terms, excuses must be pleaded specifically" *Durell v. Sharp Healthcare* (2010) 183

26  Cal. App. 4th 1350, 1367. The Motion fails to allege an excuse for non-performance by

27  Defendants, thus, the Motion fails.

28

- 17 -

50. Furthermore, because the Defendants did not, and still do not, have any admissible evidence to support the recitals contained in the NOD (*Tomczak, id.*), the NOD is not privileged under Cal. Civ. Code § 47 (a) or (b), it is a qualifiedly privileged communication with malice and is considered as "unprivileged" under Cal. Civ. Code § 47(c). *Kachlon v. Markowitz* (2008) 168 CA4th 316, 85 CR3d 532 applies here (applying qualified privilege for slander of title against foreclosing trustee). ... the notice is not privileged and is an unprivileged communication with malice.

51. Defendants are again misplaced in their assertions that "judicially noticeable facts" contradict anything in this record **(Def's MTD Pg. 25, Ln. 22)**. There are no judicially noticeable facts from which Defendants may draw any factual reference against Macklin, particularly when the records themselves contradict Defendant's positions at every turn. The NOD has been repudiated as to its recitals and there exists a factual dispute. Rule 12(b)(6) does not allow for such a dismissal.

52. Macklin's "admissions" as to ceasing payments to Accredited does not manifest a breach, admission or a default in the contract. Defendants had a duty to answer Macklin's request for debt validation and a beneficiary statement under Cal. Civ. Code § 2943. Those requests went unanswered, thus, no default may arise when Defendants breached their own duties first. (See: Doctrine of First Material Breach). Even if Macklin had not requested the answers from the lender, the lender still owed a contractual duty of 30 days' notice of a right to assert the non-existence of a default prior to executing and recording the NOD by contract.

53. The trustee's authority to exercise the power of sale is subject to the beneficiary's express declaration of default and instructions to the trustee to sell the property. CAL. CIV. CODE §§ 2924(a)(1)(B)–(C) (Deering Supp. 2012) (permitting the notice of default to be recorded by the trustee, mortgagee, beneficiary, or an authorized agent but stating that it is the beneficiary who elects to sell the property and who provides the information in the default notice that a breach of an obligation for which the deed of trust is security has occurred and the nature of each breach); *Glaski*, 160 Cal. Rptr. 3d at 453 [observing that the "lender-

OPPOSITION TO DEFENDANTS MOTION TO DISMISS

beneficiary" decides whether to pursue non-judicial foreclosure under the deed of trust used by the parties in this case]; see also 4 HARRY D. MILLER & MARVIN B. STARR, MILLER & STARR CALIFORNIA REAL ESTATE § 10:4 (3d ed. 2000). No such admissible evidence is before this court that supports the contention the beneficiary ever instructed the servicer or the trustee to act. Macklin has alleged that no such evidence of this fact exists. A dispute as to those facts is present.

54.   Counsel's characterization of a breach of sec. 22 of the deed as "immaterial" sounds hollow and cannot stand as testimony. One cannot admit a breach and then dismiss it by stating that it was immaterial. **(Def's MTD, Pg. 26, Ln. 14-15.)**. The contract must be construed liberally in favor of Plaintiff and strictly against Defendants.

## EQUAL CREDIT OPPORTUNITY ACT (ECOA)

55.   *Schlegel v Wells* Fargo *Bank* (9th Cir. July 3, 2013). The 9th Circuit panel agreed that the acceleration of appellant's debt (the notice of default) constituted a revocation or material alteration of a consumer debt and thus met the definition of adverse action under the ECOA.

56.   Defendants are again incorrect when they assert that Macklin does not state a claim under ECOA, rather, Plaintiff has sufficiently and factually met his burden of pleading facts that support this claim. The NOD was executed by Defendants, and it constitutes a revocation or material alteration of a consumer's debt. Defendants use of *Gorham-DiMaggio v. Countrywide Home Loans,* 13 Inc., N.D.N.Y.2008, 592 F.Supp.2d 283, affirmed 421 Fed.Appx. 97, 2011 WL 1681998, is not controlling in any way here. *Schlegel* binds Defendants.

57.   Rule 12(b)(6) is not appropriate and Defendant cannot invoke its privileges, there is a material fact dispute regarding the Notice of Default and the ECOA does offer relief to Macklin.

## FAIR CREDIT REPORTING ACT (FCRA)

- 19 -

OPPOSITION TO DEFENDANTS MOTION TO DISMISS

58. Defendants once again rely upon res judicata argument here which has been exhaustively argued, *id.* For the purposes of judicial economy, Plaintiff incorporates his argument regarding res judicata and estoppel to apply to this defense as well. The fact of default has always been disputed by Macklin and this fact is not overcome by use of res judicata or claim preclusion by Defendants.

59. Defendants defense is not allowed under Rule 12(b)(6) here. There are material facts in dispute.

## UCL/ BUSINESS & PROFESSIONS CODE 17200

60. Defendants here again attempt to sidetrack the court. The allegation of legislatively violative practices are throughout Plaintiff's Complaint. A simple, thorough reading of Macklin's Complaint clearly establishes each and every unlawful act, the laws it violates, and the roles of each Defendant. It is apparent that Defendants do not understand the well-established rule of law that when one buys a pig, the stink comes with it.

## CONCLUSION

Defendants had a duty to convince this court that there were no triable issues of fact and no disputes of those facts. Defendants have failed in this attempt at a quasi-summary judgment styled as a Rule 12(b)(6) Motion.

Macklin alleges that his contract is void. The contract was formed by the use of false means, an undisputed fact.

Defendants stand in the shoes of their predecessor(s) in interest as a matter of law and carry full liability.

Macklin sufficiently alleged TILA violations and timely rescission. Those facts are disputed by Defendants.

Macklin alleged facts as to Breach of Contract sufficient to go beyond the realm of "speculation" by exhibiting unrefuted documents with facts in dispute.

- 20 -

1
2
3
4

Macklin sufficiently states claims on all causes of action with specificity and clarity, Defendants ask this court to dismiss before any discovery can be made. Defendants are perilously.incorrect in their attempts to ignore the United States Supreme Court decisions and the CFPB's authority to promulgate their own Rules.

5
6
7
8

Defendants make statements against interest in their quest to provide a system of smoke and mirrors, hoping that the court won't look under the hood. The court is bound by a duty to effectuate justice, no matter the names of the Defendants, albeit a bank or servicing agent.

9
10
11
12
13

The court should deny the Defendants Motion to Dismiss with prejudice and commence full discovery as to the factual dispute herein.

14    Respectfully Submitted,                    /s/ James Macklin

15                                               James Macklin, Defendant in Pro Se
16
17
18
19
20
21
22
23
24
25
26
27
28

- 21 -
OPPOSITION TO DEFENDANTS MOTION TO DISMISS

# **<u>EXHIBIT L</u>**

# **<u>EXHIBIT L</u>**

1    Robert A. Bleicher (Bar No. 111334)
     rbleicher@carr-mcclellan.com
2    J. Craig Crawford (Bar No. 238466)
     ccrawford@carr-mcclellan.com
3    CARR, McCLELLAN, INGERSOLL,
     THOMPSON & HORN
4    Professional Law Corporation
     216 Park Road
5    P.O. Box 513
     Burlingame, California  94011-0513
6    Telephone:      (650) 342-9600
     Facsimile:      (650) 342-7685
7
     Attorneys for Defendants
8    Select Portfolio Servicing, Inc., and
     Deutsche Bank National Trust Co.
9

10                   UNITED STATES DISTRICT COURT

11                   EASTERN DISTRICT OF CALIFORNIA

12

13    JAMES L. MACKLIN,                    Case No.  2:10-cv-1097-MCE-KJN PS

14              Plaintiff,                 **DEFENDANTS SELECT PORTFOLIO
                                           SERVICING, INC., AND DEUTSCHE
15    v.                                   BANK NATIONAL TRUST CO.'S REPLY
                                           IN SUPPORT OF MOTION TO DISMISS
16    MATTHEW HOLLINGSWORTH, et al.,       THE SECOND AMENDED COMPLAINT**

17              Defendants.               Date:      August 21, 2014
                                          Time:      10:00 a.m.
18                                        Courtroom  25
                                          Judge:     Hon. Kendall J. Newman
19

20

21

22

23

24

25

26

27

28

Defendants' Reply in Support of Motion to Dismiss
                                                    the Second Amended Complaint
                                                    2:10-cv-1097-MCE-KJN PS

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION ..................................................................................................... 1

II.    ARGUMENT ........................................................................................................... 1

    A.    The bankruptcy court judgment is a final judgment for purposes of res judicata ........................................................................................................ 1

        1.    Mr. Macklin consented to the bankruptcy court's authority to enter a final judgment ................................................................. 4

        2.    This Court may elect to treat the bankruptcy court judgment as proposed findings of fact and conclusions of law subject to de novo review ....................................................................................... 5

        3.    Mr. Macklin fails to respond to SPS's privity argument .......................... 6

    B.    Mr. Macklin otherwise fails to explain how he could cure the defects in his Second Amended Complaint ............................................................................. 7

        1.    Mr. Macklin does not explain how the defense of illegality of contract states a claim upon which relief may be granted ........................ 8

        2.    Mr. Macklin's does not allege a material breach of the Deed of Trust ........................................................................................ 8

        3.    Mr. Macklin does not demonstrate an adverse action under ECOA ........... 9

        4.    Mr. Macklin does not cure the defects in his FCRA cause of action ........ 10

        5.    Mr. Macklin's TILA claims fail ................................................................ 11

        6.    Mr. Macklin's UCL claim fails ................................................................. 13

    C.    The Second Amended Complaint contains numerous other fundamental defects regarding the relationship between Mr. Macklin and defendants DBNT and SPS ........................................................................................................ 13

        1.    Mr. Macklin lacks standing to challenge the timing of the transfer of the Note into the REMIC ................................................................... 14

        2.    DBNT's assignee status under the Deed of Trust does not make it a general assignee for purposes of successor liability .......................... 15

    D.    DBNT and SPS request that any dismissal be made with prejudice .................... 15

III.    CONCLUSION ...................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ashe v. Swenson*,
   397 U.S. 436 (1970) ....................................................... 11

*Atchison, Topeka and Santa Fe Railway Co. v. Brown & Bryant, Inc.*,
   159 F.3d 358 (9th Cir.1997) ....................................................... 14-15

*In re Bellingham Ins. Agency*,
   702 F.3d 553 (9th Cir. 2012).......................................................... 2, 4, 5

*Doe v. United States*,
   58 F.3d 494 (9th Cir.1995)............................................................. 15

*Executive Benefits Insurance Agency v. Arkison*,
   Case No. 12-1200, 573 U.S. ___ (2014) ......................................... 2, 3, 4, 5

*GECCMC 2005-C1 Plummer St. Office Ltd. P'Ship v. J. P. Morgan Chase Bank, N.A.*,
   671 F.3d 1027 (9th Cir. 2012) ....................................................... 14

*German Alliance Ins. v. Home Water Supply*,
   226 U.S. 220, 230 ....................................................................... 14

*Insurance Underwriters Clearing House, Inc. v. Natomas Co.*,
   184 Cal. App. 3d 1520 (1986)......................................................... 9

*Jefferson School of Social Science v. Subversive Activities Control Board*,
   331 F.2d 76 (D.C. Cir.1963) ........................................................... 7

*Leeds v. Meltz*,
   85 F.3d 51 (2nd Cir. 1996) ............................................................. 11

*Merritt v. Countrywide Fin. Corp.*,
   2014 WL 3451299 (9th Cir. July 16, 2014) ...................................... 12, 13

*Murfitt v. Bank of Am. NA*,
   2013 WL 7098636 (C.D. Cal. Oct. 22, 2013) ................................... 10

*Nader v. Democratic Nat. Comm.*,
   590 F. Supp. 2d 164 (D.D.C. 2008) ................................................ 15

*Newdow v. Congress of U.S. of America*,
   435 F.Supp.2d 1066 (E.D. Cal. 2006)............................................... 11

*Newman v. Bank of New York Mellon*,
   2013 WL 1499490, at n. 2 (E.D. Cal. Oct. 11, 2013) ......................... 14

*Rockridge Trust v. Wells Fargo, N.A.*,
   ⸺ F.Supp. ⸺, 2013 WL 5428722, at *17 (N.D.Cal.2013) .............. 10

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Schimmels,*
127 F.3d 875 (9th Cir. 1997)........................................................................... 7

*Schlegel v. Wells Fargo Bank, N.A.,*
720 F.3d 1204  (9th Cir. 2013).......................................................................... 9

*Southwest Airlines Co. v. Texas International Airlines, Inc.,*
546 F.2d 84 (5th Cir.), *cert. denied,* 434 U.S. 832 (1977)................................ 7

*Stern v. Marshall,*
131 Sup. Ct. 2594 (2011) ................................................ 2, 3, 4, 5, 6

*Stiefel v. Bechtel Corp.,*
497 F.Supp.2d 1138 (S.D. Cal. 2007) ............................................................ 11

*Superior Motels, Inc. v. Rinn Motor Hotels, Inc.,*
195 Cal. App. 3d 1032  (1987).......................................................................... 9

*Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.,*
819 F.2d 746 (7th Cir.1987).............................................................................. 8

*Tina v. Countrywide Home Loans, Inc.,*
2008 WL 4790906 (S.D. Cal. Oct.30, 2008) .................................................... 8

*Wellness Int'l Network Ltd. v. Sharif,*
272 F.3d 751 (7th Cir. 2013)............................................................................. 5

**Califonia State Cases**

*Brown v. Grimes,*
192 Cal. App. 4th 265 (2011)............................................................................ 9

*Jenkins v. JP Morgan Chase Bank, N.A.,*
216 Cal. App. 4th 497 (2013).......................................................................... 14

*Keshtgar v. U.S. Bank, N.A.*
226 Cal. App. 4th 1201  (2014)....................................................................... 14

*Plotnik v. Meihaus,*
208 Cal. App. 4th 1590, 1602-03 (2012) .......................................................... 8

*Ray v. Alad Corp.,*
19 Cal. 3d 22, 28 (1977)  ............................................................................... 15

*Sackett v. Spindler,*
248 Cal. App. 2d 220 (1967)............................................................................. 9

**Federal Statutes**

15 U.S.C 1639c ............................................................................................... 13

**TABLE OF AUTHORITIES**
(continued)

Page(s)

15 U.S.C. § 1635(a) ................................................................................................ 13

15 U.S.C. § 1691(d)(6)........................................................................................... 10

28 U.S.C. § 151 ........................................................................................................ 3

28 U.S.C. § 157(b) ................................................................................................... 3

28 U.S.C. § 157(c)(1).......................................................................................... 4, 6

Bus.  & Prof. Code § 17200 ................................................................................... 13

**Rules**

United States Bankruptcy Court, District of Nevada, Local Bankruptcy Rule 9014.2................... 4

**Treatises**

1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 852, pp. 938–940 .......................... 9

1

**I.    INTRODUCTION**

2

Through his far-ranging and often incomprehensible opposition, Mr. Macklin fails to

3

demonstrate a single legitimate ground to prevent this Court from once again dismissing Mr.

4

Macklin's claims.  Rather, Mr. Macklin's opposition confirms that the underlying dispute – and

5

indeed the same causes of action – was thoroughly litigated to conclusion in the bankruptcy court.

6

Mr. Macklin's attempts to dismiss the consequences of those proceedings, which he initiated,

7

expressly consented to, and defended as jurisdictionally appropriate, are based on a fundamental

8

misunderstanding of the bankruptcy court's power to enter final judgments and this Court's

9

ability to cure any defects in that procedure.  Once this threshold issue is resolved, the path is

10

clear for this Court to preclude Mr. Macklin from re-litigating his claims against Deutsche Bank

11

National Trust Company ("DBNT") and Select Portfolio Servicing, Inc. ("SPS").

12

Even if Mr. Macklin could re-litigate his claims, the Court should not ignore the thorough

13

and thoughtful analysis of the Honorable Ronald Sargis when he determined that Mr. Macklin

14

had not – and could not – state a claim for relief based on the undisputed facts in this case.

15

Mr. Macklin's latest – and *seventh* – attempt to plead a cognizable claim against DBNT and SPS

16

fares no better.  Mr. Macklin is bound by the facts of his claims.  These facts establish that he

17

unreasonably delayed bringing his claims against DBNT and SPS, that DBNT and SPS did not

18

commit the allegedly unlawful acts and did not succeed to any third party who did, that Mr.

19

Macklin lacks standing, and that Mr. Macklin cannot claim the benefit of later enacted legislation.

20

DBNT and SPS request that the Court put an end to Mr. Macklin's relentless vendetta.

21

**II.    ARGUMENT**

22

**A.    The bankruptcy court judgment is a final judgment for purposes of res judicata.**

23

Mr. Macklin argues that res judicata does not apply here because of the constitutional

24

limit on the ability of a bankruptcy court – an Article I court – to issue a final judgment on

25

matters that are properly reserved for Article III courts.  (Opposition, 2:20-25; 3:11-15; 13:6-9)

26

In support of this argument, Mr. Macklin cites to the Supreme Court's decision in *Stern v.*

27

*Marshall*, 131 Sup. Ct. 2594 (2011).  Mr. Macklin's reliance on *Stern v. Marshall* is misplaced.

28

Since the Supreme Court's decision in *Stern*, a series of decisions both clarified and

Defendants' Reply in Support of Motion to Dismiss
the Second Amended Complaint
2:10-cv-1097-MCE-KJN PS

1   limited its impact.  Relevant here, the Ninth Circuit and the Supreme Court have recognized two

2   exceptions to the general rule that a bankruptcy court lacks the ability to enter final orders and

3   judgments.  First, a bankruptcy court may enter a final judgment where the party against whom

4   judgment is entered consented to the bankruptcy court's authority.  Second, the bankruptcy

5   court's judgment may be treated as findings of fact and conclusions of law subject to the *de novo*

6   review under the "non-core" statutory scheme.

7          The relevant authority for these two principles is the Ninth Circuit's decision in *In re*

8   *Bellingham Ins. Agency*, 702 F.3d 553 (9th Cir. 2012) and the Supreme Court's review of that

9   decision in *Executive Benefits Insurance Agency v. Arkison*, Case No. 12-1200, 573 U.S. ___

10  (2014).  In *Bellingham*, the bankruptcy trustee initiated an adversary proceeding to pursue

11  fraudulent conveyance claims against Executive Benefits Insurance Agency ("EBIA") and other

12  defendants.  The trustee ultimately filed a motion for summary judgment in the bankruptcy court.

13  The bankruptcy court granted summary judgment on the fraudulent conveyance claims.  EBIA

14  appealed the grant of summary judgment to the district court, which affirmed the bankruptcy

15  court's decision after a *de novo* review of the summary judgment ruling.

16         EBIA appealed again to the Ninth Circuit.  Following the Supreme Court's decision in

17  *Stern v. Marshall*, discussed *infra*, EBIA moved to have the appeal dismissed on grounds that

18  Article III of the United States Constitution did not permit the bankruptcy court to issue a final

19  judgment on the underlying fraudulent conveyance claims.  The Ninth Circuit denied EBIA's

20  motion.

21         In denying the motion, the Ninth Circuit held that there are two independent grounds for

22  upholding the finality of the judgment entered by the bankruptcy court.  First, while Article III

23  does not permit a bankruptcy court to enter a fraudulent conveyance claim against a noncreditor

24  without consent of the parties, EBIA had ***impliedly consented*** to the bankruptcy court's

25  adjudication in bankruptcy case.

26         As a second and independent grounds for denying EBIA's motion, the Ninth Circuit held

27  that, even if EBIA had not consented to the bankruptcy court's entry of a final judgment, any

28  procedural defects in the judgment were cured upon the district court's *de novo* review and

1  affirmation of the bankruptcy court's grant of summary judgment, which is the same standard of

2  review applied to a bankruptcy court's proposed findings of fact and conclusions of law under the

3  "non-core" statutory scheme.

4       EBIA appealed yet again, this time to the Supreme Court, and the Supreme Court granted

5  certiorari. *Executive Benefits Insurance Agency v. Arkison*, Case No. 12-1200, 573 U.S. ___

6  (2014). In its decision, the Supreme Court declined to address the issue of consent, electing

7  instead to resolve the case on the basis of the district court's *de novo* review. In particular, the

8  Supreme Court said:

9       We hold today that when, under *Stern*'s reasoning, the Constitution
10  does not permit a bankruptcy court to enter final judgment on a
   bankruptcy-related claim, the relevant statute nevertheless permits a
11  bankruptcy court to issue proposed findings of fact and conclusions
   of law to be reviewed *de novo* by the district court. Because the
12  District Court in this case conducted the *de novo* review that
   [EBIA] demands, we affirm the judgment of the Court of Appeals
13  upholding the District Court's decision.

14       This procedure allows the district court to avoid potential uncertainty associated with a

15  bankruptcy court's adjudication of any claims by conducting its own *de novo* review:

16       As we explain in greater detail below, when a bankruptcy court is
   presented with such a claim, the proper course is to issue proposed
17  findings of fact and conclusions of law. The district court will then
   review the claim *de novo* and enter judgment. This approach
18  accords with the bankruptcy statute and does not implicate the
   constitutional defect identified by *Stern*.
19

20       Importantly, the Supreme Court found that there was no statutory gap under *Stern* since it

21  was able to reconcile the district court's review with an existing severability provisions calling for

22  *de novo* review of non-core claims:

23       The plain text of this severability provision closes the so-called
   "gap" created by *Stern* claims. When a court identifies a claim as
24  a *Stern* claim, it has necessarily "held invalid" the "application" of
   §157(b)—i.e., the "core" label and its attendant procedures—to the
25  litigant's claim. Note following §151. In that circumstance, the
   statute instructs that "the remainder of th[e] Act . . . is not affected
26  thereby." *Ibid.* That remainder includes §157(c), which governs
   non-core proceedings. With the "core" category no longer
27  available for the *Stern* claim at issue, we look to §157(c)(1) to
   determine whether the claim may be adjudicated as a non-core
28  claim—specifically, whether it is "not a core proceeding" but is

    - 3 -    

1
2
3

"otherwise related to a case under title 11." If the claim satisfies the criteria of §157(c)(1), the bankruptcy court simply treats the claims as non-core: The bankruptcy court should hear the proceeding and submit proposed findings of fact and conclusions of law for *de novo* review and entry of judgment.

4    Addressing the issue of consent which formed one of the alternate bases in the Ninth

5    Circuit's opinion, the Supreme Court expressly "reserve[d] … for another day" whether Article

6    III permits a bankruptcy court to enter final judgment on a *Stern* claim with the consent of the

7    parties.  Accordingly, the Supreme Court elected not to disturb the Ninth Circuit's decision with

8    regard to the issue of consent.

9    Thus, while Mr. Macklin correctly identifies the issues presented by *Stern*, his opposition

10    disregards subsequent decisions that filled in some of the perceived gaps created by *Stern*.  Had

11    Mr. Macklin done so, he would have come to understand that the problems identified in *Stern* can

12    be cured through consent and *de novo* review.

13    **1.    Mr. Macklin consented to the bankruptcy court's authority to enter a final
           judgment.**

14

15    Following the *Executive Benefits* decision, the law in the Ninth Circuit remains that a

16    party to a contested bankruptcy matter may consent to the bankruptcy court's authority to enter a

17    final order or judgment.  *See In re Bellingham*.  This consent may be express or implied.  *Id.*

18    (finding that debtor's filing of a voluntary bankruptcy case constituted implied consent).  To

19    remove any uncertainty regarding this issue of consent, some Ninth Circuit bankruptcy courts

20    revised their local rules to **require** the pleader to state whether or not it consents to entry of final

21    orders and judgments.  *See, e.g.,* United States Bankruptcy Court, District of Nevada, Local

22    Bankruptcy Rule 9014.2.

23    Here, Mr. Macklin unequivocally and expressly consented to the bankruptcy court's entry

24    of final orders and judgments.  In his Adversary Complaint, Mr. Macklin pleaded that the

25    adversary proceeding was a core proceeding, ***and*** that, "[t]o the extent this proceeding is

26    determined to be a non-core proceeding, [Mr. Macklin] ***consents to the entry of final orders or***

27    ***judgment by the bankruptcy court.***"  [Complaint, ¶ 3].  In his First Amended Complaint,

28    Mr. Macklin again pleaded:  "Plaintiff consents to the entry of final order or judgment by the

1   bankruptcy court." [First Amended Adversary Complaint, ¶ 2]. Mr. Macklin's proposed Second

2   Amended Complaint contained identical allegations. Moreover, even if Mr. Macklin had not

3   expressly consented to the bankruptcy court's authority by filing the voluntary bankruptcy case

4   and filing the Adversary Proceeding against DBNT, Mr. Macklin both expressly and *impliedly*

5   consented to the bankruptcy court's authority. *See In re Bellingham.* There can be no doubt that

6   Mr. Macklin consented to the bankruptcy court's ability to enter final orders and judgments. The

7   bankruptcy court did exactly what Mr. Macklin asked it to do. Mr. Macklin cannot seek to

8   relieve himself of the final judgment after the fact merely because he does not like the outcome.

9       The current state of Ninth Circuit jurisprudence provides that Mr. Macklin's express and

10  implied consent satisfies whatever jurisdictional gaps were left over from *Stern.* Although the

11  Supreme Court may resolve a circuit split on this issue next term, *see Wellness Int'l Network Ltd.*

12  *v. Sharif*, 272 F.3d 751 (7th Cir. 2013), cert. granted, __ U.S.L.W. __ (U.S. Jul. 1, 2014) (No. 13-

13  9355, this Court is bound to follow controlling precedent. That precedent provides that Mr.

14  Macklin consented to the bankruptcy court's ability to enter a final judgment. Mr. Macklin

15  cannot now escape the consequences of his prior consent.

16
17      **2.    This Court may elect to treat the bankruptcy court judgment as proposed
        findings of fact and conclusions of law subject to *de novo* review.**

18      Even if Mr. Macklin had not consented to the bankruptcy court's ability to enter the

19  Judgment, this Court may still cure any *Stern* defects by treating the Judgment as proposed

20  findings of fact and conclusions of law under the procedure set forth in Section 157. *See*

21  *Executive Benefits.* Should the Court elect to conduct such a *de novo* review of the Judgment, the

22  Court could undisputedly enter a final judgment.

23      In *Executive Benefits*, the Chapter 7 trustee brought an action against EBIA to recover

24  assets transferred to EBIA under the theory the transfers were fraudulent conveyances. Following

25  a dispute regarding the appropriate forum—bankruptcy court or district court—to resolve the

26  fraudulent conveyance claim, the trustee moved for summary judgment in the bankruptcy court.

27  The bankruptcy court granted the motion, and EBIA appealed to the district court. The district

28  court reviewed the bankruptcy court's decision to grant summary judgment *de novo*; the district

1  court affirmed.

2       On appeal to the Ninth Circuit, the Court of Appeal affirmed.  The Supreme Court granted

3  certiorari to resolve a question left unanswered in *Stern*.  That question was whether the existing

4  procedure under Section 157(c)(1) for a district court to refer cases or proceedings arising under

5  the Bankruptcy Code to bankruptcy judges solved the *Stern* court's concerns that only Article III

6  courts were constitutionally able to finally adjudicate core proceedings.  The Supreme Court

7  concluded that this procedure was constitutionally sufficient where the district court conducted a

8  *de novo* review.

9       Here, however, there was no such review following the bankruptcy court's grant of

10  summary judgment.  Unlike EBIA, Mr. Macklin decided to not seek district court *de novo* review,

11  electing instead to appeal the Judgment to the Ninth Circuit Bankruptcy Appellate Panel

12  ("BAP").[1]  Mr. Macklin's appeal was untimely, thereby divesting the BAP of jurisdiction.  But

13  Mr. Macklin's decision to not appeal the Judgment to the district court, where the Judgment

14  would have been subject to *de novo* review, does not allow him to now avoid the effects of res

15  judicata.  That is because, just as a district court could have treated the Judgment as findings of

16  fact and conclusions of law under Section 157 upon an appeal from the Judgment,[2] so too can this

17  Court treat the Judgment as findings of fact and conclusions of law.  Accordingly, DBNT and

18  SPS respectfully request that, in an abundance of caution and to preserve the issue for appeal, the

19  Court conduct a *de novo* review of the bankruptcy court's Judgment.

20      **3.**    **Mr. Macklin fails to respond to SPS's privity argument.**

21       Having established no less than two grounds for finding the bankruptcy court's Judgment

22  to constitute a final judgment for purposes of res judicata, the sole issue is whether Mr. Macklin,

23  DBNT and SPS were parties or in privity with parties to the action resulting in the Judgment.

24       In his opposition, Mr. Macklin appears to argue that there was no contractual privity

25  between him and defendants DBNT and SPS.  [Opposition, 14:19-15:9]  Mr. Macklin

26      [1] There can be little doubt that, had the bankruptcy court and DBNT had the benefit of the *Executive Benefits* decision, they too would have sought district court *de novo* review under Section 157.

27

28      [2] *See also Winters v. State Farm Fire and Cas. Co.*, 73 F.3d 224 (9th Cir. 1995) (review of grant of summary judgment is entitled to *de novo* review).

1   misunderstands the type of privity contemplated by the doctrine of res judicata.

2        "'Privity'—for the purposes of applying the doctrine of *res judicata*—is a legal

3   conclusion "designating a person so identified in interest with a party to former litigation that he

4   represents precisely the same right in respect to the subject matter involved." *In re Schimmels*,

5   127 F.3d 875, 881 (9th Cir. 1997) (citing *Southwest Airlines Co. v. Texas International Airlines,*

6   *Inc.,* 546 F.2d 84, 94 (5th Cir.), *cert. denied,* 434 U.S. 832 (1977) (citing *Jefferson School of*

7   *Social Science v. Subversive Activities Control Board,* 331 F.2d 76 (D.C.Cir.1963))).

8        Mr. Macklin and DBNT were parties to the Adversary Proceeding.  DBNT may clearly

9   invoke the doctrine of res judicata to preclude Mr. Macklin from re-litigating these claims.  In its

10   moving papers, SPS argues that it too may seek the benefit of the Judgment because it was in

11   privity with DBNT.  Mr. Macklin does not dispute this anywhere in his opposition.  To the

12   contrary, his opposition consistently lumps together "defendants" as a single actor perpetrating

13   the allegedly unlawful conduct that forms the basis of his claims.

14        DBNT and SPS have demonstrated that the Judgment is a final judgment for purposes of

15   res judicata.  Mr. Macklin consented to the bankruptcy court's entry of a final judgment and this

16   Court may cure any perceived defects through its own *de novo* review of that Judgment.  Mr.

17   Macklin is not entitled to another bite at the apple.  The claims in the Second Amended

18   Complaint are precluded.

19   **B.**    **Mr. Macklin otherwise fails to explain how he could cure the defects in his Second**
20          **Amended Complaint.**

21        Even if Mr. Macklin's claims against DBNT and SPS were not precluded, the Court still

22   could not allow the defective claims in the Second Amended Complaint to proceed.  Mr. Macklin

23   still has not been able to state a claim upon which relief may be granted.  To the contrary, the

24   Second Amended Complaint contains numerous omissions of critical facts that must be pled to

25   state cognizable claims and discloses incurable defenses to Mr. Macklin's ability to proceed on

26   his causes of action.  The Second Amended Complaint is fatally flawed.

27

28

**1.      Mr. Macklin does not explain how the defense of illegality of contract states a claim upon which relief may be granted.**

Mr. Macklin stubbornly clings to his illegal contract cause of action despite citing to authority that illegality of contract is a defense to a claim to enforce a contract.  Mr. Macklin does not explain how he may turn this defense into a claim for relief.  [Opposition, 10:11-12:4]  While DBTNC and SPS are reluctant to assume Mr. Macklin's arguments in opposition, it is possible that Mr. Macklin is attempting to plead a claim for declaratory relief declaring the lending documents void.  If this assumption is correct, Mr. Macklin still would not plead a claim for relief for several reasons.

First, it is well settled that a court may decline to address a claim for declaratory relief when the controversy has ripened into an actual claim for relief.  *Tina v. Countrywide Home Loans, Inc.,* 2008 WL 4790906, at *2 (S.D.Cal. Oct.30, 2008) (quoting *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 749 (7th Cir.1987)).  This undoubtedly occurred five years ago when DBNT declared Mr. Macklin in default and initiated foreclosure proceedings.  Second, even if Mr. Macklin could prove that the loan and security agreements were void, it would not be possible to return the parties to their pre-contract positions.  As the Second Amended Complaint and judicially noticeable facts make clear, DBNT has already foreclosed on the Property.

**2.      Mr. Macklin's does not allege a material breach of the Deed of Trust.**

In support of his breach of contract claims, Mr. Macklin depends on a hyper-technical interpretation of the nonjudicial foreclosure process by which DBNT and its agents must have provided him with a notice of default and acceleration before serving the statutory notice of default.  [Opposition, 17:5-22]  Mr. Macklin admits that any technical defect in the foreclosure process and loan acceleration did not rise to the level of a material breach.

Under California law, the materiality of a breach is normally a question of fact. *See Plotnik v. Meihaus*, 208 Cal. App. 4th 1590, 1602-03 (2012) (citing *Brown v. Grimes*, 192 Cal. App. 4th 265, 277 (2011)).  "However, if reasonable minds cannot differ on the issue of materiality, the issue may be resolved as a matter of law." *Insurance Underwriters Clearing*

1  *House, Inc. v. Natomas Co.*, 184 Cal. App.3d 1520, 1526-27 (1986).  Whether a partial breach of

2  a contract is material depends on "the importance or seriousness thereof and the probability of the

3  injured party getting substantial performance." 1 Witkin, Summary of Cal. Law (10th ed. 2005)

4  Contracts, § 852, pp. 938–940; *see also Superior Motels, Inc. v. Rinn Motor Hotels, Inc.,* 195 Cal.

5  App. 3d 1032, 1051 (1987); *Sackett v. Spindler*, 248 Cal. App. 2d 220, 229 (1967).

6           Here, Mr. Macklin alleges that he "decided" to stop making payments because (in his

7  opinion) his payment of the obligation under the deed of trust would not result in a default.

8  Mr. Macklin essentially admits that, he decided to implement a strategic course of conduct due to

9  the fact that the lender had taken out insurance on the loan when it was put into the REMIC.

10  [SAC, ¶ 16]  Mr. Macklin further admits that, following receipt of the Notice of Default, he did

11  not attempt to cure or dispute the default.  Consequently, irrespective of the alleged defect, the

12  outcome remained the same —default due to Mr. Macklin's decision not to make his mortgage

13  payments.  When the occurrence or non-occurrence of an event does not change the outcome,

14  then that breach is not material as a matter of law, and the Court can resolve the issue on a motion

15  to dismiss.  Mr. Macklin has failed to allege that DBNT or SPS materially breached the Deed of

16  Trust by failing to provide Mr. Macklin prior notice before the Notice of Default.

17           **3.        Mr. Macklin does not demonstrate an adverse action under ECOA.**

18           Mr. Macklin argues that the Ninth Circuit has declared the service of a Notice of Default

19  and acceleration of debt to be an adverse action under the ECOA.  In support of his position,

20  Mr. Macklin cites to *Schlegel v. Wells Fargo Bank, N.A.*, 720 F.3d 1204, 1211 (9th Cir. 2013).

21  Mr. Macklin's reliance on *Schlegel* is misplaced.

22           In *Schlegel*, the plaintiff received a loan from defendant Wells Fargo, but fell behind on

23  his payments.  *Id.* at 1206.  Wells Fargo proposed a loan modification ***extending the maturity***

24  ***date of the loan***, which plaintiff accepted.  *Id.*  For the next six months, Wells Fargo repeatedly

25  sent default notices and denied that the loan was modified.  *Id.* at 1207.  Plaintiff diligently

26  attempted to clarify that his modification was complete, but to no avail.  Wells Fargo eventually

27  acknowledged that the default notices sent to plaintiff were erroneous, but the Ninth Circuit held

28  that defendant's "prolonged non-responsiveness, and its affirmative statements regarding loan

1   acceleration and default ... plausibly gave rise to the claim that [defendant] terminated the loan

2   modification agreement and thereby revoked the [plaintiffs'] credit for purposed of § 1691(d)(6)."

3   *Id.* at 1211.

4         The *Schlegel* court ultimately held that the complaint pled sufficient facts to allege that

5   defendant took adverse action on plaintiffs' loan modification application, thereby requiring Wells

6   Fargo to supply a statement of reasons. *Id.*  Central to this holding was the Ninth Circuit's broad

7   interpretation of ECOA so as to define a "revocation of credit" as including the annulling,

8   repealing, rescinding or ***canceling a right to defer payment of a debt***.  *Id.*; *see also Murfitt v.*

9   *Bank of Am. NA*, EDCV 13-01182 JGB, 2013 WL 7098636 (C.D. Cal. Oct. 22, 2013) (holding

10   that failure to acknowledge previously agreed upon deferment of loan as part of a modification).

11         Here, Mr. Macklin does not allege that he obtained, let alone requested, a loan

12   modification.  There is no allegation that defendants DBNT or SPS agreed to defer payment of

13   the debt.  Under these situations, where the loan is due and payable, and the debtor *admits* that he

14   was in default on *his* obligation to pay, the notice of default is not an adverse action.  *See*

15   *Rockridge Trust v. Wells Fargo, N.A.,* —— F.Supp. ——, 2013 WL 5428722, at *17 (N.D. Cal.

16   2013) ("Here, in the fall of 2009, [plaintiff] sought an extension of credit, a loan modification,

17   while he was delinquent in payments on initial credit arrangement, his mortgage loan. In these

18   circumstances, there was no "adverse action" within the meaning of the ECOA. To the extent that

19   a new credit agreement was granted and then revoked, the allegations in the FAC show that

20   Shahani received written notice of the *denial* of his loan modification application within thirty

21   days of its submission ....").

22         **4.      Mr. Macklin does not cure the defects in his FCRA cause of action.**

23         Mr. Macklin does not attempt to respond to the defects addressed in defendants' motion to

24   dismiss, other than to argue that res judicata does not apply to his FCRA cause of action.  As

25   discussed above, res judicata does apply to all of Mr. Macklin's claims.  Even if it did not,

26   Mr. Macklin's admission that he was in default when he stopped making payments on the

27   obligation in December 2008 negate a necessary element of his claim.  DBNT and SPS request

28   that the Court dismiss this cause of action.

1              **5.      Mr. Macklin's TILA claims fail.**

2                   **a.      Mr. Macklin's Section 1635 TILA claim is a nonstarter.**

3           Mr. Macklin argues that the Court may not ascertain the sufficiency of his alleged notice

4   of rescission on this motion to dismiss.  Mr. Macklin is mistaken for several reasons.

5           First, as addressed above and in its moving papers, the Honorable Ronald Sargis

6   determined this issue in connection with his order dismissing the First Amended Adversary

7   Complaint as adopted in his final Judgment.  That Mr. Macklin did not rescind his loan has been

8   established as un ultimate fact, and Mr. Macklin is collaterally stopped from arguing otherwise.

9   *Ashe v. Swenson,* 397 U.S. 436, 443 (1970).

10          Second, bald assertions and conclusions of law will not enable complaint to survive

11  motion to dismiss for failure to state claim, even though relevant pleading standard is liberal.

12  *Leeds v. Meltz*, 85 F.3d 51 (2nd Cir. 1996).  In his Second Amended Complaint and Opposition,

13  Mr. Macklin assumes that it is enough that he alleges that he rescinded the loan, and DBNT and

14  SPS cannot dispute as much.  Mr. Macklin is wrong.  The determination of whether

15  Mr. Macklin's communication constituted a valid rescission is a legal issue.  He may not merely

16  conclude as much, and the Court need not assume the truth of legal conclusions cast in the form

17  of factual allegations.  *Newdow v. Congress of U.S.*, 435 F. Supp. 2d 1066 (E.D. Cal. 2006),

18  affirmed 598 F.3d 638, rehearing and rehearing en banc denied, certiorari denied 131 S.Ct. 1612.

19          Third, the incorporation by reference doctrine allows a court to consider documents whose

20  contents are alleged in a complaint and whose authenticity no party questions, but which are not

21  physically attached to the plaintiff's pleading.  *Stiefel v. Bechtel Corp.*, 497 F.Supp.2d 1138 (S.D.

22  Cal. 2007).  This doctrine is of particular relevance in situations where the plaintiff's claim

23  depends on the contents of a document and the defendant attaches the document to its motion to

24  dismiss, even though the plaintiff does not explicitly allege the contents of that document in the

25  complaint.  *Id.*  This is precisely what occurred here when Mr. Macklin incorporates by reference

26  his letter purporting to "rescind" his loan.  DBNT and SPS are entitled to put that letter before the

27  Court so that the Court may consider the contents of that letter in assessing the veracity of Mr.

28  Macklin's allegations.

1    Under all three principles, the Court arrives at the same result: Mr. Macklin's demand

2 letter does not constitute a rescission notice as a matter of law. "Rescission" is defined as:

3       1.      A party's unilateral unmaking of a contract for a legally sufficient reason,
               such as the other party's material breach. Rescission is generally available as a
4               remedy or defense for a nondefaulting party and ***restores the parties to their***
               ***precontractual positions***.
5
        2.      An agreement by contracting parties to discharge ***all remaining duties of***
6               ***performance*** and terminate the contract.

7 Black's Law Dictionary (3d ed. 2001) (emphasis added).

8    Thus, rescission requires at a minimum that both parties to a bilateral obligation be

9 relieved of their remaining duties or restored to their original position. Other than the mere

10 mention of the term "rescission," Mr. Macklin's demand letter is not capable of an interpretation

11 that he requested that the parties be returned to their original position. To the contrary, Mr.

12 Macklin unilaterally demanded that he retain the benefit of the transaction while simultaneously

13 being relieved of the burden. Mr. Macklin's demand cannot, as a matter of law, constitute a

14 notice of rescission. Because Mr. Macklin did not rescind, Mr. Macklin cannot prevail on his

15 TILA claims under Section 1635.

16    This result is not altered by Mr. Macklin's reliance on *Merritt v. Countrywide Fin. Corp.*,

17 09-17678, 2014 WL 3451299 (9th Cir. July 16, 2014). *Merritt* concerned a district court's ability

18 to consider a plaintiff's allegations of his or her ability to tender as a precondition of stating a

19 claim for relief in the context of a motion to dismiss. *Merritt* concluded that a court may not

20 consider a plaintiff's allegations of his or her ability to tender as a precondition to stating a TILA

21 claim under Section 1635. *Id.* at *5.

22    The Court need not reach this issue, however. *Merritt* recognizes that TILA sets forth a

23 statutory procedure for rescinding under Section 1635. Mr. Macklin acknowledges as much.

24 [Opposition, 6:8-14]  The first step in this process is that the borrower must notify the lender of

25 its intent to rescind. 15 U.S.C. § 1635(a). If the borrow does not initiate this process through a

26 legitimate rescission notice, then the Court need not proceed to the other timing and pleading

27 issues involved in *Merritt*. Here, Mr. Macklin did not rescind. The results before and after

28 *Merritt* are the same: Mr. Macklin has not stated a TILA claim.

1

   **b.**  **Mr. Macklin's may not seek protection under TILA Section 1639c.**

2

   In response to DBNT and SPS's argument that Mr. Macklin's loan was not covered by 15

3

United States Code section 1639c, Mr. Macklin contends that his loan post-dated the enactment

4

of TILA and therefore he is entitled to the benefit of all subsequent amendments.  Mr. Macklin is

5

wrong.  Section 1639c was enacted as part of the Dodd Frank Amendment.  This enactment

6

occurred several years after Mr. Macklin's loan originated.  Thus, unless section 1639c is

7

retroactive, Mr. Macklin cannot claim the benefit of his statute and its requirements.  Courts have

8

resolved the retroactivity of Section 1639c by declaring that it is not retroactive.  *Weller v. HSBC*

9

*Mortgage Servs.*, *Inc.*, 971 F. Supp. 2d 1072, 1077 (D. Colo. 2013).  Notably, in the years since

10

courts have made this determination, Congress has not revised this section to make it retroactive.

11

Mr. Macklin's section 1639c TILA claims fails.

12

   **6.**  **Mr. Macklin's UCL claim fails.**

13

   In their reply, DBNT and SPS confirm that there is no predicate wrongful, unlawful or

14

unfair conduct that would form the basis of a California Business & Professions Code section

15

17200 claim.  Mr. Macklin does not rebut this point except to say that he alleges "legislatively

16

violative practices" throughout his Second Amended Complaint.  This type of conclusory and

17

unsubstantiated argument is insufficient to defeat defendants' motion.

18

**C.** **The Second Amended Complaint contains numerous other fundamental defects regarding the relationship between Mr. Macklin and defendants DBNT and SPS**.

19

20

   In addition to the specific defects of the Second Amended Complaint, Mr. Macklin

21

repeatedly invokes two misstatements regarding the nature of his relationship to defendants

22

DBNT and SPS.  The first misstatement concerns Mr. Macklin's standing to challenge the timing

23

of the transfer of the assets in to the REMIC.  The second concerns Mr. Macklin's characterization of

24

DBNT as successor to Accredited Home Lenders, Inc. ("AHL").

25

   **1.**  **Mr. Macklin lacks standing to challenge the timing of the transfer of the Note into the REMIC.**

26

27

   At various times, although not altogether cogent, Mr. Macklin challenges the timing of the

28

transfer of mortgage assets into the REMIC at issue.  The results of this argument range from the

1   transfers being rendered void *ab initio* to the timing by which DBNT was to have become the

2   beneficiary under the deed of trust.  Courts have routinely rejected a borrower's ability to enforce

3   the Pooling and Servicing Agreement ("PSA") associated with REMIC due to the borrower's lack

4   of standing.  *See Keshtgar v. U.S. Bank, N.A.* 226 Cal. App. 4th 1201, 1206-07 (2014)

5   (disagreeing with *Glaski v. Bank of America, N.A.*, 218 Cal. App. 4th 1079, 1095 (2013); *Jenkins*

6   *v. JP Morgan Chase Bank, N.A.*, 216 Cal. App. 4th 497 (2013) (same); *Newman v. Bank of New*

7   *York Mellon*, 1:12-CV-1629 AWI, 2013 WL 1499490, at n. 2 (E.D. Cal. Oct. 11, 2013) ("no

8   courts have yet followed *Glaski* and *Glaski* is in a clear minority on the issue.")

9        Mr. Macklin cannot cure his standing issue through his vague, conclusory allegations that

10   he was a third party beneficiary of the PSA.  [Opposition, 14:26-15:1]  To be a true third party

11   beneficiary capable of asserting rights under the contract, the party must be an intended

12   beneficiary.  *German Alliance Ins. v. Home Water Supply,* 226 U.S. 220, 230.  To meet this

13   requirement, Mr. Macklin must establish that he is more than an incidental beneficiary.  *Id.*

14   Parties that benefit from government contracts are generally assumed to be only incidental

15   beneficiaries, and they may not enforce such contracts absent a clear intent to the contrary.

16   *GECCMC 2005-C1 Plummer St. Office Ltd. P'Ship v. J. P. Morgan Chase Bank, N.A.*, 671 F.3d

17   1027, 1033 (9th Cir. 2012).  Mr. Macklin has not – and cannot – establish that he was a specific

18   and intended third party beneficiary of the PSA.  Mr. Macklin therefore lacks standing to

19   challenge any defects in the timing of the transfer of any mortgage assets into the REMIC.

20        **2.        Assignment of Deed of Trust does not support successor liability.**

21        Mr. Macklin alleges that, "as purported assignee of the predatory loan contract," DBNT

22   "carries all benefits and liabilities under the false loan as if they were the originator of the loan."

23   [SAC, ¶¶ 7-8, 20, 58, 60, 62]  Mr. Macklin is wrong.

24        The Ninth Circuit and California limit successor liability arising from an asset purchase

25   "unless (1) the purchasing corporation expressly or impliedly agrees to assume the liability; (2)

26   the transaction amounts to a 'de-facto' consolidation or merger; (3) the purchasing corporation is

27   merely a continuation of the selling corporation; or (4) the transaction was fraudulently entered

28   into in order to escape liability." *Atchison, Topeka and Santa Fe Railway Co. v. Brown & Bryant,*

1 | *Inc.,* 159 F.3d 358, 361 (9th Cir.1997); *Ray v. Alad Corp.*, 19 Cal. 3d 22, 28 (1977).

2 |      Mr. Macklin argues in typically conclusory fashion, that AHL's assignment of the

3 | mortgage asset to DBNT makes DBNT AHL's successor in interest for liability purposes.  Mr.

4 | Macklin does not allege, nor can he, any of the accepted bases for imposing successor liability

5 | arising out of DBNT's purchase of a single mortgage asset.  DBNT is not AHL's successor and

6 | therefore did not assume any successor liability.

7 | **D.**     **DBNT and SPS request that any dismissal be made with prejudice.**

8 |      In dismissing for failure to state a claim, a court retains discretion to determine whether

9 | dismissal should be made with leave to amend.  *See Doe v. United States*, 58 F.3d 494, 497 (9th

10 | Cir.1995).  Although leave to amend should ordinarily be granted, leave is not appropriate if the

11 | court determines that leave would be futile.  *Id.* (citations omitted).  Where a dismissal is based

12 | on res judicata, the dismissal is properly made without leave to amend because res judicata

13 | applies not only to claims that were actually brought but also to claims that could have been

14 | brought.  *See, e.g., Nader v. Democratic Nat. Comm.*, 590 F. Supp. 2d 164, 170 (D.D.C. 2008)

15 | *aff'd*, 09-7004, 2009 WL 4250599 (D.C. Cir. Oct. 30, 2009).

16 |      Mr. Macklin's claims against DBNT and SPS are precluded by his prior litigation in the

17 | Adversary Proceeding.  Mr. Macklin cannot cure the foundational facts that give rise to the

18 | application of this judicial doctrine.  Accordingly, DBNT and SPS request that the Second

19 | Amended Complaint be dismissed without leave to amend.

20 |          **III.   CONCLUSION**

21 |      For the foregoing reasons, DBNT and SPS respectfully request that the Court dismiss the

22 | Second Amended Complaint without leave to amend.

23 | Dated:    August 14, 2014       CARR, McCLELLAN, INGERSOLL,
24 |            THOMPSON & HORN
           Professional Law Corporation

25 |

26 |            By: */s/ Robert A. Bleicher*
             Robert A. Bleicher/J. Craig Crawford
27 |              Attorneys for Defendants
             Select Portfolio Servicing, Inc., and Deutsche
28 |              Bank National Trust Co.

1   Robert A. Bleicher (Bar No. 111334)
    rbleicher@carr-mcclellan.com
2   J. Craig Crawford (Bar No. 238466)
    ccrawford@carr-mcclellan.com
3   CARR, McCLELLAN, INGERSOLL,
    THOMPSON & HORN
4   Professional Law Corporation
    216 Park Road
5   P.O. Box 513
    Burlingame, California  94011-0513
6   Telephone:      (650) 342-9600
    Facsimile:      (650) 342-7685
7
    Attorneys for Defendants
8   Select Portfolio Servicing, Inc., and
    Deutsche Bank National Trust Co.
9

10                  UNITED STATES DISTRICT COURT

11                  EASTERN DISTRICT OF CALIFORNIA

12   JAMES L. MACKLIN,                        Case No.  2:10-cv-1097-MCE-KJN PS

              Plaintiff,                       **CERTIFICATE OF SERVICE**
13
     v.                                        Date:       August 21, 2014
14                                             Time:       10:00 a.m.
     MATTHEW HOLLINGSWORTH, et al.,            Courtroom   25
15                                             Judge:      Hon. Kendall J. Newman
              Defendants.

16          I am employed by the law firm of Carr, McClellan, Ingersoll, Thompson & Horn
     Professional Law Corporation in the County of San Mateo, California.  I am over the age of
17   eighteen (18) years and not a party to the within action.  My business address is 216 Park Road,
     P.O. Box 513, Burlingame, California  94011-0513.
18
            On the date set forth below, I served the following:
19
     **DEFENDANTS SELECT PORTFOLIO SERVICING, INC., AND DEUTSCHE BANK**
     **NATIONAL TRUST CO.'S REPLY IN SUPPORT OF MOTION TO DISMISS THE**
20   **SECOND AMENDED COMPLAINT**

21   by placing a true copy thereof in a sealed envelope and placing this envelope for collection and
     mailing this date following the ordinary business practices of Carr, McClellan, Ingersoll,
22   Thompson & Horn Professional Law Corporation for deposit of correspondence in the United
     States Postal Service, addressed as follows:
23   James Macklin
     In Pro Per
24   P.O. Box 789
     Crystal Bay, NV  89402
25
            I declare under penalty of perjury under the laws of the State of California that the
26   foregoing is true and correct.

            Dated:  August 14, 2014
27
                                              */s/ Shara J. Bajurin*
28                                            Shara J. Bajurin

# EXHIBIT M

# EXHIBIT M

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JAMES L. MACKLIN,                          No.  2:10-cv-1097 MCE KJN PS

12                    Plaintiff,

13            v.                                  FINDINGS AND RECOMMENDATIONS

14    MATTHEW HOLLINGSWORTH, et al.,

15                    Defendants.

16

17            On April 15, 2014, plaintiff James L. Macklin ("plaintiff") filed a motion for leave to

18    amend his complaint for a second time and a proposed Second Amended Complaint ("SAC").

19    (ECF Nos. 40, 43.)  On July 1, 2014, the court granted plaintiff's motion for leave to amend and

20    the proposed SAC became the operative complaint in this action.  (ECF No. 42.)  In the SAC,

21    plaintiff alleges that defendants Select Portfolio Servicing, Inc. ("Select Portfolio"), Wells Fargo

22    Bank, N.A. ("Wells Fargo"),[1] Deutsche Bank National Trust Co. ("Deutsche Bank"), and Quality

23    Loan Service Corporation ("Quality Loan") committed breach of contract and violations of

24    several Federal and California statutes governing lending and other business practices in

25    _____

26    [1] Plaintiff erroneously named Wells Fargo Bank, N.A. as Wells Fargo & Co. in the SAC.  Wells
      Fargo Bank, N.A. notified the court of this error in its stipulation with plaintiff filed August 4,
27    2014.  (ECF No. 50.)  Wells Fargo Bank, N.A. indicates that it has accepted service of the SAC
      despite this error.  (See id. at 2.)
28

                                                    1

1  connection with the origination, underwriting, servicing, and foreclosure of plaintiff's residential

2  home loan.  (ECF No. 43.)  Presently before the court is defendants Select Portfolio, Deutsche

3  Bank, and Quality Loan's[2] (collectively "defendants") motion to dismiss plaintiff's SAC pursuant

4  to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be

5  granted.[3]  (ECF No. 45.)  Plaintiff filed an opposition and defendants filed a reply.  (ECF Nos. 52,

6  56, 59.)

7         The court heard this matter on its August 21, 2014 law and motion calendar.  Plaintiff

8  James Macklin appeared on his own behalf.  Attorney Robert Bleicher appeared on behalf of

9  defendants Deutsche Bank and Select Portfolio.  Attorney Megan Boyd appeared telephonically

10  on behalf of defendant Quality Loan.  Attorney Robert Campbell appeared telephonically on

11  behalf of defendant Wells Fargo.

12         The undersigned has fully considered the parties' briefs, the parties' oral arguments, and

13  appropriate portions of the record.  For the reasons that follow, it is recommended that

14  defendants' motion to dismiss be granted and that defendants Deutsche Bank, Select Portfolio,

15  and Quality Loan be dismissed from this action with prejudice.

16  I.     Parties' Requests for Judicial Notice

17         As an initial matter, the court addresses defendants' and plaintiff's respective requests for

18  the court to take judicial notice of certain documents.  (ECF Nos. 46, 47, 48, 53, 63.)  Pursuant to

19  Federal Rules of Evidence 201, "the court may judicially notice a fact that is not subject to

20  reasonable dispute because it: (1) is generally known within the trial court's territorial

21  jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot

22

23  [2] The present motion to dismiss was initially filed by Select Portfolio and Deutsche Bank.  (ECF
    No. 45.)  Quality Loan subsequently filed notice that it joins Select Portfolio and Deutsche Bank
24  in their motion to dismiss and argues that plaintiff's claims against Quality Loan should be
    dismissed for the same reasons stated in the motion for summary judgment.  (ECF No. 49.)
25  Quality Loan also argues in its notice of joinder additional grounds for dismissal not presented in
    Select Portfolio and Deutsche Bank's motion to dismiss.  (Id. at 2-3.)
26

27  [3] Defendant Wells Fargo does not join in the present motion to dismiss.  On August 18, 2014,
    Wells Fargo filed its own separate motion to dismiss that is currently noticed for a hearing on
28  September 25, 2014.

1  reasonably be questioned."

2        Generally, a court may not consider material beyond the complaint in ruling on a motion

3  to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Lee v. City of Los Angeles, 250

4  F.3d 668, 688 (9th Cir. 2001).  "However, '[a] court may take judicial notice of 'matters of public

5  record' without converting a motion to dismiss into a motion for summary judgment,' as long as

6  the facts noticed are not 'subject to reasonable dispute.'"  Intri-Plex Technologies, Inc. v. Crest

7  Grp., Inc., 499 F.3d 1048, 1052 (9th Cir. 2007) (quoting Lee, 250 F.3d at 689 (citation omitted));

8  see also United States v. Ritchie, 342 F.3d 903, 908-09 (9th Cir. 2003).

9        A.      Defendants' Requests

10        Defendants request that the court take judicial notice of 31 different documents.  (ECF

11  No. 46.)  In particular, defendants request that the court take judicial notice of the following:  (1)

12  the docket in Placer County Superior Court Case No. SCV 26905 (the "Superior

13  Court Action"); (2) the docket in the present action; (3) the docket in United States Bankruptcy

14  Court for the Eastern District of California Case No. 10-44610 (the "Bankruptcy Case"); (4) the

15  docket in United States Bankruptcy Court for the Eastern District of California, Case No. 11-

16  002024 (the "Adversary Proceeding"); (5) the docket in United States District Court for the

17  Eastern District of California, Case No. 2-12-cv-01752-GEB-JFM (the "Withdrawal Case"); (6)

18  the notice of default on plaintiff's loan, recorded in the Placer County Recorder's Office on

19  December 8, 2008; (7) the substitution of trustee document for plaintiff's loan, recorded in the

20  Placer County Recorder's Office on January 30, 2008; (8) the notice of trustee's sale for

21  plaintiff's property, recorded in the Placer County Recorder's Office on November 25, 2009; (9)

22  the assignment of deed of trust document for plaintiff's loan, recorded in the Placer County

23  Recorder's Office on November 26, 2009 (10) the notice of trustee's sale for plaintiff's property,

24  recorded in the Placer County Recorder's Office on November 25, 2009; (11) the trustee's deed

25  upon sale for plaintiff's property, recorded in the Placer County Recorder's Office on December

26  21, 2009; (12) the complaint in the Superior Court Action; (13) the first amended complaint in the

27  Civil Action; (14) the complaint in the Adversary Proceeding; (15) the order for preliminary

28  injunction in the Adversary Proceeding; (16) the first amended complaint in the Adversary

1  Proceeding; (17) the judgment for Deutsche Bank National Trust in the Unlawful Detainer

2  Action; (18) the memorandum of decision granting in part and denying in part Deutsche Bank's

3  motion to dismiss the first amended complaint in the Adversary Proceeding; (19) Deutsche

4  Bank's motion to withdraw the bankruptcy reference, filed in the Withdrawal Case; (20)

5  plaintiff's opposition to the motion to withdraw the bankruptcy reference, filed in the Adversary

6  Proceeding; (21) the order denying the motion to withdrawal the bankruptcy reference in the

7  Withdrawal Case; (22) the appellate opinion affirming trial court's judgment for Deutsche Bank

8  in the Unlawful Detainer Action; (23) the proposed second amended complaint in the Adversary

9  Proceeding; (24) the Order denying plaintiff's motion for leave to amend to file a second

10  amended complaint in the Adversary Proceeding;  (25) the minute order denying plaintiff's

11  motion to file a second amended complaint in the Adversary Proceeding; (26) the memorandum

12  opinion and decision granting summary judgment for Deutsche Bank in the Adversary

13  Proceeding; (27)  the order granting summary judgment for Deutsche Bank in the Adversary

14  Proceeding; (28) the judgment for Deutsche Bank in the Adversary Proceeding; (29) the minute

15  order denying plaintiff's motion to vacate judgment in the Adversary Proceeding; (30) the civil

16  minutes denying plaintiff's motion to vacate judgment in the Adversary Proceeding; and (31) the

17  Ninth Circuit Bankruptcy Appellate Panel order dismissing plaintiff's appeal of judgment in the

18  Adversary Proceeding.  (Id.)

19      Because defendants' requests for judicial notice for the documents filed in the Bankruptcy

20  Case, the Adversary Proceeding, the Withdrawal Case, and plaintiff's appeal from the Adversary

21  Proceeding involve matters of public record in related judicial proceedings, these requests are

22  granted.  See Biggs v. Terhune, 334 F.3d 910, 916 n.3 (9th Cir. 2003) ("Materials from a

23  proceeding in another tribunal are appropriate for judicial notice."), overruled on other grounds

24  by Hayward v. Marshall, 603 F.3d 546, 555 (9th Cir. 2010); Headwaters Inc. v. United States

25  Forest Serv., 399 F.3d 1047, 1051 n.3 (9th Cir. 2005) (taking judicial notice of the docket in a

26  related case).  Specifically, the court grants defendants' request for judicial notice as to the

27  documents filed as defendants' Exhibits 3, 4, 5, 14, 15, 16, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28

28  29, 30, and 31 to their request for judicial notice.  (ECF Nos. 46-3, 46-4, 46-5, 46-14, 46-15, 46-

1   16, 47-2, 47-3, 47-4, 47-5, 47-7, 47-8, 48-1, 48-2, 48-3, 48-4, 48-5, 48-6, 48-7, 48-8.)  The court

2   takes judicial notice of these documents filed in these earlier actions for the purpose of

3   recognizing the judicial acts taken and the subject matter of the plaintiff's adversary proceeding

4   before the Bankruptcy Court.  See Bank v. Magna Bank of Missouri, 894 F. Supp. 1337, 1341

5   (E.D. Mo. 1995) aff'd, 92 F.3d 743 (8th Cir. 1996) (taking judicial notice of records from prior

6   related bankruptcy proceeding to recognize the judicial acts taken and the subject matter of that

7   prior proceeding).  Such facts are not reasonably in dispute by the parties.[4]  However, the court

8   declines to take judicial notice of any of the requested documents not listed above because the

9   court finds that judicial notice of those documents is not necessary to decide the present motion to

10  dismiss.

11          B.      Plaintiff's Requests

12          Plaintiff also filed multiple requests for judicial notice.  In his initial filing, plaintiff

13  requests that the court judicially notice the following five documents: (1) a Brief by the Consumer

14  Financial Protection Bureau as Amicus Curiae in Support of Plaintiff-Appellant and Reversal

15  filed in Rosenfield v. HSBC Bank, USA, Case No. 10-1442, in the United States Tenth Circuit

16  Court of Appeals; (2) the Ninth Circuit Court of Appeals' decision in Merritt v. Countrywide Fin.

17  Corp., 09-17678, 2014 WL 3451299 (9th Cir. July 16, 2014); (3) a portion of the record for the

18  Accredited Mortgage Loan Trust Series 2006-2 available on the United States Securities and

19  Exchange Commission's website; (4) a loan application form plaintiff purports to have used in

20  conjunction with obtaining his home loan; and (5) a Truth in Lending Disclosure form

21  purportedly signed by plaintiff during his home loan application process and plaintiff's federal tax

22

23  _____

[4] Plaintiff filed an opposition to defendants' request for judicial notice.  (ECF No. 51.)  However,
many of plaintiff's objections to defendants' requests are centered on California law regarding
24  judicial notice, which is not applicable in federal court.  Furthermore, to the extent that plaintiff
objects on the basis of the Federal Rules of Evidence, such arguments are without merit because
25  under Federal Rule of Evidence 201 "[m]aterials from a proceeding in another tribunal are
appropriate for judicial notice."  Biggs v. Terhune, 334 F.3d 910, 916 n.3 (9th Cir. 2003);  United
26  States v. Wilson, 631 F.2d 118, 119 (9th Cir. 1980) ("[A federal district] court may take judicial
notice of its own records in other cases, as well as the records of an inferior court in other
27  cases."); Chandler v. United States, 378 F.2d 906, 909 (9th Cir. 1967).  Accordingly, plaintiff's
opposition to defendants' request for judicial notice is without merit.

28

1  return for the 2005 tax year.  (Id.)  Defendants filed an opposition to all of plaintiff's requests in

2  this filing except for his request for judicial notice of Ninth Circuit Court of Appeals' decision in

3  Merritt.  (ECF No. 57.)  On August 21, 2014, just prior to the hearing on defendants' motion to

4  dismiss, plaintiff also filed a supplemental request for judicial notice requesting that the court take

5  judicial notice of the United States Security and Exchange Commission's record of the "Master

6  Sales and Servicing Agreement" concerning the Accredited Mortgage Loan Trust Series 2006-2.

7  (ECF No. 63.)

8        Plaintiff asks the court to take judicial notice of documents that are quite different from

9  documents held to be proper subjects for judicial notice by the Ninth Circuit Court of Appeals.  It

10  appears that plaintiff seeks judicial notice of all of the above documents so that he may utilize

11  them in support of the substantive allegations made in his SAC.  "As a general rule, a court may

12  not take judicial notice of proceedings or records in another cause so as to supply, without formal

13  introduction of evidence, facts essential to support a contention in a cause then before it."  M/V

14  Am. Queen v. San Diego Marine Const. Corp., 708 F.2d 1483, 1491 (9th Cir. 1983).

15  Accordingly, the court cannot judicially notice the Amicus Curiae brief filed in Rosenfield.

16  Furthermore, the court declines to take judicial notice of any of the other documents plaintiff

17  requests because none of those documents have any relevance to defendants' motion to dismiss

18  currently before the court.  Accordingly, plaintiff's requests for judicial notice are denied.

19  II.   Background

20        A.   Procedural History

21        On April 2, 2010, plaintiff filed his original complaint in the Placer County Superior

22  Court alleging claims against Deutsche Bank, Select Portfolio, and other defendants regarding the

23  origination, underwriting, and servicing of the mortgage loan on plaintiff's home.  (ECF No. 2-1.)

24  Defendants removed the action to this court on May 3, 2010, on the basis of both diversity and

25  federal question jurisdiction.  (ECF No. 2.)  On June 4, 2010, plaintiff requested leave to amend

26  his complaint and filed a proposed first amended complaint.  (ECF Nos. 12, 13.)  The court

27  subsequently granted plaintiff's motion.  (ECF No. 14.)  The defendants named in the first

28  amended complaint filed an answer on June 24, 2010, and subsequently filed a motion for

1  summary judgment.  (ECF Nos. 15, 16.)

2       On September 16, 2010, plaintiff filed a Chapter 13 bankruptcy petition in the Bankruptcy

3  Court, which was subsequently converted into a proceeding under Chapter 7.  (ECF No. 46-3 at 2,

4  5.)  On October 6, 2010, the court stayed the proceedings in the present action pursuant to 11

5  U.S.C. § 362 in light of plaintiff's pending bankruptcy proceedings.  (ECF No. 25.)  The court

6  further ordered the parties to notify the court within ten days of the resolution of plaintiff's

7  bankruptcy proceedings.  (Id.)

8       On January 13, 2011, plaintiff filed a complaint in an adversary proceeding against

9  Deutsche Bank before the Bankruptcy Court.  (Pl.'s Adversary Compl. (ECF No. 46-14).)  The

10  adversary complaint alleged, among other things, claims against Deutsche Bank for fraudulent

11  conveyance, libel, quiet title, and violations of the Truth in Lending Act ("TILA").  (Id.)

12  Deutsche Bank filed a motion to dismiss the adversary complaint, which was granted with leave

13  to amend by the Bankruptcy Court on May 12, 2011.  (Electronic Docket for Adversary

14  Proceeding (ECF No. 46-4 at 11).)

15      On June 17, 2011, plaintiff filed an amended adversary complaint alleging the following

16  ten claims against Deutsche Bank:  (1) violations of TILA; (2) violations of the Real Estate

17  Settlement Procedures Act ("RESPA"); (3) violations of the Fair Credit Reporting Act ("FCRA");

18  (4) fraud; (5) unjust enrichment; (6) civil RICO violations; (7) violation of California's Unfair

19  Competition Law ("UCL"); (8) breach of a security instrument; (9) wrongful foreclosure; and

20  (10) quiet title.  (Pl.'s Am. Adversary Compl. (ECF No. 46-16).)  Deutsche bank filed a motion to

21  dismiss the amended adversary complaint on August 3, 2011.  (ECF No. 46-4 at 15.)  On

22  February 12, 2012, the Bankruptcy Court granted Deutsche Bank's motion to dismiss in part,

23  dismissing the first eight claims alleged in the amended adversary complaint with prejudice, and

24  denying the motion as to plaintiff's final two claims for wrongful foreclosure and quiet title.

25  (ECF No. 47-2.)  On February 28, 2012, Deutsche Bank filed an answer to the two surviving

26  causes of action.  (ECF No. 46-4 at 22.)

27      On July 2, 2012, through a separate action, Deutsche Bank filed a motion to withdraw the

28  bankruptcy reference so that the adversary proceeding in plaintiff's bankruptcy case could be

1   consolidated with the present action.  (ECF No. 46-5 at 2.)  The district judge presiding over the

2   withdrawal case denied Deutsche Bank's motion primarily on grounds that having the district

3   court become familiar with the facts and law of the claims underlying the adversary proceeding

4   "would duplicate much of what [the bankruptcy court] has already accomplished."  (ECF No. 47-

5   5 at 6-7.)

6          After the denial of Deutsche Bank's motion, the adversary proceeding resumed.  On

7   October 4, 2012, plaintiff filed a motion for leave to amend his adversary complaint for a second

8   time, seeking to again add claims for violations of TILA and California's UCL, in addition to

9   stating his surviving wrongful foreclosure and quiet title claims.  (ECF No. 47-7.)  The

10   Bankruptcy Court denied this motion, stating several reasons why plaintiff's proposed TILA and

11   UCL claims were not cognizable as stated in the proposed second amended adversary complaint.

12   (ECF Nos. 48-1, 48-2.)

13          On February 23, 2013, plaintiff filed a motion for summary judgment as to his surviving

14   wrongful foreclosure and quiet title claims; Deutsche Bank filed a cross-motion for summary

15   judgment on these claims.  (ECF No. 46-4 at 30-31.)  On May 23, 2013, the Bankruptcy Court

16   granted Deutsche Bank's cross-motion for summary judgment and denied plaintiff's motion for

17   summary judgment.  (ECF Nos. 48-3, 48-4.)  Judgment for Deutsche Bank in the adversary

18   proceeding was entered on July 2, 2013.  (ECF No. 48-5.)  Plaintiff filed a motion to vacate the

19   judgment; however, that motion was denied.  (ECF No. 46-4 at 33; ECF No. 48-6; ECF No. 48-

20   7.)  Plaintiff then appealed the judgment.  (ECF No. 46-4 at 35.)  On December 16, 2013, the

21   Ninth Circuit Court of Appeal's Bankruptcy Panel denied plaintiff's appeal for lack of

22   jurisdiction.  (ECF No. 48-8.)

23          On December 23, 2013, defendants filed a notice stating that plaintiff's bankruptcy

24   proceedings had reached a final resolution.  (ECF No. 26.)  As a result, the court lifted the stay on

25   the present action on February 4, 2014.  (ECF No. 29.)  Plaintiff subsequently filed a motion for

26   leave to amend his complaint for a second time along with a proposed second amended

27   complaint.  (ECF Nos. 40, 43.)  On July 1, 2014, the court granted plaintiff's motion and deemed

28   the proposed second amended complaint the operative complaint.  (ECF No. 42.)  Defendants

1    now seek to dismiss the second amended complaint pursuant to Federal Rule of Civil Procedure

2    12(b)(6). (ECF No. 45.)

3           B.       Factual Allegations in the Second Amended Complaint

4           In January of 2006, a family law court in Placer County ordered plaintiff to obtain an

5    evaluation of his home's value for purposes of a marital settlement in plaintiff's pending divorce

6    proceedings.  (SAC (ECF No. 43.) at 3.)  Plaintiff went to the business branch of Wells Fargo

7    Bank in Loomis, California.  (Id.)  While there, plaintiff was advised that he would need to

8    contact Wells Fargo's home mortgage division located in Roseville, California if he wanted to

9    complete the valuation process for his home and apply for a loan to settle the marriage estate.

10   (Id.)  Plaintiff went to the Wells Fargo branch in Roseville, where he met with Christine Medina,

11   a broker for Wells Fargo.  (Id.)  During the loan application process, plaintiff was required to

12   provide Wells Fargo with a number of documents regarding his finances, including his tax returns

13   and bank statements.  (Id.)

14          Medina later gave plaintiff a telephone interview regarding his income, place of residence,

15   job history, and other information.  (Id.)  Medina notified plaintiff over the phone "that he was

16   qualified for a loan that would effectively 'cash out' newly acquired equity as a result of his

17   residence being over-valued" by Wells Fargo.  (Id. at 3-4.)  Medina then asked plaintiff to come

18   to Wells Fargo's Roseville branch to sign the loan papers.  (Id. at 4.)  Plaintiff decided he would

19   refinance his home in order to comply with the family court's order.  (Id.)

20          Plaintiff went to the Wells Fargo in Roseville to fill out the loan paperwork.  (Id.)  When

21   plaintiff arrived, he was placed in a room with a manager of the office and a notary, who was

22   present for plaintiff's signing of the loan documents.  (Id.)  "Plaintiff was never provided with

23   any contracts to review prior to the meeting."  (Id.)  The manager advised plaintiff that the notary

24   had to leave for another signing in Folsom, California within the next hour and that plaintiff

25   needed to immediately sign the documents with the aid of yellow tabs Wells Fargo had pre-

26   attached to the loan documents.  (Id.)  "Plaintiff was then guided through the signing and had

27   completed the signing of all necessary documents within a period of less than 15 minutes."  (Id.)

28   Plaintiff was not given an opportunity to review these documents and was sent home without

1   copies of any of the documents.  (Id.)

2          Later that same week, Wells Fargo called plaintiff and told him to come back to the bank

3   to pick up the loan documents the following week.  (Id.)  The next week, plaintiff returned and

4   picked up a large file full of documents Wells Fargo purported to be the loan contract documents.

5   (Id.)  However, plaintiff later learned that the documents in the folder "were blank and contained

6   only miniscule information."  (Id.)  Wells Fargo told plaintiff that this was a customary practice

7   and that he should not worry because the Bank's policy dictated that the originals were to be

8   placed into the custody of a master document custodian.  (Id.)

9          Plaintiff made every installment payment due under the loan contract until August of

10  2008, when plaintiff noticed that no principal on the loan was being paid down through his

11  payments.  (Id.)  Plaintiff contacted the servicer of his loan to inquire into why this was

12  happening.  (Id.)  The servicer told plaintiff "that the loan was an interest-only loan."  (Id.)

13  However, Wells Fargo's employee, Medina, had told plaintiff "that the loan was a fully

14  amortized, standard performing 'principal and interest' loan."  (Id.)  "Plaintiff was never told that

15  his loan was interest-only" prior to being notified by the loan servicer.  (Id.)

16          "Plaintiff executed a dispute in writing to the loan servicer challenging the validity of the

17  loan."  (Id.)  Plaintiff subsequently attempted to rescind the loan contract by sending a writing to

18  counsel for the loan's beneficiary stating plaintiff's intention to rescind.  (Id. at 4-5.)  Plaintiff

19  received a written reply from the beneficiary's counsel indicating that the loan had not been

20  rescinded.  (Id. at 5.)

21          Plaintiff alleges that he later learned that Wells Fargo had placed false information in

22  plaintiff's loan application documents, including false information regarding plaintiff's income,

23  the amount of time plaintiff had lived in his home, the amount of time plaintiff had been

24  employed, and the actual value of the property, in order to ensure that plaintiff would be qualified

25  for a loan that he otherwise would not have been able to obtain.  (Id. at 7-8.)  Plaintiff further

26  alleges that Deutsche Bank was the purported assignee of the loan contract plaintiff entered into

27  with Wells Fargo and had "ratified the actions" of Wells Fargo.  (Id. at 8.) Plaintiff alleges that

28  Deutsche Bank received payment from Select Portfolio when it executed the Notice of Default on

10

1    plaintiff's loan.  (<u>Id.</u> at 17-18.)  In addition, plaintiff alleges that "Select [Portfolio] and Quality

2    [Loan] . . . were complicit in the acts [of Wells Fargo] by an agency relationship."  (<u>Id.</u> at 20.)

3    Finally, plaintiff alleges that all defendants illegally "took plaintiff's home by way of non-judicial

4    foreclosure."  <u>Id.</u> at 12.

5        On the basis of these factual allegations, plaintiff asserts the following six claims against

6    all defendants: (1) "illegal contract"; (2) breach of contract; (3) TILA violations; (4) violations of

7    the Equal Credit Opportunity Act ("ECOA"); (5) FCRA violations; and violations of California's

8    UCL.  (<u>Id.</u> at 11-23.)

9    III.    <u>Legal Standard</u>

10       A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6)

11    challenges the sufficiency of the pleadings set forth in the complaint.  <u>Vega v. JPMorgan Chase</u>

12    <u>Bank, N.A.</u>, 654 F. Supp. 2d 1104, 1109 (E.D. Cal. 2009).  Under the "notice pleading" standard

13    of the Federal Rules of Civil Procedure, a plaintiff's complaint must provide, in part, a "short and

14    plain statement" of plaintiff's claims showing entitlement to relief.  Fed. R. Civ. P. 8(a)(2); <u>see</u>

15    <u>also</u> <u>Paulsen v. CNF, Inc.</u>, 559 F.3d 1061, 1071 (9th Cir. 2009).  "To survive a motion to dismiss,

16    a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that

17    is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Bell Atl. Corp. v.</u>

18    <u>Twombly</u>, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads

19    factual content that allows the court to draw the reasonable inference that the defendant is liable

20    for the misconduct alleged."  <u>Id.</u>

21       In considering a motion to dismiss for failure to state a claim, the court accepts all of the

22    facts alleged in the complaint as true and construes them in the light most favorable to the

23    plaintiff.  <u>Corrie v. Caterpillar, Inc.</u>, 503 F.3d 974, 977 (9th Cir. 2007).  The court is "not,

24    however, required to accept as true conclusory allegations that are contradicted by documents

25    referred to in the complaint, and [the court does] not necessarily assume the truth of legal

26    conclusions merely because they are cast in the form of factual allegations."  <u>Paulsen</u>, 559 F.3d at

27    1071.  The court must construe a pro se pleading liberally to determine if it states a claim and,

28    prior to dismissal, tell a plaintiff of deficiencies in his complaint and give plaintiff an opportunity

1    to cure them if it appears at all possible that the plaintiff can correct the defect.  See Lopez v.

2    Smith, 203 F.3d 1122, 1130-31 (9th Cir. 2000) (en banc); accord Balistreri v. Pacifica Police

3    Dep't, 901 F.2d 696, 699 (9th Cir. 1990) (stating that "pro se pleadings are liberally construed,

4    particularly where civil rights claims are involved"); see also Hebbe v. Pliler, 627 F.3d 338, 342

5    & n.7 (9th Cir. 2010) (stating that courts continue to construe pro se filings liberally even when

6    evaluating them under the standard announced in Iqbal).

7        In ruling on a motion to dismiss filed pursuant to Rule 12(b)(6), the court "may generally

8    consider only allegations contained in the pleadings, exhibits attached to the complaint, and

9    matters properly subject to judicial notice."  Outdoor Media Group, Inc. v. City of Beaumont, 506

10   F.3d 895, 899 (9th Cir. 2007) (citation and quotation marks omitted).  Although the court may not

11   consider a memorandum in opposition to a defendant's motion to dismiss to determine the

12   propriety of a Rule 12(b)(6) motion, see Schneider v. Cal. Dep't of Corrections, 151 F.3d 1194,

13   1197 n.1 (9th Cir. 1998), it may consider allegations raised in opposition papers in deciding

14   whether to grant leave to amend, see, e.g., Broam v. Bogan, 320 F.3d 1023, 1026 n.2 (9th Cir.

15   2003).

16   IV.    Defendants' Motion to Dismiss

17       Defendants argue that plaintiff's claims alleged against them in the second amended

18   complaint should be dismissed with prejudice under the doctrine of claim preclusion because such

19   claims were either adjudicated by the Bankruptcy Court during the adversary proceeding or could

20   have been asserted by plaintiff during the adversary proceeding.

21       Claim preclusion "bars litigation in a subsequent action of any claims that were raised or

22   could have been raised in the prior action." Owens v. Kaiser Foundation Health Plan, Inc., 244

23   F.3d 708, 713 (9th Cir. 2001) (quoting Western Radio Servs. Co. v. Glickman, 123 F.3d 1189,

24   1192 (9th Cir. 1997)) (internal quotation marks omitted). When federal-court jurisdiction is based

25   on the presence of a federal question, federal preclusion doctrine applies. See Taylor v. Sturgell,

26   553 U.S. 880, 891 (2008); see also Heiser v. Woodruff, 327 U.S. 726, 733 (1946).  However,

27   "[f]or judgments in diversity cases, federal law incorporates the rules of preclusion applied by the

28   State in which the rendering court sits." Taylor v. Sturgell, 553 U.S. 880, 891 (2008) (citing

1  <u>Semtek Int'l Inc. v. Lockheed Martin Corp.</u>, 531 U.S. 497, 508 (2001)).  Nevertheless, under

2  California law, a court must apply federal preclusion rules when determining the preclusive effect

3  of a prior federal court judgment.[5]  <u>Younger v. Jensen</u>, 26 Cal.3d 397, 411 (1980).  Accordingly,

4  under federal law, "[T]he doctrine [of claim preclusion] is applicable whenever there is (1) an

5  identity of claims, (2) a final judgment on the merits, and (3) identity or privity between parties."

6  <u>Owens</u>, 244 F.3d at 713.

7           A.    <u>Identity of Claims</u>

8                 The Ninth Circuit Court of Appeals has identified four factors that should be

9  considered by a court in determining whether successive lawsuits involve an identity of claims:

10               (1) whether rights or interests established in the prior judgment
11               would be destroyed or impaired by prosecution of the second
                 action;

12               (2) whether substantially the same evidence is presented in the two
13               actions;

14               (3) whether the two suits involve infringement of the same right;
                 and

15               (4) whether the two suits arise out of the same transactional nucleus
16               of facts.

17  See <u>C.D. Anderson & Co. v. Lemos</u>, 832 F.2d 1097, 1100 (9th Cir. 1987); <u>accord</u> <u>Headwaters</u>

18  <u>Inc. v. United States Forest Serv.</u>, 399 F.3d 1047, 1052 (9th Cir. 2005); <u>Littlejohn v. United</u>

19  <u>States</u>, 321 F.3d 915, 920 (9th Cir. 2003).  "The central criterion in determining whether there is

20  an identity of claims between the first and second adjudications is whether the two suits arise out

21  of the same transactional nucleus of facts."  <u>Owens</u>, 244 F.3d at 714.

22               In most cases, "the inquiry into the 'same transactional nucleus of facts' is essentially the

23  same as whether the claim could have been brought in the first action."  <u>United States v.</u>

24  <u>Liquidators of European Fed. Credit Bank</u>, 630 F.3d 1139, 1151 (9th Cir. 2011).  "A plaintiff

25  need not bring every possible claim.  But where claims arise from the same factual circumstances,

26

27  [5] Defendants removed this case from state court on the basis of both federal question and
    diversity of citizenship jurisdiction.  (See ECF No. 1.)  For purposes of defendants' present
28  motion, federal preclusion rules apply under either basis for subject matter jurisdiction.

1    a plaintiff must bring all related claims together or forfeit the opportunity to bring any omitted

2    claim in a subsequent proceeding." Turtle Island Restoration Network v. U.S. Dep't of State, 673

3    F.3d 914, 918 (9th Cir. 2012).  "Newly articulated claims based on the same nucleus of facts may

4    still be subject to a [claim preclusion] finding if the claims could have been brought in the earlier

5    action." Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 322 F.3d 1064, 1078

6    (9th Cir. 2003); United States ex rel. Barajas v. Northrop Corp., 147 F.3d 905, 909 (9th Cir.

7    1998) ("It is immaterial whether the claims asserted subsequent to the judgment were actually

8    pursued in the action that led to the judgment; rather, the relevant inquiry is whether they could

9    have been brought.").  "The fact that res judicata depends on an 'identity of claims' does not

10   mean that an imaginative attorney may avoid preclusion by attaching a different legal label to an

11   issue that has, or could have, been litigated." Tahoe-Sierra Pres. Council, Inc., 322 F.3d at 1077-

12   78.

13       Here, an identity of claims exists between the SAC in the present case and plaintiff's

14   complaint in the Bankruptcy adversary proceeding.  In the present action, plaintiff essentially

15   seeks relief from the same alleged wrongs he unsuccessfully protested in the adversary

16   proceeding.  In his adversary complaint, the transactional nucleus of facts surrounding plaintiff's

17   claims related to the refinancing of his residential mortgage with Wells Fargo in 2006, the terms

18   of his residential loan, the servicing of his residential loan, plaintiff's attempt at rescission of that

19   loan, and the nonjudicial foreclosure resulting from plaintiff's non-payment of that loan.  (See

20   ECF No. 46-16.)  Similarly, here, the crux of plaintiff's claims in the SAC revolve around the

21   exact same series of events surrounding the origination, service of, and foreclosure on the

22   refinance loan plaintiff took out with Wells Fargo in 2006.

23       Furthermore, several of plaintiff's claims in the SAC assert the exact same legal theories

24   based on the same conduct plaintiff alleged in the adversary proceeding.  For example, plaintiff

25   asserted in his first amended adversary complaint a claim under TILA based on allegations that

26   Deutsche Bank or its agents falsified plaintiff's loan application and failed to respond to

27   plaintiff's notice of rescission.  (See ECF No. 46-16 at 25; ECF No. 47-2 at 18.)  Plaintiff now

28   seeks to assert a TILA claim against defendants on the basis of the same allegations.  Similarly,

1    plaintiff asserted claims in the adversary proceeding under the FCRA and California's Unfair

2    Competition Law and has again asserted those claims in the SAC based on the same conduct that

3    was alleged in plaintiff's adversary complaint.  In addition, to the extent that plaintiff asserts

4    claims in the SAC that were not alleged during the adversary proceeding, these claims are simply

5    new legal theories arising from the same transactional nucleus of facts and could have been raised

6    in the prior action.  See Owens, 244 F.3d at 713-14; C.D. Anderson & Co., 832 F.2d at 1100.

7    Accordingly, there exists an identity of claims between the present action and plaintiff's prior

8    adversary proceeding before the Bankruptcy Court.

9            B.      Final Judgment on the Merits

10           Here, the Bankruptcy Court granted Deutsche Bank's motion to dismiss in part and

11   dismissed the majority of plaintiff's claims with prejudice.  (ECF No. 47-2.)  Later, the

12   Bankruptcy Court granted summary judgment for Deutsche Bank with regard to plaintiff's

13   remaining claims and entered a final judgment in Deutsche Bank's favor.  (ECF No. 48-3; ECF

14   No. 48-4; ECF No. 48-5.)  Accordingly, the adversary proceeding ended in a final judgment on

15   the merits.  Mpoyo v. Litton Electro-Optical Sys., 430 F.3d 985, 988 (9th Cir. 2005) ("The second

16   res judicata element is satisfied by a summary judgment dismissal which is considered a decision

17   on the merits for res judicata purposes."); Hells Cyn. Preserv. Council v. U.S. Forest Serv., 403

18   F.3d 683, 686 (9th Cir. 2005) ("'[F]inal judgment on the merits' is synonymous with 'dismissal

19   with prejudice.'").

20           Plaintiff argues in his opposition that the Bankruptcy Court's judgment in his adversary

21   proceeding cannot be given preclusive effect because final judgment was entered by a United

22   States Bankruptcy Judge, an "Article I" judge, not a United States District Court Judge.  (ECF

23   No. 52 at 2-3.)  Plaintiff asserts that the Bankruptcy Judge's entry of a final judgment in

24   plaintiff's adversary proceeding was unconstitutional under the United States Supreme Court's

25   rulings in Stern v. Marshall, 131 S. Ct. 2594 (2011), and Northern Pipeline Const. Co. v.

26   Marathon Pipe Line Co., 458 U.S. 50 (1982), therefore invalidating the judgment entered in the

27   Bankruptcy Court in Deutsche Bank's favor.  (Id.)  However, plaintiff's reliance on these two

28   decisions is misplaced because subsequent decisions issued by the United States Supreme Court

1   and the Ninth Circuit Court of Appeals have further clarified the holding in Stern and show that

2   the Bankruptcy Court properly entered final judgment in plaintiff's adversary proceeding against

3   Deutsche Bank.

4         Except as otherwise provided by Congress, the district court has "original and exclusive

5   jurisdiction of all cases under Title 11 . . . [and] original but not exclusive jurisdiction of all civil

6   proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. §

7   1334(a) & (b); Stern, 131 S. Ct. at 2603.[6]  Under the current statutory framework, established by

8   the Bankruptcy Amendments and Federal Judgeship Act of 1984 (the "1984 Act"), Congress has

9   empowered the district court to refer any such cases and proceedings to bankruptcy judges.  See

10  28 U.S.C. § 157(a).  In particular, Congress has empowered the Bankruptcy Courts to "hear and

11  determine all cases under title 11 and all core proceedings arising under title 11, or arising in a

12  case under title 11," and to "enter appropriate orders and judgments," subject to appellate review

13  in the district court. 28 U.S.C. § 157(b)(1); 158(c)(2) (appeals).  The Ninth Circuit Court of

14  Appeals has described the Bankruptcy Court's statutory authority as follows:

15
16        What the bankruptcy court may do with a given referred proceeding depends on
          whether the proceeding is denominated a "core" or a "non-core" proceeding. In all
          "core proceedings arising under title 11, or arising in a case under title 11," a
17        bankruptcy judge has the power to "hear and determine the controversy" and enter
          final orders, subject only to appellate review. [28 U.S.C.] § 157(b)(1).  In a non-
18        core proceeding "that is otherwise related to a case under title 11," however, a
          bankruptcy judge may only "submit proposed findings of fact and conclusions of
19        law to the district court."  Id. § 157(c)(1).  The entry of final judgment in non-core
          proceedings is the sole province of Article III judges.
20

21  In re Bellingham Ins. Agency, Inc., 702 F.3d 553, 558 (9th Cir. 2012), cert. granted, 133 S. Ct.

22  2880, and aff'd sub nom. Executive Benefits Ins. Agency v. Arkison, 134 S. Ct. 2165 (2014).

23

24  [6] Cases under Title 11 are proceedings that are initiated by the filing of a petition in bankruptcy.
    See 11 U.S.C. § 101(42) (bankruptcy petition "commenc[es] a case under this title"). Civil
25  proceedings that "aris[e] under title 11, or aris[e] in ... cases under title 11" are "core
    proceedings." Stern, 1431 S. Ct. at 2605 ("core proceedings are those that arise in a bankruptcy
26  case or under Title 11"); Montana v. Goldin (In re Pegasus Gold Corp.), 394 F.3d 1189, 1193 (9th
    Cir. 2005) ("[p]roceedings 'arising in' bankruptcy cases are generally referred to as 'core'
27  proceedings, and essentially are proceedings that would not exist outside of bankruptcy") (citing
    28 U.S.C. § 157(b)(2)).
28

1   While the Bankruptcy Court generally cannot enter final judgment in non-core proceedings, the

2   statutory framework provides an exception allowing the entry of final judgment in non-core

3   proceedings "with the consent of all the parties." 28 U.S.C. § 157(c)(2).  However,

4   notwithstanding Congress's grant of authority to the Bankruptcy Courts, constitutional and

5   statutory impediments must be overcome before a bankruptcy court can adjudicate a given claim.

6        In Northern Pipeline Const. Co., the United States Supreme Court reviewed whether

7   bankruptcy judges under a statutory scheme prior to the 1984 Act "could 'constitutionally be

8   vested with jurisdiction to decide [a] state-law contract claim' against an entity not otherwise a

9   party to the proceeding."  Executive Benefits Ins. Agency, 134 S. Ct. at 2171 (quoting Northern

10   Pipeline Const. Co., 458 U.S. 50, and discussing the issue presented in that case).  The Court held

11   that Congress's grant of power to the Bankruptcy Courts to issue a final resolution on such a

12   claim violated Article III of the Constitution because it "impermissibly removed most, if not all,

13   of 'the essential attributes of the judicial power' from the Art. III district court, and has vested

14   those attributes in a non-Art. III adjunct."  Northern Pipeline Const. Co., 458 U.S. at 87.

15   Following the Supreme Court's ruling in Northern Pipeline Const. Co., Congress enacted the

16   1984 Act, which provides the current statutory scheme under which the Bankruptcy Courts

17   operate.  See In re Bellingham Ins. Agency, Inc., 702 F.3d at 559 (discussing the amendments

18   made by Congress in the 1984 Act).

19        In Stern v. Marshall, the United States Supreme Court addressed an underlying conflict

20   between Congress's amended statutory framework created by the 1984 Act and the requirements

21   of Article III.  The bankrupt in Stern had filed a common-law counterclaim for tortious

22   interference against a creditor to the estate, a claim that was expressly deemed a "core"

23   proceeding under 28 U.S.C. § 157(b)(2)(C), thereby authorizing the bankruptcy court to

24   adjudicate the claim to final judgment.  131 S. Ct. at 2604.  The respondent in that case asserted

25   that Congress had violated Article III by vesting the power to adjudicate such a claim in

26   bankruptcy court.  Id. at 2601.  The Supreme Court agreed, holding that "Congress had

27   improperly vested the Bankruptcy Court with the "'judicial Power of the United States'" when it

28   gave the Bankruptcy Court the statutory authority to enter final judgment on such a claim.

17

1   Executive Benefits Ins. Agency v. Arkison, 134 S. Ct. 2165, 2172 (2014) (discussing the Court's

2   holding in Stern). Ultimately, "Stern made clear that some claims labeled by Congress as 'core'

3   may not be adjudicated by a bankruptcy court in the manner designated by § 157(b)." Id.

4   However, as subsequently noted by the Supreme Court, "Stern did not . . . address how the

5   bankruptcy court should proceed under those circumstances." Id.

6       In the time since Stern was decided, the Ninth Circuit Court of Appeals has addressed the

7   very issue of how a bankruptcy court should proceed when faced with such circumstances. In In

8   re Bellingham Ins. Agency, Inc., 702 F.3d 553, 568 (9th Cir. 2012), the bankruptcy trustee

9   initiated an adversary proceeding against Executive Benefits Insurance Agency ("EBIA") and

10  other defendants, alleging, among other things, a fraudulent conveyance claim, a "core" claim

11  under § 157(b). 702 F.3d at 557. The bankruptcy court ultimately granted summary judgment in

12  favor of the bankruptcy trustee and entered a final judgment. Id. EBIA appealed the decision to

13  the district court, which reviewed the summary judgment decision de novo and affirmed. Id.

14  EBIA then appealed to the Ninth Circuit Court of Appeals, arguing that the bankruptcy judge was

15  constitutionally proscribed from entering final judgment on the trustee's claims under the United

16  States Supreme Court's ruling in Stern. Id.

17      Denying EBIA's appeal, the Ninth Circuit Court of Appeals determined that while Stern

18  has made it clear that bankruptcy courts do not have the general authority to enter final judgments

19  on fraudulent conveyance claims asserted against noncreditors to the bankruptcy estate, there are

20  two independent sets of circumstances under which a final judgment by a bankruptcy court on

21  "core" claims subject to the Stern ruling may still be upheld. First, the court held that, pursuant to

22  28 U.S.C. § 157(c)(2), bankruptcy courts may enter final judgments on such claims "with the

23  consent of all the parties to the proceeding," or the implied consent of the parties through their

24  failure to timely object to the bankruptcy court's authority to enter final judgment. In re

25  Bellingham Ins. Agency, Inc., 702 F.3d at 566-70. [7] In coming to this first holding, the court

26  reasoned that "[i]f consent permits a non-Article III judge to decide finally a non-core proceeding

27

28  ───────────

    [7] The court also noted that 28 U.S.C. § 157(c)(2) also permits a bankruptcy court to enter a final
    judgment on a non-core claim upon consent of all parties. Id.

1  [pursuant to 28 U.S.C. § 157(c)(2), then it surely permits the same judge to decide a core

2  proceeding in which he would, absent consent, be disentitled to enter final judgment." Id. at 567.

3  Second, the court held that, even in the absence of consent to the bankruptcy judge's jurisdiction,

4  the district court may still review the bankruptcy court's entry of judgment *de novo*, treating it as

5  proposed findings of fact and conclusions of law, thus curing the constitutional defect identified

6  in Stern. Id. at 565-66.

7        After the Ninth Circuit Court of Appeal's decision, EBIA sought review in the United

8  States Supreme Court. The Supreme Court granted certiorari for the case to be heard during the

9  Court's most recent term and issued a unanimous decision upholding the Ninth Circuit's ruling.

10  Executive Benefits Ins. Agency v. Arkison, 134 S. Ct. 2165 (2014). In affirming the decision, the

11  Supreme Court elected to resolve the case solely on the basis that the district court had conducted

12  *de novo* review of the bankruptcy court's judgment. Id. at 2174. In particular, the Court stated:

13  
14  

15  

16  

17  

> We hold today that when, under Stern's reasoning, the Constitution does not
> permit a bankruptcy court to enter final judgment on a bankruptcy-related claim,
> the relevant statute nevertheless permits a bankruptcy court to issue proposed
> findings of fact and conclusions of law to be reviewed *de novo* by the district
> court. Because the District Court in this case conducted the de novo review that
> petitioner demands, we affirm the judgment of the Court of Appeals upholding the
> District Court's decision.

18  Id. at 2168. The Supreme Court reserved the issue of "whether Article III permits a bankruptcy

19  court, with the consent of the parties, to enter final judgment on a Stern claim . . . for another

20  day." Id. at 2170, n.4. Because the Supreme Court declined to address this aspect of the Court of

21  Appeals' ruling, the Court of Appeals' holding that bankruptcy courts may enter final judgments

22  on Stern claims with the consent of all the parties to the proceeding was left undisturbed.[8]

23  ////

24  

25  [8] The court notes that the United States Supreme Court has recently granted certiorari in another
case for its upcoming term to address the very issue of whether Article III permits a bankruptcy
26  court to enter a final judgment on the basis of party consent. See Wellness Int'l Network Ltd. v.
Sharif, 272 F.3d 751 (7th Cir. 2013), cert. granted __ U.S.L.W. __ (U.S. July 1, 2014) (No. 13-
27  9355). Nevertheless, at this time, the court is bound to follow current precedent, i.e. the Ninth
Circuit Court of Appeals' ruling in In re Bellingham Ins. Agency, Inc., in addressing this issue.

28

The Ninth Circuit Court of Appeals' decision in In re Bellingham Ins. Agency, Inc. makes it clear that, contrary to plaintiff's argument, the reasoning in Stern did not invalidate the Bankruptcy Court's issuance of a final judgment in plaintiff's adversary proceeding. As an initial matter, the court notes that the Bankruptcy Court entered judgment in favor of Deutsche Bank without specifying in its orders whether it was acting pursuant to § 157(b) (core) or § 157(c)(2) (non-core with consent). Nevertheless, whether plaintiff's claims adjudicated in the adversary proceeding were "core" claims, "core" claims subject to the limitations imposed by the reasoning in Stern, or "non-core" claims is of no consequence here because plaintiff consented to the bankruptcy court's jurisdiction to issue a final judgment. In the judicially noticed first amended adversary complaint, the operative complaint at the time the Bankruptcy Court entered judgment against plaintiff, plaintiff stated the following:

> This adversary proceeding is a core proceeding as defined at 28 U.S.C. § 157(b)(2)(b) and (b)(2)(K) in that it is an action to determine the nature, extent and validity of a lien on property evidence by a deed of trust, and the allowance or disallowance of a claim. To the extent that this proceeding is determined to be a non-core proceeding, Plaintiff consents to the entry of final orders or judgment by the bankruptcy court.

(ECF No. 46-16 at 3.) Under the Ninth Circuit Court of Appeals' current precedent, such express consent was sufficient to confer jurisdiction upon the Bankruptcy Court to issue a final judgment as to plaintiff's claims asserted during the adversary proceeding, be they core claims, Stern claims, or non-core claims.[9] Furthermore, insofar as plaintiff's claims were core claims not subject to the reasoning in Stern, the Bankruptcy Court had jurisdiction to enter final judgment even without the consent of the parties. 28 U.S.C. § 157(b)(1); see Executive Benefits Ins.

---

[9] Furthermore, plaintiff impliedly consented to the Bankruptcy Court's entry of final judgment because plaintiff remained silent about his objection under Stern regarding the entry of final judgment by the Bankruptcy Court until after his bankruptcy proceedings had concluded. Under the current Ninth Circuit precedent, implied consent through such silence is sufficient to grant a bankruptcy court the authority to issue final rulings in "non-core" claims and "Stern" claims. See In re Bellingham Ins. Agency, Inc., 702 F.3d at 568 ("Because EBIA waited so long to object, and in light of its litigation tactics, we have little difficulty concluding that EBIA impliedly consented to the bankruptcy court's jurisdiction."); Mann v. Alexander Dawson Inc. (In re Mann), 907 F.2d 923, 926 (9th Cir. 1990) (holding that a debtor's decision to file an adversary proceeding in bankruptcy court, and his failure to object to the court's jurisdiction prior to the time it rendered judgment against him, meant that "he consented to the court's jurisdiction.").

1   Agency, 134 S. Ct. at 2171.  Accordingly, because the Bankruptcy Court had the authority to

2   issue a final ruling in plaintiff's adversary proceeding, its grant of summary judgment in Deutsche

3   Bank's favor in that case constitutes a final judgment for purposes of claim preclusion.

4       C.      Identity or Privity Between Parties

5       The third requirement for the doctrine of claim preclusion is privity of parties. "Privity . . .

6   is a legal conclusion designating a person so identified in interest with a party to former litigation

7   that he represents precisely the same right in respect to the subject matter involved." Headwaters

8   Inc. v. U.S. Forest Serv., 399 F.3d 1047, 1052-53 (9th Cir. 2005) (internal quotations and

9   citations omitted).  Privity is obviously present when a party to the present action was also a party

10  in the previous case.  See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 322

11  F.3d 1064, 1081 (9th Cir. 2003).  However, privity is not limited to those who were parties to

12  both actions. "Even when the parties are not identical, privity may exist if 'there is 'substantial

13  identity' between parties, that is, when there is sufficient commonality of interest.'" Id. (quoting

14  In re Gottheiner, 703 F.2d 1136, 1140 (9th Cir. 1983)).  "[P]rivity is a flexible concept dependent

15  on the particular relationship between the parties in each individual set of cases." Tahoe-Sierra

16  Pres. Council, Inc., 322 F.3d at 1081.  Generally, "federal courts will bind a non-party whose

17  interests were represented adequately by a party in the original suit." In re Schimmels, 127 F.3d

18  875, 881 (9th Cir. 1997).  "In addition, 'privity' has been found where there is a 'substantial

19  identity' between the party and nonparty, . . . and where the interests of the nonparty and party

20  are 'so closely aligned as to be 'virtually representative.''" Id. (internal citations omitted).

21      1.      Deutsche Bank

22      There is no doubt that there is an identity of parties with respect to Deutsche Bank.

23  Deutsche Bank was named as the sole defendant in the previous adversary proceeding.  Plaintiff

24  now names Deutsche Bank as a defendant to the present action and asserts claims against it that

25  were adjudicated, or could have been adjudicated, by the Bankruptcy Court in the adversary

26  proceeding.  Accordingly, all of plaintiff's claims in the present action against Deutsche Bank are

27  precluded by the prior bankruptcy action.

28  ////

1          2.          Select Portfolio and Quality Loan

2          Select Portfolio argues that even though it was not a party to the adversary proceeding, the

3   allegations in plaintiff's SAC show that there is privity between it and Deutsche Bank because

4   they "confirm that the requisite close relationship and substantial identity exists between

5   [Deutsche Bank] and [Select Portfolio] for res judicata purposes." (ECF No. 45-1 at 23.) Quality

6   Loan states in its notice of joinder that it joins Select Portfolio in this argument. (ECF No. 49 at

7   2.) The court agrees that privity is present between Deutsche Bank and these two defendants.

8          In the SAC, plaintiff alleges that Deutsche Bank was the trustee and assignee of the

9   beneficial interest in his home loan, that Select Portfolio was the servicer of his loan, that an

10  agency relationship existed between these two parties, and that they worked in concert to illegally

11  foreclose on his loan. (ECF No. 43 at 2, 6, 8, 12-13, 16, 20.) The allegations in the SAC

12  regarding Select Portfolio's role in the foreclosure on plaintiff's loan are derivative of the

13  arguments that Deutsche Bank did not have authority —in light of the alleged fact that the

14  Deutsche Bank could not assume ownership over plaintiff's loan because the loan had been

15  originated under false pretenses —to direct Select Portfolio to proceed with the foreclosure.

16  Furthermore, Select Portfolio is alleged to be an agent of Deutsche Bank and was allegedly acting

17  on Deutsche Bank's behalf when it engaged in its loan servicing and foreclosure activities. The

18  alleged existence of an agency relationship is sufficient to show privity between these two

19  defendants for purposes of claim preclusion. Adams v. Cal. Dep't of Health Servs., 487 F.3d 684,

20  691-92 (9th Cir. 2007) (agents and employees in sufficient privity to invoke claim preclusion);

21  see also Solomon v. E-Loan, Inc., 2011 WL 1253840, at *5 (E.D. Cal. Mar. 30, 2011).

22  Accordingly, the court concludes Select Portfolio was so "identified in interest" with Deutsche

23  Bank in the prior lawsuit, that privity exists between them for purposes of claim preclusion.

24         Similarly, the allegations in the SAC show that Quality Loan was also in privity with

25  Deutsche Bank. The only allegations in the SAC regarding Quality Loan are that it "acted in

26  concert with Defendant [Deutsche Bank]as an agent to falsely make a declaration of a default

27  where none existed" and that the "Notice of Default was executed by Defendant Quality [Loan] at

28  the request of Defendant Select [Portfolio]." (ECF No. 43 at 12, 17.) The alleged fact that

1  Quality Loan acted as an agent on behalf of Deutsche Bank when engaging in the activities

2  alleged in the SAC shows that the two are in privity.  See Adams, 487 F.3d at 691-92.

3  Accordingly, there is also privity between Deutsche Bank and Select Portfolio that satisfies the

4  final element of the claim preclusion doctrine.

5          Based on the foregoing, the court concludes that the doctrine of claim preclusion applies

6  to plaintiff's present lawsuit against defendants Deutsche Bank, Select Portfolio, and Quality

7  Loan.  Accordingly, this action should be dismissed with prejudice as to these defendants.

8  V.      Conclusion

9          Based on the foregoing, IT IS HEREBY RECOMMENDED that:

10         1.  Defendants Select Portfolio Servicing, Inc., Deutsche Bank National Trust Co., and

11 Quality Loan Service Corporation's motion to dismiss the second amended complaint (ECF Nos.

12 45, 49) be GRANTED; and

13         2.  Defendants Select Portfolio Servicing, Inc., Deutsche Bank National Trust Co., and

14 Quality Loan Service Corporation be dismissed from this action with prejudice.

15         These findings and recommendations are submitted to the United States District Judge

16 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen (14)

17 days after being served with these findings and recommendations, any party may file written

18 objections with the court and serve a copy on all parties.  Such a document should be captioned

19 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

20 shall be served on all parties and filed with the court within fourteen (14) days after service of the

21 objections.  The parties are advised that failure to file objections within the specified time may

22 waive the right to appeal the District Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th

23 Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

24         IT IS SO RECOMMENDED.

25 Dated:  September 8, 2014

26                                                KENDALL J. NEWMAN
                                                 UNITED STATES MAGISTRATE JUDGE
27

28

                                                23

# EXHIBIT N

# EXHIBIT N

1  Charles T. Marshall, Esquire (SBN 176091)
   Law Offices of Charles T. Marshall
2  415 Laurel Street, # 405
   San Diego, California  92101
3  Tel:    619-807-2628
   Fax:    866-575-7413
4  Email:  cmarshall@marshallestatelaw.com

5

6

7

8                    **UNITED STATES DICTRICT COURT**

9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  JAMES L. MACKLIN,                        Case No: 2:10-cv-01097-MCE-KJN

                        Plaintiff,           **PLAINTIFF'S OBJECTION TO**
12                                           **MAGISTRATE KENDALL J. NEWMAN'S**
          vs.                                **FINDINGS AND RECOMMENDATIONS;**
13                                           **REQUEST FOR HEARING UNDER**
    SELECT PORTFOLIO SERVICING, INC.,        **FEDERAL RULES OF EVIDENCE RULE**
14  DEUTSCHE BANK NAT'L TRUST CO. AS          **201 (e)**
    TRUSTEE FOR THE
15  CERTIFICATEHOLDERS OF
    ACCREDITED MORTGAGE LOAN TRUST
16  SERIES 2006-2, WELLS FARGO & CO.,
    QUALITY LOAN SERVICES, INC.,
17
                        Defendant(s).
18

19

20  TO THE COURT, PARTIES AND THEIR ATTORNEYS:

21      **PLEASE TAKE NOTICE** that Plaintiff James L. Macklin hereby Objects to U.S. District

22  Court Magistrate Kendall J. Newman's Findings and Recommendations entered into the Court

23  record on 9/8/2014 in the above titled Action.

24      FRE Rule 201 (e): On timely request, a party is entitled to be heard on the propriety of taking

25  judicial notice and the nature of the fact to be noticed. If the Court takes judicial notice before

26  notifying a party, the party, on request, is still entitled to be heard. Plaintiff Macklin requests a

27  Hearing to determine the nature of facts submitted by Defendants and on the propriety of such

28  judicial notice. Because FRE Rule 201 (e) does not require this request to be by Motion, Plaintiff

                                        - 1 -
    OBJECTION TO FINDINGS & RECOMMENDATIONS/ MAGISTRATE

asks this Court to provide a Hearing calendar in a reasonable time period not to exceed sixty (60) days from the Hearing on this Objection.

Plaintiff James L. Macklin received, by U.S. mail, the Proposed Findings and Recommendations on September 11th, 2014.

Fed. R. Civ. P., Rule 72 (b)(2): Dispositive Motions/Objections. Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy. Unless the district judge orders otherwise, the objecting party must promptly arrange for transcribing the record, or whatever portions of it the parties agree to or the Magistrate judge considers sufficient.

Fed. R. Civ. P. Rule 72 (b)(3): Resolving Objections: The district judge must determine *de novo* any part of the Magistrate judge's disposition that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the Magistrate judge with instructions.

Because Plaintiff received the Findings and Recommendations on September 11th, 2014, timely filing of this Objection comes on or before September 25th, 2014.

In the Magistrate's findings, the Court substantially relied upon representations made by counsel for Defendants within Declarations made by Robert Bleicher. The Court also relied heavily on previously heard matters and exhibits used within the Bankruptcy Court Adversary Proceeding. Plaintiff objects generally and specifically to the findings as follows.

### JUDICIAL NOTICE

At pages 4-5 of the Magistrate's Findings and Recommendations, the Court substantially allowed Defendants to judicially notice virtually every document requested by Defendants stating: "The court takes judicial notice of these documents filed in these earlier actions for the purpose of recognizing the judicial acts taken and the subject matter of the Plaintiff's adversary proceeding before the Bankruptcy Court." (Ln. 1-3, Pg. 5). Among Defendant's requests are

OBJECTION TO FINDINGS & RECOMMENDATIONS/ MAGISTRATE

many documents of whch Plaintiff also requested the same judicial notice. The Court previously took judicial action based on documents submitted for the record. The truthfulness and accuracy of those documents is the subject of Plaintiff's case at Bar here. Plaintiff objects to the judicial acts taken in the previous matter and this Court's reliance on those acts based upon documents where facts contained within those documents are in dispute, objections to which those documents are timely made.

Then, at pg. 5, Ln. 12-21, Pg. 6 Ln. 1-7, the Court identifies documents that were requested to be judicially noticed by Plaintiff: Items (3), (4), (5) and the final item named by the Court (ECF No. 63), the "Master Sales and Servicing Agreement" concerning the Accredited Mortgage Loan Trust Series 2006-2, were all exhibits and records within the same Bankruptcy Court adversary proceeding, yet, the Court denied Plaintiff's request for judicial notice.

The Court uses the language that Plaintiff "purports" that documents (3), (4) and (5) were used by Defendants. This use of the word "purports" is a prejudicial disposition and shows that the Court did not properly interpret the manner and method in which Plaintiff requested judicial notice. These instruments are permanent records of the Bankruptcy Court and are subject to timely repudiation as to the information contained within the documents. Whether or not that information is true or false is subject to FRE Rule 201 (e), an opportunity to be heard on the merits and truthfulness of the records. Plaintiff was not afforded his right to be heard under FRE Rule 201 (e). Plaintiff is entitled to such a Hearing. Plaintiff objects to having been refused his right to a hearing under the Rule, *id*.

As to document (3), the Court has already taken notice of the facts contained within the United States Securities & Exchange Commission Master Sales & Servicing Agreement ("MSSA") for "AMLT 2006-2" trust in the Bankruptcy adversary proceeding. They are self-authenticating records and as such, are beyond objection and hearsay. The MSSA is a permanent record in the Bankruptcy Court and at the United States Securities & Exchange Commission, a governmental agency, yet judicial notice was denied by the Magistrate. Plaintiff objects to the Court's denial of a properly submitted request for judicial notice. Under FRE Rule 102, Plaintiff has the right to

- 3 -

OBJECTION TO FINDINGS & RECOMMENDATIONS/ MAGISTRATE

1  promote and develop evidence re: relevant law to the end of ascertaining the truth in the instant

2  case, glean from applying the relevant facts to the relevant law, thus securing a just

3  determination.

4     Document (4) is the loan application, exhibited as a record within the Bankruptcy adversary

5  proceeding, and has never been refuted or challenged by Defendants. It is a record of the

6  previous Court. Plaintiff was denied judicial notice by the Magistrate in the instant case,

7  incorrectly. Plaintiff is entitled to judicial notice and under FRE Rule 201 (e), a Hearing to

8  determine the attendant truthfulness and facts contained therein. Plaintiff objects to the

9  Magistrate's denial of judicial notice of document (4). FRE Rule 103 (e) allows the Court to take

10  notice of a plain error affecting a substantial right, even if the right was not properly preserved.

11  Facts contained within the document clearly evidence an irrefutable right of Plaintiff to prosecute

12  his timely claims.

13     Document (5) is also a permanent record from the previous Bankruptcy Court as exhibited by

14  Plaintiff, thus, it is not subject to denial of judicial notice by this Court. Plaintiff objects to the

15  Court's denial of judicial notice because there are material facts in dispute contained within the

16  documents.

17     Plaintiff objects to the disposition of the Magistrate as relates to this case as the Findings and

18  recommendations do not afford equal protection or treatment of Plaintiff by the Court. Under the

19  Court's exact language used to support Defendant's request for judicial notice, Plaintiff's request

20  should have also been granted. *Bank v. Magna Bank of Missouri*, 894, F. Supp. 1337, 1341 (E.D.

21  Mo. 1995), aff'd. 92 F. 3d 743 (8th Cir. 1996) (taking judicial notice  from prior related

22  bankruptcy proceedings to recognize the judicial acts taken and the subject matter of that prior

23  proceeding). If Plaintiff were afforded a Rule 201 (e) Hearing and were able to show that there

24  were false facts contained within those documents, or that, in fact, the underlying debt obligation

25  was never lawfully held by the Defendant(s), both subject matter jurisdiction and judicial acts

26  taken by the previous Court would have been reviewed *de novo* by the higher Court and a much

27  different Finding would result. The previous rulings by the Bankruptcy Court would also come

28

- 4 -

OBJECTION TO FINDINGS & RECOMMENDATIONS/ MAGISTRATE

under scrutiny as to its Rulings and judicial acts. Plaintiff was not afforded this right under Rule 201 (e).

Further, the very facts contained within the documents requested by Plaintiff for judicial notice are the facts at issue in the underlying action. The Court cannot take judicial notice of disputed facts contained within Court records. Federal Rules of Evidence Rule 201 does not allow the Court to take judicial notice of facts that are in dispute. The very documents that Plaintiff requested judicial notice by the Court were, in fact, repudiated as to the truthfulness and accuracy of facts contained within those documents used by Defendants in the adversary proceeding in Bankruptcy Court.

FRE Rule 201 (b) states clearly that judicial notice may be taken of a fact ***that is not subject to reasonable dispute*** [emph. mine] because it: (1) is generally known within the trial Court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned.

Plaintiff clearly and unambiguously stated in his Second Amended Complaint and Opposition to Dismiss that all records within the Bankruptcy Court's records were disputed and that the facts contained within those documents were repudiated. See: Plaintiff's Opp. To MTD, Pg. 3, Ln. 21, pg. 4, Ln. 5, pg. 13, Ln. 27, pg. 14, Ln. 1, pg. 18, Ln. 12, pg. 19, Ln. 6 & 24, pg. 20, Ln. 4 & 7; Second Amended Complaint, at pg. 29, Ln. 4.

The Court here has expressed in its Findings that "Such facts are not reasonably in dispute by the parties" and uses a footnote (4) at pg. 5, Ln. 7. This is not true. The facts contained within the documents are in dispute. Plaintiff acknowledges that the documents and records of the Court are, in fact, records of the Court; however, Plaintiff has clearly and unambiguously refuted the truthfulness and accuracy of the documents specifically plead by Plaintiff. Plaintiff is harmed and prejudiced by the Court's disposition as to what "facts" are being noticed because Plaintiff has refuted the truthfulness of those records. If the Court were to rely upon disputed exhibits and evidence, Plaintiff will be denied his right to due process through discovery and reasonable inquiry as to those records.

OBJECTION TO FINDINGS & RECOMMENDATIONS/ MAGISTRATE

Plaintiff timely and effectively objected to the request for judicial notice (Plaintiff's Objection to Defendant's Request for Judicial Notice) and has a right to be heard. FRE Rule 201 (e): "On timely request, a party is entitled to be heard on the propriety of taking judicial notice and the nature of the fact to be noticed. If the Court takes judicial notice before notifying a party, the party, on request, is still entitled to be heard." Plaintiff was not "notified" of the Court's decision to take judicial notice of Defendant's documents until the day of the Hearing on Defendant's Motion to Dismiss, August 21st, 2014. Plaintiff is still entitled to be heard because Plaintiff specifically and timely objected to the Request. Plaintiff was denied such right by the Magistrate.

The Court also denied judicial notice of a Court record by denying the judicial notice of an Amicus Brief by the Consumer Financial Protection Bureau ("CFPB") (Document #1, pg. 5, Ln. 13, Findings and Recommendations) a U.S. governmental agency (Findings and Recommendations, pg. 6, Ln. 18). This brief is a record of the *Rosenfied v. HSBC Bank, USA*, Case No. 10-1442, US 10th Cir. Court of Appeals. Yet, in this Court's footnote at pg. 5, the Court specifically cites to *Biggs v. Terhune*, 334 F.3d 910, 916 n.3 (9th cir. 2003) and *United States v. Wilson*, 631 F.2d 118, 119 (9th cir. 2003) ("[A federal district] court *may* take judicial notice of its own records in other cases, as well as the records of an inferior court in other cases"): *Chandler v. United States*, 378 F.2d 906, 909 (9th cir. 1967).

In this footnote (4), the Magistrate summarily grants Defendants judicial notice, denies Plaintiff's objection to said notice, and denies Plaintiff's *identical* request. As is plain by the previous paragraph, the Court may take judicial notice of parallel court cases and their documents within the record, yet, the Court here did not. The fact that the CFPB entered its self-governing opinion as to the merits of that case is also central to the *law* (as opposed to factual allegations) of Plaintiff's case and the Court should have taken notice of the Brief by CFPB. It is relevant and the Court has a duty of reasonable inquiry. The *Amicus Brief* identifies construction of the TILA laws and interpretations that are directly on-point in this case where Plaintiff was dismissed improperly by the previous Bankruptcy Court. The District Court Magistrate now uses this incorrect interpretation against Macklin's rights in its ruling on the Hearing for the Motion to

1   Dismiss. This blatant misinterpretation of the law cannot stand. Plaintiff has rights under the

2   Truth-In-Lending-Act that were abrogated by the Bankruptcy Court.

3       It is also relevant to note that the CFPB expressed its opinion as to TILA claims that are

4   factually and legally ***identical*** to Plaintiff's here. These facts are considered as the official

5   opinion and ***proper interpretation of law of the CFPB*** and, because the CFPB is granted the

6   authority to promulgate its own Rules, the Court had a duty to, at a minimum, review the subject

7   matter and take notice of the Brief.

8       At pg. 6, Ln. 8-18, the Court **supposes** that Plaintiff requested judicial notice of documents in

9   order to utilize them as supporting allegations. (Ln. 9: "It **appears** that plaintiff seeks judicial

10  notice…so that he may utilize them in support of the substantive allegations made in his SAC").

11      The facts that Plaintiff used to support his causes of action were already judicially noticed, and

12  accepted by the Court, within the Bankruptcy Court and within records used by Defendants

13  request for judicial notice. Plaintiff never inferred or asserted anywhere that the request for

14  judicial notice was directed, exclusively or otherwise, to supporting allegations. The record is

15  bereft of any such assertion or inference. The disposition of the Magistrate here again prejudices

16  Plaintiff. Because *de novo* review is appropriate here, the Court must look to the attendant

17  documents that were accepted by the Magistrate on behalf of Defendants and compare those to

18  the exact same documents that were denied to Plaintiff. The U.S. Tax return of Plaintiff is not

19  subject to dispute as it is a permanent record of the Internal Revenue Service and was used by the

20  Defendants to create an illegal contract (Doc #5, Findings and Recommendations, pg. 5, Ln. 21).

21  It is a government document that is not subject to reasonable dispute because it can be accurately

22  and readily determined from sources whose accuracy cannot be reasonably questioned. FRE

23  Rule 201 (b)(2). Judicial notice should have been, and must be, granted to Plaintiff. Plaintiff is

24  entitled to a complete record for purposes of preserving the record for a potential Appeal.

25  Plaintiff objects to the disposition as it prejudiced his rights and left out material facts that could

26  be used to develop evidence law. FRE, Rule 102, 103.

27

28

OBJECTION TO FINDINGS & RECOMMENDATIONS/ MAGISTRATE

1    Facts may be refuted, challenged and drawn from these records that not only contradict the

2    Court's findings, but that demand an inquiry by this Court.

3                          **THE LEGAL STANDARD**

4        The Court cites to *Paulsen v. CNF, Inc*., 559 F.3d 1061, 1071 (9th Cir. 2009) in its

5    consideration of legal standard for Motions to Dismiss. "The court is 'not', however, required to

6    accept as true conclusory allegations that are contradicted by documents referred to in the

7    complaint…" Not one allegation within Plaintiff's Complaint is contradicted by any document

8    referred to in the complaint. Plaintiff meets and exceeds all of the requirements that would

9    preclude a Motion to Dismiss under *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl.*

10   *Corp. v. Twombly*, 550 U.S. 554, 570 (2007).

11       The Magistrate in this Court continually relies upon the case of *Executive Benefits Ins. Agency*

12   *v. Arkison*, 134 S. Ct. 2165 (2014) ("EBIA") in issuing it findings against Plaintiff here. This

13   case was taken up by the U.S. Supreme Court and in its decision the Court stated: "*We hold*

14   *today that when, under Stern's reasoning, the Constitution does not permit a bankruptcy court to*

15   *enter final judgment on a bankruptcy-related claim, the relevant statute nevertheless permits a*

16   *bankruptcy court to issue proposed findings of facts and conclusions of law **to be reviewed de***

17   ***novo by the district Court. Because the District Court in this case conducted the de novo***

18   ***review*** *that petitioner demands, we affirm the judgment of the court of appeals upholding the*

19   *District Court's decision.*" [Emph. mine].

20       In the instant matter, no such *de novo* review was ever conducted by the District Court. The

21   Supreme Court was very specific in its ruling and the facts are significantly different here. There

22   simply was never a *de novo* review of Macklin's bankruptcy case, ever. Plaintiff objects to the

23   Court's reliance on case law that is irrelevant and not directly on point to Plaintiff's facts.

24       Had *de novo* review been completed by the District Court in this matter, Plaintiff would have

25   had the opportunity to challenge the veracity, truthfulness and accuracy of documents that are in

26   dispute. Plaintiff's case is distinguishable from *EBIA*, thus, the authority is irrelevant.

27

28

- 8 -

As to the Court's position on "consent". Although the matter of consent will be reviewed by the Supreme Court, there is controlling authority directly from the U.S. Supreme Court that, at this time, controls this matter.

From *EBIA*: "***If*** the claim satisfies the criteria of § 157(c)(1), the Court simply treats the claim as non-core; The bankruptcy Court should hear the proceeding ***and submit proposed findings of fact and conclusions of law to the district Court for de novo review and entry of judgment***." None of these procedures were availed to Plaintiff in this case. [Emph. mine]

Further, the Supreme Court specifically stated the word "***If***" in its findings, relative to 157 (c)(1). We now look back to *Stern* to see ***if*** the claim satisfies the critera…and we find that the consent issue is not available…Article III is a constitutional structural limit on the powers of the federal judiciary. No constitutional deficiency can be overcome by consent. A constitutional limit on the power of the court **cannot be overcome by consent**, as determined in *Sosna v. Iowa,* 419, US 393, 398; *Mitchell v. Mauer*, 293 US 237, 244. Plaintiff's bankruptcy case here has never received the benefits as adjudicated in *EBIA*, that being a submittal of proposed facts and conclusions by the lower court to the district court, which the Supreme Court specifically relied upon in its ruling…*EBIA* is not controlling and does not satisfy Defense's burden. Dismissal was not appropriate by the Magistrate in the instant case. Thus, the disposition of the Magistrate is objected to properly. Macklin could not consent to abrogating a structural, Constitutional limit on the court's authority under U.S. Supreme Court precedent, *Sosna, Mitchell,id*.

### NEW INTERPRETATION OF LAW: TRUTH IN LENDING ACT

In Defendant's MTD, Memorandum of Points and Authorities (pg. 9, Ln. 24-pg. 10, Ln. 9), Defendant relies substantially on language drawn from a previous ruling from the Bankruptcy Court. In the Bankruptcy Court's ruling, the Court specifically states: "The court finds that the Plaintiff was entitled to send a notice of his intent to rescind, however, the court finds that the time to litigate the validity of the rescission has passed."

This statement by the Court contradicts both the written statute and the law as promulgated by the CFPB itself. There is no language anywhere within Truth In lending Act, or in its legislative

OBJECTION TO FINDINGS & RECOMMENDATIONS/ MAGISTRATE

1  intent, that mandates a time for litigating a rescission under § 1635 et. seq. Plaintiff objects to the

2  Court's reliance on the Bankruptcy Court's improper interpretation of the law under TILA.

3      Defendants had a duty to file their own case challenging the rescission based on the language

4  of the statute itself. Once the rescission was made, the time granted to comply with, or challenge,

5  the rescission by the beneficiary was 20 days. "The only requirement to be satisfied, for the

6  obligor to exercise his right to rescind, is that he must notify the creditor of the rescission by

7  mail, telegram, or other means of written communication (12 C.F.R. § 226.23 (a) (2)) and within

8  20 days of receiving the notice of rescission, the creditor shall return to the obligor any money or

9  property given as security, earnest money, down payment, or otherwise, and shall take any action

10 necessary or appropriate to reflect the termination of any security interest created under the

11 transaction."

12     The Court has acknowledged that Plaintiff had the right to rescind, *id*. 15 U.S.C. § 1635 (b)

13 states: "An obligor who exercises their right to rescind is not liable for any finance charges, and

14 any security interest given by the obligor, including any such interest arising by operation of law,

15 **becomes void upon rescission**."[emph. mine]. When Plaintiff rescinded the loan and Defendant

16 failed to challenge (by Action) the rescission ***and*** failed to return money given, the security

17 interest became void after the 20 days ran. In other words, the deed of trust was void on March

18 3rd, 2009, 20 days after Defendant received the notice of rescission. See: Def's Request for

19 Judicial Notice, DOC 47-8, pg. 2 of 64.   Defendant was precluded, on March 3rd, 2009, from

20 any act against Plaintiff's interests, judicial or non-judicial, in furtherance of an action relying

21 upon the deed/lien. The deed was void by operation of law. Defendants had no lien, by operation

22 of law, upon which to inflict a non-judicial foreclosure or sale against Plaintiff's rights and

23 interests after March 3rd, 2009.

24     Because the Court took judicial action under TILA against Plaintiff incorrectly at the time that

25 it issued its rulings in dismissing his claims, and *de novo* review never occurred in this matter,

26 Plaintiff cannot be dismissed under Rule 12 (b)(6). Justice must be served in this case.

27

28

OBJECTION TO FINDINGS & RECOMMENDATIONS/ MAGISTRATE

In *Merritt v. Countrywide*, 9th Cir., July 16, 2014 (Approved for publication) the 9th Circuit declined to extend the widely held, and previously improper, application of *Yamamoto v. Bank of New York*, 329 F. 3d 1167 (9th Cir. 2003). The panel held that an allegation of tender or ability to tender, as a condition to rescission, is not required. The panel also held that "only at summary judgment may a Court order the statutory sequence of TILA rescission altered and require tender before rescission, and then, only on a case-by-case basis, once the creditor has established a potentially viable defens." Defendants here had a duty to establish a viable defense against the rescission and never brought such an action against Plaintiff once he lawfully and timely rescinded. The language of this case is compelling, citing that "only at summary judgment" a Court may alter the sequence of TILA. This establishes that the creditor must: return all consideration, give notices that the security interests are cancelled, and then file an action to defend against the rescission, and must do so timely (20 days after receiving notice by borrower) under TILA's strict language. A material breach of TILA resulted when Defendants did not properly respond under the law.

In judge Sargis' ruling in Plaintiff's previous bankruptcy case, upon which Defendants and this Court have substantially relied (Def's MTD, DOC 45-1, pg. 15 of 30), the Court stated: "In the alternative, the Court finds that the Plaintiff's notice of rescission was not a proper notice of rescission because it did not offer to tender the loan principal. As such, the Plaintiff's right to assert TILA violations would have expired at the later of 3 years or sale of the property, which occurred on December 19th, 2009." This incorrect reading of TILA has been corrected in the *Merritt* decision in the 9th circuit just two short months ago. Plaintiff timely objects to the disposition of the Court, which substantially relied upon the improper interpretation and application of TILA. After March 3rd, 2009, Defendants had no security upon which to foreclose rights. The security interest was void after such date under *Merritt* and TILA.

Quoting *Merritt*: "Under TILA, an obligor has the "right to rescind . . . until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission required under this section... whichever is later." 15  U.S.C. § 1635(a). "Regardless of whether the required information and forms have been delivered, [the]

obligor's right of rescission shall expire three years after the date of consummation of the transaction, or upon the sale of the property." Id. § 1635(f).

"The TILA rescission provisions set out the following sequence of events for pursuing rescission: **First**, the obligor must notify [notice by U.S. Mail is sufficient] the creditor of his intention to rescind, id. § 1635(a); **then**, within 20 days after receipt of notice of rescission, the creditor must return to the obligor any security interest, id. § 1635(b); and **lastly**, "[u]pon the performance of the creditor's obligations under this section [i.e., upon return of the security interest], the obligor shall tender the property to the creditor." Id. These procedures "shall apply except when otherwise ordered by a court." *Id*. This sequence ("**first, then and lastly**") is mandatory. *Merritt, id*. [Emph. mine]. Under *Merritt*, the Court does not have the power or authority to alter this sequence until Summary Judgment in an action defending against the rescission. No such action was ever filed by Defendants.

"Notably, '[t]he sequence of rescission and tender set forth in § 1635(b) is a reordering of the common law rules governing rescission." *Williams v. Homestake Mortg. Co*., 968 F.2d 1137, 1140 (11th Cir. 1992) (citing 17A Am. Jur. 2d Contracts § 590, at 600–01 (1991)). **<u>Specifically, "[a]lthough tender of consideration received is an equitable prerequisite to rescission, the requirement was abolished by the Truth in Lending Act."</u>** **<u>*Palmer v. Wilson*, 502 F.2d 860, 861 (9th Cir. 1974)</u>** [emph. mine] "Under § 1635(b)," consequently, all that the consumer need do is notify the creditor of his intent to rescind. **<u>The agreement is then automatically rescinded and the creditor must, ordinarily, tender first. Thus, rescission under § 1635 places the consumer in a much stronger bargaining position than he enjoys under the traditional rules of rescission.</u>**" *Merritt v. Countrywide*, 9th Cir. [Emph. mine].

Plaintiff Macklin lawfully and timely rescinded. The Bankruptcy Court then wrongfully dismissed his claim. The Laws under TILA are clear and unambiguous and Macklin followed them to the letter. Any reliance on the previously dismissed claim is wholly void and must be over-turned immediately. The 9th circuit's decision in *Merritt* must be recognized by this Court.

OBJECTION TO FINDINGS & RECOMMENDATIONS/ MAGISTRATE

1    The TILA violations that are available to Plaintiff were not fully in view or discoverable until

2    Macklin received discovery from Defendants in the District Court proceeding in late 2010, when

3    Plaintiff received volumes of documents that outlined the nature of how the loan application was

4    falsified using falsely inflated income. Plaintiff had never seen these relevant documents before

5    that time. The bankruptcy was filed within days of receipt of the discovery in this case, which

6    was then stayed by the bankruptcy filing.

7    "Equitable tolling principles are to be read into every Federal Statute of Limitations unless

8    Congress expressly provides to the contrary in clear and unambiguous language". See: *Rotella v.*

9    *Wood*, 528, 549, 560-61, 120 Sup. Ct. Because TILA does not evidence a contrary Congressional

10   intent, its statute of limitations must be read to be subject to equitable tolling, particularly since

11   the Act is to be construed liberally in favor of consumers. The principles of discovering claims,

12   and those claims being equitably tolled is clear. Macklin had until September, 2011 to state his

13   TILA claims, and did so timely.

14   The Bankruptcy Court's incorrect assertion that Macklin's rescission was "expired", due to

15   lack of tender, and the fact that the law is clearly in favor of Macklin's timely rescission and

16   subsequent filing for relief well within the time required under equitable tolling principles mean

17   that, at a bare minimum, the TILA matter must move forward and cannot be dismissed by Rule

18   12 (b)(6). The disposition of the Magistrate in the instant matter was incorrect under the

19   substantive law.

**CONCLUSION**

20   Plaintiff is entitled to pursue claims against all Defendants as this Court has unfortunately

21   misconstrued facts and law. The Federal Rules of Evidence also support his right to be heard in

22   applying the kinds of facts to be heard and his opportunity to be heard regarding facts contained

23   within judicially noticed documents by Defendants. FRE Rule 201 et. seq.

24   

25   

26   

27   Dated:   September 22, 2014                    */s/ Charles T. Marshall*
                                                     Charles T. Marshall
28                                                   Attorney for Plaintiff

- 13 -

OBJECTION TO FINDINGS & RECOMMENDATIONS/ MAGISTRATE

# EXHIBIT O

# EXHIBIT O

1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JAMES L. MACKLIN,                        No.  2:10-cv-1097-MCE-KJN

12              Plaintiff,

13        v.                                   ORDER

14   MATTHEW HOLLINGSWORTH, et al.,

15              Defendants.

16

17        On September 8, 2014, the magistrate judge filed findings and recommendations (ECF.

18   No. 65) herein which were served on the parties and which contained notice that any objections to

19   the findings and recommendations were to be filed within fourteen days.  On September 22, 2014,

20   plaintiffs filed objections to the proposed findings and recommendations (ECF. No. 72).  On

21   October 9, 2014, defendant Deutsche Bank National Trust (ECF No. 77) and defendant Quality

22   Loan Services Corporation (ECF No. 78) each filed a response to plaintiff's objections, which

23   have been considered by the court.

24        This court reviews de novo those portions of the proposed findings of fact to which an

25   objection has been made.  28 U.S.C. § 636(b)(1); McDonnell Douglas Corp. v. Commodore

26   Business Machines, 656 F.2d 1309, 1313 (9th Cir. 1981), cert. denied, 455 U.S. 920 (1982); see

27   also Dawson v. Marshall, 561 F.3d 930, 932 (9th Cir. 2009).  As to any portion of the proposed

28   findings of fact to which no objection has been made, the court assumes its correctness and

1

1   decides the motions on the applicable law.  See Orand v. United States, 602 F.2d 207, 208 (9th

2   Cir. 1979).  The magistrate judge's conclusions of law are reviewed de novo.  See Britt v. Simi

3   Valley Unified School Dist., 708 F.2d 452, 454 (9th Cir. 1983).

4        The court has reviewed the applicable legal standards and, good cause appearing,

5   concludes that it is appropriate to adopt the proposed findings and recommendations in full.

6   Accordingly, IT IS ORDERED that:

7        1.  The Proposed Findings and Recommendations filed September 8, 2014, are

8   ADOPTED;

9        2. Defendants Select Portfolio Servicing, Inc., Deutsche Bank National Trust Co., and

10   Quality Loan Service Corporation's motions to dismiss the second amended complaint (ECF Nos.

11   45, 49) are GRANTED; and

12        3.  Defendants Select Portfolio Servicing, Inc., Deutsche Bank National Trust Co., and

13   Quality Loan Service Corporation are DISMISSED from this action WITH PREJUDICE.

14

15   DATED:  December 24, 2014

16

17                  _____

18        MORRISON C. ENGLAND, JR, CHIEF JUDGE
        UNITED STATES DISTRICT COURT

19

20

21

22

23

24

25

26

27

28

# EXHIBIT P

# EXHIBIT P

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

**JUDGMENT IN A CIVIL CASE**

**JAMES L. MACKLIN,**

CASE NO: **2:10–CV–01097–MCE–KJN**

v.

**WELLS FARGO &AMP; CO., ET AL.,**

_____

**XX** –– **Decision by the Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

   **THAT JUDGMENT IS HEREBY ENTERED IN ACCORDANCE WITH THE COURT'S ORDER FILED ON 1/14/15**

**Marianne Matherly**
Clerk of Court

ENTERED:  **January 14, 2015**

by:  /s/  A. Meuleman_____
              Deputy Clerk

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JAMES L. MACKLIN,

Plaintiff,

v.

MATTHEW HOLLINGSWORTH, et al.,

Defendants.

No.  2:10-cv-01097-MCE-KJN

**MEMORANDUM AND ORDER**

In the operative Second Amended Complaint ("SAC") in this action, Plaintiff alleges that Defendants Deutsche Bank National Trust ("Deutsche Bank"), Select Portfolio Servicing, Inc. ("Select Portfolio"), Quality Loan Service Corporation ("Quality Loan"), and Wells Fargo Bank, N.A. ("Wells Fargo")[1] are liable for breach of contract, and also violated  several Federal and California statutes governing lending and other business practices in connection with the origination, underwriting, servicing, and foreclosure of Plaintiff's residential home loan.  ECF No. 43.  Three of the named defendants—Deutsche Bank, Select Portfolio, and Quality Loan—filed a Motion to Dismiss before the assigned Magistrate Judge on July 21, 2014.  ECF 45.  The Magistrate Judge issued his Findings and Recommendations on Deutsche Bank, Select

---

[1] Plaintiff erroneously named Wells Fargo Bank, N.A. as Wells Fargo & Co. in the SAC.  Wells Fargo Bank, N.A. notified the Court of this error in its stipulation with Plaintiff filed August 4, 2014.  ECF No. 50.

1   Portfolio, and Quality Loan's Motion to Dismiss on September 8, 2014, recommending

2   that the Motion be granted under the doctrine of claim preclusion.  ECF No. 65.  On

3   December 29, 2014, this Court adopted, in full, the  Findings and Recommendations on

4   Deutsche Bank, Select Portfolio, and Quality Loan's Motion to Dismiss.  ECF No. 86.

5          Presently before the Court is Wells Fargo's Motions to Dismiss filed on August 18,

6   2014, which is also based on claim preclusion.  ECF No. 62.[2]  Before the assigned

7   Magistrate Judge could issue findings and recommendations on Wells Fargo's Motion,

8   Plaintiff, who had previously been proceeding pro se, obtained counsel and the case

9   was referred to this Court by the Magistrate Judge under Local Rule 302(c)(21).  ECF

10  Nos. 71, 73, 74.

11         For the reasons discussed below, Wells Fargo's Motion to Dismiss is GRANTED.

12

13                              **BACKGROUND[3]**

14

15         **A.  Procedural History**

16         On April 2, 2010, Plaintiff filed his original complaint in the Placer County Superior

17  Court alleging claims against Deutsche Bank, Select Portfolio, and other defendants

18  regarding the origination, underwriting, and servicing of a loan to refinance the mortgage

19  on Plaintiff's home.  ECF No. 2-1.  Defendants removed the action to this Court on

20  May 3, 2010, on the basis of both diversity and federal question jurisdiction.  ECF No. 2.

21  Defendants filed a motion for summary judgment on August, 20 2010.  ECF Nos. 15, 16.

22  On September 16, 2010, Plaintiff filed for bankruptcy.  ECF No. 46-3.  The Court stayed

23  the proceedings in the civil case in light of Plaintiff's pending bankruptcy proceedings.

24  ECF No. 25.

25  _____

26         [2]  Because oral argument would not be of material assistance, the Court ordered this matter
    submitted on the briefs.  E.D. Cal. Local R. 230(g); ECF No. 85.

27         [3] Because the parties are familiar with the background of this case, this section only recites a
    general overview of the facts as taken from the Magistrate Judge's Findings and Recommendations from
28  September 8, 2014.  Additional facts may be found in the Findings and Recommendations, ECF 65.

1    On January 13, 2011, Plaintiff filed a complaint in an adversary proceeding

2   against Deutsche Bank before the Bankruptcy Court.  Adversary Compl., ECF No. 46-

3   14.  Deutsche Bank filed a motion to dismiss the adversary complaint, which was

4   granted with leave to amend by the Bankruptcy Court on May 12, 2011.  Electronic

5   Docket for Adversary Proceeding, ECF No. 46-4 at 11.

6    On June 17, 2011, Plaintiff filed an amended adversary complaint alleging the

7   following ten claims against Deutsche Bank: (1) violations of the Truth in Lending Act

8   ("TILA"); (2) violations of the Real Estate Settlement Procedures Act ("RESPA");

9   (3) violations of the Fair Credit Reporting Act ("FCRA"); (4) fraud; (5) unjust enrichment;

10   (6) civil Racketeer Influenced and Corrupt Organizations Act ("RICO") violations;

11   (7) violation of California's Unfair Competition Law ("UCL"); (8) breach of security

12   instrument; (9) wrongful foreclosure; and (10) quiet title.  ECF No. 46-16.  Deutsche

13   Bank filed a motion to dismiss the amended adversary complaint on August 3, 2011.

14   ECF No. 46-4 at 15.  On February 12, 2012, the Bankruptcy Court granted Deutsche

15   Bank's motion to dismiss in part, dismissing the first eight claims alleged in the amended

16   adversary complaint with prejudice and denying the motion as to Plaintiff's final two

17   claims.

18    On October 4, 2012, Plaintiff filed a motion for leave to amend his adversary

19   complaint for a second time, seeking to again add claims for violations of TILA and

20   California's UCL, in addition to his surviving wrongful foreclosure and quiet title claims.

21   ECF No. 47-7.  The Bankruptcy Court denied this motion, stating that the TILA and UCL

22   claims were not cognizable as stated in the proposed second amended adversary

23   complaint.  ECF Nos. 48-1, 48-2.

24    On February 23, 2013, Plaintiff filed a motion for summary judgment on the

25   surviving quiet title and wrongful foreclosure claims; Deutsche Bank thereafter filed its

26   own cross-motion for summary judgment as to the same claims.  ECF No. 46-4 at 30-31.

27   On May 23, 2013, the Bankruptcy Court granted Deutsche Bank's cross-motion for

28   summary judgment and denied Plaintiff's motion for summary judgment.  ECF Nos. 48-3,

1  48-4.  Judgment for Deutsche Bank was entered on July 2, 2013.  ECF No. 48-5.

2  Plaintiff filed a motion to vacate the judgment, which was denied.  ECF No. 46-4 at 33;

3  ECF No. 48-6; ECF No. 48-7.  Plaintiff then appealed the judgment.  ECF No. 46-4 at 35.

4  On December 16, 2013, the Ninth Circuit Court of Appeal's Bankruptcy Panel denied

5  Plaintiff's appeal for lack of jurisdiction because the appeal was untimely.  ECF No. 48-8.

6        On December 23, 2013, Defendants filed a notice stating that Plaintiff's

7  bankruptcy proceedings had reached a final resolution.  ECF No. 26.  As a result, this

8  Court lifted its stay on the present action on February 4, 2014.  ECF No. 29.  Plaintiff

9  subsequently filed a motion for leave to amend his complaint for a second time along

10  with a proposed Second Amended Complaint ("SAC").  ECF Nos. 40, 43.  On July 1,

11  2014, the assigned Magistrate Judge granted Plaintiff's motion and deemed the

12  proposed SAC the operative complaint in this matter.  ECF No. 42. Defendant Wells

13  Fargo now seeks to dismiss the SAC pursuant to Federal Rule of Civil Procedure

14  12(b)(6).  ECF No. 62.

15        **B. Factual Allegations in Second Amended Complaint**

16        In January 2006, a family law court in Placer County ordered Plaintiff to obtain an

17  evaluation of his home's value for purposes of a marital settlement in Plaintiff's pending

18  divorce proceedings.  ECF No. 43 at 3.  Plaintiff went to the business branch of Wells

19  Fargo Bank in Loomis, California.  Id.   While there, Plaintiff was advised that he would

20  need to contact Wells Fargo's home mortgage division located in Roseville, California, if

21  he wanted to complete the valuation process for his home and apply for a loan to settle

22  the marriage estate.  Id.  Plaintiff went to the Wells Fargo branch in Roseville, where he

23  met with Christine Medina, a broker for Wells Fargo.  Id.  During the loan application

24  process, Plaintiff was required to provide Wells Fargo with a number of documents

25  regarding his finances, including his tax returns and bank statements.  Id.

26        Medina later interviewed Plaintiff by telephone regarding his income, place of

27  residence, job history and other information.  Id.  Medina subsequently notified plaintiff

28  over the phone "that he was qualified for a loan that would effectively 'cash out' newly

1    acquired equity as a result of his residence being over-valued" by Wells Fargo.  Id. at

2    3-4.  Medina then asked Plaintiff to come to Wells Fargo's Roseville branch to sign the

3    loan papers.  Id. at 4.  Plaintiff decided he would refinance his home in order to comply

4    with the family court's order.  Id.

5        Plaintiff went to the Wells Fargo in Roseville to fill out the loan paperwork.  Id.

6    When Plaintiff arrived, he was placed in a room with a manager of the office and a

7    notary, who was present for Plaintiff's signing of the loan documents.  Id.  "Plaintiff was

8    never provided with any contracts to review prior to the meeting."  Id.  The manager

9    advised Plaintiff that the notary had to leave for another signing in Folsom, California,

10   within the next hour and that Plaintiff needed to immediately sign the documents with the

11   aid of yellow tabs Wells Fargo had pre-attached to the loan documents.  Id.  "Plaintiff

12   was then guided through the signing and had completed the signing of all necessary

13   documents within a period of less than 15 minutes."  Id.  Plaintiff was not given an

14   opportunity to review these documents and was sent home without copies of any of the

15   documents.  Id.

16       Later that same week, Wells Fargo called Plaintiff and told him to come back to

17   the bank to pick up the loan documents the following week.  Id.  The next week, Plaintiff

18   returned and picked up a large file of documents that, according to Wells Fargo, were

19   the loan contract documents.  Id.  However, Plaintiff later learned that the documents in

20   the folder "were blank and contained only miniscule information."  Id.  Wells Fargo told

21   Plaintiff that this was a customary practice and advised him not to worry because the

22   Bank's policy dictated that the originals were to be placed into the custody of a master

23   document custodian.  Id.

24       Plaintiff made every installment payment due under the loan contract until August

25   of 2008, when Plaintiff noticed that no principal on the loan was being paid down through

26   his payments.  Id.  Plaintiff contacted the servicer of his loan to inquire into why this was

27   happening.  Id.  The servicer told Plaintiff "that the loan was an interest-only loan."  Id.

28   However, Wells Fargo's employee, Medina, had told Plaintiff "that the loan was a fully

1    amortized, standard performing 'principal and interest' loan." Id. "Plaintiff was never told

2    that his loan was interest-only" prior to being notified by the loan servicer.  Id.

3          "Plaintiff executed a dispute in writing to the loan servicer challenging the validity

4    of the loan." Id.  Plaintiff subsequently attempted to rescind the loan contract by sending

5    a writing to counsel for the loan's beneficiary stating Plaintiff's intention to rescind.  Id. at

6    4-5.  Plaintiff received a written reply from the beneficiary's counsel indicating that the

7    loan had not been rescinded.  Id. at 5.

8          Plaintiff alleges that he later learned that Wells Fargo had placed false information

9    in Plaintiff's loan application documents, including false information regarding Plaintiff's

10    income, the amount of time Plaintiff had lived in his home, the amount of time Plaintiff

11    had been employed, and the actual value of the property, in order to ensure that Plaintiff

12    would qualify  for a loan that he would otherwise have been unable to obtain.  Id. at 7-8.

13    Plaintiff further alleges that Deutsche Bank was the purported assignee of the loan

14    contract Plaintiff entered into with Wells Fargo and had "ratified the actions" of Wells

15    Fargo.  Id. at 8.  Plaintiff alleges that Deutsche Bank received payment from Select

16    Portfolio when it executed the Notice of Default on Plaintiff's loan.  Id. at 17-18.  In

17    addition, Plaintiff alleges that "Select [Portfolio] and Quality [Loan] . . . were complicit in

18    the acts [of Wells Fargo] by an agency relationship."  Id. at 20.  Finally, Plaintiff alleges

19    that all defendants illegally "took [P]laintiff's home by way of non-judicial foreclosure."  Id.

20    at 12.

21          On the basis of these factual allegations, Plaintiff asserts the following six claims

22    against all defendants in the SAC: (1) "illegal contract"; (2) breach of contract; (3) TILA

23    violations; (4) violations of the Equal Credit Opportunity Act ("ECOA"); (5) FCRA

24    violations; and (6) violations of California's UCL.  Id. at 11-23.

25    ///

26    ///

27    ///

28    ///

1  **STANDARD**

2

3  On a motion to dismiss for failure to state a claim under Federal Rule of Civil

4  Procedure 12(b)(6), all allegations of material fact must be accepted as true and

5  construed in the light most favorable to the nonmoving party.  Cahill v. Liberty Mut. Ins.

6  Co., 80 F.3d 336,337-38 (9th Cir. 1996).  Rule 8(a)(2) requires only "a short and plain

7  statement of the claim showing that the pleader is entitled to relief" in order to "give the

8  defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Bell

9  Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41,

10  47 (1957)).  A complaint attacked by a Rule 12(b)(6) motion to dismiss does not require

11  detailed factual allegations.  However, "a plaintiff's obligation to provide the grounds of

12  his entitlement to relief requires more than labels and conclusions, and a formulaic

13  recitation of the elements of a cause of action will not do."  Id. (internal citations and

14  quotations omitted).  A court is not required to accept as true a "legal conclusion

15  couched as a factual allegation."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950 (2009)

16  (quoting Twombly, 550 U.S. at 555).  "Factual allegations must be enough to raise a

17  right to relief above the speculative level."  Twombly, 550 U.S. at 555 (citing 5 Charles

18  Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004)

19  (stating that the pleading must contain something more than "a statement of facts that

20  merely creates a suspicion [of] a legally cognizable right of action.")).

21  Furthermore, "Rule 8(a)(2) . . . requires a showing, rather than a blanket

22  assertion, of entitlement to relief."  Twombly, 550 U.S. at 556 n.3 (internal citations and

23  quotations omitted).  Thus, "[w]ithout some factual allegation in the complaint, it is hard

24  to see how a claimant could satisfy the requirements of providing not only 'fair notice' of

25  the nature of the claim, but also 'grounds' on which the claim rests."  Id. (citing 5 Charles

26  Alan Wright & Arthur R. Miller, supra, at § 1202).  A pleading must contain "only enough

27  facts to state a claim to relief that is plausible on its face."  Id. at 570.  If the "plaintiffs . . .

28  have not nudged their claims across the line from conceivable to plausible, their

1   complaint must be dismissed." Id.  However, "[a] well-pleaded complaint may proceed

2   even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a

3   recovery is very remote and unlikely.'"  Id. at 556 (quoting Scheuer v. Rhodes, 416 U.S.

4   232, 236 (1974)).

5

6                                          **ANALYSIS**

7

8       **A.  Parties' Requests for Judicial Notice**

9          Before the Court addresses the merits of Defendant Wells Fargo's Motion to

10  Dismiss, the Court will address the parties' requests for judicial notice (ECF Nos. 62-1,

11  79-2).  Pursuant to Federal Rules of Evidence 201, "the court may judicially notice a fact

12  that is not subject to reasonable dispute because it: (1) is generally known within the trial

13  court's territorial jurisdiction; or (2) can be accurately and readily determined from

14  sources whose accuracy cannot reasonably be questioned."

15         Generally, a court may not consider material beyond the complaint in ruling on a

16  motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) because if a

17  court considers matters outside the pleading, the motion to dismiss is converted to a

18  motion for summary judgment.  Lee v. City of Los Angeles, 250 F.3d 668, 688 (9th Cir.

19  2001).  There are two exceptions to this rule.  "First, a court may consider material which

20  is properly submitted as part of the complaint . . . .  If the documents are not physically

21  attached to the complaint, they may be considered if the documents' authenticity is not

22  contested and the plaintiff's complaint necessarily relies on them."  Id. (internal citations

23  and quotation marks omitted).  Second, "a court may take judicial notice of matters of

24  public record without converting a motion to dismiss into a motion for summary

25  judgment, as long as the facts are not subject to reasonable dispute."  Intri-Plex

26  Technologies, Inc. v. Crest Grp., Inc., 499 F.3d 1048, 1052 (9th Cir. 2007) (internal

27  citations and quotation marks omitted).

28  ///

                                              8

**1. Defendant's Requests**

Defendant asks the Court to take notice of eight documents: a deed of trust, a notice of default, two notices of trustee sale, an assignment of deed of trust, a trustee's deed upon sale, a voluntary petition filed in Bankruptcy Court, and a discharge of debtor entered by the Bankruptcy Court.  ECF No. 62-1.

The first six documents are documents that were recorded in the Placer County Recorder's Office.  As undisputed matters of public record, the Court may take judicial notice of their existence  See Lee, 250 F.3d at 688-89.  The final two documents involve matters of public record in related judicial proceedings, of which the Court may also take judicial notice.  See Biggs v. Terhune, 334 F.3d 910, 916 n.3 (9th Cir. 2003) ("Materials from a proceeding in another tribunal are appropriate for judicial notice."); Commodity Futures Trading Comm'n v. Co. Petri Marketing Group, Inc., 680 F.2d 573, 584 (9th Cir. 1982) (taking notice of pleadings).

Wells Fargo also incorporates the judicial notice request of Deutsche Bank and Select Portfolio Servicing, ECF Nos. 46-48.  See ECF No. 62 at 3, n.6.  To the extent that these 31 documents were noticed by the Magistrate Judge in his Findings and Recommendations (see ECF No. 65 at 3-5), they are noticed by this Court as the Court has adopted the Findings and Recommendations in full (see ECF No. 86).

**2. Plaintiff's Requests**

Plaintiff asks the Court to take notice of six documents: an amicus brief in an unrelated case; a published Ninth Circuit Court of Appeals opinion; the United States Securities & Exchange Commission website, which contains documents from the Accredited Mortgage Loan Trust Series 2006-2; Plaintiff's loan application; Plaintiff's income tax return; and Truth in Lending disclosures that Plaintiff signed.  ECF No. 79-2. Defendant objects to all of Plaintiff's requests except for his request for judicial notice of the Ninth Circuit Court of Appeals' decision.  ECF No. 84.

These are the same documents that Plaintiff attempted to have noticed by Magistrate Judge Newman in conjunction with Deutsche Bank, Select Portfolio, and

1    Quality Loan's Motion to Dismiss.  See ECF No. 57.  In his Findings and

2    Recommendations, the Magistrate Judge denied these requests because the documents

3    were irrelevant to the motion to dismiss and were offered to support the substantive

4    allegations in the SAC.  See ECF No. 65 at 6.

5        This Court has already reviewed and adopted, in full, the Magistrate Judge's

6    Findings and Recommendations, including the findings on Plaintiff's request for judicial

7    notice of these documents.  See ECF No. 86.  Therefore, the Court will not take judicial

8    notice of these documents.

9        **B. Claim Preclusion**

10       Like its previously dismissed codefendants, Wells Fargo argues that Plaintiff's

11   claims as to Wells Fargo in the SAC should be dismissed with prejudice under the

12   doctrine of claim preclusion.  Claim preclusion "bars litigation in subsequent action of any

13   claims that were raised or could have been raised in the prior action."  Owens v. Kaiser

14   Foundation Health Plan, Inc., 244 F.3d 708, 713 (9th Cir. 2001) (internal quotation marks

15   omitted).  Under federal law,[4] the doctrine of claim preclusion "is applicable whenever

16   there is (1) an identity of claims, (2) a final judgment on the merits, and (3) identity or

17   privity between parties."  Id.

18       **1. Identity of Claims**

19       "The central criterion in determining whether there is an identity of claims between

20   the first and second adjudications is whether the two suits arise out of the same

21   transactional nucleus of facts."  Id. at 714.  The Court must also consider: "(1) whether

22   rights or interests established in the prior judgment would  be  destroyed  or  impaired

23   by  prosecution  of  the  second action; (2) whether substantially the same evidence is

24   presented in the two actions; and (3) whether the two suits involve infringement of the

25       ⁴ Defendants removed this case from California state court on the basis of both federal question
26   and diversity of citizenship jurisdiction.  ECF No.1.  Federal preclusion rules apply in cases where federal-
     court jurisdiction is based on the presence of a federal question.  See Taylor v. Sturgell, 533 U.S. 880, 891
27   (2008). In diversity cases, "federal law incorporates the rules of preclusion applied by the State in which
     the rendering court sits."  Id.  In California, a court must apply federal preclusion rules when determining
28   the preclusive effect of a prior federal court judgment.  Younger v. Jensen, 26 Cal.3d 397, 411 (1980).
     Thus, federal preclusion rules apply under either basis for subject matter jurisdiction asserted herein.

1  same right." See C.D. Anderson & Co. v. Lemos, 832 F.2d 1097, 1100 (9th Cir. 1987);

2  accord Headwaters Inc. v. United States Forest Serv., 399 F.3d 1047, 1052 (9th Cir.

3  2005); Littlejohn v. United States, 321 F.3d 915, 920 (9th Cir. 2003).

4      In most cases, "the inquiry into the 'same transactional nucleus of facts' is

5  essentially the same as whether the claim could have been brought in the first action."

6  United States v. Liquidators of European Fed. Credit Bank, 630 F.3d 1139, 1151 (9th

7  Cir. 2011).  "A plaintiff need not bring every possible claim.  But where claims arise from

8  the same factual circumstances, a plaintiff must bring all related claims together or forfeit

9  the opportunity to bring any omitted claim in a subsequent proceeding."  Turtle Island

10  Restoration Network v. U.S. Dep't of State, 673 F.3d 914, 918 (9th Cir. 2012).  "Newly

11  articulated claims based on the same nucleus of facts may still be subject to a [claim

12  preclusion] finding if the claims could have been brought in the earlier action."  Tahoe-

13  Sierra Pres. Council, Inc.  v. Tahoe Reg' l Planning Agency, 322 F.3d 1064, 1078 (9th

14  Cir. 2003); United States ex rel. Barajas v. Northrop Corp., 147 F.3d 905, 909 (9th Cir.

15  1998) ("It is immaterial whether the claims asserted subsequent to the judgment were

16  actually pursued in the action that led to the judgment; rather, the relevant inquiry is

17  whether they could have been brought.").

18      The claims in Plaintiff's SAC are either the same as the claims brought in the

19  adversary proceeding in the bankruptcy court or they are claims that could have been

20  raised because they arise out of the "same transactional nucleus of fact."  Both

21  complaints involve claims related to the refinancing of Plaintiff's residential mortgage, the

22  terms of his residential loan, the servicing of his residential loan, Plaintiff's attempt at

23  rescission of that loan, and the non-judicial foreclosure of the loan.  See ECF No. 46-16.

24      While most of Plaintiff's claims are directed at "Defendants" generally, it appears

25  to the Court that the claims against Wells Fargo stem from the alleged falsification of

26  Plaintiff's loan application.  The loan application was created by a Wells Fargo employee

27  and signed at a Wells Fargo branch, but the promissory note and deed of trust were

28  between Plaintiff and Accredited Home Lenders.  ECF No. 45-2 at Exhibit 1.  Since this

1  was the extent of Wells Fargo's involvement with Plaintiff's loan, any claims specific to

2  Wells Fargo must stem from the origination of the loan.  In his first amended adversary

3  complaint, Plaintiff asserted a claim under the TILA based on allegations that Deutsche

4  Bank "or its agents" falsified plaintiff's loan application.  See ECF No. 46-16 at 22-25.

5  The Bankruptcy Court considered this claim when it rendered its decision in the

6  adversary proceeding.  See ECF No. 47-2 at 17.  Therefore, the claims against Wells

7  Fargo in the SAC are the same as those brought in the adversary proceeding and there

8  is consequently an identity of claims.

9  **2. Final Judgment on the Merits**

10  The Magistrate Judge's Findings and Recommendations (ECF No. 65), already

11  adopted in full by this Court (ECF No. 86), determined that a decision from a bankruptcy

12  court can be given preclusive effect.  Essentially, under current Ninth Circuit law,

13  decisions in core and non-core bankruptcy proceedings can be a final judgment with the

14  consent of the parties.  28 U.S.C. § 157(c)(2) (non-core claims); In re Bellingham Ins.

15  Agency, Inc., 702 F.3d 553 (9th Cir. 2012) (core claims).[5]  In Plaintiff's first amended

16  adversary complaint in the Bankruptcy Court, he stated, "Plaintiff consents to the entry of

17  final orders or judgment by the bankruptcy court."  This shows that Plaintiff consented to

18  the decision in the adversary claim serving as a final judgment in the case.  Therefore,

19  the Bankruptcy Court's dismissal and grant of summary judgment in favor of Deutsche

20  Bank is a final judgment for purposes of claim preclusion.  Mpoyo v. Litton Electro-

21  Optical Sys., 430 F.3d 985, 988 (9th Cir. 2005) ("The second res judicata element is

22  satisfied by a summary judgment dismissal which is considered a decision on the merits

23  for res judicata purposes."); Hells Cyn. Preserv. Council v. U.S. Forest Serv., 403 F.3d

24  683, 686 (9th Cir. 2005) ("'[F]inal judgment on the merits' is synonymous with 'dismissal

25  with prejudice.'").

26  ///

27  _____

[5] This holding was left undisturbed by the recent Supreme Court decision, Executive Benefits Ins.
28  Agency v. Arkison, 134 S. Ct. 2165, 2170, n.4 (2014) (reserving the issue of "whether Article III permits a
bankruptcy court, with the consent of the parties, to enter final judgment on a [claim] . . . for another day").

### 3. Privity

Privity is the main issue that must be decided on this Motion since the adversary proceeding in Bankruptcy Court was only between Deutsche Bank and Plaintiff. Wells Fargo was not added to this case until the SAC, which was filed in July 2014. "Privity . . . is a legal conclusion designating a person so identified in interest with a party to former litigation that he represents precisely the same right in respect to the subject matter involved." Headwaters Inc. v. U.S. Forest Serv., 399 F.3d 1047, 1052-53 (9th Cir. 2005) (internal citations and quotation marks omitted). "Even when the parties are not identical, privity may exist if 'there is 'substantial identity' between parties, that is, when there is sufficient commonality of interest.'" Tahoe-Sierra Pres. Council, 322 F.3d at 1081 (quoting In re Gottheiner, 703 F.2d 1136, 1140 (9th Cir. 1983)). "[P]rivity is a flexible concept dependent on the particular relationship between the parties in each individual set of cases." Tahoe-Sierra Pres. Council, 322 F.3d at 1081. Generally, "federal courts will bind a non-party whose interests were represented adequately by a party in the original suit." In re Schimmels, 127 F.3d 875, 881 (9th Cir. 1997). "In addition, 'privity' has been found where there is a 'substantial  identity' between the party and nonparty, . . . and where the interests of the nonparty and party are 'so closely aligned as to be 'virtually representative.'" Id. (internal citations omitted).

At the adversary proceeding, Plaintiff claimed that Deutsche Bank was liable for Wells Fargo's alleged conduct in the SAC—violating the TILA by obtaining the loan under fraudulent circumstances. In the adversary proceeding, Deutsche Bank argued that the Plaintiff's TILA claim was untimely under the statute of limitations, and the Bankruptcy Court agreed. See ECF No. 47-2 at 19-21. This is presumably the same argument that Wells Fargo would have made at the proceeding. Indeed, Wells Fargo makes this same argument in its Motion to Dismiss. See ECF No. 62 at 19. Therefore, the Court finds that Wells Fargo's interests were adequately represented at the adversary proceeding by Deutsche Bank, creating privity between Deutsche Bank and Wells Fargo.

1    Since the three requirements for claim preclusion are met, the Court finds that

2  Wells Fargo's Motion to Dismiss must be granted.

3

4                                    **CONCLUSION**

5

6    For the reasons set forth above, Wells Fargo's Motion to Dismiss (ECF No. 62) is

7  GRANTED, with prejudice.  The Clerk of Court is directed to close the file.

8    IT IS SO ORDERED.

9  Dated:  January 12, 2015

10

11

12                                    _____
                                      MORRISON C. ENGLAND, JR., CHIEF JUDGE
13                                    UNITED STATES DISTRICT COURT

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT Q

# EXHIBIT Q

Charles T. Marshall, Esq. (SBN 176091)
Law Offices of Charles T. Marshall
415 Laurel St. #405
San Diego, CA. 92101
Tel: (619) 807-2628
Fax: (866) 575-7413
Email: cmarshall@marshallestatelaw.com

Attorney for: JAMES MACKLIN

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| James L. Macklin, ) | CASE NO: 2:10-cv-01097-MCE-KJN |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Date: February 19, 2015 |
| MATTHEW HOLLINGSWORTH, et. al. ) | Time: 2:00 p.m. |
| ) | Court: Courtroom: 7, 14th floor |
| Defendants. ) | Judge: Hon. Morris C. England, Jr. |
| ) | |
| ) | |
| ) | |

## MOTION FOR RELIEF FROM ORDER UNDER FEDERAL RULES OF CIVIL

## PROCEDURE, RULE 60

The court, having ruled in its Memorandum Decision and Order on January 14th, 2015, is requested to relieve Plaintiff by Vacating **all** Orders, Findings & Recommendations and Judgments that are in conflict with *Jesinoski v. Countrywide Home Loans Inc*., 729 F.3d 1092 (8th Cir. 2013), *cert. granted,* 82 U.S.L.W. 3366 (U.S. Apr. 28, 2014) (Docket No. 13-684, **SCOTUS Unanimous decision January 13th, 2015, Author: Justice Scalia**) attached hereto as **Exhibit 1, RFJN**; and *Merritt v. Countrywide Financial Corporation*, U.S. Court of Appeals, 9th Circuit, decided July 16, 2014, attached hereto as **Exhibit 2, RFJN**.

The grounds for this Action are that there was no mortgage or deed of trust encumbering the real property of James Macklin at the outset of the related bankruptcy case and the Adversary Proceeding. This court substantially relied upon the decisions of the bankruptcy court in making its final ruling specifically related to Macklin's TILA Rescission. Under the terms of the Truth in Lending Act ("TILA"), as reviewed and held by SCOTUS on January 13th, 2015, when the "lender" failed to return Macklin's money, or file a declaratory Action within 21 days, defending against his lawful rescission that was perfected on March 3rd, 2009, the mortgage was nullified and the debt to the lender and any purported assignees became void by operation of law that existed at the time of the perfection of rescission on March 3rd, 2009.

Thus, the Adversary Proceeding and the related bankruptcy under Chapter 13, converted to a Chapter 7, were never about a secured creditor, nor was this case. All payments that Macklin made to the original lender, including closing costs and monthly payments from April 14th, 2006 through March 3rd, 2009, are due back to Macklin under the strict holding by SCOTUS in the *Jesinoski* case, *id*. Defendant Deustche Bank Nat'l Trust Co., as Trustee for the Certificate-Holders of the Accredited Mortgage Loan Trust Series 2006-2 ("DBNTC") in the instant Action never had any interest in the Macklin loan as a result of any purported assignments, *ab initio*.

The bankruptcy court had specific knowledge of the rescission and went so far as to acknowledge that Macklin had lawfully invoked his rescission right (see below from Hon. Judge Ronald Sargis' Memorandum decision). This court relied substantially upon the bankruptcy courts prior Orders and Rulings.

All recorded documents, including: Deed of Trust, Promissory Note, assignments of deed and substitutions of trustee, Notice of Default, Notice of Sale and Trustee's Deed Upon Sale, that were used by Defendant in this case that relied on a valid debt, or that post-dated the rescission perfection date of March 3rd, 2009, are void by operation of law and were unavailable as authoritative or as providing any form of legal notice to Macklin or this court.

All Orders, Judgments and Decisions that have been issued by this court are also void by operation of law under the guidance of the SCOTUS decision, *id*.

Unbeknownst to Macklin, and this court, and all courts hearing matters regarding TILA Rescission claims, all of the previous decisions regarding TILA Rescission were about to be overturned by SCOTUS' unanimous decision on the matter. Macklin did, in fact, have rights that were abrogated by the actions of the court and for this reason; the previous Orders, Decisions and Judgments must be vacated in the interests of justice. The error of law cannot stand.

### JURISDICTION

1. **FRCP 60(b)** provides for relief from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief. As is fully briefed herein below, the court is asked to relieve Plaintiff under FRCP Rule 60(b)(1), (4), (5) and (6) by vacating all previous Orders of this court in this case. The District Court has had subject matter jurisdiction over this matter.

2. **FRCP Rule 60 (d) Other Powers to Grant Relief.** This rule does not limit a court's power to: (1) entertain an independent action to relieve a party from a judgment, order, or proceeding.

### LEGAL STANDARD

3. The legal standard for FRCP Rule 60 (b) comes from the Ninth Circuit, determining that courts must apply a four-factor equitable test, examining: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship,* 507 U.S. 380, 395 (1993); *Briones v. Riviera Hotel & Casino,* 116 F.3d 379, 381 (9th Cir. 1997) (adopting this test for consideration of Rule 60(b) motions). Through other decisions, including *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220 (9th Cir. 2000), and *Pincay v. Andrews,* 389 F.3d 853 (9th Cir. 2004) (en banc), the Ninth Circuit has further clarified how courts should apply this test.

4.   There is no prejudice, nor anticipated prejudice, to the opposing party as they have held no rights under the operative Rescission since March 3rd, 2009, unlawfully gained possession of the subject real property at issue for over 3 years, have not sold the property, nor have they made any effort to maintain the property and have, instead, allowed the property to sit un-maintained and degenerating daily, thus committing waste.  In fact, the opposing party has been unjustly enriched by unlawfully taking putative title to and physical possession of, the Macklin property and through the Bankruptcy Court's grant of possession to the opposing party because of error of law. The only prejudice present is against Macklin as he lost possession of his only home. The balance tips sharply in Macklin's favor here. The TILA matter is also still pending, and there is not a final, non-appealable ruling, in this U.S. District court case No. 2:10-cv-1097-MCE-KJN.

5.   The Supreme Court's decision in *Jesinoski, id.*, regarding TILA Rescission was filed January 13, 2015 and there is no impact on these proceedings because of any delay. This motion comes within 30 days of the landmark decision.

6.   Plaintiff's well-pled facts from four years ago are echoed nearly verbatim in the U.S. Supreme Court's opinion attached hereto as **Exhibit 1, RFJN**. Defendants had a duty to know and understand the laws as they are written; ignorance of the law is not an excuse or a reason for delay. Justice for Macklin has been delayed for six (6) years. Any delay at this point is purely by the hands of the Defendants and, unfortunately, by the courts, due to the error of law that occurred in 2011, 2013 and 2015 by the Orders of both of the courts (BK and USDC).

7.   The movant has always acted in good faith in exercising his rights to defend title to his unique real property as is evinced by the U.S. Supreme Court's decision that mirrors and wholly supports Plaintiff's TILA Rescission cause of action and well-pled facts related thereto. Plaintiff has never acted with malice or intent to delay. The Plaintiff was dispossessed of the property as soon as the temporary injunction in bankruptcy was lifted and Defendants took legal title, even if only temporarily under these circumstances. See: *Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993).

8.   The balance of equities tips sharply in Plaintiff's favor as he was dispossessed of his only home, while Defendant maintains a multi-billion dollar portfolio of real property income streams. Macklin has waited long enough.

## UNDISPUTED FACTUAL BACKGROUND

9.   On April 14th, 2006, Plaintiff executed a note and first and second deed of trust with Accredited Home Loans, Inc. totaling $632,000.00. Macklin has alleged a perfected rescission under TILA Rescission § 1635(a). **Adv. Pro**.**Doc. No. 129, Exhibits 1, 2, 14, 15 and 16**.

10. Plaintiff perfected rescission (See: **RFJN, NO. 4, Exh. 16**; *Jesinoski*) of the loan transaction under TILA § 1635(a) on March 3rd, 2009, upon the lender's receipt of the rescission notice by Macklin (February 12th, 2009) (**AP Doc. No. 129, Exhibit 16**) and the statutory 21 days running without compliance by Lender (March 3rd, 2009).

11. Counsel for Lender replied to Macklin on March 31st, 2009 by arguing that the rescission was not valid. **Adv. Pro. Doc. No. 129, Exhibit 15**. This written argument came **more than 47 days after the lawful time to reply** by an action to defend against the rescission was due under TILA. An action was required to be filed by March 3rd, 2009 by Lender under TILA, the Lender elected to waive their right. The Lender ***and any purported assignees of the Lender*** were equitably estopped from any act in furtherance of Lender's rights that were extinguished on this critical date by failure to comply with TILA. Defendant DBNTC stands in the shoes of the Lender, Accredited Home Loans, Inc. This court, in both its ruling against Macklin for Defendants DBNTC and the subsequent Wells Fargo Motion to Dismiss (**Document 87 filed 1-14-2015**) stated that "…Deutsche Bank argued that the plaintiff's TILA claim was untimely under the statute of limitations, and the bankruptcy court agreed." (**Pg. 13, Ln. 21-23**; **Pg. 3, Ln. 18-23**).

12. The court here then goes on to state that there is an identity of claims between DBNTC and Wells Fargo (**DOC 87 Filed 1-14-2015, Pg. 12, Ln. 3-8**) as it specifically relates to TILA Rescission. The court here next states that preclusive effect is given to decisions of the bankruptcy court (**DOC 87, Pg. 12, Ln. 10-12**). Therefore, all Defendants to the Macklin Action are included in all decisions by this court.

13. Original Lender, Accredited Home Lenders, Inc., executed a false/forged assignment of deed attempting to transfer interest in the Macklin loan to a statutory REMIC trust (subject to Internal Revenue Code § 806D et. seq.) on Nov. 30th, 2009. The trust (Defendant DBNTC) was closed to transfers of beneficial interest on June 1st, 2006. **AP Doc. No. 129, Exhibit 6.** The rescission was also already perfected on March 3rd, 2009. See: *Jesinoski*, RFJN Exhibit 1. The original Lender had no interest to assign to DBNTC after March 3rd, 2009 by operation of law.

14. Plaintiff Macklin alleged Truth In Lending Act ("TILA") Rescission in the Adversary Proceeding (Case No. 11-02024) in this court. See: **AP Dckt. No's. 120-129, 201**.

15. Deutsche Bank moved to dismiss the First Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) as made applicable to the adversary proceeding by Federal Rule of Bankruptcy Procedure 7012. (**AP Dckt. No. 150**) On February 16, 2012, Judge Sargis issued a Memorandum Opinion and Order dismissing all causes of action in the First Amended Complaint except the Ninth Cause of Action for wrongful foreclosure and the Tenth Cause of Action for quiet title. (**AP Dckt. Nos. 221 and 222**) A copy of the Memorandum Opinion and Decision at (**AP Dckt. Nos. 221**).

16. Within the dismissed causes of action was Macklin's TILA Rescission action.

17. Mr. Macklin moved for summary judgment on February 21, 2013. (**AP Dckt. No. 307**) Deutsche Bank ("DBNTC") opposed Mr. Macklin's motion and requested that summary judgment be entered in its favor on the Ninth Cause of Action for wrongful foreclosure and the Tenth Cause of Action for quiet title, pursuant to Federal Rule of Civil Procedure 56, subdivision (f)(1). (**AP Dckt. No. 314**) After a hearing on the summary judgment motion, the Court granted summary judgment for Deutsche Bank and against Plaintiff. A copy of the order granting summary judgment is at (**AP Dckt. No. 327**). The Court entered judgment for Deutsche Bank and against Mr. Macklin on July 2, 2013. A copy of the Judgment is at (**AP Dckt. No. 349**). Mr. Macklin filed a motion to vacate the summary judgment on June 20, 2013. (**AP Dckt. No. 338**) The Court denied that motion on July 29, 2013. (**AP Dckt. No. 357**).

18. On October 4th, 2012, Plaintiff moved the court to amend his Adversary Complaint and in the court's ruling on the Motion the court stated:

*"The Plaintiff argues that under 11 USC § 1635, the Plaintiff has an absolute right to rescind for TILA violations. Plaintiff asserts only notice to the lender is required to effect rescission. **The court finds the Plaintiff was entitled to send a notice of his intent to rescind, however, the court finds the time to litigate the validity of the rescission has passed.**"*(Emph mine) *"The court follows the controlling 9th Circuit finding the one-year statute of limitations began when the lender made clear its intention not to unwind the transaction in the March 31, 2009 letter from Roup & Associates." "In the alternative, **the court finds that the Plaintiff's Notice of Rescission was not proper notice of rescission because it did not offer to tender the loan principal.** (Emph. mine) 12 CFR §§ 1026.15(d)(3), 1026.23(d)(3). As such, the Plaintiff's right to assert TILA violations would have expired at the later of 3 years or sale of the property, which occurred on December 19, 2009."*

19. Plaintiff's cause of action under TILA Rescission was dismissed by the court under this exact ruling.

20. On July 16th, 2014, the case of *Merritt v. Countrywide* (**Exhibit 2, RFJN**) was decided by the Ninth Circuit. In the decision by the court, it was held that there **never has been a requirement of tender** under the TILA requirements and that, in fact, the only requirement for effective rescission was notice, which the court in the bankruptcy AP case has stated unequivocally that Macklin exercised his right to rescind by notice. However, the bankruptcy court imposed an error of law when it stated that a one year statute of limitations began to run when the lender refused to "unwind the transaction" and Macklin failed to tender. The tender requirement imposed by the Court in that case was error of law under TILA, as held under *Merritt, id*. Therefore, all Orders and Judgments in ***this*** case, and in reliance on the bankruptcy case, that are in conflict with *Merritt* must be vacated.

21. On January 13th, 2015, the Supreme Court of the United States issued a landmark decision in *Jesinoski v. Countrywide Home Loans* (**Plaintiff's RFJN Exhibit 1**). In this unanimous

decision, Justice Scalia, in his delivery of the opinion of the court, stated clearly and unambiguously:

> "A borrower exercising his right to rescind under the Act _need only provide written notice to his lender within the 3 year period, not file suit within that period._ Section 1635(a)'s unequivocal terms—a borrower 'shall have the right to rescind'... by notifying the creditor... of his intention to do so' (emphasis added)—leave no doubt that _rescission is effected_ when the borrower notifies the creditor of his intention to rescind. And the fact that the Act modified the common law condition precedent to rescission at law, see sec. 1635(b), hardly implies that the Act thereby codified rescission in equity."(Emph. mine)

## PLAINTIFF IS ENTITLED TO RELIEF

22. Under the existing laws as defined and described above by both the Ninth Circuit and the U.S. Supreme Court, Plaintiff Macklin has evidenced an undeniable right to relief. Fed. R. Civ. Procedure Rule 60 (b) grants Plaintiff here with an absolute right to relief from any judgment or Order that conflicts with both the 9th Circuit and the U.S. Supreme Court's recent decisions regarding the proper interpretation of the existing laws under TILA as they existed at the time of the previous Findings and Recommendations and Orders of this court.

23. The court must vacate its Order based on the facts in evidence in this case. Plaintiff has proven that a tremendous injustice and misapplication of existing law has occurred in the court's Orders.

24. It is clear from the court's previous Rulings (¶17 above) that the court dismissed Plaintiff's rights under TILA for **both** reasons of tender and timeliness of filing suit under the Act. These decisions were an error of law concerning rights that existed for the benefit of Plaintiff.

25. Under the plain reasoning of both _Jesinoski_ and _Merritt_, it is without a doubt that Plaintiff rescinded his loan timely and, that as of March 3rd, 2009, there has been no secured debt or

beneficial interest from which Defendant DBNTC may have acquired any standing, or rights, as they may relate to the rescinded loan. This is *Res Judicata*. All defenses are time-barred.

26. On March 3rd, 2009, exactly 21 days after the lender received the rescission from Macklin, an equitable estoppel was effected against Defendant DBNTC from any act in furtherance of the terms of the deed of trust…the deed was null and void on that date as a result of the Lender failing to comply with existing laws under TILA. *Jesinoski*.

27. Because the loan was void on March 3rd, 2009, Defendant DBNTC proceeded against Plaintiff's rights without any authority whatsoever, causing extreme prejudice, harm, loss and damages to his personal and professional life. His home was taken from him by an illegal process. TILA was enacted specifically to protect consumers from the acts of Defendant DBNTC. Plaintiff is entitled to those protections and the court has a duty to uphold those rights vigilantly.

28. In Plaintiff's bankruptcy court **FAC (AP)** at pg. 7, par. 18: "after many certified letters to the alleged authoritative parties, **Plaintiff rescinded his loan transaction timely and in writing** to the lender, servicer, and counsel retained…" Plaintiff unambiguously factually pled the rescission and brought unrefuted evidence of the rescission, which the court has acknowledged as being proper and timely.

29. The loan had been rescinded, yet, Defendant here did nothing to mitigate its own damages. Instead, Defendant's counsel, Ron Roup, argued with and intimidated Plaintiff Macklin.

30. The court, however, presumed the validity of the contract and failed to recognize that the rescission was *perfected* by Macklin on March 3rd, 2009 in its ruling on Plaintiff's MSJ on May 24th, 2013, stating that "The dispute before the court….relates to a non-judicial foreclosure sale…and the rights and interests arising from that sale". (**AP, Pg. 1, ln. 26, Mem. Opin. & Dec**.). This is reversible error by the court. **The entirety of Defendant DBNTC's interest is extinguished under these two landmark decisions, which govern existing law that was firmly in place when Plaintiff introduced his Complaint(s) in this court.** Plaintiff is entitled to the protections and firm resolve that this court must show by vacating its previous Orders as they have prejudiced Plaintiff's rights.

31. After a thorough examination of the record in all three Memorandum Decisions and Opinions in the Adversary Proceeding (BK), it is irrefutable that ***this*** court substantially relied on its improper interpretation of TILA, pursuant to *Jesinoski* and *Merritt*, and dismissed causes of action against Macklin. The entirety of the record in both cases conflicts with the Supreme Court's decision in *Jesinoski* and the *Merritt* decision in the 9th Circuit. The Orders must be vacated.

32. In reviewing a district court's decision for clear error, our court of appeals will find clear error only upon "a definite and firm conviction that a mistake has been committed." *United States v. Ruiz—Gaxiola*, 623 F.3d 684, 693 (9th Cir.2010). If a court "got the law right" and "did not clearly err in its factual determinations," then clear error was not committed—even if another reasonable judicial body "would have arrived at a different result." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir.2011). Plaintiff asserts that the court did not "get the law right" as it existed in this case and as it stands in *stare decisis* under *Merritt* and *Jesinoski, id*. Clear error has been committed.

33. 23.    In *In re Lenox*, 902 F.2d 737, 740 (9th Cir.1990), the court indicated that Rule 60(b) "does not prohibit a bankruptcy judge from reviewing, sua sponte, a previous order.... And although FRCP 60(b) refers to relief from final orders, it does not restrict the bankruptcy court's power to reconsider any of its previous orders when equity so requires." *Id*. at 739. Equity requires such a form of relief in this case. Macklin's loan was properly rescinded, but his real property and equity was taken from him by improper process.

34. In *Simer v. Rios*, 661 F.2d 655 (7th Cir.1981), for example, the Seventh Circuit refused to decide whether intervenors could bring a Rule 60(b) motion, concluding that it was within the district court's power under Rule 60(b)(4) to vacate a judgment that was void ***because it was obtained in a violation of procedural due process***. *Id*. at 663 n. 18. (Emph added). Plaintiff's procedural due process under TILA was violated. The Orders of this court are void.

35. The catch-all provision, Rule 60(b)(6), has been invoked to relieve a party of a final judgment in "extraordinary circumstances." This case warrants extraordinary circumstances.

**CONCLUSION**

For all of the reasons herein, and in the interests of justice, Plaintiff asks this court for relief from all Orders, Decisions, Judgments or Proceedings that were executed by this court under Rule 60 (b) (1) [Mistake, etc]; (4) [the judgment is void *and* violated due process under *Jesinoski* and *Merritt, id*.]; (5) [applying prospectively the Order/Judgment is no longer equitable]; and (6) [any other reason that justifies relief].

Because the rescission was perfected in 2009, a year prior to the filed Chapter 13 (converted to Chapter 7), and Plaintiff and this court relied on the BK court's improper interpretation of TILA throughout the entirety of the proceedings, Plaintiff shall be required to list the asset (real property) as unencumbered with approximately $130,000.00 due and payable to him by the assignee of the debt, Deutsche Bank National Trust Co., as trustee for the Accredited Mortgage Loan Trust 2006-2 series certificate-holders. If not for the actions of Defendant DBNTC, the Bankruptcy would never have been filed by Plaintiff in this case.

Plaintiff respectfully asks this court to declare all Orders of this court void by reason of the undisputed facts contained herein.


Respectfully Submitted,


Dated: January 22, 2015                    Charles T. Marshall, Esq.


                                           By:   /s/ Charles T. Marshall
                                           Attorney for James Macklin